**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MOBIL CERRO NEGRO, LTD., <br><br> Plaintiff, <br><br> v. <br><br> PDVSA CERRO NEGRO S.A., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. $\underline{07 \; CV \; 11590}$

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN
## ORDER OF ATTACHMENT WITHOUT NOTICE

Michael C. Miller (MM-4632)
STEPTOE & JOHNSON LLP
750 Seventh Avenue, Suite 1900
New York, New York 10019
tel: (212) 506-3900
fax: (212) 506-3950

Howard H. Stahl (*pro hac vice* application pending)
Steven K. Davidson (*pro hac vice* application pending)
Mark A. Moran (*pro hac vice* application pending)
Michael J. Baratz (*pro hac vice* application pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
tel: (202) 429-3000
fax: (202) 429-3902

*Counsel for Plaintiff*

Date:   December 27, 2007

*Of Counsel:*

Toni D. Hennike
Luis Marulanda del Valle
Law Department
EXXON MOBIL CORPORATION
800 Bell Street
Houston, Texas 77002
713-656-6716 (telephone)
713-656-3496 (telefax)

Charles A. Beach (CB-6791)
Law Department
EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039-2298
972-444-1466 (telephone)
972-444-1435 (telefax)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.    INTRODUCTION ................................................................................1

II.   BACKGROUND ................................................................................4

    A.    The Genesis of the Cerro Negro Joint Venture....................................4

    B.    The Association Agreement ................................................................5

        1.    In General ................................................................................5

        2.    PDVSA CN's Obligation to Indemnify Mobil CN for
              Discriminatory Actions by Venezuela That Cause a Material
              Adverse Impact ................................................................6

    C.    The Discriminatory Actions of the Venezuelan Government....................9

    D.    PDVSA CN's Breach of the Cerro Negro Association Agreement..............12

    E.    The Assets Within This Jurisdiction – The Cash Waterfall ....................14

III.  ARGUMENT................................................................................17

    A.    The Court Has the Power to Attach PDVSA CN's Assets in This
        Jurisdiction Under Rule 64 of the Federal Rules of Civil Procedure
        and State Law ................................................................17

    B.    New York State Law Authorizes an Order of Attachment Without
        Notice in Aid of Arbitration ................................................................17

        1.    Standards Governing a Request for Attachment....................17

              a.    It Is Probable That Mobil CN Will Succeed on the
                    Merits ................................................................19

              b.    Without This Provisional Relief, Any Award to Which
                    Mobil CN May Be Entitled Will Be Rendered
                    Ineffectual ................................................................20

              c.    The Claim To Be Asserted in the ICC Arbitration Is a
                    Cause of Action, and the Amount To Be Demanded
                    From PDVSA CN Exceeds All Counterclaims Known to
                    Mobil CN................................................................23

        2.    CPLR § 6211(a) Provides for an Order of Attachment Without
             Notice................................................................23

        3.    The Cash Waterfall Is Subject to Attachment ....................24

    C.    Under FRCP Rule 4.1, the Court Should Appoint a Special Process
        Server ................................................................25

IV.   CONCLUSION ................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Algonquin Power Corp. v. Trafalgar Power Inc.*,
No. CIV A5:00 CV 1246 (NPMD), 2000 WL 33963085, at *7 (N.D.N.Y. Nov. 8,
2000) ..................................................................................................................................18

*Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*,
876 F. Supp. 482 (S.D.N.Y. 1994) ........................................................................................1

*Borden, Inc. v. Meiji Milk Prods., Co.*,
919 F.2d 822 (2d Cir. 1990)..................................................................................................1

*Capital Ventures Int'l v. Republic of Argentina*,
443 F.3d 214 (2d Cir. 2006)................................................................................................24

*County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co.*,
180 A.D.2d 468, 579 N.Y.S.2d 376 (1st Dep't 1992) .....................................................18, 20

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003)..............................................................................................................1

*Drexel Burnham Lambert, Inc. v. Ruebsamen*,
139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988) ..............................................18, 20, 21

*Eisenberg v. Citation-Langley Corp.*,
92 A.D.2d 795, 459 N.Y.S.2d 788 (1st Dep't 1983) ...........................................................23

*Erickson v. Kidder Peabody & Co.*,
166 Misc. 2d 1, 630 N.Y.S.2d 861 (N.Y. Sup. Ct. 1995) ....................................................18

*Habitations Ltd. v. BKL Realty Sales Corp.*,
160 A.D.2d 423, 554 N.Y.S.2d 117 (1st Dep't 1990) .........................................................20

*In re Cullman Ventures, Inc.*,
252 A.D.2d 222, 682 N.Y.S.2d 391 (1st Dep't 1998) .........................................................17

*In re Thornton & Naumes, LLP*,
36 A.D.3d 1119, 829 N.Y.S.2d 248 (3d Dep't 2007) ..........................................................17

*Kates v. Marine Midland Bank, N.A.*,
541 N.Y.S.2d 925 (Sup. Ct. 1989).......................................................................................24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Banivensa Capital Mkts., Ltd.*,
No. 94 CIV 2778, 1995 WL 380129 (S.D.N.Y. June 26, 1995)...........................................18

*New York Janitorial Serv., Inc. v. Easthampton Dewitt Corp.*,
    420 N.Y.S.2d 100 (Sup. Ct. 1979)..................................................................23

*SG Cowen Sec. Corp. v. Messih*,
    224 F.3d 79 (2d Cir. 2000)..................................................................17, 18

*Sierra USA Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp.*,
    824 N.Y.S.2d 560 (Sup. Ct. 2006)....................................................22

*SiVault Sys., Inc. v. Wondernet, Ltd.*,
    No. 05 Civ. 0890 (CRWS), 2005 WL 681457, at *3 (S.D.N.Y. Mar. 28, 2005)....... 16, *passim*

*Venconsul N.V. v. Tim In'l N.V.*,
    No. 03 Civ. 5387 (LTS)(MHD), 2003 WL 21804833 (S.D.N.Y. Aug. 6, 2003) ......................1

**STATUTES**

9 U.S.C. § 203 (2000) ..................................................................................1

28 U.S.C. § 1331 (2000) ..............................................................................1

28 U.S.C. § 1603 (2000) ..............................................................................1

CPLR § 5201..........................................................................................23, 24

CPLR 6201..........................................................................................17, 18 21

CPLR § 6202................................................................................................23

CPLR § 6211................................................................................................23

CPLR § 6212................................................................................17, 18, 23

CPLR § 6214................................................................................................24

CPLR § 7502(c) ....................................................................17, 18, 22

**RULES**

Rule 4.1 of the Federal Rules of Civil Procedure ....................................3, 25

Rule 64 of the Federal Rules of Civil Procedure ....................................1, 16

## I.    INTRODUCTION

Plaintiff Mobil Cerro Negro, Ltd. ("Mobil CN") seeks an *ex parte* Order of Attachment

pursuant to Rule 64 of the Federal Rules of Civil Procedure ("FRCP") and Articles 62 and 75 of

New York's Civil Practice Law and Rules ("CPLR").[1]  Mobil CN also seeks the appointment of

a special process server pursuant to FRCP 4.1.  As described in the Complaint and declarations

made in support of this motion, this action seeks an Order of Attachment in aid of a multi-billion

dollar international arbitration to be commenced by Mobil CN under the Arbitration Rules of the

International Chamber of Commerce ("ICC") in New York, New York within thirty days of the

issuance of the requested Order of Attachment.

Defendant PDVSA Cerro Negro S.A. ("PDVSA CN")[2] and Mobil CN entered into the

Cerro Negro Association Agreement (the "Association Agreement") in 1997 to establish a joint

venture to exploit extra-heavy oil resources in the Orinoco Oil Belt in Venezuela (the "Cerro

Negro Joint Venture").  Among other obligations, PDVSA CN agreed in the Association

Agreement to provide indemnification to Mobil CN in the event that Venezuela expropriated

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (2000) in that this action arises under the laws of the United States, specifically Chapter Two of the Federal Arbitration Act ("Convention on the Recognition and Enforcement of Foreign Arbitral Awards"), *see* 9 U.S.C. § 203 (2000). *Venconsul N.V. v. Tim In'l N.V.*, No. 03 Civ. 5387 (LTS)(MHD), 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003); *see also Borden, Inc. v. Meiji Milk Prods., Co.*, 919 F.2d 822 (2d Cir. 1990); *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994).

[2] Defendant PDVSA CN is a wholly-owned subsidiary of PDVSA Petróleo, S.A., which in turn is a wholly-owned subsidiary of PDVSA, which itself is wholly-owned by the Government of Venezuela. *See* Declaration of Michael J. Baratz ("Baratz Decl."), Ex. 3; Ex. 4. PDVSA CN thus is a third-tier, indirectly owned subsidiary of the Government of Venezuela, and therefore, is not entitled to sovereign immunity. The Foreign Sovereign Immunities Act applies to "foreign states" or "agencies or instrumentalities" of a "foreign state." *See* 28 U.S.C. § 1603(a) (2000). As a third-tier subsidiary, PDVSA CN is not an agency or instrumentality of Venezuela. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475-77 (2003) (entity whose ownership is separated by "one or more corporate tiers" from foreign state does not fall within majority ownership provision of 28 U.S.C. § 1603(b)(2)).

Mobil CN's interests in the Cerro Negro Joint Venture or Association Agreement.

It is uncontroverted that in June 2007, Venezuela expropriated without compensation

Mobil CN's interests in the Cerro Negro Joint Venture and the Association Agreement to fulfill

its plan to nationalize oil ventures in the Orinoco Oil Belt. Mobil CN has demanded that

PDVSA CN honor its indemnification obligation, but PDVSA CN has ignored that demand,

notwithstanding its concession that Venezuela has expropriated Mobil CN's interests.

Consequently, Mobil CN is being forced to commence arbitration to recover damages caused by

PDVSA CN's breach of its indemnification obligations. The damages amount to multiple

billions of dollars.

In this action, Mobil CN seeks to attach funds maintained for the benefit of PDVSA CN

in a series of designated "Project Accounts" at The Bank of New York Mellon Corporation

("Bank of New York") within the Southern District of New York. At present, PDVSA CN

cannot access these funds because PDVSA CN issued irrevocable instructions to the Bank of

New York that these funds must be segregated to guarantee the repayment of approximately

$538,000,000 of bonds issued in 1998 to finance the Cerro Negro Joint Venture.

Petróleos de Venezuela, S.A. ("PDVSA"), the national oil company of Venezuela, has

made an offer to purchase the outstanding bonds on or before December 31, 2007. According to

the Offer to Purchase and Consent Solicitation Statement ("Offer to Purchase"), PDVSA is

soliciting the consent of the bondholders to release the collateral and security interests securing

the bonds and terminate the irrevocable instructions. Once PDVSA purchases the outstanding

bonds, PDVSA CN's share of the Project Accounts (sometimes referred to as the "cash

waterfall" and estimated to be $300,000,000) will be free from any restrictions, including the

irrevocable instructions. At that moment, PDVSA CN will be able to transfer its funds from

-2-

New York and dissipate them, and to take other actions to make the funds unavailable to satisfy an eventual arbitral award and any judgment entered thereon. As far as Mobil CN knows, the cash waterfall is PDVSA CN's sole asset in the U.S. Mobil CN seeks to attach the cash waterfall by an *ex parte* Order of Attachment to secure payment of the award to result from the impending ICC arbitration.

An *ex parte* Order of Attachment is necessary because Mobil CN does not seek through this action to interfere with, restrain, or prohibit PDVSA's Offer to Purchase the outstanding bonds from the bondholders. An Order of Attachment served with notice, or one served prior to the closing of the Offer to Purchase, could interfere with completion of PDVSA's purchase of the bonds, and could prevent the release of the funds in the Project Accounts. However, if Mobil CN postpones seeking an Order of Attachment until completion of PDVSA's purchase of the bonds and the release of the cash waterfall to PDVSA CN, the funds are virtually certain to be transferred outside the reach of Mobil CN before a restraint can be put in place.[3] Accordingly, Mobil CN does not intend to serve the Order of Attachment until sometime between December 28 and December 31, 2007, after the Offer to Purchase has closed (currently scheduled for December 28) but ***prior*** to the release of PDVSA CN's funds from the Project Accounts.

Because PDVSA CN is being stripped of its most important assets – its interests in the Cerro Negro Joint Venture are being transferred to another company as part of Venezuela's program of nationalization – an *ex parte* Order of Attachment is required to preserve PDVSA CN's only known assets in New York for partial satisfaction of the arbitral award that Mobil CN is likely to obtain in the impending ICC arbitration. Without this provisional relief, any award to

---

[3] Since the timing of service of the Order of Attachment will in all likelihood be critical to the success of the relief sought herein, Mobil CN is moving for the court to appoint a special process server pursuant to Rule 4.1 of the Federal Rules of Civil Procedure. *See infra* Part III.C.

-3-

which Mobil CN may be entitled will be "rendered ineffectual."

## II.    BACKGROUND

Mobil CN intends to commence an arbitration against at least PDVSA CN, and perhaps

others, within 30 days of the granting of the requested Order of Attachment, unless this deadline

is extended by the Court.[4] *See* Declaration of Steven K. Davidson ("Davidson Decl.") ¶ 2.  The

ICC arbitration arises out of a number of interrelated disputes, including the breach by PDVSA

CN of its indemnification obligation in the Association Agreement.

### A.    The Genesis of the Cerro Negro Joint Venture

In 1991, PVDSA, along with its wholly-owned subsidiary Lagoven, S.A. ("Lagoven"),

identified Mobil Corporation ("Mobil") as a candidate possessing both the expertise and

financial capacity to participate in a joint venture to develop extra-heavy crude oil fields in the

Orinoco Oil Belt in Venezuela.  *See* Baratz Decl., Ex. 8 ¶ 3 (Declaration of J.R. Massey

("Massey Decl."), Exxon Mobil Vice President for operations in Canada, South America, and the

United States with over thirty-four (34) years of experience with the company).  To induce

foreign oil companies to participate in such ventures, such as the Cerro Negro Joint Venture,

PDVSA and Venezuela designed a series of financial incentives meant to make the projects more

attractive to potential investors.  *See id.* ¶ 8 (Massey Decl.).  These included:  (i) reduction of the

---

[4] In a guaranty executed at the same time as the Association Agreement, PDVSA
guaranteed all the obligations undertaken by PDVSA CN in the Association Agreement.  Article
18.2 of the Association Agreement provides that "[a]ny dispute arising out of or concerning this
[Association] Agreement shall be settled exclusively and finally by [ICC] arbitration. . . . Unless
otherwise agreed by all parties to the arbitration, all arbitration proceedings under this
Agreement shall be conducted in New York City . . . ." Baratz Decl., Ex. 1 art. 18.2.  In
addition, Rule 23(2) of the ICC Rules of Arbitration allows parties to seek judicial relief for
interim measures, without waiving their arbitral rights.  *Id.* ("Before the file is transmitted to the
Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any
competent judicial authority for interim or conservatory measures . . . [without] waiver of the
arbitration agreement.").

applicable income-tax rate, which was granted by law in a "Framework of Conditions" that would govern the Cerro Negro Joint Venture (*id.*, Ex. 15); (ii) reduction of the applicable royalty, which was granted by means of a Royalty Reduction Agreement (*id.*, Ex. 17); and (iii) the right to expand the project, by individual decision or jointly with other participants, which was incorporated in the Association Agreement (*id.*, Ex. 1).

### B.     The Association Agreement

#### 1.     In General

On October 28, 1997, Lagoven Cerro Negro, S.A. ("Lagoven CN"), a Lagoven subsidiary, Mobil Producción e Industrialización de Venezuela, S.A. ("Mobil PIV"), and Veba Oel Venezuela Orinoco, GmbH ("Veba Orinoco"), a subsidiary of BP, signed the Association Agreement, which established the Cerro Negro Joint Venture for a term of thirty-five years. Baratz Decl., Ex. 1 art. 16.1; Ex. 8 ¶ 9 (Massey Decl.). On October 29, 1997, Mobil PIV assigned its rights in the Association Agreement to Mobil CN. *Id.* Ex. 8 ¶ 10 (Massey Decl.). On May 11, 1998, Lagoven CN changed its name to PDVSA CN. *Id.* Until the expropriation described below, the parties' percentage interests in the Cerro Negro Joint Venture were: PDVSA CN – 41 2/3 %; Mobil CN – 41 2/3 %; and Veba Orinoco – 16 2/3 %. *Id.* ¶ 11; Ex. 1 art. 2.2.

Under the Association Agreement and the companion Reservation and Dedication Agreement, Lagoven authorized PDVSA CN, Mobil CN, and Veba Orinoco to exploit the oil fields located in the Cerro Negro area during the 35-year life of the venture. *See* Baratz Decl., Ex. 1 art. 16.1; Ex. 18. The project included: (i) exploiting and developing the extra-heavy crude oil fields in the Cerro Negro area; (ii) constructing an upgrader at the Jose Complex on the Venezuelan coast with the capacity to upgrade 120,000 bpd of extra-heavy crude oil (or 155,000 bpd of diluted crude oil "DCO") to a level of 16.5° API; (iii) laying pipelines between the Cerro

Negro area and the Jose Complex (approximately 180 miles); and (iv) selling the resulting

products. *Id.* arts. 1-2, 5-7. The Chalmette Joint Venture, a related joint venture between PDV

Chalmette, Inc., a subsidiary of PDVSA and Mobil Oil Corporation and Mobil Pipe Line

Company, would purchase all the DCO and synthetic crude oil ("SCO") production to which

Mobil CN and PDVSA CN were entitled under the Association Agreement. *Id.* Ex. 1 art. 1.

The Association Agreement granted the parties an undivided interest in the assets and

liabilities of the venture in proportion to their respective interests. *Id.* The parties' title to the oil

produced in Cerro Negro vested in the participants at the wellhead, also in proportion to their

respective interests. *Id.* Each party was separately responsible for paying its share of royalties

and taxes to Venezuela and its subdivisions. *Id.*

### 2.    PDVSA CN's Obligation to Indemnify Mobil CN for Discriminatory Actions by Venezuela That Cause a Material Adverse Impact

In the Association Agreement, PDVSA CN undertook to provide indemnification, in an

amount specified under that agreement, for damages suffered by Mobil CN as a consequence of

any Discriminatory Action that causes a Material Adverse Impact, as these terms are defined in

the Association Agreement. *Id.* Ex. 1 art. 1; Ex. 8 ¶ 12 (Massey Decl.).[5] Discriminatory Action

causing a Material Adverse Impact includes the expropriation of Mobil CN's interests in the

Cerro Negro Joint Venture as well as other governmental measures that do not apply to

corporations in general and that would curtail Mobil CN's cash flows. *See* Baratz Decl., Ex. 1

arts. 1; 15.1(b).

---

[5] PDVSA CN must also discharge its obligations under the Association Agreement in good faith, an obligation that is implicit in any agreement under Venezuelan law (Article 1160 of the Venezuelan Civil Code), as well as other laws. Similarly, the Association Agreement provides that, if PDVSA CN concurs with Mobil CN that a Discriminatory Action has occurred and has resulted in a Material Adverse Impact, PDVSA CN is obligated to "negotiate in good faith compensatory damages." *See* Baratz Decl., Ex. 1 art. 15.1.

The term "Discriminatory Action" is defined in the Association Agreement as follows:

> "'Discriminatory Action' *shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Action, which is unjust* . . . or with respect to tax rates, foreign-exchange controls *or the expropriation or condemnation of assets of the Project, or the interests of a Foreign Party in the Project, provided that said change of (or any change in the interpretation or application of) Venezuelan law, or any Governmental Action is not applicable to Corporations in the Republic of Venezuela in general (including the imposition of income tax on the Project or any Foreign Party in its capacity as a participant in the Project, at a rate that is in contradiction with the last sentence of the Fifteenth Condition)*[6];
>
> . . .
>
> An action that would otherwise fall within the definition of Discriminatory Action will be deemed unjust if it results in a Material Adverse Impact." [7]

A Discriminatory Action includes an expropriation of Mobil CN's interest in the Cerro Negro

Joint Venture or Association Agreement. *Id.*

Article 1 of the Association Agreement defines "Material Adverse Impact" [as] a

decrease in Mobil CN's Net Cash Flow [of] more than five percent in any fiscal year as a

consequence of the Discriminatory Action(s) as compared with what the participant's Net Cash

Flow would have been absent those actions. *Id.*

PDVSA CN's obligation to compensate Mobil CN for Discriminatory Actions that cause

a Material Adverse Impact carries with it certain procedural steps (*see* Baratz Decl., Ex. 8 ¶ 13

(Massey Decl.)):

---

[6] The "Fifteenth Condition" is set out in the Framework of Conditions, which was passed by the Congress of Venezuela. *See* Baratz Decl., Ex. 15. The Fifteenth Condition provided that entities participating in the Cerro Negro Project would be exempted from local and state taxes, and could only be taxed under an ordinary regime. *Id.*

[7] Baratz Decl., Ex 1 art. 1 (emphasis added). "Governmental Action" is also defined in Article 1 of the Association Agreement. *Id.*

(a)    *First*, if Mobil CN determines that a Discriminatory Action has occurred which "may result" in a Material Adverse Impact, Mobil CN must notify PDVSA CN about the Discriminatory Action. Baratz Decl., Ex. 1, art. 15.1(a).

(b)    *Second*, if Mobil CN concludes that it has "actually suffered" a Material Adverse Impact as a consequence of the Discriminatory Action that has previously been notified to PDVSA CN, Mobil CN "must promptly" send PDVSA CN a notice of such determination (the so called "Notice of Discriminatory Action"). *Id.*

(c)    *Third*, if there is "any legal remedy available to reverse or obtain relief from [the] Discriminatory Action," Mobil CN must commence a "legal action" against the Venezuelan Government seeking compensation for the Discriminatory Actions. The purpose of this requirement is to mitigate damages. *Id.*

Once those three steps are taken, PDVSA CN must indemnify Mobil CN for a Discriminatory Action that has caused a Material Adverse Impact. Baratz Decl., Ex. 8 ¶ 14 (Massey Decl.). That obligation ceases, however, if all of the following three conditions are met: (i) the Price of Brent Crude Oil[8] is in excess of the Threshold Price[9] for a period of six consecutive months at least once during the life of the Association Agreement; (ii) the average Price of Brent Crude Oil for a given Fiscal Year is in excess of the Threshold Price; *and* (iii) Mobil CN receives a "Net Cash Flow after taking into account the effect of the Discriminatory Action(s) [...] that bears at least a reasonable relationship, [...], to the Threshold Cash Flow[10] for

----

[8] Price of Brent Crude Oil is a daily average of high and low quotes per barrel for dated Brent Blend, FOB Sullom Voe, deflated to 1996 dollars using a U.S. inflation index. Baratz Decl., Ex. 1 art. 1.

[9] Threshold Price equals US$27 per barrel, in 1996 dollars (or US$34.33 per barrel in 2007 dollars). *Id.* Ex. 16; Ex. 9 ¶ 7.

[10] Threshold Cash Flow should be understood as the net profits for any given fiscal year that a participant in the Cerro Negro Project would have received assuming for the calculation the Threshold Price, *i.e.*, US$27 per barrel in 1996 dollars. *See* Baratz Decl., Ex. 16, § 7.3.

such Fiscal year." *See* Baratz Decl., Ex. 1 art. 15.2. As explained below, because at least the third condition fails in the present case, PDVSA CN's obligation to indemnify is still in full effect.

The Accounting Procedures Agreement, annexed to the Association Agreement, provides a formula to calculate the damages resulting from Discriminatory Actions that have caused a Material Adverse Impact. *See* Baratz Decl., Ex. 16; Ex. 9 ¶ 3 (Declaration of Hobert E. Plunkett ("Plunkett Decl."), Asset Enhancement Manager for Exxon Mobil Production Company, with over thirty-one (31) years of experience with the company). According to Section 7.4 of the Accounting Procedures Agreement, the damages payable by PDVSA CN shall be equal to the difference between the Net Cash Flow for a given fiscal year, taking into account the impact of the Discriminatory Action(s), and the Net Cash Flow for the same period without taking into account the impact of that (those) measure(s). Baratz Decl., Ex. 9 ¶ 4 (Plunkett Decl.). The obligation to indemnify arises whenever that difference exceeds 5% of the participant's Net Cash Flow for that fiscal year. *Id.*

The damages calculated according to the formula described above are limited by a cap: PDVSA CN's obligation to indemnify may not exceed the difference between the Threshold Cash Flow and the Adjusted Net Cash Flow.[11] Baratz Decl., Ex. 9 ¶ 5 (Plunkett Decl.).

### C.    The Discriminatory Actions of the Venezuelan Government

Since October 2004, Venezuela has taken a series of adverse measures against Mobil CN that constitute Discriminatory Actions under the Association Agreement because these measures are Governmental Actions, as defined in the Association Agreement, or changes in Venezuelan

---

[11] *See* Baratz Decl., Ex. 16, § 7.5. Under the Accounting Procedures Agreement, Adjusted Net Cash Flow means the Net Cash Flow received by a party during a given fiscal year after certain adjustments. *Id.*

law that either do not apply to all companies in Venezuela or violate the Framework of Conditions. *See* Baratz Decl., Ex. 8 ¶ 15 (Massey Decl.). Those measures include the direct expropriation of Mobil CN's interests in the Association Agreement and the Cerro Negro Joint Venture without compensation and measures taken preceding expropriation, including: (i) repudiation of the Royalty Reduction Agreement and imposition of the so-called extraction tax (a disguised royalty); (ii) refusal to allow the expansion of the Cerro Negro Project under previously agreed terms and conditions; (iii) income-tax increase on participants in Orinoco Oil Belt ventures in violation of the Framework of Conditions; and (iv) imposition of production and export curtailments to the Cerro Negro Joint Venture in violation of the Association Agreement. *Id.* ¶ 16.

Mobil CN intends to seek compensation for each of these Discriminatory Actions in the ICC arbitration. For the sake of brevity, Plaintiff will address in this memorandum only the direct expropriation of its interests in the Association Agreement and the Cerro Negro Joint Venture, which constitute the bulk of the damages that Plaintiff will seek in the ICC arbitration.

On February 26, 2007, President Chávez issued Decree No. 5200 on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements (the "Nationalization Decree").[12] *See* Baratz Decl., Ex. 2 at 11-12. The Nationalization Decree ordered, among other things, that the strategic associations located in the Orinoco Oil Belt, including Cerro Negro, be transformed ("migrated") into new mixed companies under the Organic Law on Hydrocarbons,[13] in which PDVSA or one

---

[12] *See* Baratz Decl., Ex. 6.

[13] In November 2001, President Hugo Chávez (exercising delegated legislative powers) issued the Organic Law on Hydrocarbons (Official Gazette No. 37323 of 13 Nov. 2001), which replaced the Hydrocarbons Law of 1943, as amended. *See* Baratz Decl., Ex. 5.

of its subsidiaries would hold at least a 60% participation interest.[14]  Baratz Decl., Ex. 2 at 11.

According to Article 4 of the Nationalization Decree, participants in so-called strategic associations located in the Orinoco Oil Belt, such as Mobil CN, had four (4) months (until June 26, 2007) to accept dictated terms under which they could participate in the new mixed companies. *See* Baratz Decl., Ex. 6. The mixed companies would be established and would operate under a different statutory framework (the Organic Law on Hydrocarbons) and new contractual arrangements that would replace the previous association agreements. *Id.* The new statutory and contractual regime not only substantially reduced the equity but also radically curtailed the rights of private companies, such as Mobil CN, participating in such projects. *Id.*

Further, under Article 3 of the Nationalization Decree, the operator of the Cerro Negro Project was required to surrender control of all activities and operations related to the project to Corporación Venezolana del Petróleo, S.A. ("CVP"), a wholly owned subsidiary of PDVSA, (or another affiliate of PDVSA) no later than April 30, 2007. *Id.* On that date, under compulsion of the Nationalization Decree and with full reservation of rights, Operadora Cerro Negro, S.A., a wholly-owned subsidiary of Mobil that operated the Cerro Negro Project, surrendered to PDVSA Petróleo S.A., a subsidiary of PDVSA, the operations and control of all activities related to the Cerro Negro Project. *Id.*

As required by the Nationalization Decree, Mobil CN discussed with Venezuela terms and conditions for Mobil CN's potential participation in the new mixed company that would own and control the Cerro Negro Project. Baratz Decl., Ex. 8 ¶¶ 17-18 (Massey Decl.). As of June 26, 2007, Mobil CN refused to accede to the non-negotiable terms and conditions that Venezuela

_____

[14] *See* Baratz Decl., Ex. 6 § 1.

proffered, which failed to provide compensation for the taking of Mobil CN's rights under the Association Agreement as required by applicable law. *Id.* ¶ 18.

Article 5 of the Nationalization Decree provides that, if participants in strategic associations, such as the Mobil CN, refused to accept the terms for new mixed companies by the end of the four-month period contemplated in Article 4 (which expired on June 26, 2007), "the Republic, through Petróleos de Venezuela S.A. or any of its subsidiaries that may be designated for such purpose, shall directly assume the activities of the associations . . . ." Baratz Decl., Ex. 6; Ex. 8 ¶ 19 (Massey Decl.). As of June 27, 2007, the Nationalization Decree deprived Mobil CN of its participation in activities and production of the Cerro Negro Joint Venture. *Id.*, Ex. 8 ¶ 20 (Massey Decl.). As of that date, Venezuela expropriated, without compensation, the interests of Mobil CN in the Cerro Negro Joint Venture, including Mobil CN's interests in the Association Agreement. *See id.* ¶ 21. This expropriation was ratified by the National Assembly in October 2007. *See* Baratz Decl., Ex. 7.

### D.    PDVSA CN's Breach of the Cerro Negro Association Agreement

On June 22, June 25 and June 27, 2007, Mobil CN notified both PDVSA CN and PDVSA in writing, pursuant to the Association Agreement, that the measures described above constitute Discriminatory Actions that may result in a Material Adverse Impact in fiscal years 2007 and future fiscal years, and demanded prompt payment of compensatory damages according to the terms of the Association Agreement. Baratz Decl., Ex. 8 ¶¶ 22-23 (Massey Decl.); Exs. 12-14.

On September 6, 2007, in an effort to mitigate damages as required by the Association Agreement, Mobil CN and related entities, commenced a legal action against Venezuela by filing a Request for Arbitration with the International Centre for Settlement of Investment Disputes seeking compensation for, among other things, the measures described above, including the

expropriation of Mobil CN's interests in the Cerro Negro Joint Venture (the "ICSID Arbitration"). *See* Baratz Decl., Ex. 8 ¶ 25 (Massey Decl.); ICSID Case No. ARB/07/27 (October 10, 2007).

PDVSA CN has acknowledged that the Nationalization Decree has effected an expropriation of Mobil CN's interest in the Cerro Negro Joint Venture. In a July 25, 2007 letter to the Bank of New York (the security trustee of certain financing arrangements related to the Cerro Negro Joint Venture), Curtis, Mallet-Prevost, Colt and Mosle LLP, as "counsel to PDVSA Cerro Negro, S.A.," stated that "[p]ursuant to such Decree [the Nationalization Decree], the Mobil Borrower [Mobil CN] has ceased to have an interest in the Project as of June 27, 200[7][sic]." *See* Baratz Decl., Ex. 11. In that same letter, PDVSA CN confirmed that all its interests in the Cerro Negro Joint Venture will be transferred to "Corporación Venezolana del Petróleo, S.A., a subsidiary of PDVSA" which will hold "an 83.33% interest" in the new mixed company that will become owner of the Cerro Negro Project. *Id.*

As stated above, *see* II.B.2., *supra*, PDVSA CN has an obligation to indemnify Mobil CN for any Discriminatory Action that causes a Material Adverse Impact unless *each* of three conditions is met. There can be no question that, at minimum, the third of these conditions has not been satisfied: that Mobil CN receives a "Net Cash Flow after taking into account the effect of the Discriminatory Action(s) [. . .] that bears at least a reasonable relationship, [. . .] to the Threshold Cash Flow for such Fiscal year." *See* Baratz Decl. Ex. 9 ¶ 6 (Plunkett Decl.).

As a result of Venezuela's expropriation of Mobil CN's interest in the Cerro Negro Joint Venture, Mobil CN has suffered a severe impairment in its Net Cash Flow for Fiscal Year 2007 and has been deprived of any Net Cash Flow for the remaining 28 fiscal years of the agreed term of the Cerro Negro Project. *Id.* As a result of "Discriminatory Actions," Mobil CN's Net Cash

- 13 -

Flow will bear no reasonable relationship to the Threshold Cash Flow for fiscal year 2007 or for any future fiscal year of the agreed term of the Association Agreement. *Id.*

In spite of acknowledging the expropriation of Mobil CN's interests in the Cerro Negro Joint Venture, and contrary to the duty to perform its contractual obligations in good faith, PDVSA CN has failed to take the steps contemplated in Article 15.1, paragraphs (a) and (b) of the Association Agreement. Baratz Decl., Ex. 1. In particular, PDVSA CN has failed (i) to give notice of concurrence that the aforesaid expropriation constitutes a Discriminatory Action resulting in a Material Adverse Impact under the terms of the Association Agreement; (ii) to engage in good faith in a joint calculation of the compensation due to Mobil CN under the Association Agreement; and (iii) without prejudice to Mobil CN's right to full indemnification from Venezuela, to pay to Mobil CN compensatory damages as required and determined under Article 15 of the Association Agreement and Section 7 of the Accounting Procedures Agreement. *Id.*

### E.    The Assets Within This Jurisdiction – The Cash Waterfall

The Cerro Negro Joint Venture was financed, in part, through a $600,000,000 bond financing issued by Cerro Negro Finance, Ltd in 1998.[15] The proceeds of the bonds were divided equally among Mobil CN and PDVSA CN to finance the Cerro Negro Joint Venture. *See* Baratz Decl., Ex. 2 at 9. The bondholders' interests were protected by a Common Security Agreement, which mandated several security interests as collateral, as well as other restrictions on the right to use and dispose of certain assets. *See* Baratz Decl., Ex. 2 at ii, 10. The security and other assets relevant to this action are a series of designated accounts established and

---

[15] Cerro Negro Finance, Ltd. is a special purpose vehicle incorporated under the laws of the Cayman Islands for the sole purpose of issuing bonds to finance a portion of the Cerro Negro Joint Venture. The original bond issue in 1998 was for $600,000,000. The amount currently outstanding on the bonds is estimated to be $538,000,000. *See* Baratz Decl., Ex. 2 at 33.

maintained at banks in New York, New York. Baratz Decl., Ex. 8 ¶ 28 (Massey Decl.); Ex. 2 at

7. Mobil CN and PDVSA CN were required to establish and maintain in New York: (i) a

segregated Disbursement Account; (ii) a segregated Operating Revenues Account; (iii) a

segregated Distribution Account; (iv) a segregated Casualty Proceeds Account; (v) a segregated

O&M Account; and (vi) a segregated Debt Service Account. *See* Baratz Decl., Exs. 2 at 10, 20.

Additionally, Mobil CN was required to establish a Debt Service Reserve Account. *See id.*

These accounts, as well as other segregated accounts not maintained in New York, were

collectively referred to as the Project Accounts. *See id.*

PDVSA CN's share of the Project Accounts (currently approximately $300,000,000),

sometimes referred to as the "cash waterfall," are maintained in designated accounts at The Bank

of New York, in New York, New York. *See* Baratz Decl., Ex. 8 ¶ 28 (Massey Decl.). Proceeds

from the Project Accounts were distributed in a particular order and for particular purposes. *See*

Baratz Decl., Ex. 2 at 10-11. As part of the collateral to guarantee the repayment of the bonds

issued by Cerro Negro Finance, Ltd., Mobil CN pledged its rights in the cash waterfall as a

security interest. *Id.* PDVSA CN provided assurances to the bondholders in a different way: it

issued irrevocable instructions to the Bank of New York, as security trustee, restricting the use of

the funds to the terms of the Common Security Agreement. *Id.* After the bondholders are paid

off, however, the restrictions placed on the cash waterfall, including the irrevocable instructions,

will be released. *Id.*; Exs. 19-20. Consequently, PDVSA CN and Mobil CN will have

unrestricted access to their respective portions of the cash waterfall.

PDVSA CN's share of the cash waterfall is likely PDVSA CN's sole asset available to

satisfy any eventual arbitral award. *See* Baratz Decl., Ex. 8 ¶ 28 (Massey Decl.). Upon

PDVSA's purchase of the outstanding bonds, PDVSA CN will be free to transfer its share of the

- 15 -

cash waterfall from New York, to dissipate the funds, and to take other actions to make the funds unavailable for satisfying an eventual award or any judgment entered thereon. The purpose of this action is to attach PDVSA CN's interest in the cash waterfall (after the bond purchase has closed) to secure at least partial payment of the ICC arbitral award that Mobil CN is likely to obtain in the ICC arbitration.

Under the terms of the Offer to Purchase, consummation of the offer requires the valid tender of the bonds from bondholders representing seventy-five percent (75%) of the aggregate principal amount of all outstanding bonds and receipt of the bondholders' consent to eliminate the security interest in the cash waterfall and terminate the irrevocable instructions. *See* Baratz Decl., Ex. 2. Over ninety percent (90%) of the bondholders have tendered their bonds pursuant to the terms of the Offer to Purchase. *See* Baratz Decl., Ex. 10 (PDVSA December 21, 2007 press release). Thus, the repurchase is a virtual certainty.

On or around December 28, 2007, but before December 31, 2007, Venezuela or PDVSA will transfer monies to Chase Manhattan Bank required to finance the purchase of, and will purchase, any outstanding bonds of Cerro Negro Finance, Ltd. that are tendered in accordance with the terms of the Offer to Purchase. *See* Davidson Decl. ¶ 9; Baratz Decl., Ex. 19. The total amount of funds required to purchase all of the outstanding bonds pursuant to the offer is estimated to be $538,000,000. Baratz Decl., Ex. 2. Thereafter, PDVSA CN's share of the cash waterfall will most likely be disbursed by the Bank of New York between December 28 and December 31, 2007. *See* Baratz Decl., Ex. 19. Immediately after PDVSA has purchased the outstanding bonds, Mobil CN will seek to attach by way of an Order of Attachment the funds available to PDVSA CN from the cash waterfall.

**III.    ARGUMENT**

**A.    The Court Has the Power to Attach PDVSA CN's Assets in This Jurisdiction Under Rule 64 of the Federal Rules of Civil Procedure and State Law**

Rule 64, FRCP, provides, in relevant part, as follows:

> At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies.

Accordingly, New York law governs Mobil CN's right to attach PDVSA CN's assets in this

jurisdiction. *SiVault Sys., Inc. v. Wondernet, Ltd.*, No. 05 Civ. 0890 (CRWS), 2005 WL 681457,

at \*3 (S.D.N.Y. Mar. 28, 2005).

**B.    New York State Law Authorizes an Order of Attachment Without Notice in Aid of Arbitration**

**1.    Standards Governing a Request for Attachment**

New York law expressly provides that a party may apply to a court for an order seeking

prejudgment attachment in aid of arbitration. CPLR § 7502(c) provides as follows:

> **Provisional remedies.** The supreme court in the county in which an arbitration is pending or in a county specified in subdivision (a) of this section, may entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitration that is pending or that is to be commenced inside or outside this state, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. The provisions of articles 62 and 63 of this chapter shall apply to the application, including those relating to undertakings and to the time for commencement of an action (arbitration shall be deemed an action for this purpose), except that the sole ground for the granting of the remedy shall be as stated above. If an arbitration is not commenced within thirty days of the granting of the provisional relief, the order granting such relief shall expire and be null and void and costs, including reasonable attorney's fees, awarded to the respondent. The court may reduce or expand this period of time for good cause shown. The form of

- 17 -

> the application shall be as provided in subdivision (a) of this
> section.

*Id.*

Cases applying CPLR § 7502(c) have held that the requirements of CPLR § 6212(a) must be met before an order of attachment is granted. *See SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 82 (2d Cir. 2000); *In re Thornton & Naumes, LLP*, 36 A.D.3d 1119, 1119-20, 829 N.Y.S.2d 248, 249 (3d Dep't 2007); *In re Cullman Ventures, Inc.*, 252 A.D.2d 222, 230, 682 N.Y.S.2d 391, 396 (1st Dep't 1998). However, CPLR § 7502(c), by its express terms, provides that CPLR § 6201 does not apply to the analysis of whether to issue an order of attachment. *SiVault Sys.*, 2005 WL 681457, at *8-10.[16] The "sole ground" relevant to an application for an order of attachment brought under CPLR § 7502(c) is "that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." 166 Misc. 2d at 4, 630 N.Y.S.2d at 862.[17]

Under CPLR § 6212(a), as modified by CPLR § 7502(c), Mobil CN must show that: (1) there is a cause of action; (2) 't is probable that the plaintiff will succeed on the merits; (3) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff; and (4) "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." CPLR § 6212(a); CPLR § 7502(c). Each of these elements is satisfied by this

---

[16] *See also County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co.*, 180 A.D.2d 468, 469, 579 N.Y.S.2d 376, 377 (1st Dep't 1992); *Drexel Burnham Lambert, Inc. v. Ruebsamen*, 139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988); *Erickson v. Kidder Peabody & Co.*, 166 Misc. 2d 1, 4, 630 N.Y.S.2d 861, 862 (N.Y. Sup. Ct. 1995).

[17] Even if CPLR § 6201(a) applied, one or more grounds for attachment provided for in CPLR § 6201 exist here because PDVSA CN is a foreign corporation not qualified to do business within the state. *See* CPLR § 6201(a).

motion.[18]  Accordingly, the Court should enter an order of attachment without notice.

### a.    It Is Probable That Mobil CN Will Succeed on the Merits

Although courts typically have not placed great weight on the requirement that plaintiffs

demonstrate a likelihood of success on the merits in an arbitration, *see SG Cowen Sec. Corp.,*

224 F.3d at 84; *SiVault Sys.,* 2005 WL 681457, at *11-12, Mobil CN can meet even the higher

standard that it is more likely than not to succeed on its arbitration claims.  *See Algonquin Power*

*Corp. v. Trafalgar Power Inc.*, No. CIV A5:00 CV 1246 (NPMD), 2000 WL 33963085, at *7

(N.D.N.Y. Nov. 8, 2000) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Banivensa*

*Capital Mkts., Ltd.*, No. 94 CIV 2778, 1995 WL 380129, at *1 (S.D.N.Y. June 26, 1995)).  The

facts here are not in dispute.  First, the Association Agreement expressly sets out PDVSA CN's

obligation to provide indemnification to Mobil CN for Discriminatory Actions of Venezuela,

including the expropriation of Mobil CN's interests in the Cerro Negro Joint Venture or

Association Agreement, that cause a Material Adverse Impact.  Second, PDVSA CN has

conceded that Venezuela has expropriated Mobil CN's interest in the Cerro Negro Joint Venture.

And, third, Mobil CN has received no compensation from Venezuela nor has it received any

indemnification from PDVSA CN for the Discriminatory Actions of Venezuela.

Among other Discriminatory Actions, on February 26, 2007, President Chavez signed the

Nationalization Decree, which required that the Cerro Negro Project be converted into a "mixed

company," in which a wholly-owned subsidiary of PDVSA other than PDVSA CN would hold an

equity interest of at least 60%.  Under compulsion of the Nationalization Decree, operational

---

[18] CPLR § 6212(b) requires that Mobil CN post an "undertaking, in a total amount fixed by the court, but not less than five hundred dollars . . . ."  *Id.*  Further, under CPLR § 6219, the garnishee's statement is to be served within ten (10) days after an order of attachment has been served, unless a different time is ordered by the Court.  Mobil CN requests that the Court order the garnishee's statement be served on Mobil CN within five (5) days after service of the Order of Attachment.

control of the Cerro Negro Project was transferred to PDVSA Petróleo S.A., effective April 30,

2007. Also, as a result of the Nationalization Decree, as of June 27, 2007, Mobil CN was

deprived of participating in the activities, production, and revenue of the Cerro Negro Joint

Venture. Accordingly, as of that date, Venezuela expropriated, without compensation, the

interests of Mobil CN in the Cerro Negro Joint Venture, including the Association Agreement.

Both PDVSA and PDVSA CN concede this fact. *See* Baratz Decl., Ex. 2 at 11 (Offer to

Purchase); Ex. 11 (letter from Curtis, Mallet-Prevost, Colt and Mosle LLP to the Bank of New

York (July 25, 2007)). Moreover, PDVSA CN expressly agreed in the Association Agreement to

provide indemnification to Mobil CN in the event of expropriation and has not done so. Mobil

CN has complied with the procedural requirements under the contract by: (1) providing PDVSA

CN with notice of the Discriminatory Actions that has resulted in a Material Adverse Impact, and

(2) commencing the ICSID Arbitration against Venezuela to mitigate its damages. Thus, Mobil

CN is more likely than not to succeed on the merits of its arbitration claim.

    **b.**  **Without This Provisional Relief, Any Award to Which Mobil
CN May Be Entitled Will Be Rendered Ineffectual**

Whether an award would be rendered ineffectual without provisional relief is a

determination left to the court's discretion, based on the facts of each case. Prejudgment

attachments have been supported by facts independently demonstrating that: (1) the assets

subject to attachment are the only viable source of recovery; (2) the defendant's financial

condition makes recovery unlikely; (3) the assets subject to attachment can easily be transferred

outside of the jurisdiction and out of the reach of creditors; and (4) the plaintiff will be unable to

enforce the arbitration award outside of the jurisdiction. *See SiVault Sys.,* 2005 WL 681457, at

*13; *County Natwest Sec. Corp. v. Jesup, Josephthal & Co.*, 80 A.D.2d 468, 579 N.Y.S.2d 376

(1st Dep't 1992); *Habitations Ltd. v. BKL Realty Sales Corp.*, 160 A.D.2d 423, 554 N.Y.S.2d

117 (1st Dep't 1990); *Drexel Burnham Lambert Inc. v. Ruebsamen*, 139 A.D.2d 323, 531

N.Y.S.2d 547 (1st Dep't 1988). Here, Mobil CN can satisfy the criteria established by case law.

Mobil CN can establish, based on the evidence provided herewith, that: (1) the assets

subject to attachment are the only viable source of funds to satisfy an award in the ICC

arbitration; (2) PDVSA CN's financial condition makes recovery unlikely, because PDVSA

CN's interests in the Cerro Negro Project are being transferred to the new mixed company; (3)

PDVSA CN's share of the cash waterfall easily can be — and most likely will be — transferred

out of the reach of Mobil CN; and (4) Mobil CN will have difficulty enforcing the award outside

of this jurisdiction against PDVSA CN, which has no known assets outside of the jurisdiction

other than those being transferred to the new mixed company.

In *Drexel Burnham Lambert*, Drexel attempted through arbitration to recover a debt of

approximately $230,000 arising from the respondents' liquidated securities account. In support

of that arbitration, Drexel sought to attach $250,000 of funds in another unrelated account that

the defendants held. 139 A.D.2d at 325, 531 N.Y.S.2d at 548. Drexel argued that the

respondents were non-residents, citizens of West Germany, who recently suffered substantial

losses in a stock market drop. More importantly, Drexel argued that it would be unable to

enforce a final award against the respondents "substantial property . . . in West Germany"

because enforcement of a judgment arising out of losses relating to options and margin trading

would be prohibited by West German law. *Id.* at 326, 531 N.Y.S.2d at 549. Drexel asserted that

the remaining account in New York subject to attachment was the only viable source of recovery

on the award. The court concluded that

> [a] plain reading of this provision [7502(c)] indicates that . . . the
> language of the statute neither limits an order of attachment in aid
> of arbitration to the narrow circumstances set forth in CPLR 6201
> (3) nor requires that the petitioner demonstrate any affirmative

> conduct on the part of respondent(s) . . . Therefore, respondents'
> possible or likely transfer of assets from New York to West
> Germany, along with petitioner's inability to enforce the
> arbitration award in West Germany should it ultimately prevail in
> its claim against respondents, is certainly sufficient to support an
> order of attachment.

*Id.* at 323, 531 N.Y.S.2d at 550; *see also SiVault Sys.*, 2005 WL 681457 at *1, 4 (finding that

SiVault established that "the award to which SiVault may be entitled may be rendered

ineffectual," where SiVault offered testimony that WonderNet had no assets in the United States

other than the assets subject to attachment).

The Offer to Purchase establishes that PDVSA CN (identified therein as a "Borrower")

was "formed solely for the purpose of participating in the Cerro Negro Project," and that its

"only assets and activities have been those relating to the Cerro Negro Project." The Offer to

Purchase further establishes that after PDVSA purchases the bonds, the only assets of PDVSA

CN will be transferred to another entity — an "Empresa Mixta," or mixed company, with which

Mobil CN has no privity. The Offer to Purchase provides as follows:

> The assets currently utilized in the operation of the Cerro Negro
> Project and the rights to develop the related oil reserves are being
> transferred to a new *Empresa Mixta*. Moreover, as a consequence
> of the migration process initiated by Decree 5.200, Mobil CN and
> its affiliates will have no interest in the new *Empresa Mixta* which
> will carry out the activities previously carried out by the Cerro
> Negro Project. The new *Empresa Mixta* will be owned 83% by
> CVP and 16 % by British Petroleum plc, through Veba.

Baratz Decl., Ex. 2 at iv. Consequently, following the closing of PDVSA's Offer to Purchase the

outstanding bonds, the cash waterfall will be PDVSA CN's sole asset.

If the cash waterfall is not attached, PDVSA CN is virtually certain to put those funds

beyond Mobil CN's reach, and Mobil CN will have no source of recovery against PDVSA CN in

the United States, or any known source elsewhere. As a result, unless Mobil CN is able to attach

the "cash waterfall," any arbitration award it obtains against PDVSA CN in the future will be

"rendered ineffectual" because PDVSA CN will no longer have any assets.

        **c.    The Claim To Be Asserted in the ICC Arbitration Is a Cause of Action, and the Amount To Be Demanded From PDVSA CN Exceeds All Counterclaims Known to Mobil CN**

The other elements required for an order of attachment are satisfied. As a threshold matter, CPLR § 7502(c) expressly authorizes a court to issue an order of attachment in aid of a pending, or soon to be commenced, arbitration. In the ICC arbitration, Mobil CN will assert a claim against PDVSA CN, among other things, for breach of its agreement to indemnify Mobil CN for the Discriminatory Actions taken against Mobil CN. That claim is a cause of action for the purposes of CPLR § 7502(c). *See SiVault Sys.,* 2005 WL 681457, at *10-11; *Sierra USA Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp.,* 824 N.Y.S.2d 560, 561 (Sup. Ct. 2006); *see also* Baratz Decl., Ex. 1, § 15.1. In addition, Mobil CN is not aware of any counterclaims PDVSA CN can legitimately assert. *See* Baratz Decl., Ex. 8 ¶ 29. In any event, the amount to be demanded from PDVSA CN -- multiple billions of dollars in damages -- would likely far exceed all counterclaims PDVSA CN could credibly assert. *See* Baratz Decl., Ex. 9 ¶ 10 (Plunkett Decl.). Finally, no previous application has been made to this Court, or any other court, for the relief requested herein, and no other provisional remedy has been secured or sought in this action against this Defendant. *See* Davidson Decl. ¶¶ 10-11.

        **2.    CPLR § 6211(a) Provides for an Order of Attachment Without Notice**

CPLR § 6211(a) provides that "[a]n order of attachment may be granted without notice, before or after service of summons and at any time prior to judgment." *Id.; see also New York Janitorial Serv., Inc. v. Easthampton Dewitt Corp.,* 420 N.Y.S.2d 100, 101 (Sup. Ct. 1979). When a plaintiff proceeds *ex parte,* the Court's order must direct the plaintiff to make a motion to confirm the attachment no later than five (5) days after the levy. *See* CPLR § 6211(b). Levy occurs once the order of attachment is served. *Eisenberg v. Citation-Langley Corp.,* 92 A.D.2d

- 23 -

795, 795-96, 459 N.Y.S.2d 788, 789 (1st Dep't 1983). Mobil CN will move to confirm the order

of attachment no more than five days after the order has been served.[19]

### 3.    The Cash Waterfall Is Subject to Attachment

CPLR § 6202 provides that "[a]ny debt or property against which a money judgment may

be enforced as provided in section 5201 is subject to attachment." *Id.* CPLR § 5201 provides

that "[a] money judgment may be enforced against any property which could be assigned or

transferred . . . ." *Id.* The supporting papers demonstrate that the cash waterfall, maintained at

the Bank of New York, is a debt owing to, or is property belonging to, PDVSA CN. *Capital

Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218-20 (2d Cir. 2006). Accordingly, the

cash waterfall is a debt or property that is subject to attachment by Mobil CN. Moreover, this

Court's Order of Attachment may be served upon the Bank of New York as garnishee in that the

Bank of New York "owes a debt to the defendant." CPLR § 6214; *Kates v. Marine Midland

Bank, N.A.*, 541 N.Y.S.2d 925, 927 (Sup. Ct. 1989).

Once the bonds are purchased, the cash waterfall will be released. Even though Mobil

CN could serve an Order of Attachment upon issuance, it does not want to risk interfering with

PDVSA's Offer to Purchase. Consequently, Mobil CN will attempt to serve the Order of

Attachment on the Bank of New York the instant the restrictions on the cash waterfall (PDVSA's

irrevocable instructions to transfer the funds to purchase the bonds) have been released, but not

before.

---

[19] Additionally, CPLR § 6212 provides that, within ten (10) days after the granting of an
Order of Attachment, a plaintiff must file the order, the declaration and other papers on which
the order was based, and the summons and complaint in the action. Mobil CN will file within
this period. Mobil CN has not yet filed these papers with the clerk so as not to provide PDVSA
CN notice and potentially interfere with PDVSA's Offer to Purchase the outstanding bonds.

**C.      Under FRCP Rule 4.1, the Court Should Appoint a Special Process Server**

Pursuant to Rule 4.1, FRCP, Mobil CN also seeks an order appointing Lenor Marquis and Kimberlyn Brzozowski, of Steptoe & Johnson LLP, to act in the place and stead of the U.S. Marshal for the purpose of serving the Order of Attachment and effecting the levy.  FRCP 4.1(a) provides as follows:

> Process — other than a summons under Rule 4 or a subpoena under Rule 45 — must be served by a United States marshal or deputy marshal or by a person specially appointed for that purpose.
> . . . .

*Id.*  The Court is authorized to appoint a person to serve the Order of Attachment.  *Id.*  Since the timing of service of the Order of Attachment will in all likelihood be critical to the success of the relief sought herein, affording Mobil CN control over the service of the order (which is not effective until served) materially increases the chances that the intended funds will be restrained.

**IV.     CONCLUSION**

For the foregoing reasons, Mobil CN respectfully requests that this Court issue an *ex parte* Order of Attachment in the terms set forth in the proposed order submitted herewith and to appoint Lenor Marquis and Kimberlyn Brzozowski, of Steptoe & Johnson LLP, to act in the place and stead of the U.S. Marshal for the purpose of serving the Order of Attachment and effecting the levy.  Mobil CN will thereafter move for confirmation of the order pursuant to the requirements of the CPLR.

Dated:   New York, New York
         December 27, 2007

Respectfully submitted,

Michael C. Miller (MM-4632)
STEPTOE & JOHNSON LLP
750 Seventh Avenue, Suite 1900
New York, New York 10019
tel: (212) 506-3900
fax: (212) 506-3950

Howard H. Stahl (*pro hac vice* application pending)
Steven K. Davidson (*pro hac vice* application pending)
Mark A. Moran (*pro hac vice* application pending)
Michael J. Baratz (*pro hac vice* application pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
tel: (202) 429-3000
fax: (202) 429-3902

*Counsel for Plaintiff*

Of Counsel:

Toni D. Hennike
Luis Marulanda del Valle
Law Department
EXXON MOBIL CORPORATION
800 Bell Street
Houston, Texas 77002
713-656-6716 (telephone)
713-656-3496 (telefax)
Charles A. Beach (CB-6791)
Law Department
EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039-2298
972-444-1466 (telephone)
972-444-1435 (telefax)