**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MOBIL CERRO NEGRO, LTD., <br><br> Plaintiff, <br><br> v. <br><br> PDVSA CERRO NEGRO S.A., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 07 Civ. 11590 (DAB) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONFIRM ORDER OF ATTACHMENT

Michael C. Miller (MM-4632)
STEPTOE & JOHNSON LLP
750 Seventh Avenue, Suite 1900
New York, New York 10019
tel: (212) 506-3900
fax: (212) 506-3950

Howard H. Stahl (admitted *pro hac vice*)
Steven K. Davidson (admitted *pro hac vice*)
Mark A. Moran (admitted *pro hac vice*)
Michael J. Baratz (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
tel: (202) 429-3000
fax: (202) 429-3902

*Counsel for Plaintiff*


*Of Counsel:*

Toni D. Hennike
Luis Marulanda del Valle
Law Department
EXXON MOBIL CORPORATION
800 Bell Street
Houston, Texas 77002
tel:  (713) 656-3636
fax:  (713) 656-3496

Charles A. Beach (CB-6791)
Law Department
EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039-2298
tel:  (9720 444-1466
fax:  (972) 444-1435

Date:  January 2, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

I.     INTRODUCTION .......................................................................................1

II.    BACKGROUND .........................................................................................3

    A.    The Genesis of the Cerro Negro Joint Venture ...................................4

    B.    The Association Agreement ...............................................................4

        1.    In General ...................................................................................4

        2.    PDVSA CN's Obligation to Indemnify Mobil CN for
            Discriminatory Actions by Venezuela That Cause a Material
            Adverse Impact .........................................................................6

    C.    The Discriminatory Actions of the Venezuelan Government ...........8

    D.    PDVSA CN's Breach of the Cerro Negro Association Agreement ...11

    E.    The Assets Within This Jurisdiction – The Cash Waterfall ............13

III.   ARGUMENT ...........................................................................................15

    A.    The Court Has the Power to Attach PDVSA CN's Assets in This
        Jurisdiction Under Rule 64 of the Federal Rules of Civil Procedure
        and State Law ...................................................................................15

    B.    The Cash Waterfall Is Subject to Attachment .................................15

    C.    The Order of Attachment Should Be Confirmed .............................16

        1.    The Grounds for Attachment Are Met .........................................17

            a.    It Is Probable That Mobil CN Will Succeed on the
               Merits .............................................................................17

            b.    Without This Provisional Relief, Any Award to Which
               Mobil CN May Be Entitled Will Be Rendered
               Ineffectual .....................................................................19

            c.    The Claim to Be Asserted in the ICC Arbitration Is a
               Cause of Action, and the Amount Demanded From
               PDVSA CN Exceeds All Counterclaims Known to
               Mobil CN .......................................................................21

        2.    There Is a Clear Need for the Attachment To Be Continued .............22

IV.    CONCLUSION ........................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Algonquin Power Corp. v. Trafalgar Power Inc.*,
   No. CIV A5:00 CV 1246 (NPMD), 2000 WL 33963085, at *7 (N.D.N.Y. Nov. 8,
   2000) ..................................................................................................................18

*Alpha Petroleum Trading Co. v. Richards*,
   No. 85 CIV 8553 (CHS), 1986 WL 3515 (S.D.N.Y. Mar. 16, 1986) ...............................16, 22

*Capital Ventures Int'l v. Republic of Argentina*,
   443 F.3d 214 (2d Cir. 2006).......................................................................................16

*Correspondent Serv. Corp. v. J.V.W. Inv. Ltd.*,
   No. 99 CIV 8934 (RWS), 2000 WL 1718785 (S.D.N.Y. Nov. 14, 2000).........................16, 22

*County Natwest Sec. Corp. v. Jesup, Josephthal & Co.*,
   80 A.D.2d 468, 579 N.Y.S.2d 376 (1st Dep't 1992) ................................................19

*Cullman Ventures, Inc.*,
   252 A.D.2d 222, 682 N.Y.S.2d 391 (1st Dep't 1998) .............................................17

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003)...................................................................................................1

*Drexel Burnham Lambert Inc. v. Ruebsamen*,
   139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988) .........................................19, 20

*Erickson v. Kidder Peabody & Co.*,166
   Misc. 2d 1, 630 N.Y.S.2d 861 (Sup. Ct. N.Y. County 1995) ...................................17

*Habitations Ltd. V. BKL Realty Sales Corp.*,
   160 A.D.2d 423, 554 N.Y.S.2d 117 (1st Dep't 1990) .............................................19

*Kates v. Marine Midland Bank, N.A.*,
   541 N.Y.S.2d 925 (Sup. Ct. Monroe County 1989) ................................................16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Banivensa Capital Mkts., Ltd.*,
   No. 94 CIV 2778, 1995 WL 380129 (S.D.N.Y. June 26, 1995)..............................18

*SG Cowen Sec. Corp. v. Messih*,
   224 F.3d 79 (2d Cir. 2000)........................................................................................17

*Sierra USA Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp.*,
   824 N.Y.S.2d 560 (Sup. Ct. N.Y. County 2006) .....................................................22

*SiVault Sys., Inc. v. Wondernet, Ltd.*,
    No. 05 Civ. 0890 (CRWS), 2005 WL 681457, at *3 (S.D.N.Y. Mar. 28, 2005)....... 15, *passim*

*Thornton & Naumes, LLP*,
    36 A.D.3d 1119, 829 N.Y.S.2d 248 (3d Dep't 2007) ................................................17


**STATUTES**

28 U.S.C. § 1603 (2000) ................................................................................1

CPLR § 5201................................................................................16

CPLR § 6201 ................................................................................17, 20

CPLR § 6202................................................................................15

CPLR § 6211(b)................................................................................16

CPLR § 6212(a) ................................................................................17

CPLR § 6214................................................................................16

CPLR § 6223(b)................................................................................16

CPLR § 7502(c) ................................................................................1,17,22


**RULES**

Rule 64 of the Federal Rules of Civil Procedure ........................................................1, 15

## I.    INTRODUCTION

Plaintiff Mobil Cerro Negro, Ltd. ("Mobil CN") seeks to confirm this Court's Order of

Attachment, entered on December 27, 2007, pursuant to Rule 64 of the Federal Rules of Civil

Procedure ("FRCP") and Articles 62 and 75 of New York's Civil Practice Law and Rules

("CPLR").  As described in the Complaint and declarations made in support of this motion,

Mobil CN seeks an Order of Attachment in aid of a multi-billion dollar international arbitration

to be commenced by Mobil CN under the Arbitration Rules of the International Chamber of

Commerce ("ICC") in New York, New York within thirty days of the issuance of the Order of

Attachment.[1]  *See* CPLR § 7502(c).

Defendant PDVSA Cerro Negro S.A. ("PDVSA CN")[2] and Mobil CN entered into the

---

[1] Article 18.2 of the Cerro Negro Association Agreement (the "Association Agreement") provides that "[a]ny dispute arising out of or concerning this [Association] Agreement shall be settled exclusively and finally by arbitration.  The arbitration shall be conducted . . . in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules") . . . Unless otherwise agreed by all parties to the arbitration, all arbitration proceedings under this Agreement shall be conducted in New York City . . . ." Declaration of Michael J. Baratz ("Baratz Decl."), Ex. 1 art. 18.2 (dated Dec. 26, 2007), which was filed on December 27, 2007, in support of Mobil CN's Motion for an Order of Attachment Without Notice and is incorporated by reference herein.  In addition, Article 23(2) of the ICC Rules of Arbitration allows parties to seek judicial relief for interim measures, without waiving their arbitral rights ("Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures.  The application of a party to a judicial authority for such measures . . . shall not be deemed to be an infringement or a waiver of the arbitration agreement . . . .").

[2] Defendant PDVSA CN is a wholly-owned subsidiary of PDVSA Petróleo, S.A., which in turn is a wholly-owned subsidiary of PDVSA, which itself is wholly-owned by the Government of Venezuela.  *See* Baratz Decl., Ex. 3; Ex. 4.  PDVSA CN thus is a third-tier, indirectly owned subsidiary of the Government of Venezuela, and therefore, is not entitled to sovereign immunity.  The Foreign Sovereign Immunities Act applies to "foreign states" or "agencies or instrumentalities" of a "foreign state."  *See* 28 U.S.C. § 1603(a) (2000).  As a third-tier subsidiary, PDVSA CN is not an agency or instrumentality of Venezuela.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475-77 (2003) (entity whose ownership is separated by "one or more corporate tiers" from foreign state does not fall within majority ownership provision of 28 U.S.C. § 1603(b)(2)).

Association Agreement in 1997 to establish a joint venture to exploit extra-heavy oil resources in the Orinoco Oil Belt in Venezuela (the "Cerro Negro Joint Venture"). Among other obligations, PDVSA CN agreed in the Association Agreement to provide indemnification to Mobil CN in the event that Venezuela expropriated Mobil CN's interests in the Cerro Negro Joint Venture or Association Agreement.

PDVSA CN has admitted the incontrovertible fact that in June 2007, Venezuela expropriated without compensation Mobil CN's interests in the Cerro Negro Joint Venture and the Association Agreement to fulfill its plan to nationalize oil ventures in the Orinoco Oil Belt. Mobil CN has demanded that PDVSA CN honor its indemnification obligation, but PDVSA CN has ignored that demand. Consequently, Mobil CN is compelled to commence an arbitration to recover damages caused by PDVSA CN's breach of its indemnification obligations. The damages amount to multiple billions of dollars.

In this action, Mobil CN seeks to attach funds maintained for the benefit of PDVSA CN in a series of designated "Project Accounts" at The Bank of New York Mellon Corporation ("Bank of New York") within the Southern District of New York. Previously, PDVSA CN could not access these funds because PDVSA CN issued irrevocable instructions to the Bank of New York that these funds had to be segregated to guarantee the repayment of approximately $538,000,000 of bonds issued in 1998 to finance the Cerro Negro Joint Venture.[3]

Petróleos de Venezuela, S.A. ("PDVSA"), the national oil company of Venezuela, purchased the outstanding bonds on December 28, 2007. As reflected in the Offer to Purchase

---

[3] Cerro Negro Finance, Ltd. is a special purpose vehicle incorporated under the laws of the Cayman Islands for the sole purpose of issuing bonds to finance a portion of the Cerro Negro Joint Venture. The original bond issue in 1998 was for $600,000,000. The amount outstanding on the bonds at the time of PDVSA's purchase thereof was $538,000,000. *See* Baratz Decl., Ex. 2 at 33.

and Consent Solicitation Statement ("Offer to Purchase"), PDVSA obtained the consent of the bondholders to release the collateral and security interests securing the bonds and to terminate the irrevocable instructions. When PDVSA purchased the outstanding bonds, PDVSA CN's share of the Project Accounts (sometimes referred to as the "cash waterfall"), $300,000,000, became free from any restrictions, including the irrevocable instructions. Once the irrevocable instructions were removed and the bonds had been purchased by PDVSA, Mobil CN served its Order of Attachment on the Bank of New York and the Project Accounts were frozen, thus preventing PDVSA CN from transferring the Project Account funds from New York and otherwise dissipating them.

As part of Venezuela's program of nationalization, PDVSA CN's interests in the Cerro Negro Joint Venture are being transferred to an "Empresa Mixta," or "mixed company," an entity with which Mobil CN has no privity. As far as Mobil CN knows, the cash waterfall is PDVSA CN's sole asset in the U.S. Accordingly, since PDVSA CN is being stripped of its most important assets by transfer of its interests in the Cerro Negro Joint Venture to the "mixed company," the Order of Attachment must be confirmed to preserve PDVSA CN's only known assets in New York for partial satisfaction of the arbitral award that Mobil CN is likely to obtain in the impending ICC arbitration. Without this provisional relief, any award to which Mobil CN may be entitled will be "rendered ineffectual."

## II.    BACKGROUND

Mobil CN intends to commence arbitration against at least PDVSA CN, and perhaps others,[4] within thirty (30) days of the granting of the requested Order of Attachment, unless this deadline is extended by the Court. *See* Declaration of Steven K. Davidson ("Davidson Decl.") ¶

---

[4] In a guaranty executed at the same time as the Association Agreement, PDVSA guaranteed all the obligations undertaken by PDVSA CN in the Association Agreement.

4 (dated Jan. 2, 2008), which is submitted herewith. The ICC arbitration arises out of a number

of interrelated disputes, including the breach by PDVSA CN of its indemnification obligation in

the Association Agreement.

### A.    The Genesis of the Cerro Negro Joint Venture

In 1991, PDVSA, along with its wholly-owned subsidiary Lagoven, S.A. ("Lagoven"),

identified Mobil Corporation ("Mobil") as a candidate possessing both the expertise and

financial capacity to participate in a joint venture to develop extra-heavy crude oil fields in the

Orinoco Oil Belt in Venezuela. *See* Baratz Decl., Ex. 8 ¶ 3 (Declaration of J.R. Massey

("Massey Decl."), Exxon Mobil Vice President for operations in Canada, South America, and the

United States with over thirty-four (34) years of experience with the company). To induce

foreign oil companies to participate in ventures such as the Cerro Negro Joint Venture, PDVSA

and Venezuela designed a series of financial incentives meant to make the projects more

attractive to potential investors. *See id.*, Ex. 8 ¶ 8 (Massey Decl.).[5]

### B.    The Association Agreement

#### 1.    In General

On October 28, 1997, Lagoven Cerro Negro, S.A. ("Lagoven CN"), a Lagoven

subsidiary, Mobil Producción e Industrialización de Venezuela, S.A. ("Mobil PIV"), and Veba

Oel Venezuela Orinoco, GmbH ("Veba Orinoco"), a subsidiary of BP, signed the Association

Agreement, which established the Cerro Negro Joint Venture for a term of thirty-five years. *Id.*,

Ex. 1 art. 16.1; Ex. 8 ¶ 9 (Massey Decl.). On October 29, 1997, Mobil PIV assigned its rights in

---

[5] These included: (i) reduction of the applicable income-tax rate, which was granted by law in a "Framework of Conditions" that would govern the Cerro Negro Joint Venture (*id.*, Ex. 15); (ii) reduction of the applicable royalty, which was granted by means of a Royalty Reduction Agreement (*id.*, Ex. 17); and (iii) the right to expand the project, by individual decision or jointly with other participants, which was incorporated in the Association Agreement (*id.*, Ex. 1).

the Association Agreement to Mobil CN. *Id.*, Ex. 8 ¶ 10 (Massey Decl.). On May 11, 1998,

Lagoven CN changed its name to PDVSA CN. *Id.* Until the expropriation described below, the

parties' percentage interests in the Cerro Negro Joint Venture were: PDVSA CN – 41 2/3 %;

Mobil CN – 41 2/3 %; and Veba Orinoco – 16 2/3 %. *Id.*, Ex. 8 ¶ 11 (Massey Decl.); Ex. 1 art.

2.2.

 Under the Association Agreement and the companion Reservation and Dedication

Agreement, Lagoven authorized PDVSA CN, Mobil CN, and Veba Orinoco to exploit the oil

fields located in the Cerro Negro area during the 35-year life of the venture. *See id.*, Ex. 1 art.

16.1; Ex. 18. The project included: (i) exploiting and developing the extra-heavy crude oil fields

in the Cerro Negro area; (ii) constructing an upgrader at the Jose Complex on the Venezuelan

coast with the capacity to upgrade 120,000 bpd of extra-heavy crude oil (or 155,000 bpd of

diluted crude oil ("DCO") to a level of 16.5° API; (iii) laying pipelines between the Cerro Negro

area and the Jose Complex (approximately 180 miles); and (iv) selling the resulting products.

*Id.*, Ex. 1 arts. 1-2, 5-7. The Chalmette Joint Venture, a related joint venture between PDV

Chalmette, Inc. (a subsidiary of PDVSA), Mobil Oil Corporation and Mobil Pipe Line Company,

would purchase all the DCO and synthetic crude oil ("SCO") production to which Mobil CN and

PDVSA CN were entitled under the Association Agreement. *Id.*, Ex. 1 art. 1.

 The Association Agreement granted the parties an undivided interest in the assets and

liabilities of the venture in proportion to their respective interests. *Id.* The parties' title to the oil

produced in Cerro Negro vested in the participants at the wellhead, also in proportion to their

respective interests. *Id.* Each party was separately responsible for paying its share of royalties

and taxes to Venezuela and its subdivisions. *Id.*

2.    **PDVSA CN's Obligation to Indemnify Mobil CN for Discriminatory Actions by Venezuela That Cause a Material Adverse Impact**

In the Association Agreement, PDVSA CN undertook to provide indemnification, in an amount specified under that agreement, for damages suffered by Mobil CN as a consequence of any Discriminatory Action that causes a Material Adverse Impact, as these terms are defined in the Association Agreement. *Id.*, Ex. 1 art. 1; Ex. 8 ¶ 12 (Massey Decl.).[6] Discriminatory Action causing a Material Adverse Impact includes the expropriation of Mobil CN's interests in the Cerro Negro Joint Venture as well as other governmental measures that do not apply to corporations in general and that would curtail Mobil CN's cash flows. *See id.*, Ex. 1 arts. 1; 15.1(b).

The term "Discriminatory Action" is defined in the Association Agreement as follows:

> "'Discriminatory Action' *shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Action, which is unjust* ... or with respect to tax rates, foreign-exchange controls *or the expropriation or condemnation of assets of the Project, or the interests of a Foreign Party in the Project, provided that said change of (or any change in the interpretation or application of) Venezuelan law, or any Governmental Action is not applicable to Corporations in the Republic of Venezuela in general (including the imposition of income tax on the Project or any Foreign Party in its capacity as a participant in the Project, at a rate that is in contradiction with the last sentence of the Fifteenth Condition);*[7]

---

[6] PDVSA CN must also discharge its obligations under the Association Agreement in good faith, an obligation that is implicit in any agreement under Venezuelan law (Article 1160 of the Venezuelan Civil Code), as well as other laws. Similarly, the Association Agreement provides that, if PDVSA CN concurs with Mobil CN that a Discriminatory Action has occurred and has resulted in a Material Adverse Impact, PDVSA CN is obligated to "negotiate in good faith compensatory damages." *See id.*, Ex. 1 art. 15.1(a).

[7] The "Fifteenth Condition" is set out in the Framework of Conditions, which was passed by the Congress of Venezuela. *See id.*, Ex. 15. The Fifteenth Condition provided that entities participating in the Cerro Negro Project would be exempted from local and state taxes, and could only be taxed under an ordinary regime. *Id.*

. . .

> An action that would otherwise fall within the definition of
> Discriminatory Action will be deemed unjust if it results in a
> Material Adverse Impact." [8]

Article 1 of the Association Agreement defines "Material Adverse Impact" as a decrease

in Mobil CN's Net Cash Flow of more than five percent in any fiscal year as a consequence of

the Discriminatory Action(s) as compared with what the participant's Net Cash Flow would have

been absent those actions. *Id.*

To trigger PDVSA CN's obligation to compensate Mobil CN for Discriminatory Actions

that cause a Material Adverse Impact, Mobil CN is required to take certain actions, all of which

have been completed (*see id.*, Ex. 8 ¶ 13 (Massey Decl.)).[9]  Accordingly, PDVSA CN must now

indemnify Mobil CN pursuant to the Association Agreement.[10]

The Accounting Procedures Agreement, annexed to the Association Agreement, provides

a formula to calculate the damages resulting from Discriminatory Actions that have caused a

Material Adverse Impact. *See id.*, Ex. 16 § 7.4; Ex. 9 ¶ 3 (Declaration of Hobert E. Plunkett

("Plunkett Decl.")), Asset Enhancement Manager for Exxon Mobil Production Company, with

---

[8] *Id.*, Ex 1 art. 1 (emphasis added).  "Governmental Action" is also defined in Article 1 of the Association Agreement. *Id.*

[9] *First*, if Mobil CN determines that a Discriminatory Action has occurred which "may result" in a Material Adverse Impact, Mobil CN must notify PDVSA CN about the Discriminatory Action. *Id.*, Ex. 1, art. 15.1(a). *Second*, if Mobil CN concludes that it has "actually suffered" a Material Adverse Impact as a consequence of the Discriminatory Action that has previously been notified to PDVSA CN, Mobil CN "must promptly" send PDVSA CN a notice of such determination (the so called "Notice of Discriminatory Action"). *Id. Third*, if there is "any legal remedy available to reverse or obtain relief from [the] Discriminatory Action," Mobil CN must commence a "legal action" against the Venezuelan Government seeking compensation for the Discriminatory Actions.  The purpose of this requirement is to mitigate damages. *Id.*

[10] As described *infra* at Part II.D., this obligation ceases only if certain conditions not applicable here are present.

over thirty-one (31) years of experience with the company). According to Section 7.4 of the Accounting Procedures Agreement, the damages payable by PDVSA CN shall be equal to the difference between the Net Cash Flow for a given fiscal year, taking into account the impact of the Discriminatory Action(s), and the Net Cash Flow for the same period without taking into account the impact of that (those) measure(s). *Id.*, Ex. 9 ¶ 4 (Plunkett Decl.). The obligation to indemnify arises whenever that difference exceeds 5% of the participant's Net Cash Flow for that fiscal year. *Id.* The damages calculated according to the formula described above are limited by a cap: PDVSA CN's obligation to indemnify may not exceed the difference between the Threshold Cash Flow and the Adjusted Net Cash Flow.[11] *Id.*, Ex. 9 ¶ 5 (Plunkett Decl.).

### C.    The Discriminatory Actions of the Venezuelan Government

Since October 2004, Venezuela has taken a series of Governmental Actions against Mobil CN that constitute Discriminatory Actions under the Association Agreement. *See id.*, Ex. 8 ¶ 15 (Massey Decl.). Those measures include the direct expropriation of Mobil CN's interests in the Association Agreement and the Cerro Negro Joint Venture without compensation and measures taken preceding expropriation, including: (i) repudiation of the Royalty Reduction Agreement and imposition of the so-called extraction tax (a disguised royalty); (ii) refusal to allow the expansion of the Cerro Negro Project under previously agreed terms and conditions; (iii) income-tax increase on participants in Orinoco Oil Belt ventures in violation of the Framework of Conditions; and (iv) imposition of production and export curtailments to the Cerro Negro Joint Venture in violation of the Association Agreement. *Id.*, Ex. 8 ¶ 16 (Massey Decl.).

---

[11] *See id.*, Ex. 16, § 7.5. Under the Accounting Procedures Agreement, Adjusted Net Cash Flow means the Net Cash Flow received by a party during a given fiscal year after certain adjustments. *Id.*

Mobil CN intends to seek compensation for each of these Discriminatory Actions in the ICC arbitration. For the sake of brevity, Plaintiff will address in this memorandum only the direct expropriation of its interests in the Association Agreement and the Cerro Negro Joint Venture, which constitute the bulk of the damages that Plaintiff will seek in the ICC arbitration.

On February 26, 2007, President Chávez issued Decree No. 5200 on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements (the "Nationalization Decree").[12] *See id.*, Ex. 2 at 11-12. The Nationalization Decree ordered, among other things, that the strategic associations located in the Orinoco Oil Belt, including Cerro Negro, be transformed ("migrated") into new mixed companies, "Empresa Mixta," under the Organic Law on Hydrocarbons,[13] in which PDVSA or one of its subsidiaries would hold at least a 60% participation interest.[14] *Id.*, Ex. 2 at 11. Mobil CN has no interest in, or connection with, the new mixed companies.

According to Article 4 of the Nationalization Decree, participants in so-called strategic associations located in the Orinoco Oil Belt, such as Mobil CN, had four months (until June 26, 2007) to accept dictated terms under which they could participate in the new mixed companies. *See id.*, Ex. 6. The mixed companies would be established and would operate under a different statutory framework (the Organic Law on Hydrocarbons) and new contractual arrangements that would replace the previous association agreements. *Id.* The new statutory and contractual

---

[12] *See id.*, Ex. 6.

[13] In November 2001, President Hugo Chávez (exercising delegated legislative powers) issued the Organic Law on Hydrocarbons (Official Gazette No. 37323 of 13 Nov. 2001), which replaced the Hydrocarbons Law of 1943, as amended. *See id.*, Ex. 5.

[14] *See id.*, Ex. 6 § 1.

regime not only substantially reduced the equity but also radically curtailed the rights of private companies, such as Mobil CN, participating in such projects. *Id.*

Further, under Article 3 of the Nationalization Decree, the operator of the Cerro Negro Project was required to surrender control of all activities and operations related to the project to Corporación Venezolana del Petróleo, S.A. ("CVP"), a wholly owned subsidiary of PDVSA (or another affiliate of PDVSA), no later than April 30, 2007. *Id.* On that date, under compulsion of the Nationalization Decree and with full reservation of rights, Operadora Cerro Negro, S.A., a wholly-owned subsidiary of Mobil that operated the Cerro Negro Project, surrendered to PDVSA Petróleo S.A., a subsidiary of PDVSA, the operations and control of all activities related to the Cerro Negro Project. *Id.*

As required by the Nationalization Decree, Mobil CN discussed with Venezuela terms and conditions for Mobil CN's potential participation in the new mixed company that would own and control the Cerro Negro Project. *Id.*, Ex. 8 ¶¶ 17-18 (Massey Decl.). Mobil CN refused to accede to the non-negotiable terms and conditions that Venezuela proffered, which failed to provide compensation for the taking of Mobil CN's rights under the Association Agreement as required by applicable law. *Id.*, Ex. 8 ¶ 18 (Massey Decl.).

Article 5 of the Nationalization Decree provides that, if participants in strategic associations, such as the Mobil CN, refused to accept the terms for new mixed companies by the end of the four-month period contemplated in Article 4 (which expired on June 26, 2007), "the Republic, through Petróleos de Venezuela S.A. or any of its subsidiaries that may be designated for such purpose, shall directly assume the activities of the associations . . . ." *Id.*, Ex. 6; Ex. 8 ¶ 19 (Massey Decl.). As of June 27, 2007, the Nationalization Decree deprived Mobil CN of its participation in activities and production of the Cerro Negro Joint Venture. *Id.*, Ex. 8 ¶ 20

(Massey Decl.).  As of that date, Venezuela expropriated, without compensation, the interests of Mobil CN in the Cerro Negro Joint Venture, including Mobil CN's interests in the Association Agreement.  *See id.*, Ex. 8 ¶ 21 (Massey Decl.).  This expropriation was ratified by the National Assembly in October 2007.  *See id.*, Ex. 7.

### D.    PDVSA CN's Breach of the Cerro Negro Association Agreement

Following Venezuela's expropriation of Mobil CN's interest, Mobil CN satisfied the three required procedures of Association Agreement Article 15.1(a), discussed *infra* at footnote 8.  On June 22, June 25 and June 27, 2007, Mobil CN notified both PDVSA CN and PDVSA in writing that the measures described above constitute Discriminatory Actions that may result in a Material Adverse Impact in fiscal years 2007 and future fiscal years and demanded prompt payment of compensatory damages according to the terms of the Association Agreement.  *Id.*, Ex. 8 ¶¶ 22-23 (Massey Decl.); Exs. 12-14.  When PDVSA CN did not compensate Mobil CN for its damages, Mobil CN and related entities, commenced a legal action against Venezuela on September 6, 2007 by filing a Request for Arbitration with the International Centre for Settlement of Investment Disputes seeking compensation for, among other things, the measures described above, including the expropriation of Mobil CN's interests in the Cerro Negro Joint Venture (the "ICSID Arbitration").  *See id.*, Ex. 8 ¶ 25 (Massey Decl.); ICSID Case No. ARB/07/27 (October 10, 2007).

PDVSA CN has acknowledged that the Nationalization Decree has effected an expropriation of Mobil CN's interest in the Cerro Negro Joint Venture.  In a July 25, 2007 letter to the Bank of New York (the security trustee of certain financing arrangements related to the Cerro Negro Joint Venture), Curtis, Mallet-Prevost, Colt and Mosle LLP, as "counsel to PDVSA Cerro Negro, S.A.," stated that "[p]ursuant to such Decree [the Nationalization Decree], the Mobil Borrower [Mobil CN] has ceased to have an interest in the Project as of June 27,

200[7][sic]." *See* Baratz Decl., Ex. 11. In that same letter, PDVSA CN confirmed that all its

interests in the Cerro Negro Joint Venture will be transferred to "Corporación Venezolana del

Petróleo, S.A., a subsidiary of PDVSA" which will hold "an 83.33% interest" in the new mixed

company that will become owner of the Cerro Negro Project. *Id.*

     PDVSA CN has an obligation to indemnify Mobil CN for any Discriminatory Action that

causes a Material Adverse Impact unless *each* of three conditions is met.[15] At a minimum, the

third condition has not been satisfied: that Mobil CN receives a "Net Cash Flow after taking into

account the effect of the Discriminatory Action(s) [. . .] that bears at least a reasonable

relationship, [. . .] to the Threshold Cash Flow for such Fiscal year." *See id.*, Ex. 9 ¶ 6 (Plunkett

Decl.). This is so because as a result of Venezuela's expropriation of Mobil CN's interest in the

Cerro Negro Joint Venture, Mobil CN has suffered a severe impairment in its Net Cash Flow for

Fiscal Year 2007 and has been deprived of any Net Cash Flow for the remaining 28 fiscal years

of the agreed term of the Cerro Negro Project. *Id.* Accordingly, because of "Discriminatory

Actions," Mobil CN's Net Cash Flow will bear no reasonable relationship to the Threshold Cash

Flow for fiscal year 2007 or for any future fiscal year of the agreed term of the Association

Agreement. *Id.*

     In spite of PDVSA CN's admission that Venezuela expropriated Mobil CN's interests in

---

[15] The three conditions are: (i) the Price of Brent Crude Oil (a daily average of high and low quotes per barrel for dated Brent Blend, FOB Sullom Voe, deflated to 1996 dollars using a U.S. inflation index, Baratz Decl., Ex. 1 art. 1) is in excess of the Threshold Price (US$27 per barrel, in 1996 dollars (or US$34.33 per barrel in 2007 dollars), *id.*, Ex. 16; Ex. 9 ¶ 7) for a period of six consecutive months at least once during the life of the Association Agreement; (ii) the average Price of Brent Crude Oil for a given Fiscal Year is in excess of the Threshold Price; *and* (iii) Mobil CN receives a "Net Cash Flow after taking into account the effect of the Discriminatory Action(s) [...] that bears at least a reasonable relationship, [...], to the Threshold Cash Flow (the net profits for any given fiscal year that a participant in the Cerro Negro Project would have received assuming for the calculation the Threshold Price, *i.e.*, US$27 per barrel in 1996 dollars. *See id.*, Ex. 16, § 7.3) for such Fiscal year." *See id.*, Ex. 1 art. 15.2.

the Cerro Negro Joint Venture, and contrary to the duty to perform its contractual obligations in good faith, PDVSA CN has failed to take the steps contemplated in Article 15.1, paragraphs (a) and (b) of the Association Agreement. *Id.*, Ex. 1. In particular, PDVSA CN has failed (i) to give notice of concurrence that the aforesaid expropriation constitutes a Discriminatory Action resulting in a Material Adverse Impact under the terms of the Association Agreement; (ii) to engage in good faith in a joint calculation of the compensation due to Mobil CN under the Association Agreement; and (iii) without prejudice to Mobil CN's right to full indemnification from Venezuela, to pay to Mobil CN compensatory damages as required and determined under Article 15 of the Association Agreement and Section 7 of the Accounting Procedures Agreement. *Id.*

### E.    The Assets Within This Jurisdiction – The Cash Waterfall

The Cerro Negro Joint Venture was financed, in part, through a $600,000,000 bond financing issued by Cerro Negro Finance, Ltd. in 1998. The proceeds of the bonds were divided equally among Mobil CN and PDVSA CN. *See id.*, Ex. 2 at 9. The bondholders' interests were protected by a Common Security Agreement, which mandated several security interests as collateral, as well as other restrictions on the right to use and dispose of certain assets. *See id.*, Ex. 2 at ii, 10. The security and other assets relevant to this action have been maintained in bank accounts in New York, New York. *Id.*, Ex. 8 ¶ 28 (Massey Decl.); Ex. 2 at 7. Mobil CN and PDVSA CN were required to establish and maintain in New York: (i) a segregated Disbursement Account; (ii) a segregated Operating Revenues Account; (iii) a segregated Distribution Account; (iv) a segregated Casualty Proceeds Account; (v) a segregated O&M Account; and (vi) a segregated Debt Service Account. *See id.*, Ex. 2 at 10, 20. Additionally, Mobil CN was required to establish a Debt Service Reserve Account. *See id.* These accounts, as

- 13 -

well as other segregated accounts not maintained in New York, were collectively referred to as the Project Accounts. *See id.*

PDVSA's share of the Project Accounts (approximately $300,000,000), sometimes referred to as the "cash waterfall," have been maintained in designated accounts at the Bank of New York. *See id.*, Ex. 8 ¶ 28 (Massey Decl.). Proceeds from the Project Accounts were distributed in a particular order and for particular purposes. *See id.*, Ex. 2 at 10-11. As part of the collateral to guarantee the repayment of the bonds issued by Cerro Negro Finance, Ltd., Mobil CN pledged its rights in the cash waterfall as a security interest. *Id.* PDVSA CN provided assurances to the bondholders in a different way: it issued irrevocable instructions to the Bank of New York, as security trustee, restricting the use of the funds to the terms of the Common Security Agreement. *Id.*

On December 28, 2007, PDVSA transferred approximately $538,000,000 to Chase Manhattan Bank to finance the purchase of any outstanding bonds of Cerro Negro Finance, Ltd. that were tendered in accordance with the terms of the Offer to Purchase. *See* Davidson Decl. ¶ 9; Baratz Decl., Ex. 3. Once PDVSA purchased the outstanding bonds, and all the bondholders were paid off, the contractual restrictions placed on the cash waterfall, including the irrevocable instructions, were released. *See* Davidson Decl. ¶ 9; Baratz Decl., Exs. 2-3. Consequently, PDVSA CN would have gained unrestricted access to its portion of the cash waterfall, absent an Order of Attachment.

Anticipating this release of funds, on December 27, 2007, Mobil CN sought an *ex parte* Order of Attachment of the funds available to PDVSA CN from the cash waterfall, which this Court granted on that same day. Mobil CN sought the order without notice because notice, or service prior to the closing of the Offer to Purchase, could have interfered with completion of

PDVSA's purchase of the bonds and could have prevented the release of the funds in the Project

Accounts. *See* Davidson Decl. ¶ 10. On December 28, 2007, after the Offer to Purchase closed

and the bonds had been purchased, Mobil CN served the Order of Attachment on the Bank of

New York. *See id.* ¶ 11.

PDVSA CN's share of the cash waterfall is likely PDVSA CN's sole asset available to

satisfy any eventual arbitral award. *See* Baratz Decl., Ex. 8 ¶ 28 (Massey Decl.). Without the

Order of Attachment, upon PDVSA's purchase of the outstanding bonds, PDVSA CN could

have transferred its share of the cash waterfall from New York, dissipated the funds, and taken

other actions to make the funds unavailable for satisfying an eventual award or any judgment

entered thereon. The purpose of this action is to attach PDVSA CN's interest in the cash

waterfall to secure at least partial payment of the ICC arbitral award that Mobil CN is likely to

obtain in the ICC arbitration.

## III.    ARGUMENT

### A.    The Court Has the Power to Attach PDVSA CN's Assets in This Jurisdiction Under Rule 64 of the Federal Rules of Civil Procedure and State Law

Rule 64, FRCP, provides, in relevant part, as follows:

> At the commencement of and throughout an action, every remedy
> is available that, under the law of the state where the court is
> located, provides for seizing a person or property to secure
> satisfaction of the potential judgment. But a federal statute
> governs to the extent it applies.

Accordingly, New York law governs Mobil CN's right to attach PDVSA CN's assets in this

jurisdiction. *SiVault Sys., Inc. v. Wondernet, Ltd.*, No. 05 Civ. 0890 (CRWS), 2005 WL 681457,

at *3 (S.D.N.Y. Mar. 28, 2005).

### B.    The Cash Waterfall Is Subject to Attachment

CPLR § 6202 provides that "[a]ny debt or property against which a money judgment may

be enforced as provided in section 5201 is subject to attachment." *Id.* CPLR § 5201 provides

that "[a] money judgment may be enforced against any property which could be assigned or

transferred . . . ." *Id.* The supporting papers demonstrate that the cash waterfall maintained at

the Bank of New York is a debt owing to, or is property belonging to, PDVSA CN. *Capital*

*Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218-20 (2d Cir. 2006). Accordingly, the

cash waterfall is a debt or property that is subject to attachment by Mobil CN. Moreover, this

Court's Order of Attachment may be served upon the Bank of New York as garnishee in that the

Bank of New York "owes a debt to the defendant." CPLR § 6214; *Kates v. Marine Midland*

*Bank, N.A.*, 541 N.Y.S.2d 925, 927 (Sup. Ct. Monroe County 1989).

### C.    The Order of Attachment Should Be Confirmed

The standard governing a request for confirmation of an Order of Attachment is governed

by CPLR § 6211(b), which provides that:

> An order of attachment granted without notice shall provide that
> within a period not to exceed five days after levy, the plaintiff shall
> move, on such notice as the court shall direct to the defendant, the
> garnishee, if any, and the sheriff, for an order confirming the order
> of attachment . . . . Upon the motion to confirm, the provisions of
> subdivision (b) of section 6223 shall apply.

*Id.*; *see also Alpha Petroleum Trading Co. v. Richards*, No. 85 CIV 8553 (CHS), 1986 WL 3515,

at *1 (S.D.N.Y. Mar. 16, 1986). To satisfy its burden of proof to confirm the *ex parte*

attachment order under CPLR § 6223(b), Mobil CN must show that: (1) the grounds for

attachment are met; (2) there is a need for continuing the levy; and (3) it is probable that Mobil

CN will succeed on the merits. CPLR § 6211(b); *see also Correspondent Serv. Corp. v. J.V.W.*

*Inv. Ltd.,* No. 99 CIV 8934 (RWS), 2000 WL 1718785, at *4 (S.D.N.Y. Nov. 14, 2000).

Each of these elements is satisfied by this motion. Accordingly, the Court should enter

an order of attachment without notice.

### 1.    The Grounds for Attachment Are Met

New York law expressly provides that a party may apply to a court for an order seeking prejudgment attachment in aid of arbitration. CPLR § 7502(c). Cases applying CPLR § 7502(c) have held that the requirements of CPLR § 6212(a) must be met before an order of attachment is granted. *See SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 82 (2d Cir. 2000); *In re Thornton & Naumes, LLP*, 36 A.D.3d 1119, 1119-20, 829 N.Y.S.2d 248, 249 (3d Dep't 2007); *In re Cullman Ventures, Inc.*, 252 A.D.2d 222, 230, 682 N.Y.S.2d 391, 396 (1st Dep't 1998).

However, CPLR § 7502(c), by its express terms, provides that CPLR § 6201 does not apply to the analysis of whether to issue an order of attachment. *SiVault Sys.*, 2005 WL 681457, at *8-10. The "sole ground" relevant to an application for an order of attachment brought under CPLR § 7502(c) is "that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."[16] *Erickson v. Kidder Peabody & Co.*, 166 Misc. 2d 1, 4, 630 N.Y.S.2d 861, 862 (N.Y. Sup. Ct. 1995).

The grounds for an attachment in aid of arbitration under CPLR § 6212(a), as modified by CPLR § 7502(c) are: (1) there is a cause of action; (2) it is probable that the plaintiff will succeed on the merits; (3) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff; and (4) "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." CPLR § 6212(a); CPLR § 7502(c).

### a.    It Is Probable That Mobil CN Will Succeed on the Merits

Although courts typically have not placed great weight on the requirement that plaintiffs demonstrate a likelihood of success on the merits in an arbitration, *see SG Cowen Sec. Corp.*,

---

[16] Even if CPLR § 6201(a) applied, one or more grounds for attachment provided for in CPLR § 6201 exist here because PDVSA CN is a foreign corporation not qualified to do business within the state. *See* CPLR § 6201(a).

224 F.3d at 84; *SiVault Sys.,* 2005 WL 681457, at *11-12, Mobil CN can meet even the higher

standard that it is more likely than not to succeed on its arbitration claims. *See Algonquin Power*

*Corp. v. Trafalgar Power Inc.*, No. CIV A5:00 CV 1246 (NPMD), 2000 WL 33963085, at *7

(N.D.N.Y. Nov. 8, 2000) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Banivensa*

*Capital Mkts., Ltd.*, No. 94 CIV 2778, 1995 WL 380129, at *1 (S.D.N.Y. June 26, 1995)).  The

facts here are not in dispute.  First, the Association Agreement expressly sets out PDVSA CN's

obligation to provide indemnification to Mobil CN for Discriminatory Actions of Venezuela,

including the expropriation of Mobil CN's interests in the Cerro Negro Joint Venture or

Association Agreement, that cause a Material Adverse Impact.  Second, PDVSA CN has

conceded that Venezuela has expropriated Mobil CN's interest in the Cerro Negro Joint Venture.

Third, Mobil CN has received no compensation from Venezuela nor has it received any

indemnification from PDVSA CN for the Discriminatory Actions of Venezuela.

Among other Discriminatory Actions, on February 26, 2007, President Chavez signed the

Nationalization Decree, which required that the Cerro Negro Project be converted into a "mixed

company," in which a wholly-owned subsidiary of PDVSA, other than PDVSA CN, would hold

an equity interest of at least 60%.  Under compulsion of the Nationalization Decree, operational

control of the Cerro Negro Project was transferred to PDVSA Petróleo S.A., effective April 30,

2007.  Also, as a result of the Nationalization Decree, as of June 27, 2007, Mobil CN was

deprived of participating in the activities, production, and revenue of the Cerro Negro Joint

Venture.  Accordingly, as of that date, Venezuela expropriated, without compensation, the

interests of Mobil CN in the Cerro Negro Joint Venture, including the Association Agreement.

Both PDVSA and PDVSA CN concede that Venezuela expropriated Mobil CN's

interests in the Cerro Negro Project without compensation required by applicable law. *See*

Baratz Decl., Ex. 2 at 11 (Offer to Purchase); Ex. 11 (letter from Curtis, Mallet-Prevost, Colt and Mosle LLP to the Bank of New York (July 25, 2007)). PDVSA CN expressly agreed in the Association Agreement to provide indemnification to Mobil CN in the event of expropriation, and indisputably, it has not done so. Mobil CN has complied with the procedural requirements under the contract by: (1) providing PDVSA CN with notice of the Discriminatory Actions that has resulted in a Material Adverse Impact, and (2) commencing the ICSID Arbitration against Venezuela to mitigate its damages. Thus, Mobil CN is more likely than not to succeed on the merits of its arbitration claim.

### b.    Without This Provisional Relief, Any Award to Which Mobil CN May Be Entitled Will Be Rendered Ineffectual

Whether an award would be rendered ineffectual without provisional relief is a determination left to the court's discretion, based on the facts of each case. A finding of "rendered ineffectual" has been supported by facts independently demonstrating that: (1) the assets subject to attachment are the only viable source of recovery; (2) the defendant's financial condition makes recovery unlikely; (3) the assets subject to attachment can easily be transferred outside of the jurisdiction or otherwise put out of the reach of creditors; and (4) the plaintiff will be unable to enforce the arbitration award outside of the jurisdiction. *See SiVault Sys.*, 2005 WL 681457, at *13; *County Natwest Sec. Corp. v. Jesup, Josephthal & Co.*, 80 A.D.2d 468, 579 N.Y.S.2d 376 (1st Dep't 1992); *Habitations Ltd. V. BKL Realty Sales Corp.*, 160 A.D.2d 423, 554 N.Y.S.2d 117 (1st Dep't 1990); *Drexel Burnham Lambert Inc. v. Ruebsamen*, 139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988). Here, Mobil CN satisfies the criteria established by case law.

Mobil CN can establish, based on the evidence provided herewith, that: (1) the assets subject to attachment are the only viable source of funds to satisfy an award in the ICC

arbitration; (2) PDVSA CN's financial condition makes recovery unlikely, because PDVSA

CN's interests in the Cerro Negro Project are being transferred to the new mixed company; (3)

PDVSA CN's share of the cash waterfall easily can be — and most likely will be — transferred

out of the reach of Mobil CN; and (4) Mobil CN will have difficulty enforcing the award outside

of this jurisdiction against PDVSA CN, which has no known assets outside of the jurisdiction

other than those in Venezuela, which are being transferred to the new mixed company.

In *Drexel Burnham Lambert*, Drexel attempted through arbitration to recover a debt of

approximately $230,000 arising from the respondents' liquidated securities account. In support

of that arbitration, Drexel sought to attach $250,000 of funds in another unrelated account that

the defendants held. 139 A.D.2d at 325, 531 N.Y.S.2d at 548. Drexel argued that the

respondents were non-residents, citizens of West Germany, who recently suffered substantial

losses in a stock market drop. More importantly, Drexel argued that it would be unable to

enforce a final award against the respondents "substantial property . . . in West Germany"

because enforcement of a judgment arising out of losses relating to options and margin trading

would be prohibited by West German law. *Id.* at 326, 531 N.Y.S.2d at 549. Drexel asserted that

the remaining account in New York subject to attachment was the only viable source of recovery

on the award. The court concluded that

> [a] plain reading of this provision [7502(c)] indicates that . . . the
> language of the statute neither limits an order of attachment in aid
> of arbitration to the narrow circumstances set forth in CPLR 6201
> (3) nor requires that the petitioner demonstrate any affirmative
> conduct on the part of respondent(s) . . . Therefore, respondents'
> possible or likely transfer of assets from New York to West
> Germany, along with petitioner's inability to enforce the
> arbitration award in West Germany should it ultimately prevail in
> its claim against respondents, is certainly sufficient to support an
> order of attachment.

*Id.* At 323, 531 N.Y.S.2d at 550; *see also SiVault Sys.*, 2005 WL 681457 at *1, 4 (finding that

SiVault established that "the award to which SiVault may be entitled may be rendered

ineffectual," where SiVault offered testimony that WonderNet had no assets in the United States

other than the assets subject to attachment).

The Offer to Purchase establishes that PDVSA CN (identified therein as a "Borrower")

was "formed solely for the purpose of participating in the Cerro Negro Project," and that its

"only assets and activities have been those relating to the Cerro Negro Project." The Offer to

Purchase further establishes that after PDVSA purchases the bonds, the only assets of PDVSA

CN will be transferred to another entity — an "Empresa Mixta," or mixed company, with which

Mobil CN has no privity. The Offer to Purchase provides as follows:

> The assets currently utilized in the operation of the Cerro Negro
> Project and the rights to develop the related oil reserves are being
> transferred to a new *Empresa Mixta*. Moreover, as a consequence
> of the migration process initiated by Decree 5.200, Mobil CN and
> its affiliates will have no interest in the new *Empresa Mixta* which
> will carry out the activities previously carried out by the Cerro
> Negro Project. The new *Empresa Mixta* will be owned 83% by
> CVP and 16 % by British Petroleum plc, through Veba.

Baratz Decl., Ex. 2 at iv. Consequently, following the closing of PDVSA's Offer to Purchase the

outstanding bonds, the cash waterfall will be PDVSA CN's sole asset.

If the cash waterfall is not attached, PDVSA CN is virtually certain to put those funds

beyond Mobil CN's reach, and Mobil CN will have no source of recovery against PDVSA CN in

the United States, or any known source elsewhere. As a result, unless Mobil CN is able to attach

the "cash waterfall," any arbitration award it obtains against PDVSA CN in the future will be

"rendered ineffectual" because PDVSA CN will no longer have any assets.

      c.      **The Claim to Be Asserted in the ICC Arbitration Is a Cause of
Action, and the Amount Demanded From PDVSA CN Exceeds
All Counterclaims Known to Mobil CN**

The other elements required for an order of attachment are also satisfied. As a threshold

- 21 -

matter, CPLR § 7502(c) expressly authorizes a court to issue an order of attachment in aid of a

pending, or soon to be commenced, arbitration. In the ICC arbitration, Mobil CN will assert a

claim against PDVSA CN, among other things, for breach of its agreement to indemnify Mobil

CN for the Discriminatory Actions taken against Mobil CN. That claim is a cause of action for

the purposes of CPLR § 7502(c). *See SiVault Sys.,* 2005 WL 681457, at \*10-11; *Sierra USA*

*Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp.*, 824 N.Y.S.2d 560, 561 (Sup. Ct. N.Y. County

2006); *see also* Baratz Decl., Ex. 1, § 15.1. In addition, Mobil CN is not aware of any

counterclaims PDVSA CN can legitimately assert. *See* Baratz Decl., Ex. 8 ¶ 29. In any event,

the amount demanded from PDVSA CN – multiple billions of dollars in damages – would likely

far exceed all counterclaims PDVSA CN could credibly assert. *See* Baratz Decl., Ex. 9 ¶ 10

(Plunkett Decl.). Finally, no previous application has been made to this Court, or any other

court, for the relief requested herein, and no other provisional remedy has been secured or sought

in this action against this Defendant. *See* Davidson Decl. ¶ 15.

### 2.    There Is a Clear Need for the Attachment To Be Continued

The cash waterfall is PDVSA CN's only known asset in the United States. It is the only

viable source of funds available to satisfy the award that Mobil CN is likely to obtain in the ICC

arbitration. Unless Mobil CN's attachment on this asset is continued, PDVSA CN will have the

opportunity to transfer these funds out of the jurisdiction and to dissipate the funds or to take

other action to make the funds inaccessible for satisfying any arbitral award. To avoid this

possibility, the attachment should be continued pending the final outcome of this matter. *See*

*Correspondent Serv. Corp. v. J.V.W. Inv. Ltd.,* No. 99 CIV 8934 (RWS), 2000 WL 1718785, at

\*4 (S.D.N.Y. Nov. 14, 2000) (movant demonstrated a need "to avert the chance that the funds

will be transferred out of the jurisdiction"); *Alpha Petroleum Trading Co. v. Richards*, 1986 WL

3515, at *1 (levy was "necessary to provide adequate security for any judgment plaintiff may

ultimately obtain in these proceedings").[17]

## IV.    CONCLUSION

For the foregoing reasons, Mobil CN respectfully requests that this Court Confirm the

Order of Attachment.

Dated:    New York, New York
          January 2, 2008

Respectfully submitted,

Michael C. Miller (MM-4632)
STEPTOE & JOHNSON LLP
750 Seventh Avenue, Suite 1900
New York, New York 10019
tel: (212) 506-3900
fax: (212) 506-3950

Howard H. Stahl (admitted *pro hac vice*)
Steven K. Davidson (admitted *pro hac vice*)
Mark A. Moran (admitted *pro hac vice*)
Michael J. Baratz (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
tel: (202) 429-3000
fax: (202) 429-3902

*Counsel for Plaintiff*

Of Counsel:

Toni D. Hennike
Luis Marulanda del Valle
Law Department
EXXON MOBIL CORPORATION

---

[17] As discussed *supra* in Part C.1.a., there is a high probability that Mobil CN will succeed on the merits of its arbitration claims. Accordingly, for all the same reasons that this ground for attachment has been met, the third requirement of the confirmation standard — "likelihood of success on the merits" — is satisfied as well.

800 Bell Street
Houston, Texas 77002
tel:  (713) 656-3636
fax:  (713) 656-3496

Charles A. Beach (CB-6791)
Law Department
EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039-2298
tel:  (972) 444-1466
fax:  (972) 444-1435