UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

MOBIL CERRO NEGRO, LTD.,                              :

                     Plaintiff,        :     No. 07 Civ. 11590 (DAB)

         -against-                                   :     **AFFIDAVIT OF**
                                      **BRIAN O'KELLY**
PDVSA CERRO NEGRO, S.A.,                              :

                 Defendant.        :

-------------------------------------------------------------------- X

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK )

          BRIAN O'KELLY, being duly sworn, deposes and says:

          1.    I am head of the New York office of PDV USA Inc., an indirect wholly-owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"), which provides financial and market intelligence services to PDVSA, including advising PDVSA with respect to its financial transactions, assisting PDVSA in negotiation of financings, and serving as PDVSA's liaison in dealings with lenders, rating agencies and other participants in financing matters.

          2.    In that capacity, I participated in the discussions and negotiations with respect to the Cerro Negro Project debt restructuring, as described below.

          3.    I submit this affidavit in opposition to the motions of Mobil Cerro Negro, Ltd. ("Mobil CN") to confirm the *ex parte* Orders of Attachment issued on December 27, 2007 and January 8, 2008.

          4.    I am familiar with the facts stated herein, which are based upon my personal knowledge, except as to those matters which are stated upon my information and belief.

**The Cerro Negro Project**

  5.  On October 28, 1997, PDVSA Cerro Negro, S.A. ("PDVSA CN",

formerly known as Lagoven Cerro Negro, S.A.), an indirect wholly-owned subsidiary of

PDVSA, together with Mobil Producción e Industrialización de Venezuela, S.A. ("Mobil PIV")

and Veba Oel Venezuela Orinoco GmbH ("Veba Orinoco"), now known as Veba Oil & Gas

Cerro Negro GmbH, a subsidiary of British Petroleum, entered into the Cerro Negro Association

Agreement (the "Association Agreement"), to explore, develop, produce and upgrade extra

heavy crude oil from the oil reserves located in the Orinoco Oil Belt in eastern Venezuela (the

"Cerro Negro Project").

  6.  Upon information and belief, Mobil PIV subsequently assigned its rights

in the Association Agreement to Mobil CN, now a subsidiary of ExxonMobil Corporation

("ExxonMobil").

  7.  The ownership interests in the Cerro Negro Project were as follows:

PDVSA CN 41-2/3%; Mobil CN 41-2/3%; and Veba Orinoco 16-2/3%.

  8.  In June 1998, PDVSA CN and Mobil CN arranged for the financing of the

Cerro Negro Project through (i) the issuance by Cerro Negro Finance, Ltd., a special purpose

vehicle (the "Issuer"), of bonds in the original principal amount of $600,000,000 (the "Bonds")

under a Bond Indenture dated June 18, 1998 (the "Indenture") among the Issuer, PDVSA CN

and Mobil CN as guarantors, and Deutsche Bank Trust Company Americas (as successor-in-

interest to Bankers Trust Company), as Bond Trustee (the "Bond Trustee"), and (ii) a term loan

of $300,000,000 (the "Bank Debt") from certain bank lenders pursuant to a Bank Lenders Senior

Project Loan Agreement dated as of June 18, 1998 among PDVSA CN, Mobil CN, ABN AMRO

Bank N.V. as Facility Agent (the "Facility Agent"), and various bank lenders (the "Bank

Lenders").[1] The holders of the Bonds (the "Bondholders") and the Bank Lenders are collectively referred to as the "Senior Project Lenders".

        9.    PDVSA CN and Mobil CN were each ultimately liable for repayment of 50% of the Bonds and the Bank Debt (together, the "Senior Project Debt").

**The Project Accounts**

        10.    As security for the Senior Project Debt, PDVSA CN, Mobil CN, the Issuer, the Facility Agent, the Bond Trustee, The Bank of New York, as Security Trustee (the "Security Trustee"), and certain other parties entered into a Common Security Agreement dated as of June 18, 1998 (the "Common Security Agreement"), pursuant to which, among other things, the Issuer, PDVSA CN and Mobil CN agreed to certain restrictive covenants and/or pledged and granted security interests in certain assets.

        11.    Under the Common Security Agreement, the respective positions of PDVSA CN and Mobil CN in the revenues from sales of upgraded crude oil were to be deposited in a series of segregated accounts established with the Security Trustee at The Bank of New York in New York and certain local currency accounts established in Venezuela with ABN AMRO Bank, N.V., Venezuelan Branch (collectively, the "Project Accounts").

        12.    The Common Security Agreement provided that the funds in the Project Accounts were to be applied and transferred by the Security Trustee to pay Cerro Negro Project operating and maintenance costs and capital expenditures, as well as principal, interest and additional amounts due on the Senior Project Debt, with the balance available for distributions to PDVSA CN and Mobil CN (the "Cash Waterfall"), provided, *inter alia*, that no event of default

---

[1] Veba Orinoco did not participate in the financing of the Cerro Negro Project.

or prospective default then existed and relevant reserve and funding requirements and debt service coverage ratios were met.

13.    Pursuant to the Common Security Agreement, and certain other related financing documents (the "Other Financing Documents"), Mobil CN pledged and granted a security interest in its Project Accounts and all funds on deposit in such accounts to the Security Trustee as collateral for the Senior Project Debt, and Mobil CN and Mobil Cerro Negro Holding, Ltd., the shareholder of Mobil CN (the "Mobil Shareholder"), granted security interests in certain other assets related to the Cerro Negro Project, including the shares of Mobil CN and rights of Mobil CN under various Project-related agreements.

14.    PDVSA CN and its affiliates did not pledge any assets as security for the Senior Project Debt. PDVSA CN did, however, issue irrevocable instructions that all revenues from sales of upgraded crude oil and other products of the Cerro Negro Project be deposited in its Project Accounts and applied by the Security Trustee in accordance with the Cash Waterfall provisions of the Common Security Agreement.

**The Restructuring of The Senior Project Debt**

15.    In early 2007, certain changes in Venezuelan law led to a restructuring of the Cerro Negro Project. Under the new law, various projects (including Cerro Negro) were required to be converted into *Empresas Mixtas* (mixed companies) in which a PDVSA subsidiary would hold an equity interest of at least 60%.

16.    As a result of these changes in the Cerro Negro Project, certain Bondholders began expressing concerns about the state of the Cerro Negro Project, their interests in and the value of the collateral securing the Senior Project Debt, and the ability of Mobil CN and PDVSA CN to continue servicing the Senior Project Debt. On or about April 27, 2007,

-4-

PDVSA CN and Mobil CN received a notice of prospective default under the Indenture and the Common Security Agreement.

17.    As a result of the events referred to above, both PDVSA CN and Mobil CN were unable to withdraw funds in the Project Accounts that would otherwise have been available to them under the Cash Waterfall provisions of the Common Security Agreement. Consequently, the Project Accounts accumulated funds in excess of the amounts necessary to operate the Cerro Negro Project and satisfy the Borrowers' obligations with respect thereto.

18.    In response to the Bondholders' concerns and the notice of prospective default, beginning in May 2007, PDVSA CN together with Mobil CN held numerous discussions in a joint and cooperative effort to address these concerns and to develop a strategy for managing the Senior Project Debt in light of the changes in Venezuelan law and the remedial actions which the Senior Project Lenders might take. Representatives of Mobil CN and of ExxonMobil, its ultimate parent entity, expressly stated on several occasions, beginning in late June or early July 2007, that regardless of the differences which remained between the ExxonMobil companies and Venezuela with respect to the actions taken by Venezuela affecting their interests in the Cerro Negro Project, there was no reason not to cooperate in good faith to restructure the financing for the Cerro Negro Project, on which Mobil CN remained 50% liable. On information and belief, these representatives also expressly stated their intention to continue cooperating in good faith to ensure the continued supply of crude oil from the Cerro Negro Project to a refinery in Chalmette, Louisiana, which remains owned in equal parts by an ExxonMobil subsidiary and a subsidiary of PDVSA, another key area of mutual interest.

19.    On information and belief, on at least one of the occasions where the ExxonMobil entities expressed their desire to continue cooperation in matters relating to the

restructuring of the financing and the crude oil supply, the ExxonMobil delegation was headed by Mr. J.R. Massey – the same representative who has submitted a Declaration in support of Mobil CN's motion for an *ex parte* attachment order in this case.

20.    In furtherance of this cooperation, effective June 1, 2007, PDVSA CN and Mobil CN jointly hired a financial advisor, Lazard Frères & Co. LLC ("Lazard"), to advise them on all financial aspects of the restructuring of the Senior Project Debt. Thereafter, there were various meetings among PDVSA CN, Mobil CN and Lazard in which the representatives of Mobil CN continued to express their view that, despite their disagreements with the legal measures affecting their interests in the Cerro Negro Project, it was in the interest of both parties to cooperate in the restructuring of the Senior Project Debt.

21.    Throughout the process of negotiating with the Bank Lenders and the Bondholders, it was clear that the interests of PDVSA CN and Mobil CN with regard to the restructuring of the Senior Project Debt were generally aligned. From the earliest discussions concerning the debt restructuring, it was understood that one of the principal and fundamental economic objectives was to accomplish the release of the funds of both Mobil CN and PDVSA CN that had been trapped in the Project Accounts, and that could not be released without consent of the Bondholders.

22.    In furtherance of that objective and others, PDVSA ultimately agreed to purchase the Bonds from the Bondholders pursuant to a tender offer and consent solicitation (the "Tender Offer") and repay the Bank Debt in full, taking sole responsibility for the purchase and repayment, including the obligations of Mobil CN – a process which would ultimately take seven months to accomplish and would require extensive documentation and coordination among PDVSA CN and Mobil CN.

-6-

23.     On November 14, 2007, PDVSA entered into a Lock-Up Agreement (the "Lock-Up Agreement") with the holders of approximately 79% in aggregate principal amount of the outstanding Bonds (the "Lock-Up Holders"). The Lock-Up Agreement set forth the general terms and conditions of, and the obligations and commitments of the parties with respect to, the Tender Offer.

24.     Throughout the negotiations with the Bondholders, Mobil CN was kept apprised of the status of the negotiations and was provided with drafts of the Lock-Up Agreement and related Term Sheet for its review and comment. In fact, a number of revisions to the Lock-Up Agreement and Term Sheet were made in response to comments raised by Mobil CN and its representatives, including its counsel, Latham & Watkins LLP ("Latham & Watkins").

25.     Pursuant to the Lock-Up Agreement, PDVSA agreed to commence the Tender Offer for 100% of the Bonds at a price equal to 100% of their outstanding principal amount and accrued and unpaid interest thereon, plus a premium equal to 33% of the redemption premium which would have been payable on the Bonds in an optional redemption by the Issuer under the Indenture, and to consummate the Tender Offer and pay the tendering Bondholders no later than December 31, 2007. If the Tender Offer could not be completed by that date, PDVSA agreed (subject to certain exceptions) to purchase the Bonds held by the Lock-Up Holders in a direct sale no later than December 31, 2007.

26.     The Lock-Up Agreement contemplated that the Tender Offer would include a consent solicitation pursuant to which PDVSA would solicit consents from the Bondholders to vote their Bonds to approve a number of amendments to the Indenture, the Common Security Agreement and the Other Financing Documents to, among other things: (i)

-7-

waive any existing defaults, "Prospective Defaults" and "Events of Default" (as defined in the

Common Security Agreement) resulting from the events in Venezuela, including any such

defaults by Mobil CN, (ii) eliminate all or substantially all of the covenants and events of default

under the Indenture, the Common Security Agreement and the Other Financing Documents, (iii)

release all of the collateral and other property of Mobil CN, the Mobil CN Shareholder and

PDVSA CN securing the Senior Project Debt (the "Collateral"), including the release and

distribution of all funds on deposit in the Project Accounts to Mobil CN and PDVSA CN, and

(iv) direct the Security Trustee to release all security interests created under the Common

Security Agreement and the Other Financing Documents and to terminate certain of these

agreements. The Lock-Up Agreement also contemplated that PDVSA would repay the Bank

Debt in full upon completion of the Tender Offer (the "Bank Debt Repayment").

27.    Thus, all parties understood that upon the purchase of the Bonds by

PDVSA and the Bank Debt Repayment, the funds in the Project Accounts would be released and

transferred as directed by Mobil CN and PDVSA CN, each with respect to its own funds. All

parties, including Mobil CN, knew that the release of the funds was an essential condition of the

transaction, which presumably is why Mobil CN did not reveal the fact that it intended to breach

its express and implied representations of good faith cooperation in consummating the

transaction, as detailed below.

28.    The Lock-Up Holders agreed in the Lock-Up Agreement to, among other

things, tender their Bonds and deliver their consents no later than 10 business days after the

commencement of the Tender Offer and not to withdraw the tender of their Bonds or their

consent prior to the closing of the Tender Offer (subject to certain exceptions). The Lock-Up

Holders also agreed not to take any actions with respect to the Cerro Negro Project, PDVSA CN

and/or Mobil CN or the Bonds that would interfere with the operation of the Cerro Negro Project in the ordinary course, or adversely affect the Borrowers or the Cerro Negro Project, including, without limitation, (i) giving or instructing the Bond Trustee or the Security Trustee to give any notices of default to Mobil CN and/or to PDVSA CN, (ii) taking or joining in any other action or instructing the Bond Trustee or the Security Trustee to take any action to exercise or enforce any remedies, including against Mobil CN and/or PDVSA CN, and (iii) objecting to or interfering with any request for withdrawals of funds from the Project Accounts to pay for operating and maintenance costs of the Cerro Negro Project (the "Standstill Undertakings").

29.    The undertakings under the Lock-Up Agreement provided Mobil CN with significant benefits, at minimal cost to Mobil CN.  These benefits included the protections afforded by the Standstill Undertakings and the prospect that the Senior Project Debt would be consensually restructured and/or repaid upon a successful completion of the Tender Offer, which would result in the release of all Collateral, including the release of Mobil CN's funds in the Project Accounts.  At no point did PDVSA request or require that Mobil CN assume any obligations under the Lock-Up Agreement, despite the fact that Mobil CN was liable for repayment of 50% of the Senior Project Debt.

30.    In November 2007, the documentation relating to the Tender Offer was prepared, including the Omnibus Termination Agreement (the "Termination Agreement"), which was the definitive agreement among PDVSA CN, Mobil CN and each of their respective affiliates, the Senior Project Lenders, the Facility Agent, the Bond Trustee and the Security Trustee relating to the amendment and termination of the Common Security Agreement and certain of the Other Financing Documents, the release of the Collateral and the waivers of any

defaults and events of default under the Common Security Agreement and the Other Financing Documents. The Termination Agreement is attached hereto as Exhibit A.

31.    Mobil CN was provided with drafts of the Termination Agreement for its review and comment prior to the commencement of the Tender Offer and a number of revisions were made to the Termination Agreement to address concerns raised by Mobil CN.

32.    The parties to the Termination Agreement included PDVSA, PDVSA CN, PDVSA Petróleo, S.A. (the shareholder of PDVSA CN), Mobil CN, Mobil Corporation ("Mobil"), the Mobil Shareholder, the Security Trustee, the Bond Trustee and the Facility Agent. The Termination Agreement is governed by New York law.

33.    By the terms of the Termination Agreement, the parties, including Mobil CN, agreed to: (i) amend and the terminate the Common Security Agreement and the Other Financing Documents specified therein, (ii) eliminate substantially all of the restrictive covenants and events of default to which both PDVSA CN and Mobil CN were subject under the Indenture, the Common Security Agreement and the Other Financing Documents, (iii) release all of the Collateral, including the funds of PDVSA CN and Mobil CN in the Project Accounts, (iv) waive any and all prior and existing defaults, "Prospective Defaults," "Events of Default" and "Declared Events of Default" under the Indenture, the Common Security Agreement and the Other Financing Documents, and (v) rescind any prior or existing notices of default or "Prospective Default" delivered pursuant to the Indenture and the Common Security Agreement.

34.    With respect to the Collateral, Section 3(b)(i) of the Termination Agreement provides that both PDVSA CN and Mobil CN would be entitled to the return of their respective funds in the Project Accounts:

The Security Trustee shall . . . (i) pay, assign, transfer and deliver to (A) the PDVSA Borrower, by wire transfer to an account designated in writing by the PDVSA Borrower, all of the funds and investments (if any) held in (1) the Project Accounts (and sub-accounts) of the PDVSA Borrower, (2) the Senior Debt Service Account, (3) the O&M Account, and (4) the Local Currency O&M Account (or, at the request of the PDVSA Borrower, retain such funds in the applicable Project Accounts specified by the PDVSA Borrower until further directed by the PDVSA Borrower), and (B) the Mobil Borrower, by wire transfer to an account designated in writing by the Mobil Borrower, all of the funds and investments (if any) held in the Project Accounts (and sub-accounts) of the Mobil Borrower, other than the funds held in (i) the Senior Debt Service Reserve Account, fifty percent (50%) of which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower) (in full satisfaction of the Subordinated Debt owing by the Mobil Borrower to the PDVSA Borrower as provided in Section 5.05(b) of the Common Security Agreement and that certain Inter-Sponsor Agreement dated as of June 18, 1998 among Mobil, PDVSA, the Shareholders and the Borrowers) and fifty percent (50%) of which shall be distributed to the Mobil Borrower and (ii) the Project Accounts (and sub-accounts) specified in clause (A) of this subsection (b)(i) (which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower, as provided in clause (A) of this subsection (b)(i)).

(Termination Agreement § 3(b)(i)).

35.    The Termination Agreement also contained an express representation and warranty by Mobil CN and the other Sponsor Parties (as defined therein), which included Mobil CN's affiliates, as follows:

Each of the Sponsor Parties hereby represents and warrants that, as of the date of [the Termination] Agreement:

(d)    there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment (including without limitation any foreign exchange controls for which appropriate approvals and other similar authorizations have not been obtained), no provision of its charter or other

-11-

> constitutive documents and no provision of any mortgage,
> indenture, contract or other agreement binding on it or
> affecting its properties <u>that</u>, in each case, <u>would prohibit,</u>
> <u>conflict with or in any way prevent the execution, delivery</u>
> <u>or performance of the terms of this Agreement</u>.

Termination Agreement, § 6(d) (emphasis added).

36.    As stated above, an essential economic objective of the bond repurchase, clearly understood by all parties, was to attain the release of the funds which were trapped in the Project Accounts of PDVSA CN and Mobil CN.

37.    The obvious purpose of the representation and warranty contained in § 6(d) of the Termination Agreement was to ensure that the Termination Agreement could be fully performed, and that each party, including PDVSA CN, would obtain the benefits thereunder, including the release of the funds in the Project Accounts to be transferred as directed by PDVSA CN – which PDVSA CN is now prevented from doing due to the December 27 *ex parte* Order of Attachment. I would be very surprised if any party to the debt restructuring, including Mobil CN, understood the representation and warranty contained in § 6(d) of the Termination Agreement to mean anything other than that no party would undertake any action that would prevent the release of PDVSA CN's funds in the Project Accounts as directed by PDVSA CN, including by secretly attaching those funds at the moment the Termination Agreement became effective, as Mobil CN did here.

38.    In accordance with the terms of the Termination Agreement, counsel for PDVSA CN and counsel for Mobil CN executed a funds flow memorandum on behalf of their respective clients (the "Funds Flow Memorandum") which, among other things, instructed the Security Trustee as to the manner in which the funds of PDVSA CN and Mobil CN on deposit in the Project Accounts should be distributed or transferred at the time of the closing of the Tender Offer and the Bank Debt Repayment.

39.     The Termination Agreement provided substantial economic benefit to Mobil CN. In addition to the release of the funds in the Mobil CN Project Accounts, the Termination Agreement also provided for the release to Mobil CN of the other Collateral, including the following items of Collateral which were returned to and/or released for the benefit of Mobil CN, the Mobil Shareholder and Mobil at the closing of the Tender Offer and Bank Debt Repayment: (i) the shares owned by Mobil in Operadora Cerro Negro, S.A., the operating company for the Cerro Negro Project, (ii) the shares owned by Mobil CN in Petrolera Cerro Negro, S.A., the management company for the Cerro Negro Project, (iii) the shares owned by the Mobil Shareholder in Mobil CN, (iv) the rights of Mobil CN under certain commercial agreements relating to the Cerro Negro Project, and (v) the other Collateral referred to in the Common Security Agreement.

40.     Mobil CN had an interest in ensuring that the Tender Offer and Bank Debt Repayment would be consummated, as the financial restructuring resulted in numerous significant economic benefits to Mobil CN and its affiliates. These included: (i) the repayment and discharge of all of the Bank Debt, including the fifty percent (50%) for which Mobil CN was liable, (ii) the release of all of the Collateral of Mobil, the Mobil Shareholder and Mobil CN, including approximately $242 million which were on deposit in the Project Accounts of Mobil CN, (iii) the elimination of nearly all of the covenants and events of default in the Indenture, Common Security Agreement and the Other Financing Documents to which Mobil, the Mobil Shareholder and Mobil CN were subject, and (iv) the waiver of all prior and existing defaults and events of default under the Indenture, the Common Security Agreement and the Other Financing Documents. Although the Bonds purchased by PDVSA in the Tender Offer have not yet been cancelled and remain outstanding, nearly all of the protections and covenants securing the

-13-

Bonds, and the burdens on Mobil CN as a borrower associated therewith, have been eliminated (other than the obligation to repay the Bonds in accordance with their original terms).

41.     Mobil CN would not have obtained these benefits if it had merely repaid its 50% of the obligations on the Senior Project Debt. In such event, Mobil CN's funds in the Project Accounts would have remained subject to the liens as provided in the Common Security Agreement and thus could not have been released. Short of a repayment in full of the Senior Project Debt (which would have necessitated the payment of 100% of the redemption premium on the Bonds at a cost of approximately $65 million in excess of the amount paid by PDVSA in the Tender Offer and Bank Repayment), Mobil CN's funds in the Project Accounts could only be released to it upon completion of a restructuring transaction satisfactory to the Senior Project Lenders, such as the Tender Offer and Bank Repayment, which PDVSA undertook to do and, in fact, did.

42.     In consummating the Tender Offer and the Bank Debt Repayment, PDVSA did not request or require Mobil, the Mobil Shareholder or Mobil CN to contribute any funds or make any payments, even though the ExxonMobil entities would reap considerable benefits from this transaction. PDVSA bore nearly all of the costs associated with the Tender Offer and Bank Debt Repayment.

**The Closing**

43.     The Tender Offer commenced on November 29, 2007.

44.     On December 28, 2007, PDVSA purchased in excess of 99% of the then outstanding principal amount of the Bonds, for a total purchase price of $501,140,755.74, and repaid the Bank Debt in full in the amount of $129,409,354.69.

45.    At approximately 1:50 pm on December 28, 2007, all parties confirmed that all conditions in connection with the Tender Offer and Bank Debt Repayment had been satisfied, other than the payment conditions.

46.    Starting at approximately 2:30 pm and up until 4:49 pm on December 28, 2007, representatives of the Bondholders and the Bank Lenders sent confirmations that they had received payment pursuant to the Tender Offer and Bank Debt Repayment.

47.    Upon the final confirmation of receipt of wire transfer pursuant to the Bank Debt Repayment at 4:49 pm on December 28, 2007, the Tender Offer and Bank Debt Repayment were completed, the Termination Agreement became effective, and the Closing became effective.

**Mobil CN's Attachment of PDVSA CN's
Assets in the New York Project Accounts**

48.    Upon information and belief, following the Closing, and in compliance with the terms of the Termination Agreement and the Funds Flow Memorandum, the Security Trustee released all of Mobil CN's Collateral and, in connection therewith, transferred $242,099,049.22 from Mobil CN's Project Accounts to an account of Exxon Overseas Investment Corporation.

49.    However, the Security Trustee cannot transfer the funds in PDVSA CN's Project Accounts because at 4:10 pm on December 28, 2007 – forty minutes before the Termination Agreement became effective – Mobil CN, unbeknownst to PDVSA CN, served a levy upon the monies contained in PDVSA CN's Project Accounts in New York.

50.    Despite assurances from Mobil CN's representatives that it would cooperate in PDVSA's efforts to successfully restructure the Senior Project Debt – a restructuring that was designed and intended by the parties to benefit both PDVSA CN and

-15-

Mobil CN – and despite the express representation made by the Mobil parties in the Termination Agreement that no order existed which would prevent the consummation of the transactions, at no time prior to the launch of the Tender Offer or its completion did Mobil CN or its representatives disclose their intention to seek the attachment of PDVSA CN's assets and prevent the Security Trustee from transferring the funds in PDVSA CN's Project Accounts. Nor did they reveal the existence of the Order of Attachment which they had obtained the day before the Closing, even though their counsel, Latham & Watkins, as well as an officer of ExxonMobil, were in attendance at the Closing, feigning continued cooperation in good faith while another law firm was working behind the scenes preparing this attachment.

51.    As a result of Mobil CN's action in attaching the funds in the PDVSA CN Project Accounts, PDVSA CN has been deprived of the benefits of the restructuring. Mobil CN, on the other hand, has been able to obtain the full benefits of the restructuring, only by breaching its express and implied representations of cooperation in the transactions and its express representation in the Termination Agreement that no order existed which "would prohibit, conflict with or in any way prevent the execution, delivery or performance" of that Agreement, including the release by the Security Trustee of PDVSA CN's funds at its direction.

BRIAN O'KELLY

Sworn to before me this
23rd day of January 2008

Notary Public

GLORIA DIAZ-BUJAN
Notary Public, State of New York
No. 01DI4701327
Qualified in New York County
Commission Expires April 30, 20___

-16-

# EXHIBIT A

# OMNIBUS TERMINATION AGREEMENT

This OMNIBUS TERMINATION AGREEMENT (this "Agreement"), dated as of December 28, 2007, is entered into by and among:

MOBIL CORPORATION., a corporation incorporated under the laws of the State of Delaware ("Mobil");

MOBIL CERRO NEGRO HOLDING, LTD., a Delaware corporation (the "Mobil Shareholder");

MOBIL CERRO NEGRO, LTD., a Bahamas corporation (the "Mobil Borrower");

EXXONMOBIL SALES & SUPPLY LLC, a Delaware limited liability company, as successor-in-interest to Mobil Sales & Supply Corporation ("Mobil Marketing");

PETRÓLEOS DE VENEZUELA, S.A., a *sociedad anónima* organized under the laws of the Bolivarian Republic of Venezuela ("PDVSA");

PDVSA PETRÓLEO, S.A. (formerly known as PDVSA Petróleo y Gas, S.A.), a *sociedad anónima* organized under the laws of the Bolivarian Republic of Venezuela, as successor-in-interest to Lagoven, S.A. (the "PDVSA Shareholder," and together with the Mobil Shareholder, the "Shareholders");

PDVSA CERRO NEGRO, S.A., a *sociedad anónima* organized under the laws of the Bolivarian Republic of Venezuela (the "PDVSA Borrower" and together with the Mobil Borrower, collectively, the "Borrowers");

CERRO NEGRO FINANCE, LTD., a Cayman Islands exempted company, as issuer (the "Issuer", and together with Mobil, Mobil Marketing, PDVSA, the Shareholders and the Borrowers, the "Sponsor Parties");

ABN AMRO BANK N.V., a bank organized under the laws of The Netherlands, as Facility Agent for the Bank Lenders (the "Facility Agent");

DEUTSCHE BANK TRUST COMPANY AMERICAS, successor-in-interest to BANKERS TRUST COMPANY, not in its individual capacity except as expressly set forth in the Common Security Agreement referred to below, but solely as Bond Trustee (the "Bond Trustee");

THE BANK OF NEW YORK, a New York banking corporation, not in its individual capacity except as expressly set forth in the Common Security Agreement referred to below, but solely as Security Trustee (the "Security Trustee");

4038117v10

**ABN AMRO BANK N.V.**, Venezuelan Branch, as trustee under that certain Trust Agreement dated June 17, 1998 (the "Venezuelan Accounts Trustee");

**HOLLANDSCHE BANK-UNIE N.V.**, a bank organized under the laws of The Netherlands, as Financial Institution (the "Financial Institution");

**VEBA OIL & GAS CERRO NEGRO GMBH**, a corporation incorporated under the laws of Germany, as successor-in-interest to Veba Oel Venezuela Orinoco GMBH ("Veba"); and

**DEUTSCHE BP AG**, a corporation organized under the laws of Germany, as successor-in-interest to Veba Oel AG ("Deutsche BP").

Capitalized terms used but not otherwise defined in this Agreement have the meanings assigned to them in the Common Security Agreement referred to below.

## RECITALS:

A.    Mobil, the Mobil Shareholder, the Mobil Borrower, PDVSA, the PDVSA Shareholder, the PDVSA Borrower, Veba, Deutsche BP, the Issuer, the Facility Agent, the Bond Trustee, the Security Trustee, the Financial Institution, the Venezuelan Accounts Trustee and the Senior Project Lenders were participants (the "Project Financing Participants") in the financing of the Cerro Negro extra-heavy crude oil project (the "Project");

B.    The Issuer, the Mobil Borrower, the PDVSA Borrower and the Bond Trustee are parties to that certain Indenture dated as of June 18, 1998 (the "Indenture"), pursuant to which the Issuer issued certain 7.33% bonds due 2009, 7.90% bonds due 2020 and 8.03% bonds due 2028 (collectively, the "Bonds");

C.    Pursuant to those certain Participation Agreements dated as of June 18, 1998, the proceeds of the issuance of the Bonds were applied by the Issuer towards the purchase of participation interests in the Loans made to each Borrower under those certain Financial Institution Loan Agreements and Promissory Notes dated as of June 18, 1998 between the Financial Institution and each of the Borrowers (the "Financial Institution Loan Agreements");

D.    The Borrowers, the Facility Agent and the bank lenders referred to therein (the "Bank Lenders") are parties to that certain Bank Lenders Senior Project Loan Agreement dated as of June 18, 1998 (the "Bank Lenders Senior Project Loan Agreement"), pursuant to which the Bank Lenders made certain loans to the Borrowers (the "Bank Debt");

E.    As security and in consideration for the Bank Debt, the Bonds and the Financial Institution Loans, the Mobil Shareholder, the Mobil Borrower, the PDVSA Shareholder, the PDVSA Borrower, the Issuer, the Facility Agent, the Bond Trustee, the Security Trustee and the Financial Institution entered into that certain Common Security Agreement dated as of June 18, 1998 (the "Common Security Agreement"), pursuant to which, among other

things, the Borrowers, the Shareholders and the Issuer granted security interests in the Collateral for the benefit of the Senior Project Lenders and/or agreed to certain covenants;

F.      On or about the date hereof, PDVSA has consummated a tender offer and consent solicitation pursuant to which PDVSA has purchased __% of the outstanding Bonds (the "Tender Offer") from the holders thereof (the "Tendering Bondholders") and, in connection therewith, obtained the consents and agreements of the Tendering Bondholders to, among other things, (i) (A) adopt certain proposed amendments to the Indenture, (B) amend the Common Security Agreement and the Other Financing Documents (as defined in the Offer to Purchase and Consent Solicitation Statement dated November 29, 2007 relating to the Tender Offer) (the "Other Financing Documents," and together with the Common Security Agreement, the "Project Financing Documents") to provide for the termination of the Project Financing Documents upon the consent of Holders of more than 75% of the aggregate principal amount of the Bonds and all of the Bank Lenders, and (C) terminate the Common Security Agreement and the Other Financing Documents, in order to (x) eliminate substantially all of the restrictive covenants and Events of Default under the Common Security Agreement and the Other Financing Documents, (y) release the liens on all of the collateral securing the Bonds and the other Senior Project Debt under the Common Security Agreement and the Other Financing Documents, and (z) supplement, modify or eliminate certain other provisions of the Indenture; and (ii) (A) waive any and all prior and existing defaults, Prospective Defaults, Events of Default and Declared Events of Default under the Indenture, the Common Security Agreement and the other Financing Documents, and (B) rescind any prior or existing notices of default or Prospective Default delivered pursuant to the Indenture and the Common Security Agreement (the proposed amendments, terminations and release of Collateral described in (i) above and the waivers and rescissions described in (ii) above, together with any and all agreements, documents and instruments giving effect to such amendments, terminations, release of Collateral, waivers and rescissions, are referred to herein collectively as the "Structural Amendments");

G.      In connection with the Tender Offer, the Issuer, the Mobil Borrower, the PDVSA Borrower and the Bond Trustee, on behalf of the holders of all of the Bonds (the "Bondholders"), have entered into a Supplemental Indenture dated as of the date hereof (the "Supplemental Indenture") to, among other things, give effect to the Structural Amendments (as applicable), including to authorize the Security Trustee to enter into this Agreement and implement the terms hereof;

H.      On or about the date hereof, PDVSA has, on behalf of the Borrowers, repaid 100% of the Loans and the other obligations outstanding under the Bank Lenders Senior Project Loan Agreement (the "Bank Debt Repayment");

I.      In connection with the Bank Debt Repayment, the Facility Agent and the Bank Lenders executed and delivered that certain Payoff Letter dated as of the date hereof (the "Payoff Letter"), for the benefit of the Mobil Borrower and the PDVSA Borrower, pursuant to which the Bank Lenders, subject to the Bank Debt Repayment, (i) acknowledged and agreed that 100% of the Loans and other obligations outstanding under the Bank Lenders Senior Project Loan Agreement have been repaid, satisfied and discharged in full and (ii) agreed to the Structural Amendments (as applicable), and have instructed the Facility Agent (a) to enter into

3

this Agreement and implement the terms hereof and (b) to instruct the Security Trustee to enter into this Agreement and implement the terms hereof; and

J.    To facilitate the implementation of the Structural Amendments, the Project Financing Participants (as applicable) have agreed to enter into this Agreement to (i) terminate each of the Terminated Agreements (as defined in Section 2(a) hereof), (ii) release and discharge the liens on all of the Collateral securing the Senior Project Debt Obligations, (iii) waive any and all prior and existing defaults, Prospective Defaults, Events of Default and Declared Events of Defaults under the Common Security Agreement and the other Financing Documents, and (iv) rescind any prior or existing notices of default or Prospective Default delivered pursuant to the Common Security Agreement.

NOW, THEREFORE, to give effect to the foregoing, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    *Amendment of Financing and Project Documents.*

(a)    The applicable Project Financing Participants hereby agree that Section 15.02 of the Common Security Agreement is hereby amended by inserting the following at the end of such Section:

"Notwithstanding the foregoing conditions set forth in clauses (a) and (b) above, upon the written consent of (i) Bondholders holding more than 75% of the aggregate principal amount of the Bonds then outstanding and (ii) each Bank Lender, this Agreement, the Financing Documents, the Offtake Support Agreement, the Offtake Support Assignment, the Security Documents (including, without limitation, (A) the Mobil Local Currency Accounts Trust Agreement dated as of June 17, 1998 among the Mobil Borrower and the Venezuelan Accounts Trustee, (B) the Custody Agreement dated as of June 18, 1998 among the PDVSA Borrower and the Security Trustee, (C) the Custody Agreement dated as of June 18, 1998 among the PDVSA Shareholder and the Security Trustee, (D) the Pledge Agreement dated as of June 18, 1998 among Mobil and the Security Trustee (regarding the shares of Mobil in the Operating Company), (E) the Pledge Agreement dated as of June 18, 1998 among the Mobil Borrower and the Security Trustee (regarding the shares of the Mobil Borrower in the Management Company), and (F) the Pledge Agreement dated as of June 18, 1998 among the Mobil Borrower and the Security Trustee (regarding rights under the Chalmette Offtake Agreement, the Stork Licensing Agreement, the Foster Wheeler Licensing Agreement and the Financial Institution Guarantee)), the Veba Oel Guarantee and the Veba OVO Support Agreement, and the security

interests and rights created by or pursuant to this Agreement or any Security Document, shall terminate."

(b)    In furtherance of subsection (a) hereof, to the extent necessary, the parties hereto agree that each Terminated Agreement (as defined below) other than the Common Security Agreement shall be deemed to have been amended hereby, *mutatis mutandis*, to provide that such Terminated Agreement may be terminated as provided in Section 15.02 of the Common Security Agreement; *provided, however*, that the Veba Oel Guarantee and the Veba OVO Support Agreement (each as defined in the Common Security Agreement) (the "Veba Agreements") shall not be deemed to have been amended until all of the parties thereto have executed and delivered their respective signature pages to this Agreement  (it being acknowledged and agreed, for the avoidance of doubt, that the deemed amendment of all other Terminated Agreements shall be effective upon execution and delivery of this Agreement by all of the other parties hereto).

2.    *Termination of Financing and Project Documents.*

(a)    The applicable Project Financing Participants hereby acknowledge and agree that (1) each of the following agreements (collectively, the "Terminated Agreements") are hereby terminated, discharged and of no further force and effect (except as set forth in the parenthetical in clause (2) below) and (2) all of the rights, obligations, liabilities, agreements, covenants and conditions of each of the parties thereunder are hereby released, discharged and terminated in full (in each case, other than any such rights, obligations, liabilities, agreements, covenants and conditions which expressly survive the termination of such Terminated Agreement):

(i)    Common Security Agreement;

(ii)    Custody Agreement dated as of June 18, 1998 among the PDVSA Borrower and the Security Trustee;

(iii)    Custody Agreement dated as of June 18, 1998 among the PDVSA Shareholder and the Security Trustee;

(iv)    Mobil Local Currency Accounts Trust Agreement dated June 17, 1998 among the Mobil Borrower and the Venezuelan Accounts Trustee (the "Mobil Local Accounts Trust Agreement");

(v)    Pledge Agreement dated as of June 18, 1998 among Mobil and the Security Trustee (regarding the shares of Mobil in the Operating Company);

(vi)    Pledge Agreement dated as of June 18, 1998 among the Mobil Borrower and the Security Trustee (regarding the shares of the Mobil Borrower in the Management Company);

(vii)    Pledge Agreement dated as of June 18, 1998 among the Mobil Borrower and the Security Trustee (regarding rights under the Chalmette Offtake Agreement, the

5

Stork Licensing Agreement, the Foster Wheeler Licensing Agreement and the Financial Institution Guarantee) (the "Rights Pledge Agreement");

       (viii)   Mobil Corporation Chalmette Offtake Guarantee for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 among Mobil and the Security Trustee;

       (ix)   PDVSA Chalmette Offtake Guarantee for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 between PDVSA and the Security Trustee;

       (x)   Offtake Support Agreement for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 among the Mobil Borrower, the PDVSA Borrower, Mobil Marketing and the Security Trustee;

       (xi)   Offtake Support Assignment for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 among Mobil Marketing and the PDVSA Shareholder;

       (xii)   Offtake Support Agreement Guarantee for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 among Mobil and the Security Trustee;

       (xiii)   Offtake Support Assignment Guarantee for the Extra Heavy Crude Oil Project dated as of June 18, 1998 among PDVSA and the Security Trustee;

       (xiv)   Transfer Restrictions Agreement dated as of June 18, 1998 among Mobil, the Mobil Borrower, PDVSA, the PDVSA Borrower, the Bond Trustee, the Facility Agent and the Security Trustee;

       (xv)   Veba OVO Support Agreement for the Extra Heavy Crude Oil Project dated as of June 18, 1998 among Veba and the Security Trustee;

       (xvi)   Veba Oel AG Support Guarantee for the Cerro Negro Extra Heavy Crude Oil Project dated as of June 18, 1998 among Deutsche BP and the Security Trustee; and

       (xvii)   Irrevocable Payment Instructions of the PDVSA Borrower dated as of June 18, 1998 (the "PDVSA Borrower Irrevocable Payment Instructions").

The foregoing notwithstanding, neither of the Terminated Agreements referred to in clauses (xv) and (xvi) above shall be terminated or discharged until all of the parties thereto have executed and delivered their respective signature pages to this Agreement (it being acknowledged and agreed, for the avoidance of doubt, that the termination and discharge of all other Terminated Agreements shall be effective upon execution and delivery of this Agreement by all of the other parties hereto).

       (b)   References to a Terminated Agreement in any Project-related agreement, document or instrument which is not being terminated hereunder shall be deemed to be amended, *mutatis mutandis*, to reflect the termination of such Terminated Agreement and the release,

discharge and termination in full of the parties' rights, obligations, liabilities, agreements, covenants and conditions thereunder.

3.    *Release of Liens.*

(a)    The Security Trustee and, with respect to the Local Currency Accounts, the Venezuelan Accounts Trustee, on behalf of itself and the other Senior Project Lenders (acting at the direction of the requisite percentage of such Senior Project Lenders under the applicable Senior Project Loan Agreement or Financing Document), hereby acknowledges and agrees that the liens, security interests and trusts (collectively, the "Liens") existing on or with respect to the Collateral and the other assets and properties of the Sponsor Parties under the Common Security Agreement, the Security Documents or the other Financing Documents are hereby irrevocably released, discharged and terminated, automatically and without any further action by or on behalf of the Security Trustee or the other Senior Project Lenders, including, without limitation, the Liens on and with respect to the following assets and properties: (i) the Project Accounts, (ii) any insurance policy with non-Venezuelan insurers, (iii) the Management Company Shares, (iv) the Mobil Borrower Shares, (v) the Operator Shares, (vi) the PDVSA Borrower Shares, (vii) any Subordinated Debt and the Subordinated Notes, (viii) the Bond Proceeds Account, the Participation Certificates and the rights of the Issuer under the Participation Agreements and Financial Institution Guarantee, (ix) Expropriation Compensation, (x) the rights under the Chalmette Offtake Agreement, the Foster Wheeler Licensing Agreement, the Stork Licensing Agreement and the Post-Closing Project Agreements, (xi) all rights under the Assignment Agreements, and (xii) rights under the Permitted Hedge Agreements.  For the avoidance of doubt, (A) the irrevocable payment instructions of the PDVSA Borrower under the Common Security Agreement (including, without limitation, under Article 5 thereof) and the PDVSA Borrower Irrevocable Payment Instructions are hereby released and discharged in all respects, and (B) the power of attorney granted to the Security Trustee under Section 6.11(c) of the Common Security Agreement is hereby revoked.

(b)    In furtherance of subsection (a) above, the Security Trustee (and, with respect to the Local Currency Accounts, the Venezuelan Accounts Trustee), shall, upon payment of its fees and expenses, at the cost and expense of the applicable Sponsor Party, promptly:

(i)    pay, assign, transfer and deliver to (A) the PDVSA Borrower, by wire transfer to an account designated in writing by the PDVSA Borrower, all of the funds and investments (if any) held in (1) the Project Accounts (and sub-accounts) of the PDVSA Borrower, (2) the Senior Debt Service Account, (3) the O&M Account, and (4) the Local Currency O&M Account (or, at the request of the PDVSA Borrower, retain such funds in the applicable Project Accounts specified by the PDVSA Borrower until further directed by the PDVSA Borrower), and (B) the Mobil Borrower, by wire transfer to an account designated in writing by the Mobil Borrower, all of the funds and investments (if any) held in the Project Accounts (and sub-accounts) of the Mobil Borrower, other than the funds held in (i) the Senior Debt Service Reserve Account, fifty percent (50%) of which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower) (in full satisfaction of the Subordinated Debt owing by the Mobil Borrower to the PDVSA Borrower as provided in Section 5.05(b) of the Common Security Agreement and

7

that certain Inter-Sponsor Agreement dated as of June 18, 1998 among Mobil, PDVSA, the Shareholders and the Borrowers) and fifty percent (50%) of which shall be distributed to the Mobil Borrower and (ii) the Project Accounts (and sub-accounts) specified in clause (A) of this subsection (b)(i) (which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower, as provided in clause (A) of this subsection (b)(i)));

(ii)    deliver to the applicable pledgors physical possession of any share certificates, stocks powers, participation certificates and other instruments delivered to the Security Trustee as Collateral, including without limitation, with respect to (i) the Operator Shares pledged by Mobil, (ii) the Management Company Shares pledged by the Mobil Borrower, (iii) the Mobil Borrower Shares pledged by the Mobil Shareholder, (iv) the Management Company Shares transferred by the PDVSA Borrower to the Security Trustee pursuant to the Custody Agreement, (v) the PDVSA Borrower Shares transferred by the PDVSA Shareholder to the Security Trustee pursuant to the Custody Agreement and (vi) the Participation Certificates pledged by the Issuer;

(iii)    at the request of a Sponsor Party, execute, deliver and/or file Uniform Commercial Code termination statements and such other termination statements, releases, deeds, satisfactions, documents and instruments under New York law, Venezuelan law or other applicable law as are necessary or reasonably requested by such Sponsor Party in connection with the release and termination of the Liens hereunder, including without limitation, executing, delivering, notarizing and filing an agreement for the termination of the Mobil Local Accounts Trust Agreement and the Rights Pledge Agreement and executing and delivering notices of termination of the Assignment and Acknowledgement Agreements with respect to the Foster Wheeler Licensing Agreement and the Stork Licensing Agreement; and

(iv)    deliver to each of the Sponsor Parties (as applicable) any other assets or property of such Sponsor Party constituting Collateral in the Security Trustee's possession or control.

The Sponsor Parties are hereby authorized to file all Uniform Commercial Code termination statements and such other termination statements, releases, documents, instruments as are necessary or advisable under New York law, Venezuelan law or any other applicable law to release or terminate any and all Liens in and to the Collateral.

4.    *Waivers.* Each of the Security Trustee, the Bond Trustee, the Facility Agent and the Financial Institution, on behalf of itself and the other Senior Project Lenders whom it represents (acting at the direction of the requisite percentage of such Senior Project Lenders under the applicable Senior Project Loan Agreement or Financing Document), hereby waives any and all defaults, Prospective Defaults, Events of Default and Declared Events of Default of any nature whatsoever under the Indenture, the Bank Lenders Senior Project Loan Agreement, the Common Security Agreement and the other Financing Documents existing or continuing on or prior to the date hereof, and whether known or unknown. To the extent any notice delivered by or on behalf of the Senior Project Lenders on or prior to the date hereof

8

constituted a notice of default, Prospective Default, Event of Default or a Declared Event of Default, such notice is hereby rescinded and revoked in all respects.

5.    *Further Assurances.*  From time to time, upon request of any Sponsor Party, the Security Trustee and the Senior Project Lenders shall, without further consideration (other than reimbursement by such Sponsor Party for any reasonable costs and expenses, including reasonable fees and expenses of counsel), execute, deliver and acknowledge all such further documents, agreements, certificates, deeds and instruments, and do such further acts as the Sponsor Parties may reasonably request to more effectively evidence or effectuate the transactions contemplated by this Agreement, including, but not limited to, the release and termination of the Terminated Agreements and the release and discharge of all Liens in the Collateral.

6.    *Representations and Warranties.*  Each of the Sponsor Parties hereby represents and warrants that, as of the date of this Agreement:

(a)    it has all corporate power and authority to (i) execute and deliver this Agreement and (ii) perform and incur all its other obligations provided for herein;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and legally binding obligation enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(c)    all authorizations, approvals and consents from governmental authorities that are necessary for the execution and delivery by it of this Agreement and the performance of its other obligations hereunder have been obtained and are in full force and effect; and

(d)    there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment (including without limitation any foreign exchange controls for which appropriate approvals and other similar authorizations have not been obtained), no provision of its charter or other constitutive documents and no provision of any mortgage, indenture, contract or other agreement binding on it or affecting its properties that, in each case, would prohibit, conflict with or in any way prevent the execution, delivery or performance of the terms of this Agreement.

7.    *Source of Payments Limited; Rights and Liabilities of the Issuer.*

(a)    The obligations of the Issuer to the parties to this Agreement shall be limited to the lesser of (a) the nominal amount of the claim of a party determined in accordance with the terms of this Agreement (other than this clause) (the "Claim"); and (b) the product of (i) the Net Proceeds (as defined below) divided by the aggregate gross amount of the Claim and all obligations of the Issuer ranking pari passu with the Claim and (ii) the nominal amount of the Claim. In this Section, "Net Proceeds" means the net proceeds of realization of all the assets of the Issuer other than the ordinary share capital and the transaction fee charged by the Issuer and any interest earned thereon after payment of, or provision for, all debts, costs, expenses and other

obligations of the Issuer as determined by the directors of the Issuer in their absolute discretion, other than the Claim and any obligations ranking pari passu with or behind the Claim. If there are no Net Proceeds, the Issuer shall have no obligations to the relevant party under this Agreement.

(b)    The parties to this Agreement hereby acknowledge and agree that the Issuer's obligations under this Agreement are solely the corporate obligations of the Issuer, and that a party to this Agreement shall not have any recourse against any of the directors, officers or employees of the Issuer for any claims, losses, damages, liabilities, indemnities or other obligations whatsoever in connection with any transactions contemplated by this Agreement.

(c)    The parties to this Agreement shall not take any action or commence any proceedings against the Issuer to recover any amounts due and payable by the Issuer under this Agreement except as expressly permitted by the provisions of this Agreement. The parties to this Agreement shall not take any action or commence any proceedings or petition a court for the liquidation of the Issuer, nor enter into any arrangement, reorganization or insolvency proceedings in relation to the Issuer whether under the laws of the Cayman Islands or other applicable bankruptcy laws until one year and one day after the later to occur of the payment in respect of the Claim or the extinction of party's rights in respect of the Claim.

8.    *Direction to the Security Trustee.* Each of the Bond Trustee, acting at the direction of the requisite percentage of Bondholders pursuant to the Supplemental Indenture, and the Facility Agent, acting at the direction of the requisite percentage of Bank Lenders pursuant to the Payoff Letter, confirms that it has instructed and directed (and, for the avoidance of doubt, does hereby instruct and direct) the Security Trustee to execute and deliver this Agreement and any and all documents to be delivered pursuant to the terms hereof and otherwise consummate the transactions contemplated hereby (the foregoing direction, together with the directions and instructions under the Payoff Letter and the Supplemental Indenture, being the "Direction").

9.    *Indemnification.* PDVSA and each of the Borrowers (each such person being an "Indemnifying Person") hereby agree to, and shall, pay and reimburse and be liable to the Security Trustee, the Bond Trustee, the Facility Agent and each of their respective directors, officers, employees and agents (each such person being an "Indemnified Person") on demand for, and to indemnify and hold harmless each such Indemnified Person from and against, without limitation, any and all losses, liabilities, judgments, claims, causes of actions, fees (including the extraordinary fees of the Security Trustee), costs and expenses (including the reasonable fees, disbursements and costs of legal counsel and experts) (collectively referred to herein as "Losses") incurred or suffered by an Indemnified Person in any way, directly or indirectly, arising out of, related to, or connected with the compliance by such Indemnified Person with the Direction and the other terms of this Agreement, the Payoff Letter and the Supplemental Indenture or the taking or omitting to take any action in accordance with the Direction and the other terms of this Agreement, the Payoff Letter and the Supplemental Indenture, including, without limitation, (i) any claim, cause of action, litigation, proceeding, action or investigation (whether civil, criminal or administrative and whether sounding in tort, contract or otherwise and whether such Indemnified Person is a party to such litigation, proceeding or investigation) in any way directly or indirectly, arising out of, related to, or connected with, the taking, by any

10

Indemnified Person, of action in accordance with the Direction or the other terms of this Agreement, the Payoff Letter and the Supplemental Indenture and (ii) the enforcement of this Agreement; *provided, however,* that the foregoing indemnity shall not be applicable to (x) any Losses suffered or incurred by an Indemnified Person as a result of an Indemnified Person's gross negligence, bad faith or willful misconduct or (y) in connection with a breach by an Indemnified Person of its obligations to an Indemnifying Person, in each case as determined by a judgment of a court that is binding on such Indemnified Person, is final and is not subject to review on appeal. The Indemnifying Persons shall have the right, through the appointment of counsel, to participate in and/or control any action, suit or proceeding for which they are liable as indemnitors hereunder, provided that the Indemnifying Persons shall not have the right to control such action, suit or proceeding if they involve potential imposition of criminal liability upon the Indemnified Person or a conflict of interest between the Indemnifying Persons and the Indemnified Persons and in such case the Indemnified Persons shall have the right to retain its own counsel, at the expense of the Indemnifying Persons, and such participation by the Indemnified Persons in the defense shall not release the Indemnifying Persons from any liability that they may have to such Indemnified Persons.

          10.    *Miscellaneous.*

          (a)    *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

          (b)    *Waiver of Jury Trial.* Each party hereto hereby waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

          (c)    *Severability.* If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

          (d)    *Counterparts.* This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

          (e)    *Consent to Jurisdiction; Waiver of Immunity.*

          (i)    Each party hereto hereby irrevocably consents and agrees, for the benefit of each other party hereto, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement may be brought in any Federal or State court located in the Borough of Manhattan, The City of New York, and hereby irrevocably accepts and submits to the non-exclusive jurisdiction of each such court with respect to any such action, suit or proceeding. Each party hereto hereby waives to the fullest extent permitted by applicable laws any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such court and hereby further waives and agrees not to plead or claim

in any such court that any such action, suit or proceeding brought therein has been brought in an inconvenient forum.

(ii) To the extent that PDVSA, the PDVSA Shareholder, the PDVSA Borrower or the Issuer has or thereafter may acquire or be entitled to claim for itself or its assets any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its assets, each of PDVSA, the PDVSA Shareholder, the PDVSA Borrower and the Issuer hereby irrevocably agrees not to claim and waives such immunity in respect of its obligations under this Agreement and the transactions contemplated thereby, provided that no such party is waiving any immunity from attachment prior to judgment to which it may now or hereafter be entitled. Without limiting the generality of the waivers set forth in this Section 10(e)(ii), all waivers made in this subsection shall be effective to the fullest extent permitted under the United States Foreign Sovereign Immunities Act of 1976, as amended, and are intended to be irrevocable for purposes of such Act.

(f) *Amendments.* This Agreement may be amended, modified, supplemented or be subject to a waiver only by an agreement in writing signed by each party hereto.

(g) *References.* Any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified from time to time.

(h) *Veba and Deutsche BP.* The parties hereto acknowledge and agree that Veba and Deutsche BP are parties to this Agreement for the limited purposes of amending the Veba Agreements pursuant to Section 1(b) and terminating the Veba Agreements pursuant to clauses (xv) and (xvi) of Section 2(a) hereof.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth above.

**MOBIL CORPORATION**

By: _____

Name: _____

Title: _____


**MOBIL CERRO NEGRO HOLDING, LTD.**

By: _____

Name: _____

Title: _____


**MOBIL CERRO NEGRO, LTD.**

By: _____

Name: _____

Title: _____


**EXXONMOBIL SALES & SUPPLY LLC**

By: _____

Name: _____

Title: _____


**PETRÓLEOS DE VENEZUELA, S.A.**

By: _____

Name:  Euromario Carruyo

Title:  Director


Signature Page to Omnibus Termination Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth above.

MOBIL CORPORATION

By:_____
Name:_____
Title:_____

MOBIL CERRO NEGRO HOLDING, LTD.

By:_____
Name:_____
Title:_____

MOBIL CERRO NEGRO, LTD.

By:_____
Name:_____
Title:_____

EXXONMOBIL SALES & SUPPLY LLC

By:_____
Name:_____
Title:_____

PETRÓLEOS DE VENEZUELA, S.A.

By: _____
Name:  Euromario Carruyo
Title:    Director

Signature Page to Omnibus Termination Agreement

**PDVSA PETRÓLEO, S.A.**

By: _____

Name: _____

Title: _____


**PDVSA CERRO NEGRO, S.A.**

By: _____

Name: Eulogio Del Pino

Title:  President


**CERRO NEGRO FINANCE, LTD.**

By: _____

Name: _____

Title: _____


**ABN AMRO BANK N.V., as Facility Agent**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


Signature Page to Omnibus Termination Agreement

PDVSA PETRÓLEO, S.A.

By:_____
Name:_____
Title:_____

PDVSA CERRO NEGRO, S.A.

By: _____
Name: Eulogio Del Pino
Title:  President

CERRO NEGRO FINANCE, LTD.

By:_____
Name:_____
Title:_____

ABN AMRO BANK N.V., as Facility Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

Signature Page to Omnibus Termination Agreement

**PDVSA PETRÓLEO, S.A.**

By:_____
Name:_____
Title:_____


**PDVSA CERRO NEGRO, S.A.**

By:_____
Name: Eulogio Del Pino
Title:   President


**CERRO NEGRO FINANCE, LTD.**

By:_____
Name:_____
Title:_____
~~Karvem Robinson~~
~~Director~~


**ABN AMRO BANK N.V., as Facility Agent**

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____


Signature Page to Omnibus Termination Agreement

**PDVSA PETRÓLEO Y GAS, S.A.**

By:_____
Name:_____
Title:_____


**PDVSA CERRO NEGRO, S.A.**

By:_____
Name:_____
Title:_____


**CERRO NEGRO FINANCE, LTD.**

By:_____
Name:_____
Title:_____


**ABN AMRO BANK N.V., as Facility Agent**

By:_____
Name:___BRYAN J. MATTHEWS_____
Title:_____First Vice President_____


By:_____
Name:_____
Title:_____William J. Fitzgerald_____
            Group Senior Vice President


Signature Page to Omnibus Termination Agreement

12-21-07;10:28AM;ABN AMRO BANK                                    ;9535758            #  2/   2

**ABN AMRO BANK N.V., VENEZUELAN BRANCH, as Venezuelan Accounts Trustee**

By: _____
Name: Beni Rosenzvaig
Title:  Country Executive

By: _____
Name: Tulio Hernandez
Title:  Country Risk Officer


**VEBA OIL & GAS CERRO NEGRO GMBH**

By: _____
Name: _____
Title: _____


**DEUTSCHE BP AG**

By: _____
Name: _____
Title: _____


Signature Page to Omnibus Termination Agreement

**DEUTSCHE BANK TRUST COMPANY**
**AMERICAS, as Bond Trustee**


By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____


**THE BANK OF NEW YORK, as Security**
**Trustee**

By:_____
Name:_____
Title:_____


**HOLLANDSCHE BANK-UNIE N.V., as**
**Financial Institution**


By:_____
Name:_____
Title:_____


Signature Page to Omnibus Termination Agreement

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Bond Trustee

By: _____
Name: RANDY KAHN
Title: VICE PRESIDENT

By: _____
Name: Stanley Burg
Title: Vice President


THE BANK OF NEW YORK, as Security
Trustee

By: _____
Name: _____
Title: _____


HOLLANDSCHE BANK-UNIE N.V., as
Financial Institution

By: _____
Name: _____
Title: _____


Signature Page to Omnibus Termination Agreement

**DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Bond Trustee**

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____


**THE BANK OF NEW YORK, as Security
Trustee**

By:_____
Name:_____
Title:_____


**HOLLANDSCHE BANK-UNIE N.V., as
Financial Institution**

By:_____
Name: A.J.M. van der Made_____
Title: Assistant Vice President_____

By:_____
Name: C.P. Wagenaar_____
Title: Assistant Vice President_____

Signature Page to Omnibus Termination Agreement