Joseph D. Pizzurro (JP-0124)
Dora Straus (DS-8079)
Rachael Yocum (RY-7456)
CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 696-6000
Fax: (212) 697-1559

*Attorneys for Defendant PDVSA Cerro Negro, S.A.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

MOBIL CERRO NEGRO, LTD.,                                    :

                              Plaintiff,                    :     No. 07 Civ. 11590 (DAB)

               -against-                                    :

PDVSA CERRO NEGRO, S.A.,                                    :

                              Defendant.                    :

--------------------------------------------------------------------- X


**MEMORANDUM OF LAW OF
DEFENDANT PDVSA CERRO NEGRO, S.A.
IN OPPOSITION TO MOTIONS TO CONFIRM
DECEMBER 27, 2007 ORDER OF ATTACHMENT AND
JANUARY 8, 2008 ORDER OF SUPPLEMENTAL ATTACHMENT**


Dated: January 24, 2008

## Table of Contents

**Page #**

Table of Authorities ................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................. 1

FACTS ..................................................................................................................... 3

The Cerro Negro Project ..................................................................................... 3

The Project Accounts .......................................................................................... 4

The Restructuring of The Senior Project Debt ................................................... 5

Mobil CN Reaps Substantial Economic Benefit From
The Restructuring of The Senior Project Debt, At Minimal Cost To It ...................... 7

The Closing .......................................................................................................... 15

Mobil CN's Attachment of PDVSA CN's Assets in the New York Project Accounts ............ 16

ARGUMENT ........................................................................................................... 17

POINT I
MOBIL CN'S UNCLEAN HANDS BAR IT
FROM THE EQUITABLE REMEDY OF ATTACHMENT ................................. 17

POINT II
MOBIL CN HAS FAILED TO SUSTAIN ITS BURDEN
OF ESTABLISHING THAT ANY ARBITRATION AWARD IT OBTAINS
MAY BE RENDERED INEFFECTUAL WITHOUT PROVISIONAL RELIEF ................... 22

CONCLUSION ........................................................................................................ 24

# Table of Authorities

Page #

**Cases**

Dayco Corp. v. Foreign Transactions Corp.,
   705 F.2d 38 (2d Cir. 1983) ..................................................................................... 22

Dweck Law Firm, LLP v. Mann,
   340 F. Supp. 2d 353, 358 (S.D.N.Y.), reconsid. denied, 2004 U.S. Dist. LEXIS
   19601 (S.D.N.Y. Sept. 30, 2004).......................................................................... 21

ENH, Inc. v. Int'l Diffusion SRL,
   No. 97 Civ. 3202, 1997 WL 294388 (S.D.N.Y. June 2, 1997)........................... 17, 19

Filner v. Shapiro,
   633 F.2d 139 (2d. Cir. 1980) ................................................................................. 20

Founders Ins. Co. v. Everest Nat'l Ins. Co.,
   41 A.D.3d 350 N.Y.S.2d 474 (N.Y. App. Div. 1st Dep't 2007) ............................... 22

Fratelli Lozza (USA) Inc. v. Lozza (USA),
   789 F. Supp. 625 (S.D.N.Y. 1992) ...................................................................... 17, 21

Gross v. Empire Healthchoice Assurance, Inc.,
   12 Misc. 3d 1155(A), 819 N.Y.S.2d 210, 2006 N.Y. Slip. Op. 50903(U), 2006 WL
   1358474 (N.Y. Sup. Ct. N.Y. Cty. May 18, 2006), rearg. granted, adhered to, 2007
   N.Y. Slip. Op. 51390U, 16 Misc.3d 1112A, 2007 N.Y. Misc. LEXIS 4962 (N.Y.
   Sup. Ct. N.Y. Cty. July 18, 2007)...................................................................... 20, 21

Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,
   324 U.S. 806 (1945)............................................................................................... 17

**Statutes**

28 U.S.C. § 1331.......................................................................................................... 1

9 U.S.C. § 203............................................................................................................. 1

CPLR § 7502(c) ..................................................................................................... 22, 23

**Rules**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards ........................... 1

Defendant PDVSA Cerro Negro, S.A. ("PDVSA CN") respectfully submits this memorandum of law in opposition to the motions of plaintiff Mobil Cerro Negro, Ltd. ("Mobil CN") for orders confirming the *ex parte* Orders of Attachment issued by this Court on December 27, 2007 and January 8, 2008. In accordance with applicable law, PDVSA CN's opposition to the motions to confirm does not constitute an appearance in this action. PDVSA CN does not waive any defenses, jurisdictional or otherwise, and specifically reserves all such defenses, including service of process.[1]

## PRELIMINARY STATEMENT

Mobil CN has come to this Court seeking the equitable remedy of pre-judgment attachment with unclean hands. Mobil CN never pointed out to the Court that, at the time it sought this extraordinary relief, it was preparing to sign an agreement with PDVSA CN, and others, representing and warranting that there was "no provision of law ... order [or] injunction" which would "prohibit, conflict with or in any way prevent" the funds at issue from being disposed of or transferred by PDVSA CN in any way it saw fit. In fact, Mobil CN signed that agreement the very day it levied on the accounts holding those funds.

While Mobil CN has stated to this Court that it needed to obtain the Order of Attachment on an *ex parte* basis because it did not want to "interfere with, restrain, or prohibit PDVSA's Offer to Purchase the outstanding bonds," it never told the Court *why* it did not want

---

[1] Mobil CN claims that this Court has subject matter jurisdiction based on 28 U.S.C. § 1331 because its action for an *ex parte* attachment in connection with a yet-to-be commenced arbitration "falls under" the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and thus within 9 U.S.C. § 203. However, it has cited no case where arbitration, though threatened, had not yet been commenced and subject matter jurisdiction was nonetheless found to exist. PDVSA CN reserves all rights to challenge the subject matter jurisdiction of this Court in the absence of a pending arbitration.

that transfer to be interfered with. The reason was simple. Mobil CN received a substantial benefit from the purchase, a benefit it could not have achieved without breaching its obligation to act in good faith and its expressed and implied representations to PDVSA CN over a seven-month period. Mobil CN was obligated to pay 50% of the outstanding amount of the bonds that Petróleos de Venezuela, S.A. ("PDVSA"), the indirect parent company of PDVSA CN, purchased. As a result of the transaction, the accounts of Mobil CN containing over $242,000,000 that had been subject to the lien of the bondholders and the bank lenders were released and paid over to Mobil CN. Obviously, if PDVSA and PDVSA CN had known that Mobil CN was going to breach its obligations and representations and attach PDVSA CN's funds, the transaction would never have occurred and Mobil CN would not have received its benefits. Mobil CN knew this full well, which was the reason its litigation counsel sought to keep the court file under seal, while other counsel of Mobil CN was involved in the closing of the transactions, keeping up the appearance of good faith cooperation which Mobil CN was obligated to provide.

The fact that Mobil CN breached the contractual representation is sufficient in itself to warrant vacating both the *ex parte* Order of Attachment issued on December 27, 2007 and the subsequent Order of Supplemental Attachment issued on January 8, 2008. The fact that Mobil CN did so as part of a scheme calculated to conceal its misrepresentations not only from PDVSA CN, but from this Court, highlights that the *ex parte* Orders should be vacated forthwith and that Mobil CN must be called to account and pay all damages associated with its surreptitious obtaining of the Order, including the costs and attorneys' fees incurred by PDVSA CN in connection with these proceedings.

-2-

# FACTS

## The Cerro Negro Project

On October 28, 1997, PDVSA CN (formerly known as Lagoven Cerro Negro, S.A.) together with Mobil Producción e Industrialización de Venezuela, S.A. ("Mobil PIV") and Veba Oel Venezuela Orinoco GmbH ("Veba Orinoco"), now known as Veba Oil & Gas Cerro Negro GmbH, a subsidiary of British Petroleum, entered into the Cerro Negro Association Agreement (the "Association Agreement")[2], to explore, develop, produce and upgrade extra heavy crude oil from the oil reserves located in the Orinoco Oil Belt in eastern Venezuela (the "Cerro Negro Project"). (O'Kelly Aff. ¶ 5.)[3]

Mobil PIV subsequently assigned its rights in the Association Agreement to Mobil CN, now a subsidiary of ExxonMobil Corporation ("ExxonMobil"). (Id. ¶ 6.)

The ownership interests in the Cerro Negro Project were as follows:  PDVSA CN 41-2/3%; Mobil CN 41-2/3%; and Veba Orinoco 16-2/3%.  (Id. ¶ 7.)

In June 1998, PDVSA CN and Mobil CN arranged for the financing of the Cerro Negro Project through (i) the issuance by Cerro Negro Finance, Ltd., a special purpose vehicle, (the "Issuer") of bonds in the original principal amount of $600,000,000 (the "Bonds") under a Bond Indenture dated June 18, 1998 (the "Indenture") among the Issuer, PDVSA CN and Mobil CN as guarantors, and Deutsche Bank Trust Company Americas (as successor-in-interest to Bankers Trust Company), as Bond Trustee (the "Bond Trustee"), and (ii) a term loan of $300,000,000 (the "Bank Debt") from certain bank lenders pursuant to a Bank Lenders Senior

---

[2] The Association Agreement is appended to the Declaration of Michael J. Baratz Made In Support of Plaintiff's Motion for An Order of Attachment, dated December 26, 2007 ("Baratz Decl."), at Exhibit 1.

[3] References in the form O'Kelly Aff. ¶ __ are to the Affidavit of Brian O'Kelly dated January 23, 2008, submitted in opposition to the motions of Mobil CN to confirm the *ex parte* Orders of Attachment issued on December 27, 2007 and January 8, 2008.

Project Loan Agreement dated as of June 18, 1998 among PDVSA CN, Mobil CN, ABN AMRO Bank N.V. as Facility Agent (the "Facility Agent"), and various bank lenders (the "Bank Lenders").[4] The holders of the Bonds (the "Bondholders") and the Bank Lenders are collectively referred to as the "Senior Project Lenders". (Id. ¶ 8.)

PDVSA CN and Mobil CN were each ultimately liable for repayment of 50% of the Bonds and the Bank Debt (together, the "Senior Project Debt"). (Id. ¶ 9.)

**The Project Accounts**

As security for the Senior Project Debt, PDVSA CN, Mobil CN, the Issuer, the Facility Agent, the Bond Trustee, The Bank of New York, as Security Trustee (the "Security Trustee"), and certain other parties entered into a Common Security Agreement dated as of June 18, 1998 (the "Common Security Agreement"), pursuant to which, among other things, the Issuer, PDVSA CN, Mobil CN agreed to certain restrictive covenants and/or pledged and granted security interests in certain assets. (O'Kelly Aff. ¶ 10.)

Under the Common Security Agreement, the respective positions of PDVSA CN and Mobil CN in the revenues from sales of upgraded crude oil were to be deposited in a series of segregated accounts established with the Security Trustee at The Bank of New York in New York and certain local currency accounts established in Venezuela with ABN AMRO Bank, N.V., Venezuelan Branch (collectively, the "Project Accounts"). (Id. ¶ 11.)

The Common Security Agreement provided that the funds in the Project Accounts were to be applied and transferred by the Security Trustee to pay Cerro Negro Project operating and maintenance costs and capital expenditures, as well as principal, interest and additional amounts due on the Senior Project Debt, with the balance available for distributions to PDVSA

---

[4] Veba Orinoco did not participate in the financing of the Cerro Negro Project. (O'Kelly Aff. ¶ 8 n.1.)

CN and Mobil CN (the "Cash Waterfall"), provided, *inter alia*, that no event of default or prospective default then existed and relevant reserve and funding requirements and debt service coverage ratios were met.  (Id. ¶ 12.)

Pursuant to the Common Security Agreement, and certain other related financing documents (the "Other Financing Documents"), Mobil CN pledged and granted a security interest in its Project Accounts and all funds on deposit in such accounts to the Security Trustee as collateral for the Senior Project Debt, and Mobil CN and Mobil Cerro Negro Holding, Ltd., the shareholder of Mobil CN (the "Mobil Shareholder"), granted security interests in certain other assets related to the Cerro Negro Project, including the shares of Mobil CN and rights of Mobil CN under various Project-related agreements.  (Id. ¶ 13.)

PDVSA CN and its affiliates did not pledge any assets as security for the Senior Project Debt.  (Id. ¶ 14.)  PDVSA CN did, however, issue irrevocable instructions that all revenues from sales of upgraded crude oil and other products be deposited in its Project Accounts and applied by the Security Trustee in accordance with the Cash Waterfall provisions of the Common Security Agreement.  (Id.)

**The Restructuring of The Senior Project Debt**

In early 2007, certain changes in Venezuelan law led to a restructuring of the Cerro Negro Project.  (O'Kelly Aff. ¶ 15.)  Under the new law, various projects (including Cerro Negro) were required to be converted into *Empresas Mixtas* (mixed companies) in which a PDVSA subsidiary would hold an equity interest of at least 60%.  (Id.)

As a result of these changes in the Cerro Negro Project, certain Bondholders began expressing concerns about the state of the Cerro Negro Project, their interests in and the value of the collateral securing the Senior Project Debt, and the ability of Mobil CN and PDVSA CN to continue servicing the Senior Project Debt.  On or about April 27, 2007, PDVSA CN and

Mobil CN received a notice of prospective default under the Indenture and the Common Security Agreement.  (Id. ¶ 16.)

As a result of the events referred to above, both PDVSA CN and Mobil CN were unable to withdraw funds in the Project Accounts that would otherwise have been available to them under the Cash Waterfall provisions of the Common Security Agreement.  (Id. ¶ 17.) Consequently, the Project Accounts accumulated funds in excess of the amounts necessary to operate the Cerro Negro Project and satisfy the Borrowers' obligations with respect thereto.  (Id.)

In response to the Bondholders' concerns and the notice of prospective default, beginning in May of 2007, PDVSA CN together with Mobil CN held numerous discussions in a joint and cooperative effort to address these concerns and to develop a strategy for managing the Senior Project Debt in light of the changes in Venezuelan law and the remedial actions which the Senior Project Lenders might take.  (Id. ¶ 18.)  Representatives of Mobil CN and of ExxonMobil, its ultimate parent entity, expressly stated on several occasions, beginning in late June or early July 2007, that regardless of the differences which remained between the ExxonMobil companies and Venezuela with respect to the actions taken by Venezuela affecting their interests in the Cerro Negro Project, there was no reason not to cooperate in good faith to restructure the financing for the Cerro Negro Project, on which Mobil CN remained 50% liable.  These representatives also expressly stated their intention to continue cooperating in good faith to ensure the continued supply of crude oil from the Cerro Negro Project to a refinery in Chalmette, Louisiana, which remains owned in equal parts by an ExxonMobil subsidiary and a subsidiary of PDVSA, another key area of mutual interest.  (Id.)

On at least one of the occasions where the ExxonMobil entities expressed their desire to continue cooperation in matters relating to the restructuring of the financing and the

crude oil supply, the ExxonMobil delegation was headed by Mr. J.R. Massey – the same representative who has submitted a Declaration in support of Mobil CN's motion for an *ex parte* attachment order in this case.  (Id. ¶ 19.)

　　　　In furtherance of the cooperation, effective June 1, 2007, PDVSA CN and Mobil CN jointly hired a financial advisor, Lazard Frères & Co. LLC ("Lazard"), to advise them on all financial aspects of the restructuring of the Senior Project Debt.  (Id. ¶ 20.)  Thereafter, there were various meetings among PDVSA CN, Mobil CN and Lazard in which the representatives of Mobil CN continued to express their view that, despite their disagreements with the legal measures affecting their interests in the Cerro Negro Project, it was in the interest of both parties to cooperate in the restructuring of the Senior Project Debt.  (Id.)

**Mobil CN Reaps Substantial Economic Benefit From The**
**Restructuring of The Senior Project Debt, At Minimal Cost To It**

　　　　Throughout the process of negotiating with the Bank Lenders and the Bondholders, it was clear that the interests of PDVSA CN and Mobil CN with regard to the restructuring of the Senior Project Debt were generally aligned.  (O'Kelly Aff. ¶ 21.)  From the earliest discussions concerning the debt restructuring, it was understood that one of the principal and fundamental economic objectives was to accomplish the release of the funds of both Mobil CN and PDVSA CN that had been trapped in the Project Accounts, and that could not be released without the consent of the Bondholders.  (Id.)

　　　　In furtherance of that objective and others, PDVSA ultimately agreed to purchase the Bonds from the Bondholders pursuant to a tender offer and consent solicitation (the "Tender Offer") and to repay the Bank Debt in full, taking sole responsibility for the purchase and repayment, including the obligations of Mobil CN – a process which would ultimately take seven

months to accomplish and would require extensive documentation and coordination between PDVSA CN and Mobil CN.  (Id. ¶ 22.)

On November 14, 2007, PDVSA entered into a Lock-Up Agreement (the "Lock-Up Agreement") with the holders of approximately 79% in aggregate principal amount of the outstanding Bonds (the "Lock-Up Holders").  (Id. ¶ 23.)  The Lock-Up Agreement set forth the general terms and conditions of, and the obligations and commitments of the parties with respect to, the Tender Offer.  (Id.)

Throughout the negotiations with the Bondholders, Mobil CN was kept apprised of the status of the negotiations and was provided with drafts of the Lock-Up Agreement and related Term Sheet for review and comment.  (Id. ¶ 24.)  In fact, a number of revisions to the Lock-Up Agreement and Term Sheet were made in response to comments raised by Mobil CN and its representatives, including its counsel, Latham & Watkins LLP ("Latham & Watkins").  (Id.)

Pursuant to the Lock-Up Agreement, PDVSA agreed to commence the Tender Offer for 100% of the Bonds at a price equal to 100% of their outstanding principal amount and accrued and unpaid interest thereon, plus a redemption premium equal to 33% of the premium which would have been payable on such Bonds in an optional redemption by the Issuer under the Indenture, and to consummate the Tender Offer and pay the tendering Bondholders no later than December 31, 2007.  (Id. ¶ 28.)  If the Tender Offer could not be completed by that date, PDVSA agreed (subject to certain exceptions) to purchase in a direct sale the Bonds held by the Lock-Up Holders no later than December 31, 2007.  (Id.)

The Lock-Up Agreement contemplated that the Tender Offer would include a consent solicitation pursuant to which PDVSA would solicit consents from the Bondholders to

vote their Bonds to approve a number of amendments to the Indenture, the Common Security Agreement and the Other Financing Documents to, among other things: (i) waive any existing defaults, "Prospective Defaults" and "Events of Default" (as defined in the Common Security Agreement) resulting from the events in Venezuela, including any such defaults by Mobil CN, (ii) eliminate all or substantially all of the covenants and events of default under the Indenture, the Common Security Agreement and the Other Financing Documents, (iii) release all of the collateral and other property of Mobil CN, the Mobil CN Shareholder and PDVSA CN securing the Senior Project Debt (the "Collateral"), including the release and distribution of all funds on deposit in the Project Accounts to Mobil CN and PDVSA CN, and (iv) direct the Security Trustee to release all security interests created under the Common Security Agreement and the Other Financing Documents and to terminate certain of these agreements. (Id. ¶ 26.) The Lock-Up Agreement also contemplated that PDVSA would repay the Bank Debt in full upon completion of the Tender Offer (the "Bank Debt Repayment"). (Id.)

Thus, all parties understood that upon the purchase of the Bonds by PDVSA and the Bank Debt Repayment, the funds in the Project Accounts would be released and transferred as directed by Mobil CN and PDVSA CN, each with respect to its own funds. (Id. ¶ 27.) All parties, including Mobil CN, knew that the release of the funds was an essential condition of the transaction, which presumably is why Mobil CN did not reveal the fact that it intended to breach its express and implied representations of good faith cooperation in consummating the transaction, as detailed below. (Id.)

The Lock-Up Holders agreed in the Lock-Up Agreement to, among other things, tender their Bonds and deliver their consents no later than 10 business days after the commencement of the Tender Offer and not to withdraw the tender of their Bonds or their

consent prior to the closing of the Tender Offer (subject to certain exceptions).  (Id. ¶ 28.)  The Lock-Up Holders also agreed not to take any actions with respect to the Cerro Negro Project, PDVSA CN and/or Mobil CN or the Bonds that would interfere with the operation of the Cerro Negro Project in the ordinary course, or adversely affect the Borrowers or the Cerro Negro Project, including, without limitation, (i) giving or instructing the Bond Trustee or the Security Trustee to give any notices of default to Mobil CN and/or to PDVSA CN, (ii) taking or joining in any other action or instructing the Bond Trustee or the Security Trustee to take any action to exercise or enforce any remedies, including against Mobil CN and/or PDVSA CN, and (iii) objecting to or interfering with any request for withdrawals of funds from the Project Accounts to pay for operating and maintenance costs of the Cerro Negro Project (the "Standstill Undertakings").  (Id.)

The undertakings under the Lock-Up Agreement provided Mobil CN with significant benefits, at minimal cost to Mobil CN.  (Id. ¶ 29.)  These benefits included the protections afforded by the Standstill Undertakings and the prospect that the Senior Project Debt would be consensually restructured and/or repaid upon a successful completion of the Tender Offer, which would result in the release of all Collateral, including the release of Mobil CN's funds in the Project Accounts.  (Id.)  At no point did PDVSA request or require that Mobil CN assume any obligations under the Lock-Up Agreement, despite the fact that Mobil CN was liable for repayment of 50% of the Senior Project Debt.  (Id.)

In November 2007, the documentation relating to the Tender Offer was prepared, including the Omnibus Termination Agreement (the "Termination Agreement," O'Kelly Aff. Ex. A), which was the definitive agreement among PDVSA CN, Mobil CN and each of their respective affiliates, the Senior Project Lenders, the Facility Agent, the Bond Trustee and the

Security Trustee relating to the amendment and termination of the Common Security Agreement and certain of the Other Financing Documents, the release of the Collateral and the waivers of any defaults and events of default under the Common Security Agreement and the Other Financing Documents.  (O'Kelly Aff. ¶ 30.)

Mobil CN was provided with drafts of the Termination Agreement for its review and comment prior to the commencement of the Tender Offer and a number of revisions were made to the Termination Agreement to address concerns raised by Mobil CN.  (Id. ¶ 31.)

The parties to the Termination Agreement included PDVSA, PDVSA CN, PDVSA Petróleo, S.A. (the shareholder of PDVSA CN), Mobil CN, Mobil Corporation ("Mobil"), the Mobil Shareholder, the Security Trustee, the Bond Trustee and the Facility Agent. The Termination Agreement is governed by New York law.  (Id. ¶ 32.)

By the terms of the Termination Agreement, the parties, including Mobil CN, agreed to: (i) amend and the terminate the Common Security Agreement and the Other Financing Documents specified therein, (ii) eliminate substantially all of the restrictive covenants and events of default to which both PDVSA CN and Mobil CN were subject under the Indenture, the Common Security Agreement and the Other Financing Documents, (iii) release all of the Collateral, including the funds of PDVSA CN and Mobil CN in the Project Accounts, (iv) waive any and all prior and existing defaults, "Prospective Defaults," "Events of Default" and "Declared Events of Default" under the Indenture, the Common Security Agreement and the Other Financing Documents, and (v) rescind any prior or existing notices of default or "Prospective Default" delivered pursuant to the Indenture and the Common Security Agreement. (Id. ¶ 33.)

With respect to the Collateral, Section 3(b)(i) of the Termination Agreement provides that both PDVSA CN and Mobil CN would be entitled to receive the return of their respective funds in the Project Accounts:

> The Security Trustee shall . . . (i) pay, assign, transfer and deliver to (A) the PDVSA Borrower, by wire transfer to an account designated in writing by the PDVSA Borrower, all of the funds and investments (if any) held in (1) the Project Accounts (and sub-accounts) of the PDVSA Borrower, (2) the Senior Debt Service Account, (3) the O&M Account, and (4) the Local Currency O&M Account (or, at the request of the PDVSA Borrower, retain such funds in the applicable Project Accounts specified by the PDVSA Borrower until further directed by the PDVSA Borrower), and (B) the Mobil Borrower, by wire transfer to an account designated in writing by the Mobil Borrower, all of the funds and investments (if any) held in the Project Accounts (and sub-accounts) of the Mobil Borrower, other than the funds held in (i) the Senior Debt Service Reserve Account, fifty percent (50%) of which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower) (in full satisfaction of the Subordinated Debt owing by the Mobil Borrower to the PDVSA Borrower as provided in Section 5.05(b) of the Common Security Agreement and that certain Inter-Sponsor Agreement dated as of June 18, 1998 among Mobil, PDVSA, the Shareholders and the Borrowers) and fifty percent (50%) of which shall be distributed to the Mobil Borrower and (ii) the Project Accounts (and sub-accounts) specified in clause (A) of this subsection (b)(i) (which shall be distributed to the PDVSA Borrower (or, at the request of the PDVSA Borrower, retained until further directed by the PDVSA Borrower, as provided in clause (A) of this subsection (b)(i)).

(O'Kelly Aff., Ex. A, § 3(b)(i).)

The Termination Agreement also contained an express representation and warranty by Mobil CN and the other Sponsor Parties (as defined therein), which included Mobil CN's affiliates and PDVSA CN and its affiliates, as follows:

> Each of the Sponsor Parties hereby represents and warrants that, as of the date of [the Termination] Agreement:
>
> (d)    there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment (including without limitation any foreign exchange controls for which appropriate approvals and other similar authorizations have not been obtained), no provision of its charter or other constitutive documents and no provision of any mortgage, indenture, contract or other agreement binding on it or affecting its properties that, in each case, would prohibit, conflict with or in any way prevent the execution, delivery or performance of the terms of this Agreement.

(Id., § 6(d).)

As stated above, an essential economic objective of the bond repurchase, clearly understood by all parties, was to attain the release of the funds which were trapped in the Project Accounts of PDVSA CN and Mobil CN.  (O'Kelly Aff. ¶ 36.)  The obvious purpose of the representation and warranty contained in § 6(d) of the Termination Agreement was to ensure that the Termination Agreement could be fully performed, and that each party, including PDVSA CN, would obtain the benefits thereunder, including the release of the funds in the Project Accounts to be transferred as directed by PDVSA CN – which PDVSA CN is now prevented from doing due to the December 27, 2007 *ex parte* Order of Attachment.  (Id. ¶ 37.)

In accordance with the terms of the Termination Agreement, counsel for PDVSA CN and counsel for Mobil CN executed a funds flow memorandum on behalf of their respective clients (the "Funds Flow Memorandum") which, among other things, instructed the Security Trustee as to the manner in which the funds of PDVSA CN and Mobil CN on deposit in the Project Accounts should be distributed or transferred at the time of the closing of the Tender Offer and the Bank Debt Repayment.  (Id. ¶ 38.)

The Termination Agreement provided substantial economic benefit to Mobil CN. (Id. ¶ 39.) In addition to the release of the funds in the Mobil CN Project Accounts, the Termination Agreement also provided for the release to Mobil CN of the other Collateral, including the following items of Collateral which were returned to and/or released for the benefit of Mobil CN, the Mobil Shareholder and ExxonMobil at the closing of the Tender Offer and Bank Debt Repayment:  (i) the shares owned by Mobil in Operadora Cerro Negro, S.A., the operating company for the Cerro Negro Project, (ii) the shares owned by Mobil CN in Petrolera Cerro Negro, S.A., the management company for the Cerro Negro Project, (iii) the shares owned by the Mobil Shareholder in Mobil CN, (iv) the rights of Mobil CN under certain commercial agreements relating to the Cerro Negro Project, and (v) the other Collateral referred to in the Common Security Agreement.  (Id.)

Mobil CN had an interest in ensuring that the Tender Offer and Bank Debt Repayment would be consummated, as the financial restructuring resulted in numerous significant economic benefits to Mobil CN and its affiliates.  (Id. ¶ 40.)  These included: (i) the repayment and discharge of all of the Bank Debt, including the fifty percent (50%) for which Mobil CN was liable, (ii) the release of all of the Collateral of Mobil, the Mobil Shareholder and Mobil CN, including approximately $242 million which were on deposit in the Project Accounts of Mobil CN, (iii) the elimination of nearly all of the covenants and events of default in the Indenture, Common Security Agreement and the Other Financing Documents to which Mobil, the Mobil Shareholder and Mobil CN were subject, and (iv) the waiver of all prior and existing defaults and events of default under the Indenture, the Common Security Agreement and the Other Financing Documents.  (Id.)  Although the Bonds purchased by PDVSA in the Tender Offer have not yet been cancelled and remain outstanding, nearly all of the protections and

covenants securing the Bonds, and the burdens on Mobil CN as a borrower associated therewith, have been eliminated (other than the obligation to repay the Bonds in accordance with their original terms). (Id.)

Mobil CN would not have obtained these benefits if it had merely repaid its 50% of the obligations on the Senior Project Debt. (Id. ¶ 41.) In such event, Mobil CN's funds in the Project Accounts would have remained subject to the liens as provided in the Common Security Agreement and thus could not have been released. (Id.) Short of a repayment in full of the Senior Project Debt (which would have necessitated the payment of 100% of the redemption premium on the Bonds at a cost of approximately $65 million in excess of the amount paid by PDVSA in the Tender Offer and Bank Repayment), Mobil CN's funds in the Project Accounts could only be released to it upon completion of a restructuring transaction satisfactory to the Senior Project Lenders, such as the Tender Offer and Bank Repayment, which PDVSA undertook to do and, in fact, did. (Id.)

In consummating the Tender Offer and the Bank Debt Repayment, PDVSA did not request or require Mobil, the Mobil Shareholder or Mobil CN to contribute any funds or make any payments, even though the ExxonMobil entities would reap considerable benefits from this transaction. (Id. ¶ 42.) PDVSA bore nearly all of the costs associated with the Tender Offer and Bank Debt Repayment. (Id.)

**The Closing**

The Tender Offer commenced on November 29, 2007. (O'Kelly Aff. ¶ 43.)

On December 28, 2007, PDVSA purchased in excess of 99% of the then outstanding principal amount of the Bonds, for a total purchase price of $501,140,755.74 and repaid the Bank Debt in full in the amount of $129,409,354.69. (Id. ¶ 44.)

At approximately 1:50 pm on December 28, 2007, all parties confirmed that all conditions in connection with the Tender Offer and Bank Debt Repayment had been satisfied, other than the payment conditions. (Id. ¶ 45.)

Starting at approximately 2:30 pm and up until 4:49 pm on December 28, 2007, representatives of the Bondholders and the Bank Lenders sent confirmations that they had received payment pursuant to the Tender Offer and Bank Debt Repayment. (Id. ¶ 46.)

Upon the final confirmation of receipt of wire transfer pursuant to the Bank Debt Repayment at 4:49 pm on December 28, 2007, the Tender Offer and Bank Debt Repayment were completed, the Termination Agreement became effective, and the Closing became effective. (Id. ¶ 47.)

**Mobil CN's Attachment of PDVSA CN's Assets in the New York Project Accounts**

Following the Closing, and in compliance with the terms of the Termination Agreement and the Funds Flow Memorandum, the Security Trustee released all of Mobil CN's Collateral and, in connection therewith, transferred $242,099,049.22 from Mobil CN's Project Accounts to an account of Exxon Overseas Investment Corporation. (O'Kelly Aff. ¶ 48.)

However, the Security Trustee cannot transfer the funds in PDVSA CN's Project Accounts because at 4:10 pm on December 28, 2007 – forty minutes before the Termination Agreement became effective – Mobil CN, unbeknownst to PDVSA CN, served a levy upon the monies contained in PDVSA CN's Project Accounts in New York. (Id. ¶ 49.)

Despite assurances from Mobil CN's representatives that it would cooperate in PDVSA's efforts to successfully restructure the Senior Project Debt – a restructuring that was designed and intended by the parties to benefit both PDVSA CN and Mobil CN – and despite the express representation made by the Mobil parties in the Termination Agreement that no order

-16-

existed which would prevent the consummation of the transactions, at no time prior to the launch of the Tender Offer or its completion did Mobil CN or its representatives disclose their intention to seek the attachment of PDVSA CN's assets and prevent the Security Trustee from transferring the funds in PDVSA CN's Project Accounts.  (Id. ¶ 50.)  Nor did they reveal the existence of the Order of Attachment which they had obtained the day before the Closing, even though their counsel, Latham & Watkins, as well as an officer of ExxonMobil, were in attendance at the Closing, feigning continued cooperation in good faith while another law firm was working behind the scenes preparing this attachment.  (Id.)

As a result of Mobil CN's action in attaching the funds in the PDVSA CN Project Accounts, PDVSA CN has been deprived of the benefits of the restructuring.  (Id. ¶ 51.)  Mobil CN, on the other hand, has been able to obtain the full benefits of the restructuring.  (Id.)

**ARGUMENT**

**POINT I**

**MOBIL CN'S UNCLEAN HANDS BAR IT**
**FROM THE EQUITABLE REMEDY OF ATTACHMENT**

"Attachment is an equitable remedy, subject to the equitable maxim that 'he who comes into equity must come with clean hands.'"  ENH, Inc. v. Int'l Diffusion SRL, No. 97 Civ. 3202, 1997 WL 294388, at *1 (S.D.N.Y. June 2, 1997) (quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 814 (1945)).  See also Fratelli Lozza (USA) Inc. v. Lozza (USA), 789 F. Supp. 625, 636-37 (S.D.N.Y. 1992).  Mobil CN's disregard for its contractual representations and obligations and for its repeated express and implied representations over a seven-month period, as well as its lack of candor with this Court when it applied for the ex parte Order of Attachment, leave no room for doubt that it is not entitled to the equitable relief it seeks.

Mobil CN filed its initial motion for an *ex parte* Order of Attachment on December 27, 2007.  On that day, Mobil CN was collaborating with PDVSA CN, at the offices of PDVSA CN's counsel in New York, in an effort to close the Tender Offer and the Bank Debt Repayment, and thereby reap the benefits of the negotiated restructuring of the Cerro Negro Project's financing agreements, a restructuring that was being financed in total by PDVSA. Mobil CN led PDVSA CN to believe that Mobil CN was its good faith partner in the effort to negotiate with the Bondholders and the Bank Lenders and close the Tender Offer and Bank Debt Repayment, the terms of which had been known to Mobil CN for months.

As the parties worked together, Mobil CN gave no indication to PDVSA CN that it was, at the same time, surreptitiously applying to the Court to attach the very assets which were to be delivered to PDVSA CN pursuant to the terms of the Termination Agreement, to which Mobil CN was itself a party.

Mobil CN's duplicity is compounded by the fact that, as it applied for and obtained the Order of Attachment, it was preparing to execute the Termination Agreement which included Mobil CN's express representation and warranty that, as of the date of that Agreement:

> there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment (including without limitation any foreign exchange controls for which appropriate approvals and other similar authorizations have not been obtained), no provision of its charter or other constitutive documents and no provision of any mortgage, indenture, contract or other agreement binding on it or affecting its properties that, in each case, would prohibit, conflict with or in any way prevent the execution, delivery or performance of the terms of this Agreement.

(O'Kelly Aff., Ex. A, § 6(d).)

Mobil CN knew that this representation would be untrue.  And while Mobil CN included a draft of the Termination Agreement among the hundreds of pages of documents it

submitted to the Court in support of its application, it never pointed out this provision or attempted to explain to the Court how Mobil CN could be entitled to an order of attachment that would so obviously conflict with its own contractual warranty.

Mobil CN was also less than candid with the Court when it explained the purported need to obtain the Order of Attachment *ex parte* and under seal. Mobil CN did tell the Court that it did not want to interfere with PDVSA's repurchase of the bonds, but did not explain that the reason was that Mobil CN did not want to do anything that could interfere with the release of its own funds in its Project Accounts. Mobil CN wanted to be certain that it could act in a way which would preserve its own benefits resulting from the repurchase, but that PDVSA CN would not. Where, as here, a plaintiff "engaged in underhanded behavior related to the matter in which he seeks [equitable] relief," such relief is properly denied. ENH, Inc. v. Int'l Diffusion SRL, 1997 WL 294388, at *2.

At 4:10 pm on December 28, 2007, the day after obtaining the *ex parte* Order of Attachment, Mobil CN secretly levied upon PDVSA CN's funds in the New York Project Accounts. Mobil CN maneuvered the *ex parte* levy so that it would occur just minutes before the Termination Agreement and the Closing of the Tender Offer and Bank Debt Repayment became effective at 4:50 pm. At the Closing, Mobil CN knew that at that very moment, *i.e.*, as the Termination Agreement became effective and the liens on the Project Accounts released, PDVSA CN's assets in the Project Accounts had just been attached, and that this attachment prevented the Security Trustee from complying with the Termination Agreement's obligation to "pay, assign, transfer and deliver to [PDVSA CN], by wire transfer to an account designated in writing by [PDVSA CN], all of the funds and investments (if any) held in (1) the Project Accounts (and sub-accounts)." (Termination Agreement ¶ 3(b).) Mobil CN further knew that by

preventing the Security Trustee from complying with paragraph 3(b) of the Termination

Agreement, PDVSA CN would be deprived of the benefits under the Termination Agreement.

   The purpose behind the representation and warranty made by the parties in § 6(d)

of the Termination Agreement could not be more clear.  It was to ensure, as the parties to the

Termination Agreement understood, that there was no legal or contractual obstacle that could

prevent the parties to the Termination Agreement from obtaining the full benefits accorded by

the Agreement, including most notably the ability to receive and freely deal with the funds in the

Project Accounts.  (O'Kelly Aff. ¶ 37.)  Mobil CN's secret *ex parte* attachment breached and

caused a breach of this representation and was calculated to frustrate PDVSA CN's ability to

benefit from the Agreement without jeopardizing Mobil CN's benefits, benefits Mobil CN

obtained solely through the funding of the bond repurchase by PDVSA.

   In addition to constituting a violation of the representation and warranty that there

was no order that would prohibit or prevent the performance of the Termination Agreement,

Mobil CN's actions constitute a clear breach of its obligations under the Termination Agreement

of good faith and fair dealing which New York law incorporates into every contract.  Under New

York law a party may not take any action which is calculated to deprive, or has the effect of

depriving, another party from enjoying the benefits of its contract.  Filner v. Shapiro, 633 F.2d

139, 143 (2d. Cir. 1980) ("In every contract there is an implied covenant of good faith and fair

dealing, which precludes each party from engaging in conduct that will deprive the other party of

the benefits of their agreement."); Gross v. Empire Healthchoice Assurance, Inc., ) 12 Misc. 3d

1155(A), 819 N.Y.S.2d 210, 2006 N.Y. Slip. Op. 50903(U), 2006 WL 1358474, at *4 (N.Y. Sup.

Ct. N.Y. Cty. May 18, 2006) ("The covenant [of good faith and fair dealing] requires that the

parties will not take any action which may have the effect of destroying the rights of the other

party to receive the benefits of the contract."), rearg. granted, adhered to, 2007 N.Y. Slip. Op.

51390U, 16 Misc.3d 1112A, 2007 N.Y. Misc. LEXIS 4962 (N.Y. Sup. Ct. N.Y. Cty. July 18,

2007; Dweck Law Firm, LLP v. Mann, 340 F. Supp. 2d 353, 358 (S.D.N.Y.) (claim for breach of

implied covenant of good faith and fair dealing stated where defendant sought to prevent

plaintiff's performance of the contract or to withhold benefits of the contract from plaintiff),

reconsid. denied, 2004 U.S. Dist. LEXIS 19601 (S.D.N.Y. Sept. 30, 2004).

   Where, as here, a plaintiff has breached its own contractual obligations, it is not

entitled to obtain equitable relief. Fratelli Lozza, 789 F. Supp. at 637 (plaintiff's breaches of its

agreement with defendant "undermine its ability to obtain equitable relief in this court, given the

equitable premise that one who seeks equity may not invoke such relief if it has unclean hands").

   Mobil CN's conduct is a classic example of unclean hands.  Not only is it a

breach of contract, it is bad faith plain and simple.  Through its express and implied

representations over a period of seven months, Mobil CN led the parties to the Termination

Agreement, including PDVSA CN, to believe that it was cooperating in the debt restructuring.

By signing that Agreement, Mobil CN committed itself to insuring that it would, at the very

least, take no affirmative action to impede the full performance of the Agreement or to prevent

any party thereto from performing its obligations or enjoying the benefits of the Agreement.

   This Court should deny Mobil CN's motions for confirmation of the *ex parte*

Orders of Attachment.

## POINT II

## MOBIL CN HAS FAILED TO SUSTAIN ITS BURDEN OF ESTABLISHING THAT ANY ARBITRATION AWARD IT OBTAINS MAY BE RENDERED INEFFECTUAL WITHOUT PROVISIONAL RELIEF

On a motion to confirm an order of attachment, the plaintiff bears the burden of establishing each and every ground for the attachment. Dayco Corp. v. Foreign Transactions Corp., 705 F.2d 38, 39 (2d Cir. 1983). Here, Mobil CN has failed to carry its burden of establishing that any arbitration award it might obtain "may be rendered ineffectual without" the Order of Attachment. CPLR § 7502(c).

Once again, Mobil CN has been less than candid with the Court when it focused on PDVSA CN and its assets in attempting to justify the need for an attachment. In making its argument, Mobil CN completely ignores the fact that PDVSA itself has guaranteed PDVSA CN's obligations under the Association Agreement, the contract upon which Mobil CN purports it will base its claims in some as yet uncommenced ICC arbitration.[5] Indeed, reference to the guarantee is conspicuously absent from those provisions of the Association Agreement for which Mobil CN has supplied an English translation (Baratz Decl. Ex. 1).

Under the CPLR, a party is properly denied the remedy of prejudgment attachment where the obligations of the defendant have been guaranteed by third parties. Founders Ins. Co. v. Everest Nat'l Ins. Co., 41 A.D.3d 350, 839 N.Y.S.2d 474 (N.Y. App. Div. 1st Dep't 2007) (respondents' motion to attach assets properly denied for failure to show that an arbitral award would be rendered ineffectual without an attachment pursuant to CPLR 7502(c)

---

[5] See Spanish language Association Agreement attached to the Baratz Decl. at Ex. 1, ¶ 3.2. Mobil CN does mention the guarantee in passing in a footnote early in its memorandum of law, (Plf.'s Mem. of Law In Supp. Mot. To Confirm Order of Attachment, dated January 2, 2008, at p. 3 n. 4), but only in an oblique reference as to what parties it may attempt to join in an arbitration. The claims underlying Mobil CN's threatened arbitration raise complex issues which PDVSA CN will address in that arbitration, when and if Mobil CN commences it. Nothing herein should be construed as a waiver of any right or defense which PDVSA CN or PDVSA may have with respect to itself or its assets in any action or proceeding in any way related to the underlying claims of Mobil CN.

where "respondents' own submissions showed that other entities had guaranteed petitioner's obligations").

Because Mobil CN has failed to sustain its burden of establishing that an arbitration award may be rendered ineffectual without the provisional remedy of attachment, as required by CPLR § 7502(c), the motions to confirm the *ex parte* Orders of Attachment should be denied.

## CONCLUSION

For all of the foregoing reasons, Mobil CN's motions to confirm the *ex parte*

Orders of Attachment should be denied and the Orders of Attachment should be vacated

forthwith.

Dated: New York New York
        January 24, 2008

                                        Respectfully submitted,


                                        CURTIS, MALLET-PREVOST,
                                          COLT & MOSLE LLP


                                        By: _____
                                              Joseph D. Pizzurro (JP-0124)
                                        101 Park Avenue
                                        New York, New York  10178
                                        (212) 696-6000
                                        *Attorneys for Defendant*
                                        *PDVSA Cerro Negro, S.A.*


Of Counsel
Dora Straus (DS-8079)
Rachael Yocum (RY-7456)