**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOBIL CERRO NEGRO, LTD., ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 07 Civ. 11590 (DAB) |
| ) | |
| ) | |
| v. ) | **DECLARATION OF STEVEN** |
| ) | **K. DAVIDSON MADE IN** |
| ) | **SUPPORT OF PLAINTIFF'S** |
| PDVSA CERRO NEGRO S.A. ) | **REPLY MEMORANDUM OF** |
| ) | **LAW IN SUPPORT OF** |
| Defendant. ) | **MOTIONS TO CONFIRM** |
| ) | **ORDERS OF ATTACHMENT** |
| ) | |

I, Steven K. Davidson, hereby declare as follows:

1.    I am an attorney with Steptoe & Johnson LLP, one of the attorneys for Plaintiff

Mobil Cerro Negro, Ltd. ("Mobil CN") in the above-captioned action.

2.    Attached hereto are true and correct copies of the following exhibits, which are

submitted with Plaintiff Mobil CN's Reply Memorandum in Support of Its Motions to Confirm

Orders of Attachment:

Exhibit 1:    Freezing Injunction, ordered in *Mobil CN v. PDVSA*, Claim No. 2008
Folio 61 (Q.B.D. Jan. 25, 2008) (U.K.).

Exhibit 2:    Excerpts from First Affidavit of Thomas Kimpton Sprange, sworn on Jan.
22, 2008, which was filed under seal in *Mobil CN v. PDVSA*, Claim No.
2008 Folio 61 (Q.B.D.) (U.K.), and which was served in full on Curtis
Malet-Prevost, Colt & Mosle LLP, counsel for PDVSA CN.

Exhibit 3:    Exxon Mobil Corporation, Citibank Account Statement (Dec. 28, 2007)
(redacted).

Exhibit 4:    Excerpts from Amended and Restated Bond Indenture, among Cerro
Negro Finance, Ltd., Mobil CN, PDVSA CN, & Deutsche Bank Trust
Company Americas (Dec. 28, 2007).

3.    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct. Executed on February 4, 2008.

_____
Steven K. Davidson

# EXHIBIT 1

FREEZING INJUNCTION

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Before The Honourable Mr. Justice Teare

Claim No. 2008 Folio 61

Dated 24th January 2008

**MOBIL CERRO NEGRO, LTD.**

Applicant



**PETRÓLEOS DE VENEZUELA, S.A.**

Respondent

Petróleos de Venezuela, S.A.
Avenida Libertador
Edificio Petróleos de Venezuela, S.A.
Torre Este, Piso 6, La Campiña
P.O. Box 169
Caracas 1050-A
VENEZUELA

## PENAL NOTICE

IF YOU, PETRÓLEOS DE VENEZUELA, S.A., DISOBEY THIS ORDER YOU MAY
BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE FINED OR HAVE
YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING
WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF
THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY
BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

**THIS ORDER**

1.  This is a Freezing Injunction made against Petróleos de Venezuela, S.A. ('the
    Respondent' or 'PDVSA') on 24 January 2008 by Mr Justice Teare on the application
    of Mobil Cerro Negro, Ltd ('the Applicant'). The Judge read the Affidavits listed in
    Schedule A and accepted the undertakings set out in Schedule B at the end of this
    Order.

2. This order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the court to vary or discharge the order – see paragraph 15 below.

3. There will be a further hearing in respect of this order on Friday 22nd February 2008 ('the return date').

4. The Request for Arbitration in the ICC Arbitration dated January 2008 and the First Affidavit of Thomas Kimpton Sprange dated 22 January 2008 be filed under seal and remain private.

5. The Claimant be given permission to serve the Arbitration Claim Form and any other documents in these proceedings out of the jurisdiction on the Defendant.

6. The Respondent has 22 days from the date of service of the Arbitration Claim Form in which to acknowledge service or to file and serve an admission.

**FREEZING INJUNCTION**

7. Until the return date or further order of the court, the Respondent must not –

   (1) remove from England and Wales any of its assets which are in England and Wales up to the value of US$ 12,000,000,000 ("US$ 12 billion"); or

   (2) in any way dispose of, deal with or diminish the value of any of its assets whether they are in or outside England and Wales up to the same value.

8. Paragraph 7 applies to all the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions.

9. This prohibition includes the following assets in particular –

   (a) those shareholdings, in which the Applicant has an interest, whether directly or indirectly, in the following UK incorporated companies:

      (i) Nynas Limited;

      (ii) Eastham Refinery Limited;

      (iii) Nynas Bitumen Limited;

      (iv) Nynas Naphthenics Limited;

      (v) Bitor Energy Plc;

      (vi) Bitor Europe Limited;

   (b) the assets of Nynas UK Aktiebolag's UK branch;

    (c)    Nynas UK Aktiebolag's interest under a lease granted in respect of the refinery at East Camperdown Street, Dundee DD1 3LG, Scotland;

    (d)    any money standing to the credit of any bank account in the name of PDVSA on any company in which it has an interest, whether directly or indirectly, including the amount of any cheque drawn on such account which has not been cleared.

10.

    (1)    If the total value free of charges or other securities ('unencumbered value') of the Respondent's assets in England and Wales exceeds US$ 12 billion the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above US$ 12 billion.

    (2)    If the total unencumbered value of the Respondent's assets in England and Wales does not exceed US$ 12 billion the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above US$ 12 billion.

## PROVISION OF INFORMATION

11.

    (1)    Unless paragraph (2) applies, the Respondent must within 5 working days of the service of this Order and to the best of its ability inform the Applicant's solicitors of all of its assets worldwide exceeding US$ 5,000 in value whether in its own name or not and whether solely or jointly owned, giving the value, location and details of all such assets.

    (2)    If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.

12.    Within 7 working days after being served with this order, the Respondent must swear and serve on the Applicant's solicitors an affidavit setting out the above information.

## EXCEPTIONS TO THIS ORDER

13.

    (1)    This order does not prohibit the Respondent from spending a reasonable sum on legal advice and representation. But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

(2)   This order does not prohibit the Respondent from dealing with or disposing of any of his assets in the ordinary and proper course of business.

(3)   The order will cease to have effect if the Respondent –

(a)   provides security by paying the sum of US$ 12 billion into court, to be held to the order of the court; or

(b)   makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

## COSTS

14.   The costs of this application are reserved to the judge hearing the application on the return date.

## VARIATION OR DISCHARGE OF THIS ORDER

15.   Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

16.   A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

17.   A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

18.   **Effect of this order**

It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

19.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Respondent before it was notified of this order.

20.   **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

21.   **Persons outside England and Wales**

    (1)   Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

    (2)   The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court –

        (a)   the Respondent or its officer or agent appointed by power of attorney;

        (b)   any person who –

            (i)   is subject to the jurisdiction of this court;

            (ii)   has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

            (iii)   is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

        (c)   any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

22.   **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with –

    (1)   what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

    (2)   any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

## COMMUNICATIONS WITH THE COURT

All communications to the court about this order should be sent to –

**Room EB09, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The telephone number is 0207 947 6826.**

**The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.**

## SCHEDULE A

### AFFIDAVITS

The Applicant relied on the following affidavits–

 (1) First Affidavit of Steven Keith Davidson, sworn on 21 January 2008

 (2) First Affidavit of Jim R Massey, sworn on 21 January 2008

 (3) First Affidavit of Hobert E Plunkett, sworn on 21 January 2008

 (4) First Affidavit of Thomas Kimpton Sprange, sworn on 22 January 2008

 (5) First Affidavit of Luis A Ortiz-Alvarez, sworn on 22 January 2008

## SCHEDULE B

### UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make.

(2)    The Applicant will –

       (a)    on or before 7 February 2008 cause a written guarantee in the sum of US$ 1,000,000 (US$1 million) to be issued from a bank with a place of business within England or Wales, in respect of any order the court may make pursuant to paragraph (1) above; and

       (b)    immediately upon issue of the guarantee, cause a copy of it to be served on the Respondent.

(3)    The Applicant will cause an affidavit to be sworn and filed confirming the substance of what was said to the court by the Applicant's counsel/solicitors.

(4)    The Applicant will serve upon the Respondent as soon as practicable –

       (i)    copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the court on the making of the application;

       (ii)    the claim form; and

       (iii)    an application notice for continuation of the order.

(5)    Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(6)    The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(7)    If this order ceases to have effect (for example, if the Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(8)    The Applicant will not without the permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(9)   The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets from any court outside England and Wales other than the United States District Court of the Southern District of New York.

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are:

Thomas Sprange, Steptoe & Johnson, 99 Gresham Street, London EC2V 7NG, telephone: 020 7367 8000 and 07900 910 268 tsprange@steptoe.com

# EXHIBIT 2

The Claimant
First Affidavit of Thomas K Sprange
Sworn 25 January 2008
Exhibition "TKS1-TKS3"

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Claim No 2008 Folio [ ]

B E T W E E N:

MOBIL CERRO NEGRO, LTD.

Claimant/Applicant

-and-

PETRÓLEOS DE VENEZUELA, S.A.

Defendant/Respondent

---

FIRST AFFIDAVIT OF
THOMAS KIMPTON SPRANGE

---

TB/LWI 6676.0001/170626v9

I, THOMAS KIMPTON SPRANGE of 99 Gresham Street London, EC2V 7NG, England, STATE ON OATH as follows:

(1)    I am a partner in the law firm of Steptoe & Johnson and together with Steven K. Davidson have care and conduct of these proceedings.  I am authorised by the Claimant, Mobil Cerro Negro, Ltd. ("**Mobil CN**") to make this Affidavit.

(2)    Except where otherwise indicated, the facts and matters set out below are within my own knowledge.  Where so otherwise indicated, they are true to the best of my information and belief.

## I.    EXHIBIT AND REFERENCES

(3)    There is now produced and shown to me a bundle of copy documents containing exhibits marked TKS1, TKS2 and TKS3 to which I will refer more particularly by reference to tab and page number throughout this Affidavit.  I also make reference to the Case Management Bundle ("A"), Affidavits and Witness Statements Bundle ("B") and a number of documents in the Exhibit Bundles ("C1-C5") where appropriate.

## II.    OVERVIEW/PARTIES

(4)    These proceedings are brought in support of a multi-billion dollar ICC arbitration that the Claimant, Mobil CN will commence on or before 28 January 2008 under the International Chamber of Commerce Rules, with its seat in New York ("**the ICC Arbitration**") (TKS1/144-172) (C2/4/144-172), against the Respondents Petróleos de Venezuela, S.A ("**PDVSA**") and its wholly-owned subsidiary PDVSA Cerro Negro ("**PDVSA CN**").

(5)    The ICC Arbitration relates to, among other things, breaches of contractual obligations by PDVSA CN contained in the Cerro Negro Association Agreement ("**the Association Agreement,**" or "**the Cerro Negro Association Agreement**") and breaches by the Defendant of a Guaranty (the "**Guaranty**" or the "**PDVSA Guaranty**") by which PDVSA guaranteed PDVSA CN's obligation to indemnify the Claimant for damages resulting from the expropriation without compensation of Mobil CN's investment in the Bolivarian Republic of Venezuela ("**Venezuela**").

(182)  It is unlikely in my view that PDVSA would have had such a substantial operation in London without bank accounts being maintained within the jurisdiction. I note in this respect from the company's 31 December 2005 Directors' report and financial statements that it employed an average of 19 persons during 2005 and that the company *"leases its head office, five accommodation properties and five cars in the UK under operating leases"* (TKS2/581) (C3/5/581).

(183)  It is apparent that PDVSA in the past through it corporate interests in the jurisdiction has held bank accounts here. There certainly in this regard appears historically to have been a connection with National Westminster Bank Plc. Thus, Bitor Europe Limited in 1996 registered a charge under section 395 of the Companies Act 1985 over *"the sum of US$2,000,000 together with interest accrued now or to be held by National Westminster Bank Plc on an account numbered 03769623"* (TKS2/230) (C2/5/230). Further, a form 403a filed in 1997 pursuant to section 403(1) of the Companies Act 1985, being a declaration of satisfaction in full or in part of mortgage or charge, refers to the satisfaction of another charge granted in favour of National Westminster Bank Plc over the *"sum of US$3,000,000 together with interest accrued now or to be held by National Westminster Bank Plc on an account numbered P0012411"* (TKS2/232) (C2/5/232).

(184)  It appears also from another form 403a dated 31 August 1995 filed at Companies House by Bitor Europe Limited that the company had charged in favour of Bitumenes Orinoco SA *"payment obligations of Company to Bitor under a Supply Agreement – dated 5.6.89 between the Company and Bitor"* (TKS2/233) (C2/5/233). The form describes the charge as *"19.5.93 – BP Bitor Collateral Receivables Assignment"*, which, when read in the context of the description of the charge provided on the form, suggests that Bitor Europe Limited had charged payment obligations due to it from BP under a supply agreement in favour of its parent company, Bitumenes Orinoco SA. The existence of such a supply agreement again suggests a likelihood that Bitor Europe Limited would have had a bank account in the jurisdiction.

XIII.  RISK OF DISSIPATION OF ASSETS

(185)  It is my belief that there is a real risk that, unless Freezing Order relief is granted in favour of the Applicant, PDVSA's English-based assets will be dissipated with the

TS/LM016016.0001/5706263v3                    - 45 -

result that any award resulting from the ICC Arbitration, will either in part, or in whole, be unsatisfied.

(186) This belief arises from a combination of the following factors, each of which are addressed in more detail below:

(a)   PDVSA is a Venezuelan entity and most of its assets are located in Venezuela. For the reasons described in paragraph (229) *et seq.*, PDVSA's Venezuelan based assets will not be easy to pursue.

(b)   The actions of PDVSA and its subsidiaries to date indicate that there is a clear intent to remove assets from Mobil CN's reach, as described in detail in paragraph (216) *et seq.* below. These actions are consistent with the refusal of PDVSA and its subsidiary PDVSA CN to honour their clear contractual obligations to compensate Mobil CN for the expropriation of Mobil CN's assets worth in the billions of dollar and are aimed, ultimately, at depriving Mobil CN of any recovery for the compensation that may be assessed in the ICC Arbitration.

(c)   PDVSA has announced and is implementing a policy of disposing of US and European based assets and of shifting its non-Venezuelan investments into new countries. PDVSA's President has publicly endorsed Latin America and China as the new frontier for PDVSA. Examples of the disposal of significant PDVSA assets in the United States and Europe over recent years are set forth in paragraphs (192)-(200) below. They demonstrate that PDVSA is seeking to insulate itself from enforcement of international awards by transferring its assets and investments to jurisdictions in which Mobil CN will face real difficulties in seeking enforcement. As a result, PDVSA assets in jurisdictions that would otherwise be susceptible to enforcement will no longer be available.

(d)   PDVSA, through its senior management, has made no secret of its intent to resist attempts by Mobil CN to recover compensation for the expropriation of its investment. Various statements made in this regard are set forth in detail in paragraphs (229)-(231) below.

(e)    The assets of which Mobil CN is currently aware and that Mobil CN seeks to secure by Freezing Order relief are mobile in nature. They are indirectly held interests in substantial businesses and property, bank accounts and trading interests (see paragraphs (126)-(184) above). Absent Freezing Order relief, PDVSA will be free to remove these assets from the jurisdiction of this Court and Mobil CN's reach.

(187)   PDVSA may argue that there is no risk of dissipation of assets on the basis that it is a very large oil company with assets and resources located in a number of jurisdictions throughout the world.

(188)   PDVSA may argue that, as a State owned entity, it has no intention of avoiding payment of any final arbitral award. PDVSA may also point to the fact that a proportion of its revenues are allocated to social programmes in Venezuela and that freezing its assets will have a detrimental effect on its ability to meet these social responsibilities. Various of these arguments are addressed in the following paragraphs and in the Claimant's Outline Argument. Mobil CN does not believe that such arguments have merit.

A.    Nature of assets and PDVSA's established pattern of disposal

(189)   The assets of PDVSA located in the jurisdiction, as detailed above, are such that they could easily and on short notice be disposed of or dissipated in the event that Freezing Order relief is not granted.

(190)   The bank accounts located in England and Wales that Mobil CN believes are held by PDVSA directly and/or indirectly could be very quickly emptied. PDVSA's assets in the form of indirect shareholdings in a number of English companies (including Eastham Refinery Limited, Nynas Bitumen Limited and Highway Emulsions Limited, Nynas Naphthenics Limited, and through PDVSA's subsidiary Bitúmenes Orinoco SA, in Bitor Energy Plc and Bitor Europe Limited) are also capable of rapid dissipation.

(191)   By their nature, these shareholdings are mobile and have the potential to be easily removed from the reach of the Applicants. For example, PDVSA could assign all or any of its indirect shareholdings in the English companies listed above to a foreign

holding company located in a jurisdiction that has no or minimal corporate reporting requirements thereby making it difficult to establish that PDVSA directly or indirectly held an interest in the company, or to a country that has no treaties or laws allowing for the enforcement of arbitral awards against assets of companies incorporated there.

(192)  PDVSA's trading interests could be also be restructured so as to move them beyond the reach of the Claimant. As stated above in paragraphs (180)-(184), from May 1987 until April 2007, PDVSA operated a branch of a foreign company, PDV (UK) SA, in England with a registered office address of 7 Old Park Lane, London, W1K 1QR. The closure of PDV UK and the scaling back of the Bitor business as described in paragraphs (164)-(178) above indicates that the withdrawal of assets from England and Wales has likely already begun, consistent with PDVSA's approach of withdrawing its business operations from the US and Europe and instead focusing on jurisdictions such as Russia, Belarus, Cuba, China, Syria and Iran.

(193)  This pattern of activity is not limited to England and Wales. In 2006, CITGO significantly withdrew from providing gasoline to a large number of U.S. service stations. A 12 July 2006 article titled *"Citgo to stop selling gas to 1,800 U.S. Stations"* reported precisely this fact, the effect of which was reported as being that CITGO would over the next year begin to cease distributing gasoline in 10 U.S. states (TKS3/879) (C4/6/879). The report is substantiated by a similar report dated 13 July 2006 titled *"Citgo cuts off Ohio stations"* from the website of www.cleveland.com (TKS3/880-881) (C4/6/880-881).

(194)  This disposition follows an earlier divestiture of U.S. assets. In 2006, CITGO sold its interest in the 270,000 barrel per day Lyondell Houston oil refinery to its partner Lyondell Chemical, as reported in a 17 April 2007 Reuters report entitled *"PDVSA may sell stakes in two U.S. refineries"* (TKS3/907) (C4/6/907) and in a 26 February 2007 Associate Press/International Herald Tribune article (TKS3/901) (C4/6/901). Reports suggest that the sale would have raised US$2.165 billion, of which US$1.314 billion in cash would pass to PDVSA after the deduction of costs and taxes (TKS3/882-883) (C4/6/882-883).

(195)  To the present day PDVSA continues to divest itself of assets held through its CITGO arm. It was reported on the *Reuters* website on 24 August 2007 that CITGO had sold

a U.S. 545 mile long pipeline owned by it, known as the "Eagle" pipeline, which runs from Houston to Oklahoma, together with five associated terminals to Explorer Pipeline company (TKS3/918) (C4/6/918). The content of this report was confirmed in an 18 December 2007 posting on the website of the investment bank, BNP Paribas (TKS3/943) (C4/6/943).

(196) A further report from the website of *Conapri*, the Venezuelan Council for Investment Promotion, dated 8 November 2007 and titled *"Citgo agrees on sale of two asphalt refineries"* reported that *"Citgo Petroleum Corporation, the subsidiary of state-run oil holding Petróleos de Venezuela (PDVSA) based in the United States, agreed on Wednesday to sell two asphalt refineries located in Paulsboro, New Jersey, and Savannah, Georgia to company NuStar Asphalt Refining LLC"* (TKS3/937) (C4/6/937). The Paulsboro refinery has a daily refining capacity of 70,000 barrels and the Savannah one of 30,000 barrels. An article dated 1 January 2008 reported that the revenue created by the sale of these two refineries was in excess of US$0.5 billion (TKS3/949-950) (C4/6/949-950). One of these sales was also reported in a 16 November 2007 article by the Wall Street Journal (TKS3/938-942) (C4/6/938-942). These disposals clearly represent extremely significant further disposals by PDVSA of its overseas interests.

(197) Recent media reports, cited below, have also referred to a likely sale by PDVSA of a terminal owned by it in the Bahamas, the Bahamas Oil Refinery ("BORCO"), which PDVSA acquired from Chevron Corporation on 8 February 1990 for US$120 Million.

(198) In early 2007, reports emerged of PDVSA's interest in selling the BORCO facility and, according to recent press reports, the facility has now been sold. It has been suggested that the purchase price is in the region of US$1 billion (TKS3/942A) (C4/6/942A).

(199) The above disposals that have already been effected should moreover be viewed in the context of persistent reports that PDVSA is considering disposing of more, or indeed all, of the refining business that it owns through CITGO in the U.S. (TKS3/857-859) (C4/6/857-859), as well as reports - for example the 2 February 2005 article from www.axisoflogic.com (TKS3/858-859) (C4/6/858-859) indicating that the website of the Venezuelan MEP was announcing at the time that PDVSA may also sell its

refineries in Germany, Sweden and the UK. Other reports confirm this, including Simon Romero's 2 February 2005 article in the *New York Times* titled *"Venezuela considers sale of U.S. Refineries"* (TKS3/857) (C4/6/857) in which PDVSA's ownership of U.S. refineries was criticised by PDVSA's leadership. It was further reported on 2 February 2005 (TKS3/858-859) (C4/6/858-859), that PDVSA may also sell its refineries in Germany, Sweden and the UK. In respect of the German interests, attempts to secure a sale began in December 2003 and negotiations have already taken place with Lukoil.

(200)    It is thus clear that PDVSA has, in recent years, demonstrated a willingness to divest itself of its overseas refining interests, and is currently considering the possibility of divesting itself of further such interests. This supports the Applicant's contention that there is a real risk that PDVSA will continue this pattern of activity which will inevitably involve divesting itself of its refining interests as well as its other shareholdings in those UK companies detailed in paragraph (120) above.

(201)    Key drivers behind PDVSA's willingness to divest itself of these interests appears to be where the refinery is located and when the refined product is sold to a foreign oil company. A 26 February 2007 article from The Associated Press/International Herald Tribune, it was reported that PDVSA was considering selling its interest, held through CITGO, in at least one more U.S. based refinery. One of the reasons relied on this regard was a strong desire *"to refine Venezuelan oil in Nicaragua, Jamaica, Brazil or another country friendly with Venezuela"* (TKS3/901) (C4/6/901).

B.    **PDVSA is a foreign entity with the majority of its assets located in Venezuela and outside of England and Wales**

(202)    The majority of PDVSA's assets against which an award or judgment could potentially be enforced, whether held directly or indirectly, appear to be located in Venezuela, where PDVSA is incorporated.

(203)    Although PDVSA indirectly owns substantial assets in the U.S. mainly through its U.S. subsidiary, CITGO Petroleum Corporation, I am informed by Steven K. Davidson, Mobil CN's lead Counsel in the U.S. proceedings and believe that it would be challenging to obtain pre-judgment relief against these assets as a matter of U.S. law. Absent pre-judgment relief, the strong likelihood is, particularly given PDVSA's

disposal approach described in paragraphs (192)-(200) above, that these assets will be dissipated.

(204) PDVSA's assets outside of Venezuela and the U.S. appear to be of modest value, compared to the value of the assets held in Venezuela and the U.S. In this regard, Dr Juan Carlos Boué's 2004 report titled *"The Internationalisation Programme of Petroleos de Venezuela S.A. (PDVSA)"*, which was commissioned by PDV (UK) S.A., is informative. This report contains a "chronogram" which sets out details of overseas refining and storage assets acquired by PDVSA during the period 1983 to 2002 (TKS1/3) (C2/4/3). Although the chronogram lists PDVSA's refining and storage assets outside of Venezuela as totalling (at cost) in the region of US$4.07 billion, the cost value of refining assets located outside of Venezuela which are not in the U.S. is actually only approximately US$0.57 billion. While Mobil CN does not have any information as to the market value of the non-US assets located outside Venezuela, they are likely to constitute a small fraction of Mobil CN's losses arising from the expropriation.

(205) Although it is difficult to determine the total value of PDVSA's global assets, including those in Venezuela and abroad because of the fact that PDVSA has not made any reliable public filings since 2006 when it reported financial statements for the year ended 31 December 2004 to the SEC, recent estimates have placed PDVSA's global asset value at US$62.21 billion (in 2005) (TKS1/57) (C2/4/57).

(206) In light of the figures stated in Dr Juan Carlos Boué's report cited above, it is clear that the majority of PDVSA's assets are located in Venezuela and outside of England and Wales and that its assets outside of Venezuela excluding those in the U.S. are likely to be insufficient to satisfy PDVSA's liability to Mobil CN.

(207) In the event that Mobil CN is successful in obtaining an award against PDVSA in the ICC Arbitration, unless Freezing Order relief is granted, it would fall on Mobil CN to take steps to enforce its award against PDVSA's substantial assets in Venezuela. Whilst Venezuela has been a party to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") since 9 May 1995, for the reasons set out in paragraphs (229) *et seq.*, it appears that Mobil CN's prospects of successfully enforcing any award against assets of PDVSA in Venezuela

are limited, and would likely involve protracted court proceedings and substantial expense. Moreover, given the recent remarks of PDVSA's President rejecting arbitration as a means of resolving disputes relating to PDVSA and Venezuela's oil and indicating that such disputes will henceforward be reserved to the national courts, it is my belief that pressure will be exerted on the Venezuelan courts if asked to enforce an ICC award in favour of Mobil CN under the New York Convention.

(208) In this regard, it is worth highlighting recent reports to the effect that the Venezuelan Government has taken steps to increase its ability to exert pressure on the judiciary in furtherance of its own interests. A report from 30 April 2004 published on the BBC's website and titled *"Storm over Venezuela Court reform"* (TKB3/852) (C4/6/852) reported that *"opposition leaders in Venezuela have sharply criticised controversial reforms to the Supreme Court"* following the introduction of a law which increased the number of Supreme Court judges from 20 to 32. The report noted opposition statements that these changes would allow the Government to *"appoint more sympathetic judges and, in effect, dominate the judiciary"*.

(209) The focus of the controversy at the time was related to the fact that the Supreme Court was shortly going to rule on the validity of a large number of votes cast in a pending referendum relating to the presidency. The altering of the Venezuelan judiciary was also reported in an article dated 17 June 2004 titled *"Venezuela: Judicial Independence under Siege"* from the website of *Human Rights Watch* (TKB3/853-854) (C4/6/853-854) and in a 21 June 2004 article titled *"Court-packing in Venezuela"* which is carried by the *FindLaw* website (TKB3/855-856) (C4/6/855-856).

C.  **PDVSA's current and on-going restructuring of its business operations – sale of foreign operations**

(210) In the following sections and paragraphs I set forth, based on information and belief, facts relating to the broad current business policies of PDVSA in terms of the countries and geographic regions to which its activities are in the process of being redirected and the identities of its new trading partners. The sources of my information are various press reports and extracts from the website of PDVSA which are referenced below.

T3/LW/16476.0001/07052v0                           - 52 -

**Overview**

(211) Since 1998, PDVSA has undergone a sustained and comprehensive period of change with regard to location of its business operations and the identity of those counterparties with which it conducts business.

(212) A fundamental consideration, that is currently driving the major changes at PDVSA, as set out below, appears to be a desire to reverse the perceived negative consequences of the policy of "internationalisation" of Venezuela's oil producing industry. From 1983 to 2002 PDVSA's overseas investment focussed on the integration of its exploration, refining, and distribution and marketing activities with those of large oil consuming countries.

(213) For the reasons stated fully below, it is fair to say that PDVSA is currently seeking to reverse many of the effects of this policy, under which it formed joint ventures with major international oil companies ("IOCs") in such a way that, in PDVSA's current view, its interests were subjugated to those of the international oil companies and the oil consuming countries which formed their primary markets.

(214) As addressed fully below, key tendencies of PDVSA displayed in connection with its current policy of reversing the earlier negatively-perceived effects of the *internationalisation* include, to a degree, the transferring of its business assets and operations away from the US and European countries and their oil companies, to new markets, together with a general increase in the conduct of business and exchange of investment with such countries. This current tendency supports the Applicants' contention that there is a real risk that any arbitral award or judgment obtained by the Applicants further to the Arbitration may go unsatisfied unless Freezing Order relief is granted.

**Internationalisation and recent attempts to reverse this process**

(215) In a recent speech given in September 2006 during the Third OPEC International Seminar, the Venezuelan Ministry of Energy and Petroleum and President of PDVSA expressed the view that internationalisation had negatively impacted PDVSA, in particular that it had *"fallen prey to a strategy of agency capture on the part of certain consuming countries and international oil companies"* (TKS3/884) (C4/6/884).

(216)  The present PDVSA leadership have complained that, under the policy of internationalisation, only a small proportion of the profits generated found their way back to Venezuela. They have contended that reinvestment of profits abroad was not necessary to secure a stable petroleum rent and to avoid the collapse of the Venezuelan oil industry. The view was further expressed that PDVSA's international refining and marketing assets made a disproportionate contribution to the Company's costs but a negligible contribution to its taxable income (see page 36 of *"The Internationalisation programme of Petroleos de Venezuela S.A. (PDVSA)"* by Dr Juan Carlos Boue, March 2004 (TKS1/37) (C2/4/37)).

(217)  During the Third OPEC International Seminar, PDVSA's President described the steps that from 2003 onwards steps were taken to reverse this situation (TKS3/884) (C4/6/884).   This has led to a conscious effort by PDVSA in recent years to "repatriate" its wealth generating assets from the major oil consuming countries and their international oil companies. In so doing, PDVSA is currently in the process of significantly restructuring its commercial operations and diversifying its trading partners in such a way as to move away from trading with the US and Europe and instead towards states which PDVSA perceives are more like minded Governments.

(218)  It is interesting to note, given PDVSA's indirect shareholding in those UK companies identified above which are involved in the refining and trading of petroleum products, that some of the harshest criticism of the effects of the internationalisation policy that has been applied to PDVSA is directed towards PDVSA's investments in overseas refineries.   For example, PDVSA's President noted that:   *"During almost twenty years, the colossal investments in refineries abroad had not led to the repatriation of a single dollar in dividends to PDVSA's ultimate shareholder, the Venezuelan state.   All dividends were recycled within the same structure, and were invested, spent and misspent abroad, thereby allowing PDVSA to accumulate assets over which its shareholder, the state exercised no control"* (TKS3/884) (C4/6/884).

(219)  PDVSA's website currently elaborates on PDVSA's views with regard to the earlier internationalisation programme.   Again, it directs strong criticism at PDVSA's acquisition during the internationalisation programme of interests in overseas refining operations, in particular the investments made between 1986 and 1998 by PDVSA's U.S. subsidiary CITGO in eight U.S. refineries (TKS3/849) (C4/6/849).

(220) Thus, as stated in paragraph (194) above, CITGO, PDVSA's U.S. subsidiary, has recently sold its stake in the Lyondell Oil Refinery in Houston, Texas and has disposed recently of its interest in two U.S. asphalt refineries and substantial pipeline assets in the United States. CITGO has also limited its gasoline distribution market in the United States. As also stated above, rumours continue to persist that CITGO is considering divesting itself of a number of other large oil refineries owned by it in the U.S. including its refinery in Lake Charles, Louisiana, the fourth-largest in the United States at 440,000 barrels per day, its Corpus Christi, Texas refinery, which has a crude processing capacity of 150,000 barrels per day and its Lemont, Illinois refinery, which has a daily processing capacity of 150,000 barrels per day.

**PDVSA's growing ties with new markets**

(221) At the same time, the focus on expanding operations in conjunction with countries such as Russia, Cuba, China and Iran is also apparent. In an article published on 3 October 2007 by Steve Ellner titled *"Using Oil Diplomacy to Sever Venezuela's Independence"*, reference was made to talks between PDVSA and Iran, Russia and Belarus. The article also reports PDVSA's increased cooperation with countries such as Brazil, Argentina and Uruguay, as well as India, China and Vietnam in the expropriation of the Orinoco Belt:

> *"Indeed, the participation of energy-hungry economic powerhouses China and India in the Orinoco Belt may represent a great leap forward in Venezuela's attempt to diversify...*
>
> *The effect of this strategy is already apparent. During the past two years, Venezuelan oil exports to the United States have declined 8.2%. Exports to China have spiked since 2003, from 12,000 barrels a day to 150,000 ..."* (TKS3/924-925) (C4/6/924-925)

(222) Further examples of PDVSA withdrawing its commercial activities away from the countries in which the international oil companies are based, in favour of countries are cited in a 27 November 2006 article published on the website of the *"Council on Foreign Relations"* which is concerned with *"Venezuela's oil-based economy"*. Information is provided as to recent developments between PDVSA and China, Iran and India. It is reported there that PDVSA's oil exports to China have gone up to

150,000 barrels a day in 2006 from 12,300 barrels per day in 2004 and are expected to increase to 500,000 barrels per day within five years. The article also refers to China investing US$2 billion in oil related exploration and development projects in Venezuela's Zumano region and Orinoco Oil Belt (TKS3/889) (C4/6/889).

(223)   With regard to Iran, the article reports that PDVSA and Iran made an agreement in August 2006 to build joint oil refineries in Indonesia, Syria and Venezuela and that Iran's state-owned oil company Petrobars had began to invest in oil exploration and development in the Orinoco Oil Belt. The same article also reports that PDVSA agreed in 2006 to begin sending 2 million barrels per month to India and that both countries are jointly exploring heavy crude oil in India (TKS3/889) (C4/6/889).

(224)   The article reports other developments, including an agreement to build a US$335 million gas pipeline between Colombia gas fields and Venezuela's refining complex in Paraguana is cited, as is Venezuela's selling up to 100,000 barrels per day of oil to Cuba at a highly discounted rate.

(225)   A WSJ article of 1 May 2007 authored by David Luhnaw and Peter Millard, (TKS3/908-911) (C4/6/908-911) refers to Venezuela's intention, through PDVSA, to make China its *"chief strategic energy partner, both as a source of investment and an important client to exports"* (TKS3/908) (C4/6/908). The article also reports that PDVSA had unveiled a number of proposed oil-related deals with China valued at US$13 billion. In one of the deals, China National Petroleum Corporation (CNPC) would develop, together with PDVSA, a large area of Venezuela's Orinoco River region. The oil to be produced there would then be transported to China in a new, joint "super fleet" of tankers and would be processed there at three new refineries to be built to handle Orinoco heavy crude oil. See also *"The New PDVSA Contact"* from August 2005 (TKS3/860-871) (C4/6/860-871). Further, in March 2007, it was reported in the *www.mercopress.com* website that China was set to rival the U.S. as Venezuela's top oil buyer (TKS3/902-906) (C4/6/902-906). The article reports that Venezuela and China had planned to build three refineries in China to process 800,000 barrel per day of heavy Venezuelan crude.

(226)   The article highlights also that Venezuela's oil business was being moved towards state-run companies belonging to Governments considered to be like minded, and

away from the traditional international oil companies which, it is argued, had historically exploited Venezuela's oil reserves. Thus, the article states: *"Consider the list of winners of contracts handed out to companies to certify oil holdings in the Orinoco region in the last two years; Vietnam, Iran, Brazil and China. Last month, PDVSA signed a deal with Belarus to work in the Orinoco. Meanwhile, today's nationalisation ceremony pushes out U.S. companies Exxon Mobil Corp, ConocoPhillips and Chevron Corp, along with Britain's BP Plc, France's Total SA and Norway's Statoil ASA."* (TKS3/909) (C4/6/909).

(227)   In a speech delivered at the 2007 Lisbon Energy Forum, PDVSA's President elaborated on PDVSA's current policy of seeking to move away from reliance upon historic investors towards diversification of the market place with particular focus on new countries. He referred to the entities currently participating in the Orinoco Oil Belt, namely *"Iranian .corporations; Spanish REPSOL, Russian GAZPROM and LUKOIL, Chinese CNPC, Indian ONGC and companies of Cuba, Vietnam and Belarus"* (TKS3/923) (C4/6/923). He also highlighted the extent to which PDVSA had recently entered into agreements with regional Latin-American countries for the first time to supply them with oil: *"There is a set of initiatives with neighbouring countries. For one hundred years of oil production we had [n]ever [sic] used not a single barrel of oil for their development. Now, we have entered into joint agreements with Colombia, where we will lay a gas pipeline to supply gas to that country; Brazil, where we are building a refinery along with Petrobras; Uruguay, where we are supplying 50,000 bpd of oil; and Bolivia, where we are expanding La Teja Refinery and supplying 200,000 barrels of diesel. Agreements have been executed also with Argentina, Paraguay and the Caribbean."* (TKS3/923) (C4/6/923).

(228)   It was reported on 15 October 2007 in an article entitled *"Cuba, Venezuela strengthen economic ties"* on the Reuters website that the two countries had signed a large number of economic agreements aimed at furthered cooperation between them *"... including plans for nickel and oil development and a billion-dollar petro-chemical complex in Cuba"* (TKS3/933) (C4/6/933). Venezuela's and Cuba's increasing commercial corporation, particularly in respect of the oil business, was further reported in a 16 October 2007 article titled *"Cuba and Venezuela Deepen Alliance with More Accords"* published on www.venezuelaanalysis.com:

*"Cuba and Venezuela signed a total of 14 economic agreements yesterday, including a joint oil refinery, the exploration for oil in Cuba and in the Gulf of Mexico, an underwater fiber optic cable connecting the two countries, and several joint companies to undertake other ventures. They also made agreements to study many other aspects for "a growing process of union and integration"*

*By the end of the year the 2 Governments plan to inaugurate a refinery on the Southern coast of Cuba that will initially process 65,000 barrels of oil per day, and later up to 108,000 barrels."* (TKS3/935) (C4/6/935)

### A.    PDVSA's objection to International Arbitration

(229)  In a recent address to the *National Assembly Plenary on the Model for Mixed Companies* (TKS3/872-878) (C4/6/872-878), PDVSA's President criticised the company's historical tendency to agree to arbitrate disputes arising out of its agreements with IOCs and noted that: *"Throughout Venezuelan history, in the legislation that rules the mining and oil matters, the Venezuelan state always established that any dispute would be resolved before our national courts, with national jurisdiction."* He went on to express disapproval of the arbitration process and expressed the intention that future agreements and disputes *"linked to issues related to oil sovereignty would be decided and elucidated here, in our national courts. We will not accept arbitrage as a mechanism for dispute resolution."* (TKS3/875) (C4/6/875).

(230)  As detailed further below, recent reports indicate that a strong sentiment has recently emerged at PDVSA and also within the Executive and Legislative branches of the Venezuelan Government to reject international arbitration as a means of resolving disputes relating to PDVSA and its activities in connection with Venezuela's oil reserves.

(231)  In a article titled *"PDVSA open to all forms of payment for nationalized assets"*, from Business News Americas, 28 September 2007 (TKS3/921) (C4/6/921), it was reported that *"Venezuelan energy and oil minister and PDVSA President ... has said Venezuela will not accept international arbitration over the assets."*  Further, according to a

transcript of an interview with Venezuelan state television, he stated that *"We do not expect to pay out money in order to arrive at some arrangement with the [oil] companies"* (see www.gkcaracas.um.dk, 14 May 2007 (TKS3/921) (C4/6/921))

**B.      Nature of the underlying dispute**

(232)   As detailed in paragraphs (89)-(98) above, as part of his drive to nationalise key industries, the Venezuelan President decreed on 26 February 2006 that six foreign oil companies, including the Applicant, were required to make PDVSA (or its subsidiaries) the majority partner in their Orinoco Oil Belt projects through new "mixed" companies in which the foreign oil companies would have, in addition to a reduced equity participation, radically reduced rights and legal protections.

(233)   Venezuela has substantially raised its tax take from private oil producers as its bargaining power has risen along with the oil price. Now it has also completed the process of forcing all foreign companies to accept minority shares in joint ventures of PDVSA or have their investments expropriated (see *"It's our oil: Exeunt Exxon and Conoco"*, from The Economist, 28 June 2007 (TKS3/916-917) (C4/6/916-917)).

(234)   As required by the Nationalisation Decree, the foreign companies discussed with the Venezuelan Government terms and conditions for their potential participation in the new mixed company that would control the relevant joint ventures.

(235)   Seven of the eleven companies operating in the Orinoco belt, including Chevron BP and Total, agreed to the new terms. However, as of 26 June 2007, the Applicant together with ConocoPhillips and China Petroleum, refused to accept the terms and conditions that the Venezuelan Government proffered (on a non-negotiable basis), as such terms and conditions would have radically diminished the Applicant's rights under the Cerro Negro Association Agreement without due compensation (see *"US firms reject Venezuelan deal"*, from BBC News, 26 June 2007 (TKS3/914) (C4/6/914).

(236)   As of 27 June 2007, the Venezuelan Government expropriated, without compensation, the interests of the Applicant in the Cerro Negro Joint Venture including the Applicant's interests in the Cerro Negro Association Agreement. *"For us, there is no cost,"* insisted PDVSA's President *"There is an important gain: national*

sovereignty." (see "It's our oil: Exeunt Exxon and Conoco", from The Economist, 28 June 2007 (TKS3/916) (C4/6/916)).

(237)   In the Association Agreement, PDVSA CN undertook to provide indemnification, in an amount calculated under the same Agreement, for damages suffered by Mobil CN as a consequence of any Discriminatory Action that causes a material adverse impact, such as expropriation of Mobil CN's interests in the Cerro Negro Joint Venture or any other adverse measure that would curtail Mobil CN's cash flows.

(238)   The Guaranty provides that PDVSA, as the Guarantor, unconditionally and irrevocably guarantees to Mobil CN, as the Beneficiary, the timely performance of all the obligations assumed by PDVSA CN in the Association Agreement and related agreements. Article 3 of the Guaranty provides that:

> "The Guarantor additionally unconditionally and irrevocably guarantees to each of the Beneficiaries, as primary debtor and obligor, the timely performance of all of the obligations of the Guaranteed Affiliate under the Agreement and the Operating Agreement. If the Guaranteed Affiliate fails to perform any of its obligations in the manner and at the time required, the Guarantor shall perform or procure the performance of such obligation upon demand by any of the Beneficiaries." (C1/2/141).

(239)   Therefore, PDVSA has a clear contractual obligation to compensate Mobil CN where PDVSA CN fails to do so.

(240)   On 25 June 2007 and 27 June 2007, Mobil CN sent Notices of Discriminatory Actions to PDVSA CN and PDVSA (C1/2/172-173 and 177-178). The Notices stated that the measures taken by the Venezuelan Government, following the Nationalisation Decree, constituted Discriminatory Actions (as defined in the Association Agreement) that have caused a Material Adverse Impact to Mobil CN in fiscal year 2007 and future fiscal years. The Notices demanded prompt payment of compensatory damages according to the terms of the Association Agreement.

(241)   PDVSA CN has acknowledged in a letter from Curtis, Mallet-Prevost, Colt and Mosle LLP, PDVSA CN's counsel, to Carter Leyard & Millburn LLP, dated 25 July 2007,

that Mobil CN *"...ceased to have an interest in the [Cerro Negro] Project as of June 27, 300[7][sic]."* (C1/2/179-178).

(242) However, despite acknowledging the taking of Mobil CN's interests in the Cerro Negro Joint Venture, PDVSA CN has failed to provide Mobil CN with the indemnification required in the Association Agreement and, despite further demands (dated 10 October 2007) relating to PDVSA's obligations under the Guaranty and the instigation of the ICSID Arbitration, PDVSA has failed to perform, or cause the performance of, PDVSA CN's obligation to indemnify Mobil CN. The only likely conclusion that can be reached from PDVSA's failure to perform its obligations under the Guaranty is that it intends to avoid paying any compensation to the Applicant. Of particular relevance to these considerations is the fact that PDVSA CN's financial position makes recovery against it unlikely, as described in more detail in the Memorandum Of Law In Support Of Motion For An Order Of Attachment Without Notice (C1/1/40-46) filed by Mobil CN in the US Proceedings relating to PDVSA CN.

(243) The fact that PDVSA apparently is prepared to ignore its clear contractual obligations further supports my belief that there is a risk that it will take steps to put its assets out of the reach of Mobil CN by dissipating them in the manner discussed in above.

C.    PDVSA's credit history and related issues

(244) A report by the Caracas based economic institute Centro de Investigaciones Económicas ("CIECA") estimated PDVSA had a net loss of US$ 3.7 billion in 2006; a year when most other oil companies posted record profits. The CIECA analysis shows PDVSA handed over about 70 percent of its gross revenue to the state, including US$28.7 billion in taxes, royalties and dividends, and US$9.9 billion for social spending.

(245) PDVSA, *"is overstretched to capacity with any number of needs,"* according to Patrick Esteruelas, an analyst at the New York based Eurasia Group. The firm is borrowing billions from foreign lenders, while independent estimates show its output falling (see *"Government Spending Strains PDVSA"*, from the Miami Herald, 28 March 2007 (TKS3/904) (C4/6/904)). It also appears from the volume and significance of the agreements that PDVSA has entered into over recent years with

various new partners (see paragraphs (221) - (228)) that its production and financial capacity is likewise overstretched.

(246) According to Gustavo Coronel, an oil industry veteran of 28 years, a member of PDVSA's board of directors (1975-1979) and associate editor of www.petroleumworld.com, PDVSA has recently issued bonds for around US$5 billion, has borrowed around US$4 billion from China and is seeking to borrow a further US$1 billion in the international financial markets. (See www.petroleumworld.com, 20 December 2007 (TKS3/944-945) (C4/6/944-945).

(247) In the "Index of Economic Freedom 2007" by the World Heritage Foundation and the Wall Street Journal, Venezuela scores low on investment freedom, property rights, labour freedom, and freedom from corruption (TKS3/897-898) (C4/6/897-898). The report goes on to assert, among other criticisms: that the commercial regulatory process is burdensome and confusing; that the judiciary is heavily influenced by the government and does not enforce contracts well; and that corruption pervades the civil service. This is supported by the findings of Transparency International, a global anti-corruption group, which ranks Venezuela the least transparent country in Latin America and 162 out of 179 nations globally (TKS3/891) (C4/6/891).

(248) There have been recent allegations of corruption in PDVSA. The President of PDVSA recognised that, *"within a company as complex as PDVSA, that makes many types of transactions every day, there are cases that we are investigating, that we are processing."* (see *"Oil Minister Calls on Exxon and Conoco to Leave Venezuela"*, from www.venezuelanlysis.com, 30 August 2007 (TKS3/919-920) (C4/6/919-920).

(249) PDVSA has not published financial statements since 2006. The financial statements that it filed in 2006 were stated to be applicable for the financial year ending 31 December 2004. In light of the lack of recent publicly available financial statements Mobil CN has not been able to confirm the financial content of the reports described above.

XIV.  THE CONSTITUTION OF THE ARBITRAL TRIBUNAL

(250) In this application, Mobil CN seeks Freezing Order relief against PDVSA at a time when the ICC Arbitration is yet to be commenced, albeit the Request for Arbitration

(261)   In light of the above, it is my belief that it would take in the region of at least 8 to 10 weeks for the tribunal to be constituted in the ICC Arbitration and to be in a position to order the relief sought by Mobil CN in this application.

## XV.    MOBIL CN'S FINANCIAL POSITION AND UNDERTAKING AS TO DAMAGES

(262)   The following particulars with respect to Mobil CN's financial position are provided on information and belief following discussion with Mr Massey and further to my review of relevant financial records.

(263)   Mobil CN is a corporation organised and existing under the laws of the Commonwealth of the Bahamas. It is a wholly-owned indirect subsidiary of Exxon Mobil Corporation, the world's largest publicly traded international oil and gas company.

(264)   As reported on page 3 of Mobil CN's *Report of Independent Auditors and Consolidated Financial Statements December 31, 2006 and 2005"* (TKS2/310) (C2/5/310) the company in 2006 had total assets of US$1,219 billion. Revenues in 2006 were US$758,018,000, resulting in net income of US$361,943,000 after the deduction of costs and other expenses (see page 4 of the financial statements). This was an increase of over US$100 million from the previous year. As set forth in the First Affidavit of Mr. Plunkett (B/3) Mobil CN's financial position has been adversely affected by the expropriation without compensation of its interests in the Cerro Negro Joint Venture, particularly as the Cerro Negro Joint Venture represented Mobil CN's primary commercial activity.

(265)   On the basis of the above information, it is my belief that Mobil CN can meet any claim for damages which PDVSA or any third party served with the proposed freezing order could potentially bring. Moreover, I confirm that Mobil CN is prepared to provide the usual form of undertaking in damages and, if required by the Court, to fortify this undertaking by submitting an appropriate bank guarantee or bond.

SWORN by the said                                   )
**THOMAS KIMPTON SPRANGE**       )
At 99 ＱＳＯＩＨＭ  ＳＮＥＥ  ＬＯＮＤＯＮ    )
This  22ｎｄ day of January 2008         )
ＢＥＦＯＲＥ ＭＥ :
                         A Commissioner for Oaths
                 Bankside House, 107 Leadenhall Street
TSA/W/16676.0001/370626v3                London  EC3A 4AF                   - 55 -
                                 England
                               (N. F. Ready)

# EXHIBIT 3

CitiDirect® Online Banking

Account Statement Inquiry

CitiDirect Support Website

EXXON MOBIL CORPORATION

| Criteria | Summary | Details |

**Legal Text**

We have Credited Your Account.

**Account Number**

**Account Name**
EXXON OVERSEAS INVEST CORP

**Amount**
242,127,969.30

**IBAN Number**

**Branch Number**
930

**Customer Number**

**Value Date**
12/28/2007

**Currency**
USD

**Branch Name**
NEW YORK CITIBANK - CORPORATI

**Customer Name**
EXXON MOBIL CORPORATION

**Statement Date**
12/28/2007

**Entry Date**
12/28/2007

**Bank Name**
CITIBANK

**Customer Reference**
021000089

**Bank Reference**
FO7736201B840L

**Branch Tax Id Number**

**Transaction Details**

| (1) Field Name | Value |
| --- | --- |
| Ordering Bank Name/Address | NEW YORK, NY10015 |
| Originating Bank Name/Address | BANK OF NEW YORK MELLON |
| Originating Bank Name/Address | GLOBAL CORPORATE TRUST |
| Originating Bank Name/Address | JAMES FEVOLA |
| Originating Bank Name/Address | 212_815_5075 |
| By Order Of Name/Address | 057640 |
| By Order Of Name/Address | CERRO MOBIL BORROWER DISTRIBUTION A |
| Beneficiary Account/ID | 40684312 |
| Beneficiary Name/Address | EXXON OVERSEAS INVESTMENT CORP |
| Beneficiary Name/Address | C/O ESSO BERMUDA LTD |
| Beneficiary Name/Address | PO BOX GX49 |
| Beneficiary Name/Address | ST GEORGES GXEX BERMUDA |
| Correspondent Bank Account/ID | 0000469324 |
| Correspondent Bank Name/Address | DSE MANUAL WIRES |
| Correspondent Bank Name/Address | THE BANK OF NY CORP TRUST CONTROL |
| Correspondent Bank Name/Address | 111 SANDERS CREEK PKWY |
| Correspondent Bank Name/Address | EAST SYRACUSE, NY 13057_1382 |
| Bank Clearing ID | 20071228B10B154C006705 |
| Bank Clearing ID Type | FED IMAD |
| Remitter Reference | DSP071228021217700 |
| Posted Time | 16:18:00 GMT-05:00 |
| Batch Track Number | 6500200715S71 |

# EXHIBIT 4

## AMENDED AND RESTATED BOND INDENTURE

### dated as of December 28, 2007

**Among**

### CERRO NEGRO FINANCE, LTD.,
**as Issuer**

### MOBIL CERRO NEGRO, LTD.

**and**

### PDVSA CERRO NEGRO, S.A.,
**as Guarantors**

**and**

### DEUTSCHE BANK TRUST COMPANY AMERICAS,
**as Bond Trustee**

### Providing for the Issuance from Time to Time of
### Bonds in One or More Series

York City time) on the Business Day preceding that on which final judgment is given. The obligation of the Issuer and each Borrower in respect of any such sum due from any of them to the Bondholders hereunder or under any Bond shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Bondholders of any sum adjudged to be due hereunder or under such Bond in the Second Currency the Bond Trustee may purchase Dollars at the Spot Rate with the amount of the Second Currency so adjudged to be due; and the Issuer and the Borrowers hereby, as a separate obligation and notwithstanding any such judgment, agree to indemnify the Bondholders against, and to pay the Bond Trustee, for the benefit of the Bondholders, on demand, in Dollars, any excess of the sum originally due to the Bondholders in Dollars over the amount of Dollars so purchased and transferred; and if the amount of Dollars so purchased exceeds the sum originally due to the Bondholders, the Bond Trustee shall remit such excess to the relevant Borrower or Issuer, as the case may be.

SECTION 1.13.    *Legal Holidays.*  In any case where the Payment Date, Redemption Date or the Stated Maturity of any Bond or of any installment of principal thereof or payment of interest thereon, or any date on which any Defaulted Interest is proposed to be paid, shall not be a Business Day at the place in which it is presented for payment, then (notwithstanding any other provision of this Bond Indenture or such Bond) payment of interest and/or principal, and/or premium, if any, need not be made on such date, but may be made on the next succeeding Business Day at the place in which it is presented for payment with the same force and effect as if made on the Payment Date, Redemption Date, prepayment date or at the Stated Maturity, or on the date on which the Defaulted Interest is proposed to be paid, and, except as provided in the terms established for such Bond, if such payment is timely made, no interest shall accrue for the period from and after such Payment Date, Redemption Date, prepayment date or Stated Maturity, or date for the payment of Defaulted Interest, as the case may be, to the date of such payment.

SECTION 1.14.    *No Waiver.*  Nothing in this Bond Indenture or in any other instrument executed simultaneously or in connection therewith shall constitute, or be construed as, an express or implied waiver of, or shall otherwise impair or prejudice, any claim or defense that either Borrower or any of its Affiliates may have against the other Borrower or any of its Affiliates.

SECTION 1.15.    *Payments.*  The payment or deposit of any amount or amounts required to be paid or deposited with the Bond Trustee pursuant to this Bond Indenture shall be deemed to have been made by the Issuer, the Borrowers or other Person who may redeem or purchase Bonds pursuant to Section 3.09 hereof if such amount or amounts shall have been paid or deposited into the principal, interest and other amounts account established by the Bond Trustee at its Corporate Trust Office for the purpose of receiving payments of principal, interest and other amounts with respect to the Bonds, *provided* that any such payment or deposit to the Bond Trustee shall be accompanied by notification specifying the purpose for which it was made.

SECTION 1.16.    *Information to Bondholders.*  With respect to the information and documents required to be delivered to the Bond Trustee by the Borrowers pursuant to Rule 144A(d) under the Securities Act, the Bond Trustee shall deliver, at the expense of the Borrowers, any such documents and information (i) to each Bondholder and (ii) to any beneficial