# Exhibit 1

# Part A



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration ● Cour internationale d'arbitrage**



# AWARD

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

# MOBIL CERRO NEGRO, LTD
Bahamas

**Claimant (*"Mobil CN"*)**

## VS.

### 1. PETRÓLEOS DE VENEZUELA, S.A.
Venezuela

**Respondent 1 (*"PDVSA"*)**

### 2. PDVSA CERRO NEGRO, S.A.
Venezuela

**Respondent 2 (*"PDVSA-CN"*)**

# FINAL AWARD

THE ARBITRAL TRIBUNAL:

**Mr. Henri C. Alvarez (Co-Arbitrator)**

**Mr. Jacques Salès (Co-Arbitrator)**

**Prof. Dr. Karl-Heinz Böckstiegel (Chairman )**

Ms. Katherine Simpson, LL.M. (Administrative Secretary to the Tribunal)

Date of this Award: 23 December 2011

## Table of Contents

| | | | |
|---|---|---|---|
| **A.** | **The Parties** | | **15** |
| **B.** | **The Tribunal** | | **17** |
| **C.** | **Short Identification of the Case** | | **18** |
| | **C.I.** | **The Claimant's Perspective** | **18** |
| | **C.II.** | **The Respondents' Perspective** | **20** |
| **D.** | **Procedural History** | | **24** |
| **E.** | **The Principal Relevant Legal Provisions** | | **46** |
| | **E.I.** | **The Association Agreement** | **46** |
| | 1. | Article 1 – Definitions | 48 |
| | 2. | Article 7.2(a) – Development Production | 52 |
| | 3. | Articles 8.2(a) & (b) Commercial Production | 52 |
| | 4. | Articles 14.1 & 14.2 Production Curtailment | 54 |
| | 5. | Article 15.1– Consequences of Governmental Actions | 55 |
| | 6. | Article 15.2– Limitation on Lagoven CN's Obligation | 58 |
| | 7. | Article 16.1(a) & (b) – Termination | 61 |
| | 8. | Article 17.2 – Indemnification | 62 |
| | 9. | Articles 18.1, 18.2, & 18.4 –  Governing Law, Arbitration, Sovereign Rights | 62 |
| | 10. | Articles 21.1(a) & (b) – Force Majeure | 64 |
| | 11. | Article 21.2 – Notice, Duty to Mitigate | 66 |
| | 12. | Article 23.2 – Integrity of the Agreement | 67 |
| | 13. | Article 23.4(a) – Waiver and Amendments | 67 |
| | 14. | Article 23.7(a) – Official Language | 68 |

| | | |
|---|---|---|
| 15. | Article 23.9 – Contracts Outside the Scope of this Agreement | 68 |
| 16. | Article 23.11 – No Governmental Guaranties | 69 |
| E.II. | Annex G, Accounting Procedures | 69 |
| 1. | Article 1.1, Purposes | 69 |
| 2. | Article 7.1, Net Cash Flow | 70 |
| 3. | Article 7.2, Adjusted Net Cash Flow | 71 |
| 4. | Article 7.3, Reference (Threshold) Cash Flow | 72 |
| 5. | Article 7.4, Damages Payable | 73 |
| 6. | Article 7.5, Limitation | 73 |
| 7. | Article 7.7, Project Expansion | 74 |
| E.III. | The Guaranty | 75 |
| 1. | Section 3 | 75 |
| 2. | Section 5 | 76 |
| 3. | Section 6(ii) | 77 |
| 4. | Section 7 | 77 |
| 5. | Section 9 | 78 |
| 6. | Section 12 | 79 |
| 7. | Section 13 | 80 |
| E.IV. | Association Oil Supply Agreement | 80 |
| E.V. | Venezuelan Law | 81 |
| 1. | 1943 Hydrocarbons Law | 81 |
| 2. | Venezuelan Commercial Code | 82 |
| 3. | Nationalization Law | 83 |
| 4. | Law of the Supreme Court of Justice | 86 |
| 5. | Law on Administrative Procedures | 88 |
| 6. | Venezuelan Civil Code | 89 |

| 7. | Amparo Law | 96 |
| 8. | Venezuelan Code of Civil Procedure | 98 |
| 9. | Income Tax Law (1995) | 99 |
| 10. | Congressional Authorization | 101 |
| 11. | Royalty Reduction Agreement | 104 |
| 12. | Investment Law | 107 |
| 13. | Venezuelan Constitution | 107 |
| 14. | 2001 Hydrocarbons Law | 111 |
| 15. | General Comptroller and National System of Fiscal Control | 113 |
| 16. | Royalty Procedures Agreement | 115 |
| 17. | Law Against Corruption | 116 |
| 18. | Law of the Supreme Tribunal of Justice | 117 |
| 19. | Decree No. 1510 | 119 |
| 20. | Partial Amendment to Hydrocarbons Law | 121 |
| 21. | Amendment to Income Tax Law (2006) | 122 |
| 22. | Decree-Law 5200 | 125 |
| 23. | Law on Effects | 129 |
| 24. | Decree 5916 (Transfer to PetroMonagas) | 132 |
| F. | Relief Sought by the Parties Regarding the Principal Claims | 134 |
| F.I. | Relief Sought by the Claimant | 134 |
| F.II. | Relief Sought by the Respondents | 135 |
| G. | Relief Sought by the Parties Regarding the Counterclaim | 136 |
| G.I. | Relief Sought by the Respondents | 136 |
| G.II. | Relief Sought by the Claimant | 136 |

| | | | |
|---|---|---|---|
| **H.** | **Factual Background** | | **136** |
| **J.** | **The Disputed Issues** | | **158** |
| | **J.I.** | **Short Summary of Contentions of the Claimant** | **158** |
| | **J.II.** | **Short Summary of Contentions of the Respondents** | **163** |
| **K.** | **Considerations and Conclusions of the Tribunal Regarding the Claim** | | **166** |
| | **K.I.** | **Preliminary Considerations** | **166** |
| | **1.** | **Parties' Answers to Tribunal's Questions in Procedural Order No. 6** | **166** |
| | | a)  Relevance of ICSID Proceedings (PO-6 ¶ 3.1) | **166** |
| | |     i.  Claimant | **166** |
| | |     ii.  Respondents | **168** |
| | |     iii.  The Tribunal | **169** |
| | | b)  Interpretation of Term *"Occurred"* and Relevance of Ongoing Settlement Discussions (PO-6 ¶ 3.2) | **171** |
| | |     i.  Claimant | **171** |
| | |     ii.  Respondents | **173** |
| | |     iii.  The Tribunal | **175** |
| | | c)  Relationship Between *"Discriminatory Measures"* and *"Force Majeure"* in AA and Venezuelan Law (PO-6 ¶ 3.3) | **179** |
| | |     i.  Claimant | **179** |
| | |     ii.  Respondents | **181** |
| | |     iii.  The Tribunal | **182** |
| | | d)  Ability of State-Owned Enterprise To | **184** |

Rely on State Actions to Excuse

Non-Fulfillment of a Contract (PO-6 ¶ 3.4)

    i.    **Claimant**     **184**

    ii.    **Respondents**     **186**

    iii.    **The Tribunal**     **188**

e)    **Interpretation of Clause 15.1(b)(ii)**     **192**

    **and Term *"To Date"* (PO-6 ¶ 3.5)**

    i.    **Claimant**     **192**

    ii.    **Respondents**     **194**

    iii.    **The Tribunal**     **195**

f)    **Translation Considerations (PO-6 ¶ 3.6)**     **198**

    i.    **Claimant**     **198**

    ii.    **Respondents**     **198**

    iii.    **The Tribunal**     **199**

**2.**    **Applicable Law**     **200**

    a)    **Claimant**     **200**

    b)    **Respondents**     **201**

    c)    **The Tribunal**     **202**

**3.**    **Whether Association Agreement was Extinguished**     **203**

    a)    **Respondents**     **203**

    b)    **Claimant**     **207**

    c)    **The Tribunal**     **211**

**4.**    **Relevance of Decisions of Other Tribunals**     **216**

    a)    **Claimant**     **216**

    b)    **Respondents**     **217**

    c)    **The Tribunal**     **218**

**K.II.**    **Jurisdiction**     **220**

| 1. | Claimant | 220 |
| 2. | Respondents | 222 |
| 3. | The Tribunal | 223 |
| K.III: | Procedural Requirements Triggering Respondents' Duty to Indemnify Claimant | 230 |
| 1. | Notice pursuant to Section 15.1(a)  Association Agreement | 230 |
| a) | Claimant | 230 |
| b) | Respondents | 237 |
| c) | The Tribunal | 244 |
| 2. | Exhaustion of Remedies | 253 |
| a) | Claimant | 253 |
| b) | Respondents | 254 |
| c) | The Tribunal | 256 |
| K.IV. | Liability under the Association Agreement for Discriminatory Measures | 261 |
| 1. | Definition of Discriminatory Measure Causing a Materially Adverse Impact under the Association Agreement | 261 |
| a) | Claimant | 261 |
| b) | Respondents | 262 |
| c) | The Tribunal | 264 |
| 2. | Decree-Law 5200 | 272 |
| a) | Claimant | 272 |
| b) | Respondents | 275 |
| c) | The Tribunal | 277 |
| 3. | Royalty and "*Extraction Tax*" Measures | 282 |

|        | a)    | Claimant                          | 282 |
|--------|-------|-----------------------------------|-----|
|        | b)    | Respondents                       | 284 |
|        | c)    | The Tribunal                      | 286 |
| 4.     |       | Income-Tax Increase               | 296 |
|        | a)    | Claimant                          | 296 |
|        | b)    | Respondents                       | 297 |
|        | c)    | The Tribunal                      | 298 |
| 5.     |       | Production and Export Curtailments| 300 |
|        | a)    | Claimant                          | 300 |
|        | b)    | Respondents                       | 301 |
|        | c)    | The Tribunal                      | 301 |
| K.V.   |       | Excuse for Respondents' Non-Performance | 303 |
| 1.     |       | Hecho del Príncipe / Impossibility | 303 |
|        | a)    | Respondents                       | 303 |
|        | b)    | Claimant                          | 307 |
|        | c)    | The Tribunal                      | 311 |
| 2.     |       | Force Majeure                     | 317 |
|        | a)    | Respondents                       | 317 |
|        | b)    | Claimant                          | 318 |
|        | c)    | The Tribunal                      | 321 |
| K.VI.  |       | Liability under PDVSA's Guaranty  | 325 |
| 1.     |       | Claimant                          | 325 |
| 2.     |       | Respondents                       | 326 |
| 3.     |       | Tribunal                          | 326 |
| K.VII. |       | Compensation                      | 328 |
| 1.     |       | Jurisdiction                      | 328 |
|        | a)    | Claimant                          | 328 |

| | | | |
|---|---|---|---|
| | b) | Respondents | 333 |
| | c) | The Tribunal | 338 |
| 2. | | Calculation of Indemnity for FY 2007 | 351 |
| | a) | Claimant | 352 |
| | b) | Respondents | 361 |
| | c) | The Tribunal | 369 |
| 3. | | Calculation of Indemnity for FY 2008 – 2035 | 387 |
| | a) | Claimant | 387 |
| | b) | Respondents | 402 |
| | c) | The Tribunal | 417 |
| K.VIII. | | Breach of the Association Agreement | 429 |
| 1. | | Arguments by Claimant | 429 |
| 2. | | Arguments by Respondents | 430 |
| 3. | | The Tribunal | 432 |
| L. | | Considerations and Conclusions of the Tribunal Regarding the Counterclaim | 436 |
| L.I. | | Jurisdiction | 437 |
| 1. | | Respondents | 437 |
| 2. | | Claimant | 437 |
| 3. | | The Tribunal | 437 |
| L.II. | | Compensation for Attachment in New York | 438 |
| 1. | | Respondents | 438 |
| 2. | | Claimant | 439 |
| 3. | | The Tribunal | 439 |
| L.III. | | Product Sold and Delivered After 26 June 2007 | 444 |
| 1. | | Respondents | 444 |

|       |       | 2.     | Claimant                          | 444 |
|       |       | 3.     | The Tribunal                      | 445 |
|       | L.IV. | Project Financing                 |     | 447 |
|       |       | 1.     | Respondents                       | 447 |
|       |       | 2.     | Claimant                          | 448 |
|       |       | 3.     | The Tribunal                      | 449 |
| M.    | Pre-Award and Post-Award Interest |     |     | 452 |
|       | M.I.  | Claimant                          |     | 452 |
|       | M.II. | Respondents                       |     | 453 |
|       | M.III.| The Tribunal                      |     | 454 |
| N.    | Arbitration Costs                 |     |     | 459 |
|       | N.I.  | Claimant                          |     | 459 |
|       | N.II. | Respondents                       |     | 461 |
|       | N.III.| The Tribunal                      |     | 464 |
| O.    | Taxation of Award                 |     |     | 466 |
|       | O.I.  | Claimant                          |     | 466 |
|       | O.II. | Respondents                       |     | 467 |
|       | O.III.| The Tribunal                      |     | 467 |
| P.    | Decisions                         |     |     | 470 |

# Abbreviations

| | |
|---|---|
| ¶/¶¶ | Paragraph / paragraphs |
| 2001 Hydrocarbons Law | Decree No. 1510, Decree with Force of Organic Law of Hydrocarbons, (Official Gazette No. 37.323 published 13 November 2001) [*Decreto N° 1.510, Decreto con Fuerza de Ley Orgánica de Hidrocarburos*] |
| App./Apps. | Appendix / Appendices |
| Art. | Article / Articles |
| AA | Cerro Negro Association Agreement |
| Bpd | Barrels per day |
| C-I | Claimant's Request for Arbitration (January 2008) |
| C-II | Claimant's Reply to Respondents' Counterclaims (9 May 2008) |
| C-III | Claimant's Principal Memorial (30 September 2008) |
| C-IV | Claimant's Reply Memorial (15 May 2009) |
| C-V | Claimant's Post-Hearing Brief (25 October 2010) |
| C-VI | Claimant's Reply Post-Hearing Brief (November 2010) |
| C.Closing | Claimant's Closing Argument (24 September 2010) |
| C.Costs | Claimant's Statement of Costs (10 January 2011) |
| C.Costs.Reply | Claimant's Comments to Respondents' Cost Submission (24 January 2011) |
| C.Opening | Claimant's Opening Argument (30 August 2010) |
| C.Reply | Claimant's Reply to Respondents' Application for an Order Directing Claimant to Withdraw Attachments of 15 October 2008 |
| CEX | The Party's pro rata share of actual Chargeable Expenditures for such FY |
| Claimant | Mobil Cerro Negro |
| Conf. | Conferencing |
| Curtailment Measures | Measures imposing production and export curtailments |
| DCO | Diluted Crude Oil |

| | |
|---|---|
| Decree-Law 5200 | Decree No. 5200 with Rank, Value and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements [*Decreto No. 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas*] |
| | This is referred to as the "*Nationalization Decree*" throughout Claimant's memorials. |
| EHO | Extra-Heavy Crude Oil |
| Enabling Law | Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters (as published in the Official Gazette No. 38617 of 1 February 2007) [*Ley que Autoriza al Presidente de la República para Dictar Decretos con Rango, Valor y Fuerza de Ley en las Materias que se Delegan*] |
| ESAI | Energy Security Analysis, Inc |
| Ex. | Exhibit |
| Expert Conf. | Expert Conferencing |
| fn. | Footnote |
| FY | Fiscal Year |
| GCA | Gaffney, Cline and Associates, Inc. |
| Government | Government of the Bolivarian Republic of Venezuela |
| Graves-A&M | R. Dean Graves of Alvarez & Marsal |
| Guaranty or PDVSA Guaranty | PDVSA Guaranty of 28 October 1997 |
| ICAPM | International Capital Asset Pricing Models |
| ICC Decision 2008 | Decision Regarding Respondents' Application for an Order Directing Claimant to Withdraw Attachments of 19 December 2008 |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Decision | ICSID Decision on Jurisdiction (10 June 2010) |
| Investment Law | Law on the Promotion and Protection of Investments |
| IT | The Party's pro rata share of Income Taxes paid with respect to such FY |

| | |
|---|---|
| Law on Effects | Law on the Effects of the Migration Process to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements [*Ley Sobre los Efectos del Proceso de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, Así Como de los Convenios de Exploración a Riesgo y Ganancias Compartidas*] (as published in the Official Gazette No. 38785 of 8 October 2007) |
| MBD | Thousand barrels per day |
| MCN | Mobil CN |
| Mobil | Mobil Oil Company |
| Mobil CN | Mobil Cerro Negro |
| Mobil Marketing | Mobil Sales & Supply Corporation |
| n. | Footnote |
| Nationalization Law | Organic Law Reserving to the State the Industry and Commerce of Hydrocarbons (1975) |
| NY CPLR | New York Code – Civil Practice Law and Rules |
| OCN | Operadora Cerro Negro |
| OPEC | Organization for Petroleum Exporting Countries |
| p. / pp. | Page / pages |
| PDVSA | Petróleos de Venezuela, S.A. |
| PDVSA-CN | PDVSA Cerro Negro |
| PO | Procedural Order |
| Project | Cerro Negro Project |
| R | Total liftings during such FY multiplied by the Price Formula applicable to such Production, plus Joint revenues received during such FY |
| R-I | Respondents' Answer to the Request of Arbitration (2 April 2008) |
| R-II | Respondents' Principal Memorial (16 February 2009) |
| R-III | Respondents' Reply Memorial (17 August 2009) |
| R-IV | Respondents' Post-Hearing Brief (25 October 2010) |
| R-V | Respondents' Reply Post-Hearing Brief (8 November 2010) |
| R.App. | Respondents' Application for an Order Directing Claimant to Withdraw Attachments (29 August 2008) |
| R.Closing | Respondents' Closing Argument (24 September 2010) |
| R.Costs | Respondents' Cost Claim (10 January 2011) |

| | |
|---|---|
| R.Cost.Reply | Respondents' Comments on Claimant's Statement of Costs (24 January 2011) |
| R.Opening | Respondents' Opening Argument (30 August 2010) |
| Respondents | PDVSA and PDVSA-CN |
| ROY | The actual Royalty paid by a Party or on behalf of and for the account of a Party during such FY |
| RRA | Royalty Reduction Agreement |
| Royalty Measures | Repudiation of the RRA and the imposition of the Extraction Tax |
| ICC Rules | International Chamber of Commerce Rules of Arbitration (1998) |
| SCO | Synthetic Crude Oil |
| Sp. Hr. Tr. | Spanish Transcript from hearings dated 30 August 2010 through 24 September 2010 |
| TIT | The Party's pro rata share of Income Taxes that would have been paid with respect to such FY, absent the alleged Discriminatory Measure |
| TOR | Terms of Reference |
| Tr. | Transcript |
| TR | Total liftings during such time period, multiplied by the Base Price, plus Joint Revenues received during such FY |
| TROY | Royalty that would have been paid by a Party during such FY, absent the alleged Discriminatory Measure |

## A.    The Parties and their Counsel

### A.1.    Claimant:

Mobil Cerro Negro Ltd
Shirley House
50 Shirley St.
Nassau – New Providence
**Bahamas**

*Represented by:*

Mr. Oscar M. Garibaldi
Mr. Eugene D. Gulland
Mr. Thomas L. Cubbage III
Mr. Miguel López Forastier
Ms. Luisa F. Torres
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004-2401
**USA**

Mr. Rene Mouledoux
Mr. Eugene J. Silva III
Ms. Anna T. Knull
Law Department
EXXON MOBIL CORPORATION
CORP-EMB 1707-B
800 Bell Street
Houston, Harris County, Texas 77002
**USA**

## A.2.  Respondents:

1. Petróleos de Venezuela S.A.
Attn.: Dr. Armando Giraud
Avenida Libertador
Edificio Petróleos de Venezuela, S.A.
La Campiña – Caracas
**Venezuela**

2. PDVSA Cerro Negro S.A.
Attn. Eulogio Del Pino
Avenida Veracruz con Calle Cali
Edificio Pawa
Las Mercedes
**Venezuela**

*Represented by:*

George Kahale, III
Mark H. O'Donoghue
Benard V. Preziosi, Jr.
Miriam K. Harwood
Robert B. García
Lilliana Dealbert
Kabir A. N. Duggal
Curtis, Mallet-Prevost, Colt &
Mosle LLP
101 Park Avenue
New York, New York 10178
**USA**

Peter Wolrich
Curtis, Mallet-Prevost, Colt &
Mosle LLP
6, Avenue Velasquez
75008 Paris
**France**

## B.     The Arbitral Tribunal

Directly appointed by the Court on **13 August 2009,** by agreement of the Co-Arbitrators and with the consent of the Parties:

> Prof. Karl-Heinz Böckstiegel, Chairman
> Parkstrasse 38
> D-51427 Bergisch-Gladbach
> kh@khboeckstiegel.com
> **Germany**

Nominated by the Claimant and confirmed as Co-Arbitrator by the Secretary General of the ICC Court on **8 April 2008:**

> Henri C. Alvarez
> FASKEN MARTINEAU DUMOULIN LLP
> 2900-550 Burrard Street
> Vancouver, BC V6C 0A3
> halvarez@fasken.com
> **Canada**

Jointly nominated by the Respondents and confirmed as Co-Arbitrator by the Secretary General of the ICC Court on **8 April 2008:**

> Jacques Salès
> GINESTIÉ MAGELLAN PALEY-VINCENT
> Avocats à la Cour
> 10 Place des Etats-Unis
> 75116 Paris
> jsales@ginestie.com
> **France**

The administrative contact information for the Tribunal is as follows:

> ICC International Court of Arbitration
> Attention: Mr. José Ricardo Feris
> Mr. Christian Albanesi
> 38 Cours Albert 1er
> 75008 Paris

> Ms. Katherine Simpson, LL.M.
> Administrative Secretary to the Tribunal
> ksimpson.llm@hotmail.com

## C.     Short Identification of the Case

1.    The short identification below is without prejudice to the Parties' full presentation of the factual and legal details of the case and the Tribunal's considerations and conclusions.

### C.I.        Claimant's Perspective

2.    The following quotations from **Claimant's Principal Memorial** and **Claimant's Reply Memorial** summarize the main aspects of the dispute as follows (C-III ¶¶ 17 – 18, 341; C-IV ¶¶ 2 – 5; C-V ¶ 2; footnotes omitted):

> 2.    In the 1990s, because of declining oil production, PDVSA and the Government invited Mobil CN and other foreign oil companies to enter into joint ventures to develop EHO reserves, located in the Orinoco Oil Basin, which had never been commercially exploited. Attracting foreign investment to EHO projects was a difficult task, because the Republic of Venezuela had expropriated the interests of foreign oil companies (including Mobil Oil Corporation) in 1975. To overcome foreign investors' concerns about another expropriation, the Government provided investors with financial incentives to make the projects commercially attractive, and contractual and legal protections against governmental measures that might harm their investments. Those incentives and protections were enacted into law during the Government's "Oil Opening" and embodied in agreements with investors, including the Cerro Negro AA, which was approved by the Venezuelan Congress. Chief among the contractual protections was PDVSA-CN's commitment, guaranteed by PDVSA, to indemnify Mobil CN for any "expropriation or seizure" of its interests and for other "Discriminatory Measures" imposed by the Government that caused a Materially Adverse Impact on Mobil CN's cash flows from the Project. (C-IV ¶ 2).

> 3.    Under a new administration and in a changed political climate, the Government began to dismantle the Oil Opening and to eliminate PDVSA's managerial and financial autonomy. Although Government officials repeatedly assured Mobil CN and other investors that the Government would respect the terms of their agreements, in late 2004 the Government revoked the Royalty Reduction Agreement that it had concluded with investors in EHO projects. Starting in 2005, the Government imposed a new "extraction" tax that further raised the royalty rate; it increased the income-tax rate despite a commitment not to do so; it curtailed production and exports; and it withdrew other financial incentives embodied in the Oil Opening Regime and protected by the AA. In 2007, the Government took the ultimate step. It seized the operations and assets of the Cerro Negro Project (without compensation) ("Project") and gave them to a PDVSA subsidiary. The

Project has ceased to exist and part of its assets now belongs to a new project known as "PetroMonagas." (C-IV ¶ 3).

4.  Although the Respondents use euphemisms — such as "migration to a mixed enterprise" or Mobil CN's supposed refusal to "confor[m] its activities to the existing regulatory framework" — they cannot conceal that the Government seized Mobil CN's entire interest in the joint venture without paying compensation. Mobil CN negotiated with Government officials throughout 2004-07 in the hope that it could agree on a new basis for continuing its participation in the Project or, failing that, on fair compensation. In the end, Mobil CN faced a stark ultimatum: either (i) to participate in a new Government-controlled "mixed enterprise" with reduced equity, loss of management rights, surrender of all the legal protections of the AA (including indemnification and international arbitration), and a different operating project with no business plan, or (ii) to have its entire interests in the Project expropriated and pursue arbitration, despite warnings from Government officials that an arbitral award would not be honored. (C-IV ¶ 4).

5.  The very purpose of the indemnification provisions of the AA was to guarantee that Mobil CN would receive contractual indemnification for the damages that the Government's measures have caused, while Mobil CN pursues full compensation from the Republic of Venezuela. Mobil CN performed its part of the bargain: its large investment of money, technology and know-how succeeded beyond expectations and made the Project a highly profitable joint venture that, by 2005, was poised substantially to expand production during the 30 years that remained in the Project. The Respondents, by contrast, having accepted and benefited from Mobil CN's part of the bargain, have disclaimed the obligations they undertook in the AA and the Guaranty. Under the Government's tight control, they ignored the Notices of Discriminatory Measure and the Demand for Performance by which Mobil CN requested its contractual indemnification. The Respondents now offer a succession of hairsplitting defenses espousing the view that the AA is the proverbial "scrap of paper" that they can disregard at their convenience. How else to explain their remarkable assertion that Mobil CN's "proper recovery is zero"? (C-IV ¶ 5).

17. For Mobil CN (and other ExxonMobil affiliates), by contrast, the damages sought in this proceeding do not remotely provide full compensation for the financial injury imposed by the expropriation. To begin with, the indemnification formula contains negotiated limitations under which Mobil CN does not receive full compensation for its actual losses. Beyond that, the expropriation deprives Mobil CN of the chance to benefit from the risks it incurred when it could not be known whether the Project would succeed. For every successful investment in the oil industry, there are multiple failures. The successes must accordingly provide large returns to finance the many uncertain ventures that must be undertaken to produce the few successes. Here, the expropriation denies the Claimant participation in the expansion of Cerro Negro during the next 27 years — an expansion that will go far beyond the 120,000 bpd for which damages are sought in this case. To replace the

petroleum reserves of which Mobil CN has been deprived will entail new investments and new risks. (C-III ¶ 17).

18. The Respondents and the Republic of Venezuela have already profited handsomely by seizing the Claimant's investment and breaking all the commitments they made to induce that investment. Ironically, the Respondents now accuse the Claimant of greed and overreaching. The facts speak for themselves. [The Hearing confirmed that there is no dispute that, on 27 June 2007, by operation of **Decree-Law 5200**, PDVSA took possession and control of MCN's interests and assets related to the activities of the Cerro Negro Project. Nor did the Respondents deny that, for generations to come, PDVSA will enjoy billions of dollars of revenue generated by the investment, technology, and know-how that MCN brought to the Cerro Negro Project. (C-V ¶ 2)]. (C-III ¶ 18).

341. In their Answer to the Request for Arbitration, the Respondents allege that the Claimant "is indebted to" PDVSA-CN for an amount "in respect of the transactions involving the project financing [...]." Although the basis for that assertion is unclear, Mobil CN acknowledges that it continues to be indebted for one-half of the outstanding bonds issued in June 1998 to finance the Project, but not for any portion of the premium and other costs that PDVSA paid to purchase such bonds in December 2007 — a transaction that would have been unnecessary had the Government not expropriated Mobil CN's interests in the Project. Likewise, Mobil CN acknowledges that it has received a benefit from PDVSA's payment of Mobil CN's portion of the bank debt incurred to finance the Project in 1998; that benefit has been accepted as mitigation of damages. Accordingly, Mobil CN is willing to deduct from the compensation paid by the Respondents pursuant to an award entered in this case (i) an appropriate amount to be determined by the Tribunal for any obligations the Claimant may have to PDVSA for the bonds held by PDVSA, as long as PDVSA tenders such bonds for cancellation; and (ii) Mobil CN's portion of the bank debt paid off by PDVSA, as long as PDVSA produces appropriate releases. The Claimant reserves the right to address this subject in detail in replying to the Respondents' counterclaims. (C-III ¶ 341).

## C.II.   Respondents' Perspective

3. The following quotations from the **Respondents' Principal Memorial**, **Respondents' Reply Memorial** and **Respondents' Post-Hearing Reply Memorial** summarize the dispute as follows (R-II ¶ 2 – 9, 221 – 231; R-III ¶¶ 14 – 15, R-V ¶ 45, footnotes omitted):

45. As stated at the hearing, this is a case that never should have been brought. With the ICSID case moving too slowly for ExxonMobil, it decided to prepare an ICC case against PDVSA and PDVSA-CN that would allow it the opportunity to obtain a worldwide freezing order and attachments not available in the context of the ICSID proceeding.

ExxonMobil apparently also wants to use this case to build an argument supporting a future seizure of the 50% interest of a PDVSA subsidiary in the Chalmette refinery in Louisiana. None of those tactical reasons has anything to do with the merits of an indemnity claim against PDVSA-CN under the AA. (R-IV ¶ 45).

2. From the beginning, Claimant has attempted to paint this as a simple case of expropriation without compensation, requiring Respondents to either pay what it considers appropriate compensation or suffer accusations of bad faith. Claimant would have the Tribunal ignore both the applicable law and the facts and proceed immediately to verify the mathematics of its experts' calculations. (R-ll ¶ 2).

6. According to Claimant, Respondents acted in bad faith by not immediately concurring with Claimant on its interpretation of the facts, the applicable law and the Cerro Negro Association Agreement ("*AA*"), and not paying any amount under what Mr. Plunkett referred to as the simple, straightforward formula set forth in the indemnity provisions of the AA. Of course, it is not clear what amount Claimant expected Respondents to pay, whether it was the US$12 billion calculated by Mr. Plunkett, the US$10 billion set forth in the Summary of Claimant's Position in the Terms of Reference, the US$7.6 billion originally calculated by one of Claimant's external experts, the US$6.45 to US$6.85 billion now claimed, or the US$5 billion that Claimant requested without explanation or discussion in the summer of 2007 for all of its interests in Venezuela, including the Project and another project known as "La Ceiba." Indeed, the first time Claimant purported to quantify an amount due under the indemnity provisions of the AA was in December 2007, when it justified its surprise attachment of PDVSA-CN's funds in New York by claiming it was owed US$12 billion by PDVSA-CN. In short, the only bad faith exhibited in this case has been the manner in which Claimant presented its claim for purposes of obtaining the worldwide freezing order and attachments in various jurisdictions in an inappropriate attempt to apply undue pressure in negotiations. (R-ll ¶ 6).

7. While Claimant would have preferred that Respondents provide it with a windfall as it exited the Venezuelan petroleum industry, life is not that simple. Because of Claimant's insistence on unreasonable positions in negotiations, this Tribunal will have to review all of the troublesome legal, contractual and factual issues that Claimant would rather avoid. When those issues are examined, it becomes clear that Claimant is in the wrong forum, relying on contractual provisions that are of no avail to it, and that even Claimant's latest calculation of damages constitutes a gross exaggeration of the amount of its alleged loss and a distortion of the very formula upon which it relies. (R-ll ¶ 7).

8. The fact is that the full value of Claimant's entire interest in the Project, even without considering or giving effect to the limitation of liability in the AA, was less than US$1 billion, and that settlement with the Government would have been reached quite easily had Claimant not insisted on receiving exorbitant compensation. In the context of this proceeding, which involves claims against PDVSA and PDVSA-CN,

not the Government, such valuation issues have relevance only because they reflect directly upon the credibility of Claimant and its witnesses and provide further evidence that none of the amounts presented by Claimant is serious, as the AA limits – rather than expands – liability for governmental action. In other words, if the full value of the interest without consideration of any limitation of liability would have been less than US$1 billion, and indemnity under the AA would, as Ms. Otton-Goulder stated in London, yield compensation "substantially less" than full value, the amount of any indemnity even under Claimant's theory of the case would be less than the amount of Respondents' counterclaims. (R-ll ¶ 8).

9.    More importantly, the mere fact that Claimant believes that it has been wronged does not entitle it to any compensation at all, not even a single dollar, from these Respondents in these proceedings. This is not only a case of exaggerated claims; it is also a case involving legal issues and principles, as well as matters of contract interpretation that point inexorably to the conclusion that the proper recovery is zero. This would not be the first time that a claimant has ended up with no recovery on a large claim, and it would not even be the first time that an ExxonMobil company has asserted a multibillion dollar claim in an ICC arbitration only to wind up with an award of zero because its claim simply did not meet basic legal or contractual requirements. For the reasons explained in this Memorial, that is precisely the appropriate result in this case. (R-II ¶ 9).

14.   As discussed in Respondents' Principal Memorial and later in this Reply, this case involves a number of serious issues aside from the problems Claimant faces with the formula and with its argument for a risk-free discount rate, including (i) the applicability of the Venezuelan law principles relating to *causa extraña no imputable* (non-imputable external cause) and *caducidad*, (ii) the fact that the "scope" of any arbitration under Article XV of the AA does not cover indemnity for future FYs, and (iii) the fact that the governmental measures at issue do not constitute "Discriminatory Measures" within the meaning of that term in the AA. The first of these issues leads to a result that Claimant considers too harsh, as it implies the dismissal of the entire claim, but harshness of result is not a legal ground for opposing the application of well-established principles of Venezuelan law in a case that is governed exclusively by Venezuelan law. The other issues mentioned above should also constitute a total bar to the claims asserted herein, either as a matter of the application of Venezuelan legal principles or as a matter of application of the plain language of the contract. Claimant cannot unilaterally expand the scope of the indemnity provision to cover future FYs; nor could it in any event expect to receive an indemnity for any governmental measures for which it did not even meet the requirements for indemnity set forth in the contract or which did not even constitute "Discriminatory Measures" as defined in the contract. (R-III ¶ 14).

15.   Finally, Claimant's repeated references to an "expropriation without compensation" – clearly designed to create the impression that it is a victim deserving of equitable compensation in this case even if it has no legal basis for its claim – are belied by the facts. What Claimant has

sought from the beginning, from its take-it-or-leave-it demand for US$5 billion in negotiations with the Government to its abusive litigation based on patently false allegations of a US$12 billion claim, is nothing short of a windfall. Had Claimant negotiated in good faith rather than seek a windfall, there would have been no need for any tribunal to deal with these issues. (R-III ¶ 15).

230. Following the migration, after entering into express understandings of good faith cooperation in areas of common interest, including the continued operation of the Chalmette joint venture and the repayment of the outstanding Cerro Negro debt, ExxonMobil determined that it had not made sufficient progress in the negotiations with the Government and needed to apply pressure by asserting claims against Respondents for US$12 billion in damages. The New York attachment was made despite the express understanding of good faith cooperation relating to the financing that the Parties had been acting under for nearly an entire year and despite the provisions of the Termination Agreement, in which Claimant represented that "there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment. . . that . . . would prohibit, conflict with or in any way prevent the execution, delivery or performance of the terms of this Agreement." (R-II ¶ 230).

231. The New York attachment of PDVSA-CN's US$301,095,355 has caused significant damage, as those funds have been held in a low (or now no) interest-bearing account pending the outcome of this Arbitration. The interest paid on the attached funds since February 25, 2008 (when the court account into which the funds were deposited was established) has totaled only US$3,323,574 (an average rate of approximately 1.1%), and recently, with the economic crisis, the interest rate has been 0%. On the other hand, during this period, PDVSA general obligation bonds yielded on average 14.77%, representing the cost to PDVSA to borrow funds. The difference between the interest received and PDVSA's cost of borrowing represents the damage that Respondents have suffered (and will continue to suffer) as a result of the attachment. (R-II ¶ 231).

228. In 2007, shortly after the issuance of <u>**Decree-Law 5200**</u>, PDVSA-CN and Mobil CN agreed to work together cooperatively and in good faith to avoid a potential default with respect to the financing obligations for the Project and to determine an appropriate strategy. The bank debt posed no substantial hurdles because there were no prepayment penalties; however, if the bond debt were to be redeemed, a redemption premium of approximately US$100 million would have applied. Rather than redeem the bonds, PDVSA made a tender offer for the bonds which required the payment of principal, accrued interest and a premium equal to about one-third of the redemption premium that would have been required in a redemption scenario. (R-II ¶ 225). "[A]s a result of PDVSA's payments, Claimant was relieved of any obligations to the creditors, and the collateral that had been established for the benefit of the creditors, including cash of approximately US$250 million in collateral accounts maintained at the Bank of New York, was released to Mobil CN." (R-II ¶ 226). With respect to the disputed sums, the transactions at issue were required to avoid a potential declaration of

default under the financing agreements. That potential declaration of default resulted from actions by the Government, and not actions by PDVSA-CN or PDVSA. Having benefited from the transactions that were funded by PDVSA, Mobil CN cannot now claim that PDVSA must bear the full costs on its own. (R-II ¶ 228).

221.   Upon expiration of the four-month period for agreement on migration, SCO production from the Project continued to be shipped to the Chalmette Refinery. A total of 2.98 million barrels of SCO, with a value of US$171,552,666, was shipped for the account of Mobil CN. These facts are undisputed. (R-II ¶ 221).

222.   Claimant admits that it had no interest in approximately 1.68 million of the 2.98 million barrels of SCO, and that it owes PDVSA-CN US$96.1 million in respect of those barrels. As for the remaining 1.3 million barrels of SCO, which had a value of US$75.5 million, Claimant asserts that the SCO was produced from extra-heavy crude oil that had been extracted and was in "inventory" prior to June 27, 2007, and that it therefore does not owe PDVSA-CN anything for these shipments. This claim is without merit because, when Mobil CN chose not to migrate, it lost all of its interest in the Project, including any barrels in "inventory." (R-II ¶ 222).

## D.   Procedural History

4.   Mobil Cerro Negro ("*Claimant*" or "*Mobil CN*") commenced the current arbitration proceedings against Respondents Petróleos de Venezuela ("*PDVSA*") and PDVSA-Cerro Negro, S.A. ("*PDVSA-CN*") (together "*Respondents*") by submitting a **Request for Arbitration** dated **January 2008** to the ICC Court pursuant to two interrelated agreements: the Association Agreement ("*AA*") and the PDVSA Guaranty. Article 18.2 of the AA and Section 12 of the PDVSA Guaranty provide for arbitration "*in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce*," to be conducted in New York, New York, USA. (C-I ¶¶ 14 – 15). The ICC received Claimant's request for arbitration on **25 January 2008**.

5.   On **2 April 2008**, Respondents submitted their **Answer to the Request for Arbitration** and rejected each of Claimant's allegations. Respondents submitted **Counterclaims** against the Claimant relating to product sold and delivered after 26 June 2007 and to transactions involving the financing for the Project. (R-I ¶ 45). Respondents requested that the Tribunal undertake

the **Interim Measure** of ordering Claimant to immediately take actions necessary to lift the attachment orders in New York, the Netherlands Antilles, and Aruba. (R-1 ¶ 46).

6. On **8 April 2008**, the Secretary General of the ICC Court confirmed the nominations as co-arbitrators of Henri C. Alvarez and Jacques Salès, pursuant to **Article 9(2) of the ICC Rules**.

7. On **9 May 2008** Claimant submitted its **Reply to Respondents' Counterclaims** to the Secretariat. Therein, Claimant asserted that the counterclaims were each insufficient in that the Respondents failed to explain both the legal basis of each claim and the Tribunal's basis for asserting jurisdiction over each claim. (C-II ¶ 10).

8. On **19 June 2008**, the ICC Court appointed Dr. Robert Briner as Chairman of the Arbitral Tribunal, upon the proposal of the Swiss National Committee, pursuant to **Article 9(3) of the ICC Rules**.

9. On **25 July 2008**, the Parties created the **Terms of Reference**. These were submitted to the Secretariat of the ICC Court on **29 July 2008**. On **14 August 2008**, the Terms of Reference were transmitted to the ICC Court, as required by **Article 18(2) of the ICC Rules**. For ease of reference, Sections 1 – 11 of the Terms of Reference are set out below:

    **1.    The full names and descriptions of the Parties**

    1.1.    <u>The Claimant</u>

        MOBIL CERRO NEGRO, LTD.    (the « Claimant» or « MOBIL CERRO »)
        Shirley House, 50 Shirley St
        Nassau – New Providence
        Bahamas

        a corporation organized and existing under the laws of the Commonwealth of the Bahamas

    1.2.    <u>The Respondents</u>

        PETROLEOS DE VENEZUELA, S.A.    («PDVSA »)
        Attn: Dr. Armando Giraud
        Avenida Libertador

Edificio Petroleos de Venezuela, S.A.
La Campina - Caracas - Venezuela

*and*

PDVSA CERRO NEGRO, S A                    («  PDVSA-CN  »)
Attn. Eulogio Del Pino
Avenida Veracruz con Calle Cali
Edificio Pawa
Las Mercedes — Venezuela          (together the « Respondents »)

two corporations organized and existing under the laws of the Republic of
Venezuela

**2.     The Addresses of the Parties to which notifications and
        communications arising in the course of the Arbitration may be
        made**

2.1.    The Claimant:

Oscar M. GARIBALDI,
Eugene D. GULLAND
Miguel LOPEZ FORASTIER,              Tel.    001      202.662.6000
David A. SHUFORD                     Fax     001      202.662.6291
and Luisa F. TORRES                  ogaribaldi@cov.com
COVINGTON & BURLING LLP              egulland@cov.com
1201 Pennsylvania Avenue, N.W.       mlopezforastfer@cov.com
Washington, DC 20004-2401            dshuford@oov.com
U.S.A.                               ltorres@cov.com.

*and*

Toni D. Hennike                      Tel.    001      713.656.6718
Luis Marulanda del Valle             Fax     001      713.656.3496
Law Department                       toni.d.hennike@exxonmobil.com
EXXON MOBIL CORPORATION              luis.e.marulanda@exxonmobil.com
800 Bell Street
Houston, Texas 77002
U.S.A.

*and*

Charles A. BEACH                     Tel.    001  972  444  1466
EXXON MOBIL CORPORATION              Fax     001  972  444  1435
5959 Las Colinas Boulevard           charles.a.beach@exxonmobil.com
Irving, Texas 75039-2298
U.S.A.

*and*

Andrés A. MEZGRAVIS                  Tel.  0058  212  918  3333
TRAVIESO EVANS ARRIA RENGEL & PAZ    Fax   0058  212  918  3334
Avenida Principal de La Casteilana   amh@traviesoevans.com
Torre La Castellana, Piso 6
1060 Caracas - Venezuela

Counsel for the Claimant.

2.2.    The Respondents

George KAHALE, III   Tel.   001   212-696-6000
Mark O'DONOGHUE   Fax   001   212-697-1559
Benard V. PREZIOSI, JR.   gkahale@curtis.com
Miriam K. HARWOOD   modonoghue@curtis.com
CURTIS MALLET-PREVOST COLT & MOSLE LLP   bpreziosi@curtis.com
101 Park Avenue   mharwood@curtis.com
New York, NY 10178
U.S.A.

Peter WOLRICH   Tel. 0033 1 42 66 3910
CURTIS MALLET-PREVOST COLT & MOSLE LLP Fax 0033 1 42 66 39 62
6, avenue Vélasquez   pwolrich@curtis.com
75008 Paris
France

Counsel for the Respondents.

### 2.3 ICC Secretariat

Copies of all correspondence and submissions are also to be sent to the ICC Secretariat:

José Ricardo Feris   Tel. 0033 1 49 53 29 03
Counsel   Fax 0033 1 49 53 57 79
Secretariat   ica1@iccwbo.org
ICC International Court of Arbitration
38, Cours Albert 1er
F-75008 Paris

## 3. Documents Submitted So Far

The Parties have to date submitted the following briefs and exhibits:

* *Request for Arbitration* dated January 2008, received by the ICC Court on 25 January 2008 together with Exhibits 1 to 10.

* *Answer to the Request for Arbitration* received by the ICC Court on 4 April 2008 together with Exhibits 1 to 11 (Vol. I) and 12 to 17 (Vol. II).

* *Reply to Respondents' Counterclaims* dated 9 May 2008, received by the ICC Court on 13 May 2008 together with Exhibits 11 to 24. (Vol. I) and 25 to 38 (Vol. II)

Directives for the filing of further written submissions will be issued in the further course of the proceedings.

## 4. Background

The dispute between MOBIL CERRO, on the one hand and PDVSA (Venezuela's national oil company) and PDVSA-CN on the other, arises out of two interrelated agreements: the Association Agreement to which MOBIL CERRO and PDVSA-CN are parties and the Guaranty made by PDVSA for the benefit of MOBIL CERRO. The Association Agreement entered into on October 28, 1997 relates to the exploitation of certain oil fields located In Venezuela.

Pursuant to this Association Agreement, PDVSA-CN agreed to indemnify MOBIL CERRO for any "*Medida Discriminatoria*" (translated by

Claimant as "Discriminatory Action" and by Respondents as "Discriminatory Measure") taken by the Government that results in a "Materially Adverse Impact" upon MOBIL CERRO, subject to the terms and conditions contained in the Association Agreement. On October 28, 1997, PDVSA agreed to guarantee the performance of PDVSA-CN's obligations under the Association Agreement.

## 5. Summary of the Parties' Respective Claims, Counterclaims and Relief Sought by Each Party

### 5.1. The Claimant

#### 5.1.1 Summary of the Claimant's position :

##### a. Mobil-CN's Claims

In 1975, Venezuela expropriated the investments of Mobil Corporation (Mobil). To induce Mobil to accept the Government's invitation to return to Venezuela in the 1990s, PDVSA-CN agreed in the Association Agreement to indemnify Mobil-CN if Venezuela expropriated its investment again. The relevant provision indemnified Mobil-CN according to a contractual formula while it was resolving its dispute with the Government and provided Mobil-CN a remedy supplemental to the difficult process of enforcing its rights against the Government. To strengthen the protection, PDVSA guaranteed the performance of all PDVSA-CN's obligations under the Association Agreement, including guaranteeing PDVSA-CN's indemnification obligation. In 2007, Venezuela expropriated Mobil-CN's investment. PDVSA-CN and PDVSA have failed to honor their contractual commitments to compensate Mobil-CN. This arbitration is to enforce those commitments and to determine the amount due to Mobil-CN under the indemnification formula in the Association Agreement. The evidence will show that, under the contractual formula, the cumulative damages exceed US$10 billion, before any discounting to present value (this figure does not include interest).

PDVSA invited Mobil to form a joint venture to exploit the largely untapped extra-heavy crude oil in the Cerro Negro area because PDVSA lacked the financial and technical resources to exploit the reserves on its own. To attract Mobil and other selected foreign investors, the Government, following PDVSA's advice, offered various fiscal incentives, including a reduced income-tax rate and a reduced royalty. The income-tax reduction was guaranteed by the Framework of Conditions for the Cerro Negro Joint Venture approved by the Venezuelan Congress. The royalty reduction was granted by an agreement (the Royalty Reduction Agreement) among the Ministry of Energy and Mines, PDVSA Petróleo y Gas, S.A., and Mobil-CN and other parties.

In addition to the fiscal incentives given by the Government, PDVSA, through its Guaranty, and PDVSA-CN, through the Association Agreement, agreed to indemnify Mobil-CN, in an amount determined under a contractual formula (Article VII in Annex G to the Association Agreement), for any Discriminatory Action that caused a Materially Adverse Impact (as those terms are defined in that Agreement), including the expropriation of Mobil-CN's interests in the Cerro Negro venture.

The Cerro Negro Joint Venture, which was inaugurated on 28 October 1997, was successful until the Government adopted a series of Discriminatory Actions that caused a Materially Adverse Impact on Mobil-CN. Those actions included: (a) the direct expropriation of Mobil-CN's interests in the Cerro Negro Joint Venture and (b) measures that preceded the expropriation, including (i) repudiation- of the Royalty Reduction Agreement and imposition of a so-called extraction tax, (ii) refusal to allow the expansion of the Project as previously agreed, (iii) increases in income-taxes on Orinoco Oil Belt participants, (iv) curtailment of production and exports from the Cerro Negro Joint Venture.

After unsuccessfully seeking just compensation for the Discriminatory Actions from the Government Mobil-CN sought compensation from PDVSA-CN and PDVSA under the indemnification formula in the Association Agreement and the Guaranty.

Under Venezuelan law PDVSA-CN must discharge its contractual obligations in good faith. In addition, the Association Agreement provides that, if PDVSA-CN concurs with Mobil-CN that a Discriminatory Action has occurred and has resulted in a Materially Adverse Impact PDVSA-CN is obligated to "negotiate in good faith compensatory damages."

PDVSA-CN ignored the Claimant's demand for compensation even while acknowledging that the Government expropriated Mobil-CN's interests in the Cerro Negro Joint Venture. Contrary to the duty to perform its contractual obligations in good faith, PDVSA-CN has breached its obligations by failing (i) to give notice of concurrence that the expropriation constituted a Discriminatory Action resulting in a Materially Adverse Impact within the meaning of the Association Agreement; (ii) to engage in good faith in a joint calculation of the compensation due Mobil-CN under the Association Agreement; and (iii) without prejudice to Mobil-CN's right to full compensation from the Government, to indemnify Mobil-CN as required and determined under Article 15 of the Association Agreement and Article VII of Annex G thereto.

Mobil-CN gave notice to PDVSA as guarantor that PDVSA-CN was in breach of the Association Agreement and demanded prompt performance by PDVSA but PDVSA has not replied to Mobil-CN's demand for payment.

b.    The Respondents' Counterclaims

The Respondents' Answer asserts counterclaims (i) for an undetermined amount of compensation for "damage" allegedly caused to the Respondents by "Claimant's worldwide campaign of harassment against Respondents"; (ii) for approximately US$172 million for "product sold and delivered after June 26, 2007" plus interest and (iii) for approximately US$320 million in respect of the transactions involving the project financing for the Project described in the Affidavit of Brian O'Kelly (Ex. R-14, ¶¶ 4-9), plus interest.

Due to the deficient pleading of the counterclaims, it is unclear whether the Tribunal has jurisdiction to entertain the counterclaims. The Answer does not explain the legal basis for any of the counterclaims, nor does it explain the grounds for jurisdiction over each counterclaim. Without adequate explanations, each counterclaim is insufficient.

Because of the Respondents' failure to specify the legal basis for each counterclaim, Mobil-CN reserves its right to contest jurisdiction for each counterclaim if and when the Respondents explain the alleged basis for such jurisdiction. In any event, as explained in Claimant's Reply, the counterclaims appear to be without merit.

5.1.2    The Claimant's Claims and the Relief sought:

In their Request for Arbitration dated January 2008, Claimant requests that the Tribunal renders an Award:

a.    Declaring that several Discriminatory Actions have occurred and that such Actions have caused Mobil Cerro to suffer a Materially Adverse Impact in FY 2007 and in all future FYs through FY 2035.

b.    Declaring that Respondent PDVSA-CN has breached the Cerro Negro Association Agreement

    i.    by failing to compensate Mobil Cerro for the Discriminatory Actions described above; and

    ii.    by failing to deal in good faith with Mobil Cerro and failing to quantify in good faith with Mobil Cerro the compensatory damages that PDVSA-CN owes to Mobil Cerro under the Cerro Negro Association Agreement for the Discriminatory Actions.

c.    Declaring that Respondent PDVSA has breached the PDVSA Guaranty by failing to perform the obligations of its Guaranteed Affiliate, PDVSA-CN, under the Cerro Negro Association Agreement

d.    Ordering Respondents PDVSA and PDVSA-CN, jointly and severally, to pay Mobil Cerro

    i.    compensatory damages calculated according to the Cerro Negro Association Agreement and the Accounting Procedures Agreements; and

    ii.    attorneys' fees and costs according to Article 13 of the PDVSA Guaranty.

e.    Granting pre-award compound interest on all compensatory damage from the date of each breach to the date of issuance of the award and post-award compound interest on all amounts awarded from the date of the award to the date of payment.

f.    Granting costs of the arbitration (including reasonable attorneys' fees) to the extent not included in subparagraph d (ii).

g.    Granting any other or further relief that may be just and proper,

In its Reply to the Respondents' Counterclaims, the Claimant further requests the following:

a.    Dismissing the Respondents' counterclaims.

b.    Granting costs and reasonable attorneys' fees related to defending the Respondents' counterclaims,

c.    Granting any other or further relief that may be just and proper,

For the avoidance of doubt, the Claimant also notes that it does not consent to the Respondents broad reservation of rights to assert new claims or counterclaims and additional defenses (see Section 5.2.2, *infra)* and reserves Claimant's right to oppose such claims, counterclaims and defenses to the extent that they are inconsistent with Article 19 of the ICC Rules or other pertinent authority.

Similarly, the Claimant denies that the Respondents are entitled to any interim measures (see Section 5.2.2(a), *infra)* and reserves the right to seek interim measures in appropriate circumstances.

5.2.     The Respondents

5.2.1.   Summary of the Respondents' position :

Under the governing law, the Cerro Negro Association Agreement cannot form the basis for any claims made by Claimant; even if the governing law were to be ignored, the claims would not fall within the terms of the Association Agreement; even if they would, there would be no basis for Claimant's interpretation of the compensation provisions upon which it relies; even if Claimant's interpretation of the compensation provisions were correct, the Association Agreement expressly provides that neither party would have any liability for failure to perform to the extent such non-performance is due to acts, orders or decisions of government; and in any event there is no basis for Claimant's calculation of the amount of its claims.

More particularly, Respondents' position is that:

a.       Pursuant to the Law on the Effects of the Process of Migration referred   to in the Request for Arbitration, the Association Agreement was extinguished and all related controversies referred to Venezuelan Jurisdiction. Therefore, since Claimant concedes that Venezuelan law governs, the Association Agreement cannot form the basis of a claim by Claimant in this arbitration. This point at once goes to the merits and to the Jurisdiction of the Tribunal.

b.       Even if the Association Agreement had not been extinguished, the claims in any event would have no merit for various reasons:

(i)     There could be no claim for compensation against Respondents unless the governmental measures complained of fell within the definition of "Discriminatory Measure" under the Association Agreement and they did not.

(ii)    Claimant failed to meet the conditions precedent for asserting a claim under Article 15 of the Association Agreement by (a) failing to provide "immediately" the required notice of the occurrence of a Discriminatory Measure that might have a Material Adverse Impact, (b)  failing to provide "immediately" the required notice that it has suffered a Material Adverse Impact as a result of such Discriminatory Measure and (c) failing to commence and pursue legal actions to reverse or obtain relief from such Discriminatory Measure. These failures both  render the claims defective and show that Claimant itself never considered the compensation provisions of the Association Agreement to be applicable.

(iii)   With respect to the period prior to 2007, the limitation of liability provisions of Article 15 of the Association Agreement would have precluded a claim even if Claimant had asserted one, which it never

did. Even now Claimant does not seriously articulate any claim for compensation based on governmental measures taken during that period.

(iv) With respect to the claim for future cash flows, even if (a) the Association Agreement had not been extinguished, (b) the governmental actions had constituted "Discriminatory Measures" and (c) the conditions precedent specified in Article 15 of the Association Agreement had been met, the provisions of that same Article make clear that future cash flows were not covered. In fact the scope of the arbitration proceedings delineated in Article 15.1(b) of the Association Agreement confirms that future cash flows were not covered and that any such claim would not fall within the jurisdiction of this Tribunal.

(v) In any event, Article 21.1 of the Association Agreement expressly provided that neither party would have any liability for non-performance to the extent such non-performance was due to "acts of government or orders, judgments, resolutions, decisions or other actions or omissions of any governmental authority."

c. Finally, with respect to future cash flows, even if (a) the Association Agreement had not been extinguished, (b) the governmental actions had constituted "Discriminatory Measures," (c) the conditions precedent specified in Article 15 of the Association Agreement had been met and (d) the provisions of the Association Agreement did cover future cash flows, the amount of that claim would still not be more than a small fraction of the sum which Claimant has asserted in the attachment proceedings it has commenced in connection with this arbitration for various reasons, including the mistaken assumptions used by Claimant to project future cash flows and its failure to do any discounting of those assumed flows. While it should not be necessary for the Tribunal to reach those issues, the obvious defects in Claimant's calculations, particularly its failure to do any discounting, underscore the nature of both this proceeding and the accompanying worldwide campaign of freezing orders and attachments as merely an attempt to intimidate Respondents into acceding to Claimant's demand for exorbitant compensation.

5.2.2. The Respondents' Counterclaims and the Relief sought:

In their Answer to the Request for Arbitration, the Respondents request the Tribunal to:

a. Consider as a matter of priority the question of taking interim measures and order the Claimant immediately to take the actions necessary to lift the remaining attachment orders in New York, the Netherlands, the Netherlands Antilles and Aruba ;

b. Dismiss the claims asserted by the Claimant;

c. Grant the Respondents' counterclaims and order the Claimant to pay to the Respondents

   i. compensation for the damages caused to the Respondents by the "Claimant's worldwide campaign of harassment against the Respondents"; and

    ii.    amounts owed by the Claimant to PDVSA-CN, comprising (i) the amount of approximately US$ 172 million for product sold and delivered after June 26, 2007, and (ii) "the amount of approximately US$ 320 million in respect of the transactions involving the project financing for the Project described in the Affidavit of Brian O'Kelly (Ex. R-14, ¶¶4-9)," in each case plus interest.

d.    Award to the Respondents all costs incurred in connection with this Arbitration, including, without limitation, the fees and expenses of the arbitrators and the ICC administrative fees fixed by the Court, as well as the fees and expenses of any experts appointed by the Tribunal and the reasonable legal and other costs incurred by the Respondents in connection with this Arbitration;

The Respondents expressly reserve the right to submit such additional defenses, evidence, arguments, claims and counterclaims as they may deem appropriate, to supplement or augment this Answer, to respond to any allegations made by Claimant in connection with this Arbitration and to define the relief or remedies appropriate to the Tribunal's determination of this controversy.

## 6. Issues

The issues to be determined by the Arbitral Tribunal shall be those resulting from the Parties' submissions, including forthcoming submissions, and which are relevant to the adjudication of the Parties' respective claims and defenses, without prejudice to the provisions of Article 19 of the ICC Rules.

## 7. Arbitration Clause

The Association Agreement contains an arbitration clause (Article 18.2) which, in its English translation submitted by the Claimant as Exhibit 2 together with its Request for Arbitration, reads as follows:

*Any dispute arising out of or concerning this Agreement shall be settled exclusively and finally by arbitration. The arbitration shall be conducted by three (3) arbitrators (except as established below) in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules as may be agreed by all of the Parties to the relevant dispute. If there are two Parties to the dispute, or if all Parties to the dispute agree to be grouped together into two groups on the basis of a common interest and position in the dispute, then each of the Parties or groups, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall then agree within thirty (30) days on a third arbitrator to serve as Chairman. If there are more than two parties to the dispute and they do not promptly agree to be grouped together into two groups, then all three arbitrators, including the Chairman, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if the parties had failed to nominate arbitrators. Notwithstanding the foregoing, disputes submitted to arbitration with respect to Sections 12.1 (a) or 16.3, shall be resolved by a single arbitrator selected in accordance with the ICC Rules. Unless all parties to the arbitration agree to the contrary, all arbitration proceedings under this Agreement shall be conducted in New York City (United States of America). Any decision of*

*the arbitral tribunal (or the sole arbitrator) shall be final and binding upon the parties to the arbitration. Judgment for execution of any award rendered by the arbitral tribunal (or the sole arbitrator) shall be entered by any court of competent jurisdiction without review of the merits of the dispute.*

The Guaranty contains an arbitration clause (Article 12) which in its English translation submitted by the Claimant as Exhibit 3 together with its Request for Arbitration, provides that:

*Any dispute arising out of or concerning this Guaranty shall be resolved exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules which all the parties involved in the dispute may agree to. If there are two parties in the corresponding dispute, or if all parties to the dispute agree to be grouped together into two groups on the basis of their common interest and common position in the dispute, then each party or group, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall agree within a thirty (30) day time period on a third arbitrator who shall serve as President. If there are more than two parties to the dispute and the parties to the dispute do not promptly agree to be grouped into two groups, then the three arbitrators, including the President, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if none of the parties had designated an arbitrator. Unless the parties agree otherwise, all arbitration proceedings shall be conducted in New York City (United States of America). Notwithstanding the foregoing, if a dispute involves the Guarantor and the Guaranteed Affiliate, the arbitration proceeding shall be performed in accordance with Section 18.2 of the Agreement, as the only proceeding, and the Guarantor and Guaranteed Affiliate shall jointly have the rights of the Guaranteed Affiliate in accordance with Section 18.2.*

## 8. Applicable Law

Article 18.1 of the Association Agreement provides:

*This Agreement shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.*

Article 9 of the Guarantee provides :

*This Guarantee shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.*

## 9. The Arbitral Tribunal

| | | |
|---|---|---|
| Henri C. ALVAREZ | Tel | 001 604 631 3129 |
| FASKEN MARTINEAU DUMOULIN LLP | Fax | 001 604 632 3129 |
| 2900-550 Burrard Street | halvarez@fasken.com | |
| Vancouver, BC V6C0A3 | | |
| Canada | | |

Nominated by the Claimant and confirmed as co-arbitrator by the Secretary General of the ICC Court on 8 April 2008, pursuant to Article 9(2) of the ICC Rules.

Jacques SALÈS        Tel    +33 1 53 05 16 00
DENTON WILDE SAPTE    Fax    +33 1 53 05 79 20
5, avenue Percier       jacques.sales@dentonwildesapte.com
75008 Paris
France

Jointly nominated by the Respondents and confirmed as co-arbitrator by the Secretary General of the ICC Court on 8 April 2008, pursuant to Article 9(2) of the ICC Rules.

Robert BRINER       Tel.    +4122 819 08 77
5, Cours des Bastions    Fax    +41 22 819 10 89
1205 Geneva         rb@brinerarb.com
Switzerland

Appointed by the ICC Court on 19 June 2008 as Chairman of the Arbitral Tribunal, upon the proposal of the Swiss National Committee, pursuant to Article 9(3) of the ICC Rules.

### 10. Language of the Arbitration

The Arbitral Tribunal notes that the Parties have agreed that the language of the arbitration is English. Consequently, all briefs shall be submitted and all hearings shall take place in that language.

Documentary evidence existing in another language shall be translated by the party producing it into English. Any translation submitted by a party shall be accepted as complete and correct unless the other party objects as soon as reasonable to its accuracy and proposes another translation. Any dispute concerning translation shall be determined by the Arbitral Tribunal.

Documentary and testimonial evidence in another language shall be translated by the Party producing it into English.

### 11. Place of Arbitration

In accordance with the arbitration clause, the place of arbitration is New York, U.S.A.

10. On **26 August 2008**, the Chairman, on behalf of the Arbitral Tribunal, issued **Procedural Order No. 1 Regarding the Further Procedure & The Provisional Timetable** (PO-1) setting forth, among other items, the timetable for the filing of the further written briefs and the dates for a hearing regarding the procedure on the Respondents' **Request for an Order That The Remaining Attachments Be Withdrawn** (which date had already been set by the Arbitral Tribunal on 29 July 2008).

11. On **29 August 2008**, Respondents filed an **Application for an Order Directing Claimant to Withdraw Attachments**.

12. On **30 September 2008**, Claimant submitted **Claimant's Principal Memorial** to the Tribunal.

13. On **15 October 2008**, Claimant submitted its **Reply to Respondents' Application for an Order Directing Claimant to Withdraw Attachments**.

14. By e-mail of **20 October 2008** to the Tribunal, the Respondents requested the presence of Jim R. Massey at the hearing in order to examine him with respect to the various affidavits he had submitted on behalf of the Claimant.

15. On **13 November 2008**, in preparation for the 2 and 3 December 2008 hearing on the **Respondents' Application for an Order Directing Claimant to Withdraw Attachments**, the Tribunal issued **Procedural Order No. 2** (PO-2). For ease of reference, the entire operative provisions of PO-2 are set out below:

> The Arbitral Tribunal has taken note of the Submissions of the Parties regarding the organization of the Hearing to be held in New York starting 2 December 2008.
>
> In view of the importance of this Case and the inter-relation between the various attachment proceedings in the Courts of England, New York, Curaçao, Aruba and Amsterdam with the present ICC Arbitration Case 15416/JRF, the Arbitral Tribunal exceptionally considers it appropriate to also allow the questioning of Mr. Jim M. Massey on his "Second Affidavit" dated 26 February 2008, first submitted in the High Court of Justice in London and then submitted as Annex R-10 by the Respondents in the present proceedings in addition to the "Direct Testimony" of Mr. Massey dated 13 October 2008 submitted by the Claimant as C-196 in the present proceedings.
>
> Furthermore, the Respondents are also allowed to cross-examine Mr. Plunkett on the contents of his "First Affidavit" dated 21 January 2008, first submitted in the High Court of Justice and then submitted in this Arbitration by the Respondents as R-15.

> **The Arbitral Tribunal therefore orders**
>
> 1. A Hearing on the Application of the Respondents for an Order Directing Claimant to Withdraw Attachments and on the further procedure in this Case will take place in New York at
>
> The New York Helmsley
> 212 East 42nd Street
> New York, NY 10017
>
> starting on 2 December 2008 at 09:00 a.m.

2. Agenda

2.1. Opening by the Chairman.

2.2. Hearing of the Witnesses on their Affidavits

Short Direct Examination basically limited to the identification of Mr. Massey on his Affidavits filed in these proceedings as R-10 and C-196 and then of Mr. Plunkett on his Affidavit filed as R-15.

Each Witness, after his Direct Examination, will be cross-examined by the Respondents followed by a possible redirect and recross-examination.

2.3. Each Side, first the Respondents, then the Claimant will sum up its position, maximum one hour, possibly to be followed by a rebuttal round of not more than fifteen minutes for each Side.

Thereafter, depending on the time of day still on 2 December or, otherwise, on 3 December, the Arbitral Tribunal will discuss with the Parties any possible open questions in relationship to the continuation of these proceedings, including a discussion on a Hearing date.

3. The Arbitral Tribunal would appreciate it if one complete file of all material so far submitted in this Arbitration could be made available for the Arbitral Tribunal in the Hearing Room.

4. The Arbitral Tribunal understands that the Parties have reached an agreement on the reservation of the Hearing Rooms. It would appreciate receiving further details regarding the number of the rooms reserved and how the rent for these rooms is being paid.

5. The Arbitral Tribunal also understands that an agreement has been reached regarding the Court Reporter and in this respect the Tribunal would also appreciate receiving the necessary details regarding the Court Reporter retained and how the fees and expenses of this service are being paid.

6. If there should still be any issues for which the Parties would require some guidance from the Arbitral Tribunal, they are invited to submit them forthwith.

16. Following emails received from both Parties setting forth their disagreement on the questions of the time allocation and the presence of a witness during the examination of the other, the Chairman informed the Parties by email of **21 November 2008** that the Tribunal had decided that (1) the question regarding the presence of witnesses during the hearing would be discussed with the Parties at the commencement of the hearing; (2) the hearing on Respondents' Application would take place on 2 December; and (3) the discussion on the continuation of the proceedings would take place immediately after the closing statements or on the morning of 3 December 2008.

17. The hearing took place in New York on **2 December 2008**. A **transcript of the hearing** was made available to the Parties and the Arbitral Tribunal on 3 December 2008.

18. On **19 December 2008**, the Arbitral Tribunal denied Respondents' Application and issued its **Decision Regarding Respondents' Application for an Order Directing Claimant to Withdraw Attachments**. ("*ICC Decision 2008*").

19. On **16 February 2009**, Respondents submitted **Respondents' Principal Memorial** to the Tribunal.

20. On **15 May 2009**, Claimant submitted **Claimant's Reply Memorial** to the Tribunal.

21. At its session on **13 August 2009**, the Court accepted the tender of resignation of Dr. Robert Briner pursuant to **Article 12(1) of the ICC Rules**. Pursuant to **Article 12(4) of the ICC Rules**, the Court directly appointed Prof. Karl-Heinz Böckstiegel as Chairman of the Arbitral Tribunal in replacement of Dr. Briner at the same session on which the Court accepted the tender of resignation of Dr. Briner.

22. On **17 August 2009**, Respondents submitted **Respondents' Reply Memorial** to the Tribunal.

23. On **15 September 2009**, Claimant submitted a letter to the Tribunal stating that it would not file a **Rebuttal Memorial** on Counterclaims. Claimant reasoned that **Respondents' Reply Memorial** had added nothing to the discussion of the Counterclaim and referred the Tribunal to ¶¶ 222 – 244 of Claimant's Reply Memorial, submitted on 15 May 2009.

24. On **27 October 2009**, the Tribunal held a **Procedural Meeting** in New York. After conferring with the Parties, the Tribunal Issued **Procedural Order No. 3 Regarding the Further Procedure in this Case** (PO-3) on 14 November 2009.

25. On **24 May 2010**, <u>**Procedural Order No. 4**</u> (PO-4) was issued inviting deposit payments from the Parties to the ICC account for VAT on the fees of the Arbitrators.

26. On **28 May 2010**, Respondents submitted a letter to the Tribunal in accordance with Section 3.8 of PO-3 indicating their intent to call the following as witnesses at the September 2010 hearing: (1) Thomas L. Cranmer, (2) Timothy J. Cutt, (3) Paul Hoenmans, (4) Brian Lawless, (5) James R. Massey, (6) Hobert E. Plunkett, (7) Mark R. Ward, (8) Allan R. Brewer-Carías, (9) William B. Cline, (10) Neil Earnest, (11) R. Dean Graves, (12) Eugenio Hernández-Breton, (13) Scott T. Jones, and (14) Stewart C. Myers. They also intend to call as their own witnesses (1) José A. Pereira, (2) Vladimir Brailovsky and Louis T. Wells to answer questions regarding the Brailovsky/Wells Reports, (3) Jeffrey Leitzinger and Anthony Finizza of EconOne to answer questions regarding the EconOne Reports, (4) José Mélich-Orsini, and (4) Enrique Urdaneta Fontiveros.

27. On **9 July 2010**, the Court confirmed the appointment of Ms. Katherine Simpson as Administrative Secretary.

28. On **12 July 2010**, the Tribunal issued <u>**Procedural Order 5 Regarding the Preparation and Details of the Hearing**</u> (PO-5).

29. On **30 June 2010**, Claimant submitted Claimant's <u>**Documents Submission**</u> and Respondents submitted <u>**Respondents' Supplemental Exhibit Submission**</u> pursuant to Section 3.10 of PO-3 to the Tribunal.

30. On **14 July 2010**, Claimant submitted its rebuttal evidence to the Tribunal in accordance with Section 3.11 of PO-3.

31. On **30 July 2010**, Claimant submitted Claimant's <u>**Letter Regarding Legal Expert Conferencing**</u> in accordance with Section 4.4 of Procedural Order No. 5, and Claimant's <u>**Letter Regarding Updated Calculations**</u> in accordance with Section 3.12 of PO-3.

32. On **30 July 2010**, Claimant submitted **Exhibits C-327 – C-330** to the Tribunal pursuant to Section 3.12 of PO-3.

33. On **30 July 2010**, Respondents submitted **Respondents' Submission Pursuant to Sections 4.2 and 4.4 of PO-5** to the Tribunal.

34. On **7 August 2010**, Claimant submitted an email to the Tribunal, requesting that it be allowed to use two of its twenty-seven allotted hours to present its Opening Statement, in derogation of Section 3.2 of PO-5. Claimant requested that Respondents join in the request.

35. On **7 August 2010**, Respondents replied, requesting that the one-hour time limit for opening statements be maintained, as was agreed at the 27 October 2009 Procedural Meeting.

36. On **9 August 2010**, The Tribunal responded via email, ruling that the one hour length of the opening statement would be maintained. For ease of reference, the entire operative text of the email is provided below:

> The Tribunal has taken note of the Parties' mails regarding the length of the opening statements at the hearing.
>
> In view of the objection by Respondent, as the one hour length of the opening statements was agreed by both Parties, and for reasons of equal treatment of the Parties, the Tribunal concludes that this length should not be changed at this late stage before the hearing.

37. **Two hearings** were held in New York City from late August through September 2010. A transcript was made at each hearing. Prior to testifying, each witness and expert read either a "*witness declaration*" or an "*expert declaration*" aloud, as appropriate. The text of both declarations is provided below for ease of reference.

> I am aware that in my testimony I have to tell the truth and nothing but the truth. I'm also aware that if I do not comply with this obligation, I may face severe legal consequences. (hereinafter "*witness declaration*").
>
> I solemnly declare upon my honor and conscience that my statement will be in accordance with my sincere belief. (hereinafter "*expert declaration*").

38. The **first hearing** was held from **30 August 2010 – 2 September 2010**. The following individuals attended the hearing: for the Tribunal: Karl-Heinz Böckstiegel, Jacques Salès, Henri C. Alvarez, and Administrative Secretary Katherine Simpson; for Claimant: Oscar Garibaldi, Eugene D. Gulland, Thomas L. Cubbage, III, Les P. Carnegie, III, Miguel Lopez Forastier, Luisa Torres, David Shuford, Toni Hennike, and Mark Duenser; for Respondents: George Kahale, III, Benard V. Preziosi, Jr., Miriam K. Harwood, and Kabir Duggal. Also present were Hildegard Rondon de Sauso, Dr. Bernard Mommer, Dr. Alvaro Silva Calderon, Dr. Joaquin Parra, Dr. Moreeliec Pena, Dr. Alvaro Ledo, Arinna Sanchez, Robert Garcia, Prof. Enrique Urdaneta Fontiveros, Prof. José Mélich-Orsini, Jeffrey Leizinger, Anthony Finizza, Daniel Bartolomeo, Prof. Louis Wells, Vladimir Brailovsky, Orietta Fraenkel, Bianca Granados, Elizabeth O'Connell, Gloria Diaz, Gene Silva, Alberto Rivell, Anna Knull, Maria Hernandez, Mark Cuevas, Nicholas E. Cox, Silva Colla, Charlie Roberts, and Daniel Giglio. (2010 Tr. pp. 1 – 4).

39. Mr. Mark Ward testified on **30 August 2010**. (2010 Tr. pp. 138 – 337).

40. On **31 August 2010**, the Tribunal heard testimony from Mr. Paul Hoenmans (2010 Tr. 348 – 422), Mr. Thomas L. Cranmer (2010 Tr. 423 – 473), and Mr. Jim Massey (2010 Tr. 474 – 632).

41. On **1 September 2010**, the Tribunal heard testimony from Mr. Timothy J. Cutt (2010 Tr. 639 – 781) and Mr. Hobert E. Plunkett (2010 Tr. 782 – 889).

42. On **2 September 2010**, an Expert Conferencing involving Dr. Enrique Urdaneta Fontiveros, Dr. José Mélich-Orsini, Dr. Hernandez-Breton, and Dr. Allan R. Brewer-Carías took place. This was not a traditional examination through direct and cross-examination, but rather involved each of the legal experts sitting as a panel and answering questions from the Tribunal and then from counsel. The purpose of the witness conference was to learn about Venezuelan law. (2010 Tr. pp. 900 *et seq.*).

43. Prior to closing the first week of hearings, the Tribunal asked the Parties if there were any other procedural matters. The Parties indicated that they would confer about the organization for the second week of hearings and that the Parties would submit a proposal to the Tribunal.

44. On **15 September 2010**, the Claimant, by letter, requested the authorization to submit one more document, excerpts from PDVSA's 2009 Annual Report, for use at the hearing. The entire text of Claimant's request is provided below for ease of reference.

> The Claimant hereby requests authorization to submit the enclosed document as Exhibit C-331 for use at the hearing, under the "exceptional circumstances" exception of section 4.3 of Procedural Order No. 3 and section 2.1 of Procedural Order No. 5.
>
> The document consists of excerpts from PDVSA's 2009 Annual Report, in Spanish with an English translation. The report was made public on 3 August 2010. Accordingly, it could not have been included in the Claimant's pre-hearing submission of 30 June or that of 14 July 2010.
>
> Since this is a new document that PDVSA itself has prepared and recently released, there is no question of unfair surprise or prejudice to the Respondents in introducing it at this time.

45. The Tribunal invited Respondents to submit any comments they may have regarding Claimant's letter of **15 September 2010**.

46. On **16 September 2010**, Respondents objected to the proposed exhibit, stating that Respondents did not see the exceptional circumstances.

47. On **17 September 2010**, Claimant submitted its **List of Errata** for the transcript of the hearing conducted from 30 August 2010 until 2 September 2010.

48. The **second hearing** took place from **20 – 24 September 2010**. The following individuals attended the hearing on **20 September 2010**. Present for the Tribunal were: Karl-Heinz Böckstiegel, Jacques Salès, Henri C. Alvarez, and Administrative Secretary Katherine Simpson. Present for Claimant were: Oscar Garibaldi, Eugene D. Gulland, Thomas L. Cubbage, III, Les P. Carnegie, III, Miguel Lopez Forastier, Luisa Torres, Philip

Scarborough, Enrique Armijo, Mipe Okunseinde, Andres Barrera, Mark Cuevas. Present for Respondents were: George Kahale, III, Benard V. Preziosi, Jr., Miriam K. Harwood, and Kabir Duggal. Also present were Dr. Joaquin Parra, Dr. Moreeliec Pena, Robert Garcia, Prof. Enrique Urdanetta Fontiveros, Liliana Dealbert, Jeffrey Leitzinger, Anthony Finizza, Daniel Bartolomeo, Prof. Louis Wells, Vladimir Brailovsky, John Kirtley, Orietta Fraenkel, Bianca Granados, Elizabeth O'Connell, Gloria Diaz, Toni D. Hennike, Eugene J. Silva, II, Alberto Ravell, Anna Knull, Mary T. Hernandez, Alice Brown, Norman Kreutter, Robert McClure, Raymond J. Kaszuba, Charlies Augustine, William Cline, Neil Earnest, R. Dean Graves, Aaron Stai, Scott Jones, Alexis Maniatis, Nicholas E. Cox, Silvia Colla, Charlie Roberts, Daniel Giglio, and Ameer Tambawala. (2010 Tr. pp. 1016 – 1020).

49. On **20 September 2010**, the Tribunal considered whether to allow the proposed exhibit C-331 to be admitted. Considering that the document was created at a time when neither party had an opportunity to submit it within the timetable, and in light of the fact that the document is a public document, the Tribunal concluded that it should admit the document.

50. On **20 September 2010**, the Tribunal heard testimony from Mr. José Pereira (2010 Tr. pp. 1030 – 1115), Mr. Brian Lawless (2010 Tr. pp. 1115 – 1213), Mr. William B. Cline (2010 Tr. pp. 1213 – 1284), and Mr. Neil K. Earnest (2010 Tr. pp. 1285 – 1312).

51. On **21 September 2010**, the Tribunal heard testimony from Mr. Scott T. Jones (2010 Tr. pp. 1324 – 1524) and Mr. R. Dean Graves (2010 Tr. pp. 1524 – 1618).

52. On **22 September 2010**, Mr. Graves continued his testimony (2010 Tr. pp. 1630 – 1673). The Tribunal also heard testimony from Prof. Stewart C. Myers (2010 Tr. pp. 1674 – 1771), Mr. Anthony Finizza (2010 Tr. pp. 1771

– 1819), Mr. Jeffrey Leitzinger (2010 Tr. pp. 1819 – 1832), and Mr. Vladimir Brailovsky (2010 Tr. pp. 1834 – 1893).

53. On **23 September 2010**, the Tribunal heard testimony from Prof. Louis T. Wells (2010 Tr. pp. 1913 – 1950).

54. On **23 September 2010**, the Tribunal convened an expert conference with Prof. Myers and Mr. Brailovsky. (2010 Tr. pp. 1950 – 1991).

55. On **24 September 2010**, the Tribunal heard closing arguments from Claimant and Respondents. (2010 Tr. pp. 2018 – 2194). The Chairman asked the Parties if there were "*any objections to the way that this Tribunal has conducted this procedure up until now*" and the Parties indicated that they had no objections. (2010 Tr. pp. 2196). Thereafter, the hearings ended.

56. On **27 September 2010**, the Tribunal issued **Procedural Order 6 Regarding the Procedure After the Hearing in New York** (PO-6).

57. On **30 September 2010**, the Tribunal recognized the apparent typo in PO-6 and clarified that, in paragraph 3.6 of PO-6, the reference should have been to Clause 23.7 AA, rather than to Clause 12.7.

58. On **5 October 2010**, Claimant submitted its **List of Errata** for the transcript of the hearing conducted from 20 - 24 September 2010.

59. On **8 October 2010**, Respondents submitted their proposed corrections to the transcript of the hearings on the merits, entitled **Respondents' Proposed Corrections to Transcript of Hearings on the Merits, New York, August 30, 2010 – September 2, 2010 and September 20, 2010 – September 24, 2010, Based upon Comparison with Audio Recording**.

60. On **25 October 2010**, Claimant submitted **Claimant's Post-Hearing Brief** and Respondents submitted **Respondents' Post-Hearing Memorial**, via email and by courier, to the Tribunal.

61. On **8 November 2010**, Claimant submitted **Claimant's Post-Hearing Reply** and Respondents submitted **Respondents' Post-Hearing Reply Memorial**, via email and by courier, to the Tribunal.

62. On **10 January 2011**, Claimant and Respondents simultaneously submitted their respective statements regarding costs, pursuant to ¶ 2.1 of PO-6 via email and by courier. Claimant, in its **Claimant's Statement of Costs**, seeks recovery of fees and costs in the amount of US$ 24,852,177.53. Respondents, in their **Cost Claim**, seek recovery of fees and costs in the amount of US$ 18,508,775.64.

63. On **24 January 2011**, Claimant and Respondents simultaneously submitted their responses to the other Party's statements regarding costs, via email and by courier.

64. On **27 April 2011**, the ICC Secretariat informed the Parties and the Tribunal that, at its session of 21 April 2011 and pursuant to **Article 24(2) of the ICC Rules**, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award to 31 July 2011.

65. On **23 May 2011**, the Tribunal sent the following interim notice to the Parties:

> As the Parties are well aware, this procedure and its file are of exceptional volume and complexity.
>
> Therefore, after receiving the last submissions from the Parties, the Tribunal has had several rounds of deliberations and may well need several further rounds of deliberations.
>
> The Tribunal hopes that it will nevertheless be able to finalize its Award before the end of July.
>
> This interim notice is meant to keep the Parties up to date on the progress of the procedure.

66. The Parties each responded on **24 May 2011**, thanking the Tribunal for the update.

67. Nevertheless, the Tribunal required additional time to render the Award. The time-limit for rendering an Award was initially extended to 30 September 2011. The Tribunal requested an additional extension of the time-limit, and on 23 September 2011, the ICC Secretariat informed the Parties and the Tribunal that, at its session of 22 September 2011 and pursuant to **Article 24(2) of the ICC Rules**, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 31 December 2011.

68. On **26 October 2011**, the Tribunal notified the Parties that it declared the proceedings closed pursuant to **Article 22 of the ICC Rules**, and submitted the draft Award to the Court for approval pursuant to **Article 27 of the ICC Rules** on that same date.

69. The Court approved the Award at its session of **24 November 2011** and later extended the time limit for rendering the Award to 31 January 2012.

### E.     The Principal Relevant Legal Provisions

70. Without prejudice to the relevance of other contractual or law provisions, certain relevant provisions of the AA, Annex G, the Guaranty, and of Venezuelan law are presented below. The sections containing Venezuelan law has been organized chronologically. Throughout, there are numerous instances where only one Party has provided the Tribunal with a copy of a legal text and a translation. All of the translations that the Tribunal has found relevant have been provided in the tables below, and the Tribunal makes no judgment as to the validity of any translation provided.

## E.I.   Principal   Relevant   Provisions   of   the Association Agreement

71. The principal relevant provisions of the AA are found at C-87 and R-112. For ease of reference, the charts below provide the original Spanish text of the AA and the Claimant's and Respondents' translations, where available. Where only one party has provided the Tribunal with a translation, the

comparison between the Spanish original and the English translation is provided in a two-column chart. The Tribunal makes no judgment as to the validity of either Claimant's or Respondents' translations. Where helpful, the citation to where the text may be found in the record is indicated below the appropriate column.

# E.I.1.  Article 1 - Definitions

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| DEFINICIONES | DEFINITIONS | DEFINITIONS |
| "Precio Base" significará $ 27 por barril (en Dolares de 1996). | "Base Price" shall mean $ 27 per barrel (in 1996 Dollars). | [No Translation Provided] |
| "Medida Discriminatoria" significará cualquier cambio en (o cualquier cambio en la interpretación o aplicación de) la ley venezolana, o cualquier Medida Gubernamental que sea injusta y sea aplicable al Proyecto o a cualquier Parte Extranjera en su condición de participante en el Proyecto y que no se aplique en forma general a entes públicos o privados involucrados en proyectos para el mejoramiento de crudo Extrapesado en la República de Venezuela; o, con relación a tasas de impuesto, controles de cambio, o la expropiación u ocupación de activos del Proyecto o de los intereses de una Parte Extranjera en el Proyecto, siempre y cuando dicho cambio en (o cualquier cambio en la interpretación o aplicación de) la ley venezolana, o cualquier Medida Gubernamental no sea aplicable con carácter general a Empresas en la República de Venezuela (incluyendo la imposición de impuesto sobre la renta al Proyecto o a cualquier Parte Extranjera en su condición de participante en el Proyecto, a una lasa que no se corresponde con lo previsto en la última oración | "Discriminatory Measure" shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure which is unjust and is applicable to the Project or any Foreign Party in its capacity as a participant in the Project and is not generally applied to public or private entities engaged in extra-heavy crude upgrading projects in the Republic of Venezuela; or, with respect to tax rates, foreign exchange controls or the expropriation or seizure ["ocupación"] of assets of the Project or of a Foreign Party's interests in the Project, provided that such change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure is not generally applicable to Companies in the Republic of Venezuela (including the imposition of income tax on the Project or on any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond with what is provided in the last sentence of the Fifteenth Condition); or, with respect to municipal taxes (license to perform industrial and commercial activities), the | "Discriminatory Measure" shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure, which is unjust and is applicable to the Project or any Foreign Party in its capacity as a participant in the Project and which is not generally applicable to public or private entities engaged in projects for upgrading extra-heavy crude oil in the Republic of Venezuela; or, with respect to tax rates, foreign exchange controls or the expropriation or seizure of assets of the Project or a Foreign Party's interests in the Project, provided that such change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure is not applicable with general character to Companies in the Republic of Venezuela (including the imposition of income tax on the Project or any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond with what is set forth in the last sentence of the Fifteenth Condition); or with respect to municipal taxes (commercial and industrial |

de la Condición Décima Quinta); o con respecto a impuestos municipales (patente de industria y comercio), la imposición de impuestos municipales a las Partes Extranjeras en su condición de participantes en la Asociación a pesar de lo previsto en la Condición Décima Quinta, solo si la carga total del impuesto municipal sobre los ingresos brutos de la Parte Extranjera afectada provenientes del Proyecto, excede en un cuatro por ciento (4%) los ingresos brutos de la Parte Extranjera afectada provenientes del Proyecto en el Año Fiscal de que se trate, en cuyo caso, la cantidad de impuestos municipales que exceda dicho cuatro por ciento (4%) constituirá una medida discriminatoria. Una medida que esté dentro de la definición de Medida Discriminatoria será considerada injusta si resulta en un Impacto Substancialmente Adverso.

imposition of municipal taxes on the Foreign Parties in their capacity as participants in the Association notwithstanding the provision in the Fifteenth Condition, only if the aggregate burden of the municipal tax on the affected Foreign Party's gross revenue from the Project, exceeds by four percent (4%) the affected Foreign Party's gross revenue from the Project in the Fiscal Year at issue, in which event, the amount of municipal taxes that exceeds such four percent (4%) shall be a discriminatory measure. A measure that falls within the definition of Discriminatory Measure shall be deemed unjust if it results in a Materially Adverse Impact.

permits), the imposition of municipal taxes on the Foreign Parties in their capacity as participants in the Association in spite of what is set forth in the Fifteenth Condition, only if the aggregate municipal tax burden on the affected Foreign Party's gross revenues from the Project exceeds four percent (4%) of the affected Foreign Party's gross revenues from the Project in the Fiscal Year in question, in which event the amount of municipal taxes which exceeds such four percent (4%) shall constitute a discriminatory measure. A measure that would fall within the definition of Discriminatory Measure will be deemed unjust if it results in a Material Adverse Impact.

"Medidas Gubernamentales" significará cualquier medida gubernamental central o local incluyendo, entre otros, la emisión, publicación o ejecución de cualquier acto administrativo, decreto expropiatorio, confiscación o requisición de instalaciones por parte de autoridades gubernamentales, independientemente de que tales medidas sean posteriormente anuladas o revocadas por alguna autoridad judicial o administrativa competente.

"Governmental Measures" shall mean any central or local governmental measure including, inter alia, the issuance, publication or enforcement of any administrative act, expropriation decree, confiscation or requisition of facilities by governmental authorities, whether or not such measures are subsequently annulled or revoked by any competent judicial or administrative authority.

"Governmental Measures" shall mean any central or local government measure including, among others, the broadcast, publication or exercise of any administrative act, expropriation decree, confiscation or requisition of facilities by government authorities, irrespective of whether such measures are subsequently annulled or revoked by any judicial or administrative authority having jurisdiction.

"Impacto Substancialmente Adverso" significará una disminución en el Flujo de Caja Neto de una de las Partes Extranjeras en cualquier Año Fiscal de más de un cinco por ciento (5%), en comparación con lo que habría sido el Flujo de Caja Neto de la Parte Extranjera de no existir la(s) Medida(s) Discriminatorias del caso. Para los efectos de esta definición, la disminución total en el Flujo de Caja Neto de una de las Partes Extranjeras en cualquier Año Fiscal será determinada considerando todas las Medidas Discriminatorias aplicables a la Parte Extranjera en dicho Año Fiscal (independientemente de que hayan comenzado durante ese Año Fiscal o en un Año Fiscal anterior).

"Materially Adverse Impact" shall mean a decrease in a Foreign Party's Net Cash Flow in any Fiscal Year by more than five percent (5%), as compared to what such Foreign Party's Net Cash Flow would have been absent the Discriminatory Measure(s) at issue. For the purposes of this definition, the aggregate decrease in a Foreign Party's Net Cash Flow in any Fiscal Year shall be determined taking into account all Discriminatory Measures applicable to the Foreign Party in such Fiscal Year (whether they have commenced in such Fiscal Year or in a prior Fiscal Year).

"Material Adverse Impact" shall mean a decrease in a foreign Party's Net Cash Flow in any Fiscal Year of more than five percent (5%) as compared to what such Foreign Party's Net Cash Flow would have been absent the applicable Discriminatory Measure(s). For the purposes of this definition, the total decrease in a Foreign Party's Net Cash Flow in any Fiscal Year shall be determined taking into account all Discriminatory Measures applicable to the Foreign Party in said Fiscal Year (independently of whether they commenced during that Fiscal Year or in a prior Fiscal Year).

"Precio del Crudo Brent" significará el promedio, durante el período de tiempo en cuestión, del promedio aritmético diario de las cotizaciones altas y bajas por barril de Dated Brent Blend, FOB Sullom Voe, como sea publicada en Platt's Oilgram Price Report, International Spot Crude Price Assesments for Brent (DTD), publicado diariamente por la Commodities Division of Standard & Poor's, expresado en dólares promedio de 1996, según el Indice de Inflación de los Estados Unidos. En caso de que la Mezcla Brent deje de ser representativa de los precios mundiales del crudo, las Partes convendrán en un crudo de referencia diferente y en una publicación de referencia diferente que reemplace el "Precio de

"Price of Brent Crude" shall mean the average, over the period of time in question, of the daily arithmetic average of the high and low quotes per barrel of Dated Brent Blend, FOB Sullom Voe, as published in Platt's Oilgram Price Report, International Spot Crude Price Assessments for Brent (DTD), published daily by the Commodities Division of Standard & Poor's, expressed in average 1996 dollars, according to the US Inflation Index. In the event that Brent Blend ceases to be representative of world crude prices, the Parties shall agree on a different reference crude and on a different reference publication to replace the "Price of Brent Crude" used in this Agreement.

"Price of Brent Crude Oil" shall mean the average, over the period of time in question, of the daily arithmetic average of the high and low quotes per barrel of Dated Brent Blend, FOB Sullom Voe, as published in Platt's Oilgram Price Report, International Spot Crude Price Assessments for Brent (DTD), published daily by the Commodities Division of Standard & Poor's, expressed in average 1996 Dollars, according to the US Inflation Index. In the event that Brent Blend ceases to be representative of world crude oil prices, the Parties shall agree on a different reference crude oil and on a different reference publication to replace the "Price of Brent Crude Oil" used in this Agreement.

Crudo Brent" utilizado en este Convenio.

| | | |
|---|---|---|
| "Flujo de Caja Referencial" significará, con relación a una de las Partes en cualquier Año Fiscal, el flujo de caja estimado de dicha Parte asumiendo un Precio del Crudo Brent equivalente al Precio Base, calculado de acuerdo con la fórmula establecida en los Procedimientos Contables. | "Reference Cash Flow" shall mean, with respect to one of the Parties in any Fiscal Year, such Party's estimated cash flow assuming a Price of Brent Crude equivalent to the Base Price, calculated pursuant to the formula set forth in the Accounting Procedures. | "Threshold Cash Flow" shall be defined, in relation to one of the Parties in a given Fiscal Year, as the estimated cash flow of said Party assuming a Price of Brent Crude Oil equivalent to the Threshold Price, calculated in accordance with the formula established in the Accounting Procedures. |

| | | |
|---|---|---|
| "Filial" significará lo siguiente: (i) con relación a Lagoven CN, Filial significará PDVSA (definida más adelante) o cualquier entidad controlada directa o indirectamente por PDVSA; (ii) con relación a MPIV, Filial significará Mobil o cualquier entidad controlada directa o indirectamente por Mobil; (iii) con relación a Veba OVO, Filial significará Veba Oel o cualquier entidad controlada directa o indirectamente por Veba Oel; y (iv) con relación a cualquier otra Persona, Filial significará cualquier entidad directa o indirectamente controlada por, que controle o que esté bajo el control común de dicha Persona (definido más adelante). Cuando se utiliza en relación con esta definición, "control" significará la propiedad de más del cincuenta por ciento del capital y los derechos de voto en una sociedad, de igual forma serán entendidos los términos "controlados por" y "que controle". La República de Venezuela no será considerada como una Filial a los efectos de este | "Affiliate" shall mean the following: (i) with respect to Lagoven CN, Affiliate shall mean PDVSA (as defined below) or any entity directly or indirectly controlled by PDVSA; (ii) with respect to MPIV, Affiliate shall mean Mobil or any entity directly or indirectly controlled by Mobil; (iii) with respect to Veba OVO, Affiliate shall mean Veba Oel or any entity directly or indirectly controlled by Veba Oel; and (iv) with respect to any other Person, Affiliate shall mean any entity directly or indirectly controlled by, which controls or is under common control of such Person (as defined below). When used in connection with this definition, "control" shall mean the ownership of more than fifty percent of the equity interests and voting rights in a company, and "controlled by" and "which controls" shall be understood in the same manner. The Republic of Venezuela shall not be deemed to be an Affiliate for purposes of this Agreement, nor shall any other sovereign state, nor any political subdivision of | [No Translation Provided] |

Convenio, ni lo será ningún otro estado soberano, ni ninguna subdivisión política de la República de Venezuela, ni de cualquier otro estado soberano.

the Republic of Venezuela or of any other sovereign state.

# E.I.2. Article 7.2(a) - Development Production

**Spanish (Original)**

**Claimant's Translation**

Producción de Desarrollo. (a) Las Partes serán las propietarias de la Producción de Desarrollo en la cabeza del pozo, en proporción a su Porcentaje de Participación. Las Partes tendrán derecho a tomar en especie su Porcentaje de Participación en la Producción de Desarrollo, en el entendido que Lagoven CN y MPIV celebrarán con la Asociación de Chalmette un contrato de suministro, cuyos términos de precio se acompañan como Anexo E ("Convenio de Suministro de Crudo de la Asociación"), según el cual dichas Partes venderán a la Asociación de Chalmette, en circunstancias normales, FOB terminal de exportación, substancialmente toda su cuota parte en la Producción de Desarrollo (en la forma de crudo diluido) a precios de mercado; y, en el entendido que Veba OVO celebrará un contrato de suministro con Veba Oel o una de sus Filiales (el "Convenio de Suministro de Veba"), según el cual, Veba OVO venderá al sistema de refinación de Veba Oel en Alemania, FOB terminal de exportación, substancialmente toda su cuota parte en la Producción de Desarrollo (en la forma de crudo diluido) a precios de mercado. El Convenio de Suministro de Crudo de la Asociación y el Convenio de Suministro de Veba serán en lo sucesivo denominados los "Convenios de Suministro".

Development Production (a) The Parties shall be the owners of the Development Production at the wellhead, in accordance with their Percentage Interests. The Parties shall be entitled to take in kind its Percentage Interest of Development Production, in the understanding that Lagoven CN and MPIV shall enter into a supply agreement, the pricing terms of which are attached as Annex E, with the Chalmette Association (the "Association Oil Supply Agreement"), pursuant to which each such Party shall sell to the Chalmette Association, in normal circumstances, FOB export terminal, substantially all of such Party's share of the Development Production (in the form of blended crude) at market prices; and in the understanding that Veba OVO shall enter into a supply agreement with Veba Oel or one of its Affiliates (the "Veba Supply Agreement") pursuant to which Veba OVO shall sell to Veba Oel's refinery system in Germany, FOB export terminal, substantially all of Veba OVO's share of the Development Production (in the form of blended crude) at market prices. The Association Oil Supply Agreement and the Veba Supply Agreement shall be collectively referred to as the "Supply Agreements."

# E.I.3. Articles 8.2(a) & (b) – Commercial Production

**Spanish (Original)**

**Claimant's Translation**

Producción Comercial. (a) Le producción

Commercial Production (a) The production

de la Producción Comercial comenzará de la Fecha de Terminación del Mejorador, de conformidad con lo previsto en el Plan de Negocios de la Fase IV.

(b) Las Partes serán las propietarias de la Producción Comercial en la cabeza del pozo, de conformidad con sus respectivos Porcentajes de Participación. Cada una de las Partes tendrá derecho a tomar en especie su Porcentaje de Participación de la Producción Comercial, en el entendido que Lagoven CN y MPIV venderán a la Asociación de Chalmette, en circunstancias normales y de conformidad con el Convenio de Suministro de Crudo de la Asociación, substancialmente toda su cuota parte del SCO resultante del mejoramiento de la Producción Comercial, a precios de mercado, FOB terminal de exportación; y, en el entendido que Veba OVO venderá a Veba Oel o una de sus filiales, de acuerdo con el Convenio de Suministro de Veba, substancialmente toda su cuota parte en el SCO resultante del mejoramiento de la Producción Comercial, a precios de mercado, FOB terminal de exportación.

of Commercial Production shall commence following the Upgrader Completion Date, in accordance with what is provided in the Business Plan for Phase IV.

(b) The Parties shall be the owners of the Commercial Production at the wellhead, in accordance with their respective Percentage Interests. Each one of the Parties shall be entitled to take in kind its Percentage Interest of Commercial Production, in the understanding that Lagoven CN and MPIV shall sell to the Chalmette Association, in normal circumstances and pursuant to the Association Oil Supply Agreement, substantially all of such Party's share of the SCO resulting from the upgrading of the Commercial Production, at market prices, FOB export terminal; and in the understanding that Veba OVO shall sell to Veba Oel or one of its affiliates, pursuant to the Veba Supply Agreement, substantially all of its [Veba OVO's] share of the SCO resulting from the upgrading of the Commercial Production, at market prices, FOB export terminal.

(C-87; R-112)

(C-87)

# E.I.4. Articles 14.1 & 14.2 – Production Curtailment

**Spanish (Original)**

**Claimant's Translation**

14.1 <u>Reducción</u>. Las Partes reconocen que podrían verse obligadas a reducir la producción como resultado de medidas gubernamentales adoptadas de acuerdo con los compromisos internacionales de Venezuela. En caso de que se requiera dicha reducción, el porcentaje de reducción de las Partes no excederá del porcentaje de reducción de la producción requerido de las Empresas petroleras que operan en Venezuela como un todo, determinado sobre la base de la capacidad de producción disponible. Para este propósito, "la capacidad disponible de producción" significa la capacidad para la producción de hidrocarburos de los tipos sujetos a la reducción, en la medida en que dicha capacidad esté en ese momento en producción o cuya producción podría ser razonablemente iniciada dentro de los tres (3) meses siguientes a la fecha correspondiente. La capacidad de producción disponible de las Partes para cualquier período de tiempo correspondiente, se basará en la capacidad planificada de Producción establecida en el Plan de Negocios que cubra ese período, y será revisada en los períodos subsiguientes en base a la capacidad planificada para dichos períodos (excepto en la medida en que dicha capacidad planificada sea modificada como resultado de la reducción).

14.1 <u>Curtailment</u> The Parties acknowledge that they may be required to curtail production as a result of governmental measures adopted in compliance with Venezuela's international commitments. In the event that such a curtailment is required, the percentage of curtailment of the Parties shall not exceed the percentage of curtailment of production required of oil Companies operating in Venezuela as a whole, determined on the basis of available production capacity. For this purpose, "available production capacity" means capacity for the production of hydrocarbons of the types that are subject to the curtailment, to the extent such capacity is in production at that time or which production may reasonably be commenced within the three (3) months following the corresponding date. The available production capacity of the Parties for any corresponding time period shall be based on the planned Production capacity set forth in the Business Plan covering such period, and shall be revised in subsequent periods based on the planned capacity for such periods (except to the extent that such planned capacity is modified as a result of the curtailment).

14.2 <u>Mitigación del Efecto de la Reducción</u>. En caso de que sea necesario para recuperar las pérdidas de una de las Partes a consecuencia de una reducción de la producción, el plazo del Convenio será extendido hasta por cinco (5) años para permitir la producción del mismo volumen que las Partes dejaron de producir como resultado de la reducción de la producción

14.2 <u>Mitigation of Effect of Curtailment</u>. In the event necessary to recoup the losses of a Party resulting from a production curtailment, the term of the Agreement shall be extended by up to five (5) years to allow production of the same volume that the Parties failed to produce as a result of the production curtailment.

# E.I.5. Article 15.1.– Consequences of Governmental Actions

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| General. | General. | General. |

(a) En caso de que una de las Partes Extranjeras determine que se ha producido una Medida Discriminatoria que pueda resultar en un Impacto Substancialmente Adverso, dicha Parte Extranjera inmediatamente notificará a Lagoven CN sobre la Medida Discriminatoria. Adicionalmente, en caso de que dicha Parte Extranjera determine que realmente ha sufrido un Impacto Substancialmente Adverso como resultado de las Medidas Discriminatorias de la cual previamente ha notificado a Lagoven CN, inmediatamente notificará dicha determinación a Lagoven CN (la "Notificación de Medida Discriminatoria"). En la medida en que se disponga de cualquier recurso legal para revertir u obtener una reparación de dicha Medida Discriminatoria, la Parte Extranjera iniciará y ejercerá acciones legales para mitigar cualquier daño sufrido como resultado de la Medida Discriminatoria. Si Lagoven CN está de acuerdo en que se ha producido la Medida Discriminatoria y que ha resultado en un Impacto Substancialmente Adverso, Lagoven CN colaborará con la Parte Extranjera en el ejercicio de las antes mencionadas acciones legales y las Partes negociarán de buena fe los

(a) In the event that one of the Foreign Parties determines that a Discriminatory Measure has occurred which may result in a Materially Adverse Impact, such Foreign Party shall immediately provide notice of the Discriminatory Measure to Lagoven CN. Further, in the event that such Foreign Party determines that it has actually suffered a Materially Adverse Impact as a result of the Discriminatory Measures of which it has previously notified Lagoven CN, it shall immediately give notice of such determination to Lagoven CN (a "Notice of Discriminatory Measure"). To the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. If Lagoven CN concurs that the Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact, Lagoven CN shall cooperate with the Foreign Party in the pursuit of the aforesaid legal actions and the Parties shall negotiate in good faith the compensatory damages and/or possible modifications to the

(a) In the event that one of the Foreign Parties determines that a Discriminatory Measure which may lead to a Material Adverse Impact has occurred, such Foreign Party shall immediately provide notice of the Discriminatory Measure to Lagoven CN. In addition, in the event that such Foreign Party determines that it has actually suffered a Material Adverse Impact as a result of Discriminatory Measures for which notice has previously been provided to Lagoven CN, it shall immediately give notice of such determination to Lagoven CN (the "Notice of Discriminatory Measure"). To the extent any legal remedy is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. If Lagoven CN concurs that a Discriminatory Measure has occurred and has resulted in a Material Adverse Impact, Lagoven CN shall cooperate with the Foreign Party in pursuing the aforesaid legal actions and the Parties shall negotiate in good faith compensatory damages and/or possible modifications to the Agreement in order to

daños compensatorios y/o posibles modificaciones al Convenio a fin de restablecer el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria. Cualesquiera beneficios netos recibidos por la Parte Extranjera como resultado del ejercicio de las acciones legales antes mencionadas (después de la deducción de los costos legales incurridos por la Parte Extranjera en relación con las mismas) serán (i) imputados a cualquier monto que finalmente se determine que Lagoven CN adeuda de acuerdo con esta Cláusula o (ii) reembolsado a Lagoven CN si Lagoven CN ha hecho pagos previamente a la Parte Extranjera con relación a la Medida Discriminatoria en cuestión.

Agreement in order to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. Any net benefits received by the Foreign Party as a result of the pursuit of the aforesaid legal actions (after deduction of the legal costs incurred by the Foreign Party in connection therewith) shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Clause or (ii) reimbursed to Lagoven CN if Lagoven CN has previously made payments to the Foreign Party with respect to the Discriminatory Measure in question.

restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. Any net proceeds received by the Foreign Party as a result of the pursuit of the aforesaid legal actions (after deduction of the legal costs incurred by the Foreign Party in connection therewith) shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Article or (ii) reimbursed to Lagoven CN if Lagoven CN previously has made payments to the Foreign Party with respect to the Discriminatory Measure in question.

(b) Si Lagoven CN, dentro de los 90 días siguientes al recibo de la Notificación de la Medida Discriminatoria, no notifica a la Parte Extranjera sobre su concurrencia en que se han producido Medidas Discriminatorias que han resultado en un Impacto Substancial Adverso, cualquiera de las Partes podrá iniciar procedimientos de arbitraje de acuerdo con la Sección 18.2. Sin embargo, en ningún caso podrá una de las Partes iniciar procedimientos de arbitraje más de una vez por año calendario. El ámbito de los procedimientos de arbitraje incluirá: (i) una determinación de si una o más Medidas Discriminatorias se han producido y, si ese es el caso, si dichas medidas han tenido un Impacto Substancialmente Adversos sobre la Parte Extranjera; y (ii) en caso de una respuesta afirmativa a las dos interrogantes planteadas en el punto (i) de este literal, una indemnización por daños para compensar a la Parte Extranjera por las consecuencias económicas de la Medida Discriminatoria sufrida por ella hasta la fecha y recomendaciones sobre enmiendas al Convenio que restablecerían el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria.

(b) If, within the ninety (90) days following the receipt of the Notice of Discriminatory Measure, Lagoven CN does not give the Foreign Party notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred, any Party may commence arbitration proceedings in accordance with Section 18.2. In no event, however, may any one of the Parties initiate arbitration proceedings more than once per calendar year. The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if so, whether such measures have had a Materially Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative answer to the two questions specified in clause (i) of this paragraph, an award for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred.

(b) If Lagoven CN does not, within 90 days of receiving a Notice of Discriminatory Measure, give the Foreign Party notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred, any Party may commence arbitration proceedings in accordance with Section 18.2. In no event, however, may any Party initiate arbitration proceedings more than once per calendar year. The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if that is the case, whether such measures have had a Material Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative response to the two questions specified in clause (i) of this paragraph, a payment for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received if the Discriminatory Measure had not occurred.

(c) En caso de que la Medida Discriminatoria por la cual Lagoven CN está pagando una compensación a la Parte Extranjera, o en respuesta a la cual el

(c) In the event that the Discriminatory Measure for which Lagoven CN is paying compensation to the Foreign Party, or in response to which the

Convenio ha sido modificado, se revierte o deja de surtir efectos, la obligación de Lagoven CN de pagar la compensación, o la modificación hecha al Convenio, igualmente dejará de surtir efecto; siempre y cuando la Parte Extranjera haya sido compensada por los daños sufridos anteriormente como resultado de dicha Medida Discriminatoria. En caso de que Lagoven CN haya pagado a la Parte Extranjera con relación a la Medida Discriminatoria que es revertida o que deja de surtir efecto, por encima de los daños realmente sufridos como resultado de dicha Medida Discriminatoria, la Parte Extranjera inmediatamente reembolsará a Lagoven CN por el monto de dicho exceso.

Agreement has been modified, is reversed or ceases to be in effect, the obligation of Lagoven CN to pay the compensation, or the modification made to the Agreement, shall equally cease to be in effect; provided that the Foreign Party has been compensated for the damages previously suffered as a result of such Discriminatory Measure. In the event that Lagoven CN has paid to the Foreign Party with respect to the Discriminatory Measure that is reversed or that ceases to be in effect, in excess of the damages actually suffered as a result of such Discriminatory Measure, the Foreign Party shall immediately reimburse Lagoven CN for the amount of such excess.

# E.I.6. Article 15.2– Limitation on Lagoven CN's Obligations

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Limitación de la Obligación de Lagoven CN. | Limitation on Lagoven CN's Obligation. | Limitation on Lagoven CN's Obligation. |
| (a) No obstante lo anterior, después del primer período de seis (6) meses consecutivos durante el cual el Precio del Crudo Brent sobrepase el Precio Base, Lagoven CN no tendrá la obligación de compensar a ninguna Parte Extranjera por Medidas Discriminatorias en relación a cualquier Año Fiscal en que el promedio del Precio del Crudo Brent | (a) Notwithstanding the foregoing, after the first period of six (6) consecutive months during which the Price of Brent Crude exceeds the Base Price, Lagoven CN shall not have the obligation to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude | (a) Notwithstanding the foregoing, after the first period of six (6) consecutive months during which the Price of Brent Crude Oil is in excess of the Threshold Price, Lagoven CN will not be required to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude Oil is |

| | | |
|---|---|---|
| sobrepase el Precio Base, y dicha Parte Extranjera reciba un Flujo de Caja Neto, después de tomar en cuenta el efecto de la Medida Discriminatoria, cónsono con un precio de referencia por la Producción producida por las Partes que por lo menos guarde una relación razonable, ajustada en cuanto a las diferencias de calidad y transporte, al Flujo de Caja Referencial para ese Año Fiscal. | exceeds the Base Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties which bears at least a reasonable relationship, adjusted for quality and transportation differences, to the Reference Cash Flow for such Fiscal Year. | in excess of the Threshold Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties that bears at least a reasonable relationship, adjusted for quality and transportation differences, to the Threshold Cash Flow for such Fiscal Year. |
| (b) En todo caso, Lagoven CN no tendrá obligación de compensar a una Parte Extranjera por daños sufridos, o de convenir en modificaciones al Convenio, como resultado de cualquier Medida Discriminatoria que se produzca después de que el Estado Venezolano reduzca su interés directo o indirecto a (i) menos del 12,5% en el Proyecto o (ii) menos del 49,9% de Lagoven o cualquier otra Empresa petrolera operadora subsidiaria de PDVSA a la cual hayan sido transferidas las acciones de Lagoven CN o sus intereses en el Proyecto. | (b) In any event, Lagoven CN shall have no obligation to compensate a Foreign Party for damages suffered, or to agree to amendments to the Agreement, as a result of any Discriminatory Measure occurring after the Venezuelan State reduces its direct or indirect interest to (i) less than 12.5% in the Project or (ii) less than 49.9% of Lagoven or any other operating oil Company subsidiary of PDVSA to which the shares of Lagoven CN or its interests in the Project may have been transferred. | [No translation provided] |
| (c) En caso de que la Medida Discriminatoria por la cual Lagoven CN está pagando una compensación a la Parte Extranjera, o en respuesta a la cual el Convenio ha sido modificado, se revierte o deja de surtir efectos, la obligación de Lagoven CN de pagar la compensación, o la modificación hecha al Convenio, igualmente dejará de surtir efecto; siempre y cuando la Parte Extranjera haya sido compensada por los daños sufridos | (c) In the event that the Discriminatory Measure for which Lagoven CN is paying compensation to the Foreign Party, or in response to which the Agreement has been modified, is reversed or ceases to be in effect, the obligation of Lagoven CN to pay the compensation, or the modification made to the Agreement, shall equally cease to be in effect; provided that the Foreign Party has been compensated for the damages previously | |

anteriormente como resultado de dicha Medida Discriminatoria. En caso de que Lagoven CN haya pagado a la Parte Extranjera con relación a la Medida Discriminatoria que es revertida o que deja de surtir efecto, por encima de los daños realmente sufridos como resultado de dicha Medida Discriminatoria, la Parte Extranjera inmediatamente reembolsará a Lagoven CN por el monto de dicho exceso.

suffered as a result of such Discriminatory Measure. In the event that Lagoven CN has paid to the Foreign Party with respect to the Discriminatory Measure that is reversed or that ceases to be in effect, in excess of the damages actually suffered as a result of such Discriminatory Measure, the Foreign Party shall immediately reimburse Lagoven CN for the amount of such excess.

# E.I.7. Articles 16.1(a) & (b) - Termination

**Spanish (Original)**

**Claimant's Translation**

Terminación. (a) A menos que sean terminados con anterioridad de acuerdo con las Secciones 3.1, 5.2, 6.2, 12.5 o esta Sección 16.1(a), todos los derechos y obligaciones de las Partes bajo este Convenio terminarán en el trigésimo quinto (35) aniversario de la Fecha de Inicio; en el entendido que el plazo de este Convenio puede ser extendido hasta por cinco (5) años de acuerdo con la Sección 14.2; y entendido además que, en caso de un cambio en la ley venezolana que permita que este Convenio tenga un plazo indefinido, el plazo del Convenio será automáticamente extendido hasta el agotamiento del Area Designada. Este Convenio también podrá ser terminado en cualquier momento mediante el mutuo consentimiento de las Partes (la fecha en la cual este Convenio termina de acuerdo con las Secciones 3.1, 5.2, 6.2, 12.5 o esta Sección 16.1(a), la "Fecha de Terminación").

Termination Unless terminated earlier pursuant to Sections 3.1, 5.2, 6.2, 12.5 or this Section 16.1(a), all rights and obligations of the Parties under this Agreement shall terminate on the thirty-fifth (35th) anniversary of the Commencement Date; in the understanding that the term of this Agreement may be extended for up to five (5) years in accordance with Section 14.2; and in the further understanding that, in the event of a change in Venezuelan law permitting this Agreement to have an indefinite term, the term of the Agreement shall automatically be extended until the depletion of the Designated Area. This Agreement may also be terminated at any time by the mutual consent of the Parties (the date upon which this Agreement terminates in accordance with Sections 3.1, 5.2, 6.2, 12.5 or this Section 16.1(a), the "Termination Date").

(b) Los derechos y obligaciones de las Partes en relación con cualquier anticipo de acuerdo con la Cláusula XII, los pagos de acuerdo con la Cláusula XV, las indemnizaciones de acuerdo con la Sección 12.6 y 17.2, los pasivos contingentes que no se hayan arreglado de acuerdo con la Sección 16.4, el abandono de los pozos de acuerdo con la Sección 16.6, la Información del Proyecto de acuerdo con la Sección 19.1 y las obligaciones de confidencialidad de acuerdo con las Secciones 5.2, 6.2 y la Cláusula XX, sobrevivirán a la terminación de este Convenio.

(b) The rights and obligations of the Parties in respect of any advance under Clause XII, payments under Clause XV, indemnities under Sections 12.6 and 17.2, contin-gent liabilities not settled pursuant to Section 16.4, the abandonment of wells pursuant to Section 16.6, Project Information under Section 19.1, and confidentiality obligations pur-suant to Sections 5.2, 6.2 and Clause XX, shall survive the termination of this Agreement.

(C-87; R-112)

(C-87)

## E.I.8. Article 17.2 - Indemnification

**Spanish (Original)**

**Respondents' Translation**

Artículo 17.2(c)

Article 17.2(c)

Inmediatamente después del recibo por una Parte Indemnizada de la notificación del inicio de cualquier acción por la cual la Parte Indemnizada pueda tener derecho a indemnización de acuerdo con esta Sección 17.2, dicha Parte Indemnizada notificará a la Parte que Indemniza por escrito del inicio de la misma; en el entendido que omitir dicha notificación (i) no relevará a la Parte que Indemniza de responsabilidad bajo esta Sección 17.2 a menos que no haya tenido conocimiento de la acción por ningún otro medio y la falta de notificación resulte en pérdida de derechos y defensas substanciales de la Parte que Indemniza.

Immediately after the receipt by an Indemnified Party of notice of the commencement of any action for which the Indemnified Party may be entitled to indemnification pursuant to this Section 17.2, such Indemnified Party shall notify the Indemnifying Party in writing of the commencement thereof; provided that the failure to so notify [the Indemnifying Party] (i) shall not relieve the Indemnifying Party from liability under this Section 17.2 unless it did not otherwise learn of such action and such failure results in the forfeiture of substantial rights and defenses of the Indemnifying Party.

## E.I.9. Articles 18.1, 18.2, & 18.4 – Governing Law; Arbitration; Sovereign Rights

**Spanish (Original)**

**Claimant's Translation**

**Respondents' Translation**

18.1    Ley Aplicable.

18.1    Governing Law.

18.1 Applicable Law.

Este Convenio se regirá e interpretará de acuerdo con las leyes de la República de Venezuela.

This Agreement shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.

This Agreement shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.

18.2    Arbitraje.

18.2 Arbitration.

**[No Translation Provided]**

Cualquier disputa que surja o se relacione con este Convenio será dirimida exclusiva y definitivamente mediante arbitraje. El arbitraje será realizado por tres (3) árbitros (salvo lo que se establece más adelante) de acuerdo con las Reglas de Conciliación y

Any dispute arising out of or concerning this Agreement shall be settled exclusively and finally by arbitration. The arbitration shall be conducted by three (3) arbitrators (except as established below) in accordance with the Rules of Conciliation and

Arbitraje de la Cámara Internacional de Comercio (las "Reglas ICC"), o cualesquiera otras normas que sean acordadas por todas las Partes en la correspondiente disputa. Si la controversia se plantea entre dos Partes, o si todas las Partes en conflicto convienen en ser agrupadas en dos grupos basándose en una posición e interés común en la controversia, cada una de las Partes o grupos, según sea el caso, seleccionará a un árbitro de acuerdo con las Reglas ICC. Los árbitros así nombrados acordarán en treinta (30) días sobre el nombramiento de un tercer árbitro que servirá de Presidente. Si hay más de dos partes involucradas en la controversia y éstas no pueden acordar rápidamente en ser agrupados en dos grupos, entonces los tres árbitros, incluyendo al Presidente, serán designados por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio de acuerdo con las Reglas ICC, como si las partes no hubieran nombrado árbitros. No obstante, las controversias sometidas a arbitraje con relación a las Secciones 12.1(a) o 16.3, serán dirimidas por un solo árbitro seleccionado de acuerdo con las Reglas ICC. A menos que todas las partes en el arbitraje convengan lo contrario, todos los procedimientos de arbitraje según este Convenio serán realizados en la Ciudad de Nueva York (Estados Unidos de América). Cualquier decisión del tribunal de arbitraje (o del árbitro único) será firme y obligatoria para las partes en

Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules as may be agreed by all of the Parties to the corresponding dispute. If there are two Parties to the dispute, or if all Parties to the dispute agree to be grouped together into two groups on the basis of a common interest and position in the dispute, then each one of the Parties or groups, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall then agree within thirty (30) days on the nomination of a third arbitrator to serve as Chairman. If there are more than two parties to the dispute and they do not promptly agree to be grouped together into two groups, then all three arbitrators, including the Chairman, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if the parties had failed to nominate arbitrators. Notwithstanding the foregoing, disputes submitted to arbitration related to Sections 12.1(a) or 16.3 shall be resolved by a single arbitrator selected in accordance with the ICC Rules. Unless all parties to the arbitration agree to the contrary, all arbitration proceedings under this Agreement shall be conducted in New York City (United States of America). Any decision of the arbitral tribunal (or the sole arbitrator) shall be final and binding upon the parties to the arbitration. Judgment

el arbitraje. La ejecución de cualquier decisión dictada por el tribunal de arbitraje (o del árbitro único) será acordada por cualquier tribunal competente sin revisión del fondo de la controversia.

for execution of any award rendered by the arbitral tribunal (or the sole arbitrator) shall be entered by any court of competent jurisdiction without review of the merits of the dispute.

18.4    Derechos Soberanos.

18.4    Sovereign Rights.

18.4 Sovereign Rights.

Este Convenio, así como las actividades y operaciones contempladas en el mismo, en ningún caso impondrán obligaciones a la República de Venezuela o limitarán el ejercicio de sus potestades soberanas.

This Agreement, as well as the activities and operations contemplated herein, shall in no event impose obligations on the Republic of Venezuela or limit the exercise of its sovereign powers.

This Agreement, as well as the activities and operations contemplated hereby, shall in no event impose any obligations on the Republic of Venezuela or limit the exercise of its sovereign powers.

# E.I.10.    Articles 21.1(a) & (b) – *Force Majeure*

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| 21.1    Causa Extraña no imputable; Definición. | 21.1    Non-imputable Extraneous    Cause; Definition | Force Majeure |
| (a)  No se considerará que hay incumplimiento de alguna de las Partes a los efectos de este Convenio, cuando dicho incumplimiento sea causado por un Hecho de Fuerza Mayor. | (a) There shall not be considered to be a breach by any of the Parties for purposes of this Agreement, when such breach is caused by an Event of Force Majeure. | [No Translation Provided] |
| (b)  A los efectos de este Convenio, un "Hecho de Fuerza Mayor" significará cualquier hecho o circunstancia, distinta de la falta de fondos, más allá del control razonable o | (b)  For the purposes of this Agreement, an "Event of Force Majeure" shall mean any event or circumstance, other than lack of funds, beyond the reasonable control of, or unforeseen by, | (b)  For the purposes of this Agreement, an "Event of Force Majeure" shall mean any event or circumstance, other than the lack of funds, beyond the reasonable control of, or unforeseen by, |

imprevista para la Parte obligada a cumplir con la obligación correspondiente, o que, si siendo previsible, no pudo ser evitada en todo o en parte ejerciendo la debida diligencia, incluyendo, a título enunciativo, huelgas, boicots, lockouts y otras dificultades laborales, incendios, terremotos, temblores, deslizamientos de tierra, avalanchas, inundaciones, huracanes, tornados, tormentas, u otros fenómenos o calamidades naturales, explosiones, epidemias, guerras (declaradas o no), hostilidades, actividades de guerrilla, actos de terrorismo, disturbios, insurrecciones, alteraciones civiles, actos de sabotaje, bloqueos, embargos, o actos de gobierno u órdenes, sentencias, resoluciones, decisiones u otras acciones u omisiones de cualquier autoridad gubernamental, civil o militar.

the Party obligated to perform the corresponding obligation, or which, being foreseeable, could not be avoided in whole or in part by the exercise of due diligence, including, but not limited to, strikes, boycotts, lockouts and other labor difficulties, fires, earthquakes, tremors, landslides, avalanches, floods, hurricanes, tornadoes, storms, or other natural phenomena or calamities, explosions, epidemics, wars (declared or not), hostilities, guerrilla activities, terrorist acts, riots, insurrections, civil disturbances, acts of sabotage, blockades, embargoes, or acts of the government or orders, judgments, resolutions, decisions or other acts or omissions of any governmental authority, civil or military.

the Party obligated to perform the relevant obligation, or that, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence, including, but not limited to, strikes, boycotts, lockouts and other labor difficulties, fires, earthquakes, tremors, landslides, avalanches, floods, hurricanes, tornadoes, storms, and other natural phenomena or calamities, explosions, epidemics, wars (declared or not), hostilities, guerrilla activities, terrorist acts, riots, insurrections, civil disturbances, acts of sabotage, blockades, embargoes, or acts of government or orders, judgments, resolutions, decisions or other acts or omissions, of any governmental authority, civil or Military.

# E.I.11.　Article 21.2 – Notice; Duty to Mitigate

| Spanish (Original) | Claimant's Translation |
|---|---|

Notificación; Deber de Mitigar.

Notice; Duty to Mitigate

(a) Si una de las Partes no puede cumplir con alguna obligación asumida de acuerdo con este Convenio, debido a un Hecho de Fuerza Mayor, dicha Parte notificará a las otras Partes por escrito lo más pronto posible informando los motivos del incumplimiento, detalles sobre el Hecho de Fuerza Mayor y la obligación afectada por el mismo. Cualquier obligación de las Partes será temporalmente suspendida durante el período en el cual dicha Parte no pueda cumplir por motivos de Fuerza Mayor, pero solo en la medida de dicha imposibilidad para cumplir. Las Partes continuarán obligadas a cumplir con aquellas obligaciones bajo este contrato que puedan ser cumplidas a través de instalaciones que no hayan sido afectadas por el Hecho de Fuerza Mayor. La Parte afectada por el Hecho de Fuerza Mayor inmediatamente notificará a las otras Partes tan pronto como dicho hecho haya cesado y ya no le impida cumplir con sus obligaciones, e inmediatamente después reasumirá el cumplimiento de las obligaciones derivadas de este Convenio.

(a) If one of the Parties cannot comply with any obligation assumed in accordance with this Agreement because of an Event of Force Majeure, such Party shall notify the other Parties in writing as soon as possible giving the reasons for non-compliance, particulars of the Event of Force Majeure and the obligation affected thereby. Any obligation of the Parties shall be temporarily suspended during the period in which such Party is unable to perform by reason of Force Majeure, but only to the extent of such inability to perform. The Parties shall continue to be obliged to perform such obligations under this agreement which can be fulfilled through facilities that have not been affected by the Event of Force Majeure. The Party affected by the Event of Force Majeure shall immediately notify the other Parties as soon as such event has ceased and no longer prevents it from performing its obligations, and shall immediately thereafter resume performance with the obligations derived from this Agreement.

(b)　La Parte afectada por un Hecho de Fuerza Mayor se esforzará por mitigar los efectos del Hecho de Fuerza Mayor en el cumplimiento de sus obligaciones. Cuando un Hecho de Fuerza Mayor continúe por más de sesenta (60) días, las Partes se reunirán para revisar la situación y sus implicaciones para el Proyecto y discutirán las acciones a tomar ante esas circunstancias.

(b) The Party affected by an Event of Force Majeure shall endeavor to mitigate the effects of the Event of Force Majeure on the performance of its obligations. When an Event of Force Majeure continues for more than sixty (60) days, the Parties shall meet to review the situation and its implications for the Project and shall discuss the course of action to be taken in those circumstances.

# E.1.12.    Article 23.2 – Integrity of the Agreement

**Spanish (Original)**

**Claimant's Translation**

Integridad del Convenio. Este Convenio (incluyendo los Anexos y Programas que forman parte de este Convenio) establece todo el acuerdo entre las Partes en cuanto a las materias cubiertas en el mismo y reemplaza cualquier entendimiento, convenio o declaración (oral o escrita) anterior, incluyendo, a titulo enunciativo, la Carta de Intención de fecha del 20 de diciembre de 1994 entre Lagoven y Mobil Oil Corporation y sus modificaciones, y el Memorandum de Entendimiento entre Lagoven, Mobil Oil Corporation, MPIV y Veba Oel, con fecha efectiva del 1 de enero de 1997.

Integrity of the Agreement. This Agreement (including the Annexes and Schedules which are part of this Agreement) sets forth the entire agreement among the Parties as to matters covered herein and supersedes any prior understanding, agreement or statement (written or oral), including, without limitation, the Letter of Intent dated 20 December 1994 between Lagoven and Mobil Oil Corporation, and its amendments, and the Memorandum of Understanding among Lagoven, Mobil Oil Corporation, MPIV and Veba Oel, with effective date of 1 January 1997[.]

# E.1.13.    Article 23.4(a) – Waiver and Amendments

**Spanish (Original)**

**Claimant's Translation**

Renuncia y Enmiendas. (a) Para la validez de la renuncia de una de las Partes de cualquiera de sus derechos bajo este Convenio, se requerirá que la misma sea hecha por escrito y firmada por un funcionario autorizado. La renuncia de derechos se considerará limitada únicamente al asunto especifico descrito en dicho escrito y de ninguna manera disminuirá los derechos de la Parte renunciante en cualquier otro asunto.

Waiver and Amendments (a)    For the validity of the waiver by a Party of any of its rights under this Agreement, it shall be required that such waiver be made in writing and be signed by an authorized officer.    The waiver of rights shall be deemed limited only to the specific matter described in such writing and shall in no way impair the rights of the waiving Party in any other matter.).

## E.I.14.  Article 23.7(a) – Official Language

| Spanish (Original) | Claimant's Translation |
|---|---|
| 23.7  Idioma Oficial. Este Convenio se celebra en tres ejemplares originales en el idioma castellano. | 23.7  Official Language. This Agreement is being executed in three originals in the Spanish language. |

## E.1.15.  Article 23.9 – Contracts Outside the Scope of This Agreement

| Spanish (Original) | Claimant's Translation |
|---|---|
| Artículo 23.9 | Article. 23.9 |
| Contratos fuera del Alcance de Este Convenio.  Cualquier convenio celebrado por cualquiera de las Partes que viole alguna disposición de este Convenio o que esté fuera del alcance de este Convenio, no será oponible a las demás Partes, el Operador o cualquier Ente de la Asociación. Solamente la Parte que celebra dicho convenio estará sujeta a cualquier responsabilidad que surja del mismo. Cada una de las Partes será responsable por su propio financiamiento y ninguna de las Partes incurrirá en responsabilidad por la deuda, intereses u honorarios que surjan de cualquier financiamiento obtenido por las demás Partes (o por sus Filiales) en relación con el Proyecto; en el entendido que ninguna de las Partes estará obligada a participar en financiamientos disponibles para las otras Partes. | Contracts Outside the Scope of this Agreement. Any agreement entered into by any of the Parties which violates any provision of this Agreement or is outside the scope of this Agreement shall not be binding on the other Parties, the Operator or any Association Entity. Only the Party entering into such agreement shall be subject to any liability that might arise therefrom.  Each one of the Parties shall be liable for its own financing and none of the Parties shall incur liability for the debt, interest or fees arising from any financing obtained by the other Parties (or their Affiliates) in connection with the Project; it being understood that none of the Parties shall be obligated to participate in financings available to the other Parties. |

# E.I.16.    Article 23.11 – No Governmental Guaranties

**Spanish (Original)**

**Claimant's Translation**

Ausencia de Garantías Gubernamentales. Las Partes reconocen que las obligaciones asumidas por cada una de ellas a los fines de este Convenio, con respecto al financiamiento, desarrollo y operación del Proyecto no han sido ni serán garantizadas por la República de Venezuela

Absence of Government Guaranties. The Parties acknowledge that the obligations undertaken by each one of them pursuant to this Agreement in connection with the financing, development and operation of the Project have not been and shall not be guaranteed by the Republic of Venezuela.

# E.II.    Annex G, Accounting Procedures

72.  The principal relevant provisions of the Annex G Accounting Procedures are found at C-87 and R-127. As in the previous section, charts presenting the Spanish original and the Claimant's and Respondents' translations, where available, are provided below, without making any judgment as to the validity of either Party's translations.

# E.II.1    Article 1.1, Purposes

**Spanish (Original)**

**Claimant's Translation**

Propósitos. Los propósitos de estos Procedimientos Contables son establecer los principios de contabilidad para llevar los registros, relativos al Proyecto, necesarios para (i) reflejar de una forma consistente los costos reales de las actividades verticalmente integradas de explotación, producción, transporte y mejoramiento del Petróleo Extrapesado obtenido del Area Designada y comercialización del Petróleo Extra-pesado mezclado y mejorado (el "Proyecto"), (ii) facilitar el pago de las Regalías, (iii) permitir a las Partes y al Operador cumplir con sus otras obligaciones y responsabilidades en virtud del Convenio y del Convenio de Operaciones, y (iv) proveer los mecanismos de generación de toda la información requerida para permitir a las Partes cumplir con sus obligaciones legales en Venezuela y de cualquier otra

Purposes. The purposes of these Accounting Procedures are to establish the accounting principles for record keeping, relating to the Project, necessary to (i) reflect in a consistent manner the actual costs of the vertically integrated activities of exploitation, production, transportation and upgrading of the EHO obtained from the Designated Area and commercialization of the blended and upgraded EHO (the "Project"), (ii) facilitate the payment of the Royalties, (iii) permit the Parties and the Operator to comply with their other obligations and responsibilities pursuant to the Agreement and the Operating Agreement, and (iv) provide the mechanisms of generation of all the information required to allow the Parties to comply with their legal obligations in Venezuela and of any other information

| | | |
|---|---|---|
| información requerida por la Junta. | required by the Board. | |

| | | |
|---|---|---|
| La intención y propósito de estos Procedimientos Contables es que ninguna Parte se beneficie con ganancias o sufra pérdidas con respecto a las otras Partes únicamente como resultado de la aplicación de estos Procedimientos Contables. | The intent and purpose of these Accounting Procedures is that no Party benefits with profits or suffers losses with respect to the other Parties solely as a result of the application of these Accounting Procedures. | |

## E.II.2.  Article 7.1, Net Cash Flow

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Fórmula de Flujo de Caja Neto. | Net Cash Flow Formula. | Net Cash Flow Formula. |
| El Flujo de Caja Neto de una Parte para un Ejercicio Económico dado (según se mida con base en las Cuentas en Dólares) será determinado de la siguiente forma: | The Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be determined as follows: | A Party's Net Cash Flow for a given Fiscal Year (as measured based on the Dollar Accounts) shall be determined as follows: |
| $R - ROY - CEX - IT$ | $R - ROY - CEX - IT$ | $R - ROY - CEX - IT$ |
| Donde: | Where: | Where: |
| R = total de levantamientos durante tal Ejercicio Económico multiplicado por la Fórmula de Precio aplicable a tal Producción, más los Ingresos Conjuntos recibidos durante tal Ejercicio Económico | R = total liftings during such Fiscal Year multiplied by the Price Formula applicable to such Production, plus Joint Revenues received during such Fiscal Year | R = total lifting during such Fiscal Year, multiplied by the Formula Price applicable to such Production, plus Joint Revenues received during such Fiscal Year |
| ROY = la Regalia real pagada por una Parte o en nombre y por cuenta de ésta durante tal Ejercicio Económico | ROY = the actual Royalty paid by a Party or on behalf of and for the account of such Party during such Fiscal Year | ROY = the actual Royalty paid by a Party or on its behalf and for its account during such Fiscal Year |
| CEX = la porción proporcional de Gastos Imputables reales de la Parte | CEX = the Party's pro rata share of actual Chargeable Expenditures for such | CEX = the Party's pro rata share of actual Chargeable Expenditures for such Fiscal |

| para tal Ejercicio Económico. | Fiscal Year | Year |
|---|---|---|
| IT = la porción proporcional de la Parte de Impuestos sobre la Renta pagados con respecto a tal Ejercicio Económico | IT = the Party's pro rata share of Income Taxes paid with respect to such Fiscal Year | IT = the Party's pro rata share of Income Taxes paid with respect to such Fiscal Year. |

## E.II.3.    Article 7.2, Adjusted Net Cash Flow

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Flujo de Caja Neto Ajustado. | Adjusted Net Cash Flow. | Adjusted Net Cash Flow. |
| El Flujo de Caja Neto Ajustado de una Parte para un Ejercicio Económico dado (según se mida con base en las Cuentas en Dólares) será igual al Flujo de Caja Neto para una Parte para tal Ejercicio Económico, calculado sobre la base de la Fórmula de Precio ajustada aplicable, la cual será igual a la Fórmula de Precio para tal Producción inicial, con los ajustes por diferenciales por transporte y calidad según se compare con el Crudo Brent. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Net Cash Flow for a Party for such Fiscal Year, calculated on the basis of the applicable adjusted Price Formula, which shall be equal to the Price Formula for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Party's Net Cash Flow for such Fiscal Year, calculated on the basis of the applicable adjusted Formula Price, which shall be equal to the Formula Price for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude Oil. |

## E.II.4. Article 7.3, Reference (Threshold) Cash Flow

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Formula de Flujo de Caja Referencial. | Reference Cash Flow Formula. | Threshold Cash Flow Formula. |
| El Flujo de Caja Referencial de una Parte para un Ejercicio Económico dado (según se mida con base en la Cuentas en Dólares) será determinado de la siguiente forma: | The Reference Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollars Accounts) shall be determined as follows: | The Threshold Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollars Accounts) shall be determined according to the following formula: |
| TR - TROY - CEX - TIT | TR – TROY – CEX – TIT | TR – TROY – CEX – TIT |
| Donde: | Where: | Where: |
| TR = total de levantamientos durante tal período de tiempo, multiplicado por el Precio Base, más los Ingresos Conjuntos recibidos durante tal Ejercicio Económico. | TR = total liftings during such time period, multiplied by the Base Price, plus Joint Revenues received during such Fiscal Year. | TR = total lifting during such period of time, multiplied by the Threshold Price, plus Joint Revenues received during such Fiscal Year |
| TROY = la Regalía que hubiese sido pagada por una Parte durante tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria. | TROY= the Royalty that would have been paid by a Party during such Fiscal Year, absent the alleged Discriminatory Action. | TROY = the Royalty that would have been paid by a Party during such Fiscal Year, absent the alleged Discriminatory Measure |
| CEX = la porción proporcional de Gastos Imputables reales de la Parte para tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria. | CEX= the Party's pro rata share of actual Chargeable Expenditures for such Fiscal Year, absent the alleged Discriminatory Action. | CEX = the Party's pro rata share of actual Chargeable Expenditures for such Fiscal Year, absent the alleged Discriminatory Measure |
| TIT = la porción proporcional de Impuestos sobre la Renta de la Parte que hubiese sido pagada con | TIT = the Party's pro rata share of Income Taxes that would have been paid with respect to such Fiscal Year, | TIT = the Party's pro rata share of Income Taxes that would have been paid with respect to such Fiscal Year, |

| | | |
|---|---|---|
| respecto a tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria | absent the alleged Discriminatory Action. | absent the alleged Discriminatory Measure. |

## E.II.5.    Article 7.4, Damages Payable

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Daños Pagaderos. | Damages Payable. | Damages Payable. |
| Los daños pagaderos por Lagoven CN a una Parte, de acuerdo con la Sección XV del Convenio, serán equivalentes a lo que exceda a: (i) el monto en que, en ausencia del efecto de la Acción Discriminatoria en cuestión, el Flujo de Caja Neto de tal Parte para un Ejercicio Económico dado hubiese excedido (ii) el Flujo de Caja Neto de tal Parte para tal Ejercicio Económico; en el entendido de que tales daños sólo serán pagaderos si tal exceso es mayor del cinco por ciento (5%) del Flujo de Caja Neto de tal Parte para tal Ejercicio Económico (caso en el cual tales daños serán pagaderos en su totalidad) y tales daños estarán sujetos al límite establecido en la Sección 7.5. | The damages payable by Lagoven CN to a Party, pursuant to Section XV of the Agreement, shall be equal to the excess of: (i) the amount by which, absent the effect of the Discriminatory Action in question, such Party's Net Cash Flow for a given Fiscal Year would have exceeded (ii) such Party's Net Cash Flow for such Fiscal Year; in the understanding that such damages shall be payable only if such excess is greater than five percent (5%) of such Party' Net Cash Flow for such Fiscal Year (in which case such damages will be payable in full) and such damages shall be subject to the limit set forth in Section 7.5. | The damages payable by Lagoven CN to a Party pursuant to Section XV of the Agreement, shall be equal to the excess of: (i) the amount by which, absent the effect of the Discriminatory Measure in question, such Party's Net Cash Flow for a given Fiscal Year would have exceeded (ii) such Party's Net Cash Flow for such Fiscal Year; it being understood that such damages shall be payable only if such excess is greater than five percent (5%) of such Party's Net Cash Flow for such Fiscal Year (in which case such damages will be payable in full) and such damages shall be subject to the limitation set forth in Section 7.5. |

## E.II.6.    Article 7.5, Limitation

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Limitación | Limitation[.] | Limitation. |
| El límite de la obligación de compensación de Lagoven CN de acuerdo con la | The limit of Lagoven CN's compensation obligation pursuant to Section 15.2 (a) | The limitation on Lagoven CN's compensation obligation pursuant to |

Sección 15.2 (a) del Convenio será el excedente del Umbral de Flujo de Caja de una Parte sobre el Flujo de Caja Neto Ajustado de tal Parte durante el Ejercicio Económico en cuestión.

of the Agreement shall be the excess of the Threshold Cash Flow of a Party over the Adjusted Net Cash Flow of such Party during the Fiscal Year in question.

Section 15.2(a) of the Agreement shall be the excess of the Threshold Cash Flow of a Party over such Party's Adjusted Net Cash Flow during the Fiscal Year in question.

## E.II.7.    Article 7.7, Project Expansion

**Spanish (Original)**

Expansión del Proyecto. De acuerdo con la Sección 8,1 (c) del Convenio, si una o más Partes eligiesen aportar fondos adicionales para el Proyecto, sin el consentimiento unánime de todas las Partes, a fin de incrementar la capacidad del Mejorador o expandir la producción del Petróleo Extrapesado, las Partes se reunirán y de buena fe intentarán llegar a un procedimiento de contabilidad equitativo por medio del cual se asignarán ingresos y se efectuarán asignaciones de depreciación y agotamiento relacionados con tales gastos. Si las Partes no lograsen llegar a un acuerdo dentro de los ciento veinte (120) días siguientes a que una Parte solicite tal reunión, la determinación de tal procedimiento de contabilidad será sometida a la firma de contadores independiente de Arthur Andersen & Co. o a otra firma de contadores independiente que las Partes puedan convenir para la determinación definitiva.

**Claimant's Translation**

Project Expansion. In accordance with Section 8.1 (c) of the Agreement, should one or more Parties elect to contribute additional funds to the Project, without the unanimous consent of all the Parties, in order to increase the capacity of the Upgrader or expand the production of EHO, the Parties shall meet and in good faith shall attempt to reach an equitable accounting procedure by which revenues shall be allocated and depreciation and depletion allowances related to such expenditures shall be effected. Should the Parties fail to reach an agreement within one hundred and twenty (120) days after a Party requests such a meeting, the determination of such accounting procedure shall be submitted to the independent accounting firm Arthur Andersen & Co. or such other independent accounting firm as the Parties may agree for the final determination.

## E.III.   Principal Relevant Provisions of the Guaranty

73.   The principal relevant provisions of The Guaranty are found at C-3 and R-41.   As in the previous section, charts presenting the Spanish original and the Claimant's and Respondents' translations, where available, are provided below.   The translations are provided for ease of reference, and are provided without making any judgment as to the validity of either Party's translations.

### E.III.1.   Section 3

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| La Fiadora garantiza adicionalmente en forma incondicional e irrevocable a cada una de las Beneficiarias, como deudora y obligada principal, el cumplimiento oportuno de todas las obligaciones de la Filial Garantizada en virtud del Convenio y del Convenio de Operación. Si la Filial Garantizada dejare de cumplir cualquiera de sus obligaciones en la forma y en el momento exigidos, la Fiadora cumplirá o hará cumplir dicha obligación al exigirlo cualquiera de las Beneficiarias. | The Guarantor additionally unconditionally and irrevocably guarantees to each of the Beneficiaries, as primary debtor and obligor, the timely performance of all of the obligations of the Guaranteed Affiliate under the Agreement and the Operating Agreement. If the Guaranteed Affiliate fails to perform any of its obligations in the manner and at the time required, the Guarantor shall perform or procure the performance of such obligation upon demand by any of the Beneficiaries. | The Guarantor additionally unconditionally and irrevocably guarantees to each of the Beneficiaries, as primary debtor and obligor, the timely performance of all of the obligations of the Guaranteed Affiliate under the Agreement and the Operating Agreement. If the Guaranteed Affiliate fails to perform any of its obligations in the manner and at the time required, the Guarantor shall perform or procure the performance of such obligation upon demand by any of the Beneficiaries |

## E.III.2. Section 5

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Las disposiciones contenidas en el Artículo 547 del Código de Comercio de Venezuela serán plenamente aplicables a esta Fianza. En vista de ello, las Beneficiarias no tendrán obligación de intentar ningún recurso o acción contra la Filial Garantizada o con respecto a la misma antes de exigir sus derechos en virtud de esta Fianza directamente contra la Fiadora. Además, la Fiadora no podrá alegar que las Beneficiarias tenían el deber de evitar o mitigar, en cualquier forma o mediante cualquier acción, los daños resultantes del incumplimiento por la Filial Garantizada de sus obligaciones en virtud del Convenio o del Convenio de Operación. | The provisions contained in Article 547 of the Commercial Code of Venezuela shall be fully applicable to this Guaranty. Accordingly, the Beneficiaries shall not have the obligation to pursue any remedy or action against or with respect to the Guaranteed Affiliate before enforcing their rights under this Guaranty directly against the Guarantor. In addition, the Guarantor may not claim that the Beneficiaries had any duty to avoid or to mitigate, in any manner or through any action, the damages resulting from the breach by the Guaranteed Affiliate of its obligations under the Agreement or the Operating Agreement. | The provisions contained in Article 547 of the Commercial Code of Venezuela shall be fully applicable to this Guaranty. Accordingly, the Beneficiaries shall not have the obligation to pursue any remedy or action against or with respect to the Guaranteed Affiliate before enforcing their rights under this Guaranty directly against the Guarantor. In addition, the Guarantor may not claim that the Beneficiaries had any duty to avoid or to mitigate, in any manner or through any action, the damages resulting from the breach by the Guaranteed Affiliate of its obligations under the Agreement or the Operating Agreement. |

## E.III.3.  Section 6(ii)

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Las obligaciones de la Fiadora estarán limitadas a la garantía de (i) el pago por la Filial Garantizada de la porción de la Filial Garantizada en cualesquiera de las Contribuciones de Capital y otros montos pagaderos exclusivamente por la Filial Garantizada (y no por las Partes como un todo) en virtud del Convenio y el Convenio de Operación o en virtud de cualquier ley o reglamento venezolano en relación con actividades llevadas a cabo en virtud del Convenio o del Convenio de Operación, (ii) el cumplimiento por la Filial Garantizada de sus otras obligaciones en virtud del Convenio y del Convenio de Operación que recaigan exclusivamente sobre la Filial Garantizada (a diferencia de las Partes como un todo), [...] | The obligations of the Guarantor shall be limited to the guaranty of the (i) payment by the Guaranteed Affiliate of the Guaranteed Affiliate's share in any of the Capital Contributions and other amounts payable exclusively by the Guaranteed Affiliate (and not by the Parties as a whole) under the Agreement or the Operating Agreement or under any Venezuelan law or regulation related to the activities carried out under the Agreement or the Operating Agreement, (ii) the performance by the Guaranteed Affiliate of its other obligations under the Agreement and the Operating Agreement which fall exclusively on the Guaranteed Affiliate (as opposed to the Parties as a whole), [...] | The obligations of the Guarantor shall be limited to the guaranty of the (i) payment by the Guaranteed Affiliate of the Guaranteed Affiliate's share in any of the Capital Contributions and other amounts payable exclusively of the Guaranteed Affiliate (and not by the Parties as a whole) under the Agreement or the Operating Agreement or under any Venezuelan law or regulation related to the activities carried out under the Agreement or the Operating Agreement, (ii) the performance by the Guaranteed Affiliate of its other obligations under the Agreement and the Operating Agreement which fall exclusively on the Guaranteed Affiliate (as opposed to the Parties as a whole), [...] |

## E.III.4.  Section 7

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Todas las obligaciones de la Fiadora establecidas en el presente documento serán vinculantes para la Fiadora y sus sucesores. La Fiadora no podrá ceder ni delegar sus deberes u obligaciones en virtud de la presente Fianza sin el previo consentimiento escrito de las Beneficiarias, y cualquier cesión o delegación hecha sin dicho consentimiento será nula e inválida. La Fiadora | All the obligations of the Guarantor set forth herein shall bind the Guarantor and its successors. The Guarantor shall not assign or delegate its duties or obligations hereunder without the prior written consent of the Beneficiaries, and any assignment or delegation made without such consent shall be null and void. The Guarantor confirms that this Guaranty | All the obligations of the Guarantor set forth herein shall be binding on the Guarantor and on its successors. The Guarantor may not assign or delegate its duties or obligations hereunder without the prior written consent of the Beneficiaries, and any assignment or delegation made without such consent shall be null and void. The Guarantor confirms that this |

confirma que esta Fianza permanecerá en vigencia con respecto a cualquier cesionario de las obligaciones de la Filial Garantizada en virtud del Convenio o del Convenio de Operación, siempre que dicho cesionario sea una Filial de la Filial Garantizada. Al ocurrir cualquier tal cesión el cesionario será considerado como la Filial Garantizada para todos los propósitos de la presente en la medida de las obligaciones cedidas. La Fiadora adicionalmente confirma que cualquier cesionario permitido de una Beneficiaria en virtud del Convenio o del Convenio de Operación podrá ejercer todos los derechos y recursos de la Beneficiaria en virtud de esta Fianza. Ninguna otra persona o entidad será beneficiaria de esta Fianza ni tendrá ni adquirirá derechos en virtud de la misma. La Fiadora conviene en que, sin el consentimiento de las Beneficiarias, no traspasará ni cederá ningún interés directo o indirecto que pueda tener en la Filial Garantizada si, como resultado de dicho traspaso o cesión, cualquier obligación de la Fiadora (o derecho de las Beneficiarias) en virtud de la presente garantía fuese restringida o terminada.

shall remain in effect with respect to any assignee of the obligations of the Guaranteed Affiliate under the Agreement or the Operating Agreement, provided that such assignee is an Affiliate of the Guaranteed Affiliate. Upon any such assignment the assignee shall be considered as the Guaranteed Affiliate for all purposes hereunder to the extent of the assigned obligations. The Guarantor additionally confirms that any permitted assignee of a Beneficiary under the Agreement or the Operating Agreement may exercise all rights and remedies of such Beneficiary under this Guaranty. No other person or entity shall be a beneficiary of this Guaranty or shall have or acquire rights under it. The Guarantor agrees that it shall not, without the consent of the Beneficiaries, transfer or assign any direct or indirect interest it may have in the Guaranteed Affiliate if, as a result of such a transfer or assignment, any obligation of the Guarantor (or right of the Beneficiaries) hereunder would be restricted or terminated.

Guaranty shall remain in effect with respect to any assignee of the obligations of the Guaranteed Affiliate under the Agreement or the Operating Agreement, provided that such assignee is an Affiliate of the Guaranteed Affiliate. Upon any such assignment the assignee shall be considered as the Guaranteed Affiliate for all purposes hereunder to the extent of the assigned obligations. The Guarantor additionally confirms that any permitted assignee of a Beneficiary under the Agreement or the Operating Agreement may exercise all rights and remedies of such Beneficiary under this Guaranty. No other person or entity shall be a beneficiary of this Guaranty or shall have or acquire rights under it. The Guarantor agrees that it shall not, without the consent of the Beneficiaries, transfer or assign any direct or indirect interest it may have in the Guaranteed Affiliate if, as a result of such a transfer or assignment, any obligation of the Guarantor (or right of the Beneficiaries) hereunder would be restricted or terminated.

## E.III.5.     Section 9

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
| --- | --- | --- |
| Esta Fianza será regida por e interpretada de acuerdo con las leyes de la República de | This Guaranty shall be governed by and interpreted in accordance with the laws | This Guaranty shall be governed by and interpreted in accordance with the laws |

Venezuela.

of the Republic of Venezuela.

of the Republic of Venezuela.

# E.III.6.    Section 12

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Cualquier disputa que surja de o con respecto a esta Fianza será resuelta exclusiva y definitivamente por arbitraje. El arbitraje será realizado y resuelto en forma definitiva por tres (3) árbitros de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara de Comercio Internacional (las "Reglas ICC"), o aquellas otras reglas que puedan convenir todas las partes envueltas en la disputa. Si hubiere dos partes en la disputa correspondiente , o si todas las partes en disputa convienen en agruparse en dos grupos en base al interés común y posición común en la disputa, entonces cada parte o grupo, según sea el caso, seleccionará un árbitro de acuerdo con las Reglas ICC. Los árbitros así nombrados deberán convenir dentro del plazo de treinta (30) días en un tercer árbitro que servirá de Presidente. Si hubiere más de dos partes en disputa y las partes en disputa no acordaren prontamente agruparse en dos grupos, entonces los tres árbitros, incluyendo el Presidente serán seleccionados por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio de acuerdo con las Reglas ICC, tal como si ninguna de las partes hubiese designado árbitro. Salvo que las Partes convengan otra | Any dispute arising out of or concerning this Guaranty shall be resolved exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules which all the parties involved in the dispute may agree to. If there are two parties in the corresponding dispute, or if all parties to the dispute agree to be grouped together into two groups on the basis of their common interest and common position in the dispute, then each party or group, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall agree within a thirty (30) day time period on a third arbitrator who shall serve as President. If there are more than two parties to the dispute and the parties to the dispute do not promptly agree to be grouped into two groups, then the three arbitrators, including the President, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if none of the parties had | Any dispute arising out of or concerning this Guaranty shall be resolved exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules which all the parties involved in the dispute may agree to. If there are two parties in the corresponding dispute, or if all parties to the dispute agree to be grouped together into two groups on the basis of their common interest and common position in the dispute, then each party or group, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall agree within a thirty (30) day time period on a third arbitrator who shall serve as President. If there are more than two parties to the dispute and the parties to the dispute do not promptly agree to be grouped into two groups, then the three arbitrators, including the President, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if none of the parties had |

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| cosa, todos los procedimientos de arbitraje serán conducidos en la Ciudad de Nueva York (Estados Unidos de América). No obstante lo anterior, en el caso de que una disputa involucre tanto a la Fiadora como a la Filial Garantizada, el arbitraje será realizado de acuerdo con la Sección 18.2 del Convenio, como un procedimiento único, y la Fiadora y la Filial Garantizada tendrán conjuntamente los derechos de la Filial Garantizada en virtud de dicha Sección 18.2. | designated an arbitrator. Unless the parties agree otherwise, all arbitration proceedings shall be conducted in New York City (United States of America). Notwithstanding the foregoing, if a dispute involves the Guarantor and the Guaranteed Affiliate, the arbitration proceeding shall be performed in accordance with Section 18.2 of the Agreement, as the only proceeding, and the Guarantor and Guaranteed Affiliate shall jointly have the rights of the Guaranteed Affiliate in accordance with Section 18.2. | designated an arbitrator. Unless the parties agree otherwise, all arbitration proceedings shall be conducted in New York City (United States of America). Notwithstanding the foregoing, if a dispute involves the Guarantor and the Guaranteed Affiliate, the arbitration proceeding shall be performed in accordance with Section 18.2 of the Agreement, as a sole proceeding, and the Guarantor and Guaranteed Affiliate shall jointly have the rights of the Guaranteed Affiliate in accordance with Section 18.2. |

## E.III.7.   Section 13

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| La Fiadora pagará al serle exigido y contra presentación de facturas todos los costos y gastos razonables y realmente incurridos por las Beneficiarias en relación con la ejecución satisfactoria de esta Fianza, incluyendo, sin limitación, los gastos y honorarios razonables de abogados. | The Guarantor shall pay upon demand and presentation of invoices all reasonable and actual costs and expenses incurred by the Beneficiaries in connection with the satisfactory execution of this Guaranty, including, without limitation, reasonable attorneys' expenses and fees. | The Guarantor shall pay upon demand and presentation of invoices all reasonable and actual costs and expenses incurred by the Beneficiaries in connection with the satisfactory execution of this Guaranty, including, without limitation, reasonable attorneys' expenses and fees. |

## E.IV.   Association Oil Supply Agreement (Chalmette Offtake Agreement)

74.   The **Chalmette Offtake Agreement** was executed in the English language only.   The principal relevant provisions of the **Chalmette Offtake Agreement** are found at C-141 and R-72.

### Section 10.1., Chalmette Offtake Agreement
Force Majeure

Excuse from Obligations; Definition.

(a) The failure of a Party to perform any obligation incurred under this Agreement shall be excused and shall not be considered a default hereunder during the time and to the extent that such non-performance is caused by an Event of Force Majeure.

(b) For the purposes of this Agreement, an "Event of Force Majeure" shall mean any event or circumstance, other than a lack of finances, beyond the reasonable control of and unforeseeable by the Party obligated to perform the relevant obligation, or which, if foreseeable, could not have been avoided in whole or in pan by the exercise of due diligence. including but not limited to strikes, boycotts, stoppages, lockouts and other labor or employment difficulties, fires, earthquakes, tremors, landslides, avalanches, floods, hurricanes, tornadoes, storms, other natural phenomena or calamities, epidemics, quarantines, wars (declared or undeclared), hostilities, guerrilla activities, terrorist acts, riots, insurrections, civil disturbances, acts of sabotage, blockades, embargoes, or acts of state of any governmental body or any order, judgment, ruling, decision or other act or failure to act of any governmental, civil or military authority.

## E.V.      Principal Relevant Provisions of Venezuelan Law

## E.V.1.      1943 Hydrocarbons Law (as published in the Official Gazette on 13 March 1943)

75.   The principal relevant provision of the **1943 Hydrocarbons Law** is at R-2.

| **Spanish (Original)** | **Respondents' Translation** |
|---|---|
| Ley de Hidrocarburos (Gaceta Oficial N° 31 Extraordinario del 13 de marzo de 1943) | 1943 Hydrocarbons Law Published in Official Gazette No. 31 on March 13, 1943 |
| Artículo 41 | Article 41 |
| Todos los concesionarios indicados en el artículo 39 pagarán; además: | All concessionaires referred to in article 39 shall additionally pay: |
| 1 -  El impuesto de explotación, que será igual al 16 2/3 por ciento del petróleo crudo extraído, medido en el campo de producción, en las instalaciones en que se efectúe la fiscalización. Este impuesto se pagará total o parcialmente, en especie o en efectivo, a elección del Ejecutivo Nacional. | I - The exploitation tax, which will be equal to 16 2/3 percent of the crude oil extracted, measured in the production field in the facilities where the inspection is carried out. This tax shall be totally or partially paid, in kind or in cash, at the election of the National Executive |
| **Parágrafo Único.**- Con el fin de prolongar | **Sole Paragraph.**- For the purpose of |

la explotación económica de determinadas concesiones queda facultado el Ejecutivo Federal para rebajar el impuesto de explotación a que se refiere este ordinal en aquellos casos en que se demuestre a su satisfacción que el costo creciente de producción, incluido en éste el monto de los impuestos, haya llegado al límite que no permita la explotación comercial. Puede también el Ejecutivo Federal elevar de nuevo el impuesto de explotación ya rebajado hasta restablecerlo en su monto original, cuando a su juicio se hayan modificado las causas que motivaron la rebaja.[...]

extending the economic exploitation of certain concessions, the Federal Executive is hereby authorized to reduce the exploitation tax referred to in this subparagraph in those cases in which it is evidenced to its satisfaction that the increasing production cost, including tax amounts, has reached a limit that does not permit commercial exploitation. The Federal Executive is also authorized to increase again the reduced exploitation tax until restoring it to its original amount, when, in its judgment, the causes motivating the reduction have changed.[...]

## E.V.2.    Venezuelan Commercial Code (as published in the Extraordinary Official Gazette No. 475 of 21 December 1955)

76. <u>Article 282 and Article 547 of the Venezuelan Commercial Code</u> are found at R-119 App. 57 and C-140, respectively.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| CÓDIGO DE COMERCIO DE LA REPÚBLICA DE VENEZUELA (Eduven, Caracas 1955) | Commercial Code | VENEZUELAN COMMERCIAL CODE (Eduven, Caracas 1955) |
| <u>Artículo 282</u> | **[No Translation Provided]** | <u>Article 282</u> |
| Los socios que no convengan en el reintegro o en el aumento del capital, o en el cambio del objeto de la compañía, tienen derecho a separarse de ella, obteniendo el reembolso de sus acciones, en proporción del activo social, según el último balance aprobado. | | The shareholders that do not agree on a capital replenishment (reintegro) or capital increase, or in the change of the corporate purpose, shall have the right to withdraw from [the corporation], receiving reimbursement for their shares, in proportion to the corporate assets, in accordance with the last approved financial statement. |

| | | |
|---|---|---|
| La sociedad puede exigir un plazo hasta de tres meses para el reintegro, dando garantía suficiente. | | The corporation may require a term of up to three months for the replenishment (reintegro), providing sufficient guarantee. |
| Si el aumento de capital se hiciera por la emisión de nuevas acciones, no hay derecho a la separación de que habla este artículo. | | If the capital increase is carried out by issuing new stock, there shall be no right of withdrawal as mentioned in this article. |
| Los que hayan concurrido a algunas de las asambleas en que se ha tomado la decisión, deben manifestar, dentro de las veinticuatro horas de la resolución definitiva, que desean el reembolso. Los que no hayan concurrido a la asamblea, deben manifestarlo dentro de quince días de la publicación de lo resuelto. | | Those [shareholders] that have attended the shareholders' meetings in which the decision was taken, shall, within twenty-four hours of the final resolution, notify [the corporation] if they want reimbursement. Those [shareholders] that have not attended the shareholders' meeting, shall so notify [the corporation] within fifteen days of the publication of the resolution. |
| <u>Artículo 547</u> | <u>Article 547</u> | **[No Translation Provided]** |
| El fiador mercantil responde solidariamente como el deudor principal, sin poder invocar el beneficio de excusión, ni el de división. | The mercantile guarantor responds jointly as the principal debtor, without being able to invoke the benefits of excusión or division. | |

## E.V.3. Organic Law Reserving to the State the Industry and Commerce of Hydrocarbons (as published in the Official Gazette No. 1769 of 29 August 1975)

77. The principal relevant provisions of the **Nationalization Law** are found at C-55 and R-44.

| **Spanish (Original)** | **Claimant's Translations** | **Respondents' Translations** |
|---|---|---|

| Ley Orgánica que Reserva al Estado la Industria y el Comercio de los Hidrocarburos | Organic Law Reserving to the State the Industry and Commerce of Hydrocarbons | Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons |
|---|---|---|
| Artículo 1 | Article 1 | **[No Translation Provided]** |
| Se reserva al Estado, por rezones de conveniencia nacional, todo lo relativo a la exploración del territorio nacional en busca de petróleo, asfalto y demás hidrocarburos; a la explotación de yacimientos de los mismos, a la manufactura o refinación, transporte por vías especiales y almacenamiento; al comercio interior y exterior de las sustancias explotadas y refinadas, y a las obras que su manejo requiera, en los terminos señalados por esta ley. Como consecuencia de lo dispuesto en este artículo, quedarán extinguidas las concesiones otorgadas por el Ejecutivo Nacional y la extinción se hará efectiva el día 31 de diciembre de mil novecientos setenta y cinco. | For reasons of national convenience, anything related to the exploration of the national territory in search of petroleum, asphalt and other hydrocarbons; to the exploitation of reservoirs thereof; to the manufacture or refining, transportation by special means and storage; to the internal and external commerce of the exploited and refined substances, and to the works required for their handling, are reserved to the State under the terms set forth by this law. As a consequence of the provisions of this article, the concessions granted by the National Executive shall be extinguished and the extinction shall be effective on December 31, nineteen hundred and seventy-five. | |
| Se declaran de utilidad pública y de interés social las actividades mencionadas en el presente artículo, así como las obras, trabajos y servicios que fueren necesarios para realizarlas. | The activities mentioned in this article, as well as the works, labors and services required to carry them out are declared of public utility and of social interest. | |
| Lo referente a la industria del gas natural y el Mercado interno de los productos derivados de hidrocarburos, se regirá por lo dispuesto en la Ley que Reserva al Estado la Industria del Gas Natural y la Ley que Reserva al Estado la | All matters related to the natural gas industry and to the internal market of hydrocarbon by-products, shall be governed by the provisions of the Law that Reserves to the State the Natural Gas Industry and the Law that Reserves to the | |

| | | |
|---|---|---|
| Explotación del Mercado Interno de los Productos Derivados de Hidrocarburos, respectivamente, en cuanto no colida con dispuesto en la presente ley. | State the Exploitation of the Internal Market of Hydrocarbon By-products, respectively, insofar as they do not collide with the provisions of this law. | |

| Artículo 5 | Article 5 | Article 5 |
|---|---|---|
| El Estado ejercerá las actividades señaladas en el artículo 1 de la presente Ley directamente por el EJecutivo Nacional o por medio de entes de su propiedad, pudiendo celebrar los convenios operativos necesarios para la mejor realización de sus funciones, sin que en ningún caso estas gestiones afecten la esencia misma de las actividades atribuídas. | The State shall carry out the activities indicated in Article 1 of this Law directly through the National Executive or through entities owned by it, being able to enter into the operating agreements necessary for the better performance of its functions, without these arrangements affecting in any case the very essence of the activities assigned. | The State shall carry out the activities indicated in Article 1 of this Law directly through the National Executive or through state-owned entities, being able to enter into operating agreements necessary for the better performance of its functions, but in no case shall such transactions affect the essence of the reserved activities. |
| En casos especiales y cuando así convenga al interés público, el Ejecutivo Nacional o los referidos entes podrán, en el ejercicio de cualquiera de las señaladas actividades, celebrar convenios de asociación con entes privados, con una participación tal que garantice el control por parte del Estado y con una duración determinada. Para la celebración de las Cámaras en sesión conjunta, dentro de law condiciones que fijen, una vez que hayan sido debidamente informadas por el Ejecutivo Nacional de todas las circunstancias pertinentes. | In special cases and when convenient to the public interest, the National Executive or the aforesaid entities may, in the exercise of any of the aforementioned activities, enter into association agreements with private entities, with a participation such that guarantees the control by the State and with a determined duration. In order to enter into such agreements, the prior authorization of the Chambers in a joint session shall be required, under the conditions they [the Chambers] establish, once they have been duly informed by the National Executive of all relevant circumstances. | In special cases and if convenient for the public interest, the National Executive or such entities may, in the exercise of any of the indicated activities, enter into association agreements with private entities, with a participation that guarantees control on the part of the State and with a specified duration. The execution of such agreements shall require the prior authorization of the [Congressional] Chambers in joint session, within the conditions that they establish, once they have been duly informed by the National Executive of all the pertinent circumstances. |

| Artículo 6 | Article 6 | **[No Translation Provided]** |
|---|---|---|

| | |
|---|---|
| A los fines indicados en el artículo anterior, el Ejecutivo Nacional organizará la administración y gestión de las actividades reservadas, conforme a las siguientes bases: | For the purposes indicated in the preceding article, the National Executive shall organize the administration and management of the reserved activities, in conformity with the following bases: |
| Primera: creará, con las formas jurídicas que considere conveniente, las empresas que juzgue necesario para el desarrollo regular y eficiente de tales actividades, pudiendo atribuirles el ejercicio de una o más de éstas, modificar su objeto, fusionarlas o asociarlas, extinguirlas y liquidarlas y aportar su capital a otra u otras de esas mismas empresas. Estas empresas serán de la propiedad del Estado, sin perjuicio de lo dispuesto en las base Segunda de este artículo, y en caso de revestir la forma de sociedades anónimas, podrán ser constituídas con un solo socio. [...] | First: [the National Executive] shall create, in the juridical forms it considers convenient, the enterprises that it deems necessary for the regular and efficient development of such activities, being able to assign to them the exercise of one or more of these [activities], modify their object, merge or associate them, extinguish and liquidate them and contribute their capital to another or others of those same enterprises. These enterprises shall be the property of the State, without limiting the provisions of the Second basis of this Article, and putting on the form of stock companies ["sociedades anónimas"], they may be constituted with only one partner. |

### E.V.4.   Organic Law of the Supreme Court of Justice (as published in Extraordinary Official Gazette No. 1.893 30 July 1976)

78.   The relevant portion of the **Organic Law of the Supreme Court of Justice** is found at R-90.

| Spanish (Original) | Respondents' Translation |
|---|---|
| Ley Orgánica de la Corte Suprema de Justicia | Organic Law of the Supreme Court of Justice |

| Artículo 42 | Article 42 |
|---|---|
| Es de la competencia de la Corte como más alto Tribunal de la República: | The [Supreme] Court, as the highest Court of the Republic, has jurisdiction (competencia): |
| 1. Declarar la nulidad total o parcial de las leyes y demás actos generales de los cuerpos legislativos nacionales, que colidan con la Constitución; | 1. To declare the total or partial nullity of laws and other general acts of nationals legislative bodies, which collide with the Constitution; |
| 2. Decidir acerca de la inconstitucionalidad de las leyes que solicite el Presidente de la República antes de ponerle el ejecútese, conforme al artículo 173 de la Constitución; | 2. To decide, upon the request by the President of the Republic, on the unconstitutionality of laws prior to their enforcement, pursuant to Article 173 of the Constitution; |
| 3. Declarar la nulidad total o parcial de las constituciones o leyes estadales, de las ordenanzas municipales y demás actos generales de los cuerpos deliberantes de los Estados o Municipios, que colidan con la Constitución; | 3. To declare the total or partial nullity of state laws and constitutions, municipal ordinances and other general acts of state or municipal deliberative bodies, which collide with the Constitution; |
| 4. Declarar la nulidad total o parcial de los reglamentos y demás actos de efectos generales del Poder Ejecutivo Nacional, que colidan con la Constitución; | 4. To declare the total or partial nullity of regulations and other acts of general effects of the National Executive Power, which collide with the Constitution; |
| 9. Declarar la nulidad, cuando sea procedente por rezones de ilegalidad, de los actos generales de los órganos unipersonales o colegiados del Poder Público, salvo en los casos previstos en las disposiciones transitorias de esta Ley; | 9. To declare the nullity, where appropriate due to illegality, of the general acts of one person or collegiate bodies of the Public Power, except for the cases provided in the temporary provisions of this Law; |
| 10. Declarar la nulidad, cuando sea procedente por rezones de inconstitucionalidad o de ilegalidad, de los actos administrativos individuales del Poder Ejecutivo Nacional; | 10. To declare the nullity, where appropriate due to unconstitutionality or illegality, of the individual administrative acts of the National Executive Power; |
| 11. Declarar la nulidad, cuando sea procedente por rezones de inconstitucionalidad, de los actos de los órganos del Poder Público, en los casos no previstos en los ordinales 3, 4, y 6 del artículo 215 de la Constitución; | 11. To declare the nullity, where appropriate due to unconstitutionality, of the acts of the Public Power, in cases not contemplated in subparagraphs 3, 4 and 6 of Article 215 of the Constitution; |
| 12. Declarar la nulidad, cuando sea procedente por rezones de | 12. To declare the nullity, where appropriate due to unconstitutionality or illegality, of |

inconstitucionalidad o de ilegalidad, de los actos administrativos generales o individuales del Consejo Supremo Electoral o de otros órganos del Estado de igual jerarquía a nivel nacional; [...]

the general or individual administrative acts of the Electoral Supreme Council or other State bodies of equal rank at the national level[...]

## E.V.5. Organic Law on Administrative Procedures, (as published in Extraordinary Official Gazette No. 2.818 published 1 July 1981)

79. The relevant portions of the **Organic Law on Administrative Procedures** are found at R-69 App. 28 and R-119 App. 58.

| **Spanish (Original)** | **Respondents' Translation** |
|---|---|
| Ley Orgánica de Procedimientos Administrativos | Organic Law on Administrative Procedures |
| Artículo 91 | Article 91 |
| El recurso de reconsideración, cuando quien deba decidir sea el propio Ministro, así como el recurso jeráquico, deberán ser decididos en los noventa [90] días siguientes a su presentación. | The recourse of reconsideration (recurso de reconsideración), when the one who has to decide is the Minister, as well as the appeal to a higher [administrative] authority (recurso jerárquico) shall be decided in the ninety (90 days) following their filing. |
| Artículo 93 | Article 93 |
| La via contencioso administrative quedará abierta cuando interpuestos los recursos que ponen fin a la via administrative, éstos hayan sido decididos en sentido distinto al solicitado, o no se haya producido decision en los plazos correspondientes. Los plazos para intentar los recursos contenciosos son los establecidos por las leyes correspondientes. | The judicial remedy to administrative matters (via contenciosa administrative) shall be open when, once petitions that put an end to the administrative remedies have been filed, they have been decided different than what was petitioned, or if no decision was made in the established deadline. The deadlines to seek the judicial remedies (recursos contenciosos) to [administrative matters] are those set by the respective laws. |
| Artículo 94 | Article 94 |
| Es recurso de reconsideración procederá contra todo acto administrativo de character particular y deberá ser interpuesto dentro de los quince [15] días siguientes a la | The recourse of reconsideration (recurso de reconsideración) shall proceed against all administrative acts of particular effects and must be initiated before the government |

notificación del acto que se impugna, por ante al funcionario que lo dictó. Si el acto no pone fin a la vía administrative, el órgano ante el cual se interpone este recurso, decidirá dentro de los quince [15] días siguientes al recibo del mismo. Contra esta decision no puede interponerse de Nuevo dicho recurso.

official who dictated the act within 15 days following notification of the act being challenged.

Artículo 95

Article 95

El recurso jerárquico procederá cuando el órgano inferior decida no modificar el acto de que es autor en la forma solicitada en el recurso de reconsideración. El interesado podrá, dentro de los quince (15) días siguientes a la decisión a la cual se refiere el párrafo anterior, interponer el recurso jerárquico directamente para ante el Ministro.

The appeal to the highest administrative authority (recurso jerárquico) shall be appropriate when the subordinate body (órgano inferior) decides not to modify the act it made, as petitioned in the reconsideration appeal (recurso de reconsideración).

The interested party may be able to file the appeal to the highest administrative authority (recurso jerárquico) directly with the Minister., within fifteen (15) days after the decision referred to in the previous paragraph.

## E.V.6     Venezuelan Civil Code (as published in the Official Gazette No. 2990 of 26 July 1982)

80. The principal relevant provisions of the **Venezuelan Civil Code** are found at C-240, C-134, C-215 App. 21 R-46, R-68 App. 6, R-69 App. 7, R-118 App. 46, and R-119. The original Spanish texts and the translations – where available – have been inserted into the 3 column chart below. In some instances, Claimant has provided the Tribunal with multiple, slightly different translations. Those are provided in the table below. Each section contains a reference to where the text may be found in the record, and this reference is immediately following the text, rather than at the end of the table. As in the previous sections, the Tribunal makes no judgment as to the validity of any of the translations provided below.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
| --- | --- | --- |

| Código Civil de la República de Venezuela | Venezuelan Civil Code | Civil Code of the Republic of Venezuela |
|---|---|---|
| Artículo 1. | **[No Translation Provided]** | Article 1. |
| La Ley es obligatoria desde su publicación en la Gaceta Oficial o desde la fecha posterior que ella misma indique. (R-68 App. 6; R-69 App. 7) | | The law is mandatory from the date of publication in the Official Gazette or from a later date indicated therein. (R-68 App. 6; R-69 App. 7). |
| Artículo 3. | Article 3. | **[No Translation Provided]** |
| La Ley no tiene efecto retroactivo. (R-69 App. 7) | The Law does not have retroactive effect. (C-240). | |
| Artículo 6. | Article 6. | Article 6. |
| No pueden renunciarse ni relajarse por convenios particulares law leyes en cuya observancia están interesados el orden público o las buenas costumbres. (R-69 App. 7) | Laws in the compliance of which the public order and good customs are interested cannot be waived or relaxed through private agreements. (C-240; C-134). | Laws the observance of which is of interest to the public policy or sound morality cannot be waived or relaxed by private agreements. (R-69 App. 7) |
| Artículo 547. | Article 547. | Article 547. |
| Nadie puede ser obligado a ceder su propiedad, ni a permitir que otros hagan uso de ella, sino por causa de utilidad pública o social, mediante juicio contradictorio e indemnización previa. Las reglas relativas a la expropiación por causa de utilidad pública o social se determinan por leyes especiales. (R-119 App. 56) | Nobody can be obliged to assign his property, or to allow others to use it, except by cause of public or social utility, through a contradictory judicial process and prior compensation. Rules related to expropriation for reason of public or social utility shall be determined by special laws. (C-240) | No one may be forced to transfer his property, or to allow others to make use of it, unless for reasons of public or social utility, through a court proceeding (juicio contradictorio) and prior indemnification. The rules regarding expropriation for public or social utility shall be established in special laws [. . .] (R-119 App. 56). |
| Artículo 782. | **[No Translation Provided]** | Article 782. |
| Quien encontrandose por más de un año en la posesión legitima de un | | Whomever finds themselves in legitimate possession of real property, an in rem |

inmueble, de un derecho real, o de una universalidad de muebles, es perturbado en ella, puede, dentro del año, a contar desde la perturbación, pedir que se le mantenga en dicha posesión. El poseedor precario puede intentar esta acción en nombre y en interés del que posee, a quien le es facultativo intervenir en el juicio. En caso de una posesión por menor tiempo, el poseedor no tiene esta acción sino contra el no poseedor o contra quien lo fuere por un tiempo más breve. (R-119 App. 56)

right, or a collection of personal property (universalidad de muebles), and where such possession is challenged (perturbado), may, within one year, counted from the challenge, petition to retain such possession. The adverse possessor (poseedor precario) may file this action on behalf of and in the interest of the possessor, who has the option to participate in the proceeding. In the event of possession for a shorter period of time, the possessor does not have a cause of action except for one against the non-possessor or the possessor for a shorter period of time. (R-119 App. 56).

### Artículo 783.

**[No Translation Provided]**

### Article 783.

Quien haya sido despojado de la posesión, cualquiera que ella sea, de una cosa mueble o inmueble, puede, dentro del año del despojo, pedir contra el autor de él, aunque fuere el propietario, que se le restituya en la posesión. (R-119 App. 56)

Whomever has been divested of possession of any kind, whether personal or real property, may, within one year of the divestment, petition for restoration of the possession against the perpetrator of such [divestment], even if [the perpetrator] is the owner. (R-119 App. 56).

### Artículo 1159.

### Article 1159.

### Article. 1159.

Los contratos tienen fuerza de ley entre las partes. No pueden revocarse sino par mutuo consentimiento o por las causas autorizadas por la ley. (R-68 App. 6; R-69 App. 7; R-119 App. 56; C-134; C-240)

Contracts have force of Law between the parties. They cannot be revoked except for mutual consent or for causes authorized by Law. (C-240; C-134)

Contracts have the force of Law between the parties. They can only be revoked by mutual consent or by the causes authorized by law. (R-69 App. 7; R-68 App. 6)

### Artículo 1160.

### Article 1160.

### Article 1160.

Los contratos deben ejecutarse de buena fe y obligan no solamente a cumplir lo expresado en

Contracts shall be performed in good faith and bind not only to comply with what they provide, but

Contracts must be performed in good faith and oblige compliance not only with their own provisions,

ellos, sino a todas las consecuencias que se derivan de los mismos contratos, según la equidad, el usa o la ley. (R-68 App. 6; R-69 App. 7; R-119 App. 56; C-240)

also to all the consequences derived from such contracts, according to equity, usage or Law. (C-240)

but also with all of the consequences derived from the contracts themselves, according to equity, use or law. (R-119 App. 56)

---

Artículo 1167.

Article 1167.

[No Translation Provided]

[NO SPANISH ORIGINAL PROVIDED]

In a bilateral contract, if one of the parties does not perform its obligation, the other [party] can - at its election - claim judicially the performance of the contract or its termination [resolución] with damages in both cases if they are in place. (C-240; C-134)

---

Artículo 1215.

[No Translation Provided]

Article 1215.

Si el deudo se ha hecho insolvente, o por actos propios hubiere disminuido las seguridades otorgadas al acreedor para el cumplimiento de la obligación, o no le hubiere dado las garantías prometidas, no puede reclamar el beneficio del término o plazo. (R-118 App. 46)

If the debtor becomes insolvent, or by his own actions has diminished the guarantees provided to the creditor for the fuilfillment of the obligation, or has failred to deliver the promise dguarantees, he may not claim the benefit of the term or time period. (R-118 App. 46)

---

Artículo 1264.

Article 1264.

[No Translation Provided]

Law obligaciones deben cumplirse exactamente como han sido contraidas. El deudor es responsible de daños y perjuicios, en caso de contravención (C-240; C-134)

Obligations shall be performed exactly as they have been contracted. The debtor is liable for damages, in case of breach. (C-240). C-134

---

Artículo 1271.

Article 1271.

Article 1271.

E deudor sera condenado al pago de los daños y

The debtor shall be ordered to pay damages, both for

The debtor shall be condemned to pay damages

perjuicios, tanto por inejecución de la obligación como por retardo en la ejecución, si no prueba que la inejecución o el retardo provienen de una causa extraña que no le sea imputable, aunque de sup arte no haya habido mala fe. (R-69 App. 7)

failure to perform the obligation and delay in performance, if s/he does not prove that the failure or delay result from an extraneous cause not attributable to him/her, even if there has not been bad faith on his/her part. (C-134)

for non or late performance, unless he proves that late or non-performance arises from a non-imputable external cause, even in the case when he did not act in bad faith. (R-69 App. 7; R-68 App. 6)

Article 1271.

The debtor shall be ordered to pay damages, both for failure to perform the obligation and for delay in performance, unless he proves that the failure or delay are due to an extraneous cause not imputable to him, even though he may not have actedc in bath faith. C-240.

Artículo 1272.

El deudor no está obligado a pagar daños y perjuicios, cuando, a consecuencia de un caso fortuito o de fuerza mayor, ha dejado de dar o de hacer aquéllo a que estaba obligado o ha ejecutado lo que estaba prohibido.(R-69 App. 7)

Article 1272.

The debtor is not obligated to pay damages , when, as a consequence of a fortuitous event or force majeure, he failure to give or do what he was obligated or has performed what was prohibited. (C-240)

Article 1272.

The debtor is not compelled to pay damages when, as a result of an act of God or force majeure, he has not given or done what he was compelled to do or he has performed what was prohibited. (R-68 App. 6; R-69 App. 7)

Artículo 1273.

Los daños y perjuicios se deben generalmente al acreedor, por la pérdida que haya sufrido y por la utilidad de que se le haya privado, salvo las modificaciones y excepciones establecidas a continuación. (R-68 App. 6; R-69 App. 7; C-240; C-134)

Article 1273.

Damages are generally owed to the creditor, for the loss he has suffered and the profits from which he has been deprived, except for the modifications and exceptions established below. (C-240).

**[No Translation Provided]**

Article 1273.

Damages are generally owed to the creditor, for the loss s/he has suffered and the profits from which s/he

has been deprived, except for the modifications and exceptions established below. (C-134)

Artículo 1274.

El deudor no queda obligado sino por los daños y perjuicios previstos o que han podido perverse al tiempo de la celebración del contrato, cuando la falta de cumplimiento de la obligación no proviene de su dolo. (C-240; C-134)

Article 1274.

The debtor shall not be liable but for the damages foreseen or that could have been foreseen at the time of the execution of the contract, when the failure to perform the obligation does not result from its willful misconduct [dolo]. (C-240 – exact; C-134).

**[No Translation Provided]**

Artículo 1275.

Aunque la falta de cumplimiento de la obligación resulte de dolo del deudor, los daños y perjuicios relativos a la pérdida sufrida por el acreedor y a la utilidad de que se le haya privado, no deben extenderse sino a los que son consecuencia inmediata y directa de la falta de cumplimiento de la obligación. (C-240; C-134)

Article 1275.

Even if the failure to perform the obligation results from the debtor's willful misconduct [dolo], damages relating to the loss suffered by the creditor and the profit from which s/he has been deprived, shall not extend but to those which are immediate and direct consequence of the failure to perform the obligation. (C-240; C-134).

**[No Translation Provided]**

Artículo 1276.

Cuando en el contrato se hublere estipulado que quien deje de ejecutarlo debe pagar uni cantidad determinada por razón de daños y perjuicios no pueda el acreedor pedir una mayor, ni el obligado pretender que se le reciba una menor.

Article 1276.

When the contract shall have stipulated that who fails to perform it shall pay a determined amount on account of damages, the creditor cannot ask for a larger [amount], nor can the debtor pretend that a lower [amount] be received. (C-240). (C-134)

**[No Translation Provided]**

Sucede lo mismo cuando la determinación de los daños y perjuicios se hace bajo la formula de cláusula [illegible] por medio de arras. (C-240; C-134)

The same occurs when the determination of damages is made under the formula of a penalty clause or through security deposit [arras]. (C-240; C-134).

| Artículo 1277. | Article 1277. | **[No Translation Provided]** |
|---|---|---|
| A falta de convenio en las obligacione [illegible] que tienen por objeto una cantidad de dinero, los daños [illegible] perjuicios resultants del retardo en el cumplimiento [illegible] siempre en el pago del interés legal, salvo disposiciales especiales. | Absent an agreement[,] on obligations that have a sum of money as their object, the damages resulting from the delay in performance always consist in the payment of legal interest, except for special provisions. | |
| Se deben estos daños desde el dia de la more sine que el acreedor esté obligado a comprobar ninguna pérdida. (C-240; C-134). | These damages are owed from the day of default [mora] without the creditor being required to prove any loss. (C-240; C-134). | |

| Artículo 1354. | Article 1354. | |
|---|---|---|
| Quien pida la ejecución de una obligación debe probarla, y quien pretenda que ha sido libertado de elle debe por sup arte probar el pago o el heche que ha producido la extinction de su obligación. (C-240) | Whoever requests the performance of an obligation must prove it, and whoever pretends that he has been freed from that obligation must[,] on his part[,] prove the payment or the event that has produced the extinction of his obligation. (C-240). | |

| Artículo 1500. | Article 1500. | **[No Translation Provided]** |
|---|---|---|
| **[NO SPANISH ORIGINAL PROVIDED]** | In all of the cases specified in the previous articles, the action for price increase that corresponds to the seller and that which corresponds to the buyer, for the reduction of the price or the contract, must be attempted within one year counting from the day the contract was entered into, under pain of losing the respective rights. (C-240). | |

**E.V.7.** **Organic Law of Protection (Amparo) of Constitutional Rights and Guarantees (as published in Official Gazette No. 34.060 27 September 1988)**

81. The principal relevant provisions of the **Amparo Law** are found at R-69 App. 29.

| Spanish (Original) | Respondents' Translation |
|---|---|
| Ley Orgánica de Amparo sobre Derechos y Garantías Constitucionales | Organic Law of Protection (Amparo) of Constitutional Rights and Guarantees |

| Titulo 1: DISPOSICIONES FUNDAMENTALES | Title 1: FUNDAMENTAL PROVISIONS |
|---|---|

| Artículo 2 | Article 2 |
|---|---|
| La acción de amparo procede contra cualquier hecho, acto u omisión provenientes de los órganos del Poder Público Nacional, Estadal o Municipal. También procede contra el hecho, acto u omisión originados por ciudadanos, personas jurídicas, grupos u organizaciones privadas, que hayan violado, violen o amenacen violar cualquiera de las garantías o derechos amparados por esta ley. | The amparo action is appropriate against any deed, act or omission arising from the organs of the National, State or Municipal Public Power. |
| Se entenderá como amenaza válida para la procedencia de la acción de amparo aquella que sea inminente. | It is also appropriate against a deed, act or omission arising from citizens, legal persons, groups or private organizations, that have violated, that violate or threaten to violate any constitutional right or guarantee protected by this law. |

| Artículo 3 | Article 3 |
|---|---|
| También es procedente la acción de amparo, cuando la violación o amenaza de violación deriven de una norma que colida con la Constitución, en este caso, la providencia judicial que resuelva la acción interpuesta deberá apreciar la inaplicación de la norma impugnada y el Juez informará a la Corte Suprema de Justicia acerca de la respective | The amparo action is also appropriate when the violation or threat of violation arises out of a norm that collides with the Constitution. In this case, the judicial decision that resolves the action shall determine the inapplicability of the challenged law and the Judge shall inform the Supreme Court of Justice about such |

decisión.

decision.

La acción de amparo también podrá ejercerse conjuntamente con la acción popular de inconstitucionalidad de las leyes y demás actos estatales normativos, en cuyo caso, la Corte Suprema de Justicia, si lo estima procedente para la protección constitucional, podrá suspender la aplicación de la norma respecto de la situación jurídica concreta cuya violación se alega, mientras dure el juicio de nulidad.

The amparo action may also be exercised together with the popular action of the unconstitutionality of laws and other normative governmental acts, in which case the Supreme Court of Justice, if it deems it appropriate for the constitutional protection, may suspend the application of the law with respect to the specific legal situation the violation of which is alleged, during the pendency of the annulment proceedings.

Artículo 5

Article 5

La acción de amparo procede contra todo acto administrativo, actuaciones materials, vías de hecho, abstenciones u omisiones que violen o amenacen – violar un derecho o una garantía constitucionales, cuando no exista un medio procesal breve, sumario y eficaz acorde con la protección constitucional.

The amparo action is appropriate against all administrative acts, actions, de facto acts ("vías de hecho"), abstentions or omissions which violate or threaten to violate a constitutional right or guarantee, when there is no brief, expeditious and effective procedural means appropriate for constitutional protection.

Cuando la acción de amparo se ejerza contra actos administrativos de efectos particulares o contra abstenciones o negativas de la Administración, podrá formularse ante el Juez Contencioso-Administrativo compente, si lo hubiere en la localidad conjuntamente con el recurso contencioso-administrativo de anulación de actos administrativos o contra las conductas omisivas, respectivamente, que se ejerza, en estos casos, el juez, en forma breve, sumaria, efectiva y conforme a lo establecido en el artículo 22, si lo considera procedente para la protección constitucional, suspenderá los efectos del acto recurrido como garantía de dicho derecho constitucional violado, mientras dure el juicio.

When the amparo action is exercised against administrative acts with particular effects or against abstentions or refusals of the State (Administración), it could be filed before the competent administrative judge (juez contencioso-administrativo), if [such a judge] exists in such place, together with the administrative remedy of annulment (recurso contencioso-administrativo de anulación) of administrative acts or against omissions, respectively, which could be filed. In these cases, the Judge, in a brief, expeditious, and effective manner and pursuant to what is provided in Article 22, if it considers it appropriate for constitutional protection, shall suspend the effects of the challenged act as a guarantee of such violated constitutional right, during the pendency of the proceedings.

**Paragrafo unico:** Cuando se ejerza la acción de amparo contra actos administrativos conjuntamente con el recurso contencioso-administrativo que se fundamente en la violación de un derecho constitucional, el ejercicio del recurso procederá en cualquier tiempo, aún después de transcurridos los lapsos de caducidad previstos en la ley y no será necesario el

**Sole Paragraph:** When the amparo action against administrative acts is filed together with the administrative remedy (recurso contenciosoadministrativo) based on the violation of a constitutional right, the filing of this remedy shall be appropriate at any time, even after the terms of forfeiture (caducidad) provided in the Law have elapsed, and it shall not be necessary to

| | |
|---|---|
| agotamiento previo de la vía administrativo. | previously exhaust administrative remedies. |

| | |
|---|---|
| **TITULO II: DE LA ADMISIBILIDAD** | **TITLE II: ON ADMISSIBILITY** |

| | |
|---|---|
| Artículo 6 | Article 6 |

| | |
|---|---|
| No se admitirá la acción de amparo: [...] | The action of amparo shall not be admissible. [...] |

| | |
|---|---|
| 4) Cuando la acción u omisión, el acto o la resolución que violen el derecho o la garantía constitucionales hayan sido consentidos expresa o tácitamente, por el agraviado, a menos que se trate de violaciones que infrinjan el orden público o las buenas costumbres. | 4) When the action or omission, the act or decision, which violate the Constitutional right or guarantee, was expressly or tacitly accepted by the aggrieved party, unless it concerns violations that infringe public policy or sound morality (buenas costumbres). |

| | |
|---|---|
| Se entenderá que hay consentimiento expreso. Cuando hubieren transcurrido los lapsos de prescripción establecidos en leyes especiales o en su defecto seis (6) meses después de la violación o la amenaza al derecho protegido.<br><br>El consentimiento tácito es aquel que estrañ signos inequívocos de aceptación. | It shall be understood that there is an express consent, when the terms of statute of limitations established in special laws have expired, or alternatively, six (6) months after the violation or threat [of the violation] of the protected right. Tacit consent is that which has unequivocal evidence of acceptance. |

## E.V.8. Venezuelan Code of Civil Procedure (as published in the Extraordinary Official Gazette No. 4.209 of 18 September 1990)

82. **Article 12 and Article 13 of the Venezuelan Code of Civil Procedure** are found at C-215 App. 21, C-44 App. 6 and Respondents' Closing Slide 26.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Código de Procedimiento Civil | Venezuelan Code of Civil Procedure | Venezuelan Code of Civil Procedure |
| Artículo 12. | Article 12. | [No Translation Provided] |

| En la interpretación de 99ontraltos o actos que presenten oscuridad, ambigüedad o deficiencia, los jueces se alentarán al propósito y a la intención de las partes o de los otorgantes, lamiendo en mira las exigencias de la ley; de la verdad y de la Buena fe. | In the interpretation of contracts or acts that are obscure, ambiguous or deficient, judges shall be subject to the parties' purpose and intention taking into account the requirements of the law, the truth and good faith. (C-215 App. 21) |
|---|---|
| (C-215 App. 21) | (C-215 App. 21) |
| <u>Artículo 13</u> | **[No Translation Provided]**    <u>Article 13</u> |
| El juez decidirá el fondo de la causa con arreglo a la equidad, cuando las partes de común acuerdo así lo soliciten y la controversia se refiera a derechos disponibles | ...shall decide the merits of the case according to equity, when the parties, by mutual agreement, so request him and the controversy refers to rights that can be transacted |
| (C-44 App. 6) | R Closing Slide 26 |

### E.V.9    Law on Partial Amendment to the Income Tax Law and Income Tax Law (both as published in the Extraordinary Official Gazette No. 5023 of 18 December 1995)

83.  The relevant provisions of the <u>**Law on Partial Amendment to the Income Tax Law**</u> are found at C-177. The original text of <u>**Article 53**</u> provides different percentage numbers than were provided by the Claimant's translation. This Award provides the numbers exactly as provided by Claimant's translation – this is not a typo.

| **Spanish (Original)** | **Claimant's Translation** |
|---|---|
| <u>Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta</u> | Law on Partial Amendment to the Income Tax Law |

| | |
|---|---|
| Artículo 1 | Article 1 |

Se modifica al primer aparte del artículo 9°, así:

The first separate paragraph of article 9 is modified, thus:

Quedan excluidos del régimen previsto en este artículo, las empresas que se constituyan bajo convenios de asociación celebrados conforme a la Ley Orgánica que Reserva al Estado la Industria y el Comercio de los Hidrocarburos o mediante contratos de interés nacional previstos en la Constitución, para la ejecución de proyectos integrados verticalmente en materia de explotación, refinación, industrialización, emulsificación, transporte y comercialización de petróleos crudos extrapesados, bitumanes naturales y gas natural costa afuora, y las empresas ya constituídas y domicilladas en Venezuela que realicen actividades integradas de producción y emulsificación de bitumen natural, todas las cuales tributarán, bajo el regimen ordinario establealdo en esta Ley par alas compañía anónimas y los contribuyentes asimilados a éstas.

Enterprises constituted under association agreements entered into in accordance with the Organic Law that Reserves to the State the Industry and the Commerce of Hydrocarbons or through national interest contracts under the Constitution, for the execution of vertically integrated projects related to the exploitation, refining, industrialization, emulsification, transport and commercialization of extra-heavy crude oil, natural bitumens and natural gas offshore, and enterprises already constituted and domiciled in Venezuela which realize integrated activities of production and emulsification of natural bitumen, shall be excluded from the regime provided for in this article, all of which shall be taxed under the ordinary regime established in this Law for stock companies [compañías anónimas] and the taxpayers assimilated to them.

| | |
|---|---|
| Artículo 53 | Article 53 |

En enriquecimiento global neto anual/obtenido por los contribuyentes a que se reliere el artículo 7 de la presente Ley se gravará salvo, disposición en contrario, con base en la sigulente tarifa expresada en unidades tributaries (U.T.):

The aggregate annual net income, obtained by the taxpayers referred to in Article 7 of this Law shall be taxed except as otherwise provided, on the basis of the following rate expressed in taxing units (T.U.):

| | |
|---|---|
| **Tarifa N° 2** | **RATE NUMBER 2** |

1. Por la fracción comprendida hasta 2.000,00          15%

1. For the fraction contained up to 2.000 . . . . . . . . . . . . . . . . . . 15%

2. Por la fracción que exceda de 2.000,00 hasta 3.000,00          22%

2. For the fraction exceeding 2.000 up to 3.000 . . . . . . . . . . . . . . 30%

3. Por la fracción que exceda de 3.000,00 34%

3. For the fraction exceeding 3.000 34%

**E.V.10.** **Congressional Authorization of the Framework of Conditions for the Cerro Negro Association Agreement (as published in Official Gazette No. 36.224, published 10 June 1997)**

84. The principal relevant provisions of the **Framework of Conditions** are found at C-11 and R-43.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Acuerdo mediante el cual se aprueba el Marco de Condiciones que regirá el Convenio de Asociación para la explotación, transporte, mejoramiento y comercialización de crudos extrapesados a ser producidos en el área Cerro Negro de la Faja Petrolífera del Orinoco, a celebrarse entre Lagoven, S.A., Filial de Petróleos de Venezuela, y las empresas Mobil Corporation y Veba Oel AG | Framework of Condititions for the Association Agreement for the exploitation, transporting, upgrading and marketing of extra-heavy crude oil to be produced in the Cerro Negro area of the Orinoco Oil Belt | Congressional Authorization of the Framework of Conditions for the Cerro Negro Association Agreement |
| DECIMA | TENTH | TENTH |
| Cada Parte recibirá la propiedad de su correspondiente cuota parte de petróleo crudo extrapesado producido (incluyendo la "Producción de Desarrollo", tal como se define en la Condición Novena), en la cabeza de cada pozo en proporción a su respectiva participación en LA ASOCIACION. La propiedad del gas asociado con el petróleo crudo extrapesado y la de los otros productos generados en el mejoramiento del petróleo crudo extrapesado recaerá en LAS PARTES, en proporción a su respectiva participación en LA ASOCIACION, al momento | Each Party shall receive property of its respective share of produced extra-heavy crude oil (including the "Development Production," as defined in Ninth Condition), at each wellhead proportionately to its respective participation in THE ASSOCIATION. The property of the gas associated with the extra-heavy crude oil and that of other products generated in the upgrading of the extra-heavy crude oil shall belong to THE PARTIES, proportionately to their respective participation in THE ASSOCIATION, at the time of its recovery or production. THE PARTIES | Each Party shall receive property of its respective share of produced extra-heavy crude oil (including the "Development Production," as defined in Ninth Condition), at each wellhead proportionately to its respective participation in THE ASSOCIATION. The property of the gas associated with the extra-heavy crude oil and that of other products generated in the upgrading of the extra-heavy crude oil shall belong to THE PARTIES, proportionately to their respective participation in THE ASSOCIATION, at the time of **their** recovery or production. THE PARTIES |

de su recuperación o producción. LAS PARTES establecerán un plan para el uso, venta disposicion de todo el referido gas asociado y otros productos.

shall establish a plan for the use, sale, or disposal of all such associated gas and other products.

shall establish a plan for the use, sale, or disposal of all such associated gas and other products

---

DECIMA TERCERA

THIRTEENTH

THIRTEENTH

En caso de que LAS PARTES sean requendas a reducir zu producción como resultado de los compromisos internacionales de la República de Venezuela, tal disminucion no excedera el porcentaje de reducción generalmente aplicable a la industria petrolera nacional como un todo. Este porcentaje sera calculado con base a la capacidad disponible de producción. LAS PARTES deberán acordar una extension apropiada del tiempo del tiempo duracion del Convenio de Asociación en caso de alguna reducción de las aqui señaladas, para permitir a LAS PARTES producir en volumen acumulado que dejaron de producir debido a las reducciones impuestas, siempre y cuando con dicha extensión el término del Convenio de Asociación termine no mas alla del cuadragésimo (40°) aniversario de la Fecha de Comienzo.

If THE PARTIES are required to reduce their production as a result of the international commitments of the Republic of Venezuela, such reduction shall not exceed the reduction percentage generally applicable to the national oil industry as a whole. This percentage shall be calculated based on the available production capacity. THE PARTIES shall agree on an appropriate extension of the term of the Association Agreement in the event of a reduction as those indicated herein, to allow THE PARTIES to produce the accumulated volume they did not produce due to the reductions imposed provided that with the extension the term of the Association Agreement ends no later than on the fortieth (40th) anniversary of the Starting Date.

If THE PARTIES are required to reduce their production as a result of the international commitments of the Republic of Venezuela, such reduction shall not exceed the reduction percentage generally applicable to the national oil industry as a whole. This percentage shall be calculated based on the available production capacity. THE PARTIES shall agree on an appropriate extension of the term of the Association Agreement in the event of a reduction as those indicated herein, to allow THE PARTIES to produce the accumulated volume they did not produce due to the reductions imposed, provided that with the extension the term of the Association Agreement ends no later than on the fortieth (40th) anniversary of the Starting Date.

---

DECIMA QUINTA

FIFTEENTH

FIFTEENTH

Por cuanto la regulación y administración de los hidrocarburos se encuentran bajo la competencia del Poder Nacional, de conformidad con e artículo 136, ordinales 8° y 10° de la

Since the regulation and administration of hydrocarbons are under the authority of the National Government, pursuant to article 136, sections 8 and 10 of the Constitution of the

Since the regulation and administration of hydrocarbons are under the authority of the National Government, pursuant to Article 136, Sections 8 and 10 of the Constitution of the

Constitución de la República de Venezuela, y por cuanto las actividades a ser ejecutadas por LAS PARTES de acuerdo con el Convenio de Asociación están reservadas al Estado, de conformidad con los artículos 1° y 7° de la Ley Organica que Reserva al Estado la Industria y el Comercio de los Hidrocarburos, dichas actividades no estaran sujetas al pago de Impuestos Municipales (Patente de Industria y Comercio) o Estadales, asimismo, de conformidad con lo previsto en el segundo párrafo del artículo 9 de la Ley de Impuesto sobre la Renta vigente, LAS PARTES y cada uno de los Entes pagarán impuestos bajo el régimen ordinario establecido en dicha ley para compañías y entes asimilados a ellas, por cualquier ingreso obtenido en relación con las actividades de LAS PARTES (incluyendo la Producción de Desarrollo).

Republic of Venezuela, and since the activities to be carried out by THE PARTIES under the Association Agreement are reserved to the State, pursuant to articles I and 7 of the Organic Law that Reserves to the State the Industry and Commerce of Hydrocarbons, such activities shall not be subject to payment of Municipal Taxes (Industry and Commerce Excise) or State taxes; furthermore, pursuant to the second paragraph of article 9 of the Income Tax Law in force, THE PARTIES and each of the Entities shall pay taxes under the ordinary regime established in said law for companies and assimilated entities, for any income obtained in connection with the activities of THE PARTIES (including the Development Production).

Republic of Venezuela, and since the activities to be carried out by THE PARTIES under the Association of Agreement are reserved to the State, pursuant to Articles 1 and 7 of the Organic law that Reserves to the State the Industry and Trade of Hydrocarbons, such activities shall not be subject to payment of Municipal Taxes (Industry and Trade Excise Tax) or State taxes; furthermore, pursuant to the second paragraph of Article 9 of the Income Tax Law in force, THE PARTIES and each of the Entities shall pay taxes under the ordinary regime established in said law for companies and similar entities, for any income obtained in connection with the activities of THE PARTIES (including the Development Production).

## DECIMA OCTAVA

El Convenio de Asociación, y todas las actividades y operaciónes conducidas conforme a él, no impondran ninguna obligación a la República de Venezuela ni restringirán sus potestades soberanas, el ejercicio de las cuales no dara derecho a reclamación alguna, sin importar la naturaleza o caracteristicas de la reclamación, por parte de otros estados o poderes extrajeros.

## EIGHTEENTH

The Association Agreement, and all activities and operations conducted under it, shall not impose any obligation on the Republic of Venezuela nor shall they restrict its sovereign powers, the exercise of which shall not cause any claim, regardless of the nature or characteristics of the claim, from other states or foreign powers.

## EIGHTEENTH

The Association Agreement, and all activities and operations conducted under it, shall not impose any obligation on the Republic of Venezuela nor shall they restrict its sovereign powers, the exercise of which shall not give rise to any claim, regardless of the nature or characteristics of the claim, by other states or foreign powers.

## VEGÉSIMA

El Convenio de Asociación incluirá previsiones que

## TWENTIETH

The Association Agreement shall include provisions

## TWENTIETH

The Association Agreement shall include provisions

permitan la renegociación del Convenio en la forma que sea necesaria para compensar a cualquier Parte distinta de LAGOVEN, en terminus equitativos, por consecuencias economicamente adversas y significativas que surjan de la adopcion de decisiones emanadas de autoridades gubernamentales, o cambios en la legislación, que causen un tralamiento discriminatono a LA ASOCIACION, cualquier entidad o LAS PARTES en su condición de participantes en LA ASOCIACION. Sin embargo, no se considera que una Parte ha sufrido una consequencia eonomicamente adversa y significativa como resultado de cualquiera de dichas decisiones o cambios en la legislación, en cualquier momento en que la Parte este recibiendo ingresos de LA ASOCIACION igual a un precio del petróleo crudo por encima de un precio maximo que será especificado en el Convenio de Asociación. De no haber acuerdo entre LAS PARTES, los correspondientes cambios al Convenio de Asociación, asi como la indemnizacion por daños serán determinados a traves de un arbitraje.

allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, under equitable terms, for economically adverse and significant consequences arising from the adoption of decisions made by governmental authorities or changes in legislation that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered. that the Party has suffered an economically adverse and significant consequence as a result of any of said decisions or changes in legislation at any time when the Party receives income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement. In the absence of agreement among THE PARTIES, the corresponding changes in the Association Agreement, as well as the indemnities for damages shall be determined by way of arbitration.

allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, on equitable terms, for adverse and significant economic consequences arising from the adoption of decisions made by governmental authorities, or changes in legislation, that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered that a Party has suffered an adverse and significant economic consequence as a result of any of said decisions or changes in legislation, at any time when the Party is receiving income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement. If there is no agreement between THE PARTIES, the corresponding changes to the Association Agreement, as well as the indemnification for damages shall be determined by way of arbitration.

## E.V.11. Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA S.A. to Calculate the Royalty under Article 41 of the Hydrocarbons Law (29 May 1998)

85. The principal relevant provisions of the **Royalty Reduction Agreement** ("RRA") are found at C-80.

| Spanish (Original) | Claimant's Translation |
|---|---|
| **[Spanish Original Not Provided]** | Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA S.A. to Calculate the Royalty under Article. 41 of the Hydrocarbons Law |

<table>
<tr>
<td>

QUINTA: DE LA METODOLOGIA PARA EL OTORGAMIENTO DE LA REBAJA

Para propósitos de calcular la REGALIA, se procederá a multiplicar el volumen de crudo extraído en la cláusula SEGUNDA de este CONVENIO por el VM obtenido de la aplicación de la fórmula establecida en la cláusula TERCERA por el porcentaje resultante de aplicar el procedimiento que se establece a continuación en esta cláusula.

5.1. Durante el período de producción temprana o de desarrollo de cada ASOCIACION, el porcentaje aplicable para el cálculo de la REGALIA, será de 16 2/3%.

5.2. Para determinar el porcentaje que se aplicará para el cálculo de la REGALIA a pagar por cada ASOCIACION, durante el período de producción comercial, se utilizará el indicador (I), resultante de la relación entre los.INGRESOS BRUTOS ACUMULADOS y la INVERSION TOTAL, de manera que:

a) Si el indicador (I) es menor o igual a 3,00, el porcentaje aplicable para el cálculo de la REGALIA será 1%

b) Si el indicador (I) es mayor a 3,00, el porcentaje aplicable será 16 2/3%. Máximo actualmente permitido por la Ley de Hidrocarburos.

5.3. En ningún caso, el porcentaje de 1% aplicable para el cálculo de la REGALIA podrá exceder de nueve (9) años contados a

</td>
<td>

Fifth: Methodology for Granting Reduction

For purposes of calculating the ROYALTY, the volume of extracted crude referred to in clause SECOND of this AGREEMENT shall be multiplied by the VM obtained from the application of the formula established in clause THIRD by the percentage resulting from applying the procedure established below in this clause.

5.1. During the period of early or development production of each ASSOCIATION, the percentage applicable to the calculation of the ROYALTY shall be 16 2/3%.

5.2. In order to determine the percentage to be applied for the calculation of the ROYALTY to be paid by each ASSOCIATION, during the commercial production period, indicator (I) shall be used, resulting from the ratio of the ACCUMULATED GROSS INCOME to the TOTAL INVESTMENT, so that:

a) If indicator (I) is lower than or equal to 3.00, the percentage applicable to the calculation of the royalty shall be 1%.

b) If indicator (I) is higher than 3.00, the applicable percentage shall be 16 2/3%, which is the maximum presently permitted by the Law of Hydrocarbons.

5.3 In no case may the 1% percentage applicable to the calculation of the royalty exceed nine (9) years as from the

</td>
</tr>
</table>

partir del inicio de la producción comercial de cada ASOCIACION.

commencement of the commercial production of each ASSOCIATION.

A los efectos de lo previsto en este CONVENIO se entenderá que:

For the purposes of the provisions of this AGREEMENT, it shall be understood that:

PRODUCCION TEMPRANA O DE DESARROLLO significa la producción de petróleo crudo obtenida, durante el período pre-operativo, con el propósito de verificar la productividad de los yacimientos, optimizar el plan de desarrollo y alcanzar el.nivel óptimo de producción para el momento en el cual las instalaciones para el mejoramiento comiencen operaciones comerciales.

EARLY OR DEVELOPMENT PRODUCTION means the crude oil production obtained during the pre-operative period, with the purpose of verifying the productivity of the reservoirs, optimizing the development plan, and reaching an optimum production level by the time at which the facilities for the upgrading commence commercial operations.

INICIO DE LA PRODUCCION COMERCIAL de cada ASOCIACION significa lo Contemplado en los respectivos convenios de asociación.

COMMENCEMENT OF COMMERCIAL PRODUCTION of each ASSOCIATION means what is prescribed in the respective association agreements.

INGRESOS BRUTOS ACUMULADOS ó IBA será igual al monto total acumulado de las ventas brutas de crudo, productos y servicios, en dólares corrientes, contados a partir del inicio de la producción de crudo extra pesado de cada ASOCIACION.

ACCUMULATED GROSS INCOME or IBA shall be equal to the total accumulated amount of the gross sales of crude, products and services in current dollars, counted as from the beginning of the extra-heavy crude production of each ASSOCIATION.

INVERSION TOTAL ó IT será igual al monto total invertido por cada ASOCIACION, en dólares corrientes, hasta el inicio de la producción comercial.

TOTAL INVESTMENT or IT shall be equal to the total amount invested by each ASSOCIATION in current dollars, until the commencement of the commercial production.

La IT de cada ASOCIACION incluirá, entre otros, todas las inversiones en pozos, líneas de flujo, campo de producción, tuberías, mejorador, infraestructura, costos pre-operativos capitalizables, capital de trabajo, costos del financiamiento, intereses durante construcción, estudios, asesorías y similares, necesarios para y hasta el inicio de la producción comercial de cada ASOCIACION.

The IT of each ASSOCIATION shall include, among others, all the investments in wells, flow lines, production field, pipes, upgrader, infrastructure, capitalizable pre-operative costs, working capital, financing costs, interest during construction, studies, advices and the like, which are necessary for and until the commencement of the commercial production of each ASSOCIATION.

Para el cálculo de IBA e IT antes señalado, la conversión de bolívares corrientes a dólares corrientes se efectuará utilizando la

For the calculation of the above-mentioned IBA and IT, the conversion of current bolivars into current dollars shall be made

tasa de cambio referencial del bolívar con respecto al dólar de los Estados Unidos de América. establecida por el Banco Central de Venezuela, para el momento en el cual se realicen los correspondientes registros contables.

using the bolívar reference exchange rate with respect to the dollar of the United States of America, established by the Central Bank of Venezuela, at the time when the respective accounting records are made.

## E.V.12. Law on the Promotion and Protection of Investments (as published in the Official Gazette No. 5390 of 22 October 1999)

86. The relevant portion of the **Investment Law** is found at ¶¶ 67 – 68 of the ICSID Decision on Jurisdiction (10 June 2010). The Parties have not provided the original text or a translation of the **Investment Law** in this proceeding.

| Spanish (Original) | Translation (ICSID) |
|---|---|
| Artículo 22 | Article 22 |
| Las controversias que surjan entre un inversionista internacional, cuyo país de origen tenga vigente con Venezuela un tratado o acuerdo sobre promoción y protección de inversiones, o las controversias respecto de las cuales sean aplicables las disposiciones del Convenio Constitutivo del Organismo Multilateral de Garantía de Inversiones (OMGI-MIGA) o del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados (CIADI), serán sometidas al arbitraje internacional en los términos del respectivo tratado o acuerdo, si así éste lo establece, sin perjuicio de la posibilidad de hacer uso, cuando proceda, de las vías contenciosas contempladas en la legislación venezolana vigente. | Disputes arising between an international investor whose country of origin has in effect with Venezuela a treaty or agreement on the promotion and protection of investments, or disputes to which are applicable the provision of the Convention Establishing the Multilateral Investment Guarantee Agency (OMGI –MIGA) or the Convention on the Settlement of Investment Disputes between States and National of other States (ICSID), shall be submitted to international arbitration according to the terms of the respective treaty or agreement, if it so provides, without prejudice to the possibility of making use, when appropriate, of the dispute resolution means provided for under the Venezuelan legislation in effect. |

## E.V.13. Venezuelan Constitution dated 20 December 1999 (as published in Extraordinary Official Gazette No. 5453 of 24 March 2000)

87. The principal relevant provisions of the **Venezuelan Constitution** are found at C-224, R-68, R-69, and R-118. The texts are copied below and are cited to the relevant exhibit. Respondents, through witnesses, have provided the

Tribunal with two translations for Article 302. These translations are presented immediately following one another, in the chart below.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Constitución de la República Bolivariana de Venezuela | Venezuelan Constitution | Constitution of the Bolivarian Republic of Venezuela |
| Artículo 24 | Article 24 | Article 24 |
| Ninguna disposición legislativa tendra efecto retroactivo, excepto cuando imponga menor pena. Las leyes de procedimiento se aplicarán desde el momento mismo de entrar en vigencia, aun en los procesos que se hallaren en curso; pero en los procesos penales, las pruebas ya evacuadas se estimarán en cuanto beneficien al reo o a la rea, conforme a la ley vigente para la fecha en que se promovieron. | No legislative provision shall have retroactive effect, except when it imposes a lesser penalty. Procedural laws shall apply from the time they enter into force, even to proceedings in course; but in criminal proceedings, the evidence already produced shall be considered to the extent it benefits the charged individual [reo o rea], according to the laws in force at the time it was produced. | No legislative provision shall have retroactive effect, except when it imposes a lesser sanction. Procedural laws shall be applicable from the moment of their entry into force, even for the proceedings in progress. However, in criminal proceedings, the evidence already produced shall be valued to the extent that it benefits the defendant, pursuant to the law in effect at the time that the [proceedings] were commenced. |
| Cuando haya dudas se aplicará la norma que beneficie al reo o a la rea. (C-224; R-69 App. 2) | In case of doubt the norm that benefits the charged individual [reo o rea] shall be applied. (C-224) | In case of doubt, the norm that benefits the defendant shall be applied. (R-69 App. 2) |
| Artículo 27 | Article 27 | Article. 27 |
| Toda persona tiene derecho a ser amparada por los tribunales en el goce y ejercicio de los derechos y garantias construcionales, aun de aquellos inherentes a la persona que no figuren expresamente en esta Construción o en los instrumentos internacionales sobre derechos humanos. | [No Translation Provided] | Every person has the right to be protected by the courts in the enjoyment and exercise of constitutional rights and guarantees, even of those [rights and guarantees] inherent to the person that are not expressly stated in this Constitution or in the international instruments on |

[...]

human rights [...]

(C-224; R-69 App. 2)

(R-69 App. 2)

| Artículo 115 | Article 115 | Article 115 |
|---|---|---|
| Se garantiza el derecho de propiedad. Toda persona tiene derecho al uso, goce, disfrute y disposición de sus bienes. La propiedad estara sometida a las contribuciones, restricciones y obligaciones que establezca a ley con fines de utilidad pública o de interés general. Sólo por causa de utilidad pública o interés social, mediante sentencia firme y pago oportuno de justa indemnización, podrá ser declarada la expropiación de cualquier clase de bienes. (C-224; R-68 App. 5) | The right to property is guaranteed. Every person has the right to use, enjoy and dispose of his/her/its assets. Property shall be subject to contributions, restrictions and obligations established by law for the purposes of public utility or general interest. Only by reason of public utility or social interest, by means of a final judicial decision [sentencia firme] and with the prompt payment of just compensation, may the expropriation of any type of assets be declared. (C-224) | The right to property is guaranteed. All persons have the right to the use, enjoyment and disposal of their assets. Property shall be subject to contributions, restrictions and obligations established by law for the purposes of public utility or general interest. Only for reasons of public utility or social interest and by a final judgment and timely payment of just compensation, an expropriation of any class of assets may be declared. (R-68 App. 5) |

| Artículo 131 | Article 131 | Article 131 |
|---|---|---|
| Toda persona tiene el deber de cumplir a acatar esta Constitución, las leyes y los demás actos que en ejercicio de sus funciones dicten los órganos del Poder Público. (C-224; R-69 App. 2) | Every person has the duty to comply with and obey this Constitution, the laws and other official acts that the organs of Public Power dictate in the exercise of their functions. (C-224) | Every person has the duty to comply with and obey this Constitution, the laws and other acts dictated by the bodies of the Public Power, in performance of their functions. (R-69 App. 2) |

| Artículo 253 | Article 253 | Article 253 |
|---|---|---|
| La potestad de administrar justicia emana de los ciudadanos y ciudadanas y se imparte en nombre de la República por autoridad de la ley. | The authority to administer justice emanates from the citizens and is granted in the name of the Republic by authority of law. | **[No Translation Provided]** |
| Corresponde a los órganos del Poder Judicial conocer de las causas y asunios de su competencia mediante los | It corresponds to the organs of the Judicial Power to take cognizance of [conocer] suits and matters of their | |

procedimientos que determinen las leyes, y ejecutar o hacer ejecutar sus sentencias.

competence through the procedures that the laws determine, as well as to enforce their decisions or to have them enforced.

El sistema de justicia está constituido por el Tribunal Supremo de Justicia, los demás tribunals que determine la ley, el Ministerio Público, la Defensoria Pública, los órganos de investigación penal, los o las auxiliaries y funcionarios o funcionarias de justicia, el sistema penitenciario, los medios alternatives de justicia, los ciudadanos o ciudadanas que participant en la administración de justicia conforme a la ley y los abogados autorizados o abogadas autorizadas para el ejercicio. (C-224)

The system of justice is constituted by the Supreme Tribunal of Justice, the other courts that the law determines, the Public Ministry, the Public Ombudsman, the organs of criminal investigation, the auxiliaries or officials of justice, the penitentiary system, the alternative means of justice, the citizens who participate in the administration of justice in accordance with the law and the lawyers authorized for practice. (C-224)

Artículo 236

[No Translation Provided]

Article 236

Son atribuciones y obligaciones del Presidente o Presidenta de la Republica

The powers and obligations of the President of the Republic are:

8. Dictar, previa autorización por una ley habilitante, decretos con fuerza de ley. (R-118 App. 45)

8. To issue, with prior authorization through an enabling law, decrees with force of law. (R-118 App. 45)

Artículo 302

Article 302

Article 302

El Estado se reserva, mediante la ley orgánica respective, y por rezones de conveniencia nacional, la actividad petrolera y otras industrias, explotaciones, servicios y bienes de interés público y de character estrategico. El Estado promoverá la manufactura nacional de materias primas provenientes de la

[No Translation Provided]

The State reserves to itself, through the respective organic law, and for reasons of national convenience (conveniencia nacional), oil activities and other industries, exploitations, services and assets having a public interest and strategic character. The State shall promote the national manufacture of raw

explotación de los recursos naturals no renovables, con el fin de asimilar, crear e innovar tecnologías, generar empleo y crecimiento económico, y crear riqueza y bienestar para el pueblo.

(C-224; R-68 App. 5; R-69 App. 2)

materials derived from the exploitation of non-renewable national resources, with the goal of incorporating, creating and innovating technology, creating employment and economic growth, and generating wealth and well-being for the people. (R-69 App. 2)

The State reserves to itself, through the respective organic law, and for reasons of national convenience (conveniencia nacional), oil activities and other industries, exploitations, services and assets having a public interest and strategic character. The State shall promote the national manufacture of raw materials derived from the exploitation of non-renewable national resources, with the goal of incorporating, creating and innovating technology, creating employment and economic growth, and generating wealth and well-being for the people. (R-68 App. 5)

## E.V.14. Decree No. 1510, Decree with Force of Organic Law of Hydrocarbons (as published in Official Gazette No. 37.323 published 13 November 2001)

88. The principal relevant provisions of the **2001 Hydrocarbons Law** are found at C-128 and R-57.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Decreto N° 1.510, Decreto con Fuerza de Ley Orgánica de Hidrocarburos | Decree with the Force of Organic Law of Hydrocarbons of 2001 | Decree No. 1.510, Decree with Force of Organic Law of Hydrocarbons |

| Artículo 9 | Article 9 | Article 9 |
|---|---|---|
| Las actividades relativas a la exploración en busca de yacimientos de los hidrocarburos comprendidos en este Decreto Ley, a la extracción de ellos en estado natural, a su recolección, transporte y almacenamiento iniciales, se denominan actividades primarias a los efectos de este Decreto Ley. | The activities relating to the exploration in search of hydrocarbon reservoirs encompassed in this Decree-Law, to their extraction in natural state, to their initial production, transport and storage, are denominated as primary activities for purposes of this Decree-Law. | The activities related to the exploration in search of the hydrocarbon deposits referred to in this Decree-Law, to the extraction thereof in their natural condition, to the initial gathering, transportation and storage thereof, are denominated primary activities for purposes of this Decree-Law. |
| De conformidad con lo previsto en el artículo 302 de la Constitución de la República Bolivariana de Venezuela, las actividades primarias indicadas, así como las relativas a las obras que su manejo requiera, quedan reservadas al Estado en los términos establecidos en este Decreto Ley. | In accordance with what is provided in article 302 of the Constitution of the Bolivarian Republic of Venezuela, the primary activities indicated, as well as those relating to works required by their management, remain reserved to the State in the terms established in this Decree-Law. | Pursuant to the provisions of Article 302 of the Constitution of the Bolivarian Republic of Venezuela, the specified primary activities, as well as those related to the works required for the handling thereof, are reserved to the State on the terms set forth in this Decree-Law. |

| Artículo 44 | Article 44 | Article 44 |
|---|---|---|
| De los volúmenes de hidrocarburos extraídos de cualquier yacimiento, el Estado tiene derecho a una participación de treinta por ciento (30%) como regalía. | Of the volumes of hydrocarbons extracted from any reservoir, the State has the right to a thirty-percent (30%) participation by way of royalty. | In respect of the hydrocarbon volumes extracted from any field, the State has a right to a thirty percent (30%) share as a royalty. |
| El Ejecutivo Nacional, en caso de que se demuestre a su satisfacción que un yacimiento maduro o de petróleo extrapesado de la Faja del Orinoco, no es económicamente explotable con la regalía del treinta por ciento (30%) establecida en este Decreto Ley, podrá rebajaría hasta un límite de veinte por ciento (20%) a fin de lograr la economicidad de la explotación y queda facultado igualmente para restituirla, total o | The National Executive, in the event that it is demonstrated to its [the National Executive's] satisfaction that a mature reservoir or [a reservoir] of EHO in the Orinoco Oil Belt is not economically exploitable at the royalty of thirty percent (30%) set forth in this Decree-Law, may reduce it [the royalty] to a limit of twenty percent (20%) in order to attain the economic viability of the exploitation and is | The National Executive, in the event that it is demonstrated to its satisfaction that a mature field or an EHO field from the Orinoco Belt is not economically exploitable with the thirty percent (30%) royalty established in this Decree-Law, may reduce it down a limit of twenty percent (20%) in order to make the exploitation economic, and likewise shall have the right to restore it, in whole or in |

parcialmente, hasta alcanzar de Nuevo el treinta por ciento (30%), cuando se demuestre que la economicidad del yacimiento pueda mantenerse con dicha restitución.

empowered to restore it [the royalty], totally or partially, until reaching again the thirty percent (30%), when it is demonstrated that the economic viability of the reservoir could be maintained with such restoration.

part, until reaching again thirty percent (30%), when it is demonstrated that the economic viability of the field can be maintained with such reinstatement.

El Ejecutivo Nacional, en caso de que se demuestre .a su satisfacción que proyectos para mezclas de bitúmenes procedentes de la Faja Petrolífera del Orinoco, no son económicamente viables con la regalía de treinta por ciento (30%) establecida en este Decreto Ley, podrá rebajarla hasta en limite de dieciséis dos tercios por ciento (16 2/3%), a fin de lograr la economicidad de tales proyectos y queda igualmente facultado para restituirla, total o parcialmente, hasta alcanzar de Nuevo el treinta por ciento (30%), cuando se demuestre que la rentabilidad de los proyectos pueda mantenerse con dicha restitución.

The National Executive, in the event that it is demonstrated to its [the National Executive's] satisfaction that projects for mixing bitumen coming from the Orinoco Oil Belt, are not economically viable with a royalty of thirty percent (30%) set forth in this Decree-Law, may reduce it [the royalty] to the limit of sixteen-two-thirds percent (16 2/3%), in order to attain the economic viability of such projects and is likewise empowered to restore it [the royalty], totally or partially, until reaching again the thirty percent (30%), when it is demonstrated that the profitability of the projects could be maintained with such restoration.

The National Executive, in the event that it is demonstrated to its satisfaction that projects for bitumen blends originating from the Orinoco Crude Oil Belt are not economically viable with the thirty percent (30%) royalty established in this Decree-Law, may reduce it down to a limit of sixteen and two thirds percent (16 2/3%), in order to achieve the economic viability of such projects, and shall likewise have the right to restore it, in whole or in part, until reaching again thirty percent (30%), when it is demonstrated that the economics of the projects can be maintained with such reinstatement.

## E.V.15. Organic Law of the Office of the General Comptroller of the Republic and of the National System of Fiscal Control (as published in Official Gazette No. 37.347 17 December 2001)

89. The principal relevant provision of the **Organic Law of the Office of the General Comptroller of the Republic and of the National System of Fiscal Control** is found at exhibit R-73.

**Spanish (Original)**

**Respondents' Translation**

Ley Orgánica de la Contraloría General de la República y del Sistema Nacional de

Organic Law of the Office of the General Comptroller of the Republic and the

| | |
|---|---|
| Control Fiscal | National System of Fiscal Control |

| | |
|---|---|
| <u>Artículo 91</u> | <u>Article 91</u> |
| Sin perjuicio de la responsabilidad civil o penal, y de lo que dispongan otras Leyes, constituyen supuestos generadores de responsabilidad administrativa los actos, hechos u omisiones que se mencionan a continuación: | Notwithstanding civil or criminal liability, and other Laws, the acts, deeds, or omissions, mentioned below, constitute circumstances (supuestos) that produce administrative liability: |
| 12. efectuar gastos o contraer compromisos de cualquier naturaleza que puedan afectar la responsabilidad de los entes y organismos señalados en los numerales 1 al 11 del artículo 9 de esta Ley, sin autorización legal previa para ello, o sin disponer presupuestaríamente de los recursos necesarios para hacerlo; salvo que tales operaciones sean efectuadas en situaciones de emergencia evidentes, como en casos de catástrofes naturales, calamidades públicas, conflicto interior o exterior u otros análogos, cuya magnitud exija su urgente realización, pero informando de manera inmediata a los respectivos órganos de control fiscal, a fin de que procedan a tomar las medidas que estimen convenientes, dentro de los límites de esta Ley. | 12. making expenditures or entering into commitments of any nature that may affect the liability of the entities and bodies mentioned in sections 1 to 11 of Article 9 of this Law, without prior legal authorization to do so, or without having budgeted the necessary resources to do so; except if such operations are carried out in situations of evident emergency, as in the case of natural disasters, public calamities, internal or external conflict or other analogous situations, the magnitude of which requires urgent [expenditures], but immediately informing the respective bodies of fiscal control so that they may proceed to take the measures they deem appropriate, within the limitations of this Law. |
| 14. el pago, uso disposición ilegal de los fondos u otros bienes de que sean responsables el particular o funcionario respectivo, salvo que estos comprueben haber procedido en cumplimiento de orden de funcionario competente y haberle advertido por escrito la ilegalidad de la orden recibida, sin perjuicio de la responsabilidad de quien impartió la orden. | 14. illegal payment, use or disposition of funds or other assets for which the respective individual or government employee is responsible, except if they prove that they proceeded in compliance with an order from a competent government employee and that they notified him in writing of the illegality of the received order, without prejudice to the liability of the issuer of the order. |
| 15. la aprobación o autorización con sus votos, de pagos ilegales o indebidos, por parte de los miembros de las juntas directivas o de los cuerpos colegiados encargados de la administración del partrímonio de los entes y organismos señalados en los numerales 1 al 11 del artículo 9 de esta Ley, incluyendo a los miembros de los cuerpos colegiados que ejercen la función legislativa en los Estados, | 15. approval or authorization through voting of illegal or improper payments, by members of the board of directors or the collegial bodies in charge of the management of the patrimony of the entities and bodies mentioned in sections 1 to 11 of Article 9 of this Law, including the members of the collegial bodies that carry out the legislative function in the States, Districts, Metropolitan Districts and |

Distritos, Distritos Metropolitanos y Municipios.

Municipalities.

| | |
|---|---|
| 23. quienes ordenen iniciar la ejecución de contratos en contravención a una norma legal o sublegal, al plan de organización, las políticas, normativa interna, los manuales de sistemas y procedimientos que comprenden el control interno. | 23. those who order the performance of contracts in contravention of a legal or sublegal norm, the organizational plan, the policies, the internal regulation, the manuals of systems and procedures that that make up the internal control. |

### E.V.16. Procedure for Payment of Extraction Tax (Royalty) for Extra Heavy Crude Oil Produced and Sulfur Extracted by Operadora Cerro Negro, S.A. [*Procedimiento para el Pago del Impuesto de Explotación (Regalía) del Crudo Extrapesado Producido y del Azufre Extraído por Operadora Cerro Negro S.A. (OCN)]* (16 January 2002)

90. The principal relevant provisions of the <u>Royalty Procedures Agreement</u> are found at C-169.

| Spanish (Original) | Claimant's Translation |
|---|---|
| Procedimiento para el Pago del Impuesto de Explotación (Regalía) del Crudo Extrapesado Producido y del Azufre Extraído por Operadora Cerro Negro S.A. (OCN) | Procedure for Payment of Extraction Tax (Royalty) for Extra Heavy Crude Oil Produced and Sulfur Extracted by Operadora Cerro Negro, S.A. |
| 1. Objetivo | 1. Objectives |
| El objetivo de este procedimiento es determinar los pasos a seguir para el pago del Impuesto de Explotación (REGALIA) ante el Ministerio de Energía y Minas, por concepto del petroleó extrapesado producido y del Azufre extraído por Operadora Cerro Negro. S.A. (OCN) durante la etapa de producción comercial de la Asociación, conforme a lo previsto en el Convenio de Asociación y en el Convenio de Regalía suscrito entre PDVSA Petróleo y Gas. S.A. y el Ministerio de Energía y Minas (MEM) el 29 de Mayo de 1998, al cual Mobil Producción e Industrialización de Venezuela INC., Veba Oel Venezuela Orinoco Ghmb (Veba OVO) y Lagoven Cerro Negro, S.A. se adhirieron mediante comunicación de 05 de noviembre de 1998, en su condición de participantes en la | The objective of this procedure is to determine the steps to be taken vis-a-vis the Ministry of Energy and Mines for payment of the Exploitation Tax (ROYALTY) on the extra heavy crude oil produced and sulfur extracted by Operadora Cerro Negro, S.A. (OCN) during the Association's commercial production stage, pursuant to the provisions of the Association Agreement and the Royalty Agreement signed by PDVSA Petróleo y Gas, S.A. and the Ministly of Energy and Mines (MEM) on May 29, 1998, to which Mobil Producción e Industrialización de Venezuela, Inc., Veba Oel Venezuela Orinoco Ghmb [sic] (Veba OVO), and Lagoven Cerro Negro, S.A. adhered by communication dated November 5, 1998 in their capacity as participants in the Strategic Association for the |

| Spanish (Original) | Respondents' Translation |
|---|---|
| Asociación Estratégica para la explotación y mejoramiento del petróleo extrapesado proveniente del areá Cerro Negro. | exploitation and upgrading of extra heavy oil from the Cerro Negro area. |

4.4.1

Si el indicador I es menor o igual a 3; el porcentaje de Regalía a pagar será 1%.

4.4.1

If the indicator I is less than or equal to 3, the Royalty percentage payable shall be 1%.

4.4.2

Si el Indicador I es mayor a 3, el porcentaje de Regalía a pagar sera 16 213 %.

4.4.2

If the indicator I is greater than 3, the Royalty percentage payable shall be 16 2/3%.

## E.V.17. Law Against Corruption (as published in Extraordinary Official Gazette No. 5.637 7 April 2003)

91. The principal relevant provisions of the **Law Against Corruption** are found at R-74.

| Spanish (Original) | Respondents' Translation |
|---|---|
| Ley Contra la Corrupción | Law Against Corruption |
| Artículo 53 | Article 53 |
| Cualquiera de las personas indicadas en al artículo 3 de esta Ley que teniendo, por razón de su cargo, la recaudación, administración o custodia de bienes del patrimonio público o en poder de algún órgano o ente público, diere ocasión por imprudencia, negligencia, impericia o inobservancia de leyes, reglamentos, órdenes o instrucciones, a que se extravíen, pierdan, deterioren o dañen esos bienes, será penada con prisión de seis (6) meses a tres (3) años. | Any of the persons indicated in Article 3 of this Law that, due to their position, have the collection (recaudación), management or custody of assets of the public patrimony (patrimonio público) or in the hands of any public body or entity, by recklessness, negligence, or inobservance of laws, regulations, orders or instructions, brought about the mislay, loss, deterioration, or damage of those assets, shall be sentenced to six (6) months to three (3) years imprisonment. |
| Artículo 54 | Article 54 |
| El funcionario público que, indebidamente, en beneficio particular o para fines contrarios a los previstos en las leyes, reglamentos, resoluciones u órdenes de servicio, utilice o permita que otra persona utilice bienes del patrimonio público o en poder de algún organismo público, o de empresas del Estado cuya administración, tenencia o custodia se le haya confiado, será penado con prisión de seis (6) meses a cuatro (4) años. | The Government employee that, unduly, for his own benefit or for goals that are contrary to those provided by laws, regulations, resolutions or service orders, uses, or allows another person to use, assets that belong to the public patrimony (patrimonio público), or [that are] in the hands of any public body, or State companies, the management, possession or custody of which was trusted to them, shall be sentenced to six (6) months to four (4) years imprisonment. |
| Con la misma pena será sancionada la | The same sentence shall be imposed to the |

| | |
|---|---|
| persona que, con la anuencia del funcionario público, utilice los trabajadores o bienes referidos. | person that, with the consent of the Government employee, uses the aforementioned workers or assets. |

| | |
|---|---|
| Artículo 56 | Article 56 |

| | |
|---|---|
| El funcionario público que ilegalmente diere a los fondos o rentas a su cargo, una aplicación diferente a la presupuestada o destinada, aun en beneficio público, será penado con prisión de tres meses a tres anos, según la gravedad del delito. | The Government employee who illegally uses funds or revenues, which he is responsible for, for a purpose different than the one that was budgeted or envisaged, even if he acts in the public interest, shall be sentenced to three months to three years imprisonment, depending on the gravity of the crime. |

## E.V.18. Organic Law of the Supreme Tribunal of Justice of the Bolivarian Republic of Venezuela (as published in Official Gazette No. 37.942, published 20 May 2004)

92. The principal relevant provisions of the **Organic Law of the Supreme Tribunal of Justice** are found at R-69 App. 31.

| Spanish (Original) | Respondents' Translation |
|---|---|
| Ley Orgánica del Tribunal Supremo de Justicia de la República Bolivariana de Venezuela | Organic Law of the Supreme Tribunal of Justice of the Bolivarian Republic of Venezuela |

| | |
|---|---|
| Artículo 5 | Article 5 |

| | |
|---|---|
| Es de la competencia del Tribunal Supremo de Justicia como más alto Tribunal de la República: | The Supreme Tribunal of Justice, as the highest Tribunal of the Republic, has jurisdiction to: |

| | |
|---|---|
| 6. Declarar la nulidad total o parcial de las leyes nacionales y demás actos con rango de ley de la Asamblea Nacional, que colidan con la Constitución de la República Bolivariana de Venezuela, mediante el ejercicio del control concentrado de la constitucionalidad. La sentencia que declare la nulidad total o parcial deberá publicarse en la Gaceta Oficial de la República Bolivariana de Venezuela, determinando expresamente sus efectos en el tiempo; | 6. To declare the total or partial nullity of national laws and other acts having the rank of law of the National Assembly, which collide with the Constitution of the Bolivarian Republic of Venezuela, through an action of concentrated control of constitutionality. The judgment which declares the total or partial nullity must be published in the Official Gazette of the Bolivarian Republic of Venezuela, determining expressly its effects in time; |

| | |
|---|---|
| 8. Declarar la nulidad total o parcial de los actos con rango de ley dictados por el | 8. To declare the total or partial nullity of acts having the rank of law decreed by the |

Ejecutivo Nacional, que colidan con la Constitución de la República Bolivariana de Venezuela, mediante el ejercicio del control concentrado de la constitucionalidad. La sentencia que declare la nulidad total o parcial deberá publicarse en la Gaceta Oficial de la República Bolivariana de Venezuela;

National Executive, which collide with the Constitution of the Bolivarian Republic of Venezuela, through an action of concentrated control of constitutionality. The judgment which declares the total or partial nullity must be published in the Official Gazette of the Bolivarian Republic of Venezuela;

14. Resolver las colisiones que existan entre diversas disposiciones legales y declarar cuál debe prevalecer;

14. To resolve the collisions that exist between different legal provisions and declare which one should prevail;

30. Declarar la nulidad total o parcial de los reglamentos y demás actos administrativos generales o individuales del Poder Ejecutivo Nacional, por rezones de inconstitucionalidad o ilegalidad;

30. To declare the total or partial nullity of regulations or other general or individual administrative acts of the National Executive Power, for reasons of unconstitutionality or illegality;

31. Declarar la nulidad, cuando sea procedente por rezones de inconstitucionalidad o de ilegalidad, de los actos administrativos generales o individuales de los órganos que ejerzan el Poder Público de rango Nacional;

31. To declare the nullity, when it is appropriate for reasons of unconstitutionality or illegality, of general or individual administrative acts of the organs which exercise the Public Power of National rank;

Artículo 21 [...]

Article 21 [...]

Toda persona natural o juridica, que sea afectada en sus derechos o intereses por una ley, reglamento, ordenanza u otro acto administrativo de efectos generales emanado de alguno de los órganos del Poder Público Nacional, Estadal o Municipal, o que tengan interés personal, legitimo y directo en impugnar un acto administrativo de efectos particulares, puede demandar la nulidad del mismo ante el Tribunal Supremo de Justicia, por rezones de inconstitucionalidad o de ilegalidad. El Fiscal General de la República y demás funcionarios a quienes las leyes les atribuyan tal facultad, podrán también solicitar la nulidad del acto, cuando éste afecte un interés general. [...]

Each natural or legal person, whose rights or interests are affected by a law, regulation, ordinance or other administrative act of general effects issued by any of the organs of the National, State or Municipal Public Power, or who has a personal, legitimate and direct interest in challenging an administrative act of particular effects may petition its annulment before the Supreme Tribunal of Justice, for reasons of unconstitutionality or illegality. The Attorney General of the Republic and other officials with the authority granted by law may also petition the annulment of the act, when it affects a general interest. [...]

Las acciones o recursos de nulidad contra los actos generales del Poder Público podrán intentarse en cualquier tiempo, pero los dirigidos a anular actos particulares de la administración caducarán en el término de seis (6) meses, contados a partir de su publicación en el respectiva órgano oficial,

The actions or petitions for annulment (acciones o recursos de nulidad) against general acts of the Public Power may be filed at any time, but those aimed at the annulment of particular acts of the administration will lapse (caducarán) in the period of six (6) months, from the date of its

o de su notificación al interesado, si fuere procedente y aquélla no se efectuare, o cuando la administración no haya decidido el correspondiente recurso administrativo en el término de noventa (90) días continuos, contados a partir de la fecha de interposición del mismo. Sin embargo, aun en el Segundo de los casos señalados, la ilegalidad del acto podrá oponerse siempre por vía de excepción, salvo disposiciones especiales. Cuando el acto impugnado sea de efectos temporales, el recurso de nulidad caducará a los treinta (30) días.

publication in the respective official body, or from its notice to the interested party, if it is appropriate and if it is not made, or when the administration has not decided the corresponding administrative petition in the period of ninety (90) consecutive days, from the date of its filing. . . .

El Tribunal Supremo de Justicia podrá suspender los efectos de un acto administrativo de efectos particulares, cuya nulidad haya sido solicitada, a instancia de parte, cuando así lo permita la ley o la suspensión sea indispensable para evitar perjuicios irreparables o de difícil reparación por la definitiva, teniendo en cuenta la circunstancias del caso. A tal efecto, se deberá exigir al solicitante preste caución suficiente para garantizar las resultas del juicio.

The Supreme Tribunal of Justice may suspend the effects of an administrative act of particular effects, the annulment of which has been petitioned by a party, where the law permits or its suspension is necessary to avoid irreparable harm, or which cannot be remedied by final [judgment], taking into consideration the circumstances of the case.

## E.V.19. Law of Partial Reform of Decree No. 1.510 with Force of Organic Law of Hydrocarbons (as published in Official Gazette No. 38.443 24 May 2006)

93. The principal relevant provisions of the **Law of Partial Reform of Decree No. 1.510 with Force of Organic Law of Hydrocarbons** are found at R-62.

| **Spanish (Original)** | **Respondents' Translation** |
| --- | --- |
| Ley de Reforma Parcial del Decreto N° 1.510 con Fuerza de Ley Orgánica de Hidrocarburos | Law of Partial Reform of Decree No. 1.510 with Force of Organic Law of Hydrocarbons |
| Artículo 5 | Article 5 |
| Se modifica el artículo 48, en la forma siguiente: | Article 48 is modified, in the following form: |

| Artículo 48 | Article 48 |
|---|---|

Sin perjuicio de lo que en material impositiva establezcan otras leyes nacionales, las personas que realicen las actividades a que se refiere la presente Ley, deberán pagar los impuestos siguientes:

Without prejudice to any tax regulation established by other national laws, the persons carrying out the activities referred to in this law, shall pay the following taxes:

[...]

[...]

4. Impuesto del Extracción. Un tercio (1/3) del valor de todos los hidrocarburos líquidos extraídos de cualquier yacimiento, calculado sobre la misma base establecida en el artículo 47 de esta Ley para el cálculo de la regalía en dinero. Esta impuesto sera pagado mensualmente junto con la regalia prevista en el artículo 44 de esta Ley, por la empresa empresa operadora que extraiga dichos hidrocarburos. Al calcular el Impuesto de Extracción, el contribuyente tiene el derecho a deducir lo que hubiese pagado por regalia, inclusive la regalia adicional que esté pagando como ventaja especial. El contribuyente también tiene el derecho a deducir del Impuesto de Extracción lo que hubiese pagado por cualquier ventaja especial pagable anualmente, pero solamente en períodos subsecuentes al pago de dicha ventaja especial annual.

4. Extraction Tax. A third (1/3) of the value of all liquid hydrocarbons extracted from any field, calculated on the same base as was set by Article 47 of this Law for calculating the royalty payable in cash. This tax shall be paid monthly, together with the royalty set forth in Article 44 of this Law, by the operating company extracting said hydrocarbons. In calculating the Extraction Tax, the taxpayer has the right to deduct what it would have paid in royalties, including the special contribution (ventaja especial). The taxpayer also has the right to deduct from the Extraction Tax any amounts paid for any special contribution (ventaja especial) payable annually, but only in periods subsequent to those in which such annual special contribution (ventaja especial) was paid.

El Ejecutivo Nacional, cuando así lo estime justificado según las condiciones de Mercado, o de un proyecto de inversion especifico para incentivar, entre otros, proyectos de recuperación secundaria, podrá rebajar, por el tiempo que determine, el Impuesto de Extracción hasta un minimo de veinte por ciento (20%). Puedo igualmente restituir el Impuesto de Extracción a su nivel original cuando estime que las causas de la exoneración hayan cesado.

The National Executive, when it deems it justified according to market conditions, or conditions of a specific investment project to incentivize, among others, secondary recovery projects, may reduce the Extraction Tax for a period to be set by it, to a minimum of twenty percent (20%). The National Executive may likewise reinstate the Extraction Tax to its original level when it deems that the causes of the exception have ceased.

**E.V.20.** **Law on Partial Amendment to the Organic Law of Hydrocarbons and Organic Law of Hydrocarbons (as amended) (both documents as republished in the Official Gazette No. 38493 of 4 August 2006)**

94. The principal relevant provisions of the **Partial Amendment to the Organic Law of Hydrocarbons and Organic Law of Hydrocarbons** are found at C-112.

| Spanish (original) | Claimant's translation |
|---|---|
| Ley de reforma Parcial del Decreto No. 1.510 con Fuerza de Ley Organica de Hidrocarburos | Law of Partial Amendment to Decree No. 1510 with the Force of Organic Law of Hydrocarbons |
| Artículo 1 | Article 1 |
| Se modifica el Titulo de la Ley, en la forme siguiente: | The Name of the Law is amended in the following manner: |
| LEY ORGÁNICA DE HIDROCARBUROS | ORGANIC LAW OF HYDROCARBONS |
| Artículo 2 | Article 2 |
| Artículo 2. Se modifica el artículo 2, en la forma siguiente: | Article 2 is amended in the following manner: |
| Artículo 2. Las actividades relativas a los hidrocarburos gaseosos se rigen por la Ley Orgánica de Hidrocarburos Gaseosos, salvo la extracción de hidrocarburos gaseosos asociados con el petróleo que se [illegible] por la presente Ley | Article 2. The activities related to gaseous hydrocarbons are governed by the Organic Law of Gaseous Hydrocarbons, except for the extraction of gaseous hydrocarbons associated with petroleum, which shall be governed by this Law. |
| Artículo 5 | Article 5 |
| Se modifica el artículo 48, en la forma sigulente: | Article 48 is amended in the following manner: |

| Artículo 48 [...] | Article 48. (omissis ...) |
|---|---|

| | |
|---|---|
| 3. Impuesto de Consume General. Por cada litro de producio derivado de los hidrocarburos vendido en el Mercado interno entre el treinta y cincuenta por ciento (30% y 50%) del precio pagado por el consumidor final, cuys alicuola entre ambos limites será fijada anualmente en la Ley de Presupuesto. Esto impuesto a ser pagado por el consumidor final será retenido en la fuente de suministro para ser enterado instrumente al Fisco Nacional. | 3. General Consumption Tax. Per each liter of hydrocarbons by-product sold in the domestic market, between thirty and fifty percent (30% and 50%) of the price paid by the end consumer, the rate of which between both limits shall be annually fixed in the Budget Law. This tax to be paid by the end consumer shall be withheld at the source of supply in order to be monthly deposited with the National Treasury. |
| Dada, firmada y sellada en el Palacio Federal Legislativo, sede de la Asamblea Nacional, en Caracas a los dieciséis del mas de mayo de dos mil seis. Ano 196° de la independencia y 147° de la Federación. | Legislative act performed in the Federal Legislative Palace, seat of the National Assembly, in Caracas, on the third day of the month of August of two thousand and six. Year 196° since Independence and 147° since Federation. |

## E.V.21. Law on Partial Amendment to the Income Tax Law (29 August 2006) (as published in the Official Gazette No. 38529 of 25 September 2006)

95. The relevant portions of the **Law on Partial Amendment to the Income Tax Law** are found at C-113.

| **Spanish (original)** | **Claimant's Translation** |
|---|---|
| Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta | Law on Partial Amendment to the Income Tax Law |
| Artículo 1 | Article 1 |
| Los enriquecimientos anuales, netos y disponibles obtenidos en dinero o en especie, causarán impuestos según las normas establecidas en esta Ley. | The annual, net and available income obtained in money or in kind, shall incur taxes under the norms established in this Law. |
| Salvo disposición en contrario de la presente Ley, toda persona natural o jurídica, residente o domiciliada en la República Bolivariana de Venezuela, pagará impuestos sobre sus rentas de cualquier origen, sea que la causa o la fuente de ingresos esté situada dentro del país o fuera de el. Las personas naturales o jurídicas no residentes o no | Except as provided to the contrary in this Law, every natural or legal person, resident or domiciliary in the Bolivarian Republic of Venezuela, shall pay taxes over [his/her/its] income of any origin, whether the cause or the source of the income is located inside or outside the country. The natural or legal persons not residing or not domiciled in the |

domiciliadas en la República Bolivariana de Venezuela estarán sujetas al impuesto establecido en esta Ley siempre que la fuente o la causa de sus enriquecimientos esté u ocurra dentro del país, aun cuando no tengan establecimiento permanente o base fija en la República Bolivariana de Venezuela. Las personas naturales o jurídicas domiciliadas o residenciadas en el extranjera que tengan un establecimiento permanente o una base fija en el país, tributarán exclusivamente por los ingresos de fuente nacional o extranjera atribuibles a dicho establecimiento permanente o base fija.

Bolivarian Republic of Venezuela shall be subject to the tax set forth in this Law so long as the source or the cause of their income is or occurs inside the country, even when they do not have a permanent establishment or fixed base in the Bolivarian Republic of Venezuela. Natural and legal persons domiciled or residing abroad who have a permanent establishment or fixed base in the country, shall be taxed exclusively for the income of a national source or of a foreign [source] attributable to such permanent establishment or fixed base. [...]

## Artículo 9

Las companies anónimas y los contribuyentes asimilados a éstas que realicen actividades distintas a las señaladas en el artículo 11 de esta Ley, pagarán impuesto por todos sus enriquecimientos netos, con base a la tarifa prevista en el artículo 52 y a los tipos de impuesto fijados en sus parágrafos.

A las sociedades o corporaciones extranjeras, cualquiera sea la forma que revistan, les será aplicado el régimen previsto en este artículo.

Las entidades jurídicas o económicas a que se refiere el literal e del artículo 7 de esta Ley, pagarán el impuesto por todos sus enriquecimientos netos con base en lo dispuesto en el artículo 52.

Las fundaciones y asociaciones sin fines de lucro pagarán con base al artículo 50 de esta Ley.

## Article 9

Stock companies [compañías anónimas] and taxpayers assimilated to them, which carry out activities different than those indicated in article 11 of this Law, shall pay tax for all their net income, based on the rate provided in article 52 and the kinds of tax fixed in its paragraphs.

The regime provided in this article shall apply to foreign companies or corporations, whatever form they have.

The juridical or economic entities to which paragraph e of article 7 of this Law refers shall pay tax for all their net income based on what is provided in article 52

Non-profit foundations and associations shall pay based on article 50 of this Law.

## Artículo 11

Los contribuyentes distintos de las personas naturales y de sus asimilados, que se dediquen a la explotación de hidrocarburos y de actividades conexas, tales como la refinación y el transporte, o a la compra o adquisición de hidrocarburos y derivados para la explotación, estarán sujetos al

## Article 11

Taxpayers other than natural persons and than their assimilated persons, which are engaged in the exploitation of hydrocarbons and related activities, such as the refining and transport, or the purchase or acquisition of hydrocarbons and their derivatives for exploitation, shall be subject to the tax

impuesto previsto en el literal b del artículo 53 de esta Ley por todos los enriquecimientos obtenidos, aunque provengan de actividades distintas a las de tales industrias.

provided in paragraph b) of Article 53 of this Law for all income obtained, even if it comes from activities unrelated to such industries

Quedan excluidos de régimen previsto en este artículo, las empresas que realicen actividades integradas o no de exploración y explotación del gas no asociado, de procesamiento, transporte, distribución, almacenamiento, comercialización y exportación del gas y sus componente, o que se dediquen exclusivamente a la refinación de hidrocarburos o al mejoramiento de crudos pesados y extrapesados.

Enterprises that engaged in integrated or non-integrated activities, of exploration and exploitation of non-associated gas, of processing, transportation, distribution, storage, commercialization and exportation of gas and its component, or that engage exclusively in hydrocarbons' refining or in upgrading heavy and extra-heavy crudes shall be excluded from the regime provided for in this article.

Artículo 52

Article 52

El enriquecimiento global neto anual obtenido por los contribuyentes a que se refiere el artículo 9 de esta Ley, se gravará salvo disposición en contrario, con base en la siguiente Tarifa expresada en unidades tributarias (U.T.):

The annual net global income obtained by the taxpayers referred to in article 9 of this Law shall be taxed, except as otherwise provided, based on the following Rate expressed in tax units (T.U.):

Tarifa N° 2

Rate No. 2

Por la fracción comprendida hasta 2.000,00 15%

For the fraction containing up to 2.000,00 15%

Por la fracción que exceda de 2.000,00 hasta 3.000,00 22%

For the fraction exceeding 2.000,00 up to 3.000,00 22%

Por la fracción que exceda de 3.000,00 34%

For the fraction exceeding 3.000,00 34%

[...]

[...]

Artículo 53

Article 53

Los enriquecimientos anuales obtenidos por los contribuyentes a que se refieren los artículos 11 y 12 de esta Ley se gravarán, salvo disposición en contrario, con base en la siguiente Tarifa:

The annual income obtained by the taxpayers referred to in articles 11 and 12 shall be taxed, except as otherwise provided, based on the following Rate:

| | |
|---|---|
| Tarifa N° 3 | RATE No. 3 |
| [...] | [...] |

| | |
|---|---|
| b. Tasa proporcional de cincuenta por ciento (50%) para los enriquecimientos señalados en el artículo 11 de esta Ley. | b) A proportional rate of fifty percent (50%) for the income specified in article 11 of this Law. |

| | |
|---|---|
| A los fines de la determinación de los impuestos a que se contrae el encabezamiento de este artículo, se tomará en cuenta el tipo de contribuyente, las actividades a que se dedica y el origen de los enriquecimientos obtenidos. | For the purpose of determining the taxes to which the heading of this Article refers, the type of taxpayer, the activities it engages in and the origin of the obtained income shall be taken into account. |

[...]

**E.V.22.  Decree No. 5200 with Rank, Value and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements (as published in the Official Gazette No. 38632 of 26 February 2007)**

96.  The principal relevant provisions of the **Decree-Law 5200** are found at C-99 and R-7.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Decreto No. 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas | Decree No. 5200 with Rank, Value and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements | Decree No. 5.200 with Rank, Effect and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration Risk and Profit Sharing Agreements |
| Artículo 1 | Article 1 | Article 1 |
| Las asociaciones existentes entre filiales de Petróleos de Venezuela, S.A. y el sector | The associations existing between affiliates of Petróleos de Venezuela, | The existing associations between subsidiaries of Petróleos de Venezuela, |

privado que operan en la Faja Petrolífera del Orinoco, y en las denominadas de Exploración a Riesgo y Ganancias Compartidas, deberán ser ajustadas al marco legal que rige la industria petrolera nacional, deblendo transformarse en empresas mixtas en los términos establecidos en la Ley Orgánica de Hidrocarburos.

S.A. and the private sector which operate in the Orinoco Oil Belt, and in [sic] the so-called Shared-Risk-and-Profit Exploration, shall be adjusted to the legal framework that governs the national oil industry by being transformed into mixed companies according to the terms established in the Organic Hydrocarbons Law.

S.A. and the private sector operating in the Orinoco Oil Belt, as well as in those referred to as Exploration Risk and Profit Sharing Agreements, must be adjusted to the legal framework governing the national petroleum industry, and must be transformed into mixed companies in accordance with the terms set forth in the Organic Hydrocarbons Law.

En consecuencia de lo antes previsto, todas las actividades ejercidas por asociaciones estratégicas de la Faja Petrolífera del Orinoco, constituidas por las empresas Petrozuata, S.A.; Sincrudos de Oriente, S.A., Sincor, S.A., Petrolera Cerro Negro S.A. y Petrolera Hamaca, C.A.; los convenios de Exploración a Riesgo y Ganancias Compartidas de Golfo de Paria Oeste, Golfo de Parla Este y la Ceiba, así como las empresas o consorcios que se hayan constituido en ejecución de los mismos; la empresa Orifuels Sinovensa, S.A., al igual que las filiales de estas empresas que realicen actividades comerciales en la Faja Petrolífera del Orinoco, y en toda la cadena productiva, serán transferidas a las nuevas empresas mixtas.

As a consequence of the foregoing, all of the activities performed by strategic associations of the Orinoco Oil Belt, formed by the companies Petrozuata, S.A.; Sincrudos de Oriente, S.A., Sincor, S.A., Petrolera Cerro Negro S.A. and Petrolera Hamaca C.A.; the Shared-Risk-and-Profit agreements of Golfo de Paria Oeste, Golfo de Paria Este, and La Ceiba, as well as the companies or consortia that may have been incorporated for the performance of the same; the company Orifuels Sinovensa, S.A., and the affiliates of these companies that carry out commercial activities in the Orinoco Oil Belt and in all of the productive chain, shall be transferred to the new mixed companies.

As a result of the foregoing, all activities carried out by strategic associations of the Orinoco Oil Belt, composed by Petrozuata, S.A., Sincrudos de Oriente, S.A., Sincor, S.A. Petrolera Cerro Negro, S.A. and Petrolera Hamaca, c.A., the Exploration Risk and Profit Sharing Agreements of the West Paria Gulf, East Paria Gulf and La Ceiba, as well as the companies and consortia created in execution of the same; the company Orifuels Sinovensa, S.A., as well as the subsidiaries of these companies that carry out commercial activities in the Orinoco Oil Belt, and through the entire production chain, shall be transferred to the new mixed companies.

Artículo 3

Article 3

Article 3

La Corporación Venezolana de Petróleo, S.A. o la filial de Petróleos de Venezuela, S.A. que se designe al efecto para ser accionista en las nuevas Empresas Mixtas, conformará dentro de los

The Corporación Venezolana del Petróleo, S.A. or the affiliate of Petróleos de Venezuela, S.A. designated to be the shareholder of the new Mixed Companies, shall set

Corporación Venezolana del Petróleo, S.A. or the subsidiary of Petróleos de Venezuela. S.A. designated for purposes of becoming the shareholder in the new Mixed Companies, shall

siete (7) días a partir de la fecha de publicación del presente Decreto-Ley en la Gaceta Oficial de la República Bolivariana de Venezuela, una Comisión de Transición para cada asociación señalada el artículo 1° del presente Decreto-Ley, que se incorporará a la actual directiva de la asociación respectiva, a fin de garantizar la transferencia a la empresa estatal el control de todas las actividades que las asociaciones realizan. Este proceso de transferencia debe culminar el 30 de abril de 2007. Las empresas del sector privado que son parte en las asociaciones referidas deberán cooperar con la Corporación Venezolana del Petróleo, S.A. para efectuar un cambio seguro y ordenado de operadora.

up within seven (7) days following the date of publication of this Decree-Law in the Official Gazette of the Bolivarian Republic of Venezuela, a Transition Commission for each association indicated in article 1 of this Decree-Law, which shall be incorporated into the current board of directors of each association, in order to ensure the transfer to the State company of the control over all of the activities carved out by the associations. This transfer process must be completed on 30 April 2007. The companies of the private sector that are parties to the aforesaid associations shall cooperate with the Corporación Venezolana del Petróleo, S.A. to effect a safe and orderly change of operator.

form, within seven (7) days after the date of publication of this Decree Law in the Official Gazette of the Bolivarian Republic of Venezuela, a Transitional Commission for each of the associations mentioned under Article 1 of this Decree Law, which shall be incorporated to the current board of directors of the respective association, in order to guarantee the transfer of control to the state company of all the activities being performed by the associations. This transfer process shall be completed by April 30, 2007. The private sector companies that are parties to the aforementioned associations shall cooperate with Corporación Venezolana del Petróleo, S.A. in order to conduct a safe and orderly change of operator.

## Artículo 4

## Article 4

## Article 4

A las empresas del sector privado que actualmente son partes en las asociaciones referidas en el artículo 1° se les concederá un período de cuatro (4) meses, a partir de la fecha de publicación del presente Decreto-Ley en la Gaceta Oficial de la República Bolivariana de Venezuela, para acordar los términos y condiciones de su posible participación en las nuevas empresas Mixtas. Se concederán dos (2) meses adicionales para someter los señalados términos y condiciones a la Asamblea Nacional a fin de solicitar la autorización correspondiente de conformidad con la Ley

The companies of the private sector that are currently parties to the associations referred to in article 1 shall be given a period of four (4) months from the date of publication of this Decree-Law in the Official Gazette of the Bolivarian Republic of Venezuela, to agree to the terms and conditions of their possible participation in the new Mixed Companies. Two (2) additional months shall be given to submit said terms and conditions to the National Assembly in order to request the corresponding authorization according to the Organic Hydrocarbons

The private sector companies that are currently parties to the associations referred to in Article 1 shall be granted a period of four (4) months, as of the date of publication of this Decree-Law in the Official Gazette of the Bolivarian Republic of Venezuela, to agree on the terms and conditions of their possible participation in the new Mixed Companies. Two (2) additional months shall be granted for submitting such terms and conditions to the National Assembly for purposes of requesting the corresponding authorization in accordance with the

Orgánica de Hidrocarburos.    Law.        Organic Hydrocarbons Law.

Artículo 5

Article 5

Article 5

Transcurrido el plazo establecido en el artículo 4° del presente Decreto-Ley, sin que se hubiera logrado acuerdo para la constitución y funcionamiento de la Empresas Mixtas, la República, a través de Petróleos de Venezuela, S.A. o cualquiera de sus filiales que se designe al efecto, asumirá directamente las actividades ejercidas por las asociaciones referidas en al artículo 1° del presente Decreto-Ley a fin de preservar su continuidad, en razón de su carácter de utilidad pública e interés social.

If the period established in article 4 of this Decree-Law expires without an agreement having been reached for the incorporation and operation of the Mixed Companies, the Republic, through Petróleos de Venezuela, S.A. or any of its affiliates that may be designated for such purpose, shall directly assume the activities of the associations referred to in article 1 of the present Decree-Law in order to preserve their continuity, by reason of their public utility and social interest character.

Once the term established in Article 4 of this Decree-Law has expired, and if no agreement has been reached on the incorporation and operation of the Mixed Companies, the Republic, through Petróleos de Venezuela, S.A. or any of its subsidiaries designated for that purpose, shall assume directly the activities carried out by the associations referred to in Article 1 of this Decree-Law for purposes of preserving their continuity, in light of their characteristic of public utility and social interest.

Artículo 13

Article 13

Article 13

Todos los hechos y actividades vinculados al presente Decreto-Ley se regirán por la Ley Nacional, y las controversias que de los mismos deriven estarán sometidas a la jurisdicción venezolana, en la forma prevista en la Constitución de la República Bolivariana de Venezuela.

All the events and activities related to this Decree-Law shall be governed by the National Law, and the controversies derived from the same shall be subject to Venezuelan jurisdiction, in the manner provided in the Constitution of the Bolivarian Republic of Venezuela.

All acts and activities related to this Decree-Law shall be governed by National Law and all controversies that may be derived from the same shall be subject to Venezuelan jurisdiction, in the manner established in the Constitution of the Bolivarian Republic of Venezuela.

**E.V.23.** **Law on the Effects of the Migration Process to Mixed Enterprises of the Association Agreements of the Orinoco Oil Belt, As Well As of the Shared-Risk-And-Profit Exploration Agreements (as published in the Official Gazette No. 38785 on 8 October 2007)**

97. The principal relevant provisions of the **Law on Effects** are found at C-104 and R-17.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Ley Sobre los Efectos del Proceso de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, Así Como de los Convenios de Exploración a Riesgo y Ganancias Compartidas | Law on the Effects of the Migration Process to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements | Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration Risk and Profit Sharing Agreements |
| Artículo 1 | Article 1 | Article 1 |
| Los convenios que dieron origen a las asociaciones aludidas en el Artículo 1 del Decreto-Ley N° 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas, quedarán extinguidos a partir de la fecha de publicación en la Gaceta Oficial de la República Bolivariana de Venezuela del decreto que transfiera el derecho a ejercer actividades primarias a las empresas mixtas que se hubieran constituido conforme con lo previsto en dicho Decreto-Ley. | The agreements that gave rise to the associations referred to in Article 1 of Decree-Law No. 5200 with the Rank, Value and Force of Law of Migration to Mixed Enterprises of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements, shall be extinguished as of the date of publication in the Official Gazette of the Bolivarian Republic of Venezuela of the decree that transfers the right to exercise primary activities to the mixed enterprises constituted according to what is provided in said Decree-Law. | The agreements that gave origin to the associations referred to in Article I of Decree-Law No, 5,200 with Rank, Effect and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration Risk and Profit Sharing Agreements, shall be extinguished as of the date of publication in the Official Gazette of the Bolivarian Republic of Venezuela of the decree that transfers the right to exercise primary activities to the mixed companies incorporated as provided under such Decree-Law. |
| Igualmente se extinguirán, a | Likewise, those agreements | Likewise, there shall be |

partir de la fecha de publicación de esta Ley en la Gaceta Oficial de la República Bolivariana de Venezuela, aquellos convenios en que ninguna de las empresas privadas que fueran parte en las asociaciones correspondientes, hubiera alcanzado un acuerdo de migración a empresa mixta dentro del plazo establecido en el Artículo 4 del Decreto-Ley N° 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas.

in which none of the private enterprises that were a party to the corresponding associations reached an agreement for the migration to mixed enterprise within the period of time established in Article 4 of Decree-Law 5.200 with the Rank, Value and Force of Law of Migration to Mixed Enterprises of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements shall be terminated as from the date of publication of this Law in the Official Gazette of the Bolivarian Republic of Venezuela.

extinguished as of the date of publication of this Law in the Official Gazette of the Bolivarian Republic of Venezuela, those agreements in which none of the private companies parties to the corresponding associations had reached an agreement to migrate into a mixed company within the term set fourth in Article 4 of Decree-Law No, 5,200 with Rank, Effect and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration Risk and Profit Sharing Agreements.

### Artículo 2

### Article 2

### Article 2

Los intereses, acciones y participaciones en las asociaciones referidas en el ARtículo 1 del Decreto-Ley N° 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas, en las sociedades constituidas para desarrollar los proyectos correspondientes, y en los activos utilizados para la realización de las actividades de tales asociaciones, incluyendo derechos de propiedad, derechos contractuales y de otra naturaleza, que hasta el vencimiento del plazo establecido en el Artículo 4 del referido Decreto-Ley, correspondian a las empresas parte del sector privado con las cuales no se logró un acuerdo de migración a empresa mixta,

The interests, shares and participations in the associations referred to in Article 1 of Decree-Law 5200 with the Rank, Value and Force of Law of Migration to Mixed Enterprises of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements, in the companies constituted to develop the respective projects, and in the assets used to realize the activities of such associations, including property rights, contractual rights and [rights] of other nature, which until the expiration of the term established in Article 4 of said Decree-Law, belonged to enterprises of the private sector with which no agreement was reached to migrate to a mixed enterprise, are transferred, based on the reversion principle

The interests, shares of stock and participations in the associations referred to in Article I of Decree-Law No, 5.200 with Rank, Effect and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration Risk and Profit Sharing Agreements, in the companies incorporated for the development of the corresponding projects, and in the assets utilized in carrying out of the activities of such associations, including property rights, contract rights and rights of other nature, which as at the expiration of the term set forth in Article 4 of the above-mentioned Decree-Law belonged to the private sector companies with which no agreement was reached to migrate into a mixed company, shall be transferred, based on the

quedan transferidos, con base en el principio de reversión, sin necesidad de acción o instrumento adicional, a las nuevas empresas mixtas constituidas como resultado de la migración de las asociaciones respectivas, salvo lo previsto en el Artículo 3 de la presente Ley.

[principio de reversión], without the need of any action or additional instrument, to the new mixed enterprises constituted as a result of the migration of the respective associations, except as provided in Article 3 of the present Law.

reversion principle, without the need of any action or additional instrument, to the new mixed companies incorporated as a result of the migration of the respective associations, except as provided in Article 3 of the present Law.

### Artículo 3

### Article 3

### Article 3

En los casos en que ninguna de las empresas que constituían la parte privada del convenio de asociación hubiera alcanzado un acuerdo de migración a empresa mixta dentro del plazo establecido en el Artículo 4 del Decreto-Ley N° 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias Compartidas, los intereses, acciones, participaciones y derechos referidos en el Artículo 2 de la presente Ley, se mantendrán en propiedad de la filial de Petróleos de Venezuela, S.A., que hubiera asumido las actividades de la asociación de que se trate, hasta que el Ejecutivo Nacional determine la filial que en definitiva deberá asumir tales actividades.

In the cases where none of the enterprises that constituted the private party of the association agreement reached an agreement for the migration to mixed enterprise within the term established in Article 4 of Decree-Law No. 5200 with the Rank, Value and Force of Law of Migration to Mixed Enterprises of the Association greements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements, the interests, shares, participations and rights referred to in Article 2 of the present Law shall remain the property of the affiliate of Petróleos de Venezuela, S.A. that assumed the activities of the association involved, until the National Executive determines the affiliate that definitively shall assume such activities.

In those cases in which none of the companies that were the private parties to the association agreement had reached an agreement to migrate into a mixed company within the term set forth in Article 4 of Decree-Law No. 5.200 with Rank, Effect and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt as well as the Exploration Risk and Profit Sharing Agreements, the interests, shares of stock, participations and rights referred to in Article 2 of the present Law, shall remain property of the subsidiary of Petróleos de Venezuela, S.A. to have assumed the activities of the respective association until the National Executive determines the subsidiary that shall definitively assume such activities.

### Artículo 4

### Article 4

### Article 4

Las transferencias de intereses, acciones, participaciones y derechos previstas en la presente Ley no generarán obligaciones

The transfers of interests, shares, participations and rights provided in the present Law shall not give rise to tax obligations in the

The transfer of interests, shares of stock, participations and rights set forth in this Law shall not generate tax obligations in

| | | |
|---|---|---|
| tributarias en la República Bolivariana de Venezuela para ninguna persona o entidad. | Bolivarian Republic of Venezuela for any person or entity. | the Bolivarian Republic of Venezuela for any person or entity. |

| Artículo 5 | Article 5 | Article 5 |
|---|---|---|
| Todas los hechos y actividades objeto de la normativa que antecede se regirán por las leyes de la República Bolivariana de Venezuela, y las controversias que de los mismos deriven estarán sometidas a su jurisdicción, en la forma prevista en la Constitución de la República Bolivariana de Venezuela. | All facts and activities subject-matter of the foregoing provisions shall be governed by the laws of the Bolivarian Republic of Venezuela, and the disputes derived from the same shall be subject to its jurisdiction, as prescribed in the Constitution of the Bolivarian Republic of Venezuela. | All the facts and activities subject to the above-mentioned provisions shall be governed by the laws of the Bolivarian Republic of Venezuela, and the controversies deriving from them shall be submitted to its jurisdiction, in the manner established in the Constitution of the Bolivarian Republic of Venezuela. |

## E.V.24. Decree No. 5916 Transferring to PetroMonagas S.A. the Right to Develop Primary Exploration Activities Specified Therein (as published in the Official Gazette No. 38884 of 5 March 2008)

98. The relevant portion of **Decree 5916** is found in C-129 (bold in original).

| **Spanish (Original)** | **Claimant's Translation** |
|---|---|
| Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican | Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein |

| Artículo 1 | Article 1 |
|---|---|
| Se transfiere a la empresa **PetroMonagas, S.A.**, el derecho a desarrollar actividades primarias de exploración en busca de yacimientos de petróleo crudos en su en estrado natural, y su recolección, transporte y almacenamientos iniciales, de conformidad con el artículo 9° de la Ley Orgánica de Hidrocarburos. **PetroMonagas, S.A.,** podrá además | The right to develop primary activities of exploration in search of reservoirs of heavy and extra-heavy crude oil, the extraction of such crude oil in its natural state, and its initial production, transport and storage is transferred to the enterprise **PetroMonagas, S.A.,** according to article 9 of the Organic Law of Hydrocarbons. **PetroMonagas, S.A.,** may additionally develop activities of |

desarrollar actividades de mejoramiento de petróleo crudo producido por sí misma en las actividades primarias antes referidas, comercializar y vender el petróleo crudo mejorado y cualquier otro producto resultante del mejoramiento del petróleo crudo, y realizar otras actividades relacionadas con dichas actividades primarias y actividades de mejoramiento, incluyendo actividades de transporte y almacenamiento, en al área geográfica delimitada por el Ministerio del Poder Popular para la Energía y Petróleo, mediante Resolución N° 220 de fecha 09 de noviembre de 2007, publicada en la Gaceta Oficial de la República Bolivariana de Venezuela N° 38.809 de fecha 13 noviembre de 2007.

upgrading of the crude oil produced by itself in the aforesaid primary activities, commercialize and sell the upgraded crude oil and any other product resulting from the upgrading of the crude oil, and carry out other activities related to said primary activities and upgrading activities, including transportation and storage activities, in the geographic area delimited by the Ministry of the Popular Power for Energy and Petroleum, through Resolution N° 220, dated 9 November 2007, published in Official Gazette of the Bolivarian Republic of Venezuela N° 38.809 dated 13 November 2007.

## F.     Relief Sought by the Parties Regarding the Principal Claims

### F.I.       Relief Sought by the Claimant

99. The most recent version of the relief sought by Claimant on the merits is found in **Claimant's Reply Memorial (15 May 2009)** (C-III ¶ 246).

> 246. For the foregoing reasons, Mobil CN requests that the Tribunal render an award in favor of the Claimant:
>
>     (a)     Dismissing the defenses raised in the Respondents' Principal Memorial and the Respondents' counterclaims;
>
>     (b)     Declaring that Discriminatory Measures have occurred that have caused a Materially Adverse Impact on Mobil CN's cash flows from the Project in FY 2007 and in all subsequent FYs through the end of the term of the Association Agreement;
>
>     (c)     Declaring that Respondent PDVSA-CN has breached the Association Agreement;
>
>     (d)     Declaring that Respondent PDVSA has breached the Guaranty by failing to perform the obligations of its Guaranteed Affiliate, PDVSA-CN, under the Association Agreement;
>
>     (e)     Ordering PDVSA-CN and PDVSA, jointly and severally, to pay Mobil CN:
>
>         (i)     compensation for damages calculated in accordance with the Association Agreement (including Annex G) and Venezuelan law, in the amounts specified in Part V of the Claimant's Principal Memorial and Part V of this Reply, as updated at the time of the award;
>
>              [For FY 2007, Claimant seeks an indemnity in the amount of 80.5 million. For FYs 2008 – 2035, Claimant seeks an indemnity in an amount ranging from US$6.45 billion to US$6.86 billion. (C-IV ¶ 18)]
>
>         (ii)     pre-award and post-award interest, as specified in Part V of the Claimant's Principal Memorial;
>
>         (iii)     attorneys' fees and costs;
>
>     (f)     Ordering PDVSA-CN and PDVSA to protect Mobil CN from taxation of the amount awarded, as specified in the Claimant's Principal Memorial; and
>
>     (g)     Granting such further or other relief as may be just and proper.

### F.II.  Relief Sought by the Respondent

100. The most recent version of the relief sought by Respondents on the merits is found at the end of **Respondents' Reply Memorial** (**17 August 2009**) ( R-III ¶ 244):

> 244. For the reasons set forth above and in Respondents' Principal Memorial, Mobil CN's claim should be dismissed in its entirety because:
>
>  (i) the Association Agreement, which was extinguished by operation of law, cannot form the basis of a claim;
>
>  (ii) even if the Association Agreement had not been extinguished, Claimant is precluded from pursuing any claim because of failure to comply with the express requirements set forth in Section 15.1(a) of the Association Agreement;
>
>  (iii) the measures at issue in this case do not constitute "Discriminatory Measures" as defined in the Association Agreement;
>
>  (iv) even if the measures did qualify as "Discriminatory Measures," no compensation would be due for FY 2007;
>
>  (v) the indemnity provisions of the Association Agreement and the Accounting Principles do not cover future cash flows; and
>
>  (vi) even if the indemnity provisions were to be applied on a forward-looking basis, the amount of compensation that would be due under those provisions would be entirely offset by amounts owed by Claimant to Respondents.

101. Respondents also requested that the Tribunal provide the following relief in the **Terms of Reference** (TOR 5.2.2.d):

> 5.2.2.d. Award to the Respondents all costs incurred in connection with this Arbitration, including, without limitation, the fees and expenses of the arbitrators and the ICC administrative fees fixed by the Court, as well as the fees and expenses of any experts appointed by the Tribunal and the reasonable legal and other costs incurred by the Respondents in connection with this Arbitration.

### G. Relief Sought by the Parties Regarding the Counterclaim

#### G.I. Relief Sought by the Respondents

102. Respondents request that the Tribunal grant the Counterclaims. Respondents state: "*Claimant is liable to Respondents in the amount of US$508.6 million, plus interest, in respect of unpaid shipments of crude oil, financing obligations for the Project, and damages resulting from the unwarranted pre-judgment attachment in New York.*" (R-II ¶ 233).

#### G.II. Relief Sought by the Claimant

103. Claimant requests that the Tribunal dismiss Respondents' counterclaims. (C-IV ¶ 246).

### H. Factual Background

104. Without prejudice to their relevance for the considerations and conclusions of the Tribunal, the following section briefly summarizes the factual allegations regarding the claims and counterclaims, as presented by Claimant and Respondents. The facts are largely undisputed, but the source of the information is mentioned at the end of each paragraph. More comprehensive coverage of the facts can be found in **Claimant's Principal Memorial** (C-III ¶¶ 19 – 167 and Apps. B - D), **Claimant's Reply Memorial** (C-IV ¶¶ 20-31 and App. A), and **Respondents' Principal Memorial**. (R-II ¶¶ 11 – 37, 69).

105. For clarity, the Tribunal notes that the titles "*Minister of Energy and Mines*" and "*Minister of Energy and Petroleum*" and likewise "*Ministry of Energy and Mines*" and "*Ministry of Energy and Petroleum*" have been used interchangeably throughout the Parties' submissions, likely due to a change in that Ministry's name. To avoid confusion, the Tribunal refers to both as either "*Minister of Energy*" or "*Ministry of Energy*", respectively. The Tribunal, however, leaves the Parties' own language, where quoted and where used in the citations, undisturbed.

.

106. Claimant reports that, in **1975**, Venezuela expropriated the interests of all foreign oil companies in the country, including Mobil Oil Corporation ("*Mobil*"). (C-III ¶ 3-4). Claimant states that the private sector was effectively excluded from participating in the Venezuelan oil industry until the **Oil Opening (*Apertura Petrolera*)** in the **early 1990s**. (C-III ¶ 28).

> The Oil Opening was based on **Article 5 of the Nationalization Law**, which authorized the participation of private parties in the oil industry under two types of contracts between [the state-owned] PDVSA and private companies: (i) operating services agreements, under which the private company would provide specified services to PDVSA in exchange for a fee; and (ii) association agreements, under which private companies and PDVSA would enter into a joint venture for a specified term in 'special cases [...] convenient to the public interest.' (C-Ill ¶ 33).

107. Claimant reports that, in **September 1990**, PDVSA approached Mobil to determine how Mobil would react to PDVSA's new policy of international cooperation and its envisioned policy of working in long-term joint ventures of at least 25 years' duration to pursue expansion in the Orinoco Oil Belt. (C-III ¶¶ 42-43).

108. Respondents state that Mobil saw an opportunity in Venezuela's EHO reserves. According to Respondents, while low oil prices were projected to continue, Mobil determined that 3 projects in Venezuela combined would entail an initial investment of US$ 1.7 billion and could deliver an annual after tax income of US$ 200 million. (R-II ¶ 14).

109. Claimant states that the idea of working with PDVSA in the Orinoco Oil Belt, however, was not initially attractive. Claimant explains that Mobil had already been expropriated by Venezuela in 1975 and the projected rate of return of the proposed project was low. (C-III ¶¶ 45- 46). Further, the Orinoco Oil Belt, while home to one of the largest proven reserves of Venezuela, is one of the most cost-intensive and difficult regions in the world to acquire oil. The oil itself is also very low quality and requires significant processing in order to be marketable. (C-III ¶¶ 37 – 41). Thus, Claimant states: "*to persuade Mobil to invest in an extra-heavy crude*

*project in the Orinoco Oil Belt, PDVSA and the Republic of Venezuela*
*offered Mobil (i) a series of fiscal incentives, among them income-tax and*
*royalty reductions, and (ii) contract protections designed to provide Mobil*
*with prompt and adequate relief in the event of an expropriation or other*
*adverse measures affecting the economics of the project.*" (C-III ¶ 48).

110. Claimant reports that, in **August 1991**, the Republic of Venezuela adopted
the **Law on Partial Amendment to the Income Tax Law**. This law
reduced the income-tax rate applicable to income arising from new
exploitation and refining of heavy and extra-heavy crude oil under
association agreements from 67.7% to 30%. (C-III ¶ 50).

111. On **1 November 1993**, the **Agreement on Encouragement and Reciprocal**
**Protection of Investments Between the Kingdom of the Netherlands and**
**the Republic of Venezuela** was signed. (C-III ¶ 50).

112. Claimant states that, in **1994**, the **Law on Partial Amendment to the**
**Income Tax Law** was amended and the reduced income-tax rate was raised
to 34%. According to Claimant, this was the same rate imposed on
companies engaged in non-oil-related activities in Venezuela. (C-III ¶ 50).

113. Claimant states that, in **August 1994**, Lagoven, a PDVSA subsidiary
designated to work with Mobil, offered additional incentives to improve the
economic projections of the proposed venture. One of these incentives was
a reduced royalty rate.

> The applicable royalty would be 16 2/3% during the early production or
> development phase of the Project. Upon achieving commercial production
> (defined under the AA as the upgrader completion date), the royalty would be
> reduced to 1% until such time as the accumulated gross income from the Project
> exceeded three times the total initial investment (from the start of the Project
> until the beginning of commercial production), but in no event would the
> reduction period exceed nine years from the beginning of commercial
> production. (C-III ¶ 56).

114. On **17 March 1997**, the Ministry of Energy submitted the proposed
**Framework of Conditions** [*Marco de Condiciones*] for the AA to the

Venezuelan Congress, pursuant to **Article 5 of the Nationalization Law**. According to Claimant, the **Framework of Conditions** contained specific provisions for each of the following contract protections. (C-III ¶ 65). *First, "Respondent PDVSA-CN undertook to indemnify Mobil CN in the event of an expropriation of any of its interests in the Project or other governmental measures that changed, to Mobil's detriment, the fiscal terms applicable to the Project."* (C-III ¶ 60). *Second, "PDVSA guaranteed, through a separate Guaranty, that PDVSA-CN would perform all of its obligations under the AA."* (C-III ¶ 61). *Third*, the Parties agreed to submit any dispute with Mobil CN to international arbitration. (C-III ¶ 62).

115. On **10 April 1997**, the Congressional Joint Committee recommended approval of the **Framework of Conditions** and the same were approved by the Venezuelan Congress on **24 April 1997**.

116. On **2 October 1997**, the Venezuelan Congress formally authorized the execution of the AA. (C-III ¶¶ 71-73).

117. Claimant reports that, on **28 October 1997**, Lagoven Cerro Negro, S.A. (Lagoven CN, a Lagoven subsidiary, renamed *"PDVSA-CN"* on 11 May 1998), Mobil Producción e Industrialización de Venezuela, Inc. (Mobil PIV), and Veba Oel Venezuela Orinoco, GmbH (Veba Orinoco) signed the AA and created the Cerro Negro Joint Venture. Mobil PIV assigned its rights in the AA to Mobil CN the following day.

> The Project contemplated by the AA included: (i) exploiting and developing the extra-heavy crude oil fields in the Cerro Negro area; (ii) constructing an upgrader in the Jose Complex on the Venezuelan coast with the capacity to upgrade approximately 120,000 bpd of extra-heavy crude oil to a level of 16.5° API; (iii) laying pipelines between the Cerro Negro area and the Jose Complex (approximately 315 km); and (iv) selling the resulting products of Mobil CN and PDVSA-CN to the Chalmette Joint Venture. (C-III ¶ 76).

118. According to Claimant, the AA granted its parties an undivided interest in the assets and liabilities of the venture in proportion to their respective interests. Title to the oil produced by the Cerro Negro Joint Venture vested

in the participants at the wellhead, also in proportion to their respective interests. The percentage interests of the parties in the Cerro Negro Joint Venture were as follows: PDVSA-CN – 41 2/3%; Mobil CN – 41 2/3%; and Veba Orinoco – 16 2/3%. The AA established an unincorporated joint venture (the Cerro Negro Joint Venture) for a term of thirty-five years from 30 June 2000. (C-lll ¶¶ 74-75, 77).

119. Claimant reports that, on **28 October 1997**, concurrently with the execution of the AA, PDVSA issued the PDVSA Guaranty. Under this Guaranty, *"PDVSA shall guarantee all of LAGOVEN's obligations under the AA in the same terms and conditions."* (C-lll ¶ 68).

120. Claimant explains that the Project is vertically integrated. Mobil and PDVSA established a related downstream joint venture, the Chalmette Joint Venture, to refine the products resulting from the Project. (C-lll ¶ 85).

121. On **28 October 1997**, PDV Chalmette, Inc. (a PDVSA subsidiary), Mobil Oil Corporation, and Mobil Pipe Line Company entered into an Amended and Restated Limited Liability Company Agreement. The agreement created Chalmette Refining, LLC (Chalmette Refining), a company equally owned by PDVSA and Mobil through their respective subsidiaries. Chalmette Refining owns and operates the Chalmette Refinery, which is especially designed to refine diluted crude oil (*"DCO"*) and synthetic crude oil (*"SCO"*) from the Project into marketable products. (C-lll ¶ 86).

> The AA provided for the creation of a Venezuelan company, Petrolera Cerro Negro, S.A. (Petrolera Cerro Negro), to direct, coordinate, and supervise the activities related to the Project. Petrolera Cerro Negro is a Venezuelan company owned by the participants in the Cerro Negro Joint Venture in proportion to their respective interests in the Project. (C-III ¶ 82).

122. Claimant reports that, on **1 November 1997**, Mobil CN and PDVSA-CN entered into the Association Oil Supply Agreement (also known as the Chalmette Offtake Agreement) with Chalmette Refining. Under that agreement, Chalmette Refining was required to buy, at an agreed formula price, PDVSA-CN's share and Mobil CN's share of DCO and SCO

produced from the Project for the life of the Cerro Negro Joint Venture. (C-III ¶ 87).

123. On **1 December 1997**, Petrolera Cerro Negro, PDVSA-CN, Mobil CN, and Veba Orinoco signed an Operating Agreement with Operadora Cerro Negro, S.A. ("*OCN*"), a wholly-owned subsidiary of Mobil Corporation. Under the Cerro Negro Operating Agreement, OCN became the operator of the Project, acting as an agent of the participants in the Cerro Negro Joint Venture. (C-III ¶ 83). Claimant states that OCN could not be removed as the operator of the Project unless, among other requirements, a competent operator was duly appointed by the board of Petrolera Cerro Negro. (C-III ¶ 84).

124. Claimant states that, on **11 March 1998**, the Ministry of Energy approved a *Memoria Descriptiva* land designated for the Project, which stated that the "*[o]riginal [o]il in [p]lace*" in the designated area was approximately 28.6 billion barrels of EHO. (C-III ¶ 78).

125. On **29 May 1998**, the Ministry of Energy and PDVSA Petróleo y Gas, S.A., a subsidiary of PDVSA, entered into a **Royalty Reduction Agreement for the Orinoco Oil Belt** (the Royalty Reduction Agreement, "*RRA*"). According to Claimant, the RRA provided that companies participating in strategic associations could become parties to the agreement by expressing their consent in writing to the Ministry of Energy. (C-III ¶ 55).

126. Claimant describes the project financing as follows:

> The combined shares of Mobil CN and PDVSA in the estimated initial costs of the Cerro Negro Project amounted to US$1.66 billion. Forty percent of this amount was financed by equity contributions from the participants and revenues from the venture. The remainder was financed by third parties, through an issuance of bonds and loans from financial institutions. On **11 June 1998**, Cerro Negro Finance, Ltd. issued bonds for US$600 million. Mobil CN and PDVSA-CN also obtained a US$300 million loan from a consortium of financial institutions to finance the Project. The proceeds of those two sources were used to fund the respective investments of PDVSA-CN and Mobil CN in the Cerro Negro Joint Venture. PDVSA-CN and Mobil CN were ultimately responsible

for those obligations, as each severally guaranteed payment of one-half of the principal and interest. (C-III ¶ 90).

127. Claimant reports that, on **18 June 1998**, Mobil CN, PDVSA-CN, Mobil Sales & Supply Corporation (Mobil Marketing), and the Bank of New York signed the Offtake Support Agreement. Under the Offtake Support Agreement, Mobil Marketing would be required to lift and purchase, at the same formula price agreed for sales to Chalmette Refining minus a small marketing fee, any SCO shipped for the account of PDVSA-CN or Mobil CN that was not accepted by Chalmette Refining for any reason. This assumption by Mobil-CN of the ultimate marketing risk for the production from the Project was a key factor in obtaining financing. (C-III ¶ 89).

128. On **5 November 1998**, Mobil CN became a party to the RRA. (C-III ¶¶ 53-55).

129. In **August 2001**, the Project began commercial production. Production capacity exceeded 120,000 bpd, according to Claimant. (C-III ¶ 9).

130. According to Claimant, on **6 September 2001**, *"the Cerro Negro participants formally adopted the Business Plan for Phase IV, which listed the evaluation of opportunities for increased production as one of the main goals of the Operations Phase."* (C-III ¶ 121). The participants discussed the elimination of bottlenecks as a means of increasing production. The participants developed a *"De-Bottlenecking Project"* in order to increase the production of the Project to 144,000 bpd. (C-III ¶ 122).

131. On **13 November 2001**, President Hugo Chávez of the Bolivarian Republic of Venezuela issued the **Organic Law of Hydrocarbons** (*"2001 Hydrocarbons Law"*), which replaced the **Nationalization Law** and the **Law of Hydrocarbons of 1943**. Claimant states that this new law dismantled many of the legal incentives and protections that had been enacted during the Oil Opening by reserving oil production activities to the state and authorizing private parties only through mixed enterprises in

which the State owned more than 50% of the shares. Claimant explains that, pursuant to this, production from a mixed enterprise would be subject to a royalty of 30% and would have to be sold to PDVSA or another state-owned company. (C-III ¶ 102). Claimant states that, on **16 January 2002**, the Ministry of Energy and OCN (on behalf of the Project participants) signed an **Agreement on Procedures for the Payment of the Exploitation Tax (Royalty) of the Extra-Heavy Crude Produced and the Sulphur Extracted by OCN, S.A.** (the **Royalty Procedures Agreement**). According to Claimant, although the Organic Law of Hydrocarbons was already in effect, the Royalty Procedures Agreement reaffirmed that the royalty would remain at the reduced rate of 1% in accordance with the formula set forth in the Cerro Negro RRA and that it would not exceed 16 2/3% during the life of the Project. (C-III ¶ 106).

132. In **November 2003**, the Project participants endorsed a work plan and budget for the De-Bottlenecking Project. Claimant states that this plan would require only minor investment, no interruption in production, and would increase production to 144,000 bpd in the first quarter of 2006. (C-III ¶ 123). According to Claimant:

> To meet these goals, and particularly to install the equipment at the upgrader during the upcoming shutdown, the participants formally agreed on **1 April 2004** to proceed with an accelerated engineering and execution schedule. As the [De-Bottlenecking Project] went through different stages, the Project participants authorized monthly expenses related to the De-Bottlenecking Project. In **April 2004**, the participants agreed to formalize approval of the project at the next Board meeting of Petrolera Cerro Negro, then scheduled for June 2004. (C-III ¶ 124).

133. Claimant states that, a few days before the scheduled formal approval of the De-Bottlenecking Project, PDVSA-CN demanded additional concessions, including that the Project participants agree to pay a 16 2/3% royalty on any extra production achieved from the De-Bottlenecking Project and that all incremental production from the De-Bottlenecking Project be sold to PDVSA-CN. Claimant states that it accepted PDVSA-CN's new conditions to move the project forward and to complete it as scheduled. (C-III ¶ 125).

134. Claimant explains that, on **14 July 2004**, the Project participants approved the De-Bottlenecking Project and agreed to formalize that approval at the next Board meeting, which was scheduled for 20 July 2004. In the meantime, OCN continued to carry out the engineering and modification activities necessary to meet the implementation schedule that the Cerro Negro participants had established. All the expenditures for these activities were approved by the participants. Per PDVSA-CN's request, the next Board meeting was postponed until 1 December 2004. (C-III ¶¶ 125, 126).

135. Claimant states that, on **10 October 2004**, President Chávez announced in his weekly television program, "*Aló Presidente*," that the royalty rate applicable to the Orinoco Oil Belt projects, including the Project, would be increased immediately to 16 2/3%. The following day, Ministry of Energy notified PDVSA of this change by letter dated 8 October 2004. (C-III ¶¶ 109 - 111). The Government had determined that the temporary 1% royalty rate originally granted to the associations under the RRA during a time of low prices in the 1990s no longer made sense as prices of oil exceeded everyone's expectations. (R-II ¶ 21).

136. On **18 October 2004**, PDVSA informed Mark Ward, President of ExxonMobil de Venezuela S.A., of the rate increase. (C-III ¶ 111).

137. Claimant states that, on **2 November 2004**, ExxonMobil de Venezuela responded that "*it was not a party to the AA or an investor in the Project and noting that there was a legally valid agreement between the State and the participants regarding the applicable royalties.*" (C-III ¶ 112).

138. On **15 November 2004**, the Ministry of Energy notified ExxonMobil de Venezuela of this increase of rate, effective on 8 October 2004. (C-III ¶ 112). Claimant states that it paid the 16 2/3% royalty under protest.

139. Claimant states that, at the **1 December 2004** Board meeting, PDVSA-CN refused to formalize the approval of the De-Bottlenecking Project under the terms to which the Project participants had agreed in July. "*In light of the*

*government's recent decision to increase the royalty applicable to the participants of strategic associations in the Orinoco Oil Belt, PDVSA-CN and the Ministry of Energy would not allow the De-Bottlenecking Project to move forward at the agreed-upon royalty of 16 2/3%, unless the extra volumes from the project came from enhanced-oil-recovery (EOR) techniques."* (C-lll ¶ 127).

140. Claimant states that, as a result, the De-Bottlenecking Project was cancelled. *"By the time the De-Bottlenecking Project was cancelled, OCN had completed about 70% of the planned work at the upgrader and 20% of the planned work at the central production facilities. As a result, the participants lost the approximately US$30 million they had invested up to 1 December 2004 and incurred over US$10 million in costs to halt the activities related to the De-Bottlenecking Project."* (C-lll ¶ 129).

141. In **2004**, Rafael Ramírez began to serve as both the Minister of Energy and the President of PDVSA. (C-V ¶ 4).

142. Claimant states that, on **2 February 2005**, Mobil CN addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy of Venezuela, and the Attorney General of Venezuela, complaining of an increase in royalties from 1% to 16 2/3% and alleging that the Government was not honoring its commitments regarding the 1% royalty rate. (R-ll ¶ 69).

143. Respondents state that, in **April 2005**, the Government determined that the *"operating service agreements"* entered into during the Apertura Petrolera were fundamentally inconsistent with the **Nationalization Law**. Contrary to that law, the purported service contractors were not merely services contractors but also had participated in the business. (R-ll ¶ 23).

144. On **12 April 2005**, the Minister of Energy issued an Instruction setting in motion an orderly process of *"migration"* of those agreements to the new form of mixed companies required under the **2001 Hydrocarbons Law**.

145. On **25 May 2005**, the Minister of Energy delivered a speech entitled *"Full Oil Sovereignty: A National, Popular and Revolutionary Petroleum Policy."* Respondents state that in this speech, he identified violations committed by foreign oil companies in the Orinoco Oil Belt. (R-II ¶ 25).

146. Respondents state that, on **2 June 2005**, Mobil CN addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy of Venezuela and the Attorney General of Venezuela, complaining about speeches made by the President of Venezuela and the Minister of Energy of Venezuela. (R-II ¶ 69).

147. According to Respondents, on **20 June 2005**, *"Mobil CN addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy and Petroleum of Venezuela and the Attorney General of Venezuela, complaining of a June 8, 2005 notice from an official of the Ministry of Energy and Petroleum that the 30% royalty rate under the 2001 Hydrocarbons Law should be applied to the production under the AA, as well as of a statement by the Minister of Energy and Petroleum on June 15, 2005 announcing the introduction of a bill to have the oil income tax rate of 50% apply to the associations operating in the Orinoco Oil Belt."* (R-II ¶ 69).Claimant states that, on **23 June 2005**, the Ministry of Energy declared that it was illegal for the Project to produce more than a monthly average of 120,000 bpd of EHO. In a letter communicating its decision, the Ministry of Energy reserved its right to pursue legal actions for any violation of the alleged limit and directed that any production in excess of a monthly average of 120,000 bpd would be subject to a 30% royalty. (C-III ¶ 130).

148. On **1 August 2005**, Mobil CN sent a letter to Minister of Energy of Venezuela objecting to the communication dated 23 June 2005 that production could not exceed 120,000 barrels per day of extra-heavy crude oil and that blending, rather than upgrading, of crude oil would not be allowed. (C-III ¶ 131; R-II ¶ 69).

149. Claimant states that, on **14 January 2006**, Vice-Minister of Hydrocarbons Dr. Bernard Mommer told Mobil CN that it would support the sale of Mobil CN's interest to a third party. (C-III ¶ 152).

150. Claimant states that, on **22 March 2006**, the Government prevented Mobil CN from selling its interests to an interested third party. (C-III ¶ 152).

151. Claimant explains that, on **16 May 2006**, the National Assembly approved a **partial amendment to the Organic Law of Hydrocarbons**, which created an additional royalty in the form of the so-called *"Extraction Tax"* [*Impuesto de Extracción*]. The law directs that all liquid hydrocarbons extracted from the soil would be subject to an Extraction Tax of 33.33%, and would so equalize fiscal conditions for all players in the oil industry. (C-III ¶ 114; R-II ¶ 26). *"The new Extraction Tax is calculated and collected in exactly the same way as the royalty. Royalty payments were to be credited to the liability for the Extraction Tax. [...]"* (C-III ¶ 115). Claimant states that it paid the additional royalties at the increased rate of 16 2/3% and the extraction tax at the rate of 16.67% under protest and with full reservation of rights. (C-III ¶ 117).

152. Respondents state that, on **26 May 2006**, Mobil CN *"addressed a letter to Minister of Foreign Affairs of Venezuela, the Minister of Energy and Mines of Venezuela and the Attorney General of Venezuela, complaining about the May 2006 amendment to the 2001 Hydrocarbons Law to create a new extraction tax on the production of hydrocarbons, which Mobil CN stated would have the 'practical consequence of increasing the royalty,' and an announcement by the President of Venezuela of the proposal to increase the income tax rate on the associations to 50%."* (R-II ¶ 69).

153. Claimant states that, on **18 August 2006**, Mr. Tim Cutt, the President of Mobil CN, met with Vice-Minister Mommer, to discuss operational matters. Vice-Minister Mommer informed Mr. Cutt that the Venezuelan Government *"intended that a mixed enterprise in which Respondent PDVSA would own*

*at least a 51% of the shares take over the production component of the Project.*" (C-III ¶¶ 138 – 139).On **29 August 2006**, the National Assembly enacted a special amendment to the **Income Tax Law** targeting EHO projects. This law increased the income-tax rate applicable to all participants in EHO projects in the Orinoco *Oil Belt from 34% to 50%, as of 1 January 2007. (C-III ¶ 132; R-II ¶ 27).* Claimant states that, on **6 September 2006,** the Ministry of Energy sent Mr. Cutt a document containing "*Non-Binding Terms for the Migration of the Association.*" Claimant reports that the document also stated that the Government intended to impose a new structure under which (i) Responde*nt PDVSA would control the commercialization and export* of crude oil; (ii) the acreage of the joint venture would be reduced; and (iii) the term of the new venture would be reduced to 25 years (three fewer years than the remaining term of the AA). The Terms would also require Mobil CN to waive all claims it might have against the Government. (C-III ¶ 140, partially quoted).

154. Claimant reports that, on **27 September 2006**, Vice-Minister Mommer informed Mr. Cutt that the Venezuelan government would "*migrate*" the entire operations of the Cerro Negro Joint Venture. Mobil CN met with Dr. Mommer several times between August and November 2006. At these meetings, the Government made it clear that it was unwilling to negotiate the terms and conditions of the "*migration.*" (C-III ¶ 141).

155. Claimant states that, on **9 October 2006**, the Ministry of Energy ordered the Cerro Negro Joint Venture to cut production by 50,000 bpd as of 5 October 2006. (C-III ¶ 135).

156. Respondents state that, on **16 October 2006**, Mobil CN "*addressed a letter to the Vice Minister of Hydrocarbons of Venezuela, responding to his invitation to discuss matters relating to the 'obligatory migration of the Cerro Negro AA to a mixed company agreement' under the 2001 Hydrocarbons Law.*" (R-II ¶ 69).

157. According to Claimant, on **27 October 2006**, the Ministry of Energy ordered a 17,000 bpd reduction on the Project's production for November 2006. (C-III ¶ 135).

158. Respondents state that, o **2 November 2006**, Mobil CN *"addressed a letter to the Minister of Energy and Petroleum regarding production curtailments ordered by the Ministry, which Mobil CN alleged were inconsistent with Article XIV of the AA as 'Curtailment of Production.'"* (R-II ¶ 69).

159. Respondents state that, on **20 November 2006**, Mobil CN *"addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy and Petroleum of Venezuela and the Attorney General of Venezuela, complaining of various governmental decisions published on November 14, 2006, regarding the calculation of royalties."* (R-II ¶ 69).

160. Claimant reports that, beginning on **1 January 2007**, it was subject to an income tax rate of 50%. (C-III ¶ 133).

161. Claimant states that, on **8 January 2007**, the Ministry of Energy ordered OCN to export no more than 2.4 million barrels per month – a 1.1 million barrel per month reduction from the 3.5 million barrels the Project exported in September 2006. Mobil CN objected to this measure. (C-III ¶ 136).

162. Claimant states that, on **8 January 2007**, Minister of Energy and President of PDVSA, Rafael Ramírez, issued a press release, *"announcing that President Chávez would seek from the National Assembly 'special powers for the creation of [...] revolutionary laws [... to] nationaliz[e] [...] the enterprises that operate in the Orinoco Oil Belt.'"* (C-III ¶ 142).

163. Respondents state that, on **12 January 2007**, Mobil CN addressed a letter to Minister of Energy of Venezuela referring to the 8 January 2007 curtailment and alleged that the curtailment was discriminatory. They alleged that the curtailment, thus, violated Article XIV of the AA, which addressed production curtailment, as well as the conditions approved by the Congress

in 1997, the **Investment Law**, bilateral investment treaties, and international law. (R-II ¶ 69).

164. Claimant reports that, on **15 January 2007**, Minister Ramírez announced that the Government had been unable to reach agreements with international oil companies that had projects in the Orinoco Oil Belt and that *"[n]ow there was no possible negotiation, the nationalization [had to] be accomplished by law.*" (C-III ¶ 142).

165. On **1 February 2007**, the National Assembly enacted the **Law That Authorizes the President of the Republic to Issue Decrees with Rank, Effect and Force of Law in the Delegated Matters** (hereinafter *"Enabling Law"*), granting to the President the authority to issue decrees with the force of law in areas such as hydrocarbons and their derivatives, for 18 months. (C-III ¶ 143; R-II ¶ 29).

166. Claimant states that, on **1 February 2007**, Minister Ramírez ordered OCN to reduce the export of SCO from the Project for the month of February by 39,200 bpd, for a monthly total of 1,097,600 barrels. PDVSA increased that curtailment to 2.1 million barrels. (C-III ¶ 136).

167. Claimant reports that, on **26 February 2007**, President Chávez's **Decree-Law 5200 on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements**, under the authority granted to him pursuant to the **Enabling Law**, was published. (R-lI ¶ 29). **Decree-Law 5200** ordered, *inter alia*, that the strategic associations located in the Orinoco Oil Belt, including Cerro Negro, be transformed (*"migrated"*) into new mixed companies operating under the statutory framework of the **Organic Law on Hydrocarbons**. (R-II ¶ 29, C-III ¶ 145). PDVSA, or one of its subsidiaries, would hold at least a 60% participation interest in the new mixed companies. (C-III ¶ 145).

168. Under **Article 3 of Decree-Law 5200**, OCN was required to surrender control of all activities and operations related to the Project to Corporación Venezolana de Petróleos S.A., a wholly owned subsidiary of PDVSA (or another PDVSA affiliate) no later than 30 April 2007. (C-III ¶ 147; R-II ¶ 30).

169. According to **Article 4 of the Decree-Law 5200**, Mobil CN and other participants in strategic associations located in the Orinoco Oil Belt had four months (until **26 June 2007**) to accept participation in the new mixed companies. (C-III ¶ 146, R-II ¶ 31).

170. Claimant explains that the mixed companies would be established and would operate under a different statutory framework (the **2001 Hydrocarbons Law**). They would operate under new contractual arrangements that would replace the previous association agreements. (C-III ¶ 146). The new contractual terms would be as follows:

   - Mobil CN would have to waive all claims against the Government. Mobil CN would no longer have enough shares to block major business and investment decisions regarding the Project, and would be a minority participant in a new enterprise with no business plan defined in advance.

   - The acreage of the Project would be reduced and the Government would not disclose the size and location of the new acreage.

   - Mobil CN would be precluded from assigning its interests and shares in the new mixed enterprise without the written consent of the Ministry and the other potential partners and the new arrangement contained no provision that would allow Mobil CN to withdraw from the enterprise.

   - The Government would have the right to terminate the agreement at any time under undefined conditions.

   - All controversies regarding the agreement would be subject to the jurisdiction of the Venezuelan courts, as opposed to international arbitration, which was the dispute-resolution mechanism provided in the AA and one of the conditions for Mobil to invest in Venezuela in the 1990s.

   - The term of the new contract would be twenty-five years; three years less than the remaining term of the AA.

   - The Government refused to discuss market value compensation for the taking of Mobil CN's rights under the AA or the diminished value of the potential participation in the mixed enterprise. (C-III ¶ 150).

171. According to Claimant, **Article 5 of the Decree-Law 5200** provided that, if participants in strategic associations, such as Mobil CN, refused to accept the terms for new mixed companies by the end of the four-month period in **Article 4** "*the Republic, through Petróleos de Venezuela S.A. or any of its subsidiaries that may be designated for the purpose, shall directly assume the activities of the associations.*" (C-III ¶ 149).

172. Claimant states that, in **March 2007**, the Ministry of Energy ordered OCN to export no more than 2.4 million barrels during that month. By that time, OCN was working on the transfer of operations of the Project to an affiliate of PDVSA, as mandated by the **Decree-Law 5200**, and it was understood that the export limitation would be in effect until the end of June 2007. (C-III ¶ 136).

173. According to Respondents, on **5 March 2007**, Mobil CN "*addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy and Mines of Venezuela and the Attorney General of Venezuela, complaining of Decree-Law 5200, which set forth the timetable for the migration to the mixed company structure under the 2001 Hydrocarbons Law. Mobil CN alleged that it considered Decree-Law 5200 to constitute an 'expropriation' in violation of the Netherlands-Venezuela bilateral investment treaty, international law and Venezuelan law, including the Investment Law.*" (R-II ¶ 69).

174. Respondents report that, on **8 March 2007**, Mobil CN wrote to Minister of Foreign Affairs of Venezuela, Minister of Energy of Venezuela and Attorney General of Venezuela, noting that the production and export curtailments starting in 2006 through 2007 constituted investment disputes with the Government. (R-II ¶ 69).

175. Claimant states that, on **30 March 2007**, bank lenders informed PDVSA-CN and Mobil CN that a "*Prospective Default may have occurred*" as a consequence of **Decree-Law 5200**. (C-II ¶ 30).

176. According to Claimant, on **26 April 2007**, project-finance creditors of the Project sent PDVSA-CN and Mobil CN **Notice of a Prospective Default** on the ground that an expropriation had occurred though the 26 February 2007 signing of **Decree-Law 5200**. (C-III ¶ 156).

177. Claimant reports that, on **30 April 2007**, OCN transferred the operations and control of all activities related to the Project, under compulsion and a show of military force, with full reservation of rights. Control was transferred to PDVSA Petróleo, S.A. (*"PDVSA Petróleo"*), a PDVSA subsidiary. As part of the enforced takeover of operations, the Government and PDVSA took possession of proprietary technology — including software and trade secrets — that ExxonMobil affiliates and unrelated parties had licensed only to Mobil CN and OCN to use in relation to the Project. (C-III ¶¶ 147 – 148).

178. Claimant states that, on **1 May 2007**, ExxonMobil de Venezuela and PDVSA Petróleo entered into a **Consulting and Support Agreement** to provide to PDVSA Petróleo consulting and support services *"related with the operation of the Project."* (C-IV ¶ 74).

179. Respondents state that, on **4 May 2007**, Mobil CN *"addressed a letter to the Minister of Foreign Affairs of Venezuela, the Minister of Energy and Mines of Venezuela and the Attorney General of Venezuela, concerning a May 1, 2007 speech by the President of Venezuela in which he stated that the 'Orinoco Oil Belt Strategic Associations are in breach of their contractual obligations.' The letter referred to the prior correspondence in which it had 'informed the Bolivarian Republic of Venezuela that investment disputes had arisen in respect of measures taken by the Republic . . . as well as the decisions relating to 'de-bottlenecking and other expansion projects.'"* (R-II ¶ 69).

180. On **15 June 2007**, PDVSA Petróleo issued a cash call to cover expenses related to the Project in July. (C-II ¶ 21).

181. On **20 June 2007**, Brown Rudnick, a law firm representing bondholders, sent a letter to PDVSA and Mobil CN threatening to issue a **Notice of Declared Event of Default** unless bonds were refinanced or restructured. (C-II ¶ 21).

182. Claimant states that, on **22 June 2007**, Mobil CN *"gave written notice to both PDVSA-CN and PDVSA that '(i) the expropriation of Mobil CN's entire interest in the Cerro Negro Joint Venture, (ii) breach and repudiation of the RRA and imposition of the so-called "extraction tax," (iii) increase in the income-tax rate applicable to Mobil CN in violation of the Framework of Conditions, and (iv) imposition of production and export curtailments applicable to the Project' 'constitute[d] Discriminatory Measures under Clause XV of the AA and will probably cause a Materially Adverse Impact on Mobil CN's Net Cash Flows in FY 2007 and future FYs.'"* (C-III ¶ 163).

183. On **25 June 2007**, Mobil CN sent a further written **Notice of Discriminatory Measure** to both PDVSA-CN and PDVSA, demanding prompt payment of the indemnity pursuant to the AA. (C-III ¶ 164; R-II ¶ 73).

184. **26 June 2007** was the deadline to form a mixed company under **Decree-Law 5200**. Mobil CN did not participate in the formation of a new mixed company. (C-III ¶ 149).

185. At the expiration of the four-month period, *"negotiations immediately commenced for an amicable settlement of any claims ExxonMobil's subsidiary might have in respect of its exit from Venezuela. [...] ExxonMobil representatives proposed a package consisting of cash, free crude oil deliveries, and assets having a total value approximating US$5 billion, representing its interest in Project and the La Ceiba Project."* (R-II ¶ 36, partially quoted).

> 165. [As of **27 June 2007**, at the expiration of the term contemplated in the **Decree-Law 5200**, the Venezuelan Government expropriated or seized, without compensation, the interests of Mobil CN in the Cerro Negro

Joint Venture. (C-III ¶ 154).] On **27 June 2007**, Mobil CN delivered a **Notice of Discriminatory Measure** to PDVSA-CN and PDVSA, explaining that the **Decree-Law 5200** had expropriated Mobil CN's interests in the Project and the expropriation had caused a Materially Adverse Impact. Mobil CN demanded prompt payment of indemnification pursuant to the AA. (C-III ¶ 165).

186. On **15 July 2007**, PDVSA Petróleo issued a cash call to cover expenses related to the Project for August 2007. (C-II ¶ 21).

187. Claimant states that, on **29 July 2007**, President Chávez changed the name of the Project to *"PetroMonagas"* in order to reflect *"the socialist process that has put an end to the Oil Opening."* (C-III ¶ 160).

188. Claimant states that, on **30 July 2007**, Mobil CN responded by letter, *"addressed to the operator and the Minister"* and copied to PDVSA-CN. The letter stated that, even though the Government had expropriated Mobil CN's interests in the Project as of 27 June 2007, Mobil CN was honoring the cash calls but doing so under protest in respect of any item related to production of crude after 26 June 2007. (C-II ¶ 21).

189. Claimant reports that, on 7 **August 2007**, Mobil CN's inventory in the Project was depleted. (C-II ¶ 20).

190. On **6 September 2007**, Claimant filed a **Request for Arbitration** against Venezuela before the International Centre for Settlement of Investment Disputes (*"ICSID"*). (R-I ¶ 20; C-I ¶ 78).

191. On **2 October 2007**, the National Assembly adopted a Resolution (*Acuerdo*) authorizing the formation of the mixed enterprise PetroMonagas, S.A. (*"PetroMonagas"*) in which Corporación Venezolana del Petróleo, S.A., a PDVSA subsidiary, would hold 83.33% of the equity and Veba Oil & Gas Cerro Negro GmbH would hold the remaining 16.67%. (C-III ¶ 161).

On **5 October 2007**, the National Assembly enacted the **Law on the Effects of the Process of Migration to Mixed Companies of the Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements** (*"Law on Effects"*). Article 1 directed that the association agreements of the Orinoco Oil Belt, such as the AA, *"shall be extinguished as*

*of the date of publication in the Official Gazette of the Bolivarian Republic of Venezuela of the decree that transfers the right to exercise primary activities to the mixed enterprises constituted according to what is provided in said Decree-Law.*" (C-III ¶ 157).

192. On **10 October 2007**, Claimant states that Mobil CN notified PDVSA that PDVSA-CN was in breach of the AA and demanded prompt performance of PDVSA's indemnity obligation. (C-III ¶ 167).

193. On **10 October 2007**, ICSID registered the **Request for Arbitration**. (C-1 ¶ 78).

194. On **29 November 2007**, PDVSA made a public offer to buy all of the outstanding bonds.

195. On **27 December 2007**, Mobil CN filed an *ex parte* **Complaint for an Order of Attachment in Aid of International Arbitration** against PDVSA-CN with the United States District Court for the Southern District of New York. Judge Castell, acting as emergency judge, ordered the US$ 300,000,000 attachment on PDVSA-CN's assets in Bank of New York. (ICC Decision 2008 ¶ 1.2.2).

196. On **28 December 2007**, PDVSA acquired nearly all of the outstanding bonds. (C-II ¶ 35). PDVSA paid US$ 129,138,839 to repay bank debt, US$ 501,140,756 to acquire more than 99% of the outstanding bonds, and US$ 1,094,726 for fees and transaction costs. (R-II ¶ 220).

197. The facts related to the attachments have been recorded as follows (ICC Decision 2008 1.2.1 – 1.2.3, summarized and reorganized):

1.2.2      On **8 January 2008**, Judge Batts issued a <u>Supplemental Attachment Order</u> for an additional US$15 million at the Bank of New York. (ICC Decision 2008 ¶ 1.2.2).

1.2.1      On **22 January 2008**, Mobil CN filed with the High Court of Justice – Queen's Bench Division Commercial Court an *ex parte* <u>Application Notice for a Freezing Injunction and Disclosure Order</u> against PDVSA. (ICC Decision 2008 ¶ 1.2.1).

1.2.1      On **24 January 2008**, the Hon. Mr. Justice Teare issued a <u>Freezing Injunction and Disclosure</u> enjoining PDVSA from disposing assets up to a value of US$12 billion and ordering PDVSA to disclose, no later than five days following the receipt of the Order, all of its assets worldwide exceeding US$5,000 in value. (ICC Decision 2008 ¶ 1.2.1).

1.2.3      On **1 February 2008**, Mobil CN filed *ex parte* applications for attachment in the District Court of Amsterdam, the Court of First Instance of Willemstad, Curacao and the Court of First Instance of Aruba in Oranjestad. On the same date, the Courts of Aruba and Curacao issued the requested orders to attach PDVSA's shares for an amount of US$12 billion. A similar attachment order was issued on 5 February 2008 by the District Court of Amsterdam for the attachment of PDVSA's shares in an amount of €8.5 billion. (ICC Decision 2008 ¶ 1.2.3).

1.2.2      Following the hearing which took place on **13 February 2008**, Judge Batts issued **on 20 February 2008** an <u>Order Confirming the Attachments</u> of an amount of US$ 315 million on deposit with or held by The Bank of New York Mellon Corporation. (ICC Decision 2008 ¶ 1.2.2).

198. Claimant reports that, since **3 March 2008**, PDVSA has been participating in the Project under a new legal form and a new name, through its subsidiary Corporación Venezolana del Petróleo, S.A. (C-III ¶ 20).

199. Claimant states that, on **4 March 2008**, PDVSA ceased to participate in the Cerro Negro Joint Venture through its wholly-owned subsidiary PDVSA-CN. On the following day, the AA terminated. (C-III ¶ 20).

200. On **5 March 2008**, President Chávez's <u>Decree No. 5916</u> was published and transferred to PetroMonagas "*[t]he right to develop primary activities of exploration in search of reservoirs of heavy and extra-heavy crude oil, the extraction of such crude oil in its natural state, and its initial production, transport and storage [...] according to <u>Article 9 of the Organic Law of</u>*

*Hydrocarbons*." According to **Article 1 of the Law on Effects**, the AA was terminated as of that date.

201. On **20 March 2008**, the London High Court of Justice "*ordered that the Freezing Injunction and all ancillary orders be discharged*." (Decision 1.2.1).

202. On **8 August 2008** the ICSID Tribunal was deemed duly constituted. (C-III ¶ 239).

## J.      The Disputed Issues

### J.I.          Short Summary of Contentions of the Claimant

203. A more comprehensive coverage of the contentions can be found in the **Claimant's Reply Memorial** (C-IV ¶¶ 9, 11-19, partially quoted, footnotes omitted, emphasis in original); and **Claimant's Principal Memorial** C-III ¶ 201 – 203).

11.    *Sovereign Powers.* [...] Mobil CN seeks in this proceeding to enforce the Respondents' contractual obligations. It makes no claim against the Republic of Venezuela and raises no question about the Government's exercise of sovereign powers. [The Congressional Authorization] contains a critical qualification: "The AA [...] shall not [...] restrict [the Republic's] sovereign powers, the exercise of which shall not [give rise to] any claim [by] *other states or foreign powers*." The restriction does not apply to the contract claims against the Respondents, but to inter-government diplomatic espousals of the claims of foreign nationals.

12.    "*Extinguishment*" *of the Agreement.* [Respondents theory that **Decree-Law 5200** and the **Law on Effects** have] immediate effects that extinguish or terminate the AA, leaving Mobil CN without any contract rights and depriving this Tribunal of jurisdiction. This contention [...] fails for three separate reasons: (i) by its own terms, the extinguishment of the AA provided in the **Law on Effects** did not become effective until March 2008, many months after Mobil CN's claims had already arisen and become vested; (ii) the Respondents' theory violates the Venezuelan Constitution, under which even laws of *orden público* having immediate effect may not be applied retroactively to past facts and effects; and (iii) by [Respondents'] own conduct, [treating] the AA as effective throughout 2007 and [...] their assertion of counterclaims[...]

13.    "*Act of the Prince,*" *Non-Imputable Extraneous Cause, and Force Majeure.* [..] By asserting these defenses of excused performance, the

Respondents necessarily concede their obligation to perform, and that concession precludes their "extinguishment" defense. The [...] AA expressly allocates to Respondent PDVSA-CN the risk of "acts of the prince" such as those the Respondents invoke [and] the indemnification provisions [...] preclude any excuse based on such "acts of the prince," whether the excuse is predicated on the general rules on non-imputable extraneous cause or on the *force majeure* clause of the contract. The obligations of a public entity that is a party to an administrative contract such as the AA cannot be excused by an "act of the prince" of the same Government that owns the public entity. The Respondents also ignore that neither the legal excuse of non-imputable extraneous cause nor the contractual excuse of *force majeure* may be asserted by a party that failed diligently to take all available actions to prevent the loss from occurring, [none of which Respondents took]. Nor did the Respondents ever comply with the provisions of the AA requiring them to provide written notice of any circumstance constituting *force majeure*.

14. *Forfeiture of Indemnification.* [...] Under Venezuelan law, a party to a contract does not forfeit contract rights unless the contract specifies the circumstances and terms of the forfeiture. [...] The Agreement declares no forfeiture of indemnification rights in the case of any supposed delay in issuing Notices of Discriminatory Measure or any failure to pursue legal remedies. The Respondents do not contend that they suffered any prejudice by reason of Mobil CN's supposed delay in issuing the notices or pursuing a legal action in an allegedly wrong forum. The proper remedy for any such damage would not be forfeiture, but a counterclaim or offset to compensate the Respondents for any proven injury.

15. *The Allegedly Delayed Notices.* [...] Mobil CN's conduct was entirely reasonable and consistent with the underlying purpose of the indemnification provisions and with the obligations of good faith and fair dealing:

- [...] Clause XV [requires] that notices be issued [...] upon Mobil CN's "*determination*" that [Discriminatory Measures] have occurred, [thereby according]. Mobil CN a reasonable discretion in determining whether, and when, it should assert claims [...].

- [...]The AA provides that, once the "*determinations*" are made and the Notices are issued, Mobil CN must pursue "any legal recourse [against the Government] available [...] to mitigate any damages suffered as a result of the Discriminatory Measure." From 2004 through 2007, Mobil CN participated in negotiations with the Government for the purpose of avoiding litigation and mitigating damages. It is uncontested that representatives of both the Government and PDVSA-CN warned Mobil CN that it should pursue those negotiations instead of commencing arbitration. Serving the notices and commencing arbitration against the Republic of Venezuela at that time would not have served the purpose of mitigating damages. Accordingly, the Respondents cannot now reasonably take the position that Mobil CN should hastily have made the "*determinations,*" issued the notices, and launched the requisite "legal action."

- Respondents can show no prejudice for the alleged delay in issuing those notices, [as Mobil CN is not seeking any indemnification for damages suffered prior to 2007].

16. *The Legal Action Requirement.* [...] Mobil CN fulfilled its obligation to pursue available legal actions that would mitigate damages, by commencing an ICSID arbitration against the Republic of Venezuela in September 2007. [...] An ICSID arbitration offers the best — and probably the sole — means by which Mobil CN can mitigate its damages [and hence satisfies the legal action requirement]. The Respondents have no basis for their suggestion that the legal-action requirement is an exhaustion-of-domestic-remedies requirement. The AA does not require Mobil CN to embark on a futile quest for redress that is neither available in the courts of Venezuela nor a prerequisite to initiating arbitration. Nor do the terms of the Agreement provide any support for the Respondents' contention that ICSID arbitration was not foreseen as a possible remedy at the time the Agreement was signed.

201. [S]tarting in October 2004, the Venezuelan Government took a series of measures against Mobil CN that were Discriminatory Measures under the AA. Those measures included: (i) the expropriation of Mobil CN's entire interest in the Cerro Negro Joint Venture, (ii) breach and repudiation of the RRA and imposition of the so-called "extraction tax," (iii) increase in the income-tax rate applicable to Mobil CN in violation of the Framework of Conditions, and (iv) imposition of production and export curtailments applicable to the Project.

202. [...]*First*, each measure was a "Governmental Measure" or a change in Venezuelan law or in the interpretation or application of such law. *Second*, each measure either increased tax rates or effected the "expropriation or seizure" of Mobil CN's interests related to the Project. *Third*, each measure was not "generally applicable to Companies in the Republic of Venezuela" and, in the case of the increase in the applicable income-tax rate, the increase did not "correspond with what is provided in the last sentence of the Fifteenth Condition."

203. [T]he measures have caused, in the aggregate, a Materially Adverse Impact in respect of FY 2007 and all future FYs through FY 2035.

17. [...] Respondents [...] distort[ ] the contractual damages formulas in ways that disregard the wording of the Agreement and produce perverse results that the parties could not have intended.

- [The] Agreement uses a hypothetical "**Reference (Threshold) Cash Flow**" that constitutes the ceiling on indemnification in almost all cases. **Reference (Threshold) Cash Flow** consists of hypothetical revenues ("*TR*"), *minus* royalties ("*TROY*"), *minus* the party's *pro rata* chargeable expenses ("*CEX*"), *minus* income taxes ("*TIT*"). The algebraic notation reflects that the three "*T-*" components — *TR*, *TROY*, and *TIT* — are hypothetical or notional items in which "*TR*" is the hypothetical **Reference (Base) Price** multiplied by "liftings;" "*TROY*" is royalty calculated from "*TR*;" and "*TIT*" is income tax calculated from "*TR*." Only "*CEX*" — which has no "*T-*" prefix — is calculated using "actual" cost data, because chargeable expenses are not

(in contrast to royalties and taxes) determined as a percentage of revenues. Nevertheless, the Respondents argue that *TROY* and *TIT* should be based on much higher *actual* revenues, not hypothetical *TR* revenues. The Respondents' mixing of apples and oranges — the use of low hypothetical *TR* for revenues but subtracting the much higher royalties and income tax associated with much higher actual revenues — is a double reduction that would eliminate or substantially reduce any indemnification.

- [...]Mobil CN's interpretation yields a **Reference (Threshold) Cash Flow** that rises steadily with increases in the relevant price of oil until the ceiling is reached, after which the **Reference (Threshold) Cash Flow** levels off and stays on a straight-line plateau even when oil prices continue to rise. By contrast, the Respondents' interpretation also rises steadily with oil price increases until the ceiling is reached — *but then declines to zero as oil prices rise further* and Mobil CN continues to receive *no revenue*. There is no rational explanation for [Respondents' construction of the indemnification]. The Respondents propose an "elimination," not a "limitation."

- For 2007, [...] the Respondents propose an "adjustment" that raises the **Chalmette Formula Price** (the sales price for SCO) to equal the much higher price of Brent Crude Oil. This improperly inflated **Adjusted Net Cash Flow** is then subtracted from the **Reference (Threshold) Cash Flow** — which is already significantly below the actual sales price because it is calculated using the hypothetical *TR* as the low Reference (Base) Price. [The AA does not justify such a price adjustment, whose only discernible purpose is to curtail the indemnity in incongruous ways].

9. The Respondents also ignore the fundamental purpose of the AA when they contend that Mobil CN has no indemnification remedy for an expropriation because the Agreement does not allow what they call "future damages." [...]

- [The indemnification damages embrace all economic consequences of the Discriminatory Measures. Section 15.1(b) [...] provides for "damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date" (the controlling Spanish text making clear that "suffered to date" refers to the "Discriminatory Measure," not to the "damages").

- Mobil CN is not seeking "future damages," but compensation for the "economic consequences" of the Discriminatory Measures at the time they were suffered. In the case of the expropriation of Mobil CN's entire interest in the Project, Mobil CN immediately suffered all "economic consequences" (including the loss of all its right to future revenues from the Project) at the time of the expropriation.

- The Respondents try to frustrate the indemnification provisions by arguing that indemnification can only be provided on a "retrospective" year-by-year basis based on the actual annual financial results of the Project. Beyond their misreading of the agreement, as they well know, it is impossible to make calculations on that basis because the Project no longer exists. Its assets have been transferred by Government fiat to

one or more new ventures, including primarily the Petromonagas venture, having a different operator, assets and participants.

- If the Respondents were correct that Mobil CN's damages cannot be calculated using the formulas in the AA, the consequence would not be that Mobil CN loses its right to be indemnified, but instead that the Respondents cannot use the formulas to impose a limitation on the indemnification damages. Both the Congressional authorization and the AA make clear that the chief function of the formulas is to impose limitations on damages when the "Foreign Party is receiving revenues" or a "Net Cash Flow" from the operation of the Project. As Mobil CN will never receive any revenues or cash flow from the Project, it would be more consistent with the Agreement to eliminate the limitation on indemnification than to eliminate the indemnification itself.

18. [...] Respondents' evidence and arguments about the calculation of damages are wholly lacking in substance and credibility. [..]

- The [...] argument that Mobil CN's damages should be substantially discounted by a "default risk" factor — *i.e.* the risk that the Respondents would not honor their indemnity obligations is preposterous. This arbitration is a breach-of-contract case to enforce indemnity obligations, not a case establishing the fair market value of assets through project cash flows. The Respondents' contractual debt to Mobil CN became fixed and payable at the time of breach. If their theory were accepted, parties breaching a contract could always argue that the damages payable should be reduced to reflect their "default risk."

- The Respondents' experts [use discount rates created by non-standard methods and inflated with improper adjustments under the guise of accounting for risks that supposedly would affect the Project.]. They discount the expected cash flows [based on] [...] the risk of hypothetical and more risky alternative investments. Furthermore, they imagine a range of unquantified and inapplicable risks to "justify" an indefensibly high discount rate — approaching 20 percent — that results in a steep reduction of the Respondents' indemnification obligations. [Respondents' failed distinguish between the Project cash flows and the cash flows created by the contractual indemnification formulas] ... [Mobil CN's expert] Professor Stewart Myers, the foremost expert in the field [...] explains that Mobil CN has taken the proper approach — calculating cash flows that incorporate the downside risks and applying a discount rate that matches the systematic risk of those cash flows. [...]

- [...] The Respondents arbitrarily reduce the output and revenues of the Project by assuming production constraints, lack of storage capacity, and restrictive OPEC quotas that are each unsupportable. They inflate the operating and capital costs of the Project by including costs that occurred because of the expropriation and that would not have occurred otherwise. They seize on several months of data during the short-term oil-price spikes of 2008 to contend that the costs of oilfield equipment and labor — which jumped with the rising price of oil but have since declined — would remain at their temporary peak. And they contradict

themselves by offering unreasonable scenarios of future oil price crashes — without acknowledging that costs decline along with reductions in the price of oil.

- The approach that best accords with the terms of the AA, and that most simplifies all calculations, is the Fixed **Reference (Threshold) Cash Flow** method, which uses data known by both parties in 2007 as the basis for every succeeding year's results, [and reflects that the Project has been terminated]. [...] Confirming the fairness of this approach is the Forecast **Reference (Threshold) Cash Flow** model, which hypothesizes a continuing Project and uses standard discounted cash flow analysis. [These two models correctly yield indemnification damages of US$6.45 billion to US$6.86 billion.

19. None of the Respondents' counterclaims has merit.

- [Mobil CN cannot be required to pay restitution for property it owned, much less for property that was not expropriated.] [U]nder the AA, Mobil CN had title to its share of the SCO in storage at the time of the expropriation and that share was properly sold for Mobil CN's account [because title vested at the wellhead]. <u>Decree-Law 5200</u> contains no provision expropriating oil inventories owned by participants in the Project.

- [...] Because Mobil CN has at all times made timely payments on outstanding bonds, there has been no default and hence no basis for acceleration of the principal amount. [...] PDVSA unilaterally restructured [...] the Project financing because the expropriation was an event of default under the bond and bank financing instruments. PDVSA did so to preserve its reputation in international credit markets and to avoid litigation with the creditors. Mobil CN has no obligation to pay Respondents

- [...] The Respondents make no showing that the attachment was wrongful in any respect and they ignore that, under New York law, the federal district court in New York possesses jurisdiction over claims for damages arising from attachments granted by that court.

## J.II. Short Summary of Contentions of the Respondents

204. Respondents' summary of contentions is found at ¶ 10 and ¶ 220 of <u>Respondents' Principal Memorial</u> and Section 5.2.1 of the <u>Terms of Reference</u>.

10. [...]

- Pursuant to the governing law, the AA cannot form the basis of a claim by Claimant in this Arbitration. This conclusion emanates from the plain meaning and effect of the laws referred to in Claimant's Principal Memorial, as well as the well-established principles relating to the

consequences of an *hecho del príncipe* (act of the prince), to which neither Claimant nor its legal experts make any reference.

- Even if the AA could form the basis of a claim, Claimant failed to meet what one of ExxonMobil's former top executives, Mr. Jim Massey, has called the procedural requirements that triggered the indemnity obligation, namely, the express requirements set forth in Article XV of the AA. In this regard, as Mr. Massey himself frankly admitted, Claimant (a) failed to provide the required "immediate" notice of the occurrence of a "Discriminatory Measure" that might lead to a "Material Adverse Impact" and (b) failed to provide the required "immediate" notice that it in fact suffered a "Material Adverse Impact" as a result of an alleged "Discriminatory Measure." As discussed below, Claimant also failed to meet the third requirement of commencing and pursuing administrative or judicial actions challenging the alleged "Discriminatory Measures." These failures at once constitute legal barriers to the assertion of Mobil CN's claim and provide compelling evidence that Claimant itself has known all along that it had no claim under the AA.

- [N]one of the governmental measures at issue in this case falls within the definition of "Discriminatory Measure." As such, there can be no basis for a claim of indemnity against PDVSA-CN under the AA and no basis for a claim against PDVSA based on the Guaranty.

- Claimant and its legal experts argue that, under Venezuelan law, the contractual indemnification provisions of the AA must be applied "exactly" as written. Yet those provisions, by their own terms, limit the scope of any arbitration for indemnity to the "economic consequences of the Discriminatory Measure suffered by it to date" and do not cover a claim for future damages, which constitutes by far the bulk of Mobil CN's damage claim. As for "FY" 2007, an application of the indemnity formula contained in the AA "exactly" in accordance with its terms leads to the conclusion that no indemnity would be owed for that "FY" as well. (R-III ¶ 10)

5.2.1 (iii) With respect to the period prior to 2007, the limitation of liability provisions of Article 15 of the AA would have precluded a claim even if Claimant had asserted one, which it never did. Even now Claimant does not seriously articulate any claim for compensation based on governmental measures taken during that period,

(iv) With respect to the claim for future cash flows, even if (a) the AA had not been extinguished, (b) the governmental actions had constituted "Discriminatory Measures" and (c) the conditions precedent specified in Article 15 of the AA had been met, the provisions of that same Article make clear that future cash flows were not covered. In fact the scope of the arbitration proceedings delineated in Article 15.1(b) of the AA confirms that future cash flows were not covered and that any such claim would not fall within the jurisdiction of this Tribunal

(v) In any event, Article 21.1 of the AA expressly provided that neither party would have any liability for non-performance to the extent such non-performance was due to "acts of government or orders, judgments, resolutions, decisions or other actions or omissions of any governmental authority."

c. Finally, with respect to future cash flows, even if (a) the AA had not been extinguished, (b) the governmental actions had constituted "Discriminatory Measures," (c) the conditions precedent specified in Article 15 of the AA had been met and (d) the provisions of the AA did cover future cash flows, the amount of that claim would still not be more than a small fraction of the sum which Claimant has asserted in the attachment proceedings it has commenced in connection with this arbitration for various reasons, including the mistaken assumptions used by Claimant to project future cash flows and its failure to do any discounting of those assumed flows. While it should not be necessary for the Tribunal to reach those issues, the obvious defects in Claimant's calculations, particularly its failure to do any discounting, underscore the nature of both this proceeding and the accompanying worldwide campaign of freezing orders and attachments as merely an attempt to intimidate Respondents into acceding to Claimant's demand for exorbitant compensation. (TOR 5.2.1)

10. Finally, even if Claimant could overcome all of the foregoing hurdles, the total amount it could claim as damages would still not be more than a small fraction of the sum it seeks to recover in this Arbitration for various reasons, including the mistaken assumptions used by Claimant to project future cash flows and the unjustifiably low discount rate it applies to those assumed flows. Such amount, even under assumptions most favorable to Claimant, would not exceed the value of Respondents' counterclaims, which are easily quantifiable and largely uncontested. (R-III ¶ 10)

220. [...]

- First, after Mobil CN chose not to participate in the 2007 migration process, it ceased to have any interest in the Project. Despite that fact, Mobil CN continued to receive proceeds of shipments of SCO produced by the Project to the Chalmette Refinery, for which it is liable to PDVSA-CN in the amount of US$171,552,666.)

- Second, with respect to the joint financing for the Project that was obtained by Mobil CN and PDVSA-CN, and for which Mobil CN and PDVSA-CN were equally liable, PDVSA entered into transactions in December 2007 that required it to (a) pay US$129,138,839 to repay the bank debt, (b) pay US$501,140,756 to acquire more than 99% of the outstanding bonds and (c) pay fees and transaction costs totaling US$1,094,726. As a result of those transactions, Mobil CN owes PDVSA a total of US$315,687,161 (less certain amounts that have been paid by Mobil CN to PDVSA on the outstanding bonds after the transactions closed).

- Third, PDVSA and PDVSA-CN have suffered damages as a result of the attachments obtained by Claimant, including primarily the attachment of US$301,095,355 in New York. Those funds are held in an account established on February 25, 2008 that has paid low interest rates -- an average of approximately 1.1% for the period through February 4, 2009 (and recently 0%). In contrast, the cost to PDVSA to borrow funds has averaged 14.77% during the period since the attachment account was established on February 25, 2008. The amount

of damages due to this attachment is approximately US$39.04 million to date, but is increasing each day. (R-III ¶ 220)

## K.  Considerations and Conclusions of the Tribunal Regarding the Claims

205.  The Tribunal considered the extensive factual and legal arguments presented by the Parties in their written and oral submissions, all of which the Tribunal has found helpful.  In this Award, the Tribunal discusses the Parties' arguments that were most relevant for the Tribunal's decisions.  The Tribunal's reasoning, without repeating all the arguments advanced by the Parties, addresses what the Tribunal considers to be the determinative factors required to decide the issues arising in this case.

### K.I.  Preliminary Considerations

### K.I.1.  Parties' Answers to Tribunal's Questions in Procedural Order No. 6

206.  Hereafter, the Parties' answers to the Tribunal's Questions in PO-6 are summarized. The Tribunal takes these answers into account in later sections of this Award in so far as it considers them to be relevant for the conclusions regarding the respective issues.

### K.I.1.a.  Relevance of ICSID Proceedings

207.  At section 3.1 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.1    Are the parallel ICSID proceedings relevant for the present case? If so, in which way and what is their present status?

### K.I.1.a.i.  Arguments by Claimant

208.  Claimant argues that the ICSID proceeding is relevant in only two respects. *First*, the ICSID proceeding meets the *"legal action"* requirement of Article 15.1(a) of the AA. *Second*, the ICSID proceeding may need to be taken into account in the future to prevent a double recovery. (C-V ¶¶ 31 – 39).

209. With respect to its *"legal action"* argument, the ICSID arbitration fulfills Article 15.1(a) AA which requires the Claimant to pursue legal actions to mitigate damages suffered as the result of a Discriminatory Measure. (C-V ¶ 32). The Discriminatory Measures at issue in this ICC arbitration are among those at issue in the ICSID proceeding. (C-V ¶ 32).

210. With respect to its *"prevention of double recovery"* argument, Claimant states as follows:

> 35. According to [Article 15.1(a)], if MCN receives from the Respondents payment of any damages awarded in this Arbitration, and later receives payment of any damages awarded in the ICSID case, MCN will reimburse the Respondents (after deducting legal costs) for the payment they made, to the extent both payments relate to the same Discriminatory Measures. Conversely, should MCN receive payment of damages awarded in the ICSID case in respect of Discriminatory Measures affecting the Project before an award of damages is entered in this Arbitration (an unlikely scenario), such payment shall be applied towards any amount owed by the Respondents in this Arbitration. (C-V ¶ 35).

211. Claimant opposes Respondents' argument that Claimant's remedies lie solely with the ICSID arbitration and states that such an argument is inconsistent with the terms of the AA. (C-V¶ 37). Instead, Claimant states that the Parties knew that pursuing a claim against the Government would be difficult and lengthy and that they, therefore, crafted the indemnity provisions such that they would function regardless of any claim that the Claimant may have against the Republic of Venezuela. (C-V ¶ 37). Article 15.1(a) contemplates an action against the Republic of Venezuela that would be conducted independently, but in parallel, with arbitration against PDVSA-CN. (C-V ¶ 34, partially quoted). Claimant further characterizes Respondents' argument that all relief lies in the ICSID proceeding as disingenuous, citing the Government's statement that it has no intention of paying an award. (C-V ¶ 38).

212. Claimant explains that the progression of the ICSID case, which was filed on 6 September 2007 and is scheduled for a hearing on all remaining issues

in February 2012, demonstrates why the indemnification provisions are a critical legal protection for Claimant. (C-V ¶ 38).

213. Finally, Claimant presents a third argument in favor of the parallel ICC arbitration. A ruling that PDVSA-CN has breached the AA is a form of relief that is available before the ICC, but not ICSID. (C-V ¶ 39). Such a ruling would enable the Claimant to purchase PDV Chalmette's Interest in Chalmette Refining LLC under Section 8.6 of the Chalmette Agreement. (C-V ¶ 39).

214. Claimant argues that the ICSID arbitration has no relevance in the determination of the merits of this case. (C-V ¶ 36). Claimant did, however, reference the ICSID case in its discussion of the discount rate:

> 30. [...] The discount rate applicable to cash flows from Claimant's interest in the Project will be determined in the ICSID case, not this one. (C-V ¶ 30).

### K.I.1.a.ii.  Arguments by Respondents

215. Respondents argue that the ICSID proceedings are the main proceedings regarding this controversy, but explain that the ICSID case has nothing to do with *"revers[ing] or obtain[ing] relief from a Discriminatory Measure,[...] but rather to obtain damages for alleged violations of international law and Venezuelan law."* (R-IV ¶ 83).

216. Respondents put forward that Claimant *"has always understood that it did not have a claim under the AA"*, and states that this is why Claimant has always dealt with the Government. Respondents state that Claimant's first mention of a claim before the ICC pursuant to the AA was made in order to *"prepare the way for attachments and freezing orders not available to it in connection with the ICSID proceeding."* (R-IV ¶ 84). Respondents urge the Tribunal to *"[leave the Claimant] to its strategy of dealing with the State."* (R-IV ¶ 84).

217. Finally, with respect to *"double compensation"*, Respondents put forward that Claimant's ICSID claim against the Government would be less than the indemnity that it seeks in this arbitration. (R-IV ¶ 85).

## K.I.1.a.iii.  The Tribunal

218. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 16 – 17, 59, 240 – 241 |
| C-IV | ¶¶ | 112 – 115 |
| R-II | Fn. | 154, 157 |
| R-III | ¶¶ | 86 – 88 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-8 | Notice of Registration of the Request for Arbitration filed before ICSID (10 October 2007) |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶¶ 25, 30 |
| C-42 | Testimony of Mark Ward (26 September 2008) at ¶ 27 |
| C-87 | Cerro Negro Association Agreement and Annexes [*Convenio de Asociación Proyecto Cerro Negro*] (28 October 1997) (hereinafter *"Association Agreement"*), Article 15.1(a) |
| C-119 | Amended and Restated Limited Liability Company Agreement of Chalmette Refining, LLC (28 October 1997) § 8.6 |
| C-136 | Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Venezuela [*Convenio Para el Estimulo y Protección Recíproca de Las Inversiones Entre la República de Venezuela y el Reino Unido de los Países Bajos*], signed at Caracas, 22 October 1991, *entered into force* 1 November 1993 (as published in the Official Gazette No. 35.269 of 6 August 1993) Art. 9.3 |
| C-138 | Letter dated 8 August 2008 from Secretary of the ICSID Tribunal to Mobil Corporation, Venezuela Holdings, B.V.; Mobil Cerro Negro Holding, Ltd.; Mobil Venezolana de Petróleos Holdings, Inc.; Mobil Cerro Negro, Ltd.; Mobil Venezolana de Petróleos, Inc.; and Bolivarian Republic of Venezuela confirming constitution of the Tribunal |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) ¶¶ 49 – 52, 70 |
| C-256 | Law on the Promotion and Protection of Investments [*Ley sobre* |

|           | *Promoción y Protección de Inversiones*] (as published in the Official Gazette No. 5390 of 22 October 1999) |
|-----------|---|
| C-257     | Mobil's Questions and Answers (October 1997) at 1 |
| C-258     | Mobil Document entitled "Venezuela Key Issues" (May 1998) at 1 |
| C-259     | Common Security Agreement among Mobil Cerro Negro Holding, Ltd., *et al.* (18 June 1998) at Section 6.07 |
| C-8       | Notice of Registration of the Request for Arbitration filed before ICSID (10 October 2007) |
| R-4       | First Affidavit of Bernard Mommer (11 February 2008) ¶ 12 |
| R-37      | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order, dated February 27, 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶ 82 |
| R-68      | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) fn. 23 |
| R-69      | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) fn. 43 |
| R-112     | Association Agreement between Lagoven Cerro Negro, S.A., Mobil Producción e Industrialización de Venezuela Inc. and Veba Oel Orinoco GMBH, executed 28 October 1997 (hereinafter *"Association Agreement"*) |
| R-114     | Supplemental Expert Report on the Discount Rate to be Applied to Projected Cash Flows, Prepared by Vladimir Brailovsky and Louis T. Wells and Appendices, (14 August 2009) (hereinafter *"Supplemental Brailovsky/Wells Report"*) ¶¶ 52-57 |
| R-119     | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) ¶¶ 49 - 52 |
| Unnumbered | *Mobil Corporation et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction (10 June 2010) *available at* http://icsid.worldbank.org/ICSID/FrontServlet?request Type=CasesRH&actionVal=showDoc&docId=DC1510_En&caseI d=C256 [hereinafter *"ICSID Decision on Jurisdiction"*] at ¶ 209(a), (b) |
| Unnumbered | Republic of Venezuela's ICSID Memorial on Jurisdiction at ¶¶ 25-26 |

## At and Following the 2010 Hearings:

| Submission | Pinpoint |
|------------|----------|
| C-V        | ¶¶ 30 – 39 |
| R-IV       | ¶¶ 83 - 86 |
| R. Closing Slides | 88 - 89 |

| Speaker    | Citation |
|------------|----------|
| C. Opening | 34 - 35, 53-54 |
| C. Closing | 2039-2040 |
| Cutt       | 702-703, 710-711 |

| Jones | 1383-1383, 1437 |
| Massey | 594-595 |
| R. Closing | 2183-2187 |
| R. Opening | 101-102 |
| Ward | 147, 238-240, 278-280, 286 |
| C. Opening | 34 - 35, 53-54 |

219. The Tribunal notes that the ICSID proceedings have passed the jurisdictional phase. The briefing schedule ends on **15 December 2011**, and the hearing on all remaining issues is scheduled for February 2012. (R-IV ¶ 86).

### K.I.1.b. Interpretation of Term *"Occurred"* and the Relevance of Ongoing Settlement Discussions

220. At section 3.2 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.2 How should the term *"occurred"* in the first sentence of Clause 15.1 of the Association Agreement (AA) be interpreted? What is the relevance of ongoing settlement discussions between the contractual parties or with the Government of Venezuela in that context?

### K.I.1.b.i. Arguments by Claimant

221. Claimant explains that the term *"occurred"* is modified by the term *"determines."*

> 41. In [Article 15.1(a)], the *determination* made by the Foreign Party has a double function: (i) it is a pre-condition to the requirement to give the first notice; and (ii) it starts the running of the period (described by the adverb "immediately") within which the first notice is to be given. The determination has two components: (i) a legal determination — that a measure that meets the definition of Discriminatory Measure has *occurred* and (ii) a financial determination — that such measure may result in a Materially Adverse Impact, as this term is defined in the Agreement. (C-V ¶ 41, citations omitted).

> 42. In principle, a determination that a Discriminatory Measure "has occurred" implies a determination that the measure has been taken, and that the taking of it has become public or known to the Foreign Party. A measure will normally "occur" when it is officially adopted and published, unless the *effects* that make it a Discriminatory Measure under the definition are postponed until a later date or are subject to condition. In such cases, the measure will not "occur" until the postponement expires or the condition is fulfilled and those effects take place. (C-V ¶ 42, citations omitted, emphasis in original).

222. With respect to **Decree-Law 5200**, the various effects of the decree did not occur until later specified dates. The takeover of operations was to occur not later than 30 April 2007, and the "*expropriation or seizure of the foreign participants' interests*" was to take place four months later, on 27 June 2007. (C-V ¶ 43). Claimant argues that the total expropriation occurred on 27 June 2007, and in support of this argument cites **Article 2 of the Law on Effects**, which confirms that Claimant's interests in the Project had belonged to Claimant until 26 June 2007. (C-V ¶ 44).

223. Claimant argues that it was not required by either the AA, the principle of good faith, or otherwise to make any determination regarding the expropriation carried out by **Decree-Law 5200** until after 27 June 2007. Claimant argues that it acted in good faith by sending the first notice 5 days prior, on 22 June 2007, when it became clear that the expropriation would occur on 27 June 2007.

224. Claimant states that the settlement discussions with the Government are relevant to the determinations related to **Decree-Law 5200** (C-V ¶¶ 47 – 49, emphasis in original, citations omitted):

> 47. The evidence shows that MCN determined in June 2007, when all hopes for a settlement with the Government had vanished, that all the Discriminatory Measures at issue in this case may cause (first notice) and had caused (second notice) a Materially Adverse Impact for FYs 2007-2035. [...] The negotiations with the Government were a key factor in the timing of MCN's determinations for two reasons:

> 48. *First*, MCN would have incurred no Materially Adverse Impact for Fiscal Years 2007-2035 if the Government and MCN had reached a global settlement in respect of all governmental measures at issue in this case. (In fact, the undisputed evidence shows that, under the indemnity formulas, MCN was not entitled to any indemnity for Fiscal Years 2004-2006.) Therefore, it was entirely appropriate to make the determinations about the impact of those measures when it became clear that the settlement negotiations had failed.

> 49. *Second*, once the second notice was given, MCN was required to pursue a legal action against the Government, for the purpose of mitigating damages. But in light of the threats from the Government and PDVSA against arbitration and Mobil's businesses in Venezuela, it became clear to MCN that settlement discussions with the Government offered the only realistic way to mitigate damages. Making early determinations

leading to an early action against the Government would have aggravated the disputes and jeopardized the chances of a negotiated settlement. (C-V ¶¶ 47 – 49).

225. Claimant rejects Respondents' argument that the event that triggered the obligation to issue the notice was the mere "*occurrence*" of the events and states that such an argument is directly contradicted by the express terms of Article 15.1(a). The AA does not require an "*objective determination*" – rather, the AA requires knowledge and a legal analysis and conclusion that the measure meets the definition of "*Discriminatory Measure*" and will have the required financial impact. (C-V ¶ 50 – 51). Contrary to Respondents' argument, the AA does not require the issuance of the notices when the determination "*could have been made.*" (C-V ¶ 52).

226. Claimant does not contend that it had the right to withhold the determinations and insists that its determinations were made in good faith. Addressing the timing of the determinations, Claimant urges the Tribunal to assess the conduct of the Parties in light of good faith, as required under Venezuelan law where the contract provides no term. Here, Claimant states that the relevant circumstances influencing the timing of the determinations include threats from the Government and PDVSA, as well as hope that negotiations would be successful and arbitration could be avoided. (C-V ¶ 53)

### K.I.1.b.ii.  Arguments by Respondents

227. Respondents explain that the term "*occurred*" should be interpreted in accordance with its plain meaning, as a synonym for "*to happen*" or "*to take place.*" (R-IV ¶ 87). An occurrence is measured by an objective standard and is "*not determined by a party subjectively deciding to announce its occurrence.*" (R-IV ¶ 87). Rather, Article 15.1(a) focuses on knowledge of the occurrence of an event "*that may lead to*" a Material Adverse Impact. It does not use a subjective standard, as advocated by Claimant. (R-V ¶ 18; R. Closing Slide 43).

228. Respondents also argue that the standard enunciated by Claimant where a measure *"occurs"* when it was taken or publicly announced would require the Tribunal to dismiss all of the claims. (R-V ¶ 23). Even assuming that each measure was discriminatory, there was no doubt that as of the date of publication of each measure, each was one that *"may lead to"* a Material Adverse Impact. (R-V ¶ 24).

229. Claimant's theory that it fulfilled the requirements for triggering indemnity, based on its definition of *"determination"* is without merit. In that respect, Respondents state as follows:

- If Claimant can withhold notice or action to reverse or obtain relief from a measure until it subjectively determines that notice should be given, Article 15.1(a) would have no rational meaning.

- The provision calls for taking immediate action once Claimant has objectively determined that an event has occurred that *"may lead to a Material Adverse Impact."*

- The very notion of waiting until *"all hope has vanished"* is irreconcilable with the purpose of Article 15.1(a), which is to provide a timely opportunity to resolve the matter before hope has vanished.

- Claimant's interpretation not only violates common sense, but it requires reading both words and concepts into the provision that are simply not there. (R. Closing Slide 34).

230. With respect to the impact of settlement discussions, Respondents state as follows:

87. [...] the existence of ongoing settlement discussions has no bearing whatsoever on whether an event has *"occurred which may result in a Material Adverse Impact,"* as the event still would have occurred and the possibility of it resulting in a Material Adverse Impact if the negotiations fail will still have existed. (R-IV ¶ 87, citations omitted).

231. Respondents do not concede that there have been negotiations with the Government about all of the measures alleged here (especially the Royalty Measure) or that such have been *"ongoing."* (R-IV ¶ 88). Instead, with respect to the Royalty Measure, Respondents state that the notion that negotiations were *"ongoing"* – occurring throughout the three years since the first measure was taken, defies common sense and is *"belied by Claimant's own testimony"* that, by early 2005, there was no doubt that

there would be no ongoing negotiations regarding the Royalty Measure. (R-IV ¶ 88).

232. The AA requires the provision of notice upon the determination that an event has occurred, not after all hope of settlement has vanished. (R-IV ¶ 30). Respondents' arguments at R-V ¶ 26 are relevant to compare with Claimant's "*good faith*" arguments:

> 26. Claimant's argument that it did not mention a claim for indemnity against PDVSA-CN because it was allegedly told that arbitration against the Government would not be helpful in negotiations is difficult to fathom. Even if Claimant believed that the Government would take offense to arbitration proceedings, that obviously did not deter Claimant from sending thirteen formal notices to the Government cataloguing alleged violations and purporting to preserve its rights against the Government. Against this history of overzealous conduct in protecting and preserving legal positions, it is hard to imagine that Claimant would feel reluctant to even mention to PDVSA-CN (or anyone else) the possibility that it also might have an indemnity claim against PDVSA-CN under the AA. (R-V ¶ 26).

233. Respondents' conclusions with respect to the requirements of Article 15.1(a) of the AA are found at R. Closing Slide 43:

- Claimant was aware of the existence and significance of the requirements and that its right to indemnity from PDVSA-CN under the contract was dependent upon fulfilling them.

- Claimant knew that the acts may, and as a matter of mathematical certainty would, lead to a Material Adverse Impact if they were not reversed.

- Claimant made a conscious business decision not to fulfill the requirements and instead to pursue its strategy directly with the Government, not PDVSA-CN or PDVSA.

- Having failed to meet the acknowledged requirements for triggering indemnity, Claimant cannot now maintain its indemnity claims.

### K.I.1.b.iii.   The Tribunal

234. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶¶ | 15, 102 – 111 |
| C-III | ¶¶ | 163 – 165, 194 – 195, 231 – 236 |
| R-II | ¶¶ | 66, 68 – 70, 76 – 79 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-5 | 22 June 2007 Notice of Discriminatory Actions that May Result in a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que Pueden Resultar en Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*] |
| C-6 | 25 June 2007 Notice of Discriminatory Actions that have caused a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que han Causado un Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*] |
| C-7 | 27 June 2007 Notice of Discriminatory Actions that have caused a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que han Causado un Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*] |
| C-22 | Transcript of "Declarations of the Minister of Popular Power for Energy and Petroleum and President of PDVSA, Rafael Ramírez, on the ExxonMobil - PDVSA Arbitration Case" [*Declaraciones del Ministro del Poder Popular para la Energía y Petróleo y Presidente de PDVSA, Rafael Ramírez, sobre el caso Arbitraje Exxon Mobil-PDVSA*] dated 8 February 2008, *available at* www.pdvsa.com. at 2 |
| C-42 | Testimony of Mark Ward (26 September 2008) ¶¶ 23 – 28 |
| Ex. 11 | Minutes of 1 December 2004 Meeting of the Board of Directors of Petrolera Cerro Negro pp. 47 - 48 |
| C-43 | Testimony of Tim Cutt (26 September 2008) ¶¶ 15, 17, 54 - 59 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) ¶¶ 78 - 79 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) p. 6 |
| Ex. 5 | 2004-2006 Damages Calculation |
| C-87 | Association Agreement, Clause I *defining "Materially Adverse Impact"*, Sections 2.1(a), 15.1(a)-(b) |
| C-99 | Decree No. 5200 with Rank, Value and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements [*Decreto No. 5.200 con Rango, Valor y Fuerza de Ley de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, así como de los Convenios de Exploración a Riesgo y Ganancias* |

|  | Compartidas] (as published in the Official Gazette No. 38632 of 26 February 2007) (hereinafter "*Decree-Law 5200*") Art. 3 – 5 |
|---|---|
| C-104 | Law on the Effects of the Migration Process to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Shared-Risk-and-Profit Exploration Agreements [*Ley Sobre los Efectos del Proceso de Migración a Empresas Mixtas de los Convenios de Asociación de la Faja Petrolífera del Orinoco, Así Como de los Convenios de Exploración a Riesgo y Ganancias Compartidas*] (as published in the Official Gazette No. 38785 of 8 October 2007) (hereinafter "*Law on Effects*") Art. 2 |
| C-134 | Venezuelan Civil Code [*Código Civil*] (as published in the Official Gazette No. 2990 of 26 July 1982) Art. 1160 (hereinafter "*Venezuelan Civil Code*") |
| C-158 | Letter from Mobil CN ( 26 May 2006) |
| C-221 | Emerson-ESAI Reply at p. 4 |
| C-223 | Mommer Interview at 6 |
| C-242 | Minutes of PDVSA-CN Shareholders' Meetings held on 27 October 2003 and 4 March 2005 at 5 |
| C-252 | *Aló Presidente*, No. 177 (11 January 2004) at 2 |
| C-253 | *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF, Official Transcript of 2 December 2008 hearing pp. 23, 135-136, 167 (hereinafter "*Tr. of 2 December 2008 Hearing*") |
| C-277 | Report of Operadora Cerro Negro to the Minister of Energy on Royalties and Extraction Tax (27 September 2006) |
| C-291 | José Mélich-Orsini, EL PAGO 151 (2000) |
| R-35 | Tr. of 2 December 2008 Hearing pp. 127 - 135 |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) ¶¶ 27 - 28 |
| App. 19 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Tierras Carreteras y Puentes, S.A. (TICAPSA) v. Ministro de Hacienda* (December 12, 2006) (English Translation, Extract) |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) ¶ 42, fn. 35 |
| R-75 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holdings, Ltd. To Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, the Minister of Energy and Petroleum and Marisol Plaza, Attorney General (2 February 2005) |
| R-76 | Letter from Mark Ward, Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. And Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Marisol Plaza, Attorney General (2 June 2005) |
| R-77 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. And Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Marisol Plaza, Attorney General (20 June 2005) |

| R-78 | Letter from Mark Ward, Mobil Cerro Negro, Ltd. To Rafael Ramírez, Minister of Energy and Petroleum (1 August 2005) |
|---|---|
| R-79 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holdings, Ltd. And Representative of Venezuela Holdings, B.V. to Bernard Mommer, Vice Minister of Hydrocarbons (16 October 2006) |
| R-80 | Letter from Timothy Cutt, Operadora Cerro Negro, S.A. to Rafael Ramírez, Minister of Energy and Petroleum (2 November 2006) |
| R-81 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holdings, Ltd. And Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Gladys María Gutiérrez, Attorney General (20 November 2006) |
| R-82 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. To Rafael Ramírez, Minister of Energy and Petroleum (12 January 2007) |
| R-83 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holdings, Ltd. And Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (5 March 2007) |
| R-84 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holdings, Ltd. And Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General ( 8 March 2007) |
| R-85 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. And Mobil Cerro Negro Holding, Ltd. And Representative of Operadora Cerro Negro, C.A., Venezuela Holdings B.V., Mobil Corporation, Agencia Operadora La Ceiba, C.A., Mobil Venezolana de Petróleos Holdings, Inc., and Mobil Venezolana de Petróleos, Inc. To Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (4 May 2007) |
| R-86 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (22 June 2007) |
| R-87 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (25 June 2007) |
| R-88 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (27 June 2007) |
| R-89 | First Affidavit of Jim Massey (January 21, 2008) *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶ 20 |
| R-112 | Association Agreement |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini |

|        |                                                                                                                                                                                                                                                                                                                                 |
| ------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|        | and Appendices (14 August 2009) at ¶¶ 34, 37                                                                                                                                                                                                                                                                                     |
| R-120  | Outline Argument on Behalf of Claimant in Support of Application for Worldwide Freezing Order, dated January 23, 2008, submitted in *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008 Folio 61 ¶ 64 |
| R-121  | Letter from William B. Berry, Executive Vice President of Exploration and Production, ConocoPhillips, to Rafael Ramírez, Minister of Energy and Mines (14 January 2005)                                                                                                                            |

**At and Following the 2010 Hearings:**

| Submission        | Pinpoint              |
| ----------------- | --------------------- |
| C-V               | ¶¶ 40 – 54            |
| R-IV              | ¶¶ 28 – 33, 87 – 88   |
| R-V               | ¶¶ 23 - 26            |
| R. Closing Slides | 29, 33 - 43           |

| Speaker     | Citation                                            |
| ----------- | --------------------------------------------------- |
| C. Closing  | 2035-2039                                           |
| C. Opening  | 52-53                                               |
| Cutt        | 702-703, 710- 714, 727-728, 729, 730, 768-769       |
| Graves      | 1671-1672                                           |
| Leitzinger  | 1821 – 1823                                         |
| Massey      | 546, 544-549, 550, 628                              |
| Procedural  | 131, 132-133 (Concerning Massey Cross-examination)  |
| R. Closing  | 2134, 2136, 2137-2138, 2142 - 2145                  |
| R. Opening  | 105                                                 |
| Ward        | 147, 238-240, 278-280, 285-286                      |

### K.I.1.c.     Relationship Between *"Discriminatory Measures"* and *"Force Majeure"* in AA and Venezuelan Law

235. At section 3.3 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.3    What is the relationship and interaction between *"Discriminatory Measure"* according to Clause 15 AA, *"Force Majeure"* according to Clause 21 AA, and *Force Majeure* in the law of Venezuela?

### K.I.1.c.i.     Arguments by Claimant

236. Claimant states that the terms *"non-imputable extraneous cause"* and *"force majeure"* have been used interchangeably. Under Venezuelan law, including **Articles 1271 and 1272 of the Venezuelan Civil Code**, the failure to

perform or delay in performing an obligation is excused if it results from a *"non-imputable extraneous cause"* / *"force majeure."* (C-V ¶ 55). Claimant explains that the operation of this general excuse can be modified by a private agreement. Where risk of an event that would otherwise qualify as a *"non-imputable extraneous cause"* or *"force majeure"* is allocated to a party, the occurrence of the event can no longer serve as an excuse for non-performance under Venezuelan law. Claimant explains that in Clause XV, the Parties allocated the risk of a Governmental Measure that would meet the definition of *"Discriminatory Measure"* on to PDVSA-CN. Claimant concludes that *"Clause XV, together with the definition of 'Discriminatory Measure,' trumps the general excuse set forth in* **Articles 1271 and Article 1272 of the Civil Code**.*"* (C-V ¶ 56).

237. Claimant rejects Respondents' argument that *"the defined term 'Discriminatory Measure' embraces only events that 'do not affect or impede in any way the ability of any party to the AA to perform its obligations thereunder[sic].'"* Claimant characterizes Respondents' argument as requiring *"non-imputable extraneous causes"* and *"force majeure"* to be specifically carved out of the scope of *"Discriminatory Measures."* (C-V ¶ 57). Nothing in the AA or Venezuelan law, however, supports Respondents' argument. Claimant states that *"[i]f a given governmental act fits within the scope of 'Discriminatory Measure' and also within the scope of 'non-imputable extraneous cause' / 'force majeure', the characterization of the act under Clause XV and the definition of 'Discriminatory Measure' must prevail because that is the raison d'être of a risk-allocation clause under Venezuelan law."* (C-V ¶ 58).

238. The issue of the relationship between Clauses XXI and XV is moot, as Respondents conceded their failure to comply with the notice requirements in Article 21.2. (C-V ¶ 61). Still, Claimant explains that Clause XV prevails as *lex specialis* in respect of Clause XXI because XV refers to a narrower class of governmental acts: those that meet the definition of Discriminatory

Measure. Such treatment of the relationship between XXI and XV does not deprive either clause of its meaning. On the other hand, Claimant continues that *"[a]s all Discriminatory Measures are necessarily 'acts of the government,' an interpretation that gives prevalence to Clause XXI would deprive Clause XV and the definition of 'Discriminatory Measure' of any purpose, in violation of the principle of effet utile."* (C-V ¶ 60).

239. With respect to Respondents' *"Non-Imputable Extraneous Cause"* defense, Claimant first puts forward that **Decree-Law 5200** and the resulting expropriation of all of Claimant's interests in the Project is a Discriminatory Measure for which PDVSA-CN assumed the risk under Clause XV. Claimant states *"[a]s Clause XV trumps both the general principles of 'non-imputable extraneous cause'/'force majeure' and the definition of 'Event of Force Majeure' in Clause XXI, the Respondents cannot rely on **Decree-Law 5200** to excuse non-fulfillment of their obligations under the Agreement."* (C-V ¶ 64). Alternatively, the 5 March 2008 extinguishment cannot excuse PDVSA-CN's failure to indemnify Claimant because (i) the claims had arisen prior to the extinguishment and the extinguishment cannot affect past effects of the contract; (ii) under Venezuelan law, the risk allocation in Clause XV survives the termination of the contract; and (iii) *"Section 16.1(b) of the AA expressly contemplates the survival of Claimant's claims to indemnification under Clause XV."* (C-V ¶ 65).

### K.I.1.c.ii.  Arguments by Respondents

240. Respondents' arguments are best left to their own words, found at R-IV ¶¶ 89 – 91 (citations omitted).

> 89.  The concepts of Discriminatory Measure under the AA and Force Majeure under either the AA or Venezuelan law are distinct. Force majeure is an act that impedes performance by a contracting party, whereas Discriminatory Measures under the AA are certain types of acts that affect the economics of the Project to the Foreign Party. Under the AA, if an act qualifying as a Discriminatory Measure occurred and the requirements of the AA were met, the Foreign Party would not claim force majeure, but it would claim indemnity under Article XV.

90. Force Majeure under the Agreement is defined in Article 21, and includes "acts of the government or orders, judgments, resolutions, decisions or other acts or omissions of any governmental authority, civil or Military," preventing a party from complying with its contractual obligations. That includes an act of the Venezuelan Government, as demonstrated by OCN's invoking a similar force majeure clause in the Chalmette Supply Contract on behalf of both Mobil-CN and PDVSA-CN based on production curtailments ordered by the Venezuelan Government.

91. As noted earlier, Claimant spent much of its legal argument in the closing trying to establish that the requirements of the force majeure clause had not been met, saying that Respondents had invoked it, but the record is clear that Respondents never invoked the force majeure clause in the AA because the Agreement had been extinguished by operation of law. Respondents only pointed out that if the contract had not been extinguished, the force majeure clause could have been invoked. The extinction of the contract in this case has as a consequence under the Venezuelan Civil Code a release of responsibility of the parties inasmuch as the extinction was due to a *causa extraña no imputable* (non-imputable external cause).

## K.I.1.c.iii. The Tribunal

In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence: **Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶¶ | 83 – 84, 88, 93 – 96 |
| R-II | ¶¶ | 58 – 63 |
| R-III | ¶¶ | 53 – 54 |
| TOR | | 5.2.1(v) |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Articles 18.4, 21.1, 21.1(b). |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶ 91 |
| C-87 | Association Agreement, Clause I *defining* of *"Discriminatory Measure"* and *"Governmental Measure"*, Articles 16.1(b); 21.1(b), 21.2, |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶¶ 18-26 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 66 - 67; 73 –77, 84 |
| C-232 | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO (4th ed. 2006) at §§ 304, 339-C, 339-D, 340(b), 456 |
| C-240 | Venezuelan Civil Code Art. 1271, 1272, 1354 |
| C-241 | MADURO LUYANDO & PITTIER SUCRE, CURSO DE OBLIGACIONES |

|  | (2008) § 389 |
|---|---|
| C-289 | José Mélich-Orsini, Doctrina General del Contrato (2006) (excerpt, Chapter XVII, Section 456) at fn. 48 |
| R-7 | Decree-Law 5200 Art. 13 |
| R-17 | Law on Effects Art. 5 |
| R-43 | Congressional Authorization of the Framework of Conditions for the Cerro Negro Association Agreement, Official Gazette No. 36.224, published 10 June 1997, Eighteenth Condition (hereinafter "*Congressional Authorization*") |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 9 – 15 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 11 – 27 |
| R-70 | Association of International Petroleum Negotiators, AIPN Model Lifting Agreement (2001) |
| R-71 | Letter from Operadora Cerro Negro, S.A. to Chalmette Refining, L.L.C. (10 January 2007) |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract) (1 November 1997) Art. 10.1(b) |
| R-73 | Organic Law of the Office of the General Comptroller of the Republic and the National System of Fiscal Control, Official Gazette No. 37.347 [*Ley Orgánica de la Contraloría General de la República y del Sistema Nacional de Control Fiscal*] (17 December 2001) Art. 91(12), (14), (15), and (23) |
| R-74 | Law Against Corruption, Official Gazette No. 5.637 (Extraordinary) [*Ley Contra la Corrupción*] (7 April 2003) Art. 53, 54, and 56 |
| R-112 | Association Agreement Article 21.1(b) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 3 – 20 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 3 – 28 |

### At and Following the 2010 Hearings:

| **Submission** | **Pinpoint** |
|---|---|
| C-V | ¶¶ 55 – 65 |
| R-IV | ¶¶ 44 – 46, 89 – 91 |

| **Speaker** | **Citation** |
|---|---|
| Brewer-Carías | 911-912 |
| C. Closing | 2044 – 2052 |
| C. Opening | 55-56, 57-58 |
| Cutt | 770-773 |
| Expert Conferencing | 931 – 935 |
| Hernández-Bretón | 918-919, 947-948 |
| Mélich-Orsini | 912 (Sp. Hr. Tr. 15: 5-12), 941-942 (Sp. Hr. Tr. 39: 7-12) |
| R. Closing | 2119 – 2128, |
| R. Opening | 98 – 101 |

Urdaneta                    951-953

### K.I.1.d.    Ability of State-Owned Enterprises To Rely on State Actions to Excuse Non-Fulfillment of a Contract

241. At section 3.4 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.4    Can an enterprise owned and controlled by the State rely on acts of that State as an excuse for non-fulfillment of a contract a) in the law of Venezuela, b) particularly under the AA?

### K.I.1.d.i.    Arguments by Claimant

242. Claimant's arguments are best presented using Claimant's own words, found at C-V ¶¶ 66 – 70 (citations omitted, emphasis in original):

> 66.    Under general principles of Venezuelan Administrative Law, a State-owned enterprise may not rely on an act of government (act of the prince) to excuse non-fulfillment of its contractual obligations, when the act at issue emanates from a governmental entity of the same territorial level of government to which the State-owned enterprise belongs.  Such governmental act is not considered extraneous to the State-owned company.

> 67.    The same is true if the issue is analyzed from the perspective of the "act of the prince" theory as a source of liability.  In administrative contracts such as the AA, the public contracting party must compensate the private co-contracting party for acts of the government that alter the economic equilibrium of the contract.  Venezuelan authors concur that this is so whether the act at issue emanates from the same public entity that is a party to the contract, *or from another public entity of the same territorial level of government (or legal order).  A fortiori*, neither type of government act may serve to excuse the public contracting entity from non-fulfillment of its contractual obligations.

> 68.    The Respondents and Mr. Urdaneta argue that liability under the Administrative Law doctrine of "act of the prince" arises only when the act emanates from the same public entity that is a party to the contract, and if the act comes from another entity it may operate as an excuse.  Their theory is largely based on a misunderstanding or mistranslation of French authors and does not reflect Venezuelan law.

> 69.    The Respondents and Mr. Urdaneta rely on an excerpt from an article by Henrique Iribarren.  But the excerpt they cite is an *incomplete* quotation from a passage of Professor Jean Rivero's treatise of French Administrative Law.  The full passage from Professor Rivero's treatise,

which neither the Respondents nor Mr. Urdaneta brought to the Tribunal's attention, contradicts their argument:

> *"La théorie [du fait du prince] ne joue* jamais *quand la mesure qui alourdit les charges du cocontractant émane non de la personne publique contractante, mais d'une autre personne publique,* par exemple quand un décret, acte de l'Etat, aggrave, en matière sociale, la situation des cocontractants des collectivités locales. "*

> *["The [act of the prince] theory never applies when the measure that burdens the obligations of the co-contracting party emanates, not from the contracting public person* [personne publique*], but from another public person* [personne publique*],* for example when a decree from the State aggravates, on labor matters, the situation of co-contracting parties of local authorities."]

70. In Professor Rivero's example, the public contracting party is a local authority and the measure burdening the private party is an act of the French State. In such a case, the "act of the prince" doctrine does not apply because the measure emanates from another *personne publique*, that is, another level of government. As Professor Brewer-Carías explained at the Hearing, the term *"personne publique"* is a term of art in French Administrative Law that refers to the various territorial levels of government. Accordingly, French legal authorities restricting the application of the "act of the prince" doctrine as a source of liability to acts of the same *"personne publique,"* are referring to acts emanating from a governmental entity of the same level of government as the public contracting party. Other authorities on which the Respondents rely are misrepresented or cited out of context.

243. Claimant has not asserted that the Government, PDVSA, and PDVSA-CN are the same legal person, but argued that the fact of their distinct legal personalities is irrelevant to the establishing of the extraneousness requirement for their *"non-imputable extraneous cause"* and *"force majeure"* defense. The acts on which Respondents rely are those that were of the same level of government to which the Respondents belong. PDVSA carried out the seizure of Claimant's assets and was the chief beneficiary of that seizure. (C-VI ¶ 34, partially quoted).

244. Claimant explains that **Decree-Law 5200** was not extraneous to Respondents:

35. [T]he pretense that **Decree-Law 5200** is extraneous to the Minister of Energy and Petroleum/President of PDVSA because it is a law and it was also signed by other ministers ignores once again the realities of

this case. It is beyond doubt that Minister Ramírez, the Minister in charge of the sector to which the measures relate, was the chief architect of the measures. The Respondents' unsupported assertion that President Chávez prepared **Decree-Law 5200** without the intimate involvement of the Minister responsible for petroleum policy and for the implementation of the Decree is just not credible. (C-VI ¶ 35).

245. Claimant argues that the inquiry under the AA is moot:

> 71. The reference to "acts of the government" in Clause XXI does not help the Respondents. *First*, as already shown, the Respondents have forcefully disclaimed any reliance on Clause XXI. *Second*, because the alleged Event of *Force Majeure* (Decree-Law 5200) is a Discriminatory Measure, it falls under Clause XV, not Clause XXI. *Third*, by the express terms of Clause XXI, an act of the government can support a *Force Majeure* defense only if it meets the requirements of Section 21.1(b), which are essentially the same as those of "non-imputable external cause / force majeure" as a general principle. Section 21.1(b) requires that the event that prevents performance of a Party's contractual obligation be "beyond the reasonable control of, or unforeseen by, the Party obligated to perform the corresponding obligation, or which being foreseeable, could not be avoided in whole or in part by the exercise of due diligence.[...]" (C-V ¶ 71, citations omitted).

### K.I.1.d.ii.    Arguments by Respondents

246. Under Venezuelan law and the decisions of the French *Conseil d'Etat*, a state-owned enterprise may rely on acts of that state to excuse non-performance. (R-IV ¶ 92). What is at issue is whether the act of state is external to the state-owned enterprises, *i.e.* whether the act was promulgated by the Government in the exercise of its sovereign powers. (R-IV ¶ 46).

247. Respondents state that PDVSA and PDVSA-CN are legal persons which are separate and distinct from the state, and that this fact has been acknowledged and accepted by both Parties. (R-IV ¶¶ 2, 94). In the London proceedings, Claimant forcefully presented thorough arguments – through counsel and through the affidavit of a legal expert – explaining why PDVSA must, as a matter of fact and law, be considered as separate and distinct from the Government, and that PDVSA did not constitute a department of the Government. (R-IV ¶ 5; R-V ¶ 8). Claimant stated that in the AA, the Parties worked to make clear that "*neither PDVSA nor PDVSA-CN was a*

*subdivision of the Republic of Venezuela.*" (R-IV ¶¶ 5, 93 - 94). This is even reflected in the text of the AA, where the definitions of "*Affiliate*", "*Governmental Action*", and "*Reservation of Sovereign Rights*" in Article 18.4, the "*No Government Guarantee*" provision of Article 23.11, and the *Force Majeure* provision of Article 21 treat the PDVSA-CN, PDVSA, and the Government as distinct entities. (R-IV ¶ 94).

248. Respondents also cite Claimant's communication with the Government as evidence that Claimant believes the three entities to be separate. While addressing production curtailments in 2007, Claimant addressed letters to the Government, claiming *force majeure* on PDVSA-CN's behalf – an action that would not be possible if Claimant believed PDVSA-CN and the Government to be the same. (R-IV ¶ 3).

249. Respondents argue that "*the exercise of sovereign powers is a matter uniquely within the province of the Government, not state companies such as PDVSA-CN or PDVSA.*" (R-IV ¶ 2). Respondents urge the Tribunal to reject Claimant's new position that PDVSA and PDVSA-CN are not separate from the Government. (R-IV ¶ 93).

250. Respondents also address Claimant's statement that Minister Ramírez authored the **Decree-Law 5200**, calling it "*untrue.*" (R-IV ¶ 4). Respondents explain that **Decree-Law 5200** was lawfully issued:

    4.    [...] the Decree-Law was a law of general application promulgated by the President of the Republic in the exercise of the power conferred by Article 236(8) of the Constitution (which permits the President to issue decrees with the force of law upon enactment of an enabling law) and in accordance with the authority granted to him by the Venezuelan legislature in the Enabling Law of February 1, 2007. Claimant also makes much of the fact that Minister Ramirez "countersigned" Decree-Law 5.200, but the Venezuelan Constitution mandates that the President shall exercise the powers granted by Article 236(8) "in the Council of Ministers" which is why Minister Ramirez, along with eighteen other Ministers, "countersigned" it. (R-IV ¶ 4, citations omitted).

251. Addressing the matter of "*extraneousness*", Respondents characterize it as irrelevant that Minister Ramírez holds both the positions of President of

PDVSA and that of Minister of Energy. This is because the separate and distinct legal status of PDVSA and PDVSA-CN is not dependent upon the individuals who occupy its executive positions, or the perceived political orientation of PDVSA. (R-IV ¶ 4, partially quoted).

> 7.    On Claimant's second contention, the notion that a law of general application promulgated by the national government does not have the same legal consequences for a state company as it does for a private company defies logic. Both the controlling Venezuelan authority on this subject and the French authority and doctrine improperly invoked by Claimant support Respondents' position. In addition, Claimant's argument that an act of the Venezuelan Government cannot excuse PDVSA-CN and PDVSA from responsibility is directly contradicted by Claimant's own action in invoking force majeure on behalf of both Mobil CN and PDVSA-CN as a consequence of the Government's production curtailment. This legal conclusion is even more compelling when the act at issue is a law of general application, as was the case here. (R-V ¶ 7).

## K.I.1.d.iii. The Tribunal

252. There has been considerable overlap between the answers to this question and the discussion on the "*hecho del príncipe*" found at Section K.V.1 of this Award. While effort has been made to limit discussion and the references in this section to the information presented that was in direct answer to or helpful in the understanding of the question, some repetition cannot be avoided.

253. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶¶ | 85 – 86, 91 – 92 |
| R-II | ¶¶ | 41, 50, 55 |
| R-III | ¶¶ | 29 – 31, n. 66 |

## Exhibits:

| Exhibit | Document Name |
| --- | --- |
| C-3 | PDVSA Guaranty [*Fianza de Fiel Cumplimiento de PDVSA*] dated 28 October 1997 (hereinafter "*PDVSA Guaranty*") |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶¶ 49 – 55 |
| C-51 | Cambridge Energy Research Associates, "The Cerro Negro Extra-heavy Oil Development: A World-class Asset" (26 September 2008) at 36 |
| C-87 | Association Agreement Clause I *defining* "*Affiliate*" and "*Governmental Measures*", Articles 16.1(b), 21.1(b), 23.11 |
| C-99 | Decree-Law 5200 Art. 12 |
| C-129 | Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein [*Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican*] (as published in the Official Gazette No. 38884 of 5 March 2008) |
| C-160 | Heads of Agreement between Lagoven, Mobil Oil Corporation, and Mobil de Venezuela (17 September 1996) (hereinafter "*Heads of Agreement*") |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶¶ 51, 56, 58 – 62; fn. 78 |
| App. 35 | Eloy Lares Martínez, *Manual de Derecho Administrativo*, 8a. Edición, Caracas 1990, pp. 361 – 363 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶ 73 – 84 |
| C-232 | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO (4th ed. 2006) §§ 304, 339-C, 339-D, 340, 456 |
| C-240 | Venezuelan Civil Code |
| C-241 | MADURO LUYANDO & PITTIER SUCRE, CURSO DE OBLIGACIONES (2008) §§ 389 – 396 |
| C-243 | 2008 Organic Law of the Public Administration (as published in Extraordinary Official Gazette No. 5890 of 31 July 2008) |
| C-244 | *Lyondell-CITGO Refining, LP v. PDVSA* (S.D.N.Y. No. 02-CV-0795), Declaration of Álvaro Silva Calderón (23 May 2002) at ¶ 17 |
| C-245 | Organic Law that Reserves to the State Assets and Services Related to Hydrocarbons' Primary Activities [*Ley Orgánica que Reserva al Estado Bienes y Servicios Conexos a las Actividades Primarias de Hidrocarburos*] (as published in Official Gazette No. 39173 of 7 May 2009) |
| C-246 | The PDVSA of Chávez Produces 1.2 Million Less Barrels Per Day (11 May 2009), at http://laverdad.com/detnotic.php?CodNotic=12392 (last accessed 14 May 2009) |
| C-247 | Index of Materials Regarding the Transformation of PDVSA Into an Instrument of the Socialist Revolution |
| C-248 | Financial and Operational Information of PDVSA and Affiliates [*Información Financiera y Operacional, PDVSA y sus Filiales*] as of 31 December 2007, Message from the President of PDVSA at 6- |

|  | 7 and Notes to the Consolidated Financial Statements at 38, 49 |
| C-249 | Ministry of Energy Press Release (25 February 2008) |
| C-250 | Air France, Court of Cassation of France (15 April 1970), reported in Recueil Dalloz Sirey 1971, at 107, 109, 110 |
| C-324 | Rafael Badell Madrid, RÉGIMEN JURÍDICO DEL CONTRATO ADMINISTRATIVO (2001)151 – 152 (2001) |
| C-325 | Rafael Badell Madrid, *La Ejecución del Contrato Administrativo: Teoría de la Imprevisión, Depreciación Monetaria e Inflación* in RÉGIMEN JURÍDICO DE LOS CONTRATOS ADMINISTRATIVOS (1991) at 68, 69 |
| C-326 | Alfredo Romero Mendoza, *El Hecho del Príncipe en los Contratos Administrativos y su Regulación en el Decreto que Contienen las Condiciones General de Contratación para la Ejecución de Obras* in TRIBUNAL SUPREMO DE JUSTICIA, REVISTA DE DERECHO No. 4 (2002) |
| R-7 | Decree-Law 5200 |
| R-43 | Congressional Authorization |
| R-64 | Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters (as published in the Official Gazette No. 38617 of 1 February 2007) (hereinafter *"Enabling Law"*) |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 7, 9-15 |
| App. 5 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published 30 December 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 131 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 11-27 |
| App. 2 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published 30 December 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 131 |
| R-71 | Letter from Operadora Cerro Negro, S.A. to Chalmette Refining, L.L.C. (10 January 2007) |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract) (1 November 1997) |
| R-73 | Organic Law of the Office of the General Comptroller of the Republic and of the National System of Fiscal Control [*Ley Orgánica de la Contraloría General de la República y del Sistema Nacional de Control Fiscal*] Art. 91(12) |
| R-74 | Law Against Corruption, Official Gazette No. 5.637 (Extraordinary), published 7 April 2003 [*Ley Contra la Corrupción*] Art. 53 – 54, 56 |
| R-112 | Association Agreement Clause I *defining* "Governmental Measures", Articles 18.4, 21.1, |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 3 – 2 0 |
| App. 45 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published 30 December 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 236 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 3 – 28 |

| App. 38 | Allan R. Brewer-Carías, ADMINISTRATIVE CONTRACTS (Editorial Jurídica Venezolana, Caracas 1992) p. 242 – 243 |
| App. 40 | DOCTRINE OF THE OFFICE OF THE ATTORNEY GENERAL OF THE REPUBLIC, September 27, 1966 (Editora Vene-Gráfica, C.A., Caracas 1967) p. 77 |
| App. 42 | Henrique Iribarren Monteverde, *The Economic Equilibrium in Administrative Contracts and the Theory of Hardship*, in INTERNATIONAL CONGRESS ON ADMINISTRATIVE LAW COMMEMORATING PROF. LUIS H. FARÍAS MATA, VOLUME I 141 (Rafael Badell Madrid ed., Universidad Católica Andrés Bello, Caracas 2006) p. 152 – 153 |
| App. 43 | Fanny Luxembourg, *Fait du Prince: Convergence of Private and Public Law*, LA SEMAINE JURIDIQUE EDITION GÉNÉRALE No. 8, I 119 (February 20, 2008) |
| App. 44 | André de Laubadère, Jean-Claude Venezia and Yves Gaudemet, TREATISE OF ADMINISTRATIVE LAW, VOLUME 1 (L.G.D.J., 15th ed., Paris 1999) p. 837 |
| App. 45 | Christophe Guettier, LAW OF ADMINISTRATIVE CONTRACTS (Presses Universitaires de France, Paris 2004) p. 562, ¶ 717 |
| App. 46 | First Affidavit of Luis A. Ortiz-Álvarez, dated January 22, 2008, submitted in *Mobil Cerro Negro Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008, Folio 61 ¶¶ 15, 85 |
| R-120 | Outline Argument on Behalf of Claimant in Support of Application for Worldwide Freezing Order, dated January 23, 2008, submitted in *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008 Folio 61 pp. 23 – 25 |
| Unnumbered | J. Rivero, DROIT ADMINISTRATIF 112 (14ème Ed.) (1992) |
| Unnumbered | G. Vedel, Droit Administratif 415 (1959) |
| Unnumbered | G. Vedel et P. Delvolvé, 2 Droit Administratif 382-383 (1990) |
| Unnumbered | M. Waline, Droit Administratif 256 (1959) |

### At and Following the 2010 Hearings:

| Submission | Pinpoint |
|---|---|
| C-V | ¶¶ 66 – 71 |
| C-VI | ¶¶ 34 – 35 |
| R-IV | ¶¶ 2-5, 45 – 46, 92 – 94 |
| R-V | ¶ 7, 8 |

| Speaker | Citation |
|---|---|
| Brewer-Carías | 929-931, 936-937 |
| C. Closing | 2019-2020, 2052 |
| C. Opening | 33, 34, 58 |
| Cutt | 702-703, 710-711, 770-775 |
| Expert Conf. | 931-935 |
| Massey | 544-545, 594-595 |
| R. Closing | 2124 – 2128 |
| R. Opening | 85-86, 101 |

Urdaneta      931 - 932
Ward          238-240, 278-280, 286

### K.I.1.e.    Interpretation of Clause 15.1(b)(ii) and Term *"To Date"*

254. At section 3.5 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.5    Assume for this question that Clause 15.1(b)(ii) AA becomes applicable and no recommendations on amendments to the AA are possible due to the termination of the AA. Should, after the part of 15.1(b)(ii) which provides for an award for damages to compensate the Foreign Party for the economic consequences of a Discriminatory Measure suffered by it *"to date"*, the following part of the sentence be interpreted to the effect that the Tribunal cannot and must not decide on any measure or remedy *"that would restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred?"*

### K.I.1.e.i.    Arguments by Claimant

255. The Tribunal *"has the power to issue an award for compensatory damages within the limitations imposed by the Agreement and the formulas in the Accounting Procedures, and MCN is entitled to such an award."* (C-V ¶ 74). In the event that the limitations do not apply or the formulas do not work, *"then the Tribunal's powers revert to those granted by the general arbitration clause of Article 18.2 and by the general principles of Venezuelan law, which require full indemnification for breach of a contractual obligation."* (C-V ¶ 75). Claimant argues that *"[t]he Tribunal's power under Article 15.1(b) to compensate MCN for the economic consequences of an expropriation necessarily entails the power to consider the loss of MCN's rights to produce EHO and sell [SCO] from 26 June 2007 through 30 June 2035."* (C-V ¶ 76).

256. Claimant states that the cross examination testimony of Mr. Massey confirms that the words *"to date"* means *"up to now."* (C-VI ¶ 15). With respect to the grammatical construction of *"suffered by it to date"*, Claimant maintains that *"to date"* modifies *"Discriminatory Measures"* and that Claimant is seeking compensation for the economic consequences of

Discriminatory Measures that it has already suffered. (C-V ¶ 75). For ease of reference, Claimant presents its argument as follows:

> 75. MCN has explained that the controlling Spanish text makes clear that "suffered by it to date" ("*sufrida por ella hasta la fecha*") refers to "Discriminatory Measure" ("*Medida Discriminatoria*") and not to "economic consequences" (*consecuencias económicas*). The Respondents concede that in Spanish "*sufrida*" goes only with "*Medida*," but argue that "to date" (*hasta la fecha*) could apply "just as easily" to "economic consequences" (*consecuencias económicas*). That is grammatically impossible, both in the official Spanish text and in the English translation. The adverbial phrase "to date" (*hasta la fecha*) modifies the accompanying past participle "suffered" (*sufrida*). The full expression in the contract is "suffered by it to date" (*sufrida por ella hasta la fecha*). And the singular past participle *sufrida* cannot grammatically refer to a plural noun (*consecuencias económicas*). (C-V ¶ 75).

257. Claimant also presents the alternative argument, stating that even if "*suffered by it to date*" refers to the economic consequences, Claimant asserts that it has already suffered the economic consequences of the expropriation, namely, on the date of the expropriation. (C-V ¶ 76).

258. Claimant argues that the above textual analysis is supported by **Article 12 of the Venezuelan Code of Civil Procedure** and **Article 1160 of the Civil Code**, which require the application of standards of good faith to contract interpretation and performance. (C-V ¶¶ 77- 78). This is not the same as empowering the Tribunal to base an award on equity alone. Equity is, however, relevant to the good-faith interpretation and performance of the contracts. (C-VI ¶¶ 21-23). Claimant explains how the application of the legal standard of good faith would function in this case.

> 78. [...] The standard of good faith under Venezuelan law [...] precludes the Respondents from seeking to avoid their contractual commitment to indemnify MCN for the economic consequences of Decree-Law 5200 by invoking supposed difficulties in applying the Accounting Procedures now that there is no longer a Cerro Negro Project generating annual cash flows. The Accounting Procedures were adopted for the purpose of determining a limitation on the indemnity for the Respondents' benefit. The Respondents, who participated in the actions that have made it impossible to apply the Accounting Procedure formulas retrospectively, and who benefited from the seizure of MCN's

interest, cannot in good faith use the difficulties in computing that limitation to deny any remedy to MCN. (C-V ¶ 78).

259. Claimant states that the law of the forum may inform the interpretation of Article 15.1(b). New York law requires that an arbitration clause be construed to give fair meaning to the words of the contract in order to realize the parties' "*reasonable expectations.*" (C-V ¶ 79). Claimant states that "*[t]he text of the Agreement and undisputed testimony show that Mobil CN had a reasonable expectation that the contract provided for arbitration allowing a meaningful award for expropriation of Mobil CN's interests in the Project.*" (C-V ¶ 79).

260. Finally, Claimants contextualize Prof. Myers's observation that "*we are outside of the contract*", stating that he was referring to the fact that he was "*out[side] of the specific implementation of the contract on a year to year basis.*" (C-V ¶¶ 83 – 84). He was referring to the situation where it is impossible to calculate the indemnity on a year-by-year basis, because the contract indemnity was only designed to work where the project continued, which it does not here. (C-V ¶¶ 83 – 84).

### K.I.1.e.ii. Arguments by Respondents

261. Respondents' answer to the Tribunal's question is best described in their own words, found in their Post-Hearing Reply Memorial (R-IV ¶ 95, citations omitted):

> 95. The answer to this question is yes, the Tribunal should not decide on any remedy for the future. Section 15.1 (b) only contemplated "recommendations" for the future. This is evident not only from the text of Section 15.1 (b), but also from the testimony in this case, including the testimony of Claimant's experts that "we are outside of the contract." (R-IV ¶ 95).

262. Respondents make the following three points to Tribunal related to the meaning of "*to date*":

> (i) Section 15.1(b) provides only for the possibility of a monetary award based on the consequences to date as quantified by the indemnity provisions and formulas, and even specifies that no more than one indemnity arbitration may be brought per FY;

(ii)  every single provision of the indemnity, including all the formulas in the Accounting Procedures, operates on a FY-by-FY basis; and

(iii)  for the future, Section 15.1(b) expressly provides that an arbitral tribunal hearing an indemnity claim may only make "recommendations." which, [...] should not be done in this case in light of the extinction of the AA. (R-V ¶ 9, citations omitted).

95.  Since there is no dispute that the AA has been extinguished, no recommendations for the future can be made. The issue of whether the extinction gives rise to any rights on the part of Claimant is a matter between Claimant and the State. (R-IV ¶ 95).

263.  Respondents argue that that Claimant distorted the meaning of "*to date*" and seeks to have the Tribunal ignore each and every provision of the indemnity and the Accounting Procedures, all of which operate on a FY by FY basis, fitting perfectly with the concept of "*to date*" in Article 15.1(b). The plain meaning of Article 15.1(b), alone or in conjunction with the Accounting Procedures, stands firmly against Claimant's "*sophistry*" that it suffered all of the "*economic consequences*" of the alleged discriminatory expropriation by mid 2007. (R-IV ¶ 15).

264.  Under Venezuelan law, indemnity provisions are to be strictly construed. (R-IV ¶ 48). Contrary to Claimant's argument, **Article 12 of the Venezuelan Code of Civil Procedure** requires a judge to "*restrict himself to the legal norms, unless the Law empowers him to decide according to equity.*" (R-IV ¶ 49).  **Article 13 of the Venezuelan Code of Civil Procedure**, as well as **Article 17 of the ICC Rules**, make it clear that the decider may only decide cases according to equity if the parties have so agreed.  No such agreement exists in this case. (R-IV ¶ 49).

### K.I.1.e.iii.  The Tribunal

265.  There has been considerable overlap between the answers to this question and the discussion on the "*Damages Jurisdiction*" found at Section K.VII.1 of this Award.  While effort has been made to limit discussion and the references in this section to the information presented in direct answer to or helpful in the understanding of the question, some repetition cannot be avoided.

266. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-III | Fn. | 528 |
| C-IV | ¶¶ | 53 – 56 |
| R-II | ¶ | 160 |
| R-III | ¶ | 186 |
| TOR | | 5.2.1.b.(iv) |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-19 | Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro S.A., U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB) |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 28 – 33, 39, 94 – 95 |
| App. 6 | Venezuelan Code of Civil Procedure [*Código de Procedimiento Civil*] (published in Extraordinary Official Gazette No. 4.209 of September 18, 1990) Art. 12 |
| App. 7 | José Mélich-Orsini, *Doctrina General del Contrato*, 4th. Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios Nr. 61, Caracas, 2006, pp. 398 – 408, 416 – 17, 808 – 13 |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) pp. 106 – 10 |
| C-87 | Association Agreement Articles 15.1(a) - (b), 15.2, 23.7 & Annex G |
| C-134 | Venezuelan Civil Code Art. 1160 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶ 40 |
| App. 21 | Venezuelan Code of Civil Procedure [*Código de Procedimiento Civil*] (published in Extraordinary Official Gazette No. 4.209 of September 18, 1990) Art. 12 |
| C-233 | Venezuela Supreme Tribunal of Justice, Constitutional Chamber, *Decision No. 1541* (17 October 2008) at 365.488 (English Tr. at 27 – 29) |
| C-239 | *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela S.A.*, High Court of Justice, Queen's Bench Division, Transcript of Public Proceedings, Commercial Court, Day 2 (29 February 2008), at 38 |
| C-285 | José Mélich-Orsini, Doctrina General del Contrato (2006) (excerpt, Chapter IX, Sections 302-304) pp. 415 – 416 |
| R-15 | First Affidavit of Hobert Plunkett (21 January 2008) |
| R-32 | Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 |

| | |
|---|---|
| R-35 | Tr. of 2 December 2008 Hearing , pp. 30 – 31, 69 – 71, 129 – 130 |
| R-38 | Tr. (24 January 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London), pp. 8, 9, 70 – 71, 84 – 85 |
| R-39 | First Affidavit of R. Dean Graves, (25 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Division, Commercial Court (London) |
| R-112 | Association Agreement Article 15.1(b) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) ¶¶ 44 – 47 |
| App. 46 | Venezuelan Civil Code |
| App. 49 | Venezuelan Code of Civil Procedure, Official Gazette No. 4.209 (Extraordinary), published September 18, 1990, [*Código de Procedimiento Civil, Artículo 12*] Art. 12 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) ¶¶ 96 – 104 |
| Unnumbered | *Republic Mortgage Ins. Co. v. Countrywide Financial Corp.*, No. 603915/2009, 28 Misc.3d 1214(A), 2010 WL 2927286, at **2 (N.Y. Supreme Court, N.Y. County, July 22, 2010) |
| Unnumbered | Karl-Heinz Böckstiegel, Public Policy and Arbitrability, in Comparative Arbitration Practice and Public Policy in Arbitration, ICCA Congress Series 177, 201-203 (Pieter Sanders ed., 1987); |
| Unnumbered | Pierre Lalive, Transnational (or Truly International) Public Policy and International Arbitration, in Comparative Arbitration Practice and Public Policy in Arbitration, ICCA Congress Series 258, at ¶¶ 141-142 (Pieter Sanders ed., 1987) |

## At and Following the 2010 Hearings:

| Submission | Pinpoint |
|---|---|
| C-V | ¶¶ 72 – 84 |
| C-VI | ¶¶ 15, 21 – 23, 45 |
| R-IV | ¶¶ 14 – 18, 48 – 49, 95 |
| R-V | ¶¶ 9 – 17 |
| R. Closing Slides | 23 - 27, 48 – 59, 65 – 76 |

| Speaker | Citation |
|---|---|
| Brewer-Carías | 1007 |
| C. Closing | 2044 – 2048, 2057 – 2064 |
| C. Opening | 55 – 56, 60 – 63 |
| Cranmer | 443, 444 |
| Cutt | 759 – 760 |
| Expert Conf. | 906 (Question by Mr. Chairman); 990 – 999 |
| Finizza | 1814 – 1815 |
| Hoenmans | 356 |
| Hernández-Bretón | 1005 – 1006, 1008, 1010 |
| Jones | 1375 – 1377, 1387, 1388, 1389, 1512 |
| Massey | 504, 575-576 |
| Mélich-Orsini | 1008 – 1010 |

| Myers | 1676, 1695-1698, 1707 – 1708 |
| Pereira | 1037 – 1040 |
| Plunkett | 802, 837 – 850, 874 |
| R. Closing | 2109, 2121 – 2123, 2149 – 2157, 2166 |
| R. Opening | 127 |
| Ward | 290, 293 – 296 |

## K.I.1.f.     Translation Considerations

267. At section 3.6 of PO-6, the Tribunal invited the Parties to respond to the following question:

> 3.6     Without prejudice to Clause 23.7 AA, in case of discrepancies of the legal meaning of wording between the Spanish original and the English translations of the AA used by the Parties, what considerations should apply?

### K.I.1.f.i.     Arguments by Claimant

268. Claimant argues that, even where the English translation of the text is ambiguous, the Spanish original is the controlling text, stating that *"[a]n ambiguous unofficial translation of the official text cannot prevail over the corresponding, unambiguous official text."* (C-V ¶ 86).

269. In response to any suggestion that the AA could be modified by reference to the pre-contractual documents, Claimant states that Article 23.2 AA is an integration clause. (C-V ¶ 87). Article 23.2 AA states that the AA *"sets for the entire agreement among the Parties as to matters covered herein and supersedes any prior understanding, agreement or statement [...]"*, thereby making it impossible to modify the original text by reference to non-binding preliminary documents. (C-V ¶ 87).

### K.I.1.f.ii.     Arguments by Respondents

270. Respondents' argument is best taken from their own words, found at R-IV ¶ 96 (citations omitted):

> 96.     Section 23.7 states that the AA is executed in the Spanish language. Claimant has said that the Agreement was negotiated and drafted in English and that there are a number of translation errors. There was no