# Exhibit 1

# Part B

testimony at the hearing about any irreconcilable discrepancies between the two versions. Claimant has tried to make an issue out of the Spanish version of Section 15.1(b), but, as demonstrated in both the Urdaneta and the Mélich-Orsini expert opinions, which were never answered by Claimant, the Spanish text is reconcilable with the English and, taken in the context of the Agreement as a whole, is unquestionably of the same effect as all the testimony in this case, namely, that the provision contemplates an arbitration dealing with the economic consequences as of that date and only recommendations for the future.

271. The argument that the Spanish version of the text requires an interpretation that is contrary to the English has not been articulated or proven at the hearing and should be rejected. (R-V ¶ 16). All of the relevant testimony in this case on the meaning of Article 15.1(b) was in English and based on the English text. (R-V ¶ 16).

## K.I.1.f.iii.    The Tribunal

272. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | fn. | 528, 540 |
| R-II | ¶¶ | 157 – 162 |
| R-III | ¶¶ | 183 – 191 |
| TOR | | 5.2.1.b(iv) |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement, Article 15.1(b) |
| C-87 | Association Agreement Articles 15.1(b), 18.1, 23.2, 23.7 |
| R-32 | Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 |
| R-35 | Tr. of 2 December 2008 Hearing pp. 70 – 17, 84 – 85 |
| R-37 | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order, dated February 27, 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.,* Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) p. 28 |

| R-38 | Tr. January 24, 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) pp. 8 – 9 |
| R-112 | Association Agreement Article 15.1(b) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) ¶¶ 44 – 47 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) ¶¶ 96 – 104 |

**At and Following the 2010 Hearings:**

| Submission | Pinpoint |
| --- | --- |
| C-V | ¶¶ 85 - 87 |
| R-IV | ¶ 96 |

| Speaker | Citation |
| --- | --- |
| Jones | 1387 |
| Massey | 575 – 576 |
| Myers | 1697 – 1698 |
| R. Closing | 2146 – 2147 |
| Ward | 295 – 296 |

## K.I.2.      Applicable Law

### K.I.2.a.      Arguments by Claimant

273. The applicable laws of Venezuela include the *"Constitution, the Civil Code and the Commercial Code, the Investment Law, international treaties, the Framework of Conditions, and the legal framework for the EHO projects that was in effect at the time the AA was concluded and that created vested rights in Mobil CN."* (C-III ¶ 175). Claimant asserts that *"ex post facto pronouncements that any branch of the Venezuelan Government may have issued or may choose to issue in the future in a self-serving effort to deprive Mobil CN of its vested rights under the AA and the Guaranty"* are not applicable to this case. (C-III ¶ 175).

274. The U.S. federal law and New York law, including laws related to arbitration as well as those related to the attachment of funds, are applicable as *lex arbitri.* (C-III ¶ 176).

275. Claimant also argues that its claims under the AA *"do not call into question the Republic of Venezuela's exercise of its sovereign powers.... Whether the*

*Discriminatory Measures adopted by the Republic of Venezuela are a lawful or unlawful exercise of those sovereign powers is not at issue in this arbitration.*" Instead, this is a matter concerning Respondents' breach of their contractual obligation to indemnify Mobil CN. (C-IV ¶ 65).

### K.I.2.b.     Arguments by Respondents

276. Respondents argue that the AA and the Guaranty are governed exclusively by Venezuelan law and, as a result, cannot form the basis of a claim in this arbitration. (R-II ¶ 38). Respondents state that neither agreement "*contain[s] any limitation on the application of Venezuelan law, either by reference to international legal principles or any other body of law, and it expressly provides that it 'shall in no event impose obligations on the Republic of Venezuela or limit the exercise of its sovereign rights.'*" (R-I ¶ 29).

277. *First*, the Respondents note that there is no stabilization clause in the AA and that there is no indication that such a clause would be permissible under the Congressional Authorization. The Congressional Authorization expressly provides that neither agreement shall "*impose obligations on the Republic of Venezuela or limit the exercise of its sovereign rights.*" (R-I ¶ 29). Respondents emphasize that the express reservation to the State's sovereign powers negates any argument with respect to stabilization or freezing of the law with respect to the Project. (R-II ¶ 25). The idea of a stabilization clause was discussed and the negotiations between the Parties resulted in no stabilization clause being included in the AA. This negotiation is reflected in Article 18.4 of the AA and the Eighteenth condition of the Framework of Conditions. (R-II ¶ 16).

278. As the AA lacked a "*freezing*" or "*stabilization clause that would preclude the applicability of changes in Venezuelan law,*" (R-V n. 1), the evolving law will be applicable to the contract. (R-II ¶ 38).

279. *Second*, Respondents state that the AA was not internationalized in any way and that it was to be governed exclusively by Venezuelan law. (R-III ¶ 25).

For these reasons and those presented in section K.I.3 concerning "*extinguishment*", Respondents state that the AA cannot form the basis of a claim.

### K.I.2.c.    The Tribunal

280. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 175 – 182 |
| C-IV | ¶¶ | 62 – 65 |
| R-I | ¶ | 29 |
| R-II | ¶¶ | 15 – 16, 38, 61 |
| R-III | ¶ | 25 |
| TOR | ¶¶ | 5.2.1(a), 8 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Articles 18.1, 18.4 |
| C-3 | PDVSA Guaranty Section 9 |
| C-11 | Congressional Authorization Eighteenth Condition |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 24 – 27, 35, 38 – 39,  86 – 88 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) ¶¶ 17 – 18 |
| C-87 | Association Agreement Articles 18.1, 18.4 |
| C-134 | Venezuelan Civil Code |
| C-173 | Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* |
| C-228 | Anadarko Petroleum Corporation 2008 Annual Report (24 February 2009) at 12 – 13 |
| R-43 | Congressional Authorization Eighteenth Condition |
| R-44 | Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons, Official Gazette No. 1.769 (Extraordinary), published August 29, 1975 [*Ley Orgánica que Reserva al Estado la Industria y el Comercio de los Hidrocarburos*] Art. 5 |
| R-67 | Julian D.M. Lew, Loukas A. Mistelis and Stefan M. Kröll, Comparative International Commercial Arbitration (Kluwer 2003) 449, §§ 18-36 & 18-37 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) |
| App. 22 | Fabiola Romero, "Autonomy of the Parties," *in Law of Private International Law, Commentary,* Tomo II, Universidad Central de |

Venezuela, Caracas, 2005 pp. 777 – 778

**At and Following the 2010 Hearings:**

| Submission | Pinpoint |
|---|---|
| R-V | fn. 1 |

281. The Parties agree, and the Tribunal agrees as well, that the AA and the Guaranty are governed by Venezuelan law. (C-III ¶ 175, R-I ¶ 29). This is reflected in the TOR at Section 8, as well as in the Parties' memorials:

> **8. Applicable Law**
>
> Article 18.1 of the AA provides:
>
> > *This Agreement shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.*
>
> Article 9 of the Guarantee [sic] provides:
>
> > *This Guarantee [sic] shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela.*

282. The Tribunal also considers that the law of the United States and New York are also relevant and applicable, insofar as they are *lex arbitri* and this arbitration has its seat in New York.

283. At issue is whether laws enacted after the signing of the AA are applicable to this matter. More extensive consideration regarding this point is found later in this Award.

## K.I.3 Whether Association Agreement was Extinguished

284. This section contains one of Respondents' affirmative defenses and, therefore, presents Respondents' arguments prior to Claimant's arguments.

### K.I.3.a. Arguments by Respondents

285. Respondents argue that, regardless of the severability issue, the AA was extinguished by Venezuelan law and, therefore, cannot form the basis of a claim for damages against Respondents under Venezuelan law. (TOR 5.2.1.a; R-I ¶ 40; R-II ¶ 50; R-III ¶ 27; R-IV ¶ 13). Respondents' experts

explain that, pursuant to **Article 1159 of the Venezuelan Civil Code**, legislative acts or other acts having the force of law can extinguish a contract. (R-II ¶ 40).

286. Under **Article 131 of the 1999 Constitution** and **Article 1 of the Venezuelan Civil Code**, the **Law on Effects** was effective upon publication in the Official Gazette on **October 8, 2007** and extinguished the AA as of that date. (R-I ¶ 40, R-II ¶ 41). With respect to the effective date of the extinguishment, Respondents argue that Claimant has already stated that the AA was *cancelado* as of **June 26, 2007** by reason of **Decree-Law 5200**. (R-IV ¶ 39; R-V ¶ 4).

> 4. Claimant places heavy emphasis on the **Law on the Effects**, but its own letters and court applications show that it viewed the AA as having been extinguished at least as early as June 27, 2007, the end of the four-month period for agreeing on migration. Indeed, in its applications for attachments in various jurisdictions, Claimant stated that **Decree-Law 5200** of February 26, 2007 announced the cancellation of the Agreement. The same view was echoed by Prof. Brewer-Carías in his writings. (R-V ¶ 4).

287. While Claimant now argues that the extinction occurred in **March 2008** (in an effort to argue that its claim arose prior to March 2008), the date of the extinction is irrelevant. The AA was validly nullified by a law of public policy. Such a law of public policy can affect existing contracts, and alter existing relationships without violating the principle of non-retroactivity. (R-IV ¶ 41).

288. Respondents note that the legal principle of extinguishment is not new. Rather, "*it was clearly enunciated in the 1974 Supreme Court decision upholding the constitutionality of the Reversion Law against a challenge on retroactivity grounds in a case involving a Mobil Affiliate as a plaintiff.*" (R-IV ¶ 41).

289. At issue is not a law retroactively making prior conduct illegal. Rather, this case involves a law of public policy precluding any further exercise of a right existing under a prior contract. (R-IV ¶ 41). Respondents argue that

Claimant has confused "*retroactivity*" with immediate effect. (R-II ¶ 43). Respondents state that "*the principle of non-retroactivity of laws does not prevent the immediate effect of new laws dealing with matters of public order, even with respect to existing legal relationships.*" (R-II ¶ 42, partially quoted).

290. Respondents' expert Professor Mélich-Orsini explains that "*public order*" is a limit to the principle of non-retroactivity of the law:

> 42.     Rules of public order ... are those rules that embody, at a given time, the objective principle of justice governing a *colectividad humana* (human community). By establishing a rule of public order, the State determines the compulsory and imperative '*deber ser'* (duty) required at the time by the *conciencia jurídica colectiva* (legal community). . . .
>
> Once the public policy character of a norm has been determined, it must be applied to all existing relationships, even without considering whether these are effects that were produced before the new law took effect and based on prior law. It asserts (*se postula*) the supremacy of the principle incorporated by the new norm over all vested rights that contradict it, thereby preventing the holders of such rights from escaping the application of the new norm shielded by the principle of non-retroactivity of the law established in Article 3 of the Civil Code. (R-II ¶ 42, emphasis in original).

291. Furthermore, even Claimant's expert Brewer-Carías relies on Professor Sánchez-Covisa, who has agreed with the above, writing that "*[n]o one may pretend to have vested rights opposed to public policy*" and that the immediate applicability of public policy laws is considered to be non-retroactive. (R-II ¶ 43).

292. Respondents direct the Tribunal's attention to a decision of the Supreme Court of Justice of Venezuela in which the Ministry of Energy applied a new law and declared several mining concessions extinguished. Therein, the Court held that the "*retroactive*" effect of the law should not be confused with its "*immediate*" effect. (R-II ¶¶ 44 – 45, partially quoted, footnotes omitted, emphasis in original).

> 44.     The norms or Laws of public policy – as mandatory as they are, since they are enacted to protect and safeguard the general interests of the community, against which it is not possible to invoke vested rights –

constitute, in effect, without a doubt, a necessary exception to the original intangibility of the concessions, which the petitioner has alleged in such an absolute manner for his [concessions] in this case.

The "retroactive" effect of the law should not be confused with its "immediate" effect. Nor must it be understood that to abolish powers and rights granted by the old law is to incur retroactivity: No[,] it is to create new situations that fall under the immediate and direct governance of the new law. To say that this power of the legislator means retroactivity is to pretend to paralyze the law, give it an indefinite and absolute permanence, that collides with the progress and social development, with the needs of the community (medio) and the requirements of the collective well-being, would be to implant the absurd norm that the law can never be changed. Portalis had already proclaimed: "To destroy an existing institution is certainly not making a law retroactive; because, if this would be the case, we would have to agree that the laws should never be changed. That the present and the future are under its domain." It is obvious that persons - natural or legal - do not have against the State, or better, against the Legislative Power, the "vested right" that no laws be enacted in any manner that modify matters in which, if we are individually interested, the public well-being is likewise.

45.    [To find otherwise would be to assume] that when the State grants a mining concession, that is to say, when it grants to a private party the right to exploit part of the public wealth constituted by the mines, it also alienates with [the concession] part of its own Sovereignty, such as its right and power to legislate to set forth its own mining policy in the manner that it deems more adequate and convenient to the general interests of the country.

293. Respondents further add a statement from the Attorney General in 1972, that *"[t]o pretend that the rights recognized by this status are everlasting subjective situations would be to disregard the legislative power."* (R-II ¶ 46).

294. The Supreme Court of Justice of Venezuela made it clear in the case *Compañía Anónima Western Ore Company v. La Nación Venezolana* that matters related to the hydrocarbon industry in Venezuela are in fact matters of *"public order."* (R-ll ¶ 48). With respect to Claimant's argument that it is immaterial whether the **Migration Laws** are properly described as part of the Venezuelan public order, Respondents state as follows (R-lll ¶¶ 46-47, footnotes omitted):

46.    Claimant's entire argument appears to rest on the theory that indemnity for all FYs, including the 27.5 future FYs, was due prior to the

extinction of the AA and that therefore the principle of non-retroactivity applies. In turn, this argument hinges upon the precise date that the extinction occurred, which Claimant alleges was in March of 2008, the date of issuance of the transfer decree authorizing the new mixed company formed by Corporación Venezolana del Petróleo, S.A. (a subsidiary of PDVSA) and Veba Oil & Gas Cerro Negro GMBH (a subsidiary of BP, ExxonMobil's former partner in the Project which participated successfully in the migration process), to conduct primary activities in accordance with the 2001 Organic Hydrocarbons Law.

47.   Claimant overlooks the fact that the character of the AA was irretrievably altered as of the first of the **Migration Laws, Decree-Law 5200**, which provided for the transfer of control of operations and the mandatory migration within a specified time period. The parties continued to operate using the AA only as a provisional legal regime in order to allow time for an orderly migration. Claimant itself has repeatedly argued that it lost all interest in even this transitory arrangement as of June 26, 2007, not March 2008, and that the Law on the Effects of the Migration merely "confirmed" or "ratified" what it calls an expropriation that had already taken place.

295.   Respondents add that the factual underpinning of this argument is further invalidated by the fact that no amount of indemnity for 27.5 years had accrued, as such can only apply on a FY to FY basis. (R-III ¶ 49).

## K.I.3.b.   Arguments by Claimant

296.   Claimant outlines its arguments with respect to extinguishment as follows (C-III ¶ 174, partially quoted, footnotes omitted):

-   the validity and effects of the arbitration clauses at issue are independent of the validity and effects of the contracts in which they are inserted (principle of separability) and are not necessarily governed by the law that applies to the merits Mobil CN's claims under the AA arose prior to the "extinction" of that agreement in March 2008 by operation of the **Law on Effects**.

-   The AA expressly provides that the indemnity obligation under Clause XV (the determination of which requires arbitration) survives any termination of the agreement.

-   Venezuelan law, including the Constitution, forecloses the possibility that governmental measures, like the **Decree-Law 5200** and the **Law on Effects**, could be applied retroactively to impair the provisions of the AA, including the arbitration clause, that are precisely designed to operate in the event of governmental measures and contractual breaches such as those that occurred in this case.

297.   Regardless of whether **Decree-Law 5200** or the **Law on Effects** in full or in part can properly be described as part of the Venezuelan *ordre public* or

whether they have immediate effect on existing contracts, their provisions do not impair the claims asserted. Mobil CN's interests in the Project had vested by the time these laws took effect. Further, the Venezuelan Supreme Tribunal of Justice recently held that matters of public order may be subject to arbitration. (C-VI ¶ 22).

298. The **Law on Effects**, not **Decree-Law 5200**, purports to extinguish or terminate the association agreements. Pursuant to **Article 1 of the Law on Effects**, the AA would be "*extinguished as of the date of publication in the Official Gazette of the Bolivarian Republic of Venezuela of the decree that transfers the right to exercise primary activities to the mixed enterprises constituted according to what is provided in [Decree-Law 5200]*." (C-IV ¶ 70). Claimant argues that under these express terms, the AA was not terminated until 5 March 2008 – the date that **Decree No. 5916** transferred rights previously assigned to the Project to PetroMonagas, S.A. (C-IV ¶¶ 69 – 70; C-VI ¶ 37).

299. Nothing in either the **Law of Effects** or **Decree-Law 5200** purports to extinguish existing claims of Foreign Parties under the Agreement. Further, as the legal experts agreed in New York, such an effect would be unconstitutionally retroactive. (C-VI ¶ 38).

300. Claimant submits that, as of **5 March 2008** date of the "*extinguishment*", all of Claimant's claims had arisen and Claimant's rights to compensation and to pursue relief had vested. (C-IV ¶ 71). By that time, Claimant had sent the **notices** of Discriminatory Measures (June 2007), had commenced the ICSID arbitration against the Republic of Venezuela (September 2007), and had commenced this arbitration (January 2008). (C-IV ¶ 75; C-V ¶ 11). The Parties' conduct also confirms that the extinguishment occurred in March 2008: the Parties continued to perform under the contract after February 2007, and PDVSA and the Government kept the AA alive until after the financing for the Project was restructured in December 2007. (C-V ¶ 12).

301. With respect to Respondents' expert Professor Mélich-Orsini's opinion that **Decree-Law 5200** "*effectively extinguished*" the AA, Claimant states that Respondents have provided no explanation of the term "*effective extinguishment.*" Claimant further adds that the various deadlines imposed by **Decree-Law 5200**, as well as the later enacted **Migration Laws**, demonstrate that **Decree-Law 5200** did not extinguish the AA. (C-IV ¶¶ 71-73). The argument that **Decree-Law 5200** extinguished the AA as of February 2007 is contradicted by Respondents' and the Government's conduct: (C-IV ¶ 74, partially quoted, emphasis in original).

- Respondents' three counterclaims against Claimant relate to events occurring between June 2007 and February 2008. By filing these, Respondents concede that the Tribunal has jurisdiction over these claims based on the AA.

- On **1 May 2007**, ExxonMobil de Venezuela, S.A., an affiliate of Mobil CN, and PDVSA Petróleo, S.A. (PDVSA Petróleo), [...] entered into a Consulting and Support Agreement, [the object of which] was to provide to PDVSA Petróleo consulting and support services "related with the operation of the Project." The agreement defined "Project" as the project "property of Mobil CN LTD. (MCN), PDVSA Cerro Negro S.A. (PDVSA-CN) and Veba Oil & Gas Cerro Negro GMBH (VEBA OIL), [...] consist[ing] of the vertically integrated activities of exploitation, production, transport and upgrading of EHO obtained in an Area located in the Orinoco Oil Belt, all in accordance with the AA for said Project subscribed on 28 October 1997 (the 'Project')."

- PDVSA Petróleo relied on the AA, including the Operating Agreement to make cash calls[...] to fund the expenses of the project in June, July, and August 2007.

- Between **26 February and 26 June 2007**, Mobil CN continued to receive its share of the production of the Project and to fund its share of the expenses of the Project according to the terms of the AA.

- **Article 2 of the Law on Effects** provides that [t]he interests, shares and participations in the associations referred to in **Article 1 of Decree-Law 5200** [...] in the companies constituted to develop the respective projects, and in the assets used to realize the activities of such associations, including property rights, contractual rights and [rights] of other nature, which until the expiration of the term established in **Article 4 of said Decree-Law** [26 June 2007], belonged to enterprises of the private sector with which no agreement was reached to migrate to a mixed enterprise, are transferred, based on the reversion principle [principio de reversión], without the need of any action or additional instrument, to the new mixed enterprises constituted as a result of the migration of the respective associations, except as provided in **Article 3 of the present Law**.

- According to the terms of the **Draft Conversion Agreement to Mixed Enterprise** prepared by the Ministry of Energy, the participants in the Project were required to *"recognize and accept, effective on the Closing Date and without the necessity of any additional act or instrument, the termination of the AA without any of such Parties or any of their affiliates having a right to receive any compensation derived from the AA [...]"* *"Closing Date"* was defined as the date that *"CVP fixes [...] which shall be (i) within the course of ten (10) calendar days [...] following the date on which the Transfer Decree is published in the Official Gazette of the Republic [...]."*

302. Claimant further considers Respondents' repudiation of their duties and their *"extinguishment"* argument to be a sign of bad faith. (C-III ¶ 312). International public policy precludes any argument that **Decree-Law 5200** somehow abrogated Claimant's right to arbitration of this dispute. (C-VI ¶ 22).

303. PDVSA's counsel in the London High Court attachment proceedings also admitted that the arbitration agreement survives the termination of the AA:

> 80.   [...] your Lordship will have in mind that it is now a commonplace of our law that an arbitration clause survives the destruction of the contract. That is so the fact that you are arguing about whether or not the contract itself had been frustrated does not prevent the arbitration clause biting to determine that very issue. (C-IV ¶ 80).

304. Regardless of extinguishment, Article 16.1(b) of the AA expressly provides that claims *"shall survive the termination of this Agreement."* (C-IV ¶¶ 68, 77). Moreover, under general principles of Venezuelan law, risk-allocation clauses such as Clause XV survive termination. (C-V ¶ 11).

305. With respect to Respondents' argument that there is no liability without an award, Claimant argues that Claimant's claims arose when the Respondents failed to meet their obligations under the AA and the Guaranty. The Respondents breached the AA when they failed to respond to Mobil CN's notices, failed to cooperate in the legal action against the Government, failed to cooperate in good faith in calculating the amount owed, and failed to pay the indemnity. (C-V ¶ 12, partially quoted; C-VI ¶ 39).

### K.I.3.c. The Tribunal

306. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 173 – 182, 312 |
| C-IV | ¶¶ | 66 – 80 |
| R-I | ¶¶ | 40 – 41 |
| R-II | ¶¶ | 40 – 50 |
| R-III | ¶¶ | 27, 43 – 49, App. A |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Articles 15, 21 |
| C-3 | PDVSA Guaranty Section 9 |
| C-4 | Annex G (Accounting Procedures) to the Association Agreement Section 7 |
| C-33 | Letter dated 30 July 2007 from David Pérez, Vice President of Mobil Cerro Negro, Ltd. to Eulogio del Pino, PDVSA Petróleo, S.A., and Minister Rafael Ramírez, Minister for Popular Power for Energy and Petroleum of the Bolivarian Republic of Venezuela, p. 2 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 24 – 27, 30, 35, 38 – 39, 86 – 88, 90 – 95 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶¶ 17 – 19, 29, 33 – 37, 50, 52 – 53, 60, 64 |
| App. 16 | Allan R. Brewer-Carías, "La estatización de los convenios de asociación que permitían la participación del capital privado en las actividades primarias de hidrocarburos suscritos antes de 2002, mediante su terminación anticipada y unilateral y la confiscación de los bienes afectos a los mismos," in Víctor Hernández Mendible (Coordinador), *Nacionalización, Libertad de Empresa y Asociaciones Mixtas,* Editorial Jurídica Venezolana, Caracas, 2008. *Available at* www.allanbrewercarias.com, Biblioteca Virtual, II.4 Artículos y Estudios, No. 559, 2008 (under "La Estatización Petrolera en 2006-2007 con la terminación unilateral y anticipada de los contratos operativos y de asociación respecto de las actividades primarias de hidrocarburos.") p. 37 |
| App. 28 | Allan R. Brewer-Carías, "La terminación anticipada y unilateral mediante leyes de 2006 y 2007 de los convenios operativos y de asociaciones petroleros que permitían la participación del capital privado en las actividades primarias suscritos antes de 2002," in *Revista de Derecho Público,* No. 109 (enero-marzo 2007), Editorial Jurídica Venezolana, Caracas 2007, pp. 47-54. *Available at* |

|         | www.allanbrewercarias.com, Biblioteca Virtual, II.4 Artículos y Estudios, No. 510, 2007 p. 10 |
|---------|---|
| C-87    | Association Agreement Articles 2, 16.1(b), 18.1, 18.2 |
| C-99    | Decree-Law 5200 Art. 1, 3, 4, 5 |
| C-101   | Draft Form of Contract for Conversion to a Mixed Company (17 January 2007) Art. 1.4, 2 |
| C-104   | Law on the Effects Art. 1, 2 |
| C-129   | Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein [*Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican*] (as published in the Official Gazette No. 38884 of 5 March 2008) Art. 1 |
| C-130   | Gary B. Born, International Commercial Arbitration pp. 55 – 56, 110 (2d ed. 2001) |
| C-131   | Final Award in ICC Case No. 6162 of 1990, XVII Yearbook of Commercial Arbitration 153 *et seq.* (1992) (ICC Case No. 6162) |
| C-132   | Award in ICC Case No. 5832 of 1988, COLLECTION OF ICC ARBITRAL AWARDS 1986-1990 (1994) at 540 |
| C-133   | Final Award of 22 February 1988 in ICC Case No. 5294, COLLECTION OF ICC ARBITRAL AWARDS 1986-1990 (1994) at 183 |
| C-134   | Venezuelan Civil Code [*Código Civil*] (as published in the Official Gazette No. 2990 of 26 July 1982) Art. 1160 |
| C-173   | Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* |
| C-214   | Second Declaration of Professor Allan R. Brewer-Carías at ¶¶ 10-14, 16 – 26, |
| C-215   | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 51, 61 – 63, 65 – 71 |
| App. 29 | Commercial Arbitration Law [*Ley de Arbitraje Comercial*] (published in Official Gazette 36.430 of April 7, 1998) Art. 7 and 25 |
| C-224   | Venezuelan Constitution [*Constitución Venezolana*], dated 20 December 1999 (as published in Extraordinary Official Gazette No. 5453 of 24 March 2000) Art. 253 |
| C-229   | Consulting Support Agreement [*Contrato de Consultoría de Apoyo y Soporte*] (29 October 1997), Second Whereas and Section 1 |
| C-230   | PDVSA Petróleo, S.A. June, July, and August 2007 Cash Calls |
| C-231   | Venezuela Supreme Tribunal of Justice, Constitutional Chamber, *Decision No. 15* (15 February 2005), *reprinted in Revista de Derecho Público*, no. 101 (Jan.-March 2005) at p. 85 |
| C-232   | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO § 456 n.48 (4th ed. 2006) |
| C-233   | Venezuela Supreme Tribunal of Justice, Constitutional Chamber, *Decision No. 1541* (17 October 2008) Eng. Tr. pp. 13-14, 27 – 29, 34 |
| C-234   | *Cardegna v. Buckeye Check Cashing, Inc.*, 546 U.S. 440, 448 – 49 (2006) |
| C-235   | *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) |
| C-236   | *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2nd Cir. 2001) |

| | |
|---|---|
| C-237 | *ACE Capital re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34-36 (2d Cir. 2002) |
| C-238 | *Pinson v. Pinson*, 824 N.Y.S. 2d 758 (N.Y. Sup. 2006, unreported) |
| C-239 | *Mobil Cerro Negro, Ltd. v. Petroleos de Venezuela S.A.*, High Court of Justice, Queen's Bench Division, Transcript of Public Proceedings, Commercial Court, Day 2 (29 February 2008) at p. 38 |
| C-248 | Financial and Operational Information of PDVSA and Affiliates [*Información Financiera y Operacional, PDVSA y sus Filiales*], as of 31 December 2007 and 2006 [*Notas a los Estados Financieros Consolidados, 31 de diciembre de 2007 y 2006*] at 140 |
| C-289 | José Mélich-Orsini, DOCTRINA GENERAL DEL CONTRATO (2006) (excerpt, Chapter XVII, Section 456) at n. 48 |
| R-7 | Decree-Law 5200 Art. 1, 3 |
| R-16 | Attachment Order of the Court of First Instance of Aruba, 1 February 2008; attachment Order of the Court of First Instance of the Curaçao Section, 1 February 2008; attachment Order of the District Court of Amsterdam, 5 February 2008 ¶ 14 |
| R-17 | Law on Effects Art. 3 & 5 |
| R-41 | PDVSA Guaranty |
| R-43 | Congressional Authorization |
| R-57 | Decree No. 1.510, Decree with Force of Organic Law of Hydrocarbons, Official Gazette No. 37.323, published 13 November 2001 ("2001 Hydrocarbons Law") |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 7, 9 – 23, 34, 39 |
| App. 3 | José Mélich-Orsini, *General Contract Doctrine*, 4th Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios N° 61, Caracas, 2006 § 194 pp. 236 – 237 |
| App. 5 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 131, 302 |
| App. 6 | Venezuelan Civil Code Art. 1, 1.159, 1.271, 1.272 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 8, 11 – 39 |
| App. 2 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 131, 203 |
| App. 7 | *Venezuelan Civil Code* Art. 1, 6, 1.159, 1.271, 1.272 |
| App. 16 | Joaquín Sánchez-Covisa, *The Temporal Effect of the Law in the Venezuelan Legal System*, Academia de Ciencias Políticas y Sociales, Serie Clásicos Venezolanos, No. 2, Caracas, 2007 pp. 193, 197 |
| App. 17 | Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Compañía Anónima Western Ore Company v. La Nación Venezolana* (December 21, 1967) pp. 20 – 23 |
| App. 18 | Opinion of the Office of the Attorney General of the Republic on the Law on Assets Subject to Reversion in Hydrocarbons Concessions, dated March 8, 1972, *in Public Law and Administration Sciences Archives – Tribute to Professor Antonio Moles Caubet by the Institute of Public Law*, Universidad Central de Venezuela, Facultad de Ciencias Jurídicas y Políticas, Instituto |

|  | de Derecho Público, Caracas, 1981, Tomo 2, Vol. 3 p. 699 *et seq.* |
|---|---|
| App. 19 | Judgment, Full Chamber of the Supreme Court of Justice, *Regarding a request for nullity on constitutional grounds of the Law on Assets Subject to Reversion in Hydrocarbons Concessions* (December 3, 1974) p. 733 |
| App. 20 | Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Asfalto de Petróleo (ASFAPETROL C.A.) v. Petróleos de Venezuela, S.A.* (PDVSA) p. 1 |
| App. 21 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Minas de San Miguel C.A. v. Ministerio de Energía y Minas* (July 16, 2008) 2 |
| R-112 | Association Agreement |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 3-9, 11 – 16, 22 – 23, 28 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 3, 22 – 23, 28 |
| App. 46 | Venezuelan Civil Code |
| R-130 | Allan R. Brewer-Carías, *La intervención del estado en la actividad mercantil,* JORNADAS DE DERECHO MERCANTIL (Universidad Católica Andrés Bello, Facultad de Derecho, Caracas 1978) p. 558 |
| Unnumbered | Karl-Heinz Böckstiegel, *Public Policy and Arbitrability,* in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 177, 201-203 (Pieter Sanders ed., 1987); |
| Unnumbered | Pierre Lalive, *Transnational (or Truly International) Public Policy and International Arbitration,* in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 258, at ¶¶ 141-142 (Pieter Sanders ed., 1987). |

## At and Following the 2010 Hearings:

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 10 – 13 |
| C-VI | ¶¶ | 22, 37 - 39 |
| R-IV | ¶¶ | 12 -13, 39 – 41 |
| R-V | ¶¶ | 4 – 5 |
| R. Closing Slides | | 14, 21 |

| Speaker | Citation |
|---|---|
| Brewer-Carías | 911 – 912, 1007 |
| C. Closing | 2044 – 2048 |
| C. Opening | 55 – 56 |
| Expert Conf. | 908 – 926, 914 – 915 (Mr. Chairman), 951 – 954, 965 – 968, 984 – 990, 1006 – 1007 |
| Hernández-Bretón | 918 – 919, 1008 |
| Mélich-Orsini | 912 [Sp. Hr. Tr. 15: 5-12] |
| R. Closing | 2119 – 28 |
| R. Opening | 104 – 106 |

307. The Tribunal agrees that, irrespective of whether the AA was extinguished, the claims based on the AA survive. Article 16(1)(b) of the AA is very helpful in this respect, which states:

    (b)     The rights and obligations of the Parties in respect of any advance under Clause XII, payments under Clause XV, indemnities under Sections 12.6 and 17.2, contingent liabilities not settled pursuant to Section 16.4, the abandonment of wells pursuant to Section 16.6, Project Information under Section 19.1, and confidentiality obligations pursuant to Sections 5.2, 6.2 and Clause XX, shall survive the termination of this Agreement.

308. The AA, thus, still needs to be applied, without regard to whether it was extinguished.

309. There is no real dispute that the AA is governed by Venezuelan law and that there is no stabilization or freezing clause that would purport to freeze Venezuelan law as it existed in 1997. There is no dispute either that Venezuelan law, including the Constitution, forecloses the possibility that governmental measures could be applied retroactively to impair the provisions of a contract. However, the *"retroactive"* effect of the law should not be confused with its immediate effect, nor must it be understood that to abolish powers and rights granted by an old law is to incur retroactivity. To say that this power of the legislation means retroactivity would be to seek, in the words of Respondents, *"to paralyze the law, give it an indefinite and absolute permanence that collides with the progress and social development, with the needs of the community and the requirements of the collective well-being, would be to implant the absurd norm that the law can never be changed."*

310. The Tribunal also notes that Claimant's expert, Mr. Brewer-Carías, agrees that no one may pretend to have vested rights opposed to public policy and that the immediate applicability of public policy laws is considered to be non-retroactive. Consensus therefore appears to exist on this general issue

between Claimant and Respondents that a new law can amend an old law with immediate effect.

311. The Tribunal finds, however, that the amendment or abrogation of an old law would not prevent a party from seeking indemnification under a contract providing, as does the AA, for (1) indemnification of that party in certain circumstances and (2) survival of the indemnification provision in the event of amendment, termination or extinguishment of the contract. The Tribunal's finding is subject, however, to the relevant party not being barred from seeking such indemnification by a force majeure clause, a non-imputable extraneous cause or contractual provisions regulating the triggering of the action for indemnification.

## K.I.4    Relevance of Decisions of Other Tribunals

### K.I.4.a.    Arguments by Claimant

312. Claimant explains that the progression of the ICSID case, filed on 6 September 2007 with a briefing schedule ending on 15 December 2011 and a final hearing scheduled for February 2012, demonstrates why the indemnification provisions are a critical legal protection for Claimant. (C-V ¶ 38).

313. Claimant opposes Respondents' argument that Claimant's remedies lie solely with the ICSID arbitration and states that such an argument is inconsistent with the terms of the AA. (C-V¶ 37). Instead, Claimant states that the Parties knew that pursuing a claim against the Government would be difficult and lengthy and that they, therefore, crafted the indemnity provisions such that they would function regardless of any claim that the Claimant may have against the Republic of Venezuela. (C-V ¶ 37). Article 15.1(a) contemplates an action against the Republic of Venezuela that would be conducted independently from, but in parallel with, arbitration against Respondents. (C-V ¶ 34, partially quoted). Claimant further characterizes Respondents' argument that all relief lies in the ICSID

proceeding as disingenuous, citing the Government's statement that it has no intention of paying an award. (C-V ¶ 38).

314. Claimant presents a third argument in favor of this parallel ICC arbitration. A ruling that PDVSA-CN has breached the AA is a form of relief that is available before this ICC Tribunal, but not in the ICSID case. (C-V ¶ 39). Such a ruling would enable the Claimant to purchase PDV Chalmette's Interest in Chalmette Refining LLC under Section 8.6 of the Chalmette Agreement. (C-V ¶ 39).

315. Claimant argues that the ICSID arbitration has no relevance in the determination of the merits of this case. (C-V ¶ 36). Claimant did, however, reference the ICSID case in its discussion of the discount rate:

> 30.    [...] The discount rate applicable to cash flows from Claimant's interest in the Project will be determined in the ICSID case, not this one. But when that occurs, the discount rate for an established project like Cerro Negro should be substantially lower than 10%. (C-V ¶ 30).

### K.I.4.b.    Arguments by Respondents

316. Respondents argue that the ICSID proceedings are the main proceedings regarding this controversy, but explain that the ICSID case has nothing to do with "*revers[ing] or obtain[ing] relief from a Discriminatory Measure,[...] but rather to obtain damages for alleged violations of international law and Venezuelan law.*" (R-IV ¶ 83).

317. Respondents suggest that Claimant "*has always understood that it did not have a claim under the AA*", and states that this is why Claimant has always dealt with the Government. Respondents state that Claimant's first mention of a claim before the ICC pursuant to the AA was made in order to "*prepare the way for attachments and freezing orders not available to it in connection with the ICSID proceeding.*" (R-IV ¶ 84). Respondents urge the Tribunal to "*[leave the Claimant] to its strategy of dealing with the State.*" (R-IV ¶ 84).

### K.I.4.c.    The Tribunal

318. In the context of this section, the Tribunal, without repeating the contents, further takes particularly into account the following sections of the Parties' Briefs and of the evidence in reply to Question 3.1 raised by the Tribal to the Parties in PO-6:

#### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 30 – 39 |
| R-IV | ¶¶ | 83 – 86 |

#### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-8 | Copy of 10 October 2007 Notice of Registration of the Request for Arbitration filed before the International Centre for Settlement of Investment Disputes. |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶ 30 |
| C-42 | Testimony of Mark Ward (26 September 2008) at ¶ 27 |
| C-87 | Association Agreement Article 15.1(a) |
| C-119 | Amended and Restated Limited Liability Company Agreement of Chalmette Refining, LLC (28 October 1997), § 8.6 |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) ¶ 12 |
| R-37 | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order (27 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶ 82 |
| R-112 | Association Agreement |
| R-114 | Supplemental Brailovsky/Wells Report ( August 14, 2009) ¶ 52 – 57 |
| Unnumbered | ICSID Decision on Jurisdiction at ¶¶ 209 (a) – (b) |
| Unnumbered | Republic of Venezuela's ICSID Memorial on Jurisdiction at ¶¶ 25-26 |

#### At and Following the 2010 Hearings:

| Submission | Pinpoint |
|---|---|
| R. Closing Slides | 88, 89 |

| Speaker | Citation |
|---|---|
| C. Opening | 34 – 35, 53 – 54 |
| C. Closing | 2039 – 2040 |
| Cutt | 702 – 703, 710 – 711 |

| Jones | 1378, 1383 – 1383, 1437 |
| Massey | 594 – 595 |
| Myers | 1762 |
| R. Closing | 2183 – 2187 |
| R. Opening | 101 – 102 |
| Ward | 147, 238 – 240, 278 – 280, 286 |

319. The disputes that arose after **21 February 2006** between Claimant and the Republic of Venezuela are subject to a currently pending ICSID arbitration (ICSID Decision). Relevant portions of the ICSID Tribunal's decisions are incorporated, where appropriate, in this Award.

320. The Tribunal notes that the ICSID proceedings have passed the jurisdictional phase. The briefing schedule ends on 15 December 2011, and the hearing on all remaining issues is scheduled for February 2012. (R-IV ¶ 86).

321. As the ICSID dispute does not involve the same Parties as the present ICC case, the Tribunal does not consider the ICSID proceeding to have any direct relevance for the present case. Whether the Republic's and its government's role involving the Respondents in the present case is of relevance will be considered later in this Award.

322. In the legal arguments made in their written and oral submissions, the Parties relied on numerous decisions of other courts and tribunals. Accordingly, it is appropriate for the Tribunal to make certain general preliminary observations in this regard.

323. First of all, the Tribunal considers it should make it clear from the outset that it regards its task in these proceedings as the very specific one of interpreting and applying the relevant provisions of the Parties' contracts whose arbitration clauses provide the mandate for this Tribunal, *i.e.* the AA and the PDVSA Guaranty, in order to decide on the relief sought by the Parties.

324. Without prejudice to the applicable law, in international arbitration, there is no duty to respect precedent with regard to decisions of other arbitral tribunals or of the national courts. However, this does not preclude the Tribunal from considering arbitral decisions or court decisions and the arguments of the Parties based upon them, to the extent that it may find that they shed any useful light on the issues that arise for decision in this case.

325. In so far as relevant, such an examination is conducted by the Tribunal later in this Award, after the Tribunal has considered the Parties' contentions and arguments regarding the various issues argued and relevant for the interpretation of the applicable legal provisions.

## K.II.      Jurisdiction

## K.II.1.      Arguments by Claimant

326. Article 18.2 of the AA and Article 12 of the PDVSA Guaranty both provide that any dispute arising from those agreements shall be settled by arbitration "*in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce,*" to be conducted in New York, NY. (C-I ¶¶ 14-15; C-III ¶¶ 168 – 172; see also TOR ¶ 8; C.Closing Slide 9).

327. Claimant provides the following responses to Respondents' jurisdictional challenges (C-III ¶ 174, footnotes omitted):

- *First,* the validity and effects of the arbitration clauses at issue are independent of the validity and effects of the contracts in which they are inserted (principle of separability) and are not necessarily governed by the law that applies to the merits.

- *Second,* Mobil CN's claims under the AA arose prior to the "extinction" of that agreement in March 2008 by operation of the **Law on Effects**.

- *Third,* the AA expressly provides that the indemnity obligation under Clause XV (the determination of which requires arbitration) survives any termination of the agreement.

- *Fourth,* Venezuelan law, including the Constitution, forecloses the possibility that governmental measures, like the **Decree-Law 5200** and the **Law on Effects**, could be applied retroactively to impair the provisions of the AA, including the arbitration clause, that are precisely designed to

operate in the event of governmental measures and contractual breaches such as those that occurred in this case.

328. Claimant also argues that Respondents' assertion of three counterclaims in this matter should be understood as an acceptance of this Tribunal's jurisdiction over this matter. (C-IV ¶ 74).

329. Claimant rejects Respondents' argument that "*the principle of severability of arbitration clauses [...] does not trump a law of public policy.*" (C-VI ¶ 21). Claimant presents six counter-arguments to Respondents' attempt to extend the "*extinguishment*" theory to this Tribunal's jurisdiction. *First*, nothing in **Decree-Law 5200** or the **Law on Effects** purports to address – or can address – disputes arising from the obligations of PDVSA-CN under the AA or those of PDVSA under the Guaranty. *Second*, Claimant is not seeking relief against the Government for events related to those laws. *Third*, "*Venezuelan jurisdiction... includes arbitration*" and this is a favored dispute-resolution mechanism under the Venezuelan Constitution. (C-IV ¶ 79; C-VI ¶ 22). *Fourth*, whether **Decree-Law 5200** has public order provisions is irrelevant to the question of jurisdiction: the Venezuelan Supreme Tribunal of Justice has recently held that matters of public order may be subject to arbitration. *Fifth*, international public policy precludes any argument that **Decree-Law 5200** somehow abrogated Claimant's right to arbitration of this dispute. (C-VI ¶ 22, partially quoted). *Sixth*, the AA itself provides that any dispute relating to the Agreement – logically including termination or "*extinguishment*" of the contract – shall be settled by arbitration. (C-IV ¶ 79).

330. In response to the Tribunal's question about which law applies to the interpretation of arbitration clauses, Professor Hernández Bretón explained that the Tribunal may determine the applicable law, without regard to the substantive law chosen by the Parties. (C. Closing Slide 9, C. Closing Statement p. 6, partially quoted). Typically, a Tribunal will apply the *lex fori* to determine the validity and interpretation of arbitration clauses. The approach also finds support under **Article V(1)(a) of the New York**

**Convention**, where this approach is used at the time of the enforcement of an award.

331. Claimant explains how, under New York and Venezuelan law, arbitration clauses must be interpreted in good faith, to give effect to the parties' reasonable expectations (C. Closing Statement p. 6; C. Closing Slide 9):

- For example, just two months ago, a New York court ruled that an arbitration clause must be interpreted to "give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Republic Mortgage Ins. Co. v. Countrywide Fin. Corp.*

- And the U.S. Court of Appeals for the Second Circuit (the circuit that includes New York) has held that the interpretation of an arbitration clause "must ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions." *Spear, Leads & Kellogg v. Cent. Life Assurance Co.*

- The same conclusions follow from a good-faith interpretation of the contract under **Article 12 of the Venezuelan Code of Civil Procedure**.

## K.II.2. Arguments by Respondents

332. From the outset, the Respondents have maintained that their *"participation in this arbitration should not be construed as acceptance of the jurisdiction of this or any other tribunal to determine the effect of the Law on Effects, and should not be viewed as a precedent for any case as to the appropriateness of settling disputes dealing with matters of public order in Venezuela, such as the legal framework regarding hydrocarbons, through international arbitration."* (R-I ¶ 40 fn. 19).

333. In the **Terms of Reference** and **Respondents' Reply Memorial**, Respondents stated: *"Pursuant to the Law on Effects referred to in the Request for Arbitration, the AA was extinguished and all related controversies referred to Venezuelan Jurisdiction. Therefore, since Claimant concedes that Venezuelan law governs, the AA cannot form the basis of a claim by Claimant in this arbitration."* (TOR 5.2.1.a; R-III ¶ 25).

334. Laws of public policy, such as **<u>Decree-Law 5200</u>**, can affect existing contracts. By its express terms, **<u>Decree-Law 5200</u>** referred all controversies regarding its interpretation and implementation to Venezuelan tribunals. Inasmuch as the AA has been extinguished by a law of general application, the Parties are precluded from basing substantive claims on it. (R-V ¶¶ 2 – 3). This has rendered the interaction between the severability of arbitration clauses on the one hand and laws of public policy on the other, somewhat academic.

335. With respect to the severability of arbitration clauses, Respondents state that, although severability is recognized in Venezuelan law, the principle of severability does not trump **<u>Decree-Law 5200</u>** – a law of public policy. (R-IV ¶ 12).

## K.II.3.　　The Tribunal

336. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 14 – 15 |
| C-III | ¶¶ | 168 – 174 |
| C-IV | ¶ | 74 |
| R-I | ¶¶ | 40 – 41 |
| R-II | ¶¶ | 41 – 49 |
| R-III | ¶ | 25 |
| TOR | ¶ | 5.2.1(a). |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Articles 15.2(a), 18.2, 21 |
| C-3 | PDVSA Guaranty Art. 12 |
| C-4 | Annex G (Accounting Procedures) to the Association Agreement Section 7 |
| C-33 | 30 July 2007 letter from David Perez, Vice President of Mobil Cerro Negro, Ltd. to Eulogio del Pino, PDVSA Petróleo, S.A., and Minister Rafael Ramírez, Minister for Popular Power for Energy and Petroleum of the Bolivarian Republic of Venezuela. p. 2 |

| | |
|---|---|
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) ¶¶ 24, 25, 28 – 33, 90 – 95 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) ¶¶ 19, 29, 44 – 47, 50, 53, 64 |
| C-87 | Association Agreement Art. 15.1(b), 16.1(b), 18.2, 21, Annex G |
| C-99 | Decree-Law 5200 Art. 13 |
| C-101 | Draft Form of Contract for Conversion to a Mixed Company (17 January 2007) Art. 1.4, 2 |
| C-104 | Law on Effects Art. 2 |
| C-130 | GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION, 110 (2d ed. 2001) pp. 55 – 56, 110 |
| C-131 | Final Award in ICC Case No. 6162 of 1990, XVII YEARBOOK OF COMMERCIAL ARBITRATION (1992), 153 *et seq.* |
| C-132 | Award in ICC Case No. 5832 of 1988, COLLECTION OF ICC ARBITRAL AWARDS 1986-1990 (1994) at 540 |
| C-133 | Final Award of 22 February 1988 in ICC Case No. 5294, COLLECTION OF ICC ARBITRAL AWARDS 1986-1990 (1994) at 183 |
| C-134 | Venezuelan Civil Code Art. 1160 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 51, 61 – 71 |
| App. 21 | Venezuelan Code of Civil Procedure [*Código de Procedimiento Civil*] (published in Extraordinary Official Gazette No. 4.209 of September 18, 1990) Art. 12 |
| App. 29 | Commercial Arbitration Law [*Ley de Arbitraje Comercial*] (published in Official Gazette 36.430 of April 7, 1998) Art. 7 and 25 |
| C-224 | Venezuelan Constitution [*Constitución Venezolana*], dated 20 December 1999 (as published in Extraordinary Official Gazette No. 5453 of 24 March 2000) Art. 253 |
| C-229 | Consulting Support Agreement [*Contrato de Consultoría de Apoyo y Soporte*] (29 October 1997), Second Whereas and Section 1 |
| C-230 | PDVSA Petróleo, S.A. June, July, and August 2007 Cash Calls |
| C-233 | Venezuela Supreme Tribunal of Justice, Constitutional Chamber, Decision No. 1541 (17 October 2008) at 365.488 (English Trans. 13 – 14, 27 – 29, 34) |
| C-234 | *Cardegna v. Buckeye Check Cashing, Inc.*, 546 U.S. 440, 448 - 449 (2006) |
| C-235 | *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) |
| C-236 | *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2nd Cir. 2001) |
| C-237 | *ACE Capital re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34 – 36 (2d Cir. 2002) |
| C-238 | *Pinson v. Pinson*, 824 N.Y.S. 2d 758 (N.Y. Sup. 2006, unreported) |
| C-239 | *Mobil Cerro Negro, Ltd. v. Petroleos de Venezuela S.A.*, High Court of Justice, Queen's Bench Division, Transcript of Public Proceedings, Commercial Court, Day 2 at 38 (29 February 2008) |
| R-7 | Decree-Law 5200 Art. 1, 13 |
| R-17 | Law on Effects Art. 1, 5 |
| R-57 | 2001 Hydrocarbons Law |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February |

2009) at ¶¶ 11-12, 14, 16-24, 39

App 3     José Mélich-Orsini, *General Contract Doctrine,* 4th Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios N° 61, Caracas, 2006

App. 5     Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*]

R-69     Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 8, 11 – 12, 30, 32 – 39

App. 2     Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*]

App. 7     Venezuelan Civil Code [*Código Civil de la República de Venezuela*] Art. 6, 131

App. 16     Joaquín Sánchez-Covisa, *The Temporal Effect of the Law in the Venezuelan Legal System,* Academia de Ciencias Políticas y Sociales, Serie Clásicos Venezolanos, No. 2, Caracas, 2007 pp. 193, 197

App. 17     Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Compañía Anónima Western Ore Company v. La Nación Venezolana* (December 21, 1967) pp. 20 – 22

App. 18     Opinion of the Office of the Attorney General of the Republic on the Law on Assets Subject to Reversion in Hydrocarbons Concessions, dated March 8, 1972, *in Public Law and Administration Sciences Archives – Tribute to Professor Antonio Moles Caubet by the Institute of Public Law,* Universidad Central de Venezuela, Facultad de Ciencias Jurídicas y Políticas, Instituto de Derecho Público, Caracas, 1981, Tomo 2, Vol. 3 pp. 699 *et seq.*

App. 19     Judgment, Full Chamber of the Supreme Court of Justice, *Regarding a request for nullity on constitutional grounds of the Law on Assets Subject to Reversion in Hydrocarbons Concessions* (December 3, 1974) p. 733

App. 20     Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Asfalto de Petróleo (ASFAPETROL C.A.) v. Petróleos de Venezuela, S.A.* (PDVSA) (August 14, 1992) p. 1

App. 21     Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Minas de San Miguel C.A. v. Ministerio de Energía y Minas* (July 16, 2008) p. 2

R-118     Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009)

App. 49     Venezuelan Code of Civil Procedure, Official Gazette No. 4.209 (Extraordinary), published September 18, 1990[*Código de Procedimiento Civil, Artículo 12*] Art. 12

Unnumbered     Karl-Heinz Böckstiegel, *Public Policy and Arbitrability*, in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 177, 201-203 (Pieter Sanders ed., 1987);

Unnumbered     Pierre Lalive, *Transnational (or Truly International) Public Policy and International Arbitration*, in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 258, at ¶¶ 141-142 (Pieter Sanders ed., 1987).

| Unnumbered | Convention on the Recognition and Enforcement of Foreign Arbitral Awards (10 June 1958), Art. V(1)(a) [hereinafter *"New York Convention"*]. |
| Unnumbered | *Republic Mortgage Ins. Co. v. Countrywide Fin. Corp.*, 2010 WL 2927286, Slip. op. at *2 (N.Y. Sup. Ct. July 22, 2010). |
| Unnumbered | *Spear, Leads & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir. 1996). |

**At and Following the 2010 Hearings:**

| Submission | Pinpoint |
| --- | --- |
| C-VI | ¶¶ 21 – 23 |
| R-IV | ¶ 12 |
| R-V | ¶¶ 2 – 3 |
| C. Closing Slide | 9 |
| C. Closing | pp. 5 – 7 |
| R. Closing Slides | 14 – 21 |

| Speaker | Citation |
| --- | --- |
| Brewer-Carías | 1006 – 1007 |
| C. Closing | 2044 – 2048 |
| C. Opening | 55-56 |
| Expert Conf. | 908 – 26, 984 – 90 |
| Hernández-Bretón | 902 – 903, 905 – 908, 1008 |

337. Respondents have consistently maintained that their participation in this arbitration should not be construed as acceptance of the jurisdiction of this Tribunal to determine the effect of the **Law on the Effects** and should not be viewed as a precedent for any case as to the appropriateness of settling disputes dealing with matters of public order in Venezuela, such as the legal framework regarding hydrocarbons, through international arbitration.

338. The Tribunal does not understand this, however, to mean that Respondents challenge the jurisdiction of this Tribunal in this arbitration in a general manner. Rather, they argue that the AA cannot form the basis of a claim by Claimant in this arbitration because of a number of reasons, from the well-established principles relating to the consequences of an *"hecho del príncipe"*, to the allegation that Claimant has forfeited its right to compensation under the AA for various reasons and, as a consequence, that Claimant has no claim against PDVSA-CN under the AA and, therefore, no claim against PDVSA under the Guaranty.

339. It thus appears that Respondents are not actually challenging the jurisdiction of this Tribunal over this dispute, but merely stating, for political or other reasons, that they do not accept that international arbitration tribunals are the appropriate forums for settling disputes dealing with matters of public policy in Venezuela.

340. On the other hand, Respondents' assertion of three counterclaims in this matter shows that they accept this Tribunal's jurisdiction over this matter.

341. For ease of reference, the relevant provisions of the AA and the PDVSA Guaranty, together with their appropriate citations in the record, are set out here:

**Articles 16.1(b) AA - Termination**

| Spanish (Original) | Claimant's Translation |
|---|---|
| (b)    Los derechos y obligaciones de las Partes en relación con cualquier anticipo de acuerdo con la Cláusula XII, los pagos de acuerdo con la Cláusula XV, las indemnizaciones de acuerdo con la Sección 12.6 y 17.2, los pasivos contingentes que no se hayan arreglado de acuerdo con la Sección 16.4, el abandono de los pozos de acuerdo con la Sección 16.6, la Información del Proyecto de acuerdo con la Sección 19.1 y las obligaciones de confidencialidad de acuerdo con las Secciones 5.2, 6.2 y la Cláusula XX, sobrevivirán a la terminación de este Convenio. | (b) The rights and obligations of the Parties in respect of any advance under Clause XII, payments under Clause XV, indemnities under Sections 12.6 and 17.2, contin-gent liabilities not settled pursuant to Section 16.4, the abandonment of wells pursuant to Section 16.6, Project Information under Section 19.1, and confidentiality obligations pur-suant to Sections 5.2, 6.2 and Clause XX, shall survive the termination of this Agreement. |
| (C-87; R-112) | (C-87) |

**Article 18.2 AA - Arbitration**

| Spanish (Original) | Claimant's Translation |
|---|---|
| 18.2    <u>Arbitraje</u>. | 18.2 <u>Arbitration</u>. |
| Cualquier disputa que surja o se relacione | Any dispute arising out of or concerning |

con este Convenio será dirimida exclusiva y definitivamente mediante arbitraje. El arbitraje será realizado por tres (3) árbitros (salvo lo que se establece más adelante) de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio (las "Reglas ICC"), o cualesquiera otras normas que sean acordadas por todas las Partes en la correspondiente disputa. Si la controversia se plantea entre dos Partes, o si todas las Partes en conflicto convienen en ser agrupadas en dos grupos basándose en una posición e interés común en la controversia, cada una de las Partes o grupos, según sea el caso, seleccionará a un árbitro de acuerdo con las Reglas ICC. Los árbitros así nombrados acordarán en treinta (30) días sobre el nombramiento de un tercer árbitro que servirá de Presidente. Si hay más de dos partes involucradas en la controversia y éstas no pueden acordar rápidamente en ser agrupados en dos grupos, entonces los tres árbitros, incluyendo al Presidente, serán designados por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio de acuerdo con las Reglas ICC, como si las partes no hubieran nombrado árbitros. No obstante, las controversias sometidas a arbitraje con relación a las Secciones 12.1(a) o 16.3, serán dirimidas por un solo árbitro seleccionado de acuerdo con las Reglas ICC. A menos que todas las partes en el arbitraje convengan lo contrario, todos los procedimientos de arbitraje según este Convenio serán realizados en la Ciudad de Nueva York (Estados Unidos de América). Cualquier decisión del tribunal de arbitraje (o del árbitro único) será firme y obligatoria para las partes en el arbitraje. La ejecución de cualquier decisión dictada por el tribunal de arbitraje (o del árbitro único) será acordada por cualquier tribunal competente sin revisión del fondo de la controversia.

this Agreement shall be settled exclusively and finally by arbitration. The arbitration shall be conducted by three (3) arbitrators (except as established below) in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules as may be agreed by all of the Parties to the corresponding dispute. If there are two Parties to the dispute, or if all Parties to the dispute agree to be grouped together into two groups on the basis of a common interest and position in the dispute, then each one of the Parties or groups, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall then agree within thirty (30) days on the nomination of a third arbitrator to serve as Chairman. If there are more than two parties to the dispute and they do not promptly agree to be grouped together into two groups, then all three arbitrators, including the Chairman, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if the parties had failed to nominate arbitrators. Notwithstanding the foregoing, disputes submitted to arbitration related to Sections 12.1(a) or 16.3 shall be resolved by a single arbitrator selected in accordance with the ICC Rules. Unless all parties to the arbitration agree to the contrary, all arbitration proceedings under this Agreement shall be conducted in New York City (United States of America). Any decision of the arbitral tribunal (or the sole arbitrator) shall be final and binding upon the parties to the arbitration. Judgment for execution of any award rendered by the arbitral tribunal (or the sole arbitrator) shall be entered by any court of competent jurisdiction without review of the merits of the dispute.

(C-87; R-112)

(C-87)

## Section 12 PDVSA Guaranty

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
| --- | --- | --- |

Cualquier disputa que surja de o con respecto a esta Fianza será resuelta exclusiva y definitivamente por arbitraje. El arbitraje será realizado y resuelto en forma definitiva por tres (3) árbitros de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara de Comercio Internacional (las "Reglas ICC"), o aquellas otras reglas que puedan convenir todas las partes envueltas en la disputa. Si hubiere dos partes en la disputa correspondiente , o si todas las partes en disputa convienen en agruparse en dos grupos en base al interés común y posición común en la disputa, entonces cada parte o grupo, según sea el caso, seleccionará un árbitro de acuerdo con las Reglas ICC. Los árbitros así nombrados deberán convenir dentro del plazo de treinta (30) días en un tercer árbitro que servirá de Presidente. Si hubiere más de dos partes en disputa y las partes en disputa no acordaren prontamente agruparse en dos grupos, entonces los tres árbitros, incluyendo el Presidente serán seleccionados por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio de acuerdo con las Reglas ICC, tal como si ninguna de las partes hubiese designado árbitro. Salvo que las Partes convengan otra cosa, todos los procedimientos de arbitraje serán conducidos en la Ciudad de Nueva York (Estados Unidos de América). No obstante lo anterior, en el caso de que una disputa involucre tanto a la Fiadora como a la Filial Garantizada, el arbitraje

Any dispute arising out of or concerning this Guaranty shall be resolved exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules which all the parties involved in the dispute may agree to. If there are two parties in the corresponding dispute, or if all parties to the dispute agree to be grouped together into two groups on the basis of their common interest and common position in the dispute, then each party or group, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall agree within a thirty (30) day time period on a third arbitrator who shall serve as President. If there are more than two parties to the dispute and the parties to the dispute do not promptly agree to be grouped into two groups, then the three arbitrators, including the President, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if none of the parties had designated an arbitrator. Unless the parties agree otherwise, all arbitration proceedings shall be conducted in New York City (United States of America). Notwithstanding the foregoing, if a dispute involves the Guarantor and the Guaranteed Affiliate, the

Any dispute arising out of or concerning this Guaranty shall be resolved exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce (the "ICC Rules"), or such other rules which all the parties involved in the dispute may agree to. If there are two parties in the corresponding dispute, or if all parties to the dispute agree to be grouped together into two groups on the basis of their common interest and common position in the dispute, then each party or group, as the case may be, shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall agree within a thirty (30) day time period on a third arbitrator who shall serve as President. If there are more than two parties to the dispute and the parties to the dispute do not promptly agree to be grouped into two groups, then the three arbitrators, including the President, shall be selected by the International Court of Arbitration of the International Chamber of Commerce in accordance with the ICC Rules, as if none of the parties had designated an arbitrator. Unless the parties agree otherwise, all arbitration proceedings shall be conducted in New York City (United States of America). Notwithstanding the foregoing, if a dispute involves the Guarantor and the Guaranteed Affiliate, the

| será realizado de acuerdo con la Sección 18.2 del Convenio, como un procedimiento único, y la Fiadora y la Filial Garantizada tendrán conjuntamente los derechos de la Filial Garantizada en virtud de dicha Sección 18.2. | arbitration proceeding shall be performed in accordance with Section 18.2 of the Agreement, as the only proceeding, and the Guarantor and Guaranteed Affiliate shall jointly have the rights of the Guaranteed Affiliate in accordance with Section 18.2. | arbitration proceeding shall be performed in accordance with Section 18.2 of the Agreement, as a sole proceeding, and the Guarantor and Guaranteed Affiliate shall jointly have the rights of the Guaranteed Affiliate in accordance with Section 18.2. |
| --- | --- | --- |
| (C-3; R-41) | (C-3) | (R-41) |

342. In any event, the Tribunal observes that:

- Article 18.2 of the AA and Section 12 of the PDVSA Guaranty both provide that any dispute arising from those agreements shall be settled by arbitration in accordance with the ICC Rules;

- Under the principle of separability, well established internationally and in Venezuela as well (**articles 7 and 25 of the Commercial Arbitration Law** and acknowledged by the Constitutional Chamber of the Supreme Court of Justice), the validity and effects of the arbitration clauses at issue are independent from the validity and effects of the contracts in which they are inserted; and

- Article 16.1(b) of the AA itself expressly provides that the indemnity obligation under Clause XV (the determination of which requires arbitration) survives any termination of the AA.

343. Further, in addition to being recognized in Venezuelan law, the principle of severability is also recognized in New York law.

344. For the above reasons, the Tribunal concludes that it has jurisdiction over this dispute.

## K.III. Procedural Requirements Triggering Respondents' Duty to Indemnify Claimant

### K.III.1. Notice pursuant to Article 15.1(a) Association Agreement

### K.III.1.a. Arguments by Claimant

345. The timing of Claimant's notices to PDVSA-CN has become an issue in this arbitration. Article 15.1(a) of the AA requires that "*in the event that one of the Foreign Parties determines that a Discriminatory Measure has occurred*

*which may result in a Materially Adverse Impact, such Foreign Party shall immediately provide notice of the Discriminatory Measure to Lagoven CN.*"
Claimant maintains that it met its burden by providing Respondents two succeeding **Notices of Discriminatory Measure**, to enforce PDVSA-CN's indemnity obligation. (C-III ¶ 194). Claimant provides a timeline detailing how it notified Respondents that it had determined that the measures at issue in this arbitration constituted Discriminatory Measures that would likely cause a Materially Adverse Impact on Claimant's Net Cash Flows, within the meaning of Clause XV of the AA. (C-III ¶¶ 163 – 167; 232 - 236 partially quoted):

- On **22 June 2007**, Mobil CN issued its first notice to both PDVSA-CN and PDVSA that it regarded the four Measures at issue [(i) the anticipated expropriation of Mobil CN's interests in the Project **on 27 June 2007**, (ii) the repudiation of the **RRA** and the imposition of the extraction tax; (iii) the increase in the applicable income tax rate; and (iv) the imposition of production and export curtailments] to be Discriminatory Measures within the meaning of the AA.

- On **25 June 2007**, Claimant sent a **Notice of Discriminatory Measure** to both PDVSA-CN and PDVSA, demanding prompt payment of the indemnification according to the AA.

- On **27 June 2007**, Claimant delivered a **Notice of Discriminatory Measure** to PDVSA-CN and PDVSA stating that Claimant's interests in the Project had been expropriated by the Government through the **Decree-Law 5200**. Claimant again demanded prompt payment of the indemnification. As of **27 September 2007** – 90 days after their issuance, Respondents had not replied to any of these requests.

- On **10 October 2007**, Claimant, through a written **Demand for Performance**. Under the PDVSA Guaranty notified PDVSA that PDVSA-CN was in breach of the AA and demanded PDVSA's prompt performance of its obligations under the PDVSA Guaranty.

346. Claimant argues that it issued the **first notice** immediately after Claimant concluded that the measures may result in a Materially Adverse Impact for FY 2007 – 2035. (C-III ¶ 233). Claimant issued the **second notice**, the **Notice of Discriminatory Measure**, immediately after Claimant concluded that the measures would have a Materially Adverse Impact. (C-III ¶ 234). Finally, Claimant issued the **third notice** once it became clear that the Venezuelan Government would not compensate Claimant for the expropriation. (C-III ¶ 235).

347. Both Parties provided the Tribunal with extensive analysis concerning the individual terms within Clause XV. With respect to the definition of "*occurred*", Claimant explains as follows:

> 42.     In principle, a determination that a Discriminatory Measure "has occurred" implies a determination that the measure has been taken, and that the taking of it has become public or known to the Foreign Party. A measure will normally "occur" when it is officially adopted and published, unless the effects that make it a Discriminatory Measure under the definition are postponed until a later date or are subject to condition. In such cases, the measure will not "occur" until the postponement expires or the condition is fulfilled and those effects take place. (C-V ¶¶ 41 - 42, citations omitted).

348. The various effects of **Decree-Law 5200** did not occur until later specified dates. The take-over of operations was to occur not later than **30 April 2007**, and the "*expropriation or seizure of the foreign participants' interests*" was to take place four months later, on **27 June 2007**. (C-V ¶ 43). Claimant argues that, pursuant to **Article 2 of the Law on Effects**, the total expropriation occurred on **27 June 2007**. (C-V ¶ 44).

349. The Article 15.1(a) "*determination*" serves a double function: (i) it is a pre-condition to the requirement to give the first notice; and (ii) it starts the running of the period (described by the adverb "*immediately*") within which the first notice is to be given. (C-V ¶ 41). Claimant explains that, by the express terms of Article 15.1(a), the requirement to give the first notice depends not on the actual occurrence of the measure, but on Claimant's *determination* that a Discriminatory Measure that may result in a Materially Adverse Impact has occurred. (C-V ¶ 50, partially quoted, emphasis added). The Article 15.1(a) determination, thus, goes beyond the knowledge that a measure has occurred and requires a legal and financial analysis to establish whether the measure meets the definition of a "*Discriminatory Measure*." (C-IV ¶¶ 41 – 45; 50 – 51). Respondents' argument that the first notice must be given once Claimant "*objectively determined*" that the said event had occurred reads additional language into Article 15.1(a), thereby requiring the issuance of the notices once the determinations "*could have been made*"

– a requirement not found in the AA. Rather, the timing of the first notice is triggered when the determination "*is actually made.*" (C-V ¶ 52).

350. Claimant argues that it was not required by either the AA, the principle of good faith, or otherwise to make any determination regarding the expropriation carried out by **Decree-Law 5200** until after **27 June 2007**. Claimant argues that it acted in good faith by sending the first notice 5 days prior, on **22 June 2007**, when it became clear that the expropriation would occur on **27 June 2007**.

351. Claimant does not contend that it had the right to withhold its determinations and insists that its determinations were made in good faith. (C-V ¶ 53). The test of whether the determination was timely is measured by the legal standard of good faith, which takes all relevant circumstances into account. Such circumstances include (1) the threats Claimant received from the Government and PDVSA and (2) the hope that negotiations with the Government could avoid arbitration. (C-V ¶ 53).

352. The notification procedures were linked to the overall objective of mitigating damages. (C-IV ¶¶ 99, 104). Under this procedure, PDVSA-CN would have had the "*opportunity to use its best offices to broker a negotiated solution to any dispute between the Venezuelan Government and the Foreign Party arising out of a Discriminatory Measure.*" (C-IV ¶ 104). This intent is confirmed by the Parties' history. Although Respondents were still independent when the AA was signed, both had direct access to high Government officials and were well positioned to negotiate with them. (C-IV ¶ 104). After 1998, however, Claimant had no reason to expect that Respondents could act independently to help reach an amicable settlement. (C-IV ¶¶ 105 – 106). In light of this, issuing the notices under the AA could have been counter-productive, placing Claimant on a collision course with the Government and the Respondents and impacting Claimant's ability to remain in Venezuela. (C-IV ¶ 8). Claimant's interpretation was reasonable, as PDVSA-CN had even urged Claimant not to pursue legal remedies

against the Royalty Measures or the income-tax increase, arguing that to do so would only make matters worse for Claimant. (C-IV ¶ 106).

353. A premature notice would have been detrimental to settlement negotiations and would have thwarted any mitigation of damages:

> 49. [...] once the second notice was given, Mobil CN was required to pursue a legal action against the Government, for the purpose of mitigating damages. But in light of the threats from the Government and PDVSA against arbitration and Mobil's businesses in Venezuela, it became clear to Mobil CN that settlement discussions with the Government offered the only realistic way to mitigate damages. Making early determinations leading to an early action against the Government would have aggravated the disputes and jeopardized the chances of a negotiated settlement. (C-V ¶ 49, citation omitted).

354. Respondents' argument that the purpose of the notification procedure was to avoid arbitration is preposterous in light of Respondents' conduct. Their attempt to avoid arbitration was based on threats against Claimant's interests, as well as warnings that Respondents would not comply with an award. Arbitration, however, could have been avoided if Respondents had concurred with the notices and cooperated as intended under the AA. (C-V ¶ 54).

355. Claimant's determination that the measures may result in a Materially Adverse Impact was inextricably bound with the attempt to negotiate an amicable settlement with the Venezuelan government. When these negotiations failed, Claimant made the determination that the Materially Adverse Impact would occur and issued the appropriate notices. (C-IV ¶¶ 110 – 111). Claimant would not have incurred any Materially Adverse Impact for FYs 2007 – 2035 if the settlements had been successful, making it inappropriate to make determinations about the impact of those measures prior to the failure of the negotiations. (C-V ¶ 48).

356. Even if the notices were untimely, however, Respondents did not rely on Claimant's alleged failure to provide notice. (C-IV ¶ 108). Even an alleged *"business judgment"* not to make a determination could not have generated

reliance or detriment, because such judgment was not communicated to the Respondents. (C-VI ¶ 40). Further, Respondents *"have not alleged any damage or other prejudice resulting from Mobil CN's alleged failure to provide timely notices or to initiate what the Respondents consider the required legal actions."* (C-IV ¶¶ 101, 108). Claimant is not asserting any damages for years prior to 2007, when it issued the **Notices of Discriminatory Measures**. Rather, Claimant is only seeking damages for those years after the formal notice was given. (C-IV ¶ 101). As an aside, Claimant states that, even if Claimant had issued the notices earlier, it would not have been entitled to any indemnity for FYs 2004 – 2006 under the AA. (C-VI ¶ 11).

357. It is not relevant that the June 2007 notices did not state that the measures preceding **Decree-Law 5200** were expropriations. The AA does not require that the notices explain why a measure qualifies as a Discriminatory Measure. (C-VI ¶ 32).

358. Respondent PDVSA-CN's obligation becomes fully enforceable upon Claimant's issuance of the notices. (C-III ¶ 197). Claimant was permitted to commence arbitration proceedings in accordance with Article 18.2 of the Arbitration Agreement because Respondents failed to concur that a Discriminatory Measure had occurred within 90 days of receipt of the **Notice of Discriminatory Measure**. Claimant maintains that this failure to concur demonstrates Respondents' bad faith, as PDVSA-CN had acknowledged the fact of the Discriminatory Measure of expropriation to third parties. (C-III ¶¶ 199 – 200, 244 - 247; C-V ¶ 54).

359. Claimant further states that the notices constituted mere *"formalities."* (C-III ¶ 236). Respondents were already on notice that the Discriminatory Measures had occurred/were occurring. Until June 2007, Respondent PDVSA-CN was in the same position as Claimant: each had a 41 2/3% interest in the Project and being subjected to the same governmental measures. Additionally, the President of PDVSA-CN concurrently served as

the Minister of Energy and "*was one of the chief architects of the measures.*" (C-III ¶ 236). Further, Respondents conceded that the President of PDVSA knew that Claimant had formally protested all of the measures at issue and sought an amicable resolution to those disputes with the Government. (C-IV ¶ 109). The evidence shows that the Respondents and the Government acted in concert, that there was no realistic chance that the Respondents would take Claimant's side and convince the Government to undo the measures, and that the Respondents suffered no damage as a result of the timing of the notices. (C-V ¶ 54; C-VI ¶¶ 11-12).

360. Under Venezuelan law, forfeiture must be clearly established as a sanction in the agreement. (C-IV ¶ 101, partially quoted).

> If the parties to the AA had intended to impose a conventional forfeiture of rights for failure to give notice, they would have provided (i) an express reference to forfeiture of the right, (ii) a more precise measure of time within which the notices were to be given and (iii) an objective standard to determine the starting point of such period. (C-IV ¶¶ 98 - 99).

361. While Claimant maintains that it provided timely notice, Claimant argues that the consequence of an untimely notification under the AA cannot have been the forfeiture of a right. Respondents' interpretation that the AA imposes "*the draconian – but unstated – sanction of depriving a party of a fundamental substantive right for that party's alleged delay in complying with procedural requirements*" finds no support in the contract itself or Venezuelan law. (C-IV ¶ 101). Claimant explains that, under Article 23.4(a) of the AA, a waiver must be in written form and must be signed by an authorized officer. In other portions of the AA where the failure to comply with certain requirements would result in a forfeiture of rights, the Parties expressly provided for such forfeiture. (C-IV ¶ 100, *citing* ¶¶ 5.2(a), 5.2(c), 6.2(a), and 6.2(c) AA).

362. Respondents' loss of rights theory and the new theory that forfeiture results from applying the doctrine of *venire contra factum proprium* are without merit for the following reasons:

8.   *First,* there is no prior act; silence is not an act under Venezuelan law. *Second,* providing notice does not contradict any prior (non-existent) act. *Third,* the Respondents have not alleged or proven that they relied in any way on MCN's silence.   Fourth, the Respondents have demonstrated no detriment as a result of their (non-existent) reliance. (C-V ¶ 8, citations omitted).

363. Further, not only is Article 17.2(c) not in support of Respondents' *"caducidad"* argument, but Respondents' new theory that the notices *"trigger"* their liability is inconsistent with their *caducidad* theory.  The Respondents cannot claim at the same time that the obligation to indemnify arises only after the notices are sent (their trigger theory) and that the right to indemnification exists but is lost if the notices are not sent (their *caducidad*/forfeiture theory). (C-VI ¶ 40 n. 91).

364. Finally, Claimant explains that the remedy for a genuine breach of the notice requirements under Venezuelan law would be for the Tribunal to award Respondents a credit against the indemnification owed under Clause XV. (C-IV ¶ 101). Such a remedy would be inappropriate here, as Respondents have suffered no prejudice as a result of any alleged breach and Claimant only seeks damages for the years 2007 and onwards. (C-IV ¶ 101).

## K.III.1.b   Arguments by Respondents

365. The Parties do not dispute the fact that meeting the notice requirements of Article 15.1(a) is required to trigger the indemnity. (R-IV ¶ 36). Claimant understood both the existence and the significance of the requirements of Article 15.1(a), and even stated in London that these requirements had to be met *"to trigger"* the indemnity obligation. (R-IV ¶ 30; R-V ¶ 21; R. Closing Slides 38, 43). Respondents maintain that Claimant failed to immediately provide them the notice of a Discriminatory Measure required under Article 15 and is, therefore, precluded from asserting any claims against PDVSA and PDVSA-CN based on those Measures. (R-I ¶¶ 36-37; R. Closing Slide 43). Respondents characterize the inadequacy of the notices provided by Claimant as follows:

71.     On June 22, 2007, Claimant sought to provide the first of the two required immediate notices under Article 15.1(a), of the following Discriminatory Actions that may result in Material Adverse Impact: (i) the royalty measure taken approximately 32 months earlier, in October of 2004; (ii) the decision not to allow project expansion on terms desired by Claimant, also taken in 2004; (iii) the imposition of the extraction tax in May 2006, more than a full year prior to the date of this purported notice to PDVSA-CN; (iv) the increase in the income tax, which was enacted in September 2006 and had been announced as early as June 2005, when Claimant first notified the Government of a potential investment dispute based on that measure; (v) the production curtailments in October 2006; (vi) the reduction in exports in January 2007; and (vii) the 'expropriation' by virtue of Decree-Law 5200, which had been issued almost four months earlier on February 26, 2007 and in respect of which Claimant had officially notified the Government of a claim within one week.

72.     Realizing that Article 15.1(a) of the AA required a second immediate notice whenever it determined "that it has actually suffered a Material Adverse Impact," Claimant, three days after its June 22, 2007 "immediate" notice that a "Discriminatory Measure which may lead to a Material Adverse Impact has occurred," sent PDVSA-CN another notice under Article 15.1(a) of the AA, this time purporting to inform PDVSA-CN that Claimant had actually suffered a Material Adverse Impact as a result of all of the actions and measures taken since 2004, except for the so-called "expropriation" effected by Decree-Law 5200. (R-II ¶¶ 71-72, partially quoted, emphasis in original).

366. With respect to Claimant's argument that it had not made the *"determination"* triggering its obligation to issue the notices, Respondents state that such an interpretation renders the immediate notice requirements meaningless and finds no support in the record. (R-III ¶ 76; R-IV ¶ 28; R. Closing Slide 34). Claimant knew, at the moment of the royalty rate increase from 1% to 16 2/3%, that that increase would result in a more than 5% impact on Net Cash Flow. (R. Closing Slides 35, 37). Respondents assert that Claimant had made the determination that the measures would result in a Materially Adverse Impact if not reversed, but that they had also determined that notice to PDVSA-CN would not serve Claimant's purpose because the Parties' interests were no longer aligned. (R-III ¶ 80). Regardless of Claimant's intentions, however, Article 15.1(a) required Claimant *"to provide the requisite notices immediately"* and Claimant failed to do so. (R-III ¶ 81).

367. Compliance with the notice requirements must be measured using an objective standard, focusing on knowledge of the occurrence of an event "*that may lead to*" a Material Adverse Impact. (R-V ¶ 18, R. Closing Slide 33). Article 15.1(a) focuses on knowledge of the occurrence of an event "*that may lead to*" a Material Adverse Impact. The term "*occurred*" should be interpreted in accordance with its plain meaning, as a synonym for "*to happen*" or "*to take place.*"

368. Respondents also argue that the standard enunciated by Claimant whereby a measure "*occurs*" when it was taken or publicly announced would require the Tribunal to dismiss all of the claims. (R-V ¶ 23). Even assuming that each measure was "*discriminatory*", there was no doubt that as of the date of publication of each measure, each was one that "*may lead to*" a Material Adverse Impact. (R-V ¶ 24).

369. Respondents further argue that Claimant conceded that the alleged Discriminatory Measures had a Material Adverse Impact in FY 2005 and 2006. Claimant's witnesses have admitted that its notices to Respondents were late. Jim Massey's sworn affidavit before the High Court of Justice in London and before this Tribunal stated that the procedural requirements triggering the indemnity had not been met, thereby also conceding that the notice requirements were a necessary pre-requisite for an indemnity. (R-III ¶ 67; R-II ¶ 75; R. Closing Slide 38).

370. Claimant's explanation that its failure to provide notice was part of a strategy to reach an agreement with the Government is incredible. (R-II ¶ 76 - 78). Claimant's statement that it held out until the last minute in the hopes of a resolution is premised on the fact that Claimant had already made the determination under Article 15.1(a), but had chosen not to act. (R-III ¶ 82). The very notion of waiting until "*all hope has vanished*" is irreconcilable with the purpose of Article 15.1(a), which is to provide a timely opportunity to resolve the matter before hope has vanished. (R-IV ¶ 30; R. Closing Slide 34). The "*last minute*" passed in October 2004, when Claimant was told that

the elimination of the 1% royalty holiday was "*non-negotiable.*" (R-III ¶ 84).

371. Respondents do not concede that there have been negotiations with the Government about all of the measures alleged here (especially the Royalty Measure) or that such have been "*ongoing.*" (R-IV ¶ 88). Instead, with respect to the Royalty Measure, Respondents state that the notion that negotiations were "*ongoing*" – occurring throughout the three years since the first measure was taken, defies common sense and is "*belied by Claimant's own testimony*" that, by early 2005, there was no doubt that there would be no ongoing negotiations regarding the Royalty Measure. (R-IV ¶ 88).

372. With respect to the impact of settlement discussions, Respondents state as follows:

> 87. [...] the existence of ongoing settlement discussions has no bearing whatsoever on whether an event has "occurred which may result in a Material Adverse Impact," as the event still would have occurred and the possibility of it resulting in a Material Adverse Impact if the negotiations fail will still have existed. (R-IV ¶ 87, citations omitted).

373. Claimant knew that an event had occurred which, if not reversed, may and in effect would lead to a material adverse impact. (R. Closing Slide 39 – 40, 42). Rather than send notices to either of the Respondents, Claimant sent notices to officials and ministries in the Venezuelan Government. Respondents cite 12 such communications, from 2 February 2005 to 4 May 2007 where Claimant complains of measures taken and yet to be taken. (R-II ¶ 69). It was not until late June 2007 that Claimant sent any notices to the Respondents. (R-I ¶ 36). Claimant knew that notices of Discriminatory Measures had to be given to PDVSA-CN and that the notices to the Government were not the same as notices to PDVSA-CN. (R-IV ¶ 3, partially quoted). Further, Respondents state that "*Claimant's conduct over the course of nearly three years in sending multiple letters to the Government detailing every conceivable violation it believed to have occurred and never once mentioning indemnity under the AA to anyone,*

*either orally or in writing, shows that Claimant never believed it had a valid claim for indemnity against PDVSA-CN, and allowed Respondents to reasonably conclude the same.*" (R-V ¶ 25). To borrow Respondents' words:

> 26. Claimant's argument that it did not mention a claim for indemnity against PDVSA-CN because it was allegedly told that arbitration against the Government would not be helpful in negotiations is difficult to fathom. Even if Claimant believed that the Government would take offense to arbitration proceedings, that obviously did not deter Claimant from sending thirteen formal notices to the Government cataloguing alleged violations and purporting to preserve its rights against the Government. Against this history of overzealous conduct in protecting and preserving legal positions, it is hard to imagine that Claimant would feel reluctant to even mention to PDVSA-CN (or anyone else) the possibility that it also might have an indemnity claim against PDVSA-CN under the AA. (R-V ¶ 26).

374. As Mr. Cutt stated in New York, Claimant made a business decision not to meet the requirements of Article 15.1(a). (R-V ¶ 22). Claimant determined long before the notices that an event occurred that may lead to a Material Adverse Impact, but Claimant decided against pursuing indemnity under the AA. (R-IV ¶ 33). The provision, however, required giving notice immediately upon the determination of the occurrence of the event, not after all hope had vanished. (R-IV ¶ 31, partially quoted, emphasis in original). Respondents argue that Claimant's failure to notify has both legal and evidentiary consequences. (R-III ¶ 65).

375. Of particular relevance are the Venezuelan legal principles/norms of "*caducidad*" (forfeiture) and "*carga*" (burden). According to these, the Claimant must timely satisfy its self-interested burden ("*carga*") of sending the appropriate notices or suffer the irreparable loss of the right ("*caducidad*") to the indemnity. As a consequence of Claimant's failure to meet its burden of immediately notifying Respondents pursuant to Article 15.1(a), Respondents argue that Claimant has forfeited its right to compensation under the AA. (R-II ¶¶ 80 – 86).

376. Respondents argue that it is immaterial that the AA did not expressly provide for *caducidad* in the event of a failure to satisfy the pre-requisites to an indemnity claim. (R-III ¶ 63; R-V ¶ 20). Respondents also state that there is no support in Venezuelan law for Claimant's theory that *caducidad* does not apply unless the contract specifically provides for it. (R-III ¶ 64). Rather, Respondents explain that *"if a party is required to undertake certain actions to conserve a right but fails to do so, the remedy is caducidad, whether or not that sanction is expressly set forth in the contract – especially when the parties emphasize the importance of immediate action."* (R-III ¶ 64, partially quoted). The term *"immediate"* has been defined by the case *Tierras Carreteras y Puentes S.A. (TICAPSA) contra el Ministro de Hacienda*, in which the Supreme Tribunal of Justice held that the term means *"without delay."* (R-III ¶ 73).

377. In response to Claimant's contractual intent argument, Respondents distinguish Articles 5.2 - 6.2 of the AA, highlighted by Claimant. Those provisions expressly provide strict forfeiture procedures because those provisions are of a different nature, addressing the progression of the Project from phase to phase. (R-III ¶ 68). Article 17.2 of the AA expressly states that a failure to notify will <u>not</u> result in a forfeiture of a right to an indemnity when the indemnitor otherwise learned of the action and was not prejudiced by the failure to notify. (R-III ¶ 70; R-IV ¶ 35). Thus, for the instance where failure to notify would not release the indemnitor from its obligations, the Parties so contracted. (R-III ¶ 70). Article 15.1(a) of the AA, however, had no such provisions, despite the Parties' demonstrated ability to create such. Absent such saving provisions, the normal rules of *caducidad* apply. (R-IV ¶ 35).

378. Respondents also assert that Claimant is precluded from seeking indemnity by virtue of principles of good faith, which are integral to Venezuelan law. By *"lying in wait"*, Claimant robbed Respondents of the opportunity to address the measures with the Venezuelan Government and their possible

consequences under the AA. (R-III ¶¶ 90 - 91). Claimant misled Respondents into believing that Claimant did not consider any of the governmental measures to be Discriminatory Measures under the AA. (R-III ¶¶ 91-92). Claimant's attempt to take a position that is inconsistent with its own prior conduct is an act of bad faith, and is inconsistent with principles of loyalty and honesty. (R-III ¶¶ 93 – 98). Finding that Claimant is precluded by virtue of principles of good faith has the same effect as if the Claimant had waived its rights by failing to notify, the difference being that *"waiver is premised on the will to abandon a subjective right, whereas the rule venire contra factum proprium non valet is applied against someone to prevent him from exercising a right contradictory to prior conduct and even though that person did not manifest his intention to waive the right."* (R-III ¶ 99).

379. Respondents counter Claimant's closing argument, stating that the doctrine of *venire contra factum proprium*, as well as the general principle that the Parties' conduct is relevant in interpreting a contract, is relevant here. Not only did Claimant fail to meet the contractual requirements to trigger the indemnity, but it also made a *"business decision"* not to seek an indemnity from PDVSA-CN – choosing instead to deal directly with the Government. (R-IV ¶ 37; R-V ¶ 22). As an evidentiary matter, Respondents submit that Claimant's failure to notify should be interpreted as an indication that Claimant believed a dispute existed with the Venezuelan Government, not with PDVSA-CN. Claimant even claimed *force majeure* on behalf of PDVSA-CN in response to the production curtailments in 2007. (R-IV ¶ 3). Respondents characterize the current matter as *"the belated attempt to manufacture a cause of action against Respondents, paving the way for the attachment of assets that could not be achieved against the Government."* (R-II ¶ 86). The thirteen notices Claimant sent to the Government, along with their failure to mention any indemnity under the AA, should be viewed in this light. (R-IV ¶ 37).

380. In response to Claimant's argument that Respondents were already *"on notice"* due to the issuance of the notices to the Government, Respondents point out that it is irrelevant that PDVSA had become aligned with the Government. Article 15.1(a) does not depend on any political analysis of who was or was not aligned with whom. (R-IV ¶ 32). Likewise, contrary to Claimant's assertion, the requirements of 15.1(a) do not depend on whether Claimant believed that the notices would have resulted in a reversal of the measures in question. (R-IV ¶ 32).

## K.III.1.c.   The Tribunal

381. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 76 – 78, 83 |
| C-III | ¶¶ | 163 – 167, 194 – 200, 232 – 236, 244 – 247 |
| C-IV | ¶¶ | 15, 98 – 111 |
| R-I | ¶¶ | 36 – 37 |
| R-II | ¶¶ | 64 – 86 |
| R-III | ¶¶ | 58 – 85, 89 – 108 |
| TOR | ¶ | 5.2.1 |

### Charts:

| Submission | | Pinpoint |
|---|---|---|
| **R-III** | ¶ | 77 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Article 15.1(a) |
| C-5 | 22 June 2007 Notice of Discriminatory Actions that May Result in a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que Pueden Resultar en Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*] |
| C-6 | 25 June 2007 Notice of Discriminatory Actions that have caused a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que han Causado un Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años* |

|  | *Fiscales Futuros*] |
|---|---|
| C-7 | 27 June 2007 Notice of Discriminatory Actions that have caused a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que han Causado un Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*] |
| C-9 | 25 July 2007 Letter from Steven Reisman of Curtis-Mallet Prevost Colt & Mosle LLP (on behalf of PDVSA Cerro Negro S.A.) to James Garden, Esq. of Carter Ledyard & Millburn LLP. |
| C-10 | 10 October 2007 Demand for Performance under the PDVSA Guaranty from Mobil Cerro Negro, Ltd. to Petróleos de Venezuela S.A. (PDVSA) |
| C-22 | Tr. of "Declarations of the Minister of Popular Power for Energy and Petroleum and President of PDVSA, Rafael Ramírez, on the ExxonMobil - PDVSA Arbitration Case" [*Declaraciones del Ministro del Poder Popular para la Energía y Petróleo y Presidente de PDVSA, Rafael Ramírez, sobre el caso Arbitraje Exxon Mobil-PDVSA*] dated 8 February 2008, *available at* www.pdvsa.com at p. 2 |
| C-42 | Testimony of Mark Ward (26 September 2008) at ¶¶ 23 – 28 |
| Ex. 11 | Minutes of 1 December 2004 Meeting of the Board of Directors of Petrolera Cerro Negro pp. 47 - 48 |
| C-43 | Testimony of Tim Cutt (26 September 2008) at ¶¶ 15, 17, 54, 56 – 60 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 33 – 46, 78 – 88 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) p. 6 |
| Ex. 5 | 2004-2006 Damages Calculation |
| C-87 | Association Agreement Clause I *defining* "*Governmental Measures*", Articles 2.1(a), 5.2(a), 5.2(c), 6.2(a), 15.1(a), 15.1(b), 23.4(a) |
| C-99 | Decree-Law 5200 Art. 3 – 5 |
| C-104 | Law on Effects Art. 2 |
| C-134 | Venezuelan Civil Code Art. 1160 |
| C-157 | Letter dated 1 August 2005 from Mobil Cerro Negro to Ministry of Energy and Mines |
| C-158 | Letter dated 26 May 2006 from Mobil Cerro Negro to Ministry of Relations, Ministry of Energy and Mines and Prosecutor General |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 45, 55 – 57 |
| C-221 | Reply Expert Report of Sarah A. Emerson of Energy Security Analysis, Inc. p. 4 |
| C-223 | Transcript of Bernard Mommer Interview (12 February 2008) p. 6 |
| C-242 | Minutes of PDVSA-CN Shareholders' Meetings held on 27 October 2003 and 4 March 2005 p. 5 |
| C-251 | REAL ACADEMIA ESPAÑOLA, DICCIONARIO DE LA LENGUA ESPAÑOLA (2d ed. 2001) |
| C-252 | *Aló Presidente*, No. 177 (11 January 2004) at p. 2 |
| C-253 | Tr. of 2 December 2008 Hearing pp. 135 – 136, 167 |

| C-254 | Letter from Mobil Cerro Negro, Ltd. to Ministry of Relations, Ministry of Energy and Petroleum, and Prosecutor General (20 June 2005) |
| C-255 | PDVSA biography, Eulogio del Pino, from www.pdvsa.com (last accessed on 14 May 2009) |
| C-274 | Mélich-Orsini, *La Prescripción Extintiva y la Caducidad* at ¶¶ 149,150, 158, 163, 166 |
| C-277 | Report of Operadora Cerro Negro to the Minister of Energy on Royalties and Extraction Tax (27 September 2006) |
| C-279 | Judgment, Supreme Court, *Corporación Venezolana del Fomento v. C.A. General de Seguros y Reaseguros et al.* (17 October 1967) at 54 |
| C-280 | Judgment, First Superior Court, *Instalaciones Radio Eléctricas v. Seguros Orinoco, C.A* (22 September 1975) at 16 |
| C-281 | Jud Judgment, Sixth Superior Court, *Talleres de Diamantes Guayana, C.A. v. Adriática Venezolana de Seguros, C.A.* (24 February 1976) at 123 |
| C-291 | José Mélich-Orsini, El Pago 151 (2000) |
| R-2 | 1943 Hydrocarbons Law, Official Gazette No. 31, published March 13, 1943 [*Ley de Hidrocarburos*] Art. 41 |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) at ¶ 4 |
| R-35 | Tr. of 2 December 2008 Hearing pp. 110 – 113, 127-135 |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 14, 24 – 30 |
| App. 16 | José Mélich-Orsini, *The Statute of Limitations and Caducidad,* Academia de Ciencias Políticas y Sociales, Serie Estudios, N° 58, Caracas, 2002 ¶¶ 149, 152 |
| App. 18 | Humberto Cuenca, *Civil Procedure Law,* Tomo I, Caracas, 2000 (Ediciones de la Biblioteca de la Universidad Central de Venezuela 2000) p. 273 – 274 |
| App. 19 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Tierras Carreteras y Puentes, S.A. (TICAPSA) v. Ministro de Hacienda* (December 12, 2006) [*Sentencia, Sala Político-Administrativa del Tribunal Supremo de Justicia, Tierras Carreteras y Puentes S.A. (TICAPSA) contra el Ministro de Hacienda (12 de diciembre de 2006)*] |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 11, 40 – 62 |
| App. 23 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Tierras Carreteras y Puentes S.A. (TICAPSA) contra el Ministro de Hacienda* (December 12, 2006) [*Sentencia, Sala Político-Administrativa del Tribunal Supremo de Justicia, Tierras Carreteras y Puentes S.A. (TICAPSA) contra el Ministro de Hacienda (12 de diciembre de 2006)*] at 4, 12 |
| App. 24 | José Mélich-Orsini, *The Statute of Limitations and Caducidad,* Academia de Ciencias Políticas y Sociales, Serie Estudios, N° 58, Caracas, 2002 ¶ 156 |
| App. 25 | Arminio Borjas, *Commentary on the Venezuelan Civil Procedure Code,* Tomo III, Caracas, 1964 p. 115 – 116 |
| App. 26 | Judgment, Accidental Federal Chamber of the former Federal and Cassation Court, *Aldo Caruso v. Junta Directiva del Hipódromo* |

|   | *Nacional y la Nación* (March 6, 1951) [*Sentencia, Sala Federal Accidental de la Corte Federal y de Casación, Aldo Caruso vs. Junta Directiva del Hipódromo Nacional y la Nación (6 de marzo de 1951)*] p. 141 |
|---|---|
| App. 27 | José Luis Aguilar Gorrondona, *Civil Law-Persons,* Manuales de Derecho, Universidad Católica Andrés Bello, Editorial Arte, Caracas, 1984 pp. 55 – 56 |
| R-71 | Letter from Operadora Cerro Negro, S.A. to Chalmette Refining, L.L.C. (10 January 2007) |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract), (1 November 1997) |
| R-75 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, the Minister of Energy and Petroleum and Marisol Plaza, Attorney General (2 February 2005) |
| R-76 | Letter from Mark Ward, Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. and Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Marisol Plaza, Attorney General (2 June 2005) |
| R-77 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. and Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Marisol Plaza, Attorney General (20 June, 2005) |
| R-78 | Letter from Mark Ward, Mobil Cerro Negro, Ltd. to Rafael Ramírez, Minister of Energy and Petroleum (1 August 2005) |
| R-79 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Bernard Mommer, Vice Minister of Hydrocarbons (16 October 2006) |
| R-80 | Letter from Timothy Cutt, Operadora Cerro Negro, S.A. to Rafael Ramírez, Minister of Energy and Petroleum (2 November 2006) |
| R-81 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Gladys María Gutiérrez, Attorney General (20 November 2006) |
| R-82 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Rafael Ramírez, Minister of Energy and Petroleum (12 January 2007) |
| R-83 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (5 March 2007) |
| R-84 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (8 March 2007) |

| R-85 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holding, Ltd. and Representative of Operadora Cerro Negro, C.A., Venezuela Holdings B.V., Mobil Corporation, Agencia Operadora La Ceiba, C.A., Mobil Venezolana de Petróleos Holdings, Inc., and Mobil Venezolana de Petróleos, Inc. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (4 May 2007) |
|---|---|
| R-86 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (22 June 2007) |
| R-87 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (25 June 2007) |
| R-88 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (27 June 2007) |
| R-89 | First Affidavit of Jim Massey (21 January 2008) *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) at ¶¶ 2, 6, 20 |
| R-112 | Association Agreement Articles 15.1(a), 17.2(c) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 28 – 43 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros and Appendices (14 August 2009) at ¶¶ 29 – 71 |
| App. 53 | Luis Ávila Merino, COMMERCIAL SURETY (Universidad Católica Andrés Bello, 2nd ed., Caracas 2005) p. 103 |
| App. 54 | José Mélich-Orsini, THE STATUTE OF LIMITATIONS AND *CADUCIDAD*, (Academia de Ciencias Políticas y Sociales, Caracas 2002) pp. 167 – 173 |
| App. 55 | Enrique Urdaneta Fontiveros, LIABILITY FOR DEFECTIVE PRODUCTS (Academia de Ciencias Políticas y Sociales, Caracas 2008) p. 143 |
| App. 56 | VENEZUELAN CIVIL CODE (Ediciones Centauro, Caracas 1982) [*CÓDIGO CIVIL DE LA REPÚBLICA DE VENEZUELA (Ediciones Centauro, Caracas 1982)*] Art. 782, 783, 1160, 1525 |
| App. 57 | VENEZUELAN COMMERCIAL CODE (Eduven, Caracas 1955) [*CÓDIGO DE COMERCIO DE LA REPÚBLICA DE VENEZUELA (Eduven, Caracas 1955) Artículos 282*] Art. 282 |
| App. 58 | Organic Law on Administrative Procedures, Official Gazette No. 2.818 (Extraordinary), published July 1, 1981 [*Ley Orgánica de Procedimientos Administrativos, Artículo 95*] Art. 95 |
| App. 60 | José Mélich-Orsini, GENERAL CONTRACT DOCTRINE (Academia de Ciencias Políticas y Sociales, 4th ed., Caracas 2006) p. 411 – 412, 423 |
| App. 61 | Venezuelan Code of Civil Procedure, Official Gazette No. 4.209 (Extraordinary), published September 18, 1990 [*Código de Procedimiento Civil, Artículo 12*] Art. 12 |
| App. 62 | Gonzalo Rodríguez Matos, *Good Faith in the Performance of a Contract, in* TOPICS OF CIVIL LAW, BOOK COMMEMORATING |

|   | |
|---|---|
| | ANDRÉS AGUILAR MAWDSLEY, VOLUME II 415 (Fernando Parra Aranguren ed., Tribunal Supremo de Justicia, Caracas 2004) pp. 437 - 438 |
| App. 63 | Alfredo Morles Hernández, COURSE ON COMMERCIAL LAW, VOLUME IV (Universidad Católica Andrés Bello, Caracas 2004) p. 2215 |
| App. 64 | Alejandro Borda, THE THEORY OF ONE'S OWN ACTS (Abeledo-Perrot, 3rd ed., Buenos Aires 2000) pp. 11, 51, 101, 133 – 134 |
| App. 66 | María Laura Estigarribia Bieber, *Evolution of the Principles of Contract Interpretation, with Special Reference to the Argentine Republic*, *in* TREATISE ON CONTRACT INTERPRETATION IN LATIN AMERICA, VOLUME I 291 (Carlos A. Soto Coaguila ed., Editora Jurídica Grijley E.I.R.L., Lima 2007) p. 302 |
| App. 67 | Superior Court of Civil and Administrative Matters of the Central Occidental Region, *Rosa Elizabeth Fernandez v. Universidad Nacional Experimental Politécnica "Antonio José de Sucre" (UNEXPO)* (December 10, 2003) pp. 4 – 5 |
| App. 68 | Haydee Barrios De Acosta, *Interpretation of Contract by a Judge in Internal Law and Private International Law*, *in* BOOK COMMEMORATING JOSÉ MÉLICH-ORSINI, VOL. I (Universidad Central de Venezuela, Caracas 1982) pp. 59 – 60 |
| App. 69 | Alejandro Borda, *Interpretation of Contracts under Argentine Law*, *in* TREATISE ON CONTRACT INTERPRETATION IN LATIN AMERICA, VOLUME I 129 (Carlos A. Soto Coaguila ed., Editora Jurídica Grijley E.I.R.L., Lima 2007) p. 148 |
| App. 70 | Aida Kemelmajer de Carlucci, *Reflections on the Interpretation of Contracts*, *in* TREATISE ON CONTRACT INTERPRETATION IN LATIN AMERICA, VOLUME I 197 (Carlos A. Soto Coaguila ed., Editora Jurídica Grijley E.I.R.L., Lima 2007) |
| App. 71 | Superior Labor Court, *Sindicato de Calzado y pieles v. U.S. Rubber International* (April 29, 1963), *in* VENEZUELAN JURISPRUDENCE 279 (Ramirez & Garay, S.A., Caracas 1963)p. 280 |
| R-120 | Outline Argument on Behalf of Claimant in Support of Application for Worldwide Freezing Order, (23 January 2008) submitted in *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008 Folio 61 ¶ 64 |
| R-121 | Letter from William B. Berry, Executive Vice President of Exploration and Production, ConocoPhillips, to Rafael Ramírez, Minister of Energy and Mines (14 January 2005) |
| R-122 | Congressional Authorization of the Association Agreement between Maraven S.A. and Conoco Inc. (Petrozuata Project), Official Gazette No. 35.293 published 9 September 1993 |
| R-123 | Congressional Authorization of the Framework of Conditions for the Association Agreement between Corpoven S.A. Filial de Petróleos de Venezuela and the companies Atlantic Richfield Co. (ARCO), Phillips Petroleum Company and Texaco, Inc. (Hamaca Project), Official Gazette No. 36.209, published 20 May 1997 |

**At and Following the 2010 Hearings:**

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 8, 40 – 54 |
| C-VI | ¶¶ | 8 – 12, 32, 40 |
| R-IV | ¶¶ | 3, 28 – 37, 87 - 88 |
| R-V | ¶¶ | 18 – 26 |
| R. Closing Slides | | 29 – 43 |

| Speaker | Citation |
|---|---|
| C. Closing | 2035 - 2039, 2041, 2043 |
| C. Opening | 48, 52 – 53, 55 |
| Cutt | 702 – 703, 710-714, 727 - 730, 733, 768 – 780 |
| Graves | 1671-1672 |
| Hernández-Bretón | 962-964 |
| Leitzinger | 1820-1823 |
| Massey | 544-554, 594-595, 628 |
| R. Closing | 2134, 2136 – 2138, 2142-2145 |
| R. Opening | 105 - 106, 111-113 |
| Ward | 146-147, 238-240, 261, 278-280, 285 - 286 |

382. *First*, it is a fact that although Claimant did not send notices to either of the Respondents until 22 June 2007, it did send notices over the years to officials and ministries in the Venezuelan government, complaining both of measures taken and yet to be taken by the government. Respondents thus cite 12 such communications, from 2 February 2005 to 4 May 2007, where complaints were notified by Claimant to the Minister of Foreign Affairs, the Minister of Energy, and the Attorney General of Venezuela. As a whole, the Tribunal is satisfied that the Minister of Foreign Affairs, the Minister of Energy and the Attorney General of Venezuela were aware that an *"investment dispute"* had arisen in respect of various measures taken by the government.

383. *Second*, even though the notices referred to in the preceding paragraph were not sent to PDVSA-CN and PDVSA, the Tribunal is satisfied that, to a certain extent, (i) PDVSA-CN, which until June 2007 was in the same position as Claimant, each having a 41.66% interest in the Project and being subjected to the same governmental measures, and (ii) PDVSA, whose President, Mr. Rafael Ramirez, concurrently served as the Minister of

Energy of Venezuela since 2004, had been made immediately aware that certain actions by the government of Venezuela could constitute Discriminatory Measures *"which may result in a Material Adverse Impact."* Indeed, on 2 February 2005, Claimant sent a letter to the Minister of Foreign Affairs, the Minister of Energy, and the Attorney General of Venezuela, complaining that the government had increased the royalties from 1% to 16.66% and stating that *"the Cerro Negro Parties consider that the Government of Venezuela is not honoring its contractual commitments under the Royalty Agreement or the obligations undertaken by the Bolivarian Republic of Venezuela under the [...] Investment Law"* (R-75), and the Tribunal notes that Respondents themselves acknowledge that *"the increase in royalty payments from 1% to 16 2/3% would obviously have a 'Material Adverse Impact' on Claimant's 'Net Cash Flow.'"* (R-II ¶ 69). Further, by letter dated June 20, 2005, Claimant informed the government that the increase to 30% of the royalty applicable to the AA and the increase of the oil income tax rate from 34% to 50% have *"broadened the investment dispute that [Claimant] brought to [the] attention [of the government] by letter dated 2 February 2005."* The ten notices that followed the 20 June 2005 letter complained about (i) the abrogation of the right to expand the Cerro Negro Project, thereby frustrating the *De-Bottlenecking Project* (R-78), (ii) a new extraction tax on the production of hydrocarbons and the announcement of the proposal to increase the income tax rate on the associations to 50% (C-158), (iii) the obligation to operate the migration of the Cerro Negro Association to a mixed company (R-79 and R-83), (iv) production and export curtailments (R-80, R-82 and R-84), (v) calculation of royalties (R-81), and (vi) challenging the fact that *"Orinoco Oil Belt Strategic Associations are in breach of their contractual obligations"* (R-85). Even though, in these 12 notices sent by Claimant to the government from February 2, 2005 to May 4, 2007, no mention was made of any claim against Respondents for compensation for a Discriminatory Measure, nor to Clause XV of the AA, it cannot be denied that Respondents were aware from the outset in February 2005 that certain actions by the government of

Venezuela could constitute Discriminatory Measures "*which may result in a Material Adverse Impact.*"

384. *Third*, the Tribunal accepts that there may be some ground for Claimant's argument that the notification procedures were linked with the overall objective of mitigating damages and with PDVSA-CN's warning to Claimant not to pursue legal remedies against the royalty measures or the income tax increase on the ground that to do so would only make matters worse for Claimant. The Tribunal can understand that a premature notice might have been detrimental to settlement negotiations and might have thwarted any mitigation of damages. In such circumstances, Claimant may have been justified in not sending the formal notices required under 15.1(a).

385. *Fourth*, the meaning of "*occurred*", "*determined*", and the settlement discussions are relevant to this question. "*Determination*" brings a subjective factor in for the timing of "*when they determined.*" Thus, it is entirely plausible that Claimant complied with the "*immediacy*" requirement upon sending the notices after it considered that all hope for an amicable settlement had vanished.

386. *Fifth*, the Tribunal is also aware of the fact that (i) Respondents apparently suffered no prejudice as a result of the timing of the notices, since Claimant is only seeking damages for those years after the formal notice was given and that (ii) the evidence tends to show that there was no realistic chance that the Respondents would support the Claimant's position and attempt to convince the Venezuelan government to undo the allegedly discriminatory measures.

387. *Finally*, the Tribunal notes that under Venezuelan law, forfeiture must be clearly established as a sanction in a contract and that, accordingly, in other portions of the AA, such as Articles 5.2(a), 5.2(c), 6.2(a) and 6.2(c), when the Parties intended that failure to comply with a certain requirement would result in a forfeiture of a right, they expressly provided for such forfeiture.

There is no express prohibition against bringing the claim without notice. Further, the Tribunal notes that, if Article 15.1(a) is interpreted and applied as Respondents maintain it should be, failure to give notice in year 1 would not prevent an arbitration in year 2.

388. For the above reasons, the Tribunal finds that, everything considered, the notice provided by the Claimant to the Respondents was sufficient. In any event, regardless of whether Claimant complied with the formal notice requirements, the Tribunal finds that any failure by Claimant to give to the Respondents the notices required by Article 15.1(a) of the AA would not result in a legal barrier to Claimant's assertion of its rights of indemnification.

## K.III.2.  Exhaustion of Remedies

### K.III.2.a.  Arguments by Claimant

389. Claimant concedes that it has a duty under Article 15.1(a) to mitigate damages by asserting claims against the Venezuelan Government. (C-III ¶ 195). In Claimant's **Request for Arbitration**, Claimant explains that it complied with this requirement by commencing a legal action against the Venezuelan Government, filing a **Request for Arbitration with the International Centre for Settlement of Investment Disputes** (ICSID) on **6 September 2007**. (C-I ¶ 78). The stated purpose of Article 15.1(a) to mitigate damages is, thus, fulfilled and any amount recovered in the ICSID proceeding will be credited toward the indemnity owed by Respondents in this arbitration. (C-I ¶¶ 84 – 85; C-IV ¶ 113; C-V ¶¶ 31 - 39).

390. The ICSID action satisfies the requirements of Article 15.1(a) which "*leaves no doubt that a legal action is required 'to the extent that it is available*," and that "*any legal recourse ... to ... obtain relief [reparación] from such 'Discriminatory Measure' satisfies the requirement*." (C-IV ¶ 113, C-V ¶ 32). The Discriminatory Measures at issue in this ICC arbitration are among those at issue in the ICSID proceeding. (C-V ¶ 32). Claimant adds that

Article 15.1(a) contemplates an action against the Republic of Venezuela that is being conducted independently but in parallel with the arbitration against PDVSA-CN. (C-V ¶ 34).

391. Claimant argues that it is irrelevant that the ICSID arbitration remedy was not available when the AA was signed, as the AA does not limit the Parties to pursue only remedies then available - any legal recourse would suffice. (C-IV ¶ 114). Further, because arbitration is both favored and considered part of the system of justice of the Republic of Venezuela, the Parties likely contemplated arbitration against the Republic of Venezuela as a means to pursue and collect *"Expropriation Compensation."* (C-IV ¶ 115).

392. Claimant also reasons that, as Respondents are aware of the injuries suffered by Claimant and have confirmed the occurrence of such to third parties, the principles of good faith obligate Respondents to cooperate in the ICSID arbitration against the Republic of Venezuela. (C-III ¶ 244).

### K.III.2.b Arguments by Respondents

393. Respondents argue that the purpose of Article 15.1(a) was to require Claimant to first challenge any Discriminatory Measure by exhausting its remedies under Venezuelan law. (R-II ¶ 89, partially quoted). Claimant has failed to pursue such remedies. Having failed to carry out this contractual burden, Claimant has forfeited any claim to indemnification under the AA as a matter of Venezuelan law. (R-II ¶ 98).

394. The ICSID case is not the kind of remedy that was contemplated in the AA, as it has nothing to do with *"revers[ing] or obtain[ing] relief from a Discriminatory Measure, [...] but rather to obtain damages for alleged violations of international law and Venezuelan law."* (R-IV ¶ 83; R-V ¶ 24). Not only is the ICSID arbitration an action to recover damages, but further, it is unlikely that the Parties contemplated arbitration as a remedy, as the **Investment Law** was not enacted when the AA was signed. (R-II ¶ 88; R-III ¶ 88).

395. Finally, with respect to "*double compensation*", Respondents put forward that Claimant's ICSID claim against the Government would be less than the indemnity that it seeks in this arbitration. (R-IV ¶ 85).

396. Respondents explain that there are three types of constitutional actions that Claimant could have used to assert their rights: "*(1) amparo against legislative acts, also referred to as amparo against norms (amparo contra norma); (2) amparo against administrative acts; and (3) amparo against judicial acts.*" (R-II ¶ 93).

397. Respondents present the laws under which Claimant could have sought remedy: (R-II ¶¶ 91 - 97, partially quoted, italics in original)

- Under **Article 94 of the Organic Law on Administrative Procedures**, Claimant could have sought the modification or withdrawal of any measure implemented by the Ministry of Energy and Petroleum that Claimant believed had an effect on it individually (*carácter particular*). Under this procedure, called a "recourse of reconsideration" (*recurso de reconsideración*), the Claimant would be empowered to challenge the measure based upon alleged violations of constitutional, legal or treaty rights.

- Under the **Organic Law of Protection (*Amparo*) of Constitutional Rights and Guarantees** (the "**Amparo Law**"), Claimant could have initiated an autonomous summary proceeding to guarantee constitutional rights that were infringed by the administrative actions or laws (*acción de amparo constitucional autónomo*).

- Under the Amparo Law, Claimant could have challenged the alleged retroactive application of **Decree-Law 5200** and other laws enacted by the National Assembly in an action for constitutional protection (*recurso de amparo constitucional*).

- Under the **Organic Law of the Supreme Tribunal of Justice** (the "**Supreme Tribunal Law**"), Claimant could have pursued an action for annulment (*recurso de nulidad*) to challenge acts of the public power (*poder público*). Under this law, the Supreme Tribunal of Justice has the power to declare the total or partial nullity of administrative acts of the Government as well as of laws enacted by the National Assembly or decreed by the National Executive (*Ejecutivo Nacional*).

398. Under the AA, Claimant was required to pursue "*any legal remedy available.*" Claimant was not at liberty to pick and choose the legal actions that it would take or would take or would refrain from taking while the potential indemnity accrued. (R-III ¶ 87).

## K.III.2.c.    The Tribunal

399. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 78, 84 – 85 |
| C-III | ¶¶ | 237 – 241, 244 |
| C-IV | ¶¶ | 112 – 115 |
| R-II | ¶¶ | 87 – 98 |
| R-III | ¶¶ | 86 – 88 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement |
| C-5 | 22 June 2007 Notice of Discriminatory Actions that May Result in a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que Pueden Resultar en Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*]. |
| C-7 | 27 June 2007 Notice of Discriminatory Actions that have caused a Materially Adverse Impact in Fiscal Year 2007 and Future Fiscal Years [*Notificación de Medidas Discriminatorias que han Causado un Impacto Sustancialmente Adverso en el Año Fiscal 2007 y Años Fiscales Futuros*]. |
| C-8 | 10 October 2007 Notice of Registration of the Request for Arbitration filed before the International Centre for Settlement of Investment Disputes. |
| C-9 | 25 July 2007 Letter from Steven Reisman of Curtis-Mallet Prevost Colt & Mosle LLP (on behalf of PDVSA Cerro Negro S.A.) to James Garden, Esq. of Carter Ledyard & Millburn LLP. |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶ 30 |
| C-42 | Testimony of Mark Ward (26 September 2008) at ¶ 27 |
| C-43 | Testimony of Tim Cutt (26 September 2008) at ¶¶ 9, 15 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 33-40, 80-81, 85-88 |
| C-87 | Association Agreement Article 15.1(a) |
| C-119 | Amended and Restated Limited Liability Company Agreement of Chalmette Refining, LLC (28 October 1997) |
| C-136 | Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Venezuela [*Convenio Para el Estimulo y Protección Recíproca de Las Inversiones Entre la República de Venezuela y el Reino Unido de los Países Bajos*], *signed at* Caracas, 22 October 1991, *entered into force* 1 November 1993 (as published in the |

| | Official Gazette No. 35.269 of 6 August 1993) Art. 9.3 |
|---|---|
| C-137 | Law on the Promotion and Protection of Investments [*Ley Sobre Promoción y Protección de Inversiones*] (as published in the Official Gazette No. 5390 of 22 October 1999) |
| C-138 | Letter dated 8 August 2008 from Secretary of the ICSID Tribunal to Mobil Corporation, Venezuela Holdings, B.V.; Mobil Cerro Negro Holding, Ltd.; Mobil Venezolana de Petróleos Holdings, Inc.; Mobil Cerro Negro, Ltd.; Mobil Venezolana de Petróleos, Inc.; and Bolivarian Republic of Venezuela confirming constitution of the Tribunal |
| C-139 | Letter dated 17 September 2008 from Secretary of the ICSID Tribunal to Mobil Corporation, Venezuela Holdings, B.V.; Mobil Cerro Negro Holding, Ltd.; Mobil Venezolana de Petróleos Holdings, Inc.; Mobil Cerro Negro, Ltd.; Mobil Venezolana de Petróleos, Inc.; and Bolivarian Republic of Venezuela confirming date of first session of ICSID Tribunal |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 49 -52, 70 |
| C-224 | Venezuelan Constitution [*Constitución Venezolana*], dated 20 December 1999 (as published in Extraordinary Official Gazette No. 5453 of 24 March 2000), Art. 253 |
| C-256 | Law on the Promotion and Protection of Investments [*Ley sobre Promoción y Protección de Inversiones*] (as published in the Official Gazette No. 5390 of 22 October 1999) |
| C-257 | Mobil's Questions and Answers (October 1997) at p. 1 |
| C-258 | Mobil Document entitled "Venezuela Key Issues" (May 1998) |
| C-259 | Common Security Agreement among Mobil Cerro Negro Holding, Ltd., *et al.* (18 June 1998) Article 6.07 |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) ¶ 12 |
| R-8 | *Mobil Cerro Negro Limited v. Petroleos de Venezuela, S.A.,* High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 (Justice Walker), *Reasons for Judgment Approved by the Court for Handing Down and Order Discharging Freezing Injunction* (20 March 2008) at ¶ 46 |
| R-37 | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order ( 27 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.,* Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶ 82 |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 24 – 30 fn. 23, 33 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 41 – 62 |
| App. 2 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999 [*Constitución de la República Bolivariana de Venezuela (1999)*] Art. 27 |
| App. 28 | Organic Law on Administrative Procedures, Official Gazette No. 2.818 (Extraordinary), published July 1, 1981 [*Ley Orgánica de Procedimientos Administrativos*] Art. 91, 93, 94 |

| | |
|---|---|
| App. 29 | Organic Law of Protection (*Amparo*) of Constitutional Rights and Guarantees, Official Gazette No. 34.060, published September 27, 1988 [*Ley Orgánica de Amparo sobre Derechos y Garantías Constitucionales*] |
| App. 31 | Organic Law of the Supreme Tribunal of Justice of the Bolivarian Republic of Venezuela, Official Gazette No. 37.942, published May 20, 2004 [*Ley Orgánica del Tribunal Supremo de Justicia de la República Bolivariana de Venezuela*] Art. 21 |
| App. 32 | Judgment, Constitutional Chamber of the Supreme Tribunal of Justice, *Cervecería Polar C.A.* (December 12, 2005) [*Sentencia, Sala Constitucional del Tribunal Supremo de Justicia, Cervecería Polar C.A. (12 de diciembre de 2005)*] |
| R-90 | Organic Law of the Supreme Court of Justice, Official Gazette No. 1.893 (Extraordinary), dated July 30, 1976 [*Ley Orgánica de la Corte Suprema de Justicia*] Art. 42 |
| R-112 | Association Agreement Clause I, Articles 15.1(a) and 15.1(c) |
| R-114 | Supplemental Brailovsky/Wells Report ¶¶ 52 - 57 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 49-52 |
| Unnumbered | ICSID Decision on Jurisdiction ¶ 209(a) – (b) |
| Unnumbered | Republic of Venezuela's ICSID Memorial on Jurisdiction at ¶¶ 25-26 & n.33 |

### At and Following the 2010 Hearings:

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 31 – 39 |
| C-VI | ¶ | 43 |
| R-IV | ¶ | 83 |
| R-V | ¶ | 24 |
| R. Closing Slides | | 88 – 89 |

| Speaker | Citation |
|---|---|
| C. Closing | 2039 – 2040 |
| C. Opening | 34 – 35, 53 - 54 |
| Cutt | 702-703, 710-711 |
| Jones | 1383-1383, 1437, 1510 |
| Massey | 594-595 |
| Myers | 1763 – 1764 |
| R. Closing | 2183 – 2187 |
| R. Opening | 101 - 102 |
| Ward | 147, 278 – 280, 286 |

400. At the outset, the Tribunal notes that Article 15.1 of the AA qualifies the legal action which Claimant is to take in two ways:

(1) by the wording "*To the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure*" and

(2) by the wording "*to mitigate any damages suffered as a result.*"

401. *First*, the Tribunal will consider the legal action which, in fact, Claimant did take, *i.e.* submitting a claim to ICSID against the State of Venezuela. Since the above qualifications do not exclude arbitration and do not necessarily only ask for legal action against the two Respondents in the present arbitration, it can well be argued that initiating ICSID arbitration against the State itself may be included if it refers to the same government measures. In this context, the Tribunal notes that on 10 June 2010, the ICSID Tribunal issued its **Decision on Jurisdiction**. Therein, that tribunal concluded that it could not derive the Republic of Venezuela's consent to arbitration from **Article 22 of the Investment Law**. (ICSID Decision ¶ 140). However, the ICSID Tribunal found that it does have jurisdiction under the ICSID Convention and the BIT with respect to any dispute in respect of the Project born after 21 February 2006 and has no jurisdiction under the **Investment Law** in respect of any dispute born before that date. (ICSID Decision ¶ 207).

402. For ease of reference, the **Dispositive Part of the ISCID Decision** is provided below:

> For the foregoing reasons;
>
> The Tribunal unanimously decides:
>
> (a) that it has jurisdiction over the claims presented by Venezuela Holdings (Netherlands), Mobil CN Holding and Mobil Venezolana Holdings (Delaware), Mobil CN and Mobil Venezolana (Bahamas) as far as:
>
> (i) they are based on alleged breaches of the Agreement on encouragement and reciprocal protection of investments concluded on 22 October 1991 between the Kingdom of the Netherlands and the Republic of Venezuela;
>
> (ii) they relate to disputes born after 21 February 2006 for the Project and after 23 November 2006 for the La Ceiba Project and in particular as far as they relate to the dispute concerning the nationalization measures taken by the Republic of Venezuela;
>
> (b) that it has no jurisdiction under Article 22 of the Venezuelan Decree with rank and force of law No. 356 on the protection and promotion of investments of 3 October 1999;

(c)     to make the necessary order for the continuation of the procedure pursuant to Arbitration Rule 41 (4);

(d)     to reserve all questions concerning the costs and expenses of the Tribunal and the costs of the Parties for subsequent determination[.] (ICSID Decision ¶ 207).

403. Therefore, the Claimant obviously did *"commence and pursue legal actions to mitigate any damages"* available against the Discriminatory Measures by initiating the ICSID arbitration.

404. Did Claimant have, in addition, a duty under the AA to initiate legal proceedings before the domestic courts of Venezuela? The present Tribunal considers that bringing an action before the national courts of Venezuela was not required and was also, arguably, unrealistic. The dispute settlement between the Parties to the AA and to the Guaranty was expressly submitted to ICC arbitration as the legal recourse of choice between the contractual Parties. Whether for the purposes of the settlement of disputes between Claimant and the Government, the exhaustion of local remedies was required is a matter to be decided by the ICSID Tribunal and not by the present Tribunal.

405. Further, Respondents have not demonstrated that they have suffered any prejudice as a result of Claimant not having pursued legal remedies within Venezuela. Therefore, attempts to bring the claim first before the domestic courts was not required to fulfill the express purpose mentioned in Article 15(1), *i.e. "to mitigate any damages suffered as a result."*

406. For the above reasons, the Tribunal concludes that Claimant is not prevented from pursuing its claim in this ICC arbitration due to lack of exhaustion of local remedies.

## K.IV. Liability under the Association Agreement for Discriminatory Measures

### K.IV.1. Definition of Discriminatory Measure Causing a Materially Adverse Impact under the Association Agreement

407. The Parties have each applied their own analysis to each of the measures described in this section. For convenience and to avoid repetition, this section begins by presenting the Claimant's and Respondents' respective analytical frameworks relating to Discriminatory Measures.

### K.IV.1.a. Arguments by Claimant

408. According to Clause I of the AA, a measure is a Discriminatory Measure if it possesses three characteristics (C-III ¶¶ 188 – 190, footnotes omitted, partially quoted):

> 188. *First*, the measure must be either (i) a "change in (or any change in the interpretation or application of) Venezuelan law" or (ii) a "Governmental Measure" that is applicable to the Project or a Foreign Party such as Mobil CN in its capacity as participant in the Project. The term "Governmental Measure" is defined in Clause I to include governmental measures of any kind, including expropriation, confiscation and requisition of facilities:
>
> > "*any central or local governmental measure including,* inter alia, *the issuance, publication or enforcement of any administrative act, expropriation decree, confiscation or requisition of facilities by governmental authorities, whether or not such measures are subsequently annulled or revoked by any competent judicial or administrative authority.*" *(C-III ¶ 188, footnotes omitted).*
>
> 189Second, the measure in question must fall into one of three categories, of which only the second is currently relevant to this case. The second category embraces measures that both (i) concern specific subject matters — *i.e.* tax rates, foreign-exchange controls, and expropriation or seizure [*ocupación*] of assets of the Project or the Foreign Party's interests in the Project — and (ii) are applicable to the Foreign Party but are not generally applicable to "Companies in the Republic of Venezuela." This second category was intended to protect, and does protect, the Foreign Party from measures that single out that company, or participants in the Project, or companies engaged in the oil industry, or companies engaged in the extra-heavy sector of the industry, instead of applying generally to all companies in Venezuela. In the case of income-tax rates, the definition is even more specific: the measure falls

within this category if the rate is different from that provided in the last sentence of the Fifteenth Condition of the Framework of Conditions. Each of the governmental measures at issue in this case falls within this second category. (C-III ¶ 189, footnotes omitted, italics in original).

> *190.*    *Third,* the measure must be unjust, [meaning that it] results in a Materially Adverse Impact. (C-III ¶ 190).

409. Respondents' argument that the definition of Discriminatory Measure was intended to encompass only those measures "*that applied with general effect to all companies to which it could possibly apply*" finds no support. Instead, "*the parties intended precisely what the Respondents now disclaim, because the purpose of the definition was to protect Mobil CN from another industry-wide expropriation.*" (C-IV ¶ 39). Respondents' self-defeating notion of discrimination deprives the second part of the definition of "*Discriminatory Measure*" of any meaning or effect. (C-VI ¶ 33).

410. Contractual rights can be the subject of expropriation under Venezuelan law. Claimant maintains that each measure preceding **Decree-Law 5200** expropriated or seized Claimant's 41 2/3% interests in the rights and assets impacted by all of the measures preceding **Decree-Law 5200**. (C-VI ¶ 29).

## K.IV.1.b.    Arguments by Respondents

411. Respondents argue that none of the measures at issue in this arbitration constitute "*Discriminatory Measures*" within the meaning of the AA and the Congressional Authorization. (R-II ¶¶ 90 – 100). Respondents argue that Clause I of the AA was designed to implement the **Twentieth Condition of the Congressional Authorization**, which states that the AA:

> 101.    [...] shall include provisions allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, on equitable terms, for adverse and significant economic consequences arising from the adoption of decisions made by governmental authorities or changes in legislation that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered that the Party has suffered an adverse and significant economic consequence as a result of any of said decisions or changes in legislation, at any time when the Party is receiving revenues from THE ASSOCIATION equal to a price of crude

oil above a maximum price that shall be specified in the AA. (R-II ¶ 101, emphasis in original).

412. The definition of a *"Discriminatory Measure"* is central to the Article 15 indemnity. Under this definition, non-economic governmental measures do not give rise to indemnity obligations. (R-II ¶ 102; R-III ¶¶ 132 – 133; R. Closing Slide 45). Rather, the purpose of this and Article 15 *"was to provide equitable compensation when the foreign party suffered an adverse economic consequence from a governmental measure directed at the association or at that party in its capacity as a participant in the association. It was not to provide a remedy for all governmental measures affecting a party."* (R-III ¶ 133).

413. There is a distinction within the definition of *"Discriminatory Measure."* The first part of the definition exempts governmental action affecting the EHO projects in Venezuela in a non-discriminatory manner. (R-III ¶ 111). The second part exempts governmental action related to taxes, exchange controls, or the expropriation or seizure of assets of the Project or of a Foreign Party's interests in the Project, only if those are *"applicable with general character to Companies in the Republic of Venezuela."* (R-III ¶ 111). Respondents characterize Claimant's arguments with respect to the alleged Discriminatory Measures below as follows:

> 112. In an effort to work its way around this two-part definition, Claimant argues that everything is an "expropriation or seizure." In this way, Claimant reaches the remarkable conclusion that every governmental measure at issue in this case is subsumed within the "narrower category," rendering the first part of the definition meaningless. This broad brush approach lacks any foundation in the language of the provision and cannot substitute for a careful review of each of the measures in question. (R-III ¶ 112).

414. Respondents continue that if every governmental measure were to be considered an expropriation, then there would be no need for the lengthy definition of *"Discriminatory Measure"* in the AA. (R-IV ¶¶ 19-20). In their closing argument, Respondents accuse Claimant and its experts of *"mistakenly assume[ing] that all measures were discriminatory, without*

*support in the record and without testimony at the hearing.*" (R. Closing Slide 46).

415. Respondents argue that the documentary evidence shows that there was only one measure that Claimant classified as an expropriation: the "*surrender of its interest in the Project.*" All other pre-migration measures were characterized as "*measures that preceded the expropriation.*" (R-IV ¶ 22).

416. With respect to the second part of the definition of "*Discriminatory Measure*" referring to an expropriation or seizure of assets, Respondents argue that the royalty, tax, and production curtailment measures at issue did not take any asset of the project and Claimant's 41 2/3% interest in the Project remained unchanged after each measure. (R-IV ¶ 23).

### K.IV.1.c.   The Tribunal

417. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

#### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 51 - 58 |
| C-III | ¶¶ | 185 – 191, 201 – 204, 229 – 230 |
| C-IV | ¶¶ | 35 – 41 |
| R-II | ¶¶ | 99 – 102 |
| R-III | ¶¶ | 109 – 112, 130 – 140 |
| TOR | ¶ | 5.1.1.a. |

#### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-11 | Congressional Authorization |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶ 26 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 41-57, 71, 74, 76-77 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) |
| C-48 | Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (28 September 2008) |

| | |
|---|---|
| C-50 | Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. and Compass Lexecon ("*Lexecon*"), a Wholly-Owned Subsidiary of FT Consulting, Inc. (26 September 2008) |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) p. A-6 |
| C-87 | Association Agreement Clause 1 *defining* "*Discriminatory Action*", "*Government Action*", and "*Materially Adverse Impact*", Article 2.1 |
| C-100 | Instrument of Transfer of Operations of the Cerro Negro Project [*Acta de Entrega de Operaciones del Proyecto Cerro Negro*] (25 April 2007) (without Annexes) *and* Letter dated 25 April 2007 from Mobil Cerro Negro, Ltd. and Operadora Cerro Negro S.A. to Ministry of Energy and Petroleum, PDVSA, PDVSA CN, and Veba Oil & Gas |
| C-158 | Letter dated 26 May 2006 from Mobil Cerro Negro to Ministry of Relations, Ministry of Energy and Mines and Prosecutor General |
| C-160 | Heads of Agreement between Lagoven, Mobil Oil Corporation, and Mobil de Venezuela (17 September 1996) |
| C-213 | Testimony of Brian Lawless (14 May 2009) |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 24, 32 |
| C-216 | Reply Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. and Compass Lexecon (15 May 2009) |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) |
| C-220 | Reply Expert Report of Professor Stewart C. Myers of the Brattle Group (13 May 2009) |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) at ¶ 10 |
| R-7 | Decree-Law 5200 Art. 3 |
| R-35 | Tr. Hearing of 2 December 2008 pp. 127 – 129, 137, 141 - 142, 145 – 149 |
| R- 43 | Congressional Authorization Fifteenth and Twentieth Condition |
| R-65 | Instrument of Transfer of Operations of the Cerro Negro Project (25 April 2007) |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) ¶¶ 19, 21(c) |
| R-75 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, the Minister of Energy and Petroleum and Marisol Plaza, Attorney General (2 February 2005) |
| R-76 | Letter from Mark Ward, Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. and Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Marisol Plaza, Attorney General (2 June 2005) |
| R-77 | Letter from Mark Ward, President of Mobil Cerro Negro, Ltd., Mobil Cerro Negro Holdings, Ltd. and Operadora Cerro Negro, S.A. to Alí Rodríguez, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Marisol Plaza, Attorney General (20 June, 2005) |
| R-78 | Letter from Mark Ward, Mobil Cerro Negro, Ltd. to Rafael |

Ramírez, Minister of Energy and Petroleum (1 August 2005)

R-79      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Bernard Mommer, Vice Minister of Hydrocarbons (16 October 2006)

R-80      Letter from Timothy Cutt, Operadora Cerro Negro, S.A. to Rafael Ramírez, Minister of Energy and Petroleum (2 November 2006)

R-81      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Petroleum and Gladys María Gutiérrez, Attorney General (20 November 2006)

R-82      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Rafael Ramírez, Minister of Energy and Petroleum (12 January 2007)

R-83      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (5 March 2007)

R-84      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holdings, Ltd. and Representative of Venezuela Holdings, B.V. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (8 March 2007)

R-85      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. and Mobil Cerro Negro Holding, Ltd. and Representative of Operadora Cerro Negro, C.A., Venezuela Holdings B.V., Mobil Corporation, Agencia Operadora La Ceiba, C.A., Mobil Venezolana de Petróleos Holdings, Inc., and Mobil Venezolana de Petróleos, Inc. to Nicolás Maduro, Minister of Foreign Affairs, Rafael Ramírez, Minister of Energy and Mines and Gladys María Gutiérrez, Attorney General (4 May 2007)

R-86      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (22 June 2007)

R-87      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (25 June 2007)

R-88      Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (27 June 2007)

R-89      First Affidavit of Jim Massey (21 January 2008) *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) at ¶¶ 19, 21(c), 25

R-112     Association Agreement Clause I *defining* "Discriminatory Measure" and Article 15

R-113     Supplemental Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, Prepared by Vladimir Brailovsky (14 August 2009) at ¶ 28

| R-116 | Supplemental Direct Testimony of José Ángel Pereira Ruimwyk (11 August 2009) |
|---|---|
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶ 22 |
| R-122 | Congressional Authorization of the Association Agreement between Maraven S.A. and Conoco Inc. (Petrozuata Project), Official Gazette No. 35.293 published 9 September 1993 |
| R-123 | Congressional Authorization of the Framework of Conditions for the Association Agreement between Corpoven S.A. Filial de Petróleos de Venezuela and the companies Atlantic Richfield Co. (ARCO), Phillips Petroleum Company and Texaco, Inc. (Hamaca Project), Official Gazette No. 36.209, published 20 May 1997 |
| R-124 | Cerro Negro, Confidential Preliminary Information Memorandum, Vol. I, March 1998 p. XV-6 |
| R-126 | Congressional Authorization of the Association Agreement between Maraven - Total - Itochu and Marubeni (Sincor Project), Official Gazette No. 35.293 published 9 September 1993 |

**At and Following the 2010 Hearings:**

| Submission | | Pinpoint |
|---|---|---|
| C-VI | ¶¶ | 29, 33 |
| R-IV | ¶¶ | 19 – 23 |
| R-V | ¶¶ | 28 – 30 |
| R. Closing Slides | | 28 - 33 |

| Speaker | Citation |
|---|---|
| C. Closing | 2030, 2035 |
| C. Opening | 46 |
| Jones | 1451 – 1458 |
| Massey | 500 – 501, 586 – 587 |
| Ward | 155 – 157 |

418. Clause 1 of the AA provides the starting point for the analysis of what constitutes Discriminatory Measure:

| **Spanish (Original)** | **Claimant's Translation** | **Respondents' Translation** |
|---|---|---|
| DEFINICIONES | DEFINITIONS | DEFINITIONS |

| | | |
|---|---|---|
| "Medida Discriminatoria" significará cualquier cambio en (o cualquier cambio en la interpretación o aplicación de) la ley venezolana, o cualquier Medida Gubernamental que sea injusta y que sea aplicable al Proyecto o a cualquier Parte Extranjera en su condición de participante en el Proyecto y que no se aplique en forma general a entes públicos o privados involucrados en proyectos para el mejoramiento de crudo Extrapesado en la República de Venezuela; o, con relación a tasas de impuesto, controles de cambio, o la expropiación u ocupación de activos del Proyecto o de los intereses de una Parte Extranjera en el Proyecto, siempre y cuando dicho cambio en (o cualquier cambio en la interpretación o aplicación de) la ley venezolana, o cualquier Medida Gubernamental no sea aplicable con carácter general a Empresas en la República de Venezuela (incluyendo la imposición de impuesto sobre la renta al Proyecto o a cualquier Parte Extranjera en su condición de participante en el Proyecto, a una lasa que no se corresponde con lo previsto en la última oración de la Condición Décima Quinta); o con respecto a impuestos municipales (patente de industria y comercio), la imposición de impuestos municipales a las Partes Extranjeras en su condición de participantes | "Discriminatory Measure" shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure which is unjust and is applicable to the Project or any Foreign Party in its capacity as a participant in the Project and is not generally applied to public or private entities engaged in Extra-heavy crude upgrading projects in the Republic of Venezuela; or, with respect to tax rates, foreign exchange controls or the expropriation or seizure ["ocupación"] of assets of the Project or of a Foreign Party's interests in the Project, provided that such change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure is not generally applicable to Companies in the Republic of Venezuela (including the imposition of income tax on the Project or on any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond with what is provided in the last sentence of the Fifteenth Condition); or, with respect to municipal taxes (license to perform industrial and commercial activities), the imposition of municipal taxes on the Foreign Parties in their capacity as participants in the Association notwithstanding the provision in the Fifteenth Condition, only if the aggregate burden of the | "Discriminatory Measure" shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure, which is unjust and is applicable to the Project or any Foreign Party in its capacity as a participant in the Project and which is not generally applicable to public or private entities engaged in projects for upgrading extra-heavy crude oil in the Republic of Venezuela; or, with respect to tax rates, foreign exchange controls or the expropriation or seizure of assets of the Project or of a Foreign Party's interests in the Project, provided that such change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure is not applicable with general character to Companies in the Republic of Venezuela (including the imposition of income tax on the Project or any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond with what is set forth in the last sentence of the Fifteenth Condition); or with respect to municipal taxes (commercial and industrial permits), the imposition of municipal taxes on the Foreign Parties in their capacity as participants in the Association in spite of what is set forth in the Fifteenth Condition, only if the aggregate municipal tax |

en la Asociación a pesar de lo previsto en la Condición Décima Quinta, solo si la carga total del impuesto municipal sobre los ingresos brutos de la Parte Extranjera afectada provenientes del Proyecto, excede en un cuatro por ciento (4%) los ingresos brutos de la Parte Extranjera afectada provenientes del Proyecto en el Año Fiscal de que se trate, en cuyo caso, la cantidad de impuestos municipales que exceda dicho cuatro por ciento (4%) constituirá una medida discriminatoria. Una medida que esté dentro de la definición de Medida Discriminatoria será considerada injusta si resulta en un Impacto Substancialmente Adverso.

municipal tax on the affected Foreign Party's gross revenue from the Project, exceeds by four percent (4%) the affected Foreign Party's gross revenue from the Project in the Fiscal Year at issue, in which event, the amount of municipal taxes that exceeds such four percent (4%) shall be a discriminatory measure. A measure that falls within the definition of Discriminatory Measure shall be deemed unjust if it results in a Materially Adverse Impact.

burden on the affected Foreign Party's gross revenues from the Project exceeds four percent (4%) of the affected Foreign Party's gross revenues from the Project in the Fiscal Year in question, in which event the amount of municipal taxes which exceeds such four percent (4%) shall constitute a discriminatory measure. A measure that would fall within the definition of Discriminatory Measure will be deemed unjust if it results in a Material Adverse Impact.

419.    Article 15 of the AA may also be of relevance.

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| General. | General. | General. |
| (a) En caso de que una de las Partes Extranjeras determine que se ha producido una Medida Discriminatoria que pueda resultar en un Impacto Substancialmente Adverso, dicha Parte Extranjera inmediatamente notificará a Lagoven CN sobre la Medida Discriminatoria. Adicionalmente, en caso de que dicha Parte Extranjera determine que realmente ha sufrido un Impacto Substancialmente Adverso como resultado de las Medidas Discriminatorias de la cual previamente ha notificado a Lagoven CN, inmediatamente notificará | (a) In the event that one of the Foreign Parties determines that a Discriminatory Measure has occurred which may result in a Materially Adverse Impact, such Foreign Party shall immediately provide notice of the Discriminatory Measure to Lagoven CN. Further, in the event that such Foreign Party determines that it has actually suffered a Materially Adverse Impact as a result of the Discriminatory Measures of which it has previously notified Lagoven CN, it shall immediately give notice of such determination | (a) In the event that one of the Foreign Parties determines that a Discriminatory Measure which may lead to a Material Adverse Impact has occurred, such Foreign Party shall immediately provide notice of the Discriminatory Measure to Lagoven CN. In addition, in the event that such Foreign Party determines that it has actually suffered a Material Adverse Impact as a result of Discriminatory Measures for which notice has previously been provided to Lagoven CN, it shall immediately give notice of such determination to |

dicha determinación a Lagoven CN (la "Notificación de Medida Discriminatoria"). En la medida en que se disponga de cualquier recurso legal para revertir u obtener una reparación de dicha Medida Discriminatoria, la Parte Extranjera iniciará y ejercerá acciones legales para mitigar cualquier daño sufrido como resultado de la Medida Discriminatoria. Si Lagoven CN está de acuerdo en que se ha producido la Medida Discriminatoria y que ha resultado en un Impacto Substancialmente Adverso, Lagoven CN colaborará con la Parte Extranjera en el ejercicio de las antes mencionadas acciones legales y las Partes negociarán de buena fe los daños compensatorios y/o posibles modificaciones al Convenio a fin de restablecer el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria. Cualesquiera beneficios netos recibidos por la Parte Extranjera como resultado del ejercicio de las acciones legales antes mencionadas (después de la deducción de los costos legales incurridos por la Parte Extranjera en relación con las mismas) serán (i) imputados a cualquier monto que finalmente se determine que Lagoven CN adeuda de acuerdo con esta Cláusula o (ii) reembolsado a Lagoven CN si Lagoven CN ha hecho pagos previamente a la Parte Extranjera con relación a la Medida Discriminatoria en cuestión.

to Lagoven CN (a "Notice of Discriminatory Measure"). To the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. If Lagoven CN concurs that the Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact, Lagoven CN shall cooperate with the Foreign Party in the pursuit of the aforesaid legal actions and the Parties shall negotiate in good faith the compensatory damages and/or possible modifications to the Agreement in order to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. Any net benefits received by the Foreign Party as a result of the pursuit of the aforesaid legal actions (after deduction of the legal costs incurred by the Foreign Party in connection therewith) shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Clause or (ii) reimbursed to Lagoven CN if Lagoven CN has previously made payments to the Foreign Party with respect to the Discriminatory Measure in question.

Lagoven CN (the "Notice of Discriminatory Measure"). To the extent any legal remedy is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. If Lagoven CN concurs that a Discriminatory Measure has occurred and has resulted in a Material Adverse Impact, Lagoven CN shall cooperate with the Foreign Party in pursuing the aforesaid legal actions and the Parties shall negotiate in good faith compensatory damages and/or possible modifications to the Agreement in order to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. Any net proceeds received by the Foreign Party as a result of the pursuit of the aforesaid legal actions (after deduction of the legal costs incurred by the Foreign Party in connection therewith) shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Article or (ii) reimbursed to Lagoven CN if Lagoven CN previously has made payments to the Foreign Party with respect to the Discriminatory Measure in question.

(b) Si Lagoven CN, dentro de los 90 días siguientes al recibo de la Notificación de la Medida Discriminatoria, no notifica a la Parte Extranjera sobre su concurrencia en que se han producido Medidas Discriminatorias que han resultado en un Impacto Substancial Adverso, cualquiera de las Partes podrá iniciar procedimientos de arbitraje de acuerdo con la Sección 18.2. Sin embargo, en ningún caso podrá una de las Partes iniciar procedimientos de arbitraje más de una vez por año calendario. El ámbito de los procedimientos de arbitraje incluirá: (i) una determinación de si una o más Medidas Discriminatorias se han producido y, si ese es el caso, si dichas medidas han tenido un Impacto Substancialmente Adversos sobre la Parte Extranjera; y (ii) en caso de una respuesta afirmativa a las dos interrogantes planteadas en el punto (i) de este literal, una indemnización por daños para compensar a la Parte Extranjera por las consecuencias económicas de la Medida Discriminatoria sufrida por ella hasta la fecha y recomendaciones sobre enmiendas al Convenio que restablecerían el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria.

(b) If, within the ninety (90) days following the receipt of the Notice of Discriminatory Measure, Lagoven CN does not give the Foreign Party notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred, any Party may commence arbitration proceedings in accordance with Section 18.2. In no event, however, may any one of the Parties initiate arbitration proceedings more than once per calendar year. The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if so, whether such measures have had a Materially Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative answer to the two questions specified in clause (i) of this paragraph, an award for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred.

(b) If Lagoven CN does not, within 90 days of receiving a Notice of Discriminatory Measure, give the Foreign Party notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred, any Party may commence arbitration proceedings in accordance with Section 18.2. In no event, however, may any Party initiate arbitration proceedings more than once per calendar year. The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if that is the case, whether such measures have had a Material Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative response to the two questions specified in clause (i) of this paragraph, a payment for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received if the Discriminatory Measure had not occurred.

420. The above quotations show that, in the AA, the term *"Discriminatory Measures"* is defined in a very complicated way.

421. Further, the Tribunal appreciates that, for a correct understanding of the intent of the contracting Parties, one may have to go beyond the wording and take into account that the expropriation in 1975, well known to the Parties, must also be considered as a background and in the context of the AA.

422. Pursuant to Article 15.1(b) of the AA, Claimant may commence arbitration proceedings in accordance with Article 18.2 of the AA in the event that, as is the case here, PDVSA-CN does not concur that a Discriminatory Measure resulting in a Material Adverse Impact has occurred.

423. In the following sections in K.IV, the Tribunal will address each alleged discriminatory action individually (a) beginning with **Decree-Law 5200**, (b) continuing with the Royalty and Extraction Tax Measures, (c) followed by the Income Tax Increase, (d) and then with the Production and Export Curtailments.

## K.IV.2.     Decree-Law 5200

### K.IV.2.a.     Arguments by Claimant

424. Claimant argues that the Government's expropriation of its entire interest in the Project by means of **Decree-Law 5200** was a Discriminatory Measure. *First*, **Decree-Law 5200** was a governmental measure and a change in Venezuelan law. *Second*, the **Decree-Law 5200** expropriated or seized Claimant's interests in the Project, including its shares and participation in the Project:

> The interests expropriated or seized included Mobil CN's 41- 2/3% participation interest in the Project, as well as its undivided interest in and to the assets, rights, and liabilities of the Project to the extent of that participation. Mobil CN's rights as a participant in the Project included, among other things, the right to exploit the Cerro Negro area, to take title to the EHO produced from the Project at the wellhead, and title to the movable and immovable property and intellectual property dedicated to the Project, as well as title to performance under the AA and related agreements. (C-III ¶ 209).

425. *Third*, as Respondents concede, **Decree-Law 5200** was not generally applicable to all companies in Venezuela, but rather that it applied to all companies operating outside of the legal framework of the **2001 Hydrocarbons Law**. (C-IV ¶ 39).

426. Claimant states that the fact that its interests were expropriated or seized as of **27 June 2007** has been recognized by the Project's project-finance creditors in their **Notice of Prospective Default**. (C-III ¶ 156). This fact of the "*expropriation*" has also been confirmed by statements made by President Chávez, the Minister of Energy and President of PDVSA Rafael Ramírez, and other representatives of PDVSA and PDVSA-CN. (C-III ¶ 155).

427. Claimant characterizes Respondents' argument that **Decree-Law 5200** merely "*nationalized or reserved to the State*" rather than "*expropriated*" Claimant's investment as both hairsplitting and irrelevant.

> (i) neither **Decree-Law 5200** nor the **Law on Effects** could accomplish such a "reservation" because the **1975 Nationalization Law** had already reserved those oil activities to the State; (ii) a "nationalization" like the one the Respondents assert **Decree-Law 5200** implemented involves expropriation; and (iii) in the end, the hair-splitting distinctions among "nationalization," "reserve" and "expropriation" do not matter, because the contract uses the alternative concept "seizure," and the Respondents do not and cannot deny that the Republic of Venezuela "seized" Mobil CN's entire investment on 27 June 2007. (C-IV ¶ 42, partially quoted).

> The Respondents' attempt to re-characterize the events of **27 June 2007** as something other than an expropriation offends any reasonable understanding of the facts and the law. The notion that this case involves a voluntary transfer of interests and a voluntary departure from the country is preposterous. The transfer was compelled by **Decree-Law 5200**. Mobil CN cooperated with an orderly transfer of operations out of a respect for law and a commitment to safety. But Mobil CN went along with the transfer with full reservation of rights and in the face of threats of armed force. (C-VI ¶ 25, citations omitted, partially quoted).

428. Vice-Minister Mommer's statement that the Republic of Venezuela expropriated Claimant's interests in the Project through **Decree-Law 5200** has not been refuted. For ease of reference his statement was: "*[w]e*

*annulled that association, expropriated the assets and owe them compensation."* (C-VI ¶ 5).

429. Claimant explains that Venezuelan scholars use the term *"nationalization"* to refer to a governmental measure that combines *"(i) reservation of an economic activity to the State with (ii) the transfer of private assets engaged in that activity to the State, usually by expropriation. According to this usage, neither __Decree-Law 5200__ nor the __Law on Effects__ is genuinely a 'nationalization' law, [as the reservation was accomplished in 1975.]"* (C-IV ¶ 42). Further, as Prof. Brewer-Carías explained, a *"nationalization"* involves an expropriation. (C-VI ¶ 26). Likewise, as Prof. Hernández-Bretón explained, even a *"regulation"* can constitute an expropriation, especially where it, as **Decree-Law 5200** did, totally destroys the value of the assets. (C-VI ¶ 27).

430. Further, Claimant states that Respondents' argument that the pre-contractual Heads of Agreement uses the term *"condemnation"* (not *"expropriation"*) and that, therefore, *"expropriation"* excludes takings of property as part of a policy of nationalization or reservation, is irrelevant. The terms of the AA are controlling, and *"even if the AA had used the term 'condemnation,' that term does not exclude the taking of property as part of a broader policy of nationalization."* (C-IV ¶ 42, footnotes omitted).

> 28. There is no evidence on the record that the notion of "expropriation or seizure" is limited to the U.S. law concept of "condemnation" or to physical taking of assets. The reference to the **Heads of Agreement** and the attempt to refer to U.S. legal concepts is inappropriate because the AA has an integration clause (Section 23.2) and is governed by Venezuelan law. And the AA cannot have been intended to refer only to physical takings, because the definition of Discriminatory Measure refers to intangible property like "assets" or "interests" which are not subject to physical taking. (C-VI ¶ 28, citation omitted).

431. Even taken by itself, the expropriation reduced Claimant's Net Cash Flow by more than five percent for FY 2007 and for the remaining 28-year term of the AA. (C-III ¶ 230).

### K.IV.2.b. Arguments by Respondents

432. Respondents state that the Tribunal must assess whether the individual provisions of **Decree-Law 5200** constitute Discriminatory Measures. Under **Article 3 of the Decree-Law 5200**, operatorship was to be transferred. With respect to the cost calculations in the damages section, Claimant has argued that increases in costs for the Project were caused by the change in operatorship. The argument assumes that the transfer of control of operations was a Discriminatory Measure. (R-III ¶ 135). The change in operatorship was carried out in every EHO project in the Orinoco Oil Belt and was, therefore, not discriminatory under the first part of the definition. (R-III ¶ 136). Claimant's presentation that ExxonMobil was an efficient operator should be disregarded in its entirety. (R-III ¶ 134).

433. The required migration under **Articles 4 and 5** also applied to all EHO associations in the Orinoco Oil Belt. Respondents argue that the migration process was not an "*expropriation*" within the meaning of the term "*Discriminatory Measure*" in the AA and that therefore, Clause XV does not apply. (R-III ¶ 138; R-IV ¶ 26).

434. Respondents also state that there was no "*seizure.*" The **Heads of Agreement** provides guidance as to the Parties' intent that the term "*seizure*" or "*ocupación*" connotes a physical taking of possession, rather than a transfer by agreement or operation of law, such as through **Decree-Law 5200**. (R-IV ¶ 26).

435. Respondents explain that Venezuelan law distinguishes between expropriation and nationalization or reservation. (R-II ¶ 122). An expropriation is "*the taking of specific property for use by the Government*" and is "*distinguished from nationalization or reservation of a particular activity to the State, which by definition is not discriminatory in nature.*" (R-II ¶ 121). Respondents state that this interpretation is consistent with Venezuelan law and the language of the definition of Discriminatory Measures in the AA. (R-III ¶ 138).

436. **Decree-Law 5200** implemented a policy of nationalization and, at the same time, allowed private parties to participate in the petroleum industry by migrating to mixed companies in which a state company maintained control through a shareholding of at least 60%. (R-II ¶ 121). Claimant was offered *"the opportunity to continue its participation in the Venezuelan petroleum industry by conforming its activities to the existing regulatory framework, with compensation for any diminution of its interest"* on the same basis as most companies, including Claimant's partner in the Cerro Negro Joint Venture, BP. (R-II ¶ 125). Respondents state that Claimant made a business decision not to accept the new legal structure – and that this refusal does not transform the *"migration"* into an *"expropriation or seizure"* within the meaning of the AA. (R-IV ¶ 27).

437. Respondents further state that, even if the law accomplished an *"expropriation or seizure of assets of the Project or the Foreign Party's interests in the Project"*, such legislative action will only be considered a Discriminatory Measure if it did not apply with a *"general character"* to companies in Venezuela. (R-III ¶ 138).

> The second part of the definition does not characterize any "expropriation or seizure" as a Discriminatory Measure. Rather, an "expropriation or seizure of assets of the Project or the Foreign Party's interests in the Project" is only to be considered a Discriminatory Measure under the terms of the definition when the measure does not apply with a "general character" to companies in Venezuela. This latter qualification would have no meaning except in connection with a policy of nationalization that applied equally to all companies involved in the oil industry. Otherwise, the qualification could only be given effect in the circumstance that all assets of all companies in Venezuela are expropriated, a scenario which is not only incredible but which has no foundation under any concept of expropriation, whether direct, indirect or otherwise, in Venezuelan law. (R-III ¶ 138, citations omitted).

438. Respondents argue that the Parties intended *"a measure that applied with general effect to all companies to which it could possibly apply, i.e., to all companies engaged in the production of hydrocarbons in Venezuela, would not constitute a Discriminatory Measure."* (R-II ¶ 124). Here, the migration process applied to all 9 companies in Venezuela operating outside the legal framework of the **2001 Hydrocarbons Law**. (R-II ¶ 123).

## K.IV.2.c.   The Tribunal

439. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 59 – 63 |
| C-III | ¶¶ | 138 – 162, 205 – 211, 229 – 230 |
| C-IV | ¶¶ | 39 – 42 |
| R-II | ¶¶ | 120 – 126 |
| R-III | ¶¶ | 130 – 140 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-9 | Copy of 25 July 2007 Letter from Steven Reisman of Curtis-Mallet Prevost Colt & Mosle LLP (on behalf of PDVSA Cerro Negro S.A.) to James Garden, Esq. Of Carter Ledyard & Millburn LLP |
| C-15 | Uncertainty Reigns Among Companies that Operate in the Belt [*Incertidumbre Reina entre Empresas que Operan en la Faja*], El Universal (9 January 2007) |
| C-17 | Tr. of speech "President Chávez in Nationalization Act of the Belt: 'We Have Buried 10 Years of Nefarious Oil Opening'" [*Presidente Chávez en Acto de Nacionalización de la Faja: "Hemos Enterrado 10 años de Nefasta Apertura Petrolera"*], broadcasted from the José Antonio Anzoátegui Industrial Complex on 1 May 2007, *available at* www.pdvsa.com at 2 |
| C-35 | 26 April 2007 letter from Deutsche Bank Trust Company Americas Trust & Securities Services, as Bond Trustee, to The Bank of New York. |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶ 26 |
| C-43 | Testimony of Tim Cutt (26 September 2008) at ¶¶ 32 – 54 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 56, 60 – 71 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶¶ 49 – 68, 72, 74, 79, 87 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) at 6 |
| C-48 | Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (28 September 2008) |
| C-50 | Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon ("*Lexecon*"), a Wholly-Owned Subsidiary of FT Consulting, Inc. (26 September 2008) |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) p. A-6 |

| | |
|---|---|
| C-87 | Association Agreement Clause I *defining "Government Measures"* and *"Materially Adverse Impact"* |
| C-95 | Non-Binding Terms for the Migration of Associations (August 2006) |
| C-96 | Ministry of Energy and Petroleum Press Release, *Presidente Chávez Solicitará Habilitante a la AN Para Favorecer al Sector Energético [President Chavez Will Solicit Enabling Law from the National Assembly to Encourage the Energy Sector]* (8 January 2007) |
| C-97 | *Venezuela Buscará Tomar Control Participación AES en EDC [Venezuela Shall Seek to Take Control Participation* [sic] *AES in EDC]*, EL UNIVERSAL (15 January 2007) |
| C-98 | Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters *[Ley Que Autoriza al Presidente de la República Para Dictar Decretos con Rango, Valor y Fuerza de Ley en las Materias que se Delegan]* (as published in the Official Gazette No. 38617 of 1 February 2007) Art. 11 |
| C-99 | Decree-Law 5200 Art. 1 – 5, 7 |
| C-100 | Instrument of Transfer of Operations of the Cerro Negro Project *[Acta de Entrega de Operaciones del Proyecto Cerro Negro]* (25 April 2007) (without Annexes) *and* Letter dated 25 April 2007 from Mobil Cerro Negro, Ltd. And Operadora Cerro Negro S.A. to Ministry of Energy and Petroleum, PDVSA, PDVSA CN, and Veba Oil & Gas |
| C-101 | Draft Form of Contract for Conversion to a Mixed Company (17 January 2007), Art. 2, 5, 6.1 – 6.3, 7 (17 January 2007) |
| C-102 | Transcript High Court of Justice – Queen's Bench Division Commercial Court (29 February 2008) at 23 |
| C-103 | Tr. from Public Proceedings *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A.*, High Court of Justice – Queen's Bench Division Commercial Court, Claim No. 2008-61 (29 February 2008) pp. 8 – 9 |
| C-104 | Law on Effects Art. 1, 2, 4 |
| C-105 | PDVSA Press Release, *Nacen Petro Anzoátegui, Petro Cedeño, Petro Piar y Petro Monagas [Petro Anzoátegui, Petro Cedeño, Petro Piar y Petro Monagas are Born]*, (29 July 2007) |
| C-106 | Resolution *[Acuerdo]* Approving the Incorporation of Mixed Company PetroMonagas S.A. between Corporación Venezolana de Petróleo, S.A. and Veba Oil & Gas Cerro Negro or their Respective Affiliates *[Acuerdo mediante el cual se aprueba la constitución de la empresa mixta PetroMonagas, S.A., entre la Corporación Venezolana de Petróleo, S.A. y Veba Oil & Gas Cerro Negro, o sus respectivas afiliadas]* (as published in the Official Gazette No. 38798 of 29 October 2007), Fourth Whereas and Art. I, 2.1, 2.12 |
| C-117 | *Sin Transición en la faja [Without Transition in the Belt]*, EL UNIVERSAL (26 August 2006) |
| C-126 | Index of Materials With Admissions By Government Officials Regarding Expropriation/Nationalization of Mobil Cerro Negro's Assets |
| C-128 | Organic Law of Hydrocarbons *[Ley Organica de Hidrocarburos]* |

|       | (as published in the Official Gazette No. 37323 of 13 November 2001) |
|-------|---------------------------------------------------------------------|
| C-129 | Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein [*Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican*] (as published in the Official Gazette No. 38884 of 5 March 2008) Art. 1 |
| C-160 | Heads of Agreement between Lagoven, Mobil Oil Corporation, and Mobil de Venezuela (17 September 1996) Ex. D |
| C-186 | Transcript of *Aló Presidente* No. 288 (29 July 2007) |
| C-213 | Testimony of Brian Lawless (14 May 2009) |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶¶ 34-37, 40-42, 48 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 9 – 13, 15, 30, 32 |
| C-216 | Reply Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. and Compass Lexecon |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) |
| C-220 | Reply Expert Report of Professor Stewart C. Myers of the Brattle Group (13 May 2009) |
| C-223 | Tr. of Bernard Mommer Interview (12 February 2008) p. 8 |
| R-4   | First Affidavit of Bernard Mommer(11 February 2008) at ¶ 10 |
| R-7   | Decree-Law 5200 Art. 1, 3, 5 |
| R-35  | Tr. of 2 December 2008 Hearing pp. 137, 141 – 142 |
| R-43  | Congressional Authorization Twentieth Condition |
| R-57  | 2001 Hydrocarbons Law |
| R-65  | Instrument of Transfer of Operations of the Cerro Negro Project, dated 25 April 2007 |
| R-68  | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 31-48 |
| R-89  | First Affidavit of Jim Massey (21 January 2008) *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) at ¶ 19 |
| R-92  | Black's Law Dictionary (West Publishing Co., 6th ed. 1990) p. 292 |
| R-112 | Association Agreement Clause 1 *defining "Discriminatory Measure"* |
| R-113 | Supplemental Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, Prepared by Vladimir Brailovsky (14 August 2009) at ¶ 28 |
| R-116 | Supplemental Direct Testimony of José Ángel Pereira Ruimwyk (11 August 2009) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 21 – 27 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 72 – 95 |
| R-122 | Congressional Authorization of the Association Agreement between Maraven S.A. and Conoco Inc. (Petrozuata Project), Official Gazette No. 35.293 published 9 September 1993 |

| R-123 | Congressional Authorization of the Framework of Conditions for the Association Agreement between Corpoven S.A. Filial de Petróleos de Venezuela and the companies Atlantic Richfield Co. (ARCO), Phillips Petroleum Company and Texaco, Inc. (Hamaca Project), Official Gazette No. 36.209, published 20 May 1997 |
| R-124 | Cerro Negro, Confidential Preliminary Information Memorandum, Vol. I, March 1998 p. XV-6 |
| R-126 | Congressional Authorization of the Association Agreement between Maraven – Total – Itochu and Marubeni (Sincor Project), Official Gazette No. 35.293 published 9 September 1993 |
| R-130 | Allan R. Brewer-Carías, *La intervención del estado en la actividad mercantil*, JORNADAS DE DERECHO MERCANTIL (Universidad Católica Andrés Bello, Facultad de Derecho, Caracas 1978) |

**At and Following the 2010 Hearings:**

| Submission | | Pinpoint |
|---|---|---|
| C-VI | ¶¶ | 5, 26 – 28 |
| R-IV | ¶¶ | 26 – 27 |

| Speaker | Citation |
|---|---|
| C. Closing | 2034 |
| C. Opening | 44 – 45 |
| Cranmer | 433, 447 – 448, 455 – 457 |
| Expert Conf. | 944, 976 – 977 |
| Graves | 1543 |
| Hoenmans | 404 |
| Jones | 1427 – 1428 |

440. At the outset, the Tribunal points out that the <u>Decree-Law 5200</u> was enacted prior to the contract's alleged extinguishment and, thus, its evaluation in the present context is not dependent on whether the Tribunal finds that the AA was indeed extinguished.

441. Now turning to the language in Clause I of the AA, the Tribunal cannot agree with Respondents' argument that the words "*expropriation*" and "*seizure*" connote a physical taking of possession, rather than a transfer by agreement or operation of law such as through <u>Decree-Law 5200</u>, and, therefore, that the transfer of operatorship and the migration of the Project to a mixed company (i) was not an "*expropriation*" or "*seizure*" within the meaning of the definition of "*Discriminatory Measure*" in Article 1 of the AA, but (ii) was rather a "*nationalization*" or "*reservation*", which Venezuelan law distinguishes from "*expropriation*" and is not covered by

the definition of Discriminatory Measure. Indeed, the Tribunal observes that it is commonly accepted in international investment practice that: [C-215 ¶ 32; C-215, App. 13 *"in other words, we can talk about expropriation, indirect expropriation, when the essential content of the right to property is eroded; when permitted 'limitations' turn into intolerable 'restrictions' because they denaturalize the right; when the owner loses 'control' over his/her property"*; I. Fadlallah, Ch. Leben, E. Teynier, « Investissements internationaux et arbitrage », in Les Cahiers de l'Arbitrage, Vol. IV – 2008] that an expropriation can be direct, implying a physical taking of property, as well as indirect. According to one author, *"direct takings of property can take various forms, ranging from outright nationalization in all economic sectors or on an industry-wide basis, to large-scale takings of land by the state, or specific taking. Indirect takings include creeping expropriations and regulatory takings. There are many forms of indirect takings that are generally recognized in the literature and in the arbitral awards as compensable. Such forms, inter alia, include the forced sale of alien property; exercising management control over the investment; unreasonable or excessive taxation"* and *"an indirect expropriation may exist if the measure attributable to the State has the effect of depriving the investor of other rights incidental to the enjoyment of its investment, even where the legal title to the property is not affected."* [Dr. Zeyad A. Alqurashi, International Oil and Gas Arbitration, OGEL special study – vol. 3, January 2005, page 137, 139]. According to another author, *"intangible property, including rights arising from a contract are susceptible of an expropriation in the same way as tangible property"* (C-135) and *"the decisive element in an indirect expropriation is the substantial loss of control or economic value of a foreign investment without a physical taking. This may take place through a large variety of forms of indirect interference with the investors' economic interests."* (C-135).

442. The Tribunal considers that Respondents' distinction between *"reservation"* and *"nationalization"*, on the one hand, and *"expropriation"* on the other

hand, borders on semantics and is irrelevant as well because the AA equates *"expropriation"* and *"seizure."*

443. The Tribunal, in particular, concludes that:

* Respondents denial, on legal grounds, that the Republic of Venezuela *"seized"* Claimant's entire investment on June 27, 2007 is unfounded;

* The notion that this case involves a voluntary transfer of interests and a voluntary departure of Mobil from Venezuela cannot be seriously entertained;

* the transfer was compelled by **Decree-Law 5200**;

* Mobil CN's cooperation for an orderly transfer of operations was made with full reservation of rights, and the exception contemplated by the AA is not applicable here, as **Decree-Law 5200** was *"not generally applicable to Companies in the Republic of Venezuela"*, even if the change in operatorship was carried out in every EHO project in the Orinoco Oil Belt.

444. In this context, the Tribunal notes that Dr. Bernard Mommer, Vice Minister of Energy, acknowledged in the following terms on 12 February 2008 that the Republic of Venezuela had expropriated Claimant's interest in the Project through **Decree-Law 5200**:

> We annulled that association, expropriated the assets and owe them compensation. (Ex. C-103).

445. Taking into account the foregoing considerations, the Tribunal concludes that **Decree-Law 5200** was a Discriminatory Measure under Clause I of the AA and that Article 15 of the AA is therefore applicable, that the expropriation implemented by **Decree-Law 5200** came into effect on 27 June 2007, and as of that date, Claimant lost all of its rights in the Project and under the AA.

## K.IV.3.   Royalty and *"Extraction Tax"* Measures

## K.IV.3.a.   Arguments by Claimant

446. Claimant's arguments are best taken from its own words, found at C-IV ¶¶ 43 – 47 (citations omitted).

### a.   Each Measure Is an Expropriation or Seizure

43. The Venezuelan Government repudiated the Royalty Reduction Agreement and applied a 16 2/3% royalty in 2004. It later imposed an Extraction Tax, which "effectively raised the royalty rate to 33 1/3%." These measures abolished Mobil Cerro Negro's vested rights under the Royalty Reduction Agreement and the Royalty Procedures Agreement. They are Discriminatory Measures that expropriated and seized the rights guaranteed by the two Royalty Agreements.

44. The Royalty Reduction Agreement guaranteed Mobil Cerro Negro a royalty rate of 1%, once the upgrader became operational, until either of two conditions was met: (i) the accumulated gross income from the Project exceeded three times the total initial investment or (ii) nine years elapsed from the beginning of commercial production involving the upgrader. When the Government abolished the Royalty Reduction Agreement, neither condition had been met. The Royalty Reduction Agreement further guaranteed a maximum royalty rate of 16 2/3%, which was the maximum rate specified in the 1943 Hydrocarbons Law. The Government nevertheless imposed the Extraction Tax, which raised the effective royalty rate to 33 1/3%.

45. The royalty measures expropriated or seized Mobil Cerro Negro's vested rights in the Royalty Reduction Agreement and the Royalty Procedures Agreement. Venezuelan law recognizes that contract rights, "property," "assets of any nature" or "rights" are protected from expropriation without compensation. Professor Hernández Bretón explains that "any type of assets, including contractual rights, can be subjected to expropriation [...]" The Respondents do not appear to contest this point.

46. The Respondents nevertheless contend that the royalty increases (as well as the other measures discussed below) were not "expropriation" but "'contributions, restrictions and obligations' on property or limitations on economic freedom that are different in character from an 'expropriation' under Venezuelan law." This characterization of the measures disregards their true impact and the specific provisions of the Association Agreement. The measures completely abrogated discrete contract rights having great value and, as a consequence, expropriated or seized those rights. As Professor Hernández Bretón explains, the concept of expropriation under Venezuelan law includes indirect expropriation, that is, "when the core (essential content) of the right to property is eroded by State action," when the "limitations" denature the right, and when the owner loses control of the property. The Venezuelan Supreme Court has held that when the limitations imposed on the right to property go beyond the essence or nature of the right, the right is extinguished. Because the Government's royalty increases deprived Mobil Cerro Negro of its valuable rights under the Royalty Reduction Agreement and the Royalty Procedures Agreement, each of those measures is an expropriation.

b. **Both Royalty Measures Are Discriminatory**

47. The royalty increases were discriminatory under the standard of the second part of the definition of "Discriminatory Measure," because they did not apply to all companies in Venezuela. The Respondents admit

that these measures were not "generally applicable" to all companies in Venezuela. As in the case of the "nationalization," however, they assert that the measures are not "discriminatory" because they applied to all companies to which they could apply, that is to all companies "eligible for the royalty holiday" and to all oil companies, respectively. As discussed above, this argument disregards the special standard of discrimination that the Association Agreement applies to expropriation or seizure, which are deemed discriminatory whenever they do not apply to all companies in Venezuela. That very broad protection against expropriation was an essential term of the Association Agreement. It required the Respondents to indemnify Mobil Cerro Negro for any expropriation or seizure that singled out the Claimant and other oil companies for adverse treatment, including actions withdrawing the special inducements for their investments.

447. *Finally*, Claimant also argues that the Executive did not have the right to end the royalty holiday at will:

> 19.    [...] the Respondents mischaracterize a decision by the Venezuelan Supreme Court as confirming "that the State always had the right [...] to end the royalty holiday when the circumstances motivating it no longer existed." But in that case there had been no challenge to any RRA; the question was whether certain clauses of an *Acuerdo* of the Venezuelan Congress authorizing the execution of the At-Risk-and-Shared-Profit Exploration Agreements were valid, and whether the Executive could reduce the royalty in certain oil-production projects at the beginning of the project or only when the depletion of the reservoir made the exploitation uneconomical. In that very different setting, the Supreme Court held that the Executive could reduce the royalty at any stage of a project. (C-VI ¶ 19).

## K.IV.3.b.    Arguments by Respondents

448. Respondents argue that the Royalty Measures fall squarely within the "*laws of general applicability*" exception in the definition of "*Discriminatory Measures*" because they applied to each of the EHO projects in Venezuela. (R-II ¶ 105). The royalty increase applies "*generally*" to every company in Venezuela eligible for the royalty holiday. (R-II ¶ 107). The Extraction Tax applies to every company producing any kind of crude oil. (R-II ¶ 115).

449. Respondents assert that Claimant's argument that the Royalty Measures constitute an expropriation is belied by its own documents introduced in this case, in which Claimant refers to the Royalty Measures as "*measures that preceded the expropriation*." (R-II ¶ 108; R-III ¶ 124). Respondents reject

Claimant's argument that the Royalty Measures constitute an *"expropriation"* and are, therefore, encompassed by the definition of Discriminatory Measure that deals with *"tax rates, foreign exchange controls, or the expropriation or seizure of assets of the Project or of a Foreign Party's interests in the Project."* (R-II ¶ 106).

450. *First,* *"there is no basis in Venezuelan law [...] for equating the Royalty Measures with an expropriation"* and such an interpretation could elevate every government act to the level of an expropriation. (R-II ¶ 107). Claimant's reference to *"vested rights"* and *"indirect expropriation"* is irrelevant. (R-III ¶¶ 115, 119).

451. *Second,* the Royalty Measures do *"not even involve a breach by the State of any obligation to Claimant with respect to Royalties."* (R-III ¶ 119). *"[T]he* **1943 Hydrocarbons Law** *under which the royalty reduction had been granted expressly preserved the Minister's authority and discretion to eliminate the royalty reduction when the causes motivating the reduction no longer exist."* (R-III ¶ 116). By 2004, the cause motivating the royalty reduction had been eliminated due to the drastic increase in the price of Brent crude oil. (R-III ¶ 118). Respondents state that Claimant has not provided any evidence to challenge this point or to disagree with the factual basis for the Government's decision. (R-IV ¶ 24). Claimant has argued that the holiday would have ended in December 2007 if it had not been terminated in October 2004. Claimant's argument is, however, based on an unaudited 2004 Price Waterhouse report that did not take into account the capitalized pre-operative costs required by the RRA. A correct calculation would reveal that the royalty holiday would have ended in 2006. (R-IV ¶ 25).

452. *Third,* the *"power of unilateral rescission of the contract"* is *"a well-settled and completely uncontroversial principle of Venezuelan law that the State has a legal right to unilaterally modify or terminate its own administrative*

*contract"* and such *"can never be considered an 'expropriation.'"* (R-III ¶¶ 120, 122).

## K.IV.3.c. The Tribunal

453. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 28 – 30, 64 – 68 |
| C-III | ¶¶ | 212 – 218 |
| C-IV | ¶¶ | 43 – 47 |
| C-VI | ¶ | 19 |
| R-II | ¶¶ | 103 – 109, 113 – 115 |
| R-III | ¶¶ | 113 – 125 |
| TOR | ¶ | 5.1.1(a) |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Clause I |
| C-41 | Testimony of Thomas L. Cranmer (25 September 2008) at ¶¶ 19, 25-26 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 72-74 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶¶ 37-41 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) |
| App. 3 | ICC Damages Flow Chart (For Years in Which *"Discriminatory Measures"* Reduced Net Cash Flow by More Than 5%) p. 2 |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) at pp. 37, A-6, App. C |
| C-80 | Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA S.A. to calculate the Royalty under Article 41 of the Hydrocarbons Law (Royalty Reduction Agreement) (29 May 1998) Section 5 |
| C-87 | Association Agreement Clause I |
| C-112 | Law on Partial Amendment to the Organic Law of Hydrocarbons [*Ley de reforma Parcial del Decreto No. 1.510 con Fuerza de Ley Organica de Hidrocarburos*] (16 May 2006) and Organic Law of Hydrocarbons (as amended) (both documents as republished in the Official Gazette No. 38493 of 4 August 2006) Art. 1, 2, 5 (modifying Article 48) |

| | |
|---|---|
| C-135 | Christoph Schreuer, *The Concept of Expropriation Under the ETC and Other Investment Protection Treaties*, 2 TDM, vol. 5 (November 2005) at ¶ 64 |
| C-160 | Heads of Agreement between Lagoven, Mobil Oil Corporation, and Mobil de Venezuela (17 September 1996) |
| C-169 | Procedure for Payment of Extraction Tax (Royalty) for Extra Heavy Crude Oil Produced and Sulfur Extracted by Operadora Cerro Negro, S.A. (OCN) [*Procedimiento para el Pago del Impuesto de Explotación (Regalía) del Crudo Extrapesado Producido y del Azufre Extraído por Operadora Cerro Negro S.A. (OCN)*] (Royalty Procedures Agreement), Articles 1, 4.4.1, 4.4.2 |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) ¶¶ 44 – 46, 49 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) ¶¶ 24, 32 – 34 |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) |
| App. 3 | PDVSA 2004 Form 20F Filing with the U.S. Securities and Exchange Commission |
| C-224 | Venezuelan Constitution [*Constitución Venezolana*], dated 20 December 1999 (as published in Extraordinary Official Gazette No. 5453 of 24 March 2000) Art. 115 |
| C-225 | Law on Expropriation for Public Utility Cause [*Ley de Expropiación por Causa de Utilidad Pública o Social*], dated 1 July 2002 (as published in Official Gazette No. 37475 of 1 July 2002), Art. 2 and 7 |
| C-226 | *Phillips Petroleum Co. Iran v. Islamic Republic of Iran*, Award of 29 June 1989, 21 Iran-U.S. C.T.R. 79, 106 (1989) |
| C-227 | *Southern Pacific Properties (Middle East) Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB 84/3, Award of 20 May 1992, 8 ICSID Review-Foreign Inv. L.J. 328, 375 (1989) |
| R-1 | 2001 Hydrocarbons Law Art. 44 |
| R-2 | 1943 Hydrocarbons Law, Official Gazette No. 31, published 13 March 1943 [*Ley de Hidrocarburos*], Art. 41 |
| R-35 | Tr. of 2 December 2008 Hearing pp. 127 – 128 |
| R-57 | Decree No. 1.510, Decree with Force of Organic Law of Hydrocarbons, Official Gazette No. 37.323, published 13 November 2001 Art. 44 |
| R-62 | Law of Partial Reform of Decree No. 1.510 with Force of Organic Law of Hydrocarbons, Official Gazette No. 38.443, published 24 May 2006 |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 27 – 48 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros ( 10 February 2009) |
| App. 6 | Decree No. 5.916, PetroMonagas S.A., Transfer Decree, Official Gazette No. 38.884, published March 5, 2008 [*Decreto N° 5.916, mediante el cual se transfiere a la empresa PetroMonagas, S.A., el derecho a desarrollar actividades primarias de exploración que en él se especifican*] |
| R-86 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. To |

|  | Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (22 June 200 |
|---|---|
| R-87 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. To Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (25 June 2007) |
| R-88 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. To Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (27 June 2007) |
| R-89 | First Affidavit of Jim Massey (21 January 2008) *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) at ¶ 25 |
| R-91 | Letter from Rafael Ramírez, Minister of Energy and Mines to Alí Rodríguez, President of Petróleos de Venezuela, S.A. (8 October, 2004) |
| R-92 | Black's Law Dictionary (West Publishing Co., 6ᵗʰ ed. 1990), p. 292 |
| R-93 | Expert Report of Barry Pulliam and Anthony Finizza, Ph.D., Econ One Research, Inc. (16 February 2009) ¶¶ 13, 42 – 53, Table 1 |
| App. 3 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 1999 and 1998 |
| App. 4 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 2000 and 1999 |
| App. 5 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 2001 and 2000 |
| App. 6 | PDVSA Cerro Negro, S.A., Financial Statements, 31 December 2001 and 2000 |
| App. 7 | Mobil Cerro Negro, Ltd., Report of Independent Public Accountants and Financial Statements, December 31, 2001 and 2000 |
| App. 23 | Supporting Data for Figure 4, Annual Average World Oil Prices 1970-2008 |
| R-94 | Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, prepared by Vladinir Brailovsky, Economía Aplicada, S.C., (16 February 2009) ¶¶ 37 – 46 |
| App. 5 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 1999 and 1998 |
| App. 6 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 2000 and 1999 |
| App. 7 | Proyecto Cerro Negro, Report of Independent Accountants and Financial Statements, December 31, 2001 and 2000 |
| App. 9 | Wood Mackenzie, *ExxonMobil, Upstream RADAR Report*, July 2007 |
| R-112 | Association Agreement Article 2.1(a) |
| R-113 | Supplemental Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, Prepared by Vladimir Brailovsky (14 August 2009) ¶¶ 22 – 24 |
| R-115 | Supplemental Expert Report of Econ One Research, Inc., (14 August 2009) ¶¶ 49 – 53 |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini and Appendices (14 August 2009) at ¶ 26 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta |

|            | Fontiveros (14 August 2009) at ¶¶ 72-95 |
|------------|------------------------------------------|
| App. 37    | Supreme Court of Justice (Full Chamber), *Nullity Action For Unconstitutionality Filed By Simón Muñóz Armas, Elías Eljuri Abraham and Others Against the Tenth, Seventeenth, Second and Fourth Clauses of Article 2 of the Authorization of the Congress of the Republic Approved on July 4, 1995*, Case No. 812-829 (August 17, 1999) [*Corte Suprema de Justicia (Sala Plena Accidental), Acción de nulidad por inconstitucionalidad de Simón Muñóz Armas, Elías Eljuri Abraham y otros en contra de las cláusulas décima, decimoséptima, segunda y cuarta del Artículo 2° del Acuerdo del Congreso de la República aprobado en fecha 4 de Julio de 1995, Exp. N° 812-829 (17 de agosto de 1999)*] at 20 |
| App. 38    | Allan R. Brewer-Carías, ADMINISTRATIVE CONTRACTS (Editorial Jurídica Venezolana, Caracas 1992) [*Allan R. Brewer-Carías, CONTRATOS ADMINISTRATIVOS (Editorial Jurídica Venezolana, Caracas 1992)*] pp. 182 – 183 |
| App. 41    | Eloy Lares Martínez, ADMINISTRATIVE LAW MANUAL (Universidad Central de Venezuela, 12ᵗʰ ed., Caracas 2001) [*Eloy Lares Martínez, MANUAL DE DERECHO ADMINISTRATIVO (Universidad Central de Venezuela, 12ª ed., Caracas 2001)*] p. 295 |
| R-124      | Cerro Negro, Confidential Preliminary Information Memorandum, Vol. I, March 1998 p. XV-6 |
| R-125      | Congressional Authorization of the formation of the mixed company, PetroMonagas S.A., between Corporación Venezolana del Petróleo S.A. and Veba Oil & Gas Cerro Negro GMBH, or their respective affiliates Official Gazette No. 38.798 (29 October 2007) Second Condition, subparagraph 6 |

### At and Following the 2010 Hearings:

| Submission        |    | Pinpoint   |
|-------------------|----|------------|
| C-VI              | ¶¶ | 19, 29, 31 |
| R-IV              | ¶¶ | 24 – 25    |
| R. Closing Slides |    | 45 – 46    |

| Speaker      | Citation    |
|--------------|-------------|
| Cline        | 1248        |
| Cutt         | 679 – 683   |
| Expert Conf. | 976 – 82    |
| Graves       | 1639 – 1648 |
| Jones        | 1435 – 1458 |
| Massey       | 500 – 501   |
| R. Closing   | 2114        |
| Ward         | 164 – 167   |

454. The Tribunal considers that, since the Parties have each considered the repudiation of the RRA and the Extraction Tax measures together as the "*Royalty Measures*" (R-III ¶ 113 – 125; C-IV ¶ 43; C-III 212 – 218), it is appropriate for the Tribunal to do the same.

455. For the following reasons, the Tribunal finds that neither the repudiation of the RRA, nor the imposition of the Extraction Tax is compensable under the indemnity provisions of the AA.

456. The starting point for this analysis is Clause I of the AA. *First*, the Tribunal considers that the end of the royalty holiday under the RRA and the imposition of the Extraction tax were each brought about by statute and thus at the very least constitute "*a change in the [...] application of Venezuelan law*" under the definition of "*Discriminatory Measure*" under Clause I of the AA.

457. *Second*, it was clear from the record that one of the Royalty Measures – the repudiation of the RRA – was "*unjust*" under Clause 1 of the AA, which, in its very last sentence, defines as "*unjust*" any Governmental Measure which results in a Materially Adverse Impact. The repudiation of the RRA resulted in an increase of the royalty rate from 1% to 16 2/3%, and, therefore, undoubtedly resulted in a Materially Adverse Impact for Claimant. This is because "*Materially Adverse Impact*" under Clause I of the AA is 5% of Net Cash Flow, and an increase of the royalty rate by 15 2/3% (from 1% to 16 2/3%) assessed on the gross value of EHO production necessarily has a greater than 5% impact on Net Cash Flow. While it is certainly plausible that, as Claimant has argued, the imposition of the Extraction Tax, which also added 16 2/3% to the royalty to be collected, also resulted in a Materially Adverse Impact, for the same reasons as above, it is also plausible that, as both Parties have argued, the Extraction Tax is largely moot, since the royalty is creditable against the extraction tax (R-III fn. 193; C-III ¶ 115). The Parties, however, seem to agree that the effect of the Royalty Measures is that the royalty rate was increased to 33.33%. (*See e.g.* R-II ¶ 237 *applying* a 33.33% ROY rate if the Royalty Measures are not compensable; C-III ¶ 116). Against this background, the Tribunal agrees and finds that the combined effect of the Royalty Measures was to increase the applicable royalty from 1% to 33.33%.

458. Under the first part of the definition of Discriminatory Measure found at Clause I AA, however, this change in law which resulted in a Materially Adverse Impact will only be a Discriminatory Measure and, therefore, will only be compensable under Clause XV AA, if the Tribunal concludes that the Royalty Measures did not apply to all companies engaged in extra-heavy crude upgrading projects in the Republic of Venezuela. Here, the Tribunal considers that there was no discrimination as required by the definition of Discriminatory Measures in Clause I AA. The Royalty Measures applied to every company engaged in extra-heavy crude upgrading projects in Venezuela. The Royalty increase applied *"generally"* to every company in Venezuela eligible for the royalty increase, and the Extraction Tax applied to every company producing any kind of crude oil. This being the case, the Tribunal concludes that it cannot be said that the Royalty Measures were discriminatory as contemplated by the definition of *"Discriminatory Measure"*, to the extent the Royalty Measure applied to all Venezuelan companies to which they could possibly have applied and did not single out the Claimant in a discriminatory manner. Accordingly, applying the contract as written, the Tribunal must find that the imposition of the Royalty Measures is not subject to the indemnity.

459. Further, Claimant has presented extensive arguments that the Royalty Measures constituted *"expropriations"*, with the effect that the Royalty Measures would be considered under the second part of the Article 1 definition. Indeed, if the Royalty Measures could be considered *"tax rates, foreign exchange controls, or the expropriation or seizure of assets"*, Claimant may be able to seek compensation. No arguments were submitted as to whether the Royalty Measures were changes of laws concerning tax rates. Thus, the Tribunal's focus, based on the submissions of the Parties, is on whether the Royalty Measures were *"expropriations."* But, as will be seen below, even if at least the Extraction Tax would be considered a tax under the second alternative of the definition of Discriminatory Measures in

Clause I AA, for the foregoing reasons, the Tribunal finds that the Royalty Measures were not Discriminatory Measures.

460. Turning first to the RRA, on **5 November 1998**, Mobil CN became a party to the RRA entered into on **29 May 1998** between the Ministry of Energy and a subsidiary of PDVSA. The RRA provided that companies participating in strategic associations could become parties to that Agreement by expressing their consent in writing to the Ministry of Energy.

461. Pursuant to Article 5.2 of the RRA, the percentage applicable for the calculation of the royalty to be paid by each association during the commercial production period was to be (i) 1% if a given *"indicator"* were lower than or equal to 3.00, and (ii) if the *"indicator"* were higher than 3.00, then the royalty rate would be 16 2/3 % *"which is the maximum presently permitted by the Law of Hydrocarbons."* Article 5.3 further provided that *"in no case may the 1% percentage applicable to the calculation of the royalty exceed nine (9) years as from the commencement of the commercial production of each association."*

462. On **13 November 2001**, President Hugo Chávez issued the **2001 Hydrocarbons Law** which reserved oil production to the State and authorized private parties to conduct their business only through mixed enterprises majority-owned by the State. Pursuant to **Article 44 of the 2001 Hydrocarbons Law**, *"in respect of the hydrocarbon volumes extracted from any field, the State has a right to a 30% share as a royalty."* However, the State retained the right (i) to reduce it to 20% in the case of mature or EHO fields from the Orinoco Belt, or to 16 2/3% for bitumen blends originating from the Orinoco Crude Oil Belt, if the National Executive became convinced that such projects were not economically viable with the 30% royalty, and (ii) to restore it again up to 30% *"when it is demonstrated that the economics of the projects can be maintained with such reinstatement."*

463. On **10 October 2004**, President Chávez announced that the circumstances justifying the royalty holiday had changed, thereby eliminating the justification for the royalty holiday, and that the royalty rate applicable to the Orinoco Oil Belt project would be increased immediately to 16 2/3%, from the 1% rate.

464. **Article 5.3 of the RRA** clearly only limits the length of the 1% percentage to a maximum of 9 years, but does not, by anymeans, give any assurance that it will indeed be granted for that full period. Had the latter been the intention of the Parties, it would have been very easy to choose language expressing that intention. Without such an assurance, the Tribunal interprets this provision as permitting an increase of the percentage at an earlier stage in the nine year period.

465. Therefore, irrespective of whether that 9-year period was to expire in December 2007 as contended by Claimant or in 2006 as contended by Respondents, the Tribunal finds that **Article 5.3 of the RRA** made it clear that the State was not contractually prevented, but rather was permitted to increase the royalty rate before the expiration of the 9-year period to 16 2/3%, which under **Article 5.2(b) of the RRA** "*is the maximum presently permitted by the law of Hydrocarbons.*"

466. Since the RRA permitted such an increase, the increase was not an "*expropriation*" as required by the second alternative of the definition of Discriminatory Measure in Clause I of the AA. The Tribunal considers that, in view of the above interpretation, such a vested right has not been provided by the RRA, and has not been shown to exist otherwise, and thus it cannot be seen as the object of an expropriation.

467. As far as the so-called **Extraction Tax** enacted in May 2006 is concerned, Claimant argues that this addition violated its right to pay a royalty in the amount established under the RRA. As the Tribunal does not agree that Claimant had a vested right to a lower indemnity under the RRA, the

Tribunal, likewise, does not agree that the Extraction Tax amounts to an expropriation.

468. The Tribunal has further noted that Claimant, in the **Terms of Reference**, referred to the Royalty Measures as *"pre-expropriation"* measures. This indicates that, at least initially, Claimant also doubted that the Royalty Measures rose to the level of an expropriation.

469. Indeed, as the Parties have both considered the repudiation of the RRA and the Extraction Tax measures together as the *"Royalty Measures"* (R-III ¶ 113 – 125; C-IV ¶ 43; C-III 212 – 218), it is difficult for the Tribunal to consider the Extraction Tax separately. However, in any case, though it could be argued that the parties to the RRA did not or could not foresee the further increase of the royalties effected by the Extraction Tax, and even if the contractual admission of royalty increases by Article 5.3 of the RRA, therefore, would not be considered as covering the 2006 increase, the Extraction Tax still cannot be considered a Discriminatory Measure as argued by Claimant, because there was not the discrimination required by that second alternative of Clause I of the AA for the following reasons.

470. The Royalty Measures applied to every company engaged in extra-heavy crude upgrading projects in Venezuela. Since the Royalties and the respective laws were never *"generally applicable to companies in the Republic of Venezuela"* as the wording of this second alternative of Article 1 of the AA provides, their respective changes and the law raising the royalties obviously also could not have such a general application, This wording of the second alternative must be interpreted taking that into account. Thus, even though the Royalty Measures did not apply to all companies doing business in Venezuela, the Royalty increase applied *"generally"* to every company in Venezuela eligible for the royalty increase, and the Extraction tax applied to every company producing any kind of crude oil. Consequently, the Tribunal finds that the *"laws of general applicability"* exception in the definition of *"Discriminatory Measures"*

does apply with respect to the Royalty Measures. This being the case, the Tribunal concludes that it cannot be said that the Royalty Measures were discriminatory as contemplated by the definition of *"Discriminatory Measure,"* to the extent the Royalty Measures applied to all Venezuelan companies to which they could possibly have applied and therefore did not single out the Claimant in a discriminatory manner. In this regard, the Tribunal distinguishes the Royalty Measures from the income tax increase, which, as explained in section K.IV.4, applied only to EHO ventures in the Orinoco Oil Belt while the ordinary regime continued for other companies in Venezuela, thus making the *"laws of general applicability"* exception in the definition of *"Discriminatory Measures"* inapplicable with respect to the income tax increase. Therefore, irrespective of the RRA, and irrespective of whether the Extraction Tax is considered as an expropriation or as a tax, consideration of the Extraction Tax separate from the earlier Royalty Measures does not lead to another result.

471. For these reasons, the Tribunal finds that the Royalty Measures are not Discriminatory Measures in the sense of the AA.

472. The above conclusion, in so far as it concerns the Extraction Tax, is the majority view of the Tribunal. Mr. Alvarez dissents from this conclusion on the basis that, in his view, the Extraction Tax was a tax different from the existing royalties, was implemented separately and was unrelated to the RRA and the latter's termination. While Mr. Alvarez agrees with the majority's conclusion that the early termination of the royalty rate reduction is not a Discriminatory Measure, albeit on the different basis that this measure was foreseen by the RRA itself and was not a change in Venezuelan law, he disagrees with the majority's conclusion that the Extraction Tax is not a Discriminatory Measure. Mr. Alvarez agrees with the majority that the Extraction Tax was not an expropriation. However, he would have accepted the Claimant's argument that the imposition of the Extraction Tax constituted a change in Venezuelan law (see, for example C-

III ¶ 215). In his view, the imposition of the Extraction Tax qualified as a change in tax rates which was "not generally applicable to Companies in the Republic of Venezuela." In his view, as it applies to "tax rates, foreign exchange controls or expropriation or seizure...of assets," the definition of a Discriminatory Measure does not except or exclude changes in tax rates that apply to all companies producing a certain kind of oil or to which the tax could apply. Rather, it simply provides that changes in tax rates are included in the definition of a Discriminatory Measure if those changes are "not generally applicable to Companies in the Republic of Venezuela." Thus, in his view, the majority's interpretation would require reading in language which is not present in the AA. Further, the definition of a Discriminatory Measure, as it relates to tax rates, is plainly not limited to income tax and includes the introduction of the new Extraction Tax. In light of its magnitude, the Extraction Tax would result in a Materially Adverse Impact and be deemed unjust pursuant to the terms of the definition. For these reasons, Mr. Alvarez would have found that the Extraction Tax qualified as a Discriminatory Measure under the terms of the AA.

## K.IV.4.    Income-Tax Increase

### K.IV.4.a.    Arguments by Claimant

473. Claimant argues that the increase in the income-tax rate applicable to participants in EHO projects in the Orinoco Oil Belt to 50% constituted a Discriminatory Measure. *First*, increase in the income-tax rate was brought about by statute and, thus, plainly constitutes a change in Venezuelan law regarding tax rates. (C-III ¶ 219). *Second*, the measure is encompassed by the definition of "*Discriminatory Measure*" which includes "*the imposition of income tax on the Project or on any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond to what is provided in the last sentence of the Fifteenth Condition.*" (C-III ¶ 221). Claimant argues that, regardless of whether the measure was an expropriation or a seizure, the income tax increase was contrary to the

purpose of the Fifteenth Condition of the Framework of Conditions, which was to guarantee *"that the participants would pay income tax under the 'ordinary regime' applicable to companies,"* which was based on an income-tax rate of 34%. (C-III ¶ 221, C-IV ¶ 49). The income tax increase only applied the rate of 50% to EHO ventures in the Orinoco Oil Belt. The *"ordinary regime"* for companies and assimilated entities continued to impose a maximum tax rate of 34%. (C-III ¶ 222). Therefore, the measure *"deprived Mobil CN of its vested right to a rate not exceeding that of the ordinary regime applicable to companies in Venezuela and, by so doing, it effected a 'seizure.'"* (C-IV ¶ 48).

### K.IV.4.b.    Arguments by Respondents

474. Respondents incorporate by reference their arguments related to *"expropriation"* in their analysis of the Royalty Measures above and state that the income tax increase was neither an expropriation, seizure, nor a Discriminatory Measure. (R-II ¶¶ 116 – 118; R-III ¶ 127).

475. With respect to Claimant's argument that the *"ordinary regime"* of income taxes is 34%, Respondents explain that *"the increase in the income tax rate to 50% effectuated by the amendment to the **Income Tax Law** in 2006 actually brought the EHO projects in line with all other companies dedicated to the exploitation of hydrocarbons, which were already paying that rate."* (R-III ¶ 127). Recalling the Tribunal's attention to the Twentieth Condition of the Congressional Authorization, there is no *"discriminatory treatment"* where the 50% oil income tax rate applies uniformly to all companies to which it could possibly apply. (R-II ¶ 118; R-III ¶ 127, partially quoted).

476. Further, Respondents argue that *"[i]f a change in the income tax rate referred to in the Fifteenth Condition of the Congressional Authorization (which is also specifically referred to in the definition of 'Discriminatory Measure') were meant to be treated as an 'expropriation or seizure of assets of the Project or of a Foreign Party's interests in the Project,' there*

*would have been no need to list a change in the income tax rate separately.*"
(R-III ¶¶ 126 - 127).

## K.IV.4.c.    The Tribunal

477. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 26 – 27, 71 – 72 |
| C-III | ¶¶ | 219 – 223 |
| C-IV | ¶¶ | 48 – 49 |
| R-II | ¶¶ | 116 – 118 |
| R-III | ¶¶ | 126 – 128 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-11 | Congressional Authorization Fifteenth Condition |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 75-76 |
| C-73 | Law on Partial Amendment to the Income Tax Law [*Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta*] (as published in the Extraordinary Official Gazette No. 4300 of 13 August 1991) Art. 7, 30 |
| C-75 | Decree No. 188 on Amendment to the Income Tax Law [*Decreto de Reforma de la Ley de Impuesto sobre la Renta*] (25 May 1994) and Income Tax Law (as amended) (both documents as published in the Extraordinary Official Gazette No. 4727 of 27 May 1994) Article 14 (modifying Art. 53 Income Tax Law) |
| C-87 | Association Agreement Clause I *defining* "*Discriminatory Measure*" |
| C-113 | Law on Partial Amendment to the Income Tax Law [*Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta*] (29 August 2006) *and* Income Tax Law (as amended) (both documents as published in the Official Gazette No. 38529 of 25 September 2006) Art. 1, 9, 52, 53 |
| C-177 | Law on Partial Amendment to the Income Tax Law [*Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta*] and Income Tax Law (both as published in the Extraordinary Official Gazette No. 5023 of 18 December 1995) Art. 9, 53 |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶ 49 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶ 33 |

| R-43 | Congressional Authorization, Fifteenth and Twentieth Conditions |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 31 – 48 and n. 34 |
| R-86 | Letter from Timothy Cutt, President of Mobil Cerro Negro, Ltd. to Eulogio Del Pino, PDVSA Cerro Negro, S.A. and Rafael Ramírez, Petróleos de Venezuela, S.A. (22 June 2007) |
| R-112 | Association Agreement Clause I |

478. **Article 53 of the Law of 29 August 2006 on Partial Amendment to the Income Tax Law** provides that:

> the annual income obtained by the taxpayers referred to in articles 11 and 12 [namely, the *"PARTICIPANTS IN EHO PROJECTS IN THE ORINOCO OIL BELT"* (EX. C-1, N° 222)] shall be taxed [...] based on the following rate :
>
> Rate N° 3
>
> [...]
>
> (b     a proportional rate of 50% for the income specified in article 11 of this Law.

479. According to the **Income Tax Law of 29 August 2006**, the other rates applicable to other taxpayers in Venezuela were respectively 15%, 22%, and 34%.

480. As the 50% income tax rate made applicable by that law to participants in EHO projects in the Orinoco Oil Belt was brought about by statute, the Tribunal finds that it plainly constituted a change in Venezuelan law regarding tax rates.

481. The Tribunal also finds that the income tax increase is covered by the definition of *"Discriminatory Measure"* which specifically includes *"the imposition of income tax on the Project or on any Foreign Party in its capacity as participant in the Project, at a rate that does not correspond with what is provided in the last sentence of the Fifteenth Condition"* of the Framework of Conditions for the AA as set forth in the Congressional Authorization published on June 10, 1997. That Fifteenth Condition was to guarantee that the participants would pay income tax *"under the ordinary regime established [...] for companies and similar entities, for any income*

*obtained in connection with the activities of the parties"*, which *"ordinary regime"* was based on an income tax rate of 34%.

482. As the income tax increase only applied the rate of 50% to EHO ventures in the Orinoco Oil Belt, with the *"ordinary regime [...] for companies and similar entities"* continuing at a maximum tax rate of 34%, the Tribunal also finds that the *"laws of general applicability"* exception in the definition of *"Discriminatory Measure"* does not apply.

483. The income tax increase from a rate of 34% to 50% undoubtedly resulted in a Materially Adverse Impact for Claimant, and may therefore be deemed *"unjust"* under the definition of *"Discriminatory Measure"* of the AA. This is because *"Material Adverse Impact"* under Article 1 of the AA is 5% of Net Cash Flow, and an increase of the income tax rate by 16% (from 34% to 50%) assessed on the gross value of EHO production necessarily has a greater than 5% impact on Net Cash Flow.

484. In view of the above considerations, the Tribunal concludes that the Income Tax increase was a Discriminatory Measure in the sense of the AA.

## K.IV.5.    Production and Export Curtailments

### K.IV.5.a.    Arguments by Claimant

485. Claimant argues that the measures imposing production and export curtailments (*"Curtailment Measures"*) on the Project were also Discriminatory Measures under the AA. *First*, the Curtailment Measures were ordered by the Minister of Energy and were, thus, Governmental Measures. (C-III ¶ 225). *Second*, the Curtailment Measures expropriated or seized Mobil CN's vested interests *"by imposing production and exports curtailments on the Project notwithstanding the AA and the Framework of Conditions, the Respondents expropriated Mobil CN's vested right[s] to produce [and export] at full capacity without being subjected to curtailment of production except in limited circumstances not present at the time the curtailments were imposed."* (C-III ¶ 226).

486. *Third,* the measures were not generally applicable to companies in Venezuela in that they only applied *"to companies engaged in the production of EHO in the Orinoco Oil Belt, not to all oil companies in Venezuela."* (C-III ¶ 227).

487. *Finally,* Claimant asserts that Respondents have not argued that the Curtailment Measures were not discriminatory. Because this and all of the above measures in the aggregate caused a Materially Adverse Impact for FY 2007, the Curtailment Measures are Discriminatory Measures. (C-IV ¶ 51).

### K.IV.5.b. Arguments by Respondents

488. The Curtailment Measures, apart from the fact that they were not *"expropriations"*, were temporary in nature. Further, they are not even relevant to this claim because Claimant has made no claim for FY 2006 and it has no claim for FY 2007 because its Net Cash Flow exceeded its Threshold Cash Flow. (R-II ¶ 119).

### K.IV.5.c. The Tribunal

489. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

#### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 73 – 75 |
| C-III | ¶¶ | 224 – 228 |
| C-IV | ¶¶ | 50 – 51 |
| R-II | ¶ | 119 |
| R-III | ¶ | 129 |

#### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-11 | Congressional Authorization, Thirteenth Condition |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶ 77 |
| C-87 | Association Agreement Articles 8.2(b), 14.1 |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May |

|          | 2009) at ¶ 49                                                      |
|----------|-------------------------------------------------------------------|
| R-116    | Supplemental Direct Testimony of José Ángel Pereira Ruimwyk (11 August 2009) at ¶ 8, n. 8 |

490. It is obvious that the measures imposing production and export curtailments ("*Curtailment Measures*") on the Project were ordered by the Minister of Energy and were thus Governmental Measures.

491. Regarding their legal basis, the Tribunal finds that the Curtailment Measures were not authorized by Article 14.1 of the AA and the Framework of Conditions, Thirteenth Condition, which entitled Claimant to produce at full capacity without being subjected to curtailment of production except "*as a result of the international commitments of the Republic of Venezuela*", circumstances not present at the time the curtailments were imposed. The Curtailment Measures likewise were not authorized under Article 8.2 of the AA, which entitled Claimant to export all production.

492. The Tribunal also finds that the Curtailment Measures were not generally applicable to companies in Venezuela, in that they only applied to companies engaged in the production of EHO in the Orinoco Oil Belt and not to all oil companies, let alone generally to companies in Venezuela.

493. The export curtailments undoubtedly resulted in a Materially Adverse Impact for Claimant, and may therefore be deemed "*unjust*" under the definition of "*Discriminatory Measure*" of the AA. This is because "*Material Adverse Impact*" under Article 1 of the AA is based on 5% of Net Cash Flow, and a loss in exports of 2,300,000 barrels in 2007 (*i.e.* Mobil CN's share of the loss in exports of about 5.5 million fewer barrels of SCO by the end of June 2007, as compared with the export target for the first half of 2007) (C-III ¶ 137), multiplied by the gross value of EHO production necessarily has a greater than 5% impact on Net Cash Flow.

494. In view of the above considerations, the Tribunal concludes that the Curtailment Measures were indeed Discriminatory Measures in the sense of the AA.

495. The Tribunal notes that, since the Curtailment Measures were temporary, Claimant has filed no claim for 2006. The possible effect on the relief sought by Claimant for the years 2007 and thereafter will be considered in the section on Quantum.

## K.V.    Excuse for Respondents' Non-Performance

496. This section presents Respondents' affirmative defenses and, therefore, lists Respondents' arguments prior to Claimant's arguments.

### K.V.1.    Hecho del Príncipe

### K.V.1.a.    Arguments by Respondents

497. Respondents' experts explain that a *hecho del príncipe (factum principis)* (Act of the Prince) is an obstacle to the performance of a promised activity that arises from a legislative act or from an administrative authority, acting in the public interest. Under **Articles 1271 and 1272 of the Venezuelan Civil Code**, the occurrence of a *"'non-imputable external cause,' including a hecho del príncipe, renders contractual performance impossible and, therefore, releases the obligor from any performance obligation and any liability or responsibility for non-performance."* (R-ll ¶¶ 55 – 57, partially quoted). An Act of the Prince meets the requirements of a non-imputable external cause in that it (1) renders performance of obligation impossible, due to the general or specific provisions of the law of mandatory compliance, and (2) is irresistible because there is no possibility of avoiding its effects. (R-II ¶¶ 51 – 54, partially quoted, footnotes omitted).

498. Respondents state that Claimant's argument that a law of general application does not have the same legal consequences for a state company as it does for a private company defies logic. Claimant's argument that an act of the Venezuelan Government cannot excuse PDVSA-CN and PDVSA from responsibility is directly contradicted by Claimant's own action in invoking *force majeure* on behalf of both Mobil CN and PDVSA-CN as a consequence of the Government's Production Curtailment. (R-V ¶ 6).

499. Firmly in their opinion that the AA was extinguished, Respondents also argue the *hecho del príncipe (factum principis)* has the same effect as if the AA had been formally extinguished. (R-II ¶ 58; R-III ¶ 55).

500. Respondents explain that *"[t]he administrative law principle that a public contracting entity must compensate its counterparty for acts that make performance more burdensome does not apply when the acts may be attributable to a different administrative entity."* (R-III ¶¶ 30, 33). Respondents reject Claimant's argument that the AA is an administrative contract to which the normal principles of causa extraña no imputable do not apply, and characterizes Claimant's argument as a request that the Tribunal not apply Venezuelan law. (R-III ¶¶ 26).

501. Respondents state that the Claimant's reference to the French Cour de Cassation is irrelevant. Respondents distinguish that case, arguing that it, unlike the present matter, involved *"a simple decision by the supervising authority organically linked to the normal functioning of the company."* These circumstances did not meet the *"extraneousness"* requirement of a *hecho del príncipe.* Respondents further argue that under the French law cited in the experts' opinion, a state party cannot be held contractually liable for measures emanating from other public persons. (R-III ¶ 29). Under Venezuelan law and the decisions of the French Conseil d'Etat, a state-owned enterprise may rely on acts of that state to excuse non-performance. (R-IV ¶ 92). What is at issue is whether the act of state is external to the state-owned enterprises, *i.e.* whether the act was promulgated by the Government in the exercise of its sovereign powers. (R-IV ¶ 46).

502. Respondents state that the governmental actions emanated from the state and were external to both PDVSA and PDVSA-CN. (R-III ¶ 36). Respondents argue that *"the exercise of sovereign powers is a matter uniquely within the province of the Government, not state companies such as PDVSA-CN or PDVSA."* (R-IV ¶ 2).

503. Turning to Claimant's argument that the Respondents are State Enterprises that *"cannot avail themselves as a matter of law, of acts of the supervising and controlling Government to justify non-performance of their contractual obligations"*, Respondents argue that Claimant's and Claimant's expert's past behavior precludes this argument. Respondents urge the Tribunal to reject Claimant's new position that PDVSA and PDVSA-CN are not separate from the Government. (R-IV ¶ 93).

504. In the London proceedings, Claimant forcefully presented thorough arguments – through counsel and through the affidavit of a legal expert – explaining why PDVSA must, as a matter of fact and law, be considered as separate and distinct from the Government, and that PDVSA did not constitute a department of the Government. (R-IV ¶ 5; R-V ¶ 8). In that proceeding, Claimant's legal expert concluded that PDVSA *"has a distinct legal personality, incorporated under the laws of Venezuela in 1975, capable of suing and being sued in its own right,"* that it *"does not perform any of the powers of the executive as set out in the Venezuelan Constitution of 1999 or Public Administration Organic Law,"* that it has *"operated as a commercial entity since its formation as an entity separate from the Venezuelan Government,"* and that *"the separate legal status of PDVSA has been confirmed by the Venezuelan courts, notwithstanding the fact that the Republic of Venezuela is its sole shareholder."* (R-III ¶ 35, footnotes omitted).

505. Respondents explain further that the Parties have recognized the distinct, separate legal personalities of PDVSA-CN, PDVSA, and the State, as demonstrated by the separate Guaranty Agreement and the text of the Congressional Authorization and the AA. (R-III ¶¶ 36, 40 – 42; R-IV ¶¶ 2-5, 92 – 94). Claimant stated that in the AA, the Parties worked to make clear that *"neither PDVSA nor PDVSA-CN was a subdivision of the Republic of Venezuela."* (R-IV ¶¶ 5, 93 - 94). This is even reflected in the text of the AA, where the definitions of *"Affiliate"*, *"Governmental Action"*, and

*"Reservation of Sovereign Rights"* in Article 18.4, the *"No Government Guarantee"* provision of Article 23.11, and the *Force Majeure* provision of Article 21 treat the PDVSA-CN, PDVSA, and the Government as distinct entities. (R-IV ¶ 94).

506. Respondents also cite Claimant's communication with the Government as evidence that Claimant believes the three entities to be separate. While addressing production curtailments in 2007, Claimant addressed letters to the Government, claiming *force majeure* on PDVSA-CN's behalf – an action that would not be possible if Claimant believed PDVSA-CN and the Government to be the same. (R-IV ¶ 3).

507. The doctrine of *causa extraña no imputable* applies to administrative contracts. (R-III ¶¶ 27 – 36). At issue is whether generally applicable law should be considered external to PDVSA-CN and PDVSA. Respondents argue that **Decree-Law 5200** was external to the Respondents and states that neither entity has the authority or power to perform legislative functions. (R-IV ¶ 45). Further, the fact that PDVSA is engaged in the hydrocarbons sector, which is the subject area of **Decree-Law 5200**, is irrelevant to the issue of externality. (R-IV ¶ 46). The fact that Minister Ramírez is the President of PDVSA and the Minister of Energy is also irrelevant, as externality is not dependent on who is the leader of the organizations. (R-IV ¶ 4). Rather, what is relevant is whether **Decree-Law 5200** was an act of PDVSA-CN or PDVSA. Since it was promulgated by the Government in the valid exercise of the Government's powers, it is external to the Respondents. (R-IV ¶ 46).

508. Respondents also address Claimant's statement that Minister Ramírez authored the **Decree-Law 5200**, calling it *"untrue."* (R-IV ¶ 4). Respondents explain that **Decree-Law 5200** was lawfully issued:

> 4.    [...] the **Decree-Law** was a law of general application promulgated by the President of the Republic in the exercise of the power conferred by Article 236(8) of the Constitution (which permits the President to issue decrees with the force of law upon enactment of an enabling law) and in

accordance with the authority granted to him by the Venezuelan legislature in the Enabling Law of February 1, 2007. Claimant also makes much of the fact that Minister Ramirez "countersigned" **Decree-Law 5.200**, but the Venezuelan Constitution mandates that the President shall exercise the powers granted by Article 236(8) "in the Council of Ministers" which is why Minister Ramirez, along with eighteen other Ministers, "countersigned" it. (R-IV ¶ 4, citations omitted).

509.  In response to Claimant's discussion on the irresistibility of **Decree-Law 5200**, Respondents consider that Claimant's expert has acknowledged "*that unless and until declared unconstitutional, 'Decree-Law 5200 had to be enforced and applied in Venezuela.*'" (R-III ¶ 39).

### K.V.1.b.     Arguments by Claimant

510.  Claimant considers that Respondents' "*Act of the Prince*" argument constitutes a concession that Respondents had obligations under the AA – making the entire "*Act of the Prince*" argument inconsistent with Respondents' extinguishment theory. (C-IV ¶ 82).

511.  Claimant also argues that the "*Acts of the Prince*" (**Decree-Law 5200** and the **Law on Effects**) in this matter do not constitute a "*non-imputable extraneous cause*" excusing Respondents from performance. *First,* Clause XV is a *pactum praestando causa* – an agreement to perform even in the face of an Act of God or of *Force Majeure*. It allocates the risk of "*Acts of the Prince*" to PDVSA-CN, therefore displacing general provisions of law excusing liability for "*Acts of the Prince.*" (C-IV ¶ 84; C-V ¶ 64).

512.  *Second,* Claimant argues that Respondents are state enterprises and, therefore, cannot avail themselves of acts of the supervising and controlling Government to justify non-performance of their contractual obligations. (C-IV ¶ 85, partially quoted). This principle finds support in a French Cour de Cassation decision, where the Court held that "*that the intervention of the supervising authority to impede the performance of the debtor's contractual obligations cannot be invoked by the debtor subject to supervision as the*

*unforeseeable and insurmountable act of an extraneous third party.*" (C-IV
¶ 86).

513. *Third, "under general principles of Venezuelan Administrative Law, a state-
owned enterprise may not rely on an act of government (Act of the Prince)
to excuse non-fulfillment of its contractual obligations, when the act at issue
emanates from a governmental entity of the same territorial level of
government to which the State-owned enterprise belongs. Such
governmental act is not considered extraneous to the state-owned
company.*" (C-V ¶ 66). This is also supported by French Administrative
Law, where acts of the same personne publique (that is, acts that emanate
from a governmental entity of the same level of government as the public
contracting party), will not excuse the public party from its obligations
under the contract. (C-V ¶ 70).

514. Claimant provides a more detailed response to Respondents' arguments to
the contrary (C-V ¶¶ 68 – 70, italics in original):

> 68. The Respondents and Mr. Urdaneta argue that liability under the
> Administrative Law doctrine of "act of the prince" arises only when the
> act emanates from the same public entity that is a party to the contract,
> and if the act comes from another entity it may operate as an excuse.
> Their theory is largely based on a misunderstanding or mistranslation of
> French authors and does not reflect Venezuelan law.

> 69. The Respondents and Mr. Urdaneta rely on an excerpt from an article
> by Henrique Iribarren. But the excerpt they cite is an incomplete
> quotation from a passage of Professor Jean Rivero's treatise of French
> Administrative Law. The full passage from Professor Rivero's treatise,
> which neither the Respondents nor Mr. Urdaneta brought to the
> Tribunal's attention, contradicts their argument:

>> "La théorie [du fait du prince] ne joue jamais quand la mesure qui
>> alourdit les charges du cocontractant émane non de la personne
>> publique contractante, mais d'une autre personne publique, *par exemple
>> quand un décret, acte de l'Etat, aggrave, en matière sociale, la
>> situation des cocontractants des collectivités locales.* "

>> ["The [act of the prince] theory never applies when the measure that
>> burdens the obligations of the co-contracting party emanates, not from
>> the contracting public person [personne publique], but from another
>> public person *[personne publique], for example when a decree from the
>> State aggravates, on labor matters, the situation of co-contracting
>> parties of local authorities.*"]

70.    In Professor Rivero's example, the public contracting party is a local authority and the measure burdening the private party is an act of the French State. In such a case, the "act of the prince" doctrine does not apply because the measure emanates from another personne publique, that is, another level of government.  As Professor Brewer-Carías explained at the Hearing, the term "personne publique" is a term of art in French Administrative Law that refers to the various territorial levels of government.  Accordingly, French legal authorities restricting the application of the "act of the prince" doctrine as a source of liability to acts of the same "personne publique," are referring to acts emanating from a governmental entity of the same level of government as the public contracting party.  Other authorities on which the Respondents rely are misrepresented or cited out of context.

515.  Claimant argues that the extraneous character of the impediment means that *"the event of which the impossibility derives, must be extraneous to the activity of the debtor and deprived of any connection with said activity."* (C-IV ¶ 88).  Here, the distinct legal personalities of PDVSA, PDVSA-CN, and the Government are irrelevant.  Respondents are part of the Government, are run by *"functionaries"*, and are instrumentalities of the Venezuelan Government.  Further, Minister Ramírez, one of the architects of all the Discriminatory Measures, has been and remains both Minister of Energy and President of PDVSA. (C-IV ¶ 91).  PDVSA and the Ministry have been jointly managed, in the same building and the same office complex. (C-V ¶ 4).  PDVSA cooperated in the design and execution of the Government's policies against Claimant's investments. (C-V ¶ 4).  The acts on which Respondents rely are those that were of the same level of Government to which the Respondents belong.   PDVSA carried out the seizure of Claimant's assets and was the chief beneficiary of Claimant's investment, the seizure and the termination of the AA. (C-IV ¶ 92; C-VI ¶ 34, partially quoted).

516.  Claimant's arguments with respect to the extraneousness of **Decree-Law 5200** are best taken from its own language:

35.    [T]he pretense that **Decree-Law 5200** is extraneous to the Minister of Energy and Petroleum/President of PDVSA because it is a law and it was also signed by other ministers ignores once again the realities of this case.  It is beyond doubt that Minister Ramírez, the Minister in charge of the sector to which the measures relate, was the chief architect

of the measures. The Respondents' unsupported assertion that President Chávez prepared **Decree-Law 5200** without the intimate involvement of the Minister responsible for petroleum policy and for the implementation of the Decree is just not credible. (C-VI ¶ 35).

517. Regardless of whether an act of government emanates from the same public entity that is a party to the contract or from another public entity of the same territorial level of government or legal order, Respondents have a responsibility to compensate Claimant for acts of government that alter the economic equilibrium of the contract. (C-V ¶ 67). Neither type of government act may excuse the public entity from non-fulfillment of its contractual obligations. (C-V ¶ 67).

518. Claimant also argues that the Respondents have not met their burden of proving that "*Act of the Prince*" prevented their performance or that the alleged "*Act of the Prince*" was unforeseeable, irresistible, and extraneous. (C-IV ¶ 89).

519. Claimant argues that "*the requirement of irresistibility 'refers to the insurmountable character of the event,' implying 'the debtor's obligation to employ that supreme effort to comply with what was promised, without permitting him to be excused by difficulties that do not really signify an impossibility of performance.*'" (C-IV ¶ 88). Respondents have made "*no effort to comply with their respective obligations under the AA and Guaranty, let alone did they employ 'all licit means available,*'" despite having been on formal notice of Claimant's demands under the AA as of **June 2007**. (C-IV ¶ 90).

520. Claimant's claims had arisen by the **5 March 2008** extinguishment of the AA, and this extinguishment cannot affect Claimant's rights under the contract. (C-V ¶ 65). Claimant also argues that "*neither **Decree-Law 5200** nor the **Law on Effects** purports to prohibit, directly or by implication, the performance of obligations to pay money due under contracts, such as PDVSA-CN's indemnity obligations under the AA or those of PDVSA under the Guaranty.*" (C-IV ¶ 90). Finally, even if the AA had been terminated,

Clause XV of the AA survives the termination of the agreement. (C-IV ¶ 90; C-V ¶ 65).

### K.V.1.c.   The Tribunal

521. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶¶ | 81 – 92 |
| R-II | ¶¶ | 50 – 58 |
| R-III | ¶¶ | 25 – 51 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Article 21.1 |
| C-3 | PDVSA Guaranty |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón at ¶¶ 12, 30, 76, 82, 87 – 92, 95 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶¶ 19, 49 – 55, 60 |
| C-51 | Cambridge Energy Research Associates, "The Cerro Negro Extra-heavy Oil Development: A World-class Asset" (26 September 2008) at 36 |
| C-87 | Association Agreement Clause I *defining "Affiliate"*, Articles 16.1(b), 23.11 |
| C-129 | Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein [*Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican*] (as published in the Official Gazette No. 38884 of 5 March 2008) |
| C-160 | Heads of Agreement between Lagoven, Mobil Oil Corporation, and Mobil de Venezuela (17 September 1996) |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶¶ 18 – 26, 51, 56, 58-62 |
| App. 35 | Eloy Lares Martínez, *Manual de Derecho Administrativo*, 8a. Edición, Caracas 1990, pp. 361- 363. |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 67, 73 – 75, 77 – 79, 81 – 83 |
| C-232 | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO (4th ed. 2006) §§ 339-B to 339-D, 340 |
| C-240 | Venezuelan Civil Code Art. 1271, 1272, 1354 |
| C-241 | MADURO LUYANDO & PITTIER SUCRE, CURSO DE OBLIGACIONES (2008) §§ 390 – 396 |

| | |
|---|---|
| C-243 | 2008 Organic Law of the Public Administration (as published in Extraordinary Official Gazette No. 5890 of 31 July 2008) |
| C-244 | *Lyondell-CITGO Refining, LP v. PDVSA* (S.D.N.Y. No. 02-CV-0795), Declaration of Álvaro Silva Calderón (23 May 2002) at ¶ 17 |
| C-245 | Organic Law that Reserves to the State Assets and Services Related to Hydrocarbons' Primary Activities [*Ley Orgánica que Reserva al Estado Bienes y Servicios Conexos a las Actividades Primarias de Hidrocarburos*] (as published in Official Gazette No. 39173 of 7 May 2009) |
| C-246 | The PDVSA of Chávez Produces 1.2 Million Less Barrels Per Day [*La PDVSA de Chávez Produce 1.2 Millones de Barriles Diarios Menos*], *La Verdad Daily* [*Diario La Verdad*] (11 May 2009), at http://laverdad.com (last accessed 14 May 2009) |
| C-247 | Index of Materials Regarding the Transformation of PDVSA Into an Instrument of the Socialist Revolution |
| C-248 | Financial and Operational Information of PDVSA and Affiliates [*Información Financiera y Operacional, PDVSA y sus Filiales*], as of 31 December 2007, and Notes to Consolidated Financial Statements, 31 December 2007 and 2006 [*Notas a los Estados Financieros Consolidados, 31 de diciembre de 2007 y 2006*] at 7, 38, 49 |
| C-249 | Ministry of Energy Press Release, "Ramírez: We have recuperated control over 500 thousand barrels that had been privatized" [*Ramírez: Hemos recuperado el control de 500 mil barriles que estaban privatizados* (25 February 2008) |
| C-250 | *Air France,* Court of Cassation of France (15 April 1970), *reported in Recueil Dalloz Sirey* 1971, at 107, 109 – 110 |
| C-289 | José Mélich-Orsini, DOCTRINA GENERAL DEL CONTRATO (2006) (excerpt, Chapter XVII, Section 456) n. 48 |
| C-324 | Rafael Badell Madrid, RÉGIMEN JURÍDICO DEL CONTRATO ADMINISTRATIVO (2001) |
| C-325 | Rafael Badell Madrid, *La Ejecución del Contrato Administrativo: Teoría de la Imprevisión, Depreciación Monetaria e Inflación* in RÉGIMEN JURÍDICO DE LOS CONTRATOS ADMINISTRATIVOS (1991) |
| C-326 | Alfredo Romero Mendoza, *El Hecho del Príncipe en los Contratos Administrativos y su Regulación en el Decreto que Contienen las Condiciones General de Contratación para la Ejecución de Obras* in TRIBUNAL SUPREMO DE JUSTICIA, REVISTA DE DERECHO No. 4 (2002) |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) at ¶ 12 |
| R-7 | Decree-Law 5200 Art. 3, Signatures |
| R-41 | PDVSA Guaranty |
| R-43 | Congressional Authorization, Eighteenth Condition |
| R-64 | Enabling Law |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 7, 9-23 |
| App. 3 | José Mélich-Orsini, *General Contract Doctrine,* 4th Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios N° 61, Caracas, 2006 |
| App. 4 | José Mélich-Orsini, "The Sanction for Contractual Non- |

| | |
|---|---|
| | Performance," *in Civil Law Studies*, Vol. I, 2 volumes, Ediciones Fabretón, Caracas, 1974, subsequently reprinted in 1986 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 12 – 39 |
| App. 7 | Venezuelan Civil Code Art. 6, 1271 - 1272 |
| App. 8 | José Mélich-Orsini, *General Contract Doctrine*, 4th Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios N° 61, Caracas, 2006 |
| App. 9 | Eloy Maduro Luyando and Emilio Pittier Sucre, *Course on Obligations, Civil Law III*, Tomo I, Universidad Católica Andrés Bello, Caracas, 1999 pp. 226 – 227 |
| App. 10 | Rafael Bernad Mainar, *Patrimonial Civil Law, Obligations*, Tomo I, Universidad Central de Venezuela, Facultad de Ciencias Jurídicas y Políticas, 2006 p. 174 |
| App. 11 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Banco Provincial, S.A. contra Banco Central de Venezuela* (27 April 2005) |
| App. 13 | José Mélich-Orsini, "The Sanction for Contractual Non-Performance," *in Civil Law Studies*, Vol. I, 2 volumes, Ediciones Fabretón, Caracas, 1974, reprinted in 1986 |
| App. 15 | Magaly Carnevali de Camacho, *Law of Obligations*, Universidad de los Andes, Mérida, 1993 |
| App. 17 | Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Compañía Anónima Western Ore Company v. La Nación Venezolana* (December 21, 1967) |
| App. 18 | Opinion of the Office of the Attorney General of the Republic on the Law on Assets Subject to Reversion in Hydrocarbons Concessions, dated March 8, 1972, *in Public Law and Administration Sciences Archives – Tribute to Professor Antonio Moles Caubet by the Institute of Public Law*, Universidad Central de Venezuela, Facultad de Ciencias Jurídicas y Políticas, Instituto de Derecho Público, Caracas, 1981, Tomo 2, Vol. 3 |
| App. 19 | Judgment, Full Chamber of the Supreme Court of Justice, *Regarding a request for nullity on constitutional grounds of the Law on Assets Subject to Reversion in Hydrocarbons Concessions* (December 3, 1974) |
| App. 20 | Judgment, Political-Administrative Chamber of the Supreme Court of Justice, *Asfalto de Petróleo (ASFAPETROL C.A.) v. Petróleos de Venezuela, S.A.* (PDVSA) (August 14, 1992) |
| App. 21 | Judgment, Political-Administrative Chamber of the Supreme Tribunal of Justice, *Minas de San Miguel C.A. v. Ministerio de Energía y Minas* (July 16, 2008) |
| R-71 | Letter from Operadora Cerro Negro, S.A. to Chalmette Refining, L.L.C. (10 January 2007) |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract) (1 November 1997) |
| R-73 | Organic Law of the Office of the General Comptroller of the Republic and the National System of Fiscal Control [*Ley Orgánica de la Contraloría General de la República y del Sistema Nacional de Control Fiscal*] Official Gazette No. 37.347, published 17 December 2001 Art. 91(12) |

| | |
|---|---|
| R-112 | Association Agreement Articles 18.4 and 21.1 |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 3 – 20, 47 |
| App. 45 | Constitution of the Bolivarian Republic of Venezuela, Official Gazette No. 36.860, published December 30, 1999, Articles 203 and 236(8) [*Constitución de la República Bolivariana de Venezuela (1999), Artículos 203 y 236(8)*] |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 3 – 28 |
| App. 38 | Allan R. Brewer-Carías, ADMINISTRATIVE CONTRACTS (Editorial Jurídica Venezolana, Caracas 1992) p. 243 |
| App. 39 | DOCTRINE OF THE OFFICE OF THE ATTORNEY GENERAL OF THE REPUBLIC, January 14, 1970 (Ediciones del Ministerio de Educación, Caracas 1971) 104 – 105 |
| App. 40 | DOCTRINE OF THE OFFICE OF THE ATTORNEY GENERAL OF THE REPUBLIC, September 27, 1966 (Editora Vene-Gráfica, C.A., Caracas 1967) p. 76 |
| App. 42 | Henrique Iribarren Monteverde, *The Economic Equilibrium in Administrative Contracts and the Theory of Hardship, in* INTERNATIONAL CONGRESS ON ADMINISTRATIVE LAW COMMEMORATING PROF. LUIS H. FARÍAS MATA, VOLUME I 141 (Rafael Badell Madrid ed., Universidad Católica Andrés Bello, Caracas 2006) 152 – 153 |
| App. 43 | Fanny Luxembourg, *Fait du Prince: Convergence of Private and Public Law*, LA SEMAINE JURIDIQUE EDITION GÉNÉRALE No. 8, I 119 (February 20, 2008) |
| App. 44 | André de Laubadère, Jean-Claude Venezia and Yves Gaudemet, TREATISE OF ADMINISTRATIVE LAW, VOLUME 1 (L.G.D.J., 15ᵗʰ ed., Paris 1999) p. 837 |
| App. 45 | Christophe Guettier, LAW OF ADMINISTRATIVE CONTRACTS (Presses Universitaires de France, Paris 2004) |
| App. 46 | First Affidavit of Luis A. Ortiz-Álvarez, dated January 22, 2008, submitted in *Mobil Cerro Negro Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008, Folio 61¶¶ 15, 85 |
| R-120 | Outline Argument on Behalf of Claimant in Support of Application for Worldwide Freezing Order (23 January 2008) submitted in *Mobil CN Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008, Folio 61, pp. 23-25 |
| Unnumbered | Karl-Heinz Böckstiegel, Public Policy and Arbitrability, in Comparative Arbitration Practice and Public Policy in Arbitration, ICCA Congress Series 177, 201-203 (Pieter Sanders ed., 1987); |
| Unnumbered | Pierre Lalive, Transnational (or Truly International) Public Policy and International Arbitration, in Comparative Arbitration Practice and Public Policy in Arbitration, ICCA Congress Series 258, at ¶¶ 141-142 (Pieter Sanders ed., 1987). |

**At and Following the 2010 Hearings:**

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 4, 62 – 71 |
| C-VI | ¶¶ | 34 - 36 |
| R-IV | ¶¶ | 2 – 5, 44 – 46, 92 – 94 |
| R-V | ¶¶ | 6 – 8 |

| Speaker | Citation |
|---|---|
| Brewer-Carías | 911 – 912, 929 – 931, 936 – 937 |
| C. Closing | 2044 – 2052 |
| C. Opening | 33, 57 – 58 |
| Cutt | 702 – 703, 710 – 711, 770 – 775 |
| Expert Conf. | 931 – 935 |
| Hernandez | 918 - 919 |
| Massey | 544 – 545, 594 – 595 |
| Mélich-Orsini | 912 |
| R. Closing | 2019 – 2020, 2048 – 2049, 2052, 2119 – 2128 |
| R. Opening | 85 – 86, 98 – 101 |
| Urdaneta | 952, 931 - 932 |
| Ward | 238 – 240, 257 278 – 280, 286 |

522. The Tribunal is aware that, indeed, there have been many arbitrations where a state party or state entities tried to excuse themselves from performance based on their own government's actions and such an excuse was not accepted by the tribunals. The Tribunal sees no reason why this principle should not be applicable here. Respondents are government companies. PDVSA's President, Mr. Ramírez, was simultaneously both the President of PDVSA and the Minister of Energy. The Tribunal also notes that, although the government and PDVSA are separate legal entities, under Article 15.2(b) of the AA there is no obligation for indemnification if the government reduces its direct or indirect interest in Respondents. In this manner, there is a link to government control within the contract

523. However, in the present case, the Tribunal considers that it does not have to rely on this general principle or such general considerations in view of the specific provisions agreed in the AA.

524. While the two Respondents in the present arbitration are different legal entities from the Republic of Venezuela, they are, by the AA and the Guaranty, contractual parties subject to the respective arbitration clauses referring disputes to ICC arbitration and to the contractual remedies provided in these legal instruments. Regardless of whether an act of government emanates from the same public entity that is a party to the contract or from another public entity, Respondents have a responsibility to compensate Claimant for acts of government in so far as such a responsibility is expressly provided for in the AA, and particularly in its Article 15. The definition of Discriminatory Measure in Clause I expressly refers to both changes in the law and governmental measures and thereby clearly indicates the scope of the contractual responsibility of the Respondents. In so far as that scope goes, it is therefore clear that neither type of state act can be considered a *hecho del príncipe* which may excuse the contractual parties from non-fulfillment of their contractual obligations.

525. It seems obvious to the Tribunal that Claimant had a reasonable expectation that Clause XV would provide for an arbitration whose scope would allow a meaningful award. Both New York law [Republic Mortgage Ins. Co. v. Countrywide Financial Corp., No. 603915/2009, 28 Misc.3d 1214(A), 2010 WL 2927286, at ** (N.Y. Supreme Court, N.Y. County, July 22, 2010), cited in C-V § 79] and Venezuelan law (in particular **Article 12 of the Venezuelan Code of Civil Procedure**) are consistent in this respect, namely, that the arbitration clause should be constructed to give fair meaning to the contractual language. **Article 12 of the Venezuelan Code of Civil Procedure** deals with risk allocation, which is relevant to Article 15 of the AA.

526. In view of the above considerations, the Tribunal concludes that Respondents cannot rely on *hecho del príncipe* to excuse non-compliance with contractual obligations covered by Article 15 AA.

### K.V.2. Force Majeure

### K.V.2.a. Arguments by Respondents

527. Respondents state that they have not claimed *force majeure* under the AA, but rather have stated that PDVSA-CN could have invoked *force majeure* under the AA if it had not been extinguished. (R-IV ¶ 44).

528. Article 21.2(b) of the AA defined Force Majeure as including *"acts of government or orders, judgments, resolutions, decisions or other acts or omissions, of any governmental authority, civil or military."* (R-II ¶ 59). Inasmuch as the **Migration Laws** are valid and binding laws of Venezuela which Respondents, as entities unquestionably subject to the jurisdiction of Venezuela, cannot disregard, these fall within the scope of the force majeure clause in the AA. (R-II ¶ 63). Respondents maintain that this force majeure clause did not allocate the risk of a hecho del príncipe impeding contractual performance to PDVSA-CN. (R-III ¶ 54, partially quoted).

529. Respondents argue that the Government's action prevented Respondents from performing obligations under the AA and the PDVSA Guaranty. They state *"not only could Respondents as state companies not make any payments under non-existent contracts, but any functionary of either Respondent who made (or authorized) such payment would be exposed to administrative and criminal sanctions."* (R-II ¶ 62).

530. Respondents explain that acts of the Government were included within the *force majeure* clause. (R-III ¶ 55-56, partially quoted, footnotes omitted):

> 55. [The AA] which expressly included "acts of government" as events of *force majeure* without excluding acts of the Government, would have constituted a defense under the language of the agreement itself interpreted in accordance with Venezuelan law.

> 56. This in fact was the interpretation given to a similar *force majeure* clause by ExxonMobil itself, when OCN, S.A., the operating subsidiary of ExxonMobil for the Project, invoked *force majeure* on behalf of both PDVSA-CN and Mobil CN as sellers under the crude oil supply contract with the Chalmette Refinery. The *force majeure* in question at that time was the Government's order limiting exports.

531. In response to the Tribunal's question at PO-6 ¶ 3.3 regarding the relationship and interaction between *"Discriminatory Measure"* under Clause XV AA, *"Force Majeure"* under Clause XXI AA, and *Force Majeure* in the law of Venezuela, Respondents state as follows:

> 89. The concepts of Discriminatory Measure under the AA and Force Majeure under either the AA or Venezuelan law are distinct. Force majeure is an act that impedes performance by a contracting party, whereas Discriminatory Measures under the AA are certain types of acts that affect the economics of the Project to the Foreign Party. Under the AA, if an act qualifying as a Discriminatory Measure occurred and the requirements of the AA were met, the Foreign Party would not claim force majeure, but it would claim indemnity under Article XV.

> 90. Force Majeure under the Agreement is defined in Article 21, and includes "acts of the government or orders, judgments, resolutions, decisions or other acts or omissions of any governmental authority, civil or Military," preventing a party from complying with its contractual obligations. That includes an act of the Venezuelan Government, as demonstrated by OCN's invoking a similar force majeure clause in the Chalmette Supply Contract on behalf of both Mobil-CN and PDVSA-CN based on production curtailments ordered by the Venezuelan Government.

> 91. As noted earlier, Claimant spent much of its legal argument in the closing trying to establish that the requirements of the force majeure clause had not been met, saying that Respondents had invoked it, but the record is clear that Respondents never invoked the force majeure clause in the AA because the Agreement had been extinguished by operation of law. Respondents only pointed out that if the contract had not been extinguished, the force majeure clause could have been invoked. The extinction of the contract in this case has as a consequence under the Venezuelan Civil Code a release of responsibility of the parties inasmuch as the extinction was due to a causa extraña no imputable (non-imputable external cause). (R-IV ¶¶ 89 -91).

### K.V.2.b.    Arguments by Claimant

532. Claimant states that the terms *"non-imputable extraneous cause"* and *"force majeure"* have been used interchangeably. Under Venezuelan law, including **Articles 1271 and 1272 of the Venezuelan Civil Code**, the failure to perform or delay in performing an obligation is excused if it results from a *"non-imputable extraneous cause"/"force majeure."* (C-V ¶ 55). Claimant explains that the operation of this general excuse can be modified by a private agreement. Where risk of an event that would otherwise qualify as a

*"non-imputable extraneous cause"* or *"force majeure"* is allocated to a party, the occurrence of the event can no longer serve as an excuse for non-performance under Venezuelan law. Claimant explains that in Clause XV, the Parties allocated the risk of a Governmental Measure that would meet the definition of *"Discriminatory Measure"* on to PDVSA-CN. Claimant concludes that *"Clause XV, together with the definition of 'Discriminatory Measure,' trumps the general excuse set forth in Articles 1271 and Article 1272 of the Civil Code."* (C-V ¶ 56).

533. Claimant argues that Respondents' reading of Clause XV in which they state that *"actions taken by the Government"* are an event of *force majeure*, deprives Clause XV of its intended purpose of compensating Claimant in the event of certain governmental measures. (C-IV ¶ 93). Claimant argues that Clause XV allocates the risk of Governmental Measures to PDVSA-CN:

> 95. It is clear that Clause XV was intended, *inter alia*, to allocate to PDVSA-CN certain risks that may be events of *force majeure* in contracts between *private* parties. For instance, the definition of "Discriminatory Measures" in the AA uses the defined term "Governmental Measure" to include all those measures for which PDVSA-CN was required to indemnify a Foreign Party under the Agreement. In contrast, "acts of the government" in Clause XXI is not a defined term, which indicates that only acts of the government *other than those that could trigger PDVSA-CN's obligation to indemnify under Clause XV* were intended to be included. Clause XV acts as the carve-out provision that, as the Respondents observe, is missing from Clause XXI. (C-IV¶ 95, footnotes omitted, emphasis in original).

534. Contrary to Respondents' argument, the defined term *"Discriminatory Measure"* does not embrace only events that *"do not affect or impede in any way the ability of any party to the AA to perform its obligations."* This argument attempts to carve such events out of the scope of a Discriminatory Measure. (C-V ¶ 57). Instead, *"the whole point of a risk allocation clause like Clause XV is to resolve the overlap between 'Discriminatory Measure' and non-imputable extraneous cause / force majeure in the opposite way, which means that the area and overlap between the scope of 'Discriminatory Measure' and the scope of non-imputable extraneous cause*

*/ force majeure is carved out of the later.*" (C-V ¶ 58). Since Clause XV allocates to PDVSA-CN the risk of Governmental Measures that meet the definition of "*Discriminatory Measures*", such "*Discriminatory Measures*" cannot excuse PDVSA-CN from fulfilling its contractual obligations. Clause XV and the definition of "*Discriminatory Measure*" trump the general excuse set forth in **Articles 1271 and 1272 of the Venezuelan Civil Code**. (C-V ¶ 56, partially quoted). Claimant states that "*[i]f a given governmental act fits within the scope of 'Discriminatory Measure' and also within the scope of 'non-imputable extraneous cause'/'force majeure', the characterization of the act under Clause XV and the definition of 'Discriminatory Measure' must prevail because that is the raison d'être of a risk-allocation clause under Venezuelan law.*" (C-V ¶ 58).

535. Under Clause XXI, an "*Event of Force Majeure*" includes "*acts of government or orders, judgments, resolutions decisions or other acts or omissions of any governmental authority, civil or military.*" (C-V ¶ 59). With respect to the relationship between Clauses XV and XXI, Claimant states as follows:

> 60. In principle, Clause XXI allocates the risk of an Event of Force Majeure to the obligee of the breached obligation. But while both Clause XXI and Clause XV deal with risks associated with governmental acts, Clause XV prevails because it is lex specialis in respect of Clause XXI. Clause XV refers to a narrower class of governmental acts: those that meet the definition of Discriminatory Measure, while Clause XXI refers to "acts of the government" in general. As all Discriminatory Measures are necessarily "acts of the government," an interpretation that gives prevalence to Clause XXI would deprive Clause XV and the definition of "Discriminatory Measure" of any purpose, in violation of the principle of effet utile. Conversely, if Clause XV is given prevalence, the reference to "act of government" in Clause XXI still preserves a purpose — to deal with those governmental measures that do not meet the definition of "Discriminatory Measure." Accordingly, the risk of an act of government that qualifies as a Discriminatory Measure lies on PDVSA-CN, whether or not such governmental measure may have otherwise qualified as an Event of Force Majeure under Clause XXI. (C-V ¶ 60, citations omitted).

536. Finally, Claimant argues that, even if the measures did constitute *force majeure*, this issue is moot because Respondents have not complied with the

notice, mitigation, and negotiation requirements of Article 21.2. (C-IV ¶ 96; C-V ¶¶ 61, 70).

> 71.  The reference to "acts of the government" in Clause XXI does not help the Respondents. First, as already shown, the Respondents have forcefully disclaimed any reliance on Clause XXI. Second, because the alleged Event of Force Majeure (**Decree-Law 5200**) is a Discriminatory Measure, it falls under Clause XV, not Clause XXI. Third, by the express terms of Clause XXI, an act of the government can support a Force Majeure defense only if it meets the requirements of Section 21.1(b), which are essentially the same as those of "non-imputable external cause / force majeure" as a general principle. Section 21.1(b) requires that the event that prevents performance of a Party's contractual obligation be "beyond the reasonable control of, or unforeseen by, the Party obligated to perform the corresponding obligation, or which being foreseeable, could not be avoided in whole or in part by the exercise of due diligence.[...]" (C-V ¶ 71, citations omitted, emphasis in original).

537. With respect to Respondents' *"Non-Imputable Extraneous Cause"* defense, Claimant first puts forward that **Decree-Law 5200** and the resulting expropriation of all of Claimant's interests it the Project is a Discriminatory Measure for which PDVSA-CN assumed the risk under Clause XV. Claimant states *"[a]s Clause XV trumps both the general principles of 'non-imputable extraneous cause'/'force majeure' and the definition of 'Event of Force Majeure' in Clause XXI, the Respondents cannot rely on **Decree-Law 5200** to excuse non-fulfillment of their obligations under the Agreement."* (C-V ¶ 64). Alternatively, the **5 March 2008** extinguishment cannot excuse PDVSA-CN's failure to indemnify Claimant because (i) the claims had arisen prior to the extinguishment and the extinguishment cannot affect past effects of the contract; (ii) under Venezuelan law, the risk allocation in Clause XV survives the termination of the contract; and (iii) *"Article 16.1(b) of the AA expressly contemplates the survival of Claimant's claims to indemnification under Clause XV."* (C-V ¶ 65).

### K.V.2.c.    The Tribunal

538. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶¶ | 84, 93 – 96 |
| R-II | ¶¶ | 58 – 63 |
| R-III | ¶¶ | 52 – 57 |
| TOR | | 5.2.1(v) |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Articles 18.4, 21.1(b), 21.2(a) and (b) |
| C-87 | Association Agreement Clause 1 *defining* "*Governmental Measures*" and "*Discriminatory Measures*", Articles 16.1(b), 18.4, 21.1(b), 21.2(a) and (b) |
| C-99 | Decree-Law 5200 Art. 12 |
| C-214 | Second Declaration of Professor Allan R. Brewer-Carías (14 May 2009) at ¶¶ 18-26 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶¶ 66 – 67, 73 -76, 84 |
| C-232 | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO (4th ed. 2006) § 340 |
| C-240 | Venezuelan Civil Code Art. 1271 – 1272 |
| C-248 | Financial and Operational Information of PDVSA and Affiliates [*Información Financiera y Operacional, PDVSA y sus Filiales*], as of 31 December 2007, and Notes to Consolidated Financial Statements, 31 December 2007 and 2006 [*Notas a los Estados Financieros Consolidados, 31 de diciembre de 2007 y 2006*] 6 – 7 |
| C-289 | José Mélich-Orsini, DOCTRINA GENERAL DEL CONTRATO (2006) (excerpt, Chapter XVII, Section 456) at n. 48 |
| C-324 | Rafael Badell Madrid, RÉGIMEN JURÍDICO DEL CONTRATO ADMINISTRATIVO (2001) at 151 |
| C-325 | Rafael Badell Madrid, *La Ejecución del Contrato Administrativo: Teoría de la Imprevisión, Depreciación Monetaria e Inflación* in RÉGIMEN JURÍDICO DE LOS CONTRATOS ADMINISTRATIVOS (1991) at 68 – 69 |
| C-326 | Alfredo Romero Mendoza, *El Hecho del Príncipe en los Contratos Administrativos y su Regulación en el Decreto que Contienen las Condiciones General de Contratación para la Ejecución de Obras* in TRIBUNAL SUPREMO DE JUSTICIA, REVISTA DE DERECHO No. 4 (2002) at 472 |
| R-7 | Decree-Law 5200 Art. 13 |
| R-17 | Law on Effects Art. 5 |
| R-43 | Congressional Authorization Eighteenth Condition. |
| R-68 | Legal Expert Opinion of Professor José Mélich-Orsini (10 February 2009) at ¶¶ 9-15 |
| R-69 | Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (10 February 2009) at ¶¶ 11 – 27 |
| R-70 | Association of International Petroleum Negotiators, AIPN Model Lifting Agreement (2001) |
| R-71 | Letter from Operadora Cerro Negro, S.A. to Chalmette Refining, |

| | | |
|---|---|---|
| | L.L.C. (10 January 2007) | |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract), dated 1 November 1997Art. 10.1(b) | |
| R-73 | Organic Law of the Office of the General Comptroller of the Republic and the National System of Fiscal Control, Official Gazette No. 37.347, published 17 December 2001 Art. 91(12), (14), (15) and (23) | |
| R-74 | Law Against Corruption [*Ley Contra la Corrupción*] Official Gazette No. 5.637 (Extraordinary), published 7 April 2003 Art. 53, 54 and 56 | |
| R-112 | Association Agreement Article 21.1(b) | |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 3 – 20 | |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 3 – 28 | |
| Unnumbered | J. Rivero, Droit Administratif (14ème Ed.) 40 (1992) | |
| Unnumbered | G. Vedel, Droit Administratif 415 (1959) | |
| Unnumbered | G. Vedel et P. Delvolvé, 2 Droit Administratif 382-383 (1990) | |
| Unnumbered | M. Waline, Droit Administratif 256 (1959) | |

### At and Following the 2010 Hearings

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 36, 55 – 65, 70 |
| R-IV | ¶¶ | 44, 89 – 91 |
| C. Closing | pp. | 16 – 17 |
| R. Closing Slide | | 20 |

| Speaker | Citation |
|---|---|
| Brewer-Carías | 911 – 912, 937 |
| C. Closing | 2044-2050 |
| C. Opening | 55 - 58 |
| Hernández-Bretón | 918 – 919; 947-948 |
| Mélich-Orsini | 912 (Sp. Hr. Tr. 15: 5-12) 941-942 (Sp. Hr. Tr. 39: 7-12) |
| R. Closing | 2119-2128 |
| R. Opening | 98-101 |
| Urdaneta | 951-953 |

539. **Article 1271 of the Venezuelan Civil Code** provides, in English translation, that "*the debtor shall be ordered to pay damages, both for failure to perform the obligation and for delay in performance, unless he proves that the failure or delay are due to an extraneous cause not imputable to him [...]*." **Article 1272 of the Civil Code** provides for its part, also in English translation, that "*the debtor is not obligated to pay*

*damages when, as a consequence of a fortuitous event or force majeure, he fails to give or do what he was obligated [...].*"

540. In the light of these two consecutive articles of the **Venezuelan Civil Code**, the Tribunal finds that the terms "*non-imputable extraneous cause*" and "*force majeure*" can be used interchangeably for present purposes to refer to an excuse for the failure to perform or delay in performing an obligation.

541. The Tribunal further notes that, under **Article 1159 of the Venezuelan Civil Code**, "*contracts have the force of law between the parties.*" Consequently, the Tribunal finds that the operation of the general "*force majeure*" or "*non-imputable extraneous cause*" excuse can be modified if such modification is mutually agreed by the Parties.

542. More specifically, the Tribunal finds that where risk of an event that would otherwise qualify as a "*non-imputable extraneous cause*" or "*force majeure*" is contractually allocated to a party, the occurrence of the event can no longer serve as an excuse for non performance under Venezuelan law.

543. The Tribunal also finds that if a given governmental act fits within the scope of "*Discriminatory Measure*" and also within the scope of "*non-imputable extraneous cause*"/"*force majeure*", the characterization of the act under Clause XV of the AA and the definition of "*Discriminatory Measure*" must be considered as a *lex specialis* and must prevail. In other words, assuming an alleged event of force majeure is a "*Discriminatory Measure*", it falls under Clause XV ("*Consequences of Governmental Actions*"), not under Clause XXI ("*Force Majeure*").

544. Finally, without espousing Claimant's view that Minister Ramirez was "*the chief architect*" of the alleged "*Discriminatory Measures*", or that as a general proposition an enterprise owned and controlled by the State cannot rely on acts of that State as an excuse for non fulfillment of a contract, the Tribunal, addressing again the matter of extraneousness, finds that it is not "*irrelevant*" that Mr. Ramirez was simultaneously both the Minister of

Energy and the President of PDVSA, and, in the same vein, that **Decree-Law 5200** is not necessarily extraneous to the Minister of Energy / President of PDVSA.

545. The Tribunal thus concludes that Article 15 AA, as a *lex specialis* over Article 21, allocates the risk for actions of the Republic of Venezuela that might otherwise be *force majeure*. Indeed, the Tribunal considers that this must have been the intention of the Parties in view of the well known history among the Parties before the conclusion of the AA.

546. Therefore, the Tribunal rules that any responsibility found for the Respondents for Discriminatory Measures due to Article 15 AA is not excused by force majeure.

## K.VI. Liability under the PDVSA Guaranty

### K.VI.1. Arguments by Claimant

547. PDVSA issued the PDVSA Guaranty on **28 October 1997**, concurrently with the execution of the AA. Under Section 3 of the Guaranty PDVSA, as the guarantor, unconditionally and irrevocably guarantees to Mobil CN (as beneficiary) the timely performance of all the obligations assumed by PDVSA-CN in the AA and related agreements. Claimant states that the Guaranty also requires PDVSA to pay on demand all reasonable costs and attorneys fees incurred by Claimant in all matters related to the enforcement of the Guaranty. (C-l ¶¶ 48 – 50, partially quoted).

548. Claimant argues that on **10 October 2007**, Claimant notified PDVSA that its Guaranteed Affiliate, PDVSA-CN, was in breach of the AA and demanded PDVSA's prompt performance of its indemnity obligation. (C-III ¶ 252). As PDVSA *"has neither paid the compensation owed to Claimant by PDVSA-CN nor even replied to Claimant's demand for performance of PDVSA's guarantee obligation,"* PDVSA is in breach of its obligations under the PDVSA Guaranty. (C-lll ¶ 252; C-V ¶ 12).

### K.VI.2.     Arguments by Respondents

549. Respondents maintain that Claimant has no claim against PDVSA-CN under the AA and, therefore, no claim against PDVSA under the Guaranty. (R-1 ¶ 42). Respondents further state *"refusing to accede to absurd demands for compensation does not constitute bad faith under Venezuelan or any other law."* (R-1 ¶ 30).

550. With respect to whether an indemnity is due, Respondents explain that the idea that a claim for indemnity for the next 27.5 years accrued prior to the extinction is belied by the language of Article 15.1(b). No indemnity is due under that provision unless and until an award for indemnity had been rendered establishing that a Discriminatory Measure causing a Materially Adverse Impact in a particular FY had accrued. Thus, no claim for breach of the indemnity obligation had even accrued for FY 2007 (due to the rise in oil prices), prior to the extinction of the contract. (R-IV ¶ 42).

### K.VI.3.     The Tribunal

551. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 48 – 50 |
| C-III | ¶¶ | 252 – 253 |
| C-V | ¶ | 12 |
| R-I | ¶¶ | 30, 42 – 44 |
| R-IV | ¶¶ | 42 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-3 | PDVSA Guaranty Art. 6(ii), 7, 13 |
| C-10 | 10 October 2007 Demand for Performance under the PDVSA Guaranty from Mobil Cerro Negro, Ltd. to Petróleos de Venezuela S.A. (PDVSA) |
| C-87 | Association Agreement Article 13.1(d)(i) |

| R-112 | Association Agreement |
| R-127 | Association Agreement Annex G Accounting Procedures |

**At and Following the 2010 Hearings:**

| Speaker | Citation |
|---------|----------|
| R. Closing | 2122 |
| R. Opening | 104 - 106 |

552. At the outset, the Tribunal recalls the text of the most relevant provision of the Guaranty:

**Section 3**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|--------------------|------------------------|--------------------------|
| La Fiadora garantiza adicionalmente en forma incondicional e irrevocable a cada una de las Beneficiarias, como deudora y obligada principal, el cumplimiento oportuno de todas las obligaciones de la Filial Garantizada en virtud del Convenio y del Convenio de Operación. Si la Filial Garantizada dejare de cumplir cualquiera de sus obligaciones en la forma y en el momento exigidos, la Fiadora cumplirá o hará cumplir dicha obligación al exigirlo cualquiera de las Beneficiarias. | The Guarantor additionally unconditionally and irrevocably guarantees to each of the Beneficiaries, as primary debtor and obligor, the timely performance of all of the obligations of the Guaranteed Affiliate under the Agreement and the Operating Agreement. If the Guaranteed Affiliate fails to perform any of its obligations in the manner and at the time required, the Guarantor shall perform or procure the performance of such obligation upon demand by any of the Beneficiaries. | The Guarantor additionally unconditionally and irrevocably guarantees to each of the Beneficiaries, as primary debtor and obligor, the timely performance of all of the obligations of the Guaranteed Affiliate under the Agreement and the Operating Agreement. If the Guaranteed Affiliate fails to perform any of its obligations in the manner and at the time required, the Guarantor shall perform or procure the performance of such obligation upon demand by any of the Beneficiaries |
| (C-3; R-41) | (C-3) | (R-41) |

553. Further, the Tribunal notes that Respondents, while insisting that the Guarantor is not liable due to the alleged lack of liability of the Guaranteed Affiliate, does not seem to contest that, should that Affiliate, *i.e.* PDVSA-CN, the 1st Respondent in this case, be found to be liable, that liability

would also apply to the Guarantor, *i.e.* PDVSA, the 2nd Respondent in this case.

554. Indeed, the Tribunal also does not see a reason why this should not be so and, therefore, concludes that the 1st Respondent's liabilities found by this Tribunal under the AA, also lead to the same liability of the 2nd Respondent under the Guaranty.

## K.VII. Compensation

## K.VII.1.    Jurisdiction

## K.VII.1.a.    Arguments by Claimant

555. In 1997, PDVSA-CN promised to indemnify Mobil CN against the economic consequences of Discriminatory Measures. (C. Closing Statement p. 21; C. Closing Slides 23, 26). Claimant argues that the Tribunal has jurisdiction over its claim for compensation through FY 2035, both under the plain meaning of the AA, and pursuant to the Parties' intent. (C. Closing Slides 27 – 29).

556. With respect to the grammatical construction of "*suffered by it to date*", Claimant maintains that "*to date*" modifies "*Discriminatory Measures*" and that Claimant is seeking compensation for the economic consequences of Discriminatory Measures that it has already suffered. (C-V ¶ 75). For ease of reference, Claimant presents its argument as follows:

> 75.    MCN has explained that the controlling Spanish text makes clear that "suffered by it to date" ("*sufrida por ella hasta la fecha*") refers to "Discriminatory Measure" ("*Medida Discriminatoria*") and not to "economic consequences" (*consecuencias económicas*). The Respondents concede that in Spanish "*sufrida*" goes only with "*Medida*," but argue that "to date" (*hasta la fecha*) could apply "just as easily" to "economic consequences" (*consecuencias económicas*). That is grammatically impossible, both in the official Spanish text and in the English translation. The adverbial phrase "to date" (*hasta la fecha*) modifies the accompanying past participle "suffered" (*sufrida*). The full expression in the contract is "suffered by it to date" (*sufrida por ella hasta la fecha*). And the singular past participle sufrida cannot

grammatically refer to a plural noun (*consecuencias económicas*). (C-V ¶ 75).

557. Pursuant to Article 23.7 of the AA, the Spanish language text is the official text. (C. Closing Statement p. 22). Claimant argues that, even where the English translation of the text is ambiguous, the Spanish original is the controlling text, stating that *"[a]n ambiguous unofficial translation of the official text cannot prevail over the corresponding, unambiguous official text."* (C-V ¶ 86).

558. In the alternative, Claimant asserts that it *"was deprived, at the time of the expropriation, of its right to the value of cash flows from the Project for the remaining term of the joint venture."* (C-V ¶¶ 75 – 77). *"Compensation for that lost right is not 'future damages,' as the Respondents mischaracterize it, but damages for the economic consequences that Mobil CN suffered at the moment its investment was expropriated or seized."* (C-IV ¶ 56, emphasis in original; C. Closing Slides 26 – 30; C-V ¶ 76). Claimant contends that its interpretation is consistent with Venezuelan law:

> 255. Venezuelan law requires full indemnification for the consequences of a contractual breach. The damages (*daños y perjuicios*) to be compensated include both out-of-pocket losses (*daño emergente, damnum emergens*) and lost profits (*lucro cesante, lucrum cessans*), as long as the damages are the direct and immediate consequence of the breach. Both *daño emergente* and *lucro cesante* are subject to compensation as of the time the obligation was breached. The quantum of the compensation for *daño emergente* and *lucro cesante* is established as of the time of the judicial or arbitral decision. (C-III ¶ 255, italics in original).

559. Claimant states that the law of the forum may inform the interpretation of Article 15.1(b). New York law requires that an arbitration clause be construed to give fair meaning to the words of the contract in order to realize the parties' *"reasonable expectations."* (C-V ¶ 79). Claimant states that *"[t]he text of the AA and undisputed testimony show that Mobil CN had a reasonable expectation that the contract provided for arbitration allowing a meaningful award for expropriation of Mobil CN's interests in the Project."* (C-V ¶ 79).

560. Claimant argues that the compensation it seeks find support in both Venezuelan and New York Law. Pursuant to **Article 12 of the Venezuelan Code of Civil Procedure** and **Article 1160 of the Civil Code**, *"[t]he Tribunal's power under Article 15.1(b) to compensate Claimant for the economic consequences of an expropriation necessarily entails the power to consider the loss of Claimant's rights to produce EHO and sell SCO from 26 June 2007 through 20 June 2035."* (C-V ¶¶ 76 – 77; C. Closing Slides 28 - 30).

> 77. **Article 12 of the Venezuelan Code of Civil Procedure** provides that contracts are to be interpreted according to "the parties' purpose and intention, taking into account the requirements of the law, the truth, and good faith." And **Article 1160 of the Civil Code** provides that "[c]ontracts shall be performed in good faith and bind not only to comply with what they provide, but also to all the consequences derived from such contracts, according to equity, usage or Law." (C-V ¶ 77, emphasis in original, citations omitted, see also C. Closing Statement pp. 22-23).

561. As Claimant suffered all of the economic consequences of the expropriation effected by **Decree-Law 5200** on **27 June 2007**, the absence of an acceleration clause in the contract is irrelevant. (C. Closing Slide 31). The promised indemnity for economic consequences was due and payable in 2007. (C. Closing Statement p. 23). In the alternative, Respondents are in anticipatory breach of the contract. (C. Closing Slides 31 - 32). Under **Article 1215 of the Venezuelan Civil Code**, when a debtor becomes insolvent or deprives the creditor of contractual assurances, that debtor loses the benefit of any contractual term (*i.e.* time period) to perform his obligation. (C-V ¶ 82, partially quoted). Respondents overlook that PDVSA-CN, a debtor, is insolvent. There is no need to wait to know that Mobil CN will earn nothing after 2007. (C. Closing Slide 32). Even if this case were analogous to an installment debt, **Article 1215** would accelerate payments even in the absence of an acceleration clause. (C-VI ¶ 46). As the entire Project has been expropriated, there is no reason to wait for future actual costs and liftings would be. (C. Closing Statement p. 24).

562. Claimant is not asking the Tribunal to render an award *ex aequo et bono*. Respondents' reference to **Article 13 of the Code of Civil Procedure**, which deals with proceedings in which the parties ask the court to render a decision according to equity, is irrelevant. (C-VI ¶ 23). Equitable principles are, however, applicable to the good-faith interpretation and performance of contracts. (C-VI ¶¶ 21-23; C. Closing Slide 28). Here, the standard of good faith precludes Respondents - who participated in the actions making it impossible to apply the Accounting Procedure formulas retrospectively and who benefited from the seizure of Claimant's interest – from seeking to avoid their commitments by invoking difficulties in applying the Accounting Procedures now that the Project is no longer generating cash flows. (C-V ¶ 78).

563. Claimant argues that Parties had intended to apply the indemnification obligations in the expropriation or seizure of assets – events that would prevent Claimant from receiving any *"actual"* cash flows and, therefore, would render a *"backward-looking"* analysis based on actual results impossible. (C-IV ¶ 57). Furthermore, as the Project no longer exists, the only means of redress is compensation. Claimant argues, therefore, that if the Parties are unable to negotiate such compensation pursuant to Article 15.1(a), then the Tribunal must issue such an award, pursuant to Article 15.1(b). (C-IV ¶ 53).

564. Claimant accuses Respondents of *"trying to frustrate the indemnification provisions by arguing that indemnification can only be provided on a 'retrospective' year-by-year basis based on the actual annual financial results of the Project."* (C-IV ¶ 9). Claimant rejects Respondents' position that the expropriation or seizure has made it impossible to apply the indemnity formulas to FYs 2008 – 2035. Claimant explains that Respondents' position of requiring actual results would have the consequence of placing no limitations on the amount of the indemnification, rather than having it be calculated on a year-by-year basis:

> The primary function of the indemnification formulas — and use of look-back data in the formulas — was to *limit the amount of indemnification in years in which Claimant actually received revenues*. When Mobil CN is receiving no revenues or **Net Cash Flow**, then the formula limiting indemnification should not be applied at all if, as the Respondents contend, the expropriation or seizure has made it impossible to apply the formulas. (C-IV ¶ 58, emphasis in original).

565. Claimant suggests that applying the indemnity provisions to this situation where the *"investment was expropriated or seized, the contract was terminated, and the Project ceased to exist"* is a "reasonable business approach that is consistent with the language of the AA." (C-IV ¶ 60).

566. Claimant also explains that applying the indemnity provisions is consistent with principles of equity.

> Bearing in mind that the limitation mechanisms of the Accounting Procedures were intended for PDVSA-CN's benefit, and that Respondents acted in concert with the government, it would be inconsistent with equitable principles to interpret the contract so that difficulties in the application of those mechanisms would render the promise of protection an illusion in the context of expropriation of production rights. (C. Closing Statement p. 22).

567. Turning to the interpretation of Articles 15.1(a) and 15.1(b) of the AA, Claimant states as follows:

> Section 15.1(a) embodies the basic promise of protection, by specifying that Mobil CN would be entitled to damages from PDVSA-CN to restore the economic benefit that Claimant would have received but for a Discriminatory Measure. That basic right is made enforceable by Section 15.1(b), which specifies that Claimant is entitled to seek and receive an award of damages in arbitration to compensation for the "economic consequences of the Discriminatory Measure." (C. Closing Statement p. 22).

568. Finally, Respondents are misquoting Prof. Myers and taking his observation that *"we are out of the contract"* completely out of context. This arbitration involves a situation where it is impossible to calculate the indemnity on a year-by-year basis. In trying to value the indemnity payments that are due to Claimant under the indemnity contract, Prof. Myers stated *"I didn't say we are out of the indemnity provisions. We are trying to apply them or figure out what damages are appropriate in a situation where the contract*

*is not working as designed, where the project is no longer what is was, et cetera.*" (C-V ¶ ¶ 83 -84).

569. Since the AA has been terminated and it is not possible to recommend amendments to the AA, the Tribunal's power is limited to issuing an award for compensation within the framework of the AA and its Accounting Procedures. (C-V ¶ 74). In the event that the limitations do not apply or the formulas do not work due to the existence of a Discriminatory Measure consisting of the expropriation or seizure of Claimant's entire interest in the Project, then the Tribunal's powers revert to those granted by the general arbitration clause of Article 18.2 and by the general principles of Venezuelan law, which require full indemnification for breach of a contractual obligation. (C-V ¶¶ 74 - 75, partially quoted).

### K.VII.1.b    Arguments by Respondents

570. Respondents' dispute that the Tribunal may issue an Award granting any remedy for the future. (R-IV ¶ 95, citations omitted):

> 95.    [T]he Tribunal should not decide on any remedy for the future. Section 15.1 (b) only contemplated "recommendations" for the future. This is evident not only from the text of Section 15.1 (b), but also from the testimony in this case, including the testimony of Claimant's experts that "we are outside of the contract." (R-IV ¶ 95).

571. Respondents argue that Claimant distorted the meaning of *"to date"* and seeks to have the Tribunal ignore each and every provision of the indemnity and the Accounting Procedures, all of which operate on a FY-by-FY basis, fitting perfectly with the concept of *"to date"* in Article 15.1(b).   The plain meaning of Article 15.1(b), alone or in conjunction with the Accounting Procedures, stands firmly against Claimant's *"sophistry"* that it suffered all of the *"economic consequences"* of the alleged discriminatory expropriation by mid 2007. (R-IV ¶ 15).

572. Respondents make the following three points to the Tribunal related to the meaning of *"to date"*:

(i)    Section 15.1(b) provides only for the possibility of a monetary award based on the consequences to date as quantified by the indemnity provisions and formulas, and even specifies that no more than one indemnity arbitration may be brought per FY;

(ii)    every single provision of the indemnity, including all the formulas in the Accounting Procedures, operates on a FY-by-FY basis; and

(iii)    for the future, Section 15.1(b) expressly provides that an arbitral tribunal hearing an indemnity claim may only make "recommendations" which [...] should not be done in this case in light of the extinction of the AA. (R-V ¶ 9, citations omitted).

95.    Since there is no dispute that the AA has been extinguished, no recommendations for the future can be made. The issue of whether the extinction gives rise to any rights on the part of Claimant is a matter between Claimant and the State. (R-IV ¶ 95).

573.    Respondents' argument with respect to Claimant's linguistic argument is best taken from their own words, found at R-IV ¶ 96 (citations omitted):

96.    Section 23.7 states that the AA is executed in the Spanish language. Claimant has said that the Agreement was negotiated and drafted in English and that there are a number of translation errors. There was no testimony at the hearing about any irreconcilable discrepancies between the two versions. Claimant has tried to make an issue out of the Spanish version of Section 15.1(b), but, as demonstrated in both the Urdaneta and the Mélich-Orsini expert opinions, which were never answered by Claimant, the Spanish text is reconcilable with the English and, taken in the context of the Agreement as a whole, is unquestionably of the same effect as all the testimony in this case, namely, that the provision contemplates an arbitration dealing with the economic consequences as of that date and only recommendations for the future.

574.    The argument that the Spanish version of the text requires an interpretation that is contrary to the English has not been articulated or proven at the hearing and should be rejected. (R-V ¶ 16). All of the relevant testimony in this case on the meaning of Article 15.1(b) was in English and based on the English text. (R-V ¶ 16).

575.    Respondents' perspective is summarized in the **Post Hearing Brief**:

61.    The indefensible manner in which Claimant began this litigation is relevant to Respondents' counterclaims, but for present purposes Claimant's original no discounting position and the subsequent change in instructions to which Mr. Graves referred demonstrate that Claimant is not here applying the indemnity provisions at all, but instead is insisting that the Tribunal "must find a way" to fashion an award for Claimant, in the words of Prof. Myers, "outside of the contract" and

outside of what the parties "originally intended." By urging this Tribunal to engage in that dangerous exercise, Claimant is asking it to stray beyond the jurisdiction of any tribunal hearing an indemnity claim under Article XV of the AA. (R-IV ¶ 61, citations omitted).

576. Respondents contend that the Tribunal lacks jurisdiction over a claim for future compensation. In this respect, Article 15.1(b) expressly indicates that the Tribunal may only make "*recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received if the Discriminatory Measure had not occurred.*" (R-II ¶ 160; R-IV ¶ 18; R-V ¶¶ 9 - 17).

577. Under Venezuelan law, indemnity provisions are strictly construed. (R-IV ¶ 48). Contrary to Claimant's argument, **Article 12 of the Venezuelan Code of Civil Procedure** requires a judge to "*restrict himself to the legal norms, unless the Law empowers him to decide according to equity.*" (R-IV ¶ 49). **Article 13 of the Venezuelan Code of Civil Procedure**, as well as **Article 17 of the ICC Rules**, make it clear that the decider may only decide cases according to equity if the parties have so agreed. No such agreement exists in this case. (R-IV ¶ 49). The damages formulas, under **Article 1264 of the Venezuelan Civil Code**, need to be performed exactly as written – making it inappropriate to alter the contract by reading into the Threshold Cash Flow formula and all of the related provisions of the indemnity, essential provisions that are not there. (R-IV ¶ 50, partially quoted).

578. Respondents argue that Article 15.1(b) contemplates indemnity for the historical economic consequences of Discriminatory Measures. Article 15.1(b) can be read in either English or Spanish to mean "*a payment for damages to compensate the Foreign Party for the economic consequences to date of the Discriminatory Measure suffered by it.*" (R-III ¶ 186; R-IV ¶ 14). This reading accords the appropriate meaning to each word in the text and eliminates any redundancies that would occur by applying the words "*to date*" to the term "*Discriminatory Measure.*" Respondents present their argument as follows (R-III ¶ 187):

187.     Section 15.1(b) of the AA addresses the scope of an arbitration. Quite clearly, a tribunal in an arbitration would only be addressing the Discriminatory Measures that had already occurred (or been "suffered"), and would not be anticipating the possible occurrence of additional Discriminatory Measures in the future. Accordingly, there would be no point in applying the words "to date" to Discriminatory Measures. On the other hand, the words "to date" do have a purpose when applied to the concept of "economic consequences." Assuming a determination that a Discriminatory Measure has occurred, the provision contemplates a payment to compensate the Foreign Party for economic consequences "to date." For the future, the provision only contemplates "recommendations on amendments to the Agreement." That is why every single provision of the AA and the Accounting Procedures relating to the indemnity is backward-looking, requiring the Tribunal to apply data from past FYs on a FY-by-FY basis. (R-III ¶ 187, footnotes omitted).

579.   All of the formulas for calculating the indemnity require a FY-by-FY analysis using the available data from past FYs. (R-III ¶ 183, 188 – 191; R-IV ¶¶ 42, 50). In support of this, Respondents provided the Tribunal with **Appendix A:   Backward-Looking Provisions of the AA**. Therein, Respondents explain that Articles I, 15.1(b) and 15.2(a) of the AA, as well as Articles 7.1 – 7.5 of the Accounting Procedures (Annex G), require the use of actual data, with and without the effect of the Discriminatory Measure(s). (R-III App. A). The AA provides no methodology for calculating **Net Cash Flows** in future FYs, when no data can be available. (R-II ¶¶ 163 - 165). Respondents assert that the only departures from this indemnity formula using actual data relate to the determination of the **Reference (Threshold) Price**. (R-ll ¶ 167). *"There is no basis in the formula for applying any kind of projection or estimate, much less a budget prepared in 2006 which obviously bears no relationship to the reality that will unfold during the next 27.5 years."* (R-V ¶ 11). The fact that no discount rate has been established in the contract is further evidence that 15.1(b) contemplates indemnity for historical economic consequences of Discriminatory Measures.

580.   Respondents also point out that, pursuant to Article 15.1(b), no more than one indemnity arbitration may be brought per FY as further support for the

fact that the indemnity would be for historical economic consequences only. (R-V ¶ 9).

581. Claimant's argument that "*the economic consequences to date include all of the lost future cash flows*" misconstrues what is at issue in this arbitration. This arbitration is not for an expropriation, but rather for specific indemnity under specific formulas. (R-V ¶ 14, partially quoted).

582. Respondents state that, even if an indemnity obligation had been fixed for each of the next 27.5 years, it would not be due now because the AA lacks an acceleration clause. (R-IV ¶ 16). Indeed, Claimant's argument in favor of acceleration finds no support in either the contract or the applicable law. (R-V ¶ 6).

> 16. That basic legal proposition is not unique to Venezuelan law; it is a general principle, which is why virtually all term loan agreements contain express acceleration clauses to override the rule that otherwise would prevail and to specifically provide for acceleration in accordance with specific procedures upon the happening of specified events. The AA contains no such provision. (R-IV ¶ 16, citations omitted).

583. Respondents further argue that Claimant's proposed acceleration pursuant to **Article 1215 of the Venezuelan Civil Code** is erroneous because none of the three required circumstances – the insolvency of the debtor, the impairment of the debtor's security, and the failure of the debtor to provide the security promised – are relevant in this case. (R-IV ¶ 17; R-V ¶ 15). Finally, Respondents explain that acceleration would be inappropriate, as this matter does not concern a purported fixed promissory-note like payment, but rather an indemnity that is contingent upon future events and calculations. (R-IV ¶ 17).

584. Respondents also call the Tribunal's attention to Claimant's argument in London, where it stated: "*[i]f the parties had intended there to be some provision to take account of accelerated receipt, they could have done so.*" (R-IV ¶ 60).

585. In response to Claimants *ex aequo et bono* argument, Respondents state that the Tribunal is not authorized to decide this matter according to equity because there has been no agreement authorizing the Tribunal to decide the case according to such principles. (R-IV ¶ 49).

586. Addressing questions of an alleged *"misquoting"* of Prof. Myers, Respondents state that the extended quote of Prof. Myers's candid observation that *"we are outside of the contract"* was that he was referring to a situation where *"it is 'impossible to calculate the indemnity on a year by year basis."* (R-V ¶ 10). Even Mr. Massey conceded that the indemnity operated on a FY-by-FY basis. (R-V ¶ 10).

## K.VII.1.c. The Tribunal

587. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 255 – 258, 263; n. 528 |
| C-IV | ¶¶ | 9, 52 – 60, 77 - 78 |
| R-II | ¶¶ | 157 - 176 |
| R-III | ¶¶ | 10, 141, 183 – 191 |
| TOR | ¶ | 5.2.1.b.(iv) |

### Charts:

| Submission | Pinpoint |
|---|---|
| C-IV | Appendix A: |
| R-III | Appendix A *"Backward-Looking Provisions of the Association Agreement"* |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Clause 1, Article 15.1(b) |
| C-4 | Annex G (Accounting Procedures) to the Association Agreement Article 7.4 |
| C-11 | Congressional Authorization, Twentieth Condition |
| C-19 | Order Confirming Attachments dated 20 February 2008 rendered in |

|  | *Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro S.A.*, U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB). |
|---|---|
| C-22 | Rafael Ramírez, Minister of Popular Power for Energy and Petroleum, Declarations of the Minister of Popular Power for Energy and Petroleum and President of PDVSA About the ExxonMobil-PDVSA Arbitration Case (8 February 2008) at pp. 2 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) ¶¶ 28 – 40, 94 – 97 |
| App. 6 | Venezuelan Code of Civil Procedure [*Código de Procedimiento Civil*] (published in Extraordinary Official Gazette No. 4.209 of September 18, 1990) Art. 12 |
| App. 7 | José Mélich-Orsini, *Doctrina General del Contrato*, 4th. Edition, Academia de Ciencias Políticas y Sociales, Serie Estudios Nr. 61, Caracas, 2006, n. 16 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) ¶ 18 |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) pp. 106 - 110 |
| C-87 | Association Agreement Articles 15.1, 15.1(b), 15.2, 23.7, Annex G (Accounting Procedures) |
| C-134 | Venezuelan Civil Code Art. 1160, 1273, 1275, 1276 |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶ 34 – 40 |
| App. 21 | Venezuelan Code of Civil Procedure [*Código de Procedimiento Civil*] (published in Extraordinary Official Gazette No. 4.209 of September 18, 1990) Art. 12 |
| App. 32 | Angel Cristóbal Montes , *El Incumplimiento de las Obligaciones* |
| C-233 | Venezuela Supreme Tribunal of Justice, Constitutional Chamber, Decision No. 1541 (17 October 2008) at 365.488 (English Tr. at 27-29) |
| C-239 | *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela S.A.*, High Court of Justice, Queen's Bench Division, Transcript of Public Proceedings, Commercial Court, Day 2 (29 February 2008) at 38 |
| C-328 | Updated Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. and Compass Lexecon (30 July 2010) |
| R-15 | First Affidavit of Hobert Plunkett (21 January 2008) |
| R-32 | Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 |
| R-35 | Tr. Hearing of 2 December 2008 pp. 30 – 31, 69 – 71, 129 – 130 |
| R-36 | Letter from Eugene D. Gulland, Esq., to Ben Preziosi, Esq. (23 December 2008) |
| R-37 | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order, dated 27 February 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.,* Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) p. 28 |
| R-38 | Tr. January 24, 2008, *Mobil Cerro Negro Limited v. Petróleos de* |

|  |  |
|---|---|
|  | *Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) pp. 8, 9, 70 – 71 |
| R-39 | First Affidavit of R. Dean Graves (25 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) |
| R-42 | *The Next Shock?*, THE ECONOMIST, March 4, 1999, *available at* www.economist.com |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract), (1 November 1997) |
| R-93 | Expert Report of Barry Pulliam and Anthony Finizza, Ph.D., Econ One Research, Inc. (16 February 2009) ¶¶ 98 – 109 n. 43 |
| R-94 | Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, prepared by Vladimir Brailovsky, Economía Aplicada, S.C. (16 February 2009) n. 22 |
| R-95 | Direct Testimony of José Ángel Pereira Ruimwyk (12 February 2009) ¶¶ 10 – 15 |
| R-98 | Expert Report on the Discount Rate to be Applied to Projected Cash Flows Prepared by Vladimir Brailovsky and Louis T. Wells (16 February 2009) ¶¶ 63 – 70 |
| R-111 | Tr.2 December 2008 Hearing pp. 54, 87 |
| R-112 | Association Agreement Article 15.1(b) |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) at ¶¶ 44 – 47, |
| App. 46 | Venezuelan Civil Code Art. 1215 |
| App. 49 | Venezuelan Code of Civil Procedure, Official Gazette No. 4.209 (Extraordinary), published September 18, 1990, [*Código de Procedimiento Civil*] Art. 12 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 96 – 104 |
| R-127 | Annex G (Accounting Procedures) Association Agreement |
| Unnumbered | *Republic Mortgage Ins. Co. v. Countrywide Financial Corp.*, No. 603915/2009, 28 Misc.3d 1214(A), 2010 WL 2927286, at **2 (N.Y. Supreme Court, N.Y. County, July 22, 2010) |
| Unnumbered | Karl-Heinz Böckstiegel, *Public Policy and Arbitrability*, in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 177, 201-203 (Pieter Sanders ed., 1987) |
| Unnumbered | Pierre Lalive, *Transnational (or Truly International) Public Policy and International Arbitration*, in COMPARATIVE ARBITRATION PRACTICE AND PUBLIC POLICY IN ARBITRATION, ICCA CONGRESS SERIES 258, at ¶¶ 141-142 (Pieter Sanders ed., 1987) |

### At and Following the 2010 Hearings:

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶¶ | 72 – 87 |
| C-VI | ¶¶ | 21 – 23, 44 - 46 |
| R-IV | ¶¶ | 12, 14 – 18, 42 – 43, 48 – 49, 60 – 61, 95 – 96 |
| R-V | ¶¶ | 6, 9 – 17 |

| C. Closing Slides | | 22 – 32 |
| C. Closing | pp. | 22 – 24 |
| R. Closing Slides | | 23 – 27, 48 – 59, 65 – 76, 80 |

| Speaker | Citation |
| --- | --- |
| Brewer-Carías | 1007 |
| C. Closing | 2044 – 2048, 2054, 2057 – 2064 |
| C. Opening | 55 – 56, 60 – 63 |
| Cranmer | 443 - 444 |
| Cutt | 759 – 760 |
| Expert. Conf. | 906 (Question by Chairman), 990 – 999, 1002 - 1005 |
| Finizza | 1814 – 1815 |
| Graves | 1653 – 1668 |
| Hernández-Bretón | 1005 - 1006, 1008, 1010 |
| Hoenmans | 356 |
| Jones | 1358 – 1363, 1370, 1375 – 1377, 1387 – 1389, 1512 |
| Leitzinger | 1823 – 1824 |
| Massey | 504, 575 – 576 |
| Mélich-Orsini | 1008 – 1010 (Sp. Hr. Tr. pp. 92 – 93) |
| Myers | 1676, 1695 – 1698, 1707 – 1708, 1746 – 1747 |
| Pereira | 1037 – 1040, 1090 – 1091, 1096, 1103 |
| Plunkett | 802, 804, 837 – 850, 874 |
| R. Closing | 2109, 2121 – 2123, 2149 – 2157, 2166 |
| R. Opening | 127 |
| Urdaneta | 1002 - 1005 |
| Ward | 290, 293 - 296 |

588. The Claimant's claim is for payment of compensation pursuant to the terms of the AA. It says that PDVSA-CN has failed to concur that a Discriminatory Measure has occurred and has refused to pay indemnification pursuant to the AA.

589. Article 15.1(b) of the AA provides that the scope of the arbitration proceedings between the Parties shall include:

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
| --- | --- | --- |
| (b) [...] (i) una determinación de si una o más Medidas Discriminatorias se han producido y, si ese es el caso, si dichas medidas han tenido un Impacto Substancialmente Adversos sobre la Parte Extranjera; y | (b) [...] (i) a determination of whether one or more Discriminatory Measures have occurred and, if so, whether such measures have had a Materially Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative answer to the | (b) [...] (i) a determination of whether one or more Discriminatory Measures have occurred and, if that is the case, whether such measures have had a Material Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative |

(ii) en caso de una respuesta afirmativa a las dos interrogantes planteadas en el punto (i) de este literal, una indemnización por daños para compensar a la Parte Extranjera por las consecuencias económicas de la Medida Discriminatoria sufrida por ella hasta la fecha y recomendaciones sobre enmiendas al Convenio que restablecerían el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria.

two questions specified in clause (i) of this paragraph, an award for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred.

response to the two questions specified in clause (i) of this paragraph, a payment for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received if the Discriminatory Measure had not occurred.

590. Article 15.2(a) of the AA further provides that PDVSA-CN's liability to Claimant shall in all cases be limited as follows:

| **Spanish (Original)** | **Claimant's Translation** | **Respondents' Translation** |
|---|---|---|
| Limitación de la Obligación de Lagoven CN. | Limitation on Lagoven CN's Obligation. | Limitation on Lagoven CN's Obligation. |
| (a) No obstante lo anterior, después del primer período de seis (6) meses consecutivos durante el cual el Precio del Crudo Brent sobrepase el Precio Base, Lagoven CN no tendrá la obligación de compensar a ninguna Parte Extranjera por Medidas Discriminatorias en relación a cualquier Año Fiscal en que el promedio del Precio del Crudo Brent sobrepase el Precio Base, y dicha Parte Extranjera reciba un Flujo de Caja Neto, después de tomar en cuenta el efecto de la Medida Discriminatoria, cónsono con un precio de referencia por la Producción producida por las Partes que por lo menos guarde una relación razonable, ajustada en cuanto a las diferencias | (a) Notwithstanding the foregoing, after the first period of six (6) consecutive months during which the Price of Brent Crude exceeds the Base Price, Lagoven CN shall not have the obligation to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude exceeds the Base Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties which bears at least a reasonable relationship, adjusted for quality and transportation | (a) Notwithstanding the foregoing, after the first period of six (6) consecutive months during which the Price of Brent Crude Oil is in excess of the Threshold Price, Lagoven CN will not be required to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude Oil is in excess of the Threshold Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties that bears at least a reasonable relationship, adjusted for quality and |

| | | |
|---|---|---|
| de calidad y transporte, al Flujo de Caja Referencial para ese Año Fiscal. | differences, to the Reference Cash Flow for such Fiscal Year. | transportation differences, to the Threshold Cash Flow for such Fiscal Year. |

591. Article 15.2(b) provides a second limitation in the event the Venezuelan State reduces its interest in either the Project or the corporate entity which participates in the Association Agreement:

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Limitación de la Obligación de Lagoven CN. | Limitation on Lagoven CN's Obligation. | Limitation on Lagoven CN's Obligation. |
| (b) En todo caso, Lagoven CN no tendrá obligación de compensar a una Parte Extranjera por daños sufridos, o de convenir en modificaciones al Convenio, como resultado de cualquier Medida Discriminatoria que se produzca después de que el Estado Venezolano reduzca su interés directo o indirecto a (i) menos del 12,5% en el Proyecto o (ii) menos del 49,9% de Lagoven o cualquier otra Empresa petrolera operadora subsidiaria de PDVSA a la cual hayan sido transferidas las acciones de Lagoven CN o sus intereses en el Proyecto. | (b) In any event, Lagoven CN shall have no obligation to compensate a Foreign Party for damages suffered, or to agree to amendments to the Agreement, as a result of any Discriminatory Measure occurring after the Venezuelan State reduces its direct or indirect interest to (i) less than 12.5% in the Project or (ii) less than 49.9% of Lagoven or any other operating oil Company subsidiary of PDVSA to which the shares of Lagoven CN or its interests in the Project may have been transferred. | [No translation provided] |

592. Although the respective English translations of these articles as supplied by the Claimant are not strictly identical to those supplied by Respondents, the Tribunal is satisfied that there is no material difference between Respondents-supplied and Claimant-supplied English translations of Articles 15.1(b) and 15.2(a) of the AA.

593. Annex G *"Accounting Procedures"* to the AA provides, *inter alia*, definitions of *"Net Cash Flow"* (Article 7.1), *"Adjusted Net Cash Flow"* (Article 7.2), *"Reference (Threshold) Cash Flow"* (Article 7.3). Article 7.4

deals with "*Damages Payable*" and Article 7.5 with the "*Limitation*" of such Damages Payable.

594. Finally, Article 1.1 of Annex G "*Purposes*" provides, inter alia, that "*the purposes of these Accounting Procedures are to establish the accounting principles for recordkeeping, relating to the Project, necessary to [...] (iii) permit the Parties and the Operation to comply with their other obligations and responsibilities pursuant to the [Association] Agreement [...]*"

595. Here again, the Tribunal is satisfied that there is no material difference between Claimant-supplied English translation of the Accounting Procedures and Respondents-supplied English translation.

596. Respondents argue that there is no jurisdiction for an Award granting any remedy for the future.

597. The Tribunal's task is to apply the Parties' common intention, as reflected in the AA. The AA must be interpreted according to the plain and ordinary meaning of the Parties' terms, considering the agreement as a whole in its general context. In this case, the evidence shows and it is undisputed that the AA was negotiated in the context of a previous nationalization/expropriation of foreign oil companies in Venezuela in 1975, and government attempts to attract these companies to return to Venezuela to invest in order to assist in the development of the oil industry, in particular in the extra-heavy crude oil in the Orinoco Belt.

598. Here, the Parties' intention, particularly considered in the context of the previous expropriation and the contractual scheme of the AA, including Article 15 and the definition of "*Discriminatory Measures*", was clearly to provide indemnification where expropriation, whether partial or complete, occurred. In the Tribunal's view, good faith interpretation of the AA requires the application of the compensatory provisions of Clause XV in the case of a complete expropriation, as occurred here.

599. Article 15.1 reflects the common intention of the Parties that in the event a Discriminatory Measure occurs, PDVSA-CN is required to assist the Foreign Party (the Claimant, Mobil CN) in reversing or obtaining relief from such Discriminatory Measure and negotiate in good faith the payment of *"compensatory damages and/or possible modifications of the agreement in order to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred."* In the event that PDVSA-CN accepts that the Discriminatory Measure has occurred and that it has a materially adverse impact on the Foreign Party, this obligation applies directly. In the event PDVSA-CN does not concur and give the Foreign Party notice of its concurrence within 90 days following receipt of a notice of Discriminatory Measure, then any party may commence arbitral proceedings in accordance with Article 18.2 of the AA. The scope of any such arbitration includes a determination of whether a Discriminatory Measure has occurred and whether any such measure has had a materially adverse impact on the Foreign Party. If these questions are answered in the affirmative, as in this case, then the Arbitral Tribunal shall award damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered to date by the Foreign Party and make recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received absent the Discriminatory Measure. Article 15.1(c) goes on to provide that in the event that the Discriminatory Measure in question is modified, reversed or ceases to be in effect, the obligation of PDVSA-CN to pay compensation or to cause the agreement to be modified, shall cease, provided that the Foreign Party has been compensated for the damages previously suffered as a result of the Discriminatory Measure. In addition, any payments in excess of the damages suffered as a result of the Discriminatory Measure are to be reimbursed to PDVSA-CN. These provisions reflect the clear intention that PDVSA-CN is responsible for paying compensation to the Claimant in order to compensate it for the damages suffered as a result of a

Discriminatory Measure and to maintain for the Foreign Party the economic benefit originally agreed by the Parties under the AA.

600. Article 15.2 introduces two limitations on PDVSA-CN's obligations under article 15.1. Article 15.2(a) places a limit or cap on the amount payable in compensation by PDVSA-CN in respect of a Discriminatory Measure based on the base price (of US$ 27 per barrel in 1996 dollars) and various defined terms in the AA and the formulas contained the accounting procedures in Annex G to the AA. This limitation does not affect PDVSA-CN's obligation to negotiate (or to agree to) amendments to the AA to restore the economic benefit that the Foreign Party would have received absent the Discriminatory Measure. Article 15.2(b) establishes a link between PDVSA-CN's obligation to compensate a Foreign Party for damages suffered, or to agree to amendments to the Agreement, as a result of any Discriminatory Measure and the interest held by the Venezuelan State in the Project or in PDVSA-CN. In the event the Venezuelan State reduces its direct or indirect interest to less that 12.5% in the Project or less than 49.9% of PDVSA-CN (or other subsidiary to which those interests are transferred), then PDVSA-CN has no obligation to compensate or to agree to amendments of the AA. It is common ground that no such reduction of the Venezuelan State's interest occurred in this case. Nevertheless, it is of some significance that the Parties linked PDVSA-CN's obligations to compensate the Foreign Party and/or negotiate/agree to amendments of the AA, to the Venezuelan State's interest in the Project and PDVSA-CN.

601. In the Tribunal's view, Article 15 imposes an obligation on PDVSA-CN – if the latter concurs that a Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact – to assist the Foreign Party to obtain relief from Discriminatory Measures adopted by the Venezuelan State and to cooperate in the restoration of the economic benefit that the Foreign Party would have received had the Discriminatory Measures not occurred while the Venezuelan State holds the percentage interest in the

Project or PDVSA-CN specified in Article 15.2(b). The only limitation on these obligations, when applicable, is the cap on compensation set out in article 15.2(a).

602. The Respondents argue that the limitation or cap on compensation depends on actual results on a fiscal year by fiscal year basis and cannot apply in the circumstances of this case where the AA has been extinguished and the formulas set out in the accounting procedures cannot be applied. The Tribunal is unable to accept this narrow interpretation of the intention of the Parties as reflected in Clause XV of the AA. Article 15.2(a) places a limit on the amount of compensation payable by PDVSA-CN in certain circumstances and, in doing so, refers to the Base Price of oil in any fiscal year and refers to defined terms and the accounting procedures which refer to cash flow and actual results achieved in specific fiscal years. These provisions appear to have as their primary focus Discriminatory Measures which could affect the concession subject of the AA on an ongoing basis and permit the application of the formula contained in the accounting procedures and the calculation of the limitation on compensation on a fiscal year basis in circumstances in which the concession and the AA continue to operate. However, this does not preclude the payment of compensation in the case of the termination and extinguishment of the AA and a complete seizure or expropriation of the Claimant's interest under the Agreement.

603. The basic obligation upon PDVSA-CN pursuant to Article 15.1 is the payment of compensatory damages and/or the possible modification of the AA in order to restore the economic benefit that the Foreign Party would have received absent the Discriminatory Measure. Pursuant to Article 15.1(b), an arbitral tribunal has the power to issue an award for compensatory damages, subject to any limitations contained elsewhere in the Agreement and the formulas in the accounting procedures. Further, the Tribunal has the authority to recommend amendments to the agreement that would restore the benefit the foreign party would have received had the

Discriminatory Measure not occurred. This reflects the intention to permit the Foreign Party to recover the portion of the injury or damages not remedied by an award because of the limitations contained in Article 15.2(a) and is also forward looking in that it addresses the future effect of the Discriminatory Measure by authorizing recommendations on amendments to the AA. The provisions of Articles 15.1(a) and (b) contemplate an ongoing concession and a duty to cooperate and negotiate to maintain the benefit that the Foreign Party (the Claimant) would have received during the course of the AA had the Discriminatory Measures not occurred. These requirements and the Tribunal's power to make recommendations to restore the economic benefit of the Foreign Party are relevant for both additional compensation in any given fiscal year which might not be remedied by an arbitral award because of the limitation placed on compensation in Article 15.2(a) and for future fiscal years during the term of the AA. While Article 15.1(b) provides that a party may only initiate one arbitration proceeding per calendar year, which is consistent with assessment of indemnification on an annual basis in an ongoing concession and agreement, an arbitration may be commenced in the following year in the event that negotiations between the Parties are not successful or recommendations by the Tribunal under Article 15.1(b) are not adopted by the Parties.

604. In the Tribunal's view, these provisions foresee an ongoing concession and intention to maintain the economic benefit of the Foreign Party for the duration of the AA within the limitations contained in that Agreement. In the event of a termination of the contract and the seizure of all of the Claimant's interest, the application of the limitation contained in Article 15.2(a) is made more difficult and the Arbitral Tribunal's authority to make recommendations on amendments to the AA that would restore the economic benefit to the Foreign Party absent the Discriminatory Measure is defeated. In the Tribunal's view, it would not be consistent with the intention of the Parties to prevent the Claimant from recovering any

compensation due to the nature of the Discriminatory Measure and the ensuing difficulty in applying the limitation contained in Article 15.2(a).

605. The Tribunal is unable to accept the Respondents' interpretation of what they say is the very limited scope of an arbitration pursuant to Article 15.1(b) of the AA. In this regard, the Tribunal notes that the arbitration clause contained in article 18.2 is very broad. Further, Article 15.1(b), in referring to arbitration pursuant to article 18.2, states that the arbitration proceedings "*shall include*" a determination as to whether a qualifying Discriminatory Measure has occurred and, if so, an award to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the agreement that would restore the economic benefit to the Foreign Party. Neither article contains any express exclusion or limitation on the granting of a remedy for the future. Indeed, the express language of Article 15.1(b) contemplates the jurisdiction of the Arbitral Tribunal to recommend modifications to the agreement to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. In addition, Article 15.2(b) seems to imply that PDVSA-CN may have some obligation to agree to the Tribunal's recommendations while the Venezuelan State maintains the requisite holdings on the Project and/or PDVSA-CN.

606. Further, the Tribunal is not persuaded that the authority to award compensation to the Foreign Party is limited to the "*economic consequences*" suffered "*to date*" in the sense that only those economic consequences suffered and reflected in actual figures for a fiscal year and suffered "*to date*" can be compensated. While the English translation of article 15.1(b) may be, to some extent ambiguous in this regard, the official Spanish version of the relevant part of the article is clear. The words "*suffered by it to date*" ("*sufrida por ella hasta la fecha*"), refers to "*Discriminatory Measure*" ("*Medida Discriminatoria*") and not to

*"economic consequences"* (*"consecuencias económicas"*). This emerges clearly from the Claimant's analysis of the Spanish text of the AA. In this case, the Discriminatory Measure at issue, the expropriation of the Claimant's interest in the Project, had clearly occurred or been suffered by both the date on which the Claimant requested indemnification and the date on which it requested arbitration. Further, and in any event, in the case of the complete seizure or expropriation of the Claimant's interest in the project, it is logical to conclude that the economic consequences were suffered at the time of the expropriation. The evidence clearly established that the Claimant would earn nothing from the Project in the future and there is no need to wait to confirm this.

607. The Claimant argues that if the limitation in Article 15.2(a) does not apply, or the formulas are impossible to implement in the case of a complete seizure or expropriation of the Foreign Party's entire interest in the Project, then the Tribunal's powers are those granted by the general arbitration clause contained in Article 18.2 and by the general principles of Venezuelan law which require full indemnification for breach of a contractual obligation. In certain regards, this argument has some appeal since the Discriminatory Measure in this case has deprived the Claimant of any **Net Cash Flow** in the future. Nevertheless, in the Tribunal's view, the basic formula contained in Section VII of the accounting procedures can properly apply in the absence of a Net Cash Flow and respect the Parties' intention to apply a limitation on compensation payable pursuant to the indemnification formula when the price of oil meets the conditions described in Article 15.2(a).

608. The indemnity provisions of the AA reflect an intention to ensure that in the event of Discriminatory Measures, the Foreign Party will receive cash flow calculated pursuant to the **Reference Cash Flow** Formula. The history of the Project and the profits it generated, as well as the world price of oil at the relevant times, indicate that using the **Reference (Threshold) Cash**

**Flow** in these circumstances would be consistent with this intention and reasonable on the facts. The calculation of a limitation on compensation on the basis of the difference between a **Reference (Threshold) Cash Flow** and **Adjusted Cash Flow** of zero is consistent with the intention of the Parties. As discussed below in addressing quantum, in circumstances where the Discriminatory Measure deprives the Claimant of any future cash flow, the limitation on indemnification contained in Article 15.2 can properly apply in a manner consistent with the intention of the Parties.

609. In reaching this conclusion, the Tribunal is not deciding in equity or *ex aequo at bono*. Rather, the Tribunal's conclusion is the result of the interpretation of the AA pursuant to the rules of contractual interpretation of Venezuelan law, which include the interpretation of contracts in good faith and the obligation to perform contracts in good faith. The interpretation resulting from these principles applies the common intention of the Parties to provide a basic level of compensation in the event of the occurrence of the Discriminatory Measures found to have occurred in this case.

610. Therefore, this Tribunal concludes that it has jurisdiction to award compensation according to Article 15 of the AA, whether related to past fiscal years or the balance of the term of the AA as originally agreed by the Parties.

## K.VII.2.     Calculation of Indemnity for FY 2007

611. Pursuant to Claimant's suggestion in **Claimant's Reply Memorial**, the term **Reference (Threshold) Cash Flow** will be used in this Award to describe what Claimant has referred to as **Reference Cash Flow** and what Respondents have referred to as **Threshold Cash Flow**. (C-IV ¶ 120). The term **Base (Threshold) Price** shall describe what Claimant had referred to as **Base Price** and Respondents have referred to as **Threshold Price**. (C-IV n. 306).

### K.VII.2.a. Arguments by Claimant

612. Claimant stated that, going back three and a half years from June 2010, the Discriminatory Measures have reduced Mobil CN's cash flows by nearly US$ 2 billion – US$ 425 million of which are from 2007 alone. (C. Closing Slide 23). Claimant argues that it is entitled to a net indemnity in the amount of approximately US$ 80.5 million for FY 2007, subject to updating at the time of the Award. (C-Ill ¶¶ 260, 309). This amount is based on the Graves-A&M Report (calculations shown below) stating that the gross indemnity amounted to US$ 177 million, less a US$ 96 million credit representing Respondents' interest in the ten shipments of SCO sent for Claimant's account after 26 June 2007. (C-Ill ¶¶ 260, 309). Claimant did not discuss the US$ 96 million credit during its closing argument.

613. Claimant explains that Annex G provides a two-step procedure for determining the indemnity. (C-Ill ¶¶ 261, 265 – 296; C-IV ¶ 119). *The first step* involves determining the amount of the indemnity payable to Claimant, which *"is equal to the difference between (i) the Net Cash Flow that Mobil CN would have received during the relevant period if the Discriminatory Measure(s) had not occurred (to be referred to as the But-For Net Cash Flow) and (ii) the Net Cash Flow that Mobil CN actually received during that period, after taking into account the impact of the Discriminatory Measure(s)."*

614. *The second step* serves to limit the amount of the indemnity.

> Section 15.2 of the AA and Annex G contain (i) limitations aimed at avoiding indemnification for *de minimis* impacts of less than 5% of the party's Net Cash Flow; and (ii) limitations related to increases in the price of oil and a hypothetical cash flow based on the **Base (Threshold) Price**. The second limitation comes into play when the "Price of Brent Crude" has exceeded a "**Base (Threshold) Price**" of US$27 per barrel (measured in 1996 Dollars) for a six-month period after execution of the Agreement and requires a comparison between a **Reference (Threshold) Cash Flow** and the Net Cash Flow actually received by Claimant in the relevant period. (C-III ¶¶ 268, 273, partially quoted, footnotes omitted).

615. Claimant contends that the amount of compensation payable to Claimant is the difference between **Reference (Threshold) Cash Flow** and **Adjusted Net Cash Flow**. The terms **Net Cash Flow** (defined by Article 7.1 of Annex G), **Adjusted Net Cash Flow** (defined by Article 7.2), and **Reference (Threshold) Cash Flow** (defined by Article 7.3) depend on retrospective data, and, in the event of an expropriation, on the latest available retrospective data. (C-III ¶ 275).

616. Claimant explains that the **Net Cash Flow** "*is determined by subtracting, from [Claimant's] share of the total gross revenues from the Project, [Claimant's] share of the royalties, chargeable capital and operating expenditures, and income taxes paid.*" (C-III ¶ 278):

> The **Net Cash Flow** of a Party for a given FY (as measured based on the Dollar Accounts) shall be determined as follows:
>
> **R – ROY – CEX – IT**[,] [w]here:
>
> **R**= total liftings during such FY <u>multiplied</u> by the Price Formula applicable to such Production, <u>plus</u> Joint Revenues received during such FY
>
> **ROY**= the actual Royalty paid by a Party or on behalf of and for the account of a Party during such FY [paid to the Government (C-III ¶ 281).]
>
> **CEX**= the Party's pro rata share of actual Chargeable Expenditures for such FY
>
> **IT**= the Party's pro rata share of Income Taxes paid with respect to such FY. (C-III ¶ 278; C-87 Annex G Article 7.1).

617. Claimant argues that **R** is equal to the revenues for Claimant's share of the oil production using the formula price set forth in the <u>**Oil Supply Agreement**</u> and Joint Revenues from the sale of by-products. (C-III ¶ 279-280).

618. The **Adjusted Net Cash Flow** is "*determined by making an adjustment to Mobil CN's Net Cash Flow to address the possibility that the Formula Price for SCO no longer bears the same relationship to the price for the specified benchmark crude oil (Brent) as the relationship between them that prevailed at the time of 'initial Production' from the Project.*" (C-III ¶¶ 283-

284). For 2007, this has the effect of reducing the indemnification. (C-III ¶ 286). Claimant asserts that, for the **Adjusted Net Cash Flow**, the Parties selected the **Price of Brent Crude Oil**, and not the **Chalmette Formula Price**, as the benchmark to determine whether global oil prices had reached a point at which the limitations of Annex G would enter into force. (C-IV ¶ 143).

619. Claimant insists that neither Annex G, Article 7.2, nor the Parties' intent support the Respondents' conclusion that "**the [Chalmette] Formula Price** used in the **Net Cash Flow** formula must be adjusted upward to a Brent-equivalent price to derive **Adjusted Net Cash Flow**." (C-IV ¶ 140). Claimant explains:

> The parties knew in 1997 that SCO would be priced lower than Brent crude oil. Accordingly, if the parties had meant to include a special price adjustment in the limitation on indemnification solely to take account of this price differential, they could have done so. If the parties had intended Section 7.2 to mean what the Respondents contend it means, it would read as follows: "The **Adjusted Net Cash Flow** of a Party for a given FY (as measured by the Dollar Accounts) shall be equal to the **Net Cash Flow** for a Party for such FY, calculated on the basis of the applicable **[Chalmette] Formula Price**, *which shall be equal to the Price of Brent Crude Oil.*" But Section 7.2 does not read that way. More particularly, if the parties had intended to replace the **Chalmette Formula Price** by the "Price of Brent Crude Oil," which is a term defined in the AA, they would have used that defined term. (C-IV ¶ 141, emphasis in original).

620. Claimant further states that, other than arbitrarily reducing the amount of indemnification, there is no discernible reason for adjusting the **Chalmette Formula Price** revenues from the Project upward to much higher "*Brent-equivalent*" revenues. (C-IV ¶ 142).

621. Claimant disagrees with Respondents' interpretation of Article 7.2 because it does not give effect to the phrase "*such initial Production.*" (C-IV ¶ 144).

622. Claimant maintains that the **Reference (Threshold) Cash Flow** "*is an estimate of the hypothetical Net Cash Flow that Mobil CN would receive, absent any Discriminatory Measure, if the oil production from the Project were deemed to have the stipulated value assigned to it by the Parties using a defined **Base (Threshold) Price**.*" (C-III ¶ 287). The **Reference**

(Threshold) Cash Flow is calculated by applying a **Base (Threshold) Price** of US$ 27 per barrel (in 1996 Dollars), escalated for inflation as of the date of breach: **25 September 2007**. This adjusted **Base (Threshold) Price** is US$ 34.38 per barrel. (C-III ¶¶ 289-290). This adjusted **Base (Threshold) Price** acts as a uniform ceiling on the **Reference (Threshold) Cash Flow** because it is independent of fluctuations in market prices. (C-IV ¶¶ 124, 133). <u>Reference (Threshold) Cash Flow</u> is calculated as follows:

> The <u>**Reference [(Threshold)] Cash Flow**</u> of a Party for a given FY (as measured based on the Dollar Accounts) shall be determined as follows:
>
> **TR - TROY - CEX - TIT**[,] [w]here:
>
> **TR**= total liftings during such time period, <u>multiplied</u> by the Base Price, <u>plus</u> Joint Revenues received during such FY. [Threshold Revenues]
>
> **TROY**= the Royalty that would have been paid by a Party during such FY, absent the alleged Discriminatory Action.
>
> **CEX**= the Party's pro rata share of the actual Chargeable Expenditures for such FY, absent the alleged Discriminatory Action.
>
> **TIT**= the Party's pro rata share of Income Taxes that would have been paid with respect to such FY, absent the alleged Discriminatory Action. (C-III 287, C-87 Annex G Section 7.3, footnotes omitted).

623. The **CEX**, unlike the **TROY** and **TIT**, is not related to revenues (C-IV ¶ 128). Claimant argues that *"the amount **CEX** should be determined by reference to the jointly approved capital expense and operating expense budget for FY 2007"* because the definition of **CEX** in the AA indicates the Parties' expectation that both Mobil CN and PDVSA-CN would have participated in planning the budget for **CEX** and approving actual expenditures. FY 2007 is the last FY for which such circumstances existed. As a result, calculations for all FYs should be made with reference to the jointly approved capital expense and operating expense budget for FY 2007. (C-III ¶ 293, partially quoted).

624. Using the *"actual"* expenditures would not appropriately capture the operating and capital expenditures *"absent the alleged Discriminatory Measure"*, as required by Article 7.3 of the Accounting Procedures. (C-217 Graves at p. 12).

625. The deviations from the 2007 budget are explained by the takeover of the Project by PDVSA at the end of April 2007 and the disruptions related to that rapid transition. (C-IV ¶ 159). This is confirmed by the history of the Project. During FYs 2002 – 2006, the budgeting of the Project was accurate when compared to the actual expenses for the Project. (C-IV ¶ 157, Graves at pp. 14 – 15). The 2007 deviations were not – as Respondents argue – a result of an unrealistic budget for FY 2007 expenses. (C-IV ¶ 159). In response to Respondents' argument that the budget was unreasonably low as compared to prior years, Claimant's witness, Mr. Lawless, explains that the 2007 operating budget did not contain projected turnaround expenses, as did the budgets for FYs 2005 and 2006. The reason for this is that no turnaround was planned for FY 2007, making the budget understandably lower. (C-213, Lawless at ¶ 8).

626. Claimant also puts forth a *"fairness and necessity"* argument for using the 2007 budgeted expenses. After **27 June 2007**, Claimant was afforded no access to records or other evidence of costs, thus making it necessary to calculate the *CEX* using the only data available: the 2007 budget. (C-IV ¶¶ 156-157). This approach was reasonable, according to the Claimant, in light of the fact that the Project's actual expenditures were historically consistently close to their budgeted expenditures. (C-IV ¶ 157).

627. Claimant argues that the *TROY* and *TIT*, unlike the *CEX*, are to be determined using hypothetical or counterfactual results, and that the word *"actual"* does not appear in their definition. (C-IV ¶¶ 124-126). The *TROY* and *TIT* definitions use the subjective mood – further supporting Claimant's arguments that they are to be determined by hypothetical or counterfactual, rather than *"actual"* facts. (C-IV ¶ 129). Claimant explains:

> The prefix *"T-"* added to all of the variables in the **Reference (Threshold) Cash Flow** formula other than *CEX* confirms that they are based upon the scenario in which the **Base (Threshold) Price** is employed to determine the variable *TR* (*Threshold Revenues*). Contrary to the Respondents' contention that *TROY*, *TIT*, and *CEX* should all be calculated on the same basis (actual Project revenues), the prefixes in Section 7.3 distinguish *TROY* and *TIT* from

*CEX*. If the Parties had intended for **Reference (Threshold) Cash Flow** royalties and income taxes to be based upon actual Project revenues, they could have repeated the variables *ROY* and *IT* used in Section 7.1, as they did with the variable *CEX*. Instead, Section 7.3 uses *TROY* (*Threshold Royalties*) and *TIT* (*Threshold Income Taxes*) to signify their relationship to the variable *TR* (*Threshold Revenues*). (C-IV ¶ 127).

628. Here, *"[t]he amount **TR (Threshold Revenues)** represents Mobil CN's share of the gross revenues from the Project under the hypothetical scenario used to construct the **Reference (Threshold) Cash Flow**. As in the case of **R**, the amount **TR** is the sum of two (in this case hypothetical) revenue amounts: (i) gross revenues for Mobil CN's share of the oil production from the Project assuming the stipulated **Base Price [US$34.38]** and (ii) 'Joint Revenues' from by-products."* (C-III ¶ 288, footnotes omitted).

629. To determine the *TROY*, Claimant advocates using the 1% royalty rate allowed under the **RRA** rather than the rate of 16 2/3%. Claimant maintains that the higher rate constitutes a Discriminatory Measure. (C-III ¶ 291; C-IV ¶¶ 150-155). Claimant's expert calculated the per barrel royalty rate as follows:

> Before the expropriation or seizure of Mobil CN's interests in the Project, royalties for EHO production from the Project were calculated by applying the royalty rate to a value specified by the Government for those barrels. After examining the historical relationship in 2007 between the Formula Price for SCO generated from Cerro Negro EHO and the value for such EHO on which the Government based royalty obligations, Graves-A&M determined that EHO was valued at 94% of the Formula Price for royalty purposes. (C-III ¶ 292).

630. Claimant contends that the *TIT* should be calculated with the income-tax rate of 34% because the imposition of a higher tax rate on such income constituted a Discriminatory Measure. (C-III ¶ 294). The appropriate calculation of the *TIT* under Venezuelan law allows deductions for operating expenses and depreciation, but not for capital expenditures. (C-IV ¶¶ 131, 160-161). Claimant asserts that the discrepancies between Claimant's and Respondents' *TIT* calculations relate to the fact that Respondents prepared their tax analysis according to U.S., rather than Venezuelan, law. (C-IV ¶ 161).

631. Claimant explains its opposition to Respondents' characterization of the *TROY* and the *TIT* in its **Reply Memorial**:

> 134. Under the Respondents' interpretation of **TROY** and **TIT**, the indemnity that the Respondents would owe in the case of expropriation of the Claimant's entire interests would increase as the **Chalmette Formula Price** at the relevant time increases until the **Chalmette Formula Price** equaled the **Base (Threshold) Price** — *but then the indemnity would decrease as the Chalmette Formula Price increases* still further. In other words, the Respondents' interpretation argues for an indemnity that peaks when the **Chalmette Formula Price** equals the **Base (Threshold) Price**, and declines even though the amount of Claimant's lost revenues increases. At a certain **Chalmette Formula Price**, the Respondents' interpretation would deprive Mobil CN of any indemnity — even though Mobil CN would no longer receive its share of revenues from the Project. The Respondents' interpretation of Section 7.3 does not merely impose a ceiling on the indemnity; *it eventually eliminates the indemnity, even as the value of the net cash flow taken from Claimant grows.* (partially quoted, emphasis in original).

> 136. Respondents' interpretations of **TROY** and **TIT** would have similar perverse effects upon the indemnity in the event of impermissible increases in the royalty or income-tax rate and other Discriminatory Measures short of expropriation or seizure of Mobil CN's entire interests. In such circumstances, Mobil CN would continue to receive some revenues based on the market-based **Chalmette Formula Price**. Such revenues would be taken into account in the calculation of **Adjusted Net Cash Flow** under Sections 7.1 and 7.2 of Annex G, not in the calculation of **Reference (Threshold) Cash Flow** under Section 7.3. Because Claimant's Net Cash Flow (and **Adjusted Net Cash Flow**) would increase as the **Chalmette Formula Price** rose, such an increase would reduce the indemnity beneath the limit established by the **Reference (Threshold) Cash Flow**. [...] Under the Respondents' interpretation of Section 7.3 the **Reference (Threshold) Cash Flow** would *also* decrease as the **Chalmette Formula Price** increased. The Respondents' interpretation thus amounts to giving a rising **Chalmette Formula Price** a compounded negative effect: (i) reducing the indemnity ceiling through reduction of the **Reference (Threshold) Cash Flow** while (ii) simultaneously reducing the indemnity by increasing the Net Cash Flow (and **Adjusted Net Cash Flow**). (C-IV ¶¶ 134, 136, partially quoted, emphasis in original).

632. Claimant charges that Respondents' interpretation of the indemnity provisions is contrary to the manifest intent of the Parties.

> The AA (Annex G in particular) shows the Parties' intent that the **Reference (Threshold) Cash Flow** defined by Section 7.3 be calculated as a relatively straightforward notional net cash flow that Mobil CN would have received if (i) the price for each barrel of liftings were equal to the stipulated **Base**

(Threshold) Price, (ii) notional royalties and taxes were proportional to those revenues, and (iii) no Discriminatory Measures had occurred. The **Net Cash Flow** resulting from the hypothetical circumstances of such a **Base (Threshold) Price** scenario represented the amount that PDVSA-CN was willing to pay, and Claimant was willing to accept, as the *quantum* of the contractual indemnity in a high price (*i.e.*, greater than **Base (Threshold) Price**) oil market. (C-IV ¶ 137 footnotes omitted, emphasis in original).

633. Defending its interpretation, Claimant maintains that the indemnity would increase in relation to the **Chalmette Formula Price** until the **Chalmette Formula Price** exceeded the **Base (Threshold) Price**, at which point the indemnity would remain constant. (C-IV ¶ 135).

634. With respect to the indemnity calculations, Claimant alleges that Respondents' calculations for FY 2007 are incorrect for two reasons. *First*, Respondents' experts improperly increase the **Adjusted Net Cash Flow** due to their flawed interpretation of Article 7.2 which allows them to convert the **Chalmette Formula Price** to what they regard as the value equivalent to the value of Brent Crude. *Second*, Respondents' experts improperly reduce the **Reference (Threshold) Cash Flow** by US$ 258 million through their flawed interpretation of Article 7.3. The experts' calculations applied the "*actual*," **Chalmette Formula Price**-based royalties and income taxes that they believe Claimant would have paid during the entire year, but for the expropriation. Claimant contends that Respondents' experts should have applied the **Base (Threshold) Price**-based values required by the *TROY* and *TIT* in their estimates. (C-IV ¶¶ 146-148).

635. Claimant retained Graves-A&M to compute the amount of compensation payable for the FY 2007. Graves-A&M applied the Claimant's interpretation in the above formulas and calculated the amount as follows (C-lll ¶¶ 299 – 309, partially quoted, partially summarized, footnotes omitted, italics in original):

-       Claimant's **But-For Net Cash Flow** and Net Cash Flow for FY 2007 were computed by subtracting, from its share of the Project's total gross revenues, Claimant's share of the royalties, chargeable capital and operating expenditures, and income taxes paid in that FY. Claimant's **But-For Net Cash Flow** was US$607 million and its **Net Cash Flow**

was US$182 million in FY 2007. The difference between the two (US$425 million) exceeds 200%, which is greater than the 5% *de minimis* limitation referred to in Section 7.4 of Annex G.

- The **Reference [(Threshold)] Cash Flow** was US$361 million and the **Adjusted Net Cash Flow** was US$184 million. The difference between the **Reference [(Threshold)] Cash Flow** and the **Adjusted Net Cash Flow** is US$177 million. Graves-A&M determined the hypothetical oil revenue component of TR by multiplying the **Base (Threshold) Price** (US$34.38 per barrel [US$27 per barrel in 1996 Dollars escalated to value at the date of breach]) times the volume of SCO production ("liftings") budgeted for the Project in FY 2007 (108,000 bpd) times Claimant's interest in the Project (41.67%). This calculation determined a hypothetical oil revenue, applying the **Base (Threshold) Price**, of approximately US$565 million. Graves-A&M then determined the hypothetical Joint Revenues (by-product) component of TR (net of royalties) by multiplying the hypothetical oil revenue amount by 2.74%, thus adding approximately US$15 million to bring the amount TR to approximately US$580 million.

- Graves-A&M determined the **TROY** by multiplying the budgeted volume of EHO production for FY 2007 (120,000 bpd) times the **Base (Threshold) Price** times 94% (to establish the value on which royalties would have been assessed), then times either 1% (for revenue until 22 December 2007) or 16 2/3% (for revenue after 22 December 2007).

- Graves-A&M determined the **CEX** using data available at the date of breach – namely, the jointly-approved capital expense and operating expense budget for FY 2007. This amount was approximately US$63 million.

- To determine the **TIT**, Graves-A&M first determined the hypothetical taxable income in the but-for scenario assumed by the **Reference [(Threshold)] Cash Flow**. That hypothetical taxable income consists of the revenue amount TR, minus the royalty expense value TROY, the operating expense component of amount CEX, and the estimated depreciation for FY 2007. Graves-A&M then multiplied the resulting hypothetical taxable income times 34%. This analysis determined a hypothetical income tax expense in the **Reference Threshold)] Cash Flow** scenario of approximately US$148 million.

- Finally, applying the cap of the indemnity which is the lesser of (i) the difference between **But-For Net Cash Flow** and **Net Cash Flow** (US$425 million) and (ii) the difference between the **Reference [(Threshold)] Cash Flow** and **Adjusted Net Cash Flow** (US$177 million), the gross amount of the indemnity owed to Claimant for FY 2007 is US$177 million. This amount is diminished by a credit in favor of PDVSA-CN in the amount of US$96 million for shipments sent for the account of Claimant, making the net indemnity approximately US$80.5 million.

636. In FYs 2005 – 2007, Claimant received net cash flows, despite Discriminatory Measures. Mr. Graves's application of Article 7.5 (and thus

Article 15.2(a)) by offsetting the **Reference (Threshold) Cash Flow** with the **Adjusted Net Cash Flow**, resulted in Claimant being entitled to no indemnity for FY 2005 and 2006, and to a reduced indemnity for FY 2007. This approach, unlike Respondents' use of US$ 19.78 for the Base Price in post-2007 calculations, was faithful to Article 15.2(a). (C-V ¶ 19, partially quoted).

### K.VII.2.b  Arguments by Respondents

637. Respondents contend that, even if the Tribunal were to find for Claimant on the merits and to reject all of Respondents' defenses, Claimant has no claim for an indemnity for FY 2007 due to the formula in the AA which limits liability. (R-II ¶ 130, R-III ¶¶ 141, 175; R-IV ¶¶ 65, 79). Under Article 15.2(a) of the AA and Article 7.5 of the Accounting Procedures, "*any indemnity is capped at the difference between the **Reference (Threshold) Cash Flow** (i.e., what Claimant's cash flow would have been absent the Discriminatory Measure, but imposing a ceiling on revenues based on a price per barrel of US$27 in 1996 dollars) and Claimant's **Adjusted Net Cash Flow**.*" (R-II ¶ 129, footnotes omitted). Respondents claim that it is undisputed that "*no indemnity could possibly be owed with respect to FY 2007 if the **Adjusted Net Cash Flow** exceeds the **Reference (Threshold) Cash Flow.***" (R-III ¶ 175).

638. Respondents state that under Article 15.2(a) of the AA and Articles 7.4 and 7.5 of the Accounting Procedures, "*the determination of the indemnity due under the AA contemplated the calculation of four distinct cash flows: (i) Net Cash Flow, (ii) the **But-For Net Cash Flow** (Net Cash Flow absent the effects of the Discriminatory Measures), (iii) **Adjusted Net Cash Flow**, and (iv) **Reference (Threshold) Cash Flow.***" (R-III ¶ 143).

639. Respondents explain how to calculate the **But-For Net Cash Flow, Adjusted Net Cash Flow**, and **Reference (Threshold) Cash Flow** in the following (R-II ¶ 146; R-III ¶¶ 148-150, partially quoted, underlining in original):

148.  [T]he **But-For Net Cash Flow [R – ROY – CEX – IT]** is a notional cash flow based upon actual results, except that, [...] (a) **ROY** is equal to the Royalty that would have been paid by or on behalf of a Party during such FY, absent the alleged Discriminatory Measure; (b) **CEX** is equal to the Party's pro rata share of actual Chargeable Expenditures for such FY, absent the alleged Discriminatory Measure; and (c) **IT** is equal to the Party's pro rata share of Income Taxes that would have been paid with respect to such FY, absent the alleged Discriminatory Measure. Contrary to Claimant's assertion, this means the amounts that the royalties and taxes would actually have been if there were no Discriminatory Measures, not the amount they would have been in a world in which the sales price of SCO equaled the Base (Threshold) Price and the price of extra-heavy crude oil was 94% of the SCO price.

149.  **Adjusted Net Cash Flow** is a notional cash flow based upon actual results – *i.e.*, actual "liftings," "Joint Revenues received," "the actual Royalty paid," "actual Chargeable Expenses," and "the Party's pro rata share of Income Taxes paid" – except that liftings are multiplied by the Formula Price adjusted upward to its Brent-equivalent. **Adjusted Net Cash Flow**, like **Net Cash Flow**, account for the effects of the Discriminatory Measures.

150   **Reference (Threshold) Cash Flow [TR - TROY - CEX – TIT]** is an "estimated cash flow <u>assuming a Price of Brent Crude Oil equivalent to the Base (Threshold) Price</u>," as calculated in accordance with Section 7.3 of the Accounting Procedures and eliminating the effects of the Discriminatory Measures. The revenues in the **Reference (Threshold) Cash Flow** formula are based upon an assumed Brent price applied to actual liftings plus Joint Revenues actually received, and (a) **TROY** is equal to the "Royalties that would have been paid by or on behalf of a Party during such FY, absent the alleged Discriminatory Measure"; (b) **CEX** is equal to "the Party's pro rata share of actual Chargeable Expenditures for such FY, absent the alleged Discriminatory Measures," and (c) **TIT** is equal to "the Party's pro rata share of Income Taxes that would have been paid with respect to such FY, absent the alleged Discriminatory Measure." [Unlike in the formula to calculate **But-For Cash Flow**, the **Reference (Threshold) Cash Flow** formula requires that the **Base (Threshold) Price** be used in place of the actual sales price under the **Chalmette Formula Price**. (R-II 146)].

640. Nothing in the **Reference (Threshold) Cash Flow** formula contemplates using a budget, an estimate, or a projection of any kind, for the future. (R-IV ¶ 58). Respondents highlight difficulties that occur when attempting to apply the decidedly backward looking indemnity provisions to forward looking events:

51.  The term "*TR*" in the **Reference (Threshold) Cash Flow** formula is defined as total lifting during the Fiscal Year, multiplied by the Threshold Price, plus Joint Revenues received during the Fiscal Year. It is not possible now to know either what the Threshold Price would be

or what the liftings or actual Joint Revenues would be for each of the next 27.5 years, as the formula contains no guidance whatsoever as to what assumptions should be made for inflation, liftings or Joint Revenues for the future. To overcome this basic point, Claimant assumes for 2007 and for every year thereafter that the Project will produce 120,000 barrels per day ("BPD") of extra-heavy crude oil and will convert those volumes into 108,000 BPD of SCO. This unrealistic assumption is based upon the budget for 2007 that was prepared in November 2006 but the hearing established that the assumption was not even valid for 2007, a year in which production was far lower than the budget due to the large number of inactive wells at the field and repairs to the coker drums. Even a pro rata implementation of the production curtailments in 2007 would have reduced production by approximately 7,000 BPD. In future years, events similarly affecting production are likely. Claimant's assumption that production shortfalls can be made up over time ignores the Government's limit of 120,000 BPD on EHO production (on a monthly average basis), a limit that is not claimed as a Discriminatory Measure. (R-IV ¶ 51).

52. It is also not possible now to determine what the royalty or income taxes would be in a future Fiscal Year, as royalties are dependent on both the volume and value of extra-heavy crude oil produced and taxes are dependent upon revenues and deductible costs, all of which are unknown. Also unknown, yet inappropriately assumed by Claimant, are whether non-discriminatory measures regarding either royalties or taxes might have been taken in the future. There is simply no basis for assuming a fixed royalty or tax rate for the next 27.5 years, as Claimant's experts were instructed to do so. (R-IV ¶ 52).

641. Respondents argue that "*an application of the Reference (Threshold) Cash Flow formula as written, rather than as Claimant would have it rewritten, yields a Reference (Threshold) Cash Flow of US$103.2 million, whereas the calculation of the Adjusted Net Cash Flow as written and as required by the entire structure of the AA and its indemnity provisions reviewed above, yields US$196.2 million.*" (R-III ¶ 175). Because the **Adjusted Net Cash Flow** (US$ 196.2 million) is greater than the **Reference (Threshold) Cash Flow** (US$ 103.2 million), no indemnity is owed to Claimant for FY 2007.

642. Respondents calculated the **Reference (Threshold) Cash Flow** using the same equation as presented by Claimant above (TR - TROY - CEX – TIT = Reference (Threshold) Cash Flow):

(i) taking the total liftings during the year (14.1 million barrels), multiplying by the **Base (Threshold) Price** (US$34.47 per barrel for

FY 2007) and adding Joint Revenues received during the FY (US$17.6 million), to determine 'TR' (US$504.9 million);

(ii) subtracting **TROY**, the royalty that would have been paid during FY 2007 absent the alleged Discriminatory Measure (US$133.4 million);

(iii) subtracting **CEX**, Claimant's pro rata share of actual Chargeable Expenditures for FY 2007 absent the alleged Discriminatory Measure (US$74.6 million); and

(iv) subtracting **TIT**, the income taxes that Claimant would have paid for FY 2007 absent the alleged Discriminatory Measure (US$193.6 million). (R-II ¶ 132, partially quoted, footnotes omitted).

643. Respondents calculate the **Adjusted Net Cash Flow** in the same manner as the **Net Cash Flow**, except that liftings are multiplied by the Formula Price adjusted upward to its Brent-equivalent, and present the formula as well as its results:

138. A calculation of Claimant's **Adjusted Net Cash Flow** for FY 2007, applying the formula for **Net Cash Flow [R – ROY – CEX – IT]** [,] but adjusting the Formula Price for the quality and transportation differentials with Brent crude oil, yields the result of US$196.2 million for FY 2007. This result is calculated as follows:

(i) taking the total liftings by Claimant during the FY (only 5.54 million barrels of oil because Claimant ceased participating in the project on 26 June 2007), multiplying by the Formula Price for the upgraded crude oil as adjusted for the aforementioned quality and transportation differentials (US$60.95 per barrel) and adding Joint Revenues received during FY 2007 (US$8.2 million), to determine 'R' (US$346.1 million);

(ii) subtracting **ROY**, the royalty actually paid by Claimant during FY 2007 (US$92.5 million);

(iii) subtracting **CEX**, Claimant's actual Chargeable Expenditures paid during FY 2007 (US$32.7 million); and

(iv) subtracting further **IT**, the income taxes actually paid by Claimant for FY 2007 (US$24.6 million). (R-II ¶ 138).

644. Respondents explain that, under <u>Article 15.2(a) Limitation on Liability and Adjustment for Quality</u>, the maximum protected cash flow was based on an SCO price of US$ 19.78. Respondents arrive at the US$ 19.78 by using the agreed Brent/SCO differential where SCO is approximately 73% of the price of Brent. Thus, where Brent is US$ 27, SCO will be 73% of that amount: US$ 19.78. All additional profits could be taken by the

Government, as those would be deemed "*extraordinary profits.*" (R-IV ¶ 62; R-V ¶ 31).

645. Respondents present counter-arguments to Claimant's interpretations of the terms as follows (R-II ¶¶ 140 – 145; R-III ¶¶ 164, 168; R-IV ¶¶ 63 – 64, partially quoted):

- Claimant presents an unfounded interpretation of the term "**Adjusted Net Cash Flow**" and attempts to read out of the **Reference (Threshold) Cash Flow** formula all words requiring the use of "actual" figures or amounts that "would have been paid absent the alleged Discriminatory Measure" in favor of invented concepts such as amounts that might have been paid under a hypothetical market scenario.

- Claimant's misapplication of the terms "**Adjusted Net Cash Flow**" and the concept of "differentials" led Claimant to assert that the formula at Section 7.3 calls for subtracting "notional expense amounts from a hypothetical revenue amount." The term "differential" is widely used in the international petroleum industry to refer to a difference in price between one crude oil and another. The AA does not refer to changes in differentials from one period to another as Claimant alleges. Rather, it refers to the adjustment of the price "for quality and transportation differences" with Brent crude oil. This adjustment was necessary in order to account for the substantial difference in quality between Brent crude oil - a light crude oil with a gravity of 38° API - and the much heavier upgraded Cerro Negro crude oil, with a gravity of 16° API. If this were not done, the entire purpose of the limitation of liability, which was triggered when Brent crude oil reached a price of US$27 per barrel in 1996 dollars, would be defeated. Unless the **Net Cash Flow** were adjusted upward to take account of the differential between upgraded Cerro Negro crude oil and Brent crude oil, the ceiling on liability would be artificially increased.

- Claimant's interpretation of **Adjusted Net Cash Flow** completely ignores the text of this provision, which clearly calls for an adjustment of the actual **Net Cash Flow** to a Brent-equivalent cash flow to be properly compared with the **Reference (Threshold) Cash Flow**. According to the plain language of the provision, if the Foreign Party receives income <u>commensurate,</u> when adjusted for the quality and transportation differential with Brent crude oil, with the **Reference (Threshold) Cash Flow**, no indemnity would be owed.

63. [...]. The terms of Section 15.2(a) clearly required an adjustment of the Net Cash Flow (calculated on the basis of an SCO price equal to the Formula Price under the Chalmette Offtake Agreement) to account for the quality differential between SCO and Brent, so that the Net Cash Flow, as so adjusted (*i.e.*, "the Adjusted Net Cash Flow"), could be compared on an apples-to-apples basis with the Threshold Cash Flow calculated on the basis of the Price of Brent Crude Oil equal to the Threshold Price. This means that in an ongoing contractual

relationship, which Claimant's experts testified is what the indemnity provisions contemplated, the maximum protected cash flow was a cash flow based on an SCO price of US$19.78.

64.    By arguing that the indemnity calls for comparison of a cash flow of zero with a Threshold Cash Flow calculated on the basis of an SCO price equal to the Threshold Price, Claimant is in effect seeking to expand the maximum protected cash flow from one based on a US$19.78 SCO price to one based on a US$27 SCO price. Under Claimant's theory, it would actually be better off out of the Agreement than in. Claimant's argument cannot be made without completely ignoring both Section 15.2(a) and the definition of Threshold Cash Flow in the body of the AA, which is precisely what Claimant has done throughout this case. Its experts barely mentioned either provision in their affidavits and at the hearing they stated that Section 15.2(a), the basic limitation provision in the Agreement, was irrelevant to their calculations. That position cannot be reconciled with the concept of limitation embodied in Section 15.2(a) and the fact that the maximum protected cash flow under the Agreement was based on a US$19.78 SCO price (in 1996 dollars). (R-IV ¶ 64; R-V ¶ 31).

646. For FY 2007, Claimant ignored the essence of the limitation in Article 15.2(a), arguing that the "*adjustment*" referred to in that provision and in Article 7.2 of the Accounting Procedures applied only when there was a change or difference in the Brent/SCO differential. Article 15.2(a), however, requires an adjustment for the Brent/SCO quality differential, not for the difference in the differential. The calculation using the required adjustment results in there being no indemnity owed under the AA for FY 2007, even if the contract had not been extinguished. (R-IV ¶ 65, partially quoted; R-V ¶¶ 31, 32).

647. Finally, Respondents contend that Claimant's "*reasonable business approach*" involves a redrafting of the Accounting Procedures.

160.    The crux of Claimant's "reasonable business" argument is that at very high prices the operation of the formula would eventually eliminate the indemnity because royalties and taxes would be calculated on a high base while revenues would be capped at the **Base (Threshold) Price.** That is correct as a matter of operation of the formula, but the fact that the result in such price scenarios is unfavorable to Claimant, reducing indemnity eventually to zero as the prices continue to rise above the **Base (Threshold) Price,** does not provide Claimant with a license to rewrite the formulas in its favor. (R-III ¶ 160).

648. Respondents assert that Claimant has sought to inflate the **Reference (Threshold) Cash Flow** by misinterpreting the *TROY* and the *CEX* calculations. *First*, Respondents note that Claimant's interpretation of the *TROY* would require a complete rewriting of those provisions such that it would read as follows: "*[t]he Royalty that would have been paid by a Party during such FY if the Formula Price had been equal to the Base (Threshold) Price, calculated based upon a value for the extra-heavy crude oil determined by applying the historical ratio between the value of extra-heavy crude oil and the Formula Price, absent the alleged Discriminatory Measure.*" (R-II ¶¶ 148 – 149, underlining to indicate text Respondents argue would be required under Claimant's interpretation).

649. Second, Claimant's interpretation of the **TIT** would require a rewriting of those provisions to read as follows: "*[t]he Party's estimated pro rata share of Income Taxes which would have been paid with respect to such FY, calculated based upon hypothetical revenues derived from the calculation of TR and using hypothetical deductions for royalties calculated as provided in TROY and hypothetical deductions for operating expenditures based upon the budget for the FY in question, absent the alleged Discriminatory Measure.*" (R-II ¶¶ 153 – 155, underlining to indicate text which Respondents argue would be required under Claimant's interpretation).

650. *Third*, Venezuelan law requires the enforcement of contractual obligations exactly as written – not as Claimant would re-write them. (R-II ¶¶ 150, 151). Respondents, therefore, maintain that the *CEX* formula, as written in Article 7.3 of the Accounting Procedures requires subtraction of actual, rather than budgeted, expenses. Indeed, none of Claimant's witnesses were unable to answer the fact that nothing in the **Threshold Cash Flow** formula contemplates using a budget, rather than the actual expenses. (R-IV ¶ 58).

651. Respondents state that actual and budget expenses rarely coincide in the petroleum industry. Actual expenses in the oil industry have dramatically increased in recent years, as has demand for oil industry materials and

services. These forces have quickly rendered the most meticulously prepared budgets obsolete. (R-II ¶ 152). Even for FY 2006, cited by Claimant as a year where the budgeted and actual expenses coincided, the Project's actual operating costs were US$ 163.3 million, 11.5% higher than the US$ 146.4 million that was budgeted for that year. (R-II ¶ 152).

652. Fourth, Respondents argue that Claimant "*has no legal basis for ignoring the actual facts concerning the costs of operations in its cash flow projections and no basis for imposing its projection of ExxonMobil's operating efficiency on the calculations of future cash flows*" because the provisions of **Decree-Law 5200** relating to control over operations do not constitute a Discriminatory Measure. (R-III ¶ 136).

653. Claimant, however, has not factored in any costs that could result from possible non-discriminatory Government regulations. (R-IV ¶ 57). In addition, Respondents present a list of issues with the 2006 budget and Claimant's cost projections:

(i)    the total disregard of Venezuelan inflation (Claimant's cost expert, Mr. Cline, said he did not even know what Venezuelan inflation was) that, unlike in earlier years, was not (and cannot be assumed in the future to be) offset by currency devaluations, coupled with Claimant's view that inflation could be controlled by accessing the "parallel" currency market or contracting with local vendors in dollars, both of which are illegal;

(ii)    the gross underestimation of capital expenditures (Claimant's Fixed Reference Cash Flow, based upon the 2007 budget prepared in November 2006, uses the absurd amount of US$6 million per year for the life of the Project, thereby ignoring turnaround costs and the enormous capital expenditures necessary to drill wells to offset what Mr. Cline said was the decline in well productivity,

(iii)    the failure to take account of the dramatic, industry-wide increase in the cost of oil services in 2008, when the price of oil hit an all-time high;

(iv)    the failure to appreciate the actual cost of turnarounds in Venezuela, including the turnaround costs for Venezuelan projects like Hamaca (US$230 million in 2009), where Chevron remains a partner; and

(v)   the failure to appreciate the true cost of the hypothetical "put" that Prof. Myers suggested might be purchased to protect against the possibility of the SCO price dropping below the Threshold Price in any future year. (R-IV ¶ 56).

654. Respondents present four calculations, purported to demonstrate the operation of the indemnity provisions and to illustrate "*the exaggerated nature of the claims asserted, even if Claimant's view of the case on the legal issues concerning the migration were to be adopted in toto.*" Nevertheless, Respondents present four alternate calculations to illustrate the operation of the indemnity provisions under various assumptions. (R-III ¶¶ 178 – 182; R-IV ¶ 78, numbers rounded, citations omitted):

> Alternative 1:  using hypothetical royalties and taxes that might have been paid if the sales of SCO were equal to the **Base (Threshold) Price** – which increases the **Reference (Threshold) Cash Flow** in favor of Claimant - and assuming that the royalty measures do not constitute Discriminatory Measures, the 2007 Indemnity is equal to US$12.7 million.

> Alternative 2:  using the identical data as in Alternative 1, except that the income tax increase to 50% does not give rise to an indemnity claim, no indemnity is owed for FY 2007.

> Alternative 3:  using the identical data as in Alternative 2, except that the actual costs for FY 2007 are used, rather than the projected costs based on the 2006 budget, no indemnity is owed for FY 2007.

> Alternative 4:  assuming that all royalty and tax measures are "Discriminatory Measures", but that Reference (Threshold) Cash Flow is calculated using actual data for costs for FY 2007 and that the volumes sold were those pursuant to the curtailment measures, the indemnity owed is equal to US$3.5 million.

## K.VII.2.c.   The Tribunal

655. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 260 – 309 |
| C-IV | ¶¶ | 116 – 161 (Apps. A, B, C) |
| R-II | ¶¶ | 127 – 156, 166 – 167 |
| R-III | ¶¶ | 136 – 137, 141 – 182 |

**Charts:**

| Submission | | Pinpoint |
|---|---|---|
| C-IV | ¶ | 134   Figure 1:   Relationship of FY 2010 Reference (Threshold) Cash Flows to Pro Forma Chalmette Formula Prices Using the Respondents' Interpretation of Section 7.3 |
| | ¶ | 135   Figure 2:   Relationship of Fiscal year 2010 Reference (Threshold) Cash Flows to Pro Forma Chalmette Formula Prices Using Claimant's Interpretation of Section 7.3 |
| | | App. A:   Comparison of Key Terms of Cerro Negro Project and PetroMonagas, S.A. |
| | | App. B (explaining Terms) |
| | | App. C (Annex G 7.1 – 7.4) |
| R-II | ¶ | 140   Calculation of Damages FY 2007 |
| R-III | ¶ | 151   Indemnity Calculation Definitions |
| | ¶ | 179   Calculation Alternative 1 for FY 2007 |
| | ¶ | 180   Calculation Alternative 2 for FY 2007 |
| | ¶ | 181   Calculation Alternative 3 for FY 2007 |
| | ¶ | 182   Calculation Alternative 4 for FY 2007 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Clause 1, Article 15.2(a) |
| C-4 | Annex G (Accounting Procedures) to the Association Agreement Articles 7.1 – 7.5 |
| C-43 | Testimony of Tim Cutt (26 September 2008) ¶ 44 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 29, 31, 97 |
| C-45 | Declaration of Professor Allan R. Brewer-Carías (26 September 2008) at ¶18 |
| C-46 | Expert Report of William B. Cline of Gaffney, Cline & Associates, Inc., "Technical Assessment of the Cerro Negro Contract Area" (26 September 2008) pp. 6, 28, 34 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) pp. 6 – 17 |
| Ex. 2 | 2007 But-For Economic Damages Prior to Limitation (Mobil-CN – 120kbd) |
| Ex. 4b | Price of Brent Crude Oil (1996 Dollars) vs. Base Price [Graph] |
| Ex. 4d | Base Price (Inflation Adjustment Calculation) |
| Ex. 5 | 2004-2006 Damages Calculation |
| Ex. 8a | Comparison of Formula Price to Brent Crude Oil – 9/9/2001 through 9/8/2002 |
| Ex. 8b | Comparison of Formula Price to Brent Crude Oil – 2007 |
| Ex. 9 | Adjusted Formula Price Based on Brent Ratio |
| Ex. 10 | 2007 Damages Payable Calculation (Mobil-CN – 120kbd) |
| App. 2 | Mobil-CN Audited Consolidated Financial Statements for the |

|  |  |
|---|---|
|  | Years Ended 2003 through 2006, together with the Reports of Independent Auditors fn. 2j, 7 |
| App. 3 | Special Report of PriceWaterhouseCoopers About the Application of the Procedures Agreed September 5, 2001 |
| C-48 | Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (28 September 2008) pp. 3, 8, 15, fn. 21 |
| C-50 | Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon ("*Lexecon*"), a Wholly-Owned Subsidiary of FT Consulting, Inc. (26 September 2008) at 11, 12 |
| Figure 4 | Calculation of Fixed Reference Cash Flow |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) at App. C, C-40 |
| C-80 | Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA S.A. to calculate the Royalty under Article 41 of the Hydrocarbons Law ("*Royalty Reduction Agreement*") (29 May 1998) Section 5 |
| C-87 | Association Agreement Clause I1 *defining "Price of Brent Crude Oil"*, *"Base Price"*, *"Production"*, *"Commercial Production"*, *"US Inflation Index"*, *"Development Production"*, Articles 14, 15.1(b), 15.2(a) and Annex G (Accounting Procedures) Articles 1.2, 7.1 – 7.5, |
| C-134 | Venezuelan Civil Code Art. 1273 – 1275 |
| C-141 | Association Oil Supply Agreement (also known as Chalmette Offtake Agreement), Mobil Cerro Negro, Lagoven Cerro Negro, S.A. and Chalmette Refining (1 November 1997) Annex B |
| C-154 | Letter dated 23 June 2005 from Ministry of Energy and Mines to Cerro Negro, Communication # 935 |
| C-213 | Testimony of Brian Lawless (14 May 2009) at ¶¶ 7 – 9, 14, 16 – 18, 26 |
| C-216 | Reply Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon (15 May 2009) at ¶¶ 4 – 6, 18, 20, 37, 39, fn. 16 |
| Figure 1 | Wood Mackenzie, Upstream RADAR Report for ExxonMobil, July 2007 |
| Figure 2 | ExxonMobil Corporation 2008 Financial & Operating Review |
| Figure 6 | Robert Pirog, "CRS Report for Congress: The Role of National Oil Companies in the International Oil Market," Congressional Research Service, August 21, 2007 |
| Figure 7 | Stacy Eller, Petery Hartley, & Kenneth Medlock, "Empirical Evidence on the Operational Efficiency of National Oil Companies," Rice University: The Changing Role of National Oil Companies in International Oil Markets, March 2007 |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) pp. 4 – 7, 12 – 31 |
| App. 1 | Operadora Cerro Negro, S.A. Sample Monthly Reports (December 2005 and December 2006) |
| App. 3 | PDVSA 2004 Form 20F Filing with the U.S. Securities and Exchange Commission [excerpt] |
| C-218 | Reply Expert Report of William B. Cline of Gaffney, Cline & Associates, Inc. (12 May 2009) pp. 6 – 8, 12 – 14 |

| | |
|---|---|
| C-220 | Reply Expert Report of Professor Stewart C. Myers of the Brattle Group (13 May 2009) |
| C-226 | *Phillips Petroleum Co. Iran v. Islamic Republic of Iran*, Award of 29 June 1989, 21 Iran-U.S. C.T.R. 79, 143 (1989) |
| C-232 | JOSÉ MÉLICH-ORSINI, DOCTRINA GENERAL DEL CONTRATO (4th ed. 2006) § 304, at 409 |
| C-260 | Larousse Grammar Spanish Language [*Larousse Gramática Lengua Español*] and Auroch Dictionary [*Diccionario Auroch*] |
| C-310 | Comparison of Claimant and Pulliam/Finizza Basis for Calculation of Reference (Threshold) Cash Flow |
| C-328 | Updated Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon (30 July 2010) |
| C-329 | Updated Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (30 July 2010) |
| R-4 | First Affidavit of Bernard Mommer (11 February 2008) ¶ 10 |
| R-15 | First Affidavit of Hobert Plunkett (21 January 2008) |
| R-32 | A Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 |
| R-35 | Tr. Of 2 December 2008 Hearing pp. 30 – 31, 58-59, 62-63, 141 |
| R-39 | First Affidavit of R. Dean Graves (25 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) |
| R-42 | *The Next Shock?*, THE ECONOMIST, (4 March 1999) |
| R-43 | Congressional Authorization |
| R-93 | Expert Report of Barry Pulliam and Anthony Finizza, Ph.D., Econ One Research, Inc. (16 February 2009) at ¶¶ 14 – 17, 20 – 34, 38, 39, 41 – 61, 88, 102, 121 – 122, fn. 9, 23, 35, 43, 71 |
| App. 8 | Wood Mackenzie, *ExxonMobil, Upstream RADAR Report*, July 2007 |
| App. 9 | Summary Table, Potential Damages for Fiscal Year 2007 Under Section VII of Accounting Procedures |
| R-94 | Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, prepared by Vladimir Brailovsky, Economía Aplicada, S.C., (16 February 2009) at ¶¶ 12 – 19, 21 – 23, 28 – 46, fn. 9, 14, 16, 18, 20 |
| App. 9 | Wood Mackenzie, *ExxonMobil, Upstream RADAR Report*, July 2007 |
| R-95 | Direct Testimony of José Ángel Pereira Ruimwyk (12 February 2009) at ¶¶ 9 – 16, 25, 26, fn. 1, 9, 13 – 15, 24, 25, 27 |
| App. 5 | Petrolera Cerro Negro Board of Directors Meeting, November 2, 2006: Work Plan and Budget 2007 p. 32 |
| R-96 | Letters from Ministry of Energy and Petroleum to Operadora Cerro Negro (8 January 2007, 1 February 2007 and 5 March 2007) |
| R-97 | Howard R. Williams and Charles J. Meyers, MANUAL OF OIL AND GAS TERMS (LexisNexis 13th ed. 2006) |
| R-98 | Expert Report on the Discount Rate to be Applied to Projected Cash Flows Prepared by Vladimir Brailovsky and Louis T. Wells (16 February 2009) at ¶¶ 49, 76 – 77 fn. 33 and Table 7 |
| R-104 | *Exxon Mobil to spend $125 billion on production in next 5 years,* |

| | |
|---|---|
| | DENTON RECORD-CHRONICLE (6 March 2008) |
| R-105 | Jad Mouawad, *Exxon Plans to Lift Output a Million Barrels a Day*, NEW YORK TIMES (8 March 2007) |
| R-112 | Association Agreement Clause 1 *defining "Threshold Cash Flow"*, Article 15.2(a) |
| R-113 | Supplemental Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, Prepared by Vladimir Brailovsky (14 August 2009) at ¶¶ 9 – 19, 26 – 28, Table 2 |
| App. 11 | Calculations of Alternative Scenarios |
| R-114 | Supplemental Brailovsky/Wells Report at ¶¶ 48 – 51, 53, 62 – 76, 79 |
| R-115 | Supplemental Expert Report of Econ One Research, Inc. (14 August 2009) at ¶¶ 11, 13 – 31 |
| R-116 | Supplemental Direct Testimony of José Ángel Pereira Ruimwyk (11 August 2009) ¶¶ 2 – 16, 22 – 32, and n. 8 |
| App. 27 | Organic Labor Law [*Ley Orgánica del Trabajo*] Official Gazette No. 5.152 (Extraordinary), published 19 June 1997, Art. 195 and 207 |
| App. 29 | Law Against Illicit Exchanges [*Ley Contra los Ilícitos Cambiarios*] Official Gazette No. 38.879, published 27 February 2008, Art. 19 |
| R-117 | Bernard Mommer, *Venezuela, Politics and Petroleum* (Cuadernos del Cendes, Year 16, No. 42 September-December 1999) |
| R-124 | Cerro Negro, Confidential Preliminary Information Memorandum, Vol. I, March 1998, p. I-8 |
| R-127 | Annex G (Accounting Procedures) to the Association Agreement Articles 7.1 – 7.5 |

## At and Following the 2010 Hearings:

| Submission | | Pinpoint |
|---|---|---|
| C-V | ¶ | 19 |
| C-VI | ¶¶ | 50 - 51 |
| R-IV | ¶¶ | 50 – 65, 78 – 79 |
| R-V | ¶¶ | 31 - 32 |
| C. Closing | pp. | 21 – 32 |
| C. Closing Slides | | 23, 31 – 34, 36, 41 – 42, 48 |
| R. Closing Slides | | 3 – 4, 65 – 76, 80, 83, 86 |

| Speaker | Citation |
|---|---|
| Brailovsky | 1836-1837 |
| C. Opening | 63 |
| Cline | 1240, 1242-1250, 1266-1268, 1275-1278 |
| Cranmer | 446 |
| Cutt | 691-692 |
| Expert Conf. 1 | 980-1985 |
| Finizza | 1772-1775, 1795-1797 |
| Graves | 1528, 1564, 1568-1572, 1581-1582, 1597-1603, 1606-1608, 1630-1632, 1653-1669, 1671-1672 |
| Hoenmans, | 405, 414-415 |
| Jones | 1335, 1360-1363, 1375-1377, 1408, 1410-1412, |

|          |                                                          |
|----------|----------------------------------------------------------|
|          | 1418, 1419, 1427, 1441-1442, 1449-1450, 1451-1453, 1457-1458 |
| Lawless  | 1188-1189                                                |
| Leitzinger | 1823-1824                                              |
| Myers    | 1695-1698, 1707-1708, 1735, 1737, 1746-1747              |
| Pereira  | 1033-1034, 1037-1040, 1057, 1106-1108                    |
| Plunkett | 796, 836-850                                             |
| R. Opening | 86, 127-131                                            |
| R. Closing | 2158-2165, 2174-2175, 2194                             |
| Ward     | 223-224                                                  |

656. After considering all of the arguments and the evidence submitted, the Tribunal concludes that, by application of the Second Limitation on liability found in Article 7.5 of the Accounting Procedures, an indemnity in the amount of US$ 12.681 million is owed to Claimant for FY 2007. The Tribunal will now identify several points which are directly relevant to this conclusion.

657. *First,* the assessment of the indemnity naturally starts with the text of the AA. Here, although the translations are not identical, the Tribunal is satisfied that there are no material differences between the Parties' translations of Article 15.1(b) and Article 15.2(a) of the AA, found at C-87 and R-112, and provided here.

**Articles 15.1(b) – Consequences of Governmental Actions**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| (b) [...] El ámbito de los procedimientos de arbitraje incluirá: (i) una determinación de si una o más Medidas Discriminatorias se han producido y, si ese es el caso, si dichas medidas han tenido un Impacto Substancialmente Adversos sobre la Parte Extranjera; y (ii) en caso de una respuesta afirmativa a las dos interrogantes planteadas en el punto (i) de este literal, una indemnización por daños para compensar a la | (b) [...] The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if so, whether such measures have had a Materially Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative answer to the two questions specified in clause (i) of this paragraph, an award for damages to compensate the Foreign Party for the economic consequences of the | (b) [...] The scope of the arbitration proceedings shall include: (i) a determination of whether one or more Discriminatory Measures have occurred and, if that is the case, whether such measures have had a Material Adverse Impact on the Foreign Party; and (ii) in the event of an affirmative response to the two questions specified in clause (i) of this paragraph, a payment for damages to compensate the Foreign Party for the economic |

| Parte Extranjera por las consecuencias económicas de la Medida Discriminatoria sufrida por ella hasta la fecha y recomendaciones sobre enmiendas al Convenio que restablecerían el beneficio económico que la Parte Extranjera hubiera recibido si no se hubiera producido la Medida Discriminatoria. | Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. | consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit that the Foreign Party would have received if the Discriminatory Measure had not occurred. |

## Article 15.2(a) – Limitation on Lagoven CN's Obligations

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Limitación de la Obligación de Lagoven CN. | Limitation on Lagoven CN's Obligation. | Limitation on Lagoven CN's Obligation. |
| (a) No obstante lo anterior, después del primer período de seis (6) meses consecutivos durante el cual el Precio del Crudo Brent sobrepase el Precio Base, Lagoven CN no tendrá la obligación de compensar a ninguna Parte Extranjera por Medidas Discriminatorias en relación a cualquier Año Fiscal en que el promedio del Precio del Crudo Brent sobrepase el Precio Base, y dicha Parte Extranjera reciba un Flujo de Caja Neto, después de tomar en cuenta el efecto de la Medida Discriminatoria, cónsono con un precio de referencia por la Producción producida por las Partes que por lo menos guarde una relación razonable, ajustada en cuanto a las diferencias de calidad y transporte, al Flujo de Caja Referencial para ese Año Fiscal. | (a) Notwithstanding the foregoing, after the first period of six (6) consecutive months during which the Price of Brent Crude exceeds the Base Price, Lagoven CN shall not have the obligation to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude exceeds the Base Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties which bears at least a reasonable relationship, adjusted for quality and transportation differences, to the Reference Cash Flow for such Fiscal Year. | (a) Notwithstanding the foregoing, after the first period during which the Price of Brent Crude Oil is in excess of the Threshold Price, Lagoven CN will not be required to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude Oil is in excess of the Threshold Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties that bears at least a reasonable relationship, adjusted for quality and transportation differences, to the Threshold Cash Flow for such Fiscal Year. |

658. Based on the foregoing texts, it is obvious that any decision taken in relation to damages depends on the Tribunal's above conclusions on what measures constitute Discriminatory Measures. Above, the Tribunal has determined

that the expropriation caused by **Decree-Law 5200**, the Income Tax Increase and the production and export curtailments constitute Discriminatory Measures that could lead to a Materially Adverse Impact under Clause I of the AA, whereas the Royalty Measures did not constitute such Discriminatory Measures. The Tribunal need not consider whether each Discriminatory Measure separately resulted in a Materially Adverse Impact. Rather, the aggregate impact of the Discriminatory Measures is relevant.

659. *Second*, the Tribunal finds that, in respect of its application to FY 2007, the Parties have no relevant disagreement as to the use of Article 7.1 of the Annex G Accounting Procedures to determine **Net Cash Flow** or Article 7.2 of the Annex G Accounting Procedures to determine **Adjusted Net Cash Flow**. These sections provide as follows:

**Article 7.1, Net Cash Flow**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Fórmula de Flujo de Caja Neto. | Net Cash Flow Formula. | Net Cash Flow Formula. |
| El Flujo de Caja Neto de una Parte para un Ejercicio Económico dado (según se mida con base en las Cuentas en Dólares) será determinado de la siguiente forma: | The Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be determined as follows: | A Party's Net Cash Flow for a given Fiscal Year (as measured based on the Dollar Accounts) shall be determined as follows: |
| $R - ROY - CEX - IT$ | $R - ROY - CEX - IT$ | $R - ROY - CEX - IT$ |
| Donde: | Where: | Where: |
| R = total de levantamientos durante tal Ejercicio Económico multiplicado por la Fórmula de Precio aplicable a tal Producción, más los Ingresos Conjuntos recibidos durante tal Ejercicio Económico | R = total liftings during such Fiscal Year multiplied by the Price Formula applicable to such Production, plus Joint Revenues received during such Fiscal Year | R = total lifting during such Fiscal Year, multiplied by the Formula Price applicable to such Production, plus Joint Revenues received during such Fiscal Year |
| ROY = la Regalía real pagada por una Parte o en nombre y por cuenta de ésta durante tal Ejercicio Económico | ROY = the actual Royalty paid by a Party or on behalf of and for the account of such Party during such Fiscal Year | ROY = the actual Royalty paid by a Party or on its behalf and for its account during such Fiscal Year |
| CEX = la porción | CEX = the Party's pro rata | CEX = the Party's pro rata |

| | | |
|---|---|---|
| proporcional de Gastos Imputables reales de la Parte para tal Ejercicio Económico. | share of actual Chargeable Expenditures for such Fiscal Year | share of actual Chargeable Expenditures for such Fiscal Year |
| IT = la porción proporcional de la Parte de Impuestos sobre la Renta pagados con respecto a tal Ejercicio Económico | IT = the Party's pro rata share of Income Taxes paid with respect to such Fiscal Year | IT = the Party's pro rata share of Income Taxes paid with respect to such Fiscal Year. |

## Article 7.2, Adjusted Net Cash Flow

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Flujo de Caja Neto Ajustado. | Adjusted Net Cash Flow. | Adjusted Net Cash Flow. |
| El Flujo de Caja Neto Ajustado de una Parte para un Ejercicio Económico dado (según se mida con base en las Cuentas en Dólares) será igual al Flujo de Caja Neto para una Parte para tal Ejercicio Económico, calculado sobre la base de la Fórmula de Precio ajustada aplicable, la cual será igual a la Fórmula de Precio para tal Producción inicial, con los ajustes por diferenciales por transporte y calidad según se compare con el Crudo Brent. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Net Cash Flow for a Party for such Fiscal Year, calculated on the basis of the applicable adjusted Price Formula, which shall be equal to the Price Formula for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Party's Net Cash Flow for such Fiscal Year, calculated on the basis of the applicable adjusted Formula Price, which shall be equal to the Formula Price for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude Oil. |

660. The Tribunal is satisfied that the Parties' translations of these sections have no material differences. In particular, the Tribunal finds that the concepts of **Net Cash Flow** and **Adjusted Net Cash Flow** are identical, except for the price to be used. In the case of the **Net Cash Flow**, the "*Price Formula*" or "*Formula Price*" is the sales price specified in the **Chalmette Supply Contact**. (C-III ¶ 279-280). This is uncontroversial and the Tribunal can, thus, proceed to the next step of determining the indemnity.

661. On this basis, the Tribunal proceeds to determine the indemnity for 2007. The first step for determining the indemnity is found in Article 7.4 of the Annex G Accounting Procedures:

**Article 7.4, Damages Payable**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Daños Pagaderos. | Damages Payable. | Damages Payable. |
| Los daños pagaderos por Lagoven CN a una Parte, de acuerdo con la Sección XV del Convenio, serán equivalentes a lo que exceda a: (i) el monto en que, en ausencia del efecto de la Acción Discriminatoria en cuestión, el Flujo de Caja Neto de tal Parte para un Ejercicio Económico dado hubiese excedido (ii) el Flujo de Caja Neto de tal Parte para tal Ejercicio Económico; en el entendido de que tales daños sólo serán pagaderos si tal exceso es mayor del cinco por ciento (5%) del Flujo de Caja Neto de tal Parte para tal Ejercicio Económico (caso en el cual tales daños serán pagaderos en su totalidad) y tales daños estarán sujetos al límite establecido en la Sección 7.5. | The damages payable by Lagoven CN to a Party, pursuant to Section XV of the Agreement, shall be equal to the excess of: (i) the amount by which, absent the effect of the Discriminatory Action in question, such Party's Net Cash Flow for a given Fiscal Year would have exceeded (ii) such Party's Net Cash Flow for such Fiscal Year; in the understanding that such damages shall be payable only if such excess is greater than five percent (5%) of such Party' Net Cash Flow for such Fiscal Year (in which case such damages will be payable in full) and such damages shall be subject to the limit set forth in Section 7.5. | The damages payable by Lagoven CN to a Party pursuant to Section XV of the Agreement, shall be equal to the excess of: (i) the amount by which, absent the effect of the Discriminatory Measure in question, such Party's Net Cash Flow for a given Fiscal Year would have exceeded (ii) such Party's Net Cash Flow for such Fiscal Year; it being understood that such damages shall be payable only if such excess is greater than five percent (5%) of such Party's Net Cash Flow for such Fiscal Year (in which case such damages will be payable in full) and such damages shall be subject to the limitation set forth in Section 7.5. |

662. The Tribunal regards its first task under Article 7.4 of the Accounting Procedures as being to determine whether, in the aggregate of all of the Discriminatory Measures, there was a 5% difference between the **But-For Cash Flow** (the **Net Cash Flow** absent Discriminatory Measures) and the **Net Cash Flow**. The Parties' calculations resulted in an excess of the **But-For Cash Flow** over the **Net Cash Flow** of greater than the 5% required by Article 7.4 of the Accounting Procedures. (C-49 § IV A; R-93 App. 9). The Tribunal therefore finds that, as to the equations for determining damages

and the process by which damages are to be determined, this first limitation (5% hurdle) of Article 7.4 of the Accounting Procedures has been met.

663. In light of the foregoing, the issue before the Tribunal is which variable inputs are to be used in the equations for the Second Limitation under Article 7.5 of the Annex G Accounting Procedures:

**Article 7.5, Limitation**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Limitación | Limitation[.] | Limitation. |
| El límite de la obligación de compensación de Lagoven CN de acuerdo con la Sección 15.2 (a) del Convenio será el excedente del Umbral de Flujo de Caja de una Parte sobre el Flujo de Caja Neto Ajustado de tal Parte durante el Ejercicio Económico en cuestión. | The limit of Lagoven CN's compensation obligation pursuant to Section 15.2 (a) of the Agreement shall be the excess of the Threshold Cash Flow of a Party over the Adjusted Net Cash Flow of such Party during the Fiscal Year in question. | The limitation on Lagoven CN's compensation obligation pursuant to Section 15.2(a) of the Agreement shall be the excess of the Threshold Cash Flow of a Party over such Party's Adjusted Net Cash Flow during the Fiscal Year in question. |

664. With respect to the second limitation, the Parties' main differences relate to the following issues:

(a) The use of **Actual Data** as opposed to **Budget Data**, specifically with respect to Sales Volumes, Costs, and Depreciation. This issue affects **Reference [Threshold] Cash Flow** calculations; and

(b) The determination of the **Adjusted Formula Price**, which affects the **Adjusted Net Cash Flow** calculations.

665. Turning first to the issue of the **Reference (Threshold) Cash Flow** for FY 2007, the Tribunal first must decide whether the **Reference (Threshold) Cash Flow** formula calls for the subtraction of "*notional expense amounts from a hypothetical revenue amount*", as Claimant contends (C-III ¶ 287), or whether the formula is exactly the same as the "*But-For Net Cash Flow*" formula except that the **Base (Threshold) Price** is used in place of the actual sales price under the **Chalmette Supply Contract** (*i.e.* the "*Formula Price*"), as Respondent argues. (R-II ¶ 146).

666. There is no disagreement between the Parties that **Reference (Threshold) Cash Flow** is calculated under Section 7.3 of the Accounting Procedures

### Article 7.3, Reference (Threshold) Cash Flow

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Formula de Flujo de Caja Referencial. | Reference Cash Flow Formula. | Threshold Cash Flow Formula. |
| El Flujo de Caja Referencial de una Parte para un Ejercicio Económico dado (según se mida con base en la Cuentas en Dólares) será determinado de la siguiente forma: | The Reference Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollars Accounts) shall be determined as follows: | The Threshold Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollars Accounts) shall be determined according to the following formula: |
| TR - TROY - CEX - TIT | TR – TROY – CEX – TIT | TR – TROY – CEX – TIT |
| Donde: | Where: | Where: |
| TR = total de levantamientos durante tal período de tiempo, multiplicado por el Precio Base, más los Ingresos Conjuntos recibidos durante tal Ejercicio Económico. | TR = total liftings during such time period, multiplied by the Base Price, plus Joint Revenues received during such Fiscal Year. | TR = total lifting during such period of time, multiplied by the Threshold Price, plus Joint Revenues received during such Fiscal Year |
| TROY = la Regalía que hubiese sido pagada por una Parte durante tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria. | TROY= the Royalty that would have been paid by a Party during such Fiscal Year, absent the alleged Discriminatory Action. | TROY = the Royalty that would have been paid by a Party during such Fiscal Year, absent the alleged Discriminatory Measure |
| CEX = la porción proporcional de Gastos Imputables reales de la Parte para tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria. | CEX= the Party's pro rata share of actual Chargeable Expenditures for such Fiscal Year, absent the alleged Discriminatory Action. | CEX = the Party's pro rata share of actual Chargeable Expenditures for such Fiscal Year, absent the alleged Discriminatory Measure |
| TIT = la porción proporcional de Impuestos sobre la Renta de la Parte que hubiese sido pagada con respecto a tal Ejercicio Económico, en ausencia de la pretendida Acción Discriminatoria | TIT = the Party's pro rata share of Income Taxes that would have been paid with respect to such Fiscal Year, absent the alleged Discriminatory Action. | TIT = the Party's pro rata share of Income Taxes that would have been paid with respect to such Fiscal Year, absent the alleged Discriminatory Measure. |

667. The Tribunal observes that the **Twentieth Condition of the Congressional Authorization for the Cerro Negro Project**, found at C-11 and R-43 stated (emphasis added):

| VEGÉSIMA | TWENTIETH | TWENTIETH |
|---|---|---|

El Convenio de Asociación incluirá previsiones que permitan la renegociación del Convenio en la forma que sea necesaria para compensar a cualquier Parte distinta de LAGOVEN, en terminus equitativos, por consecuencias economicamente adversas y significativas que surjan de la adopcion de decisiones emanadas de autoridades gubernamentales, o cambios en la legislación, que causen un tralamiento discriminatono a LA ASOCIACION, cualquier entidad o LAS PARTES en su condición de participantes en LA ASOCIACION. Sin embargo, no se considera que una Parte ha sufrido una consequencia enomicamente adversa y significativa como resultado de cualquiera de dichas decisiones o cambios en la legislación, en cualquier momento en que la Parte este recibiendo ingresos de LA ASOCIACION igual a un precio del petróleo crudo por encima de un precio maximo que será especificado en el Convenio de Asociación. De no haber acuerdo entre LAS PARTES, los correspondientes cambios al Convenio de Asociación, asi como la indemnizacion por daños serán determinados a traves de un arbitraje.

The Association Agreement shall include provisions allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, under equitable terms, for economically adverse and significant consequences arising from the adoption of decisions made by governmental authorities or changes in legislation that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered, that the Party has suffered an economically adverse and significant consequence as a result of any of said decisions or changes in legislation at any time when the Party receives income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement. In the absence of agreement among THE PARTIES, the corresponding changes in the Association Agreement, as well as the indemnities for damages shall be determined by way of arbitration.

The Association Agreement shall include provisions allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, on equitable terms, for adverse and significant economic consequences arising from the adoption of decisions made by governmental authorities, or changes in legislation, that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered that a Party has suffered an adverse and significant economic consequence as a result of any of said decisions or changes in legislation, at any time when the Party is receiving income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement, If there is no agreement between THE PARTIES, the corresponding changes to the Association Agreement, as well as the indemnification for damages shall be determined by way of arbitration.

668. This observation leads the Tribunal mechanically to conclude that the purpose of the formula defined by Section 7.3, within the mathematical equation defined by Section 7.5 – the provision implementing a limitation of the indemnity under Section 7.4 -- is to take into account that "*maximum price*" mentioned in the **Twentieth Condition of the Congressional Authorization**: in other words, the **Base (Threshold) Price** specified in

Article 1 of the AA as "*$27 per barrel (in 1996 Dollars).*" The Tribunal notes that there is no disagreement between the Parties that this US$ 27 amount is adjusted – or "*escalated*" – annually for inflation, in accordance with the AA, using the U.S. Inflation Index. Accordingly, the **Base (Threshold) Price** of US$ 27 per barrel is US$ 34.47 per barrel for FY 2007. (C-47 p. 7; R-93 p. 11).

669. Consequently, the Tribunal finds that the **Reference (Threshold) Cash Flow** formula of Section 7.3 is exactly the same as the formula used to calculate the so-called "*But-For Net Cash Flow*", except that, under Section 7.3, the **Base (Threshold) Price** is used in place of the actual sales price specified in the **Chalmette Supply Contract** (that is, the "*Formula Price*").

670. Based on the foregoing findings and observations, the Tribunal decides that application of the **Reference (Threshold) Cash Flow** formula in accordance with its terms yields US$ **236.848 million** as the Reference (Threshold) Cash Flow for Fiscal Year 2007, calculated as follows (R-113 App. 11):

   - taking total liftings during the year (108.000 SCO), multiplied by the Base (Threshold) Price (US$34.47 per barrel for Fiscal Year 2007) and adding Joint Revenues received during the Fiscal Year (US$15.513 million), to determine **TR (US$581.683 million)**;

   - subtracting **TROY**, the royalty (at a rate of 33.33%) that would have been paid during the Fiscal Year 2007 absent the alleged Discriminatory Measure (**US$197.300 million**);

   - subtracting **CEX**, Claimant's pro rata share of budgeted Chargeable Expenditures for Fiscal Year 2007 absent the alleged Discriminatory Measure (**US$62.958 million**); and

   - subtracting **TIT** (at the rate of 34%), the income taxes that Claimant would have paid for Fiscal Year 2007 absent the alleged Discriminatory Measure (**US$84.577 million**).

671. The Tribunal's considerations and conclusions regarding the Adjusted Formula Price are as follows. The definition for "*Adjusted Net Cash Flow*" is found in Article 7.2 of the Accounting Procedures:

**Article 7.2, Adjusted Net Cash Flow**

| Spanish (Original) | Claimant's Translation | Respondents' Translation |
|---|---|---|
| Flujo de Caja Neto Ajustado. | Adjusted Net Cash Flow. | Adjusted Net Cash Flow. |
| El Flujo de Caja Neto Ajustado de una Parte para un Ejercicio Económico dado (según se mida con base en las Cuentas en Dólares) será igual al Flujo de Caja Neto para una Parte para tal Ejercicio Económico, calculado sobre la base de la Fórmula de Precio ajustada aplicable, la cual será igual a la Fórmula de Precio para tal Producción inicial, con los ajustes por diferenciales por transporte y calidad según se compare con el Crudo Brent. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Net Cash Flow for a Party for such Fiscal Year, calculated on the basis of the applicable adjusted Price Formula, which shall be equal to the Price Formula for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude. | The Adjusted Net Cash Flow of a Party for a given Fiscal Year (as measured based on the Dollar Accounts) shall be equal to the Party's Net Cash Flow for such Fiscal Year, calculated on the basis of the applicable adjusted Formula Price, which shall be equal to the Formula Price for such initial Production, adjusted for transportation and quality differentials as compared to Brent Crude Oil. |

672. On this basis, the Tribunal is required to decide whether the **Adjusted Net Cash Flow** formula calls for adjusting the **Formula Price** (i) based on the change in the Brent/SCO differentials that existed during the first twelve months of commercial production as compared with those that existed in FY 2007, as Claimant contends, or (ii) based on the Brent/SCO differentials as they existed in FY 2007, as Respondents argue.

673. As a factual matter, in the view of the Tribunal the evidence shows, and the Parties seem to agree, that there is a difference in quality between Brent Crude Oil, which is a light crude oil with a gravity of 38° API, and Cerro Negro Crude Oil, which is a heavy crude oil with a gravity of 16° API. (R-93 ¶ 102). For the term "*differential*", Claimant's industry expert, Mr. Plunkett, confirmed Respondents' definition of the term "*differential*" as the difference in price between one crude oil and another. (R-97 and C-46). The Tribunal has reviewed the AA and concluded that the AA does not refer to changes in differentials, as Claimant argues, but rather to the difference in price between one crude oil and another.

674. The Tribunal agrees with Respondents' analysis that Article 7.2 of the Accounting Procedures requires that the Tribunal adjust the Formula Price for upgraded crude oil in the calculation of the Net Cash Flow upwards in order to arrive at a Brent-equivalent for use in the determination of the Adjusted Net Cash Flow. Here, the Tribunal adopts the Graves Report differential of 0.7327, which represents the average differential between Brent and upgraded crude oil during the first 12 months of production. Thus, the average Formula Price for upgraded crude oil for the first 214 days of 2007, US$ 47.19/bbl, was divided by 0.7327 to obtain the US$ 64.41/bbl adjusted price to be applied in arriving at the **Adjusted Net Cash Flow**. (R-113 ¶ 12).

675. In this context, the Tribunal finds that, to enable the comparison contemplated under Article 7.5 and Article 15.2(a) between (i) the **Reference (Threshold) Cash Flow**, based on a Brent-equivalent price of US$ 27 (in 1996 dollars, *i.e.* US$ 34.47 in 2007 dollars), on the one hand, and (ii) the **Net Cash Flow**, on the other hand, the **Formula Price** used in the **Net Cash Flow** formula must be adjusted upward (as prescribed by the **Adjusted Net Cash Flow** formula) to arrive at a Brent-equivalent price reflecting this quality differential of 73% between Brent Crude Oil and SCO. If this were not the case, the limitation of liability would be greater than contemplated under the AA because the second half of the expression in the subtraction equation represented by the formula [**Reference (Threshold) Cash Flow** − **Adjusted Net Cash Flow**] would be artificially too low given the intrinsically lower value of SCO as compared with benchmark Brent Crude Oil.

676. Moreover, since the quality and transportation differentials have essentially remained the same since the AA was signed, the Tribunal further observes that Claimant in effect is asking the Tribunal to compare (i) the **Reference (Threshold) Cash Flow**, based on a Brent-equivalent price of US$ 27 (in 1996 dollars, escalated for inflation), on the one hand, and (ii) the **Net Cash**

**Flow,** where the sales price used is the actual sales price specified in the Chalmette Supply Contract (that is, the "*Formula Price*"), on the other hand. As discussed above, the Tribunal does not agree that this was what the Parties contemplated under Article 7.5 and Article 15.2(a) and such reasoning would result in providing a "*potential economic windfall*" to Claimant over the intended indemnity. (R-115 ¶ 18). On that basis, the Tribunal finds that the **Adjusted Net Cash Flow** calculation yields **US$ 224.167 million,** adopting the calculation found in R-113 Table 2 and Appendix 11.

677. Turning to the question of the use of actual data as opposed to budgeted data, the Tribunal accepts that the FY 2007 budget is the best indicator of what the Project participants expected to happen absent Discriminatory Measures. The Tribunal considers that the following points are relevant in this regard:

    (1)    actual data reflecting actual sales and costs from the Project does not exist;

    (2)    even if actual data exists, Claimant was precluded from having access to records or documents indicating operations and costs of the Project after 27 June 2007, making it necessary to use budgeted data;

    (3)    the Accounting Procedures require data that is unaffected by the Discriminatory Measures and the FY 2007 budget reflects amounts that are relevant and reliable and have not been affected by Discriminatory Measures;

    (4)    the Project no longer exists and has become part of a substantially different venture whose entire structure was dictated by Discriminatory Measures, making relying on information from this venture inappropriate and inadequate.

678. The Tribunal is not disregarding the plain language of Article 7.3. To the contrary, the Tribunal considers that, had the Parties cooperated under the AA as they expressly intended to by signing it, the budget would have been an accurate reflection of the actual costs incurred by the Project in FY 2007. The Tribunal accepts Claimant's arguments that the deviations from the 2007 budget are explained by the takeover of the Project by PDVSA at the end of April 2007 and the disruptions related to that rapid transition. (C-IV ¶

159). This is confirmed by the history of the Project. During FYs 2002 – 2006, the budgeting of the Project was accurate when compared to the actual expenses for the Project. (C-IV ¶ 157, Graves at pp. 14 – 15). The 2007 deviations were not – as Respondents argue – a result of an unrealistic budget for FY 2007 expenses. (C-IV ¶ 159).

679. Considering the variable *"Depreciation"*, Claimant's expert, Prof. Myers, uses a figure of US$ 75.2 million, whereas Respondents apply a depreciation of US$ 28.25 million. Prof. Myers accounted for depreciation expense on the following basis:

> MCN would have depreciated its share of assets in place on the date of expropriation and also capital investments made after expropriation. I forecasted depreciation using Venezuelan tax accounting, which is based on the inflation-adjusted cost for capital investment. Assets are depreciated in Bolivars through the September 25, 2007 breach date using the Venezuelan Consumer Price Index for inflation. Cash flows after that date calculated are in U.S. dollars, and depreciation expense assumes inflation equal to the actual change in the U.S. GDP deflator through June 30, 2008 and at a forecast rate of 2% thereafter. (C-48 p. 15 footnote 21).

680. The Tribunal finds Prof. Myers's analysis persuasive and, accordingly, applies Claimant's figure of US$ 75.168 million as the depreciation variable for FY 2007. (C-48 p. 15; R-113 App. 11).

681. The Tribunal has determined that the Royalty Measures were not Discriminatory Measures within the meaning of Clause I of the AA. Therefore, the relevant royalty rate for the calculation of damages for FY 2007 is 33 1/3 %.

682. As stated above, the Tribunal has determined that the Income Tax Measures were Discriminatory Measures under Clause I of the AA.

683. Based on the foregoing analysis, the Tribunal conducts the indemnity calculations as in exhibit R-113 App. 11, according to which the **Reference (Threshold) Cash Flow** formula in accordance with its terms yields **US$ 236.848 million** and the **Adjusted Net Cash Flow** calculation yields **US$**

**224.167** million. The resulting indemnity is the **Reference (Threshold) Cash Flow** less the **Adjusted Net Cash Flow: US$ 12.681 million**.

684. The **Adjusted Net Cash Flow** calculation presented by Respondents includes the 1.3 million barrels of SCO and US$ 0.7 million of sub-products delivered after **27 June 2007**, which form part of the counterclaim in this case. The Tribunal's considerations and conclusions regarding that counterclaim are found in that section.

## K.VII.3.    Calculation of Indemnity for FY 2008 - 2035

### K.VII.3.a.    Arguments by Claimant

685. Going back three and a half years from June 2010, Discriminatory Measures have reduced Mobil CN's cash flows by nearly US$ 2 billion – US$ 1.534 billion of which are from the years 2008 - 2010 alone. (C. Closing Slide 23). Claimant claims that, under both the AA and Venezuelan law, it is entitled to damages in the amount ranging from approximately US$ 6.778 billion (Jones-Lexecon Analysis) to US$ 6.855 billion (Myers-Brattle analysis) for FY 2008-2035. This amount is expressed as a discounted present value as of **25 September 2007** and is subject to adjustment at the time of the Award. (C-III ¶¶ 260, 310).

686. Claimant argues that the Parties intended that the limitations in Annex G apply even in the case of expropriation and, therefore, adopts a *"reasonable business approach"* which uses historical data to complete the variables in the indemnity formulas. (C-IV ¶ 60). Claimant maintains that the most practical way to calculate the **Fixed Reference (Threshold) Cash Flow** uses actual Project data known at the time of PDVSA-CN's contractual breach (**25 September 2007**). (C-IV ¶ 163). According to the Claimant, this approach eliminates virtually all of the Respondents' objections concerning forecast data. (C-IV ¶ 166). Based on Claimant's *"reasonable business approach"*, the quantum for the indemnity for FY 2008 – 2035 is determined by the **Fixed Reference (Threshold) Cash Flow**. (C-III ¶ 310).

687. On **25 September 2007** the Parties knew (1) that the **Chalmette Formula Price** exceeded the **Base (Threshold) Price**; and (2) the Project was capable of continually producing more than 120,000 bpd of EHO and more than 108,000 of SCO. (C-IV ¶ 164). Claimant's analysis as to the relevance of this information is as follows:

> When [the fact that the **Chalmette Formula Price** exceeded the **Base (Threshold) Price**] is applied to the formulas of Annex G, it results in a determination that the **But-For Net Cash Flow** (determined by the **Chalmette Formula Price**) exceeds the **Reference (Threshold) Cash Flow** (determined by the **Base (Threshold) Price**. Because the **Reference (Threshold) Cash Flow** acts as a limit on the indemnity, it also establishes the *quantum* of the indemnity in these circumstances. (C-IV ¶ 165).

688. Claimant's financial experts were instructed by counsel to apply a single interpretation to the relevant formulas. (C-V ¶ 14). Claimant explains its experts Professor Stewart Myers of The Brattle Group (Myers-Brattle) and Dr. Scott Jones of Compass Lexecon (Jones-Lexecon) calculated the indemnity as follows (C-III ¶¶ 315 - 323, footnotes omitted, partially quoted):

> The experts first determined an annual **Fixed Reference Cash Flow** based on the **Base Price** on the date of breach (US$34.38), operational and expense data available on that date, and a royalty rate of 16 2/3%. This post-2007 annual **Fixed Reference Cash Flow** is materially the same as the **Reference (Threshold) Cash Flow** that Graves-A&M calculated for FY 2007, except for the different royalty rate. Then Myers-Brattle and Jones-Lexecon applied that **Fixed Reference Cash Flow** to each FY for the period 1 January 2008 through 30 June 2035. The **Fixed Reference Cash Flow** values for that period were then discounted to their present value as of the time of the breach.
>
> The experts determined the hypothetical oil revenue component of *TR* by multiplying the **Base (Threshold) Price** (US$34.38) times budgeted annual SCO liftings as of the date of breach times Claimant's interest in the Project. The resulting oil-revenue component is estimated to be US$565 million. The experts then determined the hypothetical Joint Revenues component of amount *TR* in the same manner used by Graves-A&M for FY 2007 − *i.e.* they estimated by-product revenues (net of royalties) to be 2.74% of oil revenues, or approximately US$15 million. The amount *TR* is the sum of these two components, or US$580 million.
>
> The experts then calculated the hypothetical oil royalty amount *TROY* in the **Reference (Threshold) Cash Flow** formula for the FY 2008-2035. They assumed a production budget of 120,000 bpd, multiplied by the **Base (Threshold) Price** times 94% (to establish the value on which the royalties

would have been assessed) times 16 2/3 %. The resulting *TROY* for FY 2008 – 2035 is US$98 million.

For the *CEX*, the experts used the budgeted amounts for capital-expense and operating-expense approved by both Claimant and PDVSA-CN for FY 2007. These amounts totaled US$63 million.

To determine the *TIT*, the experts determined the hypothetical taxable income in the but-for scenario assumed by the **Reference (Threshold) Cash Flow**. That hypothetical taxable income consists of the revenue amount *TR*, minus the royalty expense value *TROY* and the operating expense component of amount *CEX* and an estimate of the depreciation for FY 2007. The experts then multiplied the resulting hypothetical taxable income times 34%.

Under this analysis, the annual undiscounted **Fixed Reference Cash Flow** for each FY from 2008 to 2034 would be approximately US$300 million and US$150 million for FY 2035. This is similar to Claimant's US$316 million **Net Cash Flow** in FY 2006.

Finally, using real risk-free tax adjusted discount rates, Myers-Brattle and Jones Lexecon determined the present value of the indemnity owed as of 25 September 2007 to be approximately US$6.855 billion and US$6.778 billion, respectively. The difference between the two results is based on their use of slightly different discount rates.

689. The validity of the **Fixed Reference (Threshold) Cash Flow** calculation (US$ 301 million) is confirmed by comparing it to Claimant's **Net Cash Flows** before the expropriation (in 2005 and 2006, US$ 298 and US$ 316 million, respectively). (C-IV ¶ 167). Claimant notes, however, that the indemnity calculation should not be confused with the cash flows that would have stemmed in future years from the operation of the Project, had it continued. This calculation is for the contractual indemnity only. (C-IV ¶ 169).

690. Claimant criticizes Respondents' experts' approach for estimating the **Reference (Threshold) Cash Flow** which involved calculating it exactly the same as the **But-For Net Cash Flow**, except that the **Base (Threshold) Price** is used rather than the **Chalmette Formula Price**. This approach reduced the undiscounted value of the indemnity from FY 2007 – 2035 by approximately US$ 7.5 billion. (C-IV ¶¶ 123, 162). Claimant asserts that Respondents start from the unsupported premise that, except for *TR*, the **Reference (Threshold) Cash Flow** should be calculated using "*actual*" inputs, despite the fact that the word "*actual*" does not appear in the

definitions of **TROY** or **TIT**, but rather only in the **CEX**. (C-IV ¶ 125). The use of "*actual*" revenue inputs to determine **TROY** and **TIT** has the effect of causing the indemnity to vanish as Claimant's lost cash flow grows – a nonsensical result. (C-V ¶ 20). Claimant, thus, maintains that the **Reference (Threshold) Cash Flow** calculation is to be determined on the basis of a hypothetical **Base (Threshold) Price** scenario. (C-IV ¶ 126).

691. With respect to **TR**, Respondents' witnesses have presented two calculations. Finizza and Pulliam performed the 2007 – 2035 calculation multiplying liftings by US$ 27 per barrel (in 1996 dollars). Mr. Brailovsky, on the other hand, presented a new calculation for **TR**, achieved by multiplying liftings by US$ 19.78 per barrel rather than by US$ 27 per barrel (both in 1996 dollars). Respondents have provided no explanation for the inconsistencies between their experts. (C-V ¶ 16). Still, however, Respondents advocate for Mr. Brailovsky's US$ 19.78 per barrel approach as a means of giving effect to Article 15.2(a). By its terms, however, the limitation in Article 15.2(a) only becomes applicable in a FY in which the foreign party has received a **Net Cash Flow**, notwithstanding Discriminatory Measures. Clearly, the foreign party will not receive a **Net Cash Flow** after 2007. (C-V ¶ 17). Thus, Article 15.2(a) will not reduce the indemnity after 2007 because since then Claimant has not and will not receive any cash flow. (C-VI ¶ 47).

692. Claimant refutes Respondents' closing argument that the price applied to SCO liftings should be less than the Base Price when the price of Brent crude oil exceeds US$ 27 per barrel (in 1996 dollars). The text of Articles 7.4 and 7.5 of the Accounting Procedures is unambiguous in that respect and requires the use of the Base Price of US$ 27. (C-V ¶ 18; C-VI ¶ 47). There is no need to read any "*essence*" of Article 15.2(a) into the Accounting Procedures. (C-VI ¶ 47).

693. Claimant also attacks the instructions given to Respondents' experts:

14. Respondents' experts from EconOne admitted that they received no guidance from the Respondents' counsel in construing the provisions of the AA or the Accounting Procedures, and that they purported to apply the contract "as written." But the official text of the contract is in Spanish, and these experts admitted that they cannot read Spanish. Nor are any of the Respondents' financial experts trained as lawyers. For these reasons, the interpretations of the contract they advocate are not worthy of consideration. (C-V ¶ 14).

694. In support of their discount rate, Claimant contends that a real risk-free tax adjusted discount rate is appropriate because it applies historical data known on the date of the breach and, therefore, reflects the non-contingent nature of the **Fixed Reference (Threshold) Cash Flow**. (C-IV ¶ 168).

695. As a *"cross check"*, the Claimant's experts also calculated the **Forecast Reference (Threshold) Cash Flow** (C-III ¶¶ 324 – 331, partially quoted):

- This is essentially the same calculation as above except that it involves using a projected **Base Price**, escalated for inflation projected by the "U.S. Inflation Index", for *each* FY from 2008 to 2035, and that it uses the Project's production capacity rather than the budgeted liftings to calculate the *TR*. Claimant's experts calculated the *TR* by assuming a SCO production of 108,600 bpd, which is below capacity for the Project, rather than using the budgeted liftings for 2007 as in the **Reference (Threshold) Cash Flow** calculation. For the Joint Revenues component of the *TR*, the experts estimate hypothetical by-product revenues at 2.74% - according to their historic relationship with oil revenues. The resulting *TR* ranged from US$570 million in 2008 to US$999 million in the end term of the AA.

- Claimant's experts calculated the hypothetical oil royalty amount *TROY* on the basis of the notional values of EHO production by multiplying the **Base (Threshold) Price** for each FY from 2008 through 2035 by 94%. This was then multiplied by the royalty rate absent Discriminatory Measures of 16 2/3%. These expense forecasts vary between US$65 million and US$170 million per year over the remaining life of the AA.

- Claimant's experts determined the income tax amount *TIT* resulting from the use of an escalated **Base (Threshold) Price** and forecasted expense and operational data. This value was calculated by using the amount *TR*, minus the royalty expense value *TROY*, the operating expense component of amount *CEX*, and the estimated depreciation and other allowable tax deductions, and then multiplied by the income tax rate of 34%. Claimant's experts found the amount *TIT* resulting from this analysis to vary in the range between US$120 million and US$202 million during FY 2008 through 2035.

- Finally, Claimant's experts subtracted from the amount *TR* the amounts *TROY*, *CEX*, and *TIT*. Because the **Base (Threshold) Price** as

escalated to each FY after 2007 varied, and the forecasted expense and depreciation data varied, the undiscounted **Forecast Reference (Threshold) Cash Flow** values for each of the full years varied in a range between US$296 million and US$517 million, as shown by Claimant's experts' Myers-Brattle's and Jones-Lexecon's respective reports.

696. Claimant concludes that "*these pricing analyses show that the Forecast Reference (Threshold) Cash Flow for FY 2008 to 2035 (calculated using the escalating Base (Threshold) Price in each year) would be less than the But-For Net Cash Flow (escalated using the Formula Price). As the lesser of the two, even when the Base (Threshold) Price is adjusted for inflation for future years (rather than fixed as of September 2007), the Forecast Reference (Threshold) Cash Flow would provide the proper quantum of the indemnity obligation for FY 2008-2035 in this cross-check analysis using forecasted data.*" (C-III ¶ 334, partially quoted). The **Forecast Reference (Threshold) Cash Flow** as of September 2007 would range between US$ 6.450 billion (as calculated by Myers-Brattle) and US$ 6.668 billion (as calculated by Jones-Lexecon). (C-III ¶ 339).

697. Claimant did not instruct its experts on the discount rate applicable to the **Forecast Reference (Threshold) Cash Flow**, and the experts determined the discount rate independently. (C-VI ¶ 58). Claimant's experts discounted the **Forecast Reference (Threshold) Cash Flow** values to present rates using risk-free tax adjusted discount rates. (C-III ¶ 335). This was appropriate because uncertainty about future production of SCO was taken into account in the *TR* equation, which assumed a production of heavy-oil at 10% more than would be necessary to produce the 108,600 bpd SCO. The Annex G formulas have the effect of minimizing the impact of relevant contingencies. (C-IV ¶ 210). Currency risk does not affect the discount rate. The risk of PDVSA-CN or PDVSA default and the risk of expropriation by the Government were not taken into account. (C-III ¶ 338).

698. Claimant affirms that the production volume risks, operating costs and capital expenditure risk, and price risk were all considered by Claimant's

experts in calculating the **Forecast Reference (Threshold) Cash Flow**. (C-IV ¶ 219). The arguments below are Claimant's response to Respondents' Rebuttal to **the Forecast Reference (Threshold) Cash flow** calculations and Respondents' analysis of the discount rate as it relates to production capacity (C-IV ¶¶ 179 – 190, partially quoted, footnotes omitted):

- The Project's production capacity of 120,000 bpd of EHO and 108,600 SCO from the upgrader was demonstrated throughout the life of the Project and has nothing to do with the Project's storage capacity.

- OPEC has historically had little, if any, impact on Venezuelan oil production and does not justify a higher discount rate. Even if it did, however, Section 14.2 of the AA contemplates the need to recoup losses from Production Curtailments and allows for a 5-year extension of the AA to accomplish that. The prospect of an OPEC curtailment requiring limitation of production from the Project in the future is approximately 1% per annum (not, as the Respondents contend, 3.7% per annum). Further, the possibility of an OPEC curtailment cannot be deemed an uncertainty that may appropriately be used to justify a higher discount rate. Claimant's experts indicate that, the likelihood of an OPEC-required, imposed curtailment on the Project would not likely have an impact on the present value of Forecast Reference (Threshold) Cash Flows for FY 2008 through 2035 of greater than the range of US$21 million to US$27 million. Such cash flow reductions are equivalent to an increase to the discount rate of approximately 0.03%.

- Under Article 14.1 of the AA, disproportionate curtailments are not excluded from the definition of Discriminatory Measures and, therefore, should not be taken into account when determining the **Reference (Threshold) Cash Flow**. If future OPEC-related curtailments in compliance with Article 14.1 are considered to have some likelihood, these should be factored into the indemnity cash flows along with the allowed mark up and there would be no reason to adjust the discount rate to address this issue.

699. Professor Myers explained that macro or market risks (risks that investors cannot escape) must be considered in a discount rate in order to discount a cash flow to present value. Such risks include uncertainty about future inflation, interest rates, or oil prices. Risks about future inflation and interests rates are reflected in long-term treasury bonds, which is why it was appropriate for Prof. Myers to use that bond rate. Risks related to oil prices, however, are irrelevant in this case because the indemnity is not determined by an actual price – instead, they are determined by the base price. (C-IV ¶ 23). Even if the price were to fall below the base price (SCO Price Risk),

*"that risk would not justify the massive increase in the discount rate that the Respondents advocate."* (C-V ¶ 24).

700. Project specific risks (unconnected to macro or market risks) should not affect the discount rate. Rather, these risks should be taken into account when determining the cash flow before discounting. (C-V ¶¶ 22 - 23).

701. Claimant characterizes Respondents' *"marketing risk"* argument, that it is difficult to sell SCO, as fanciful. The Project was able to correct the fire and safety hazard that had caused the Chalmette Refinery to temporarily stop accepting SCO. Claimant asserts that, absent the Discriminatory Measure, the Chalmette Joint Venture would have continued to provide a stable outlet for Project sales, in addition to the other refiners in the Gulf of Mexico region. (C-IV ¶ 220).

702. Claimant advocates using the budgeted *CEX* rather than the actual expenditures for any of the years, stating that it would be imprudent to include operator costs that Claimant would not have tolerated if it had remained as a Project participant. (C-VI ¶ 54). Claimant's arguments with respect to using the 2007 budget for FY 2007 are incorporated herein by reference.

703. Claimant states that Respondents' arguments related to the *CEX* value, in particular about the operational costs and expenditures necessary to maintain the Project in the future, are unsupported by technical evidence. (C-IV ¶ 191). Claimant addresses several aspects of Respondents' arguments.

704. *First*, the Project's costs show a declining tendency, which accords with longstanding industry experience that rising costs can be offset by savings achieved through improved knowledge and greater efficiency, particularly as a new project settles into its long-term production phase. (C-IV ¶¶ 193 – 194; C-213 Lawless ¶ 10). This was true even when local inflation was high. (C-VI ¶ 55). Flat to declining budgets are the norm for ExxonMobil-

managed operations, unless new facilities are added. (C-213 Lawless at ¶ 10).

705. *Second,* Claimant short-term cost volatility illustrates why a longer-term view is required to forecast costs through 2035. While increases in oil prices have been met with increasing oil industry costs, the price spikes – in particular those from 2008 – were not sustained and a substantial decline in oil industry costs has occurred since then. (C-IV ¶ 192). In the long-term, the data undermines Respondents' experts' contention that oil industry cost inflation has outpaced the rate of general inflation. (C-IV ¶ 192).

706. *Third,* with respect to future cost inflation, Respondents' experts' decision to increase Gaffney, Cline and Associates, Inc.'s (GCA's) baseline forecasts of costs after 2008 by 20 – 30% based on oil industry inflation, before escalating those costs to account for general inflation, is unjustified. (C-IV ¶ 195). Claimant states that:

> *[...] the potential impact on the indemnity cash flows that could stem over time from the risk of oil industry inflation outpacing general inflation is relatively minor in the context of the entire indemnity damages. For example, the fastest growing inflation measure relied upon by the Respondents' experts exceeded the growth in the Consumer Price Index by 0.5%. If the Project experienced cost inflation at a rate 0.5% higher than general inflation, then the present value of the **Forecast Reference (Threshold) Cash Flow** for FYs 2008 through 2035 would decrease by US$72 million related to operating expenditures and US$14 million related to capital expenditures. These differences are equivalent to increases to the low-risk discount rate of only 0.09% and 0.02%, respectively. (C-IV ¶ 196).*

707. *Fourth,* local currency inflation in Venezuela is not a ground for criticizing the cost budget for the Project and GCA's cost forecasts. Claimant states that, as the costs of the Project have always been calculated in dollars rather than local currency, it is not appropriate to include currency risk when forecasting costs. (C-IV ¶ 198).

708. *Fifth,* there is little risk that the Project would need to modify existing structures to comply with environmental laws and that these modifications would increase costs. (C-IV ¶ 198). The Cerro Negro facilities were built in

the late 1990s and exceeded then-existing Venezuelan requirements. Only modest modifications would be needed if Venezuela were to match the U.S. Clean Air Act standard. (C-IV ¶¶ 191 – 198). Such modifications could be accomplished below the US$ 0.5 million sustaining capital expenditures budget for the upstream operations and within the US$ 10.5 million annual allocation for sustaining capital expenditures for the upgrader in the analysis prepared by GCA and relied upon by Myers-Brattle and Jones-Lexecon in their **Forecast Reference (Threshold) Cash Flow** calculations. (C-IV ¶ 198, partially quoted).

709. *Sixth*, Claimant states that GCA's cost forecasts – including GCA forecast that drilling in 2001 would cost US$ 2.8 million per well, even though drilling in 2005 cost less than US$ 1.6 million per well – aligns with the past experience of the Project. Mr. Pereira's statement that PetroMonagas spent an average of US$ 4.1 million to drill seven wells in 2008, however, is out of line with both the experience of the Project and with likely future costs, in light of current deflation. (C-IV ¶ 193, partially quoted, see also C-218 at 3 *et seq.*).

710. *Seventh,* Respondents' reliance on Mr. Pereira's assertions about PetroMonagas's costs is misplaced, as Mr. Lawless's testimony exposed Mr. Pereira's ignorance of past Project turnaround costs. (C-VI ¶ 53). For example, Respondents' experts expect that turnaround costs for 2010 are expected to be US$ 100 million. In 2006, however, the turnaround of the Cerro Negro upgrader cost approximately US$ 31 million (C-218 at p. 9). This turnaround was well-planned and OCN was able to call upon ExxonMobil affiliates to resolve maintenance and operational issues. PetroMonagas's costs may be higher because it lacks the same high level of technical services that the Project previously enjoyed through Claimant's involvement. (C-IV ¶¶ 199 – 200; C-VI ¶¶ 52 - 56). PDVSA does not have access to the same high level of service and has, as a result, addressed such issues in a much more costly fashion. (C-IV ¶ 200, partially quoted). The

cost increases are a result of the fact that OCN can no longer rely on ExxonMobil's expertise. (C-218, C-216 ¶¶ 18 - 24). It would be imprudent to include in the *CEX* operator costs that Claimant would not have tolerated if it had remained as a Project participant. (C-VI ¶ 54).

711. Further, PetroMonagas's costs and liftings are not merely those of the Project. As Claimant explained with respect to PetroMonagas in its closing statement:

> Mr. Pereira acknowledged that PetroMonagas is not merely the Cerro Negro Project under a new name, even though it ultimately received some of the interests of that Project. Nor are PetroMonagas's activities the same as those of Cerro Negro. Mr. Pereira admitted that the former Cerro Negro upgrader has been used to process EHO from other projects. He admitted that the former Cerro Negro upgrader has been used to create higher grade SCO than Cerro Negro had produced, making its likely cost experience different. And he admitted that PetroMonagas has a smaller concession area in the production field than Cerro Negro. (C. Closing Statement p. 24).

712. The costs incurred by the new operators of the former Project are irrelevant to the calculation of the **Reference (Threshold) Cash Flow**, which assumes that the expropriation did not take place. Furthermore, the post-takeover cost data are not reliable evidence of the value attributable to *CEX* in the **Reference (Threshold) Cash Flow** — *i.e.* the *CEX* that would have occurred absent the expropriation of Mobil CN's entire interests in the Project.

713. With respect to reducing the **Reference (Threshold) Cash Flow** by the Science and Technology and Anti-Drug Enforcement contributions, Claimant states that these would not be included under the *CEX* because these two initiatives are based upon the revenue or income of each participant. (C-VI ¶ 56).

714. With respect to price forecasts, Claimant maintains that, pursuant to the contract, "*price forecasts have a very limited function: to determine whether to use the stipulated Base (Threshold) Price in calculating the indemnity owed according to the Annex G formulas. For that purpose, it is*

*appropriate to examine whether the likely **Chalmette Formula Price*** *prevailing throughout the period of 'economic consequences' would exceed* *the **Base (Threshold) Price**. [...] The total **But-For Net Cash Flow** for FY* *2008-2035 of which Mobil CN was deprived [...] are clearly shown by these* *averages for the entire period to be virtually certain to exceed the* ***Reference (Threshold) Cash Flow** for that period. That showing suffices to* *establish that Mobil CN's indemnity is limited by — but therefore also* *measured by — the **Reference (Threshold) Cash Flow** calculated using the* ***Base (Threshold) Price** for the entire FY 2008-2035 period."* (C-IV ¶ 203, partially quoted, footnote omitted).

715. Claimant's experts do not forecast that the market price for SCO will fall below the **Base Price**, regardless of recessionary scenarios, as they have not done so as a response to the 2008 recession. (C-III ¶¶ 332 – 333; C-IV ¶ 205). Claimant states that *"[t]he average **Chalmette Formula Price** for FY* *2008 as a whole (US$83.94 per barrel) remained well above the **Base*** ***(Threshold) Price** as escalated to 2008 Dollars (US$35.17 per barrel) and* *the average **Chalmette Formula Price** is on track as of April 2009 to do so* *again in FY 2009."* (C-IV ¶ 205, footnotes omitted). Claimant believes that this trend will likely continue as reductions in oil investment will constrain supply and positively influence the price. Further, in response to Respondents' concerns, *"Energy Security Analysis, Inc. ('ESAI') has* *analyzed the issue and concluded that recent events confirm that the* *likelihood that the average **Chalmette Formula Price** in any particular FY* *before 2036 will fall below the **Base (Threshold) Price** is no more than* *roughly 10%"*, an estimate also reached by Respondents' experts Pulliam/Finizza. (C-IV ¶ 206).

716. Claimant addresses Respondents' contention that Claimant could not use its surplus capacity to make up for temporary shortfalls due to curtailments (which Respondents state have not been claimed as a Discriminatory Measure). Claimant states that the document on which Respondents rely at

R-IV ¶ 51 merely announces that production above an average of 120,000 bpd would be subject to a 30% royalty. (C-VI ¶ 48; R-IV ¶ 51). The hearings did not establish that the Project could not have actually produced 120,000 bpd in 2007, but rather, that the Project could maintain the 120,000 bpd level through 2035 and beyond if called upon. (C-VI ¶ 49).

717. In response to Respondents' analysis concerning the discount rate, Claimant insists that *"Respondents and their experts seek to obscure the contractual nature of the indemnity cash flows and treat them, for discount rate purposes, as akin to operational cash flows of the Project."* (C-IV ¶ 212). Claimant also characterizes Respondents' consideration of the Project risk within the discount rate as a strategy whereby the indemnity is reduced by *"applying a discount rate that adds back the very risks that the indemnity protects against, including the risk of expropriation."* (C-VI ¶ 57).

718. The discount rate is of tremendous significance, as it has a compounding effect:

> 29. [...] the effect on present value of the difference between discounting at 4% and 6% is far greater than the effect of the difference between discounting at 18% and 20%. As Dr. Jones observed, "if you discount something at 20 percent, you're cutting it in half every three and a quarter years [...]." (C-V ¶ 29).

719. Claimant further contends that Respondents' analysis proposing extraordinarily high discount rates *"has no analytical foundation and consists of little more than subjective, ad hoc assertions aimed at reducing the value of Mobil CN's indemnity rights."* (C-IV ¶ 211). Claimant emphasizes that the AA already protected it from many of the uncertainties – and Respondents' use of these uncertainties in the projected cash flows results in a double-counting. (C-IV ¶ 213). The only risks that are relevant to the discount rate are non-diversifiable risks and such risks are not reflected in the cash flows. (C-IV ¶ 214; C-V ¶ 25).

720. Claimant challenges Respondents' experts' reliance on two sets of irrelevant, non-standard, and illegitimate benchmarks to arrive at the 19.8%

discount rate: (i) estimated returns on ExxonMobil stock (which reflects a mixture of ExxonMobil's investments worldwide with varying degrees of risk) and capital projects stock and (ii) so-called International Capital Asset Pricing Models (*"ICAPM"*). (C-IV ¶¶ 214-217). Claimant states that Respondents have failed to quantify how particular risks would impact cash flows and have not demonstrated how these risks would justify the multi-billion dollar reduction in present value, resulting from the discount rate. (C-VI ¶ 59).

721. Respondents' experts improperly used so-called internal rates of return to calculate the discount rates. (C-V ¶ 28). With respect to reliance on the expected rate of return for investments in oil projects, *"those forward-looking estimates predict internal rates of return. Internal rates of return are not estimates of the cost of capital (which is relevant to the discount rate), but rather they express the rate of return that would make the net cash flow from a project equal to zero."* (C-IV ¶ 217, footnote omitted, emphasis in original). Claimant states that Respondents' experts use of internal rates of return result in a *"figure [that] is above the 7.5% to 8.7% discount rates cited by other independent analysts for ExxonMobil."* (C-IV ¶ 217).

> 28. [...] Professor Wells defended use of IRRs by testifying that they "did not use the IRR [...] as the principal method of determining the discount rate," but rather "as a make whole approach, that is, what kind of cash now would enable Exxon Mobil to replace the cash flow that would be lost or would be earned from the indemnity flows." Professor Myers exposed the fallacy of this "make whole approach," observing that "you can't put somebody back in the same position by taking something safe away from him or her and then telling him or her to invest it in something risky." It was in this context that Professor Myers observed that, "[i]f somebody takes a hundred dollar bill from me, I want a hundred dollars back, and it shouldn't matter whether I was going to give that hundred dollars to charity or buy groceries with it or play the lottery with it." (C-V ¶ 28).

722. Claimant notes that ICAPM purport to incorporate an *ad hoc* assessment of the local and political risk to which a typical investment in a country would be exposed — including the risk of expropriation. (C-IV ¶ 218). Claimant maintains that use of this model is not appropriate in this case because the

indemnity provisions require the calculation of cash flows absent Discriminatory Measures. (C-IV ¶ 218; C-V ¶ 25). Brailovsky's inclusion of the risk of expropriation in his discount rate is especially inappropriate. (C-V ¶ 26).

723. Claimant insists that the discount rate should not be raised on the basis of PDVSA's default risk. *First*, Respondents' argument in favor of so doing is precluded by both commercial practice and by Venezuelan law which states that *"the economic or financial condition of the debtor is irrelevant for the determination for the quantum of the damages."* (C-IV ¶ 171; C-V ¶ 27). *Second*, an extension of this argument would enable *"contract debtors [to] always argue that court judgments and arbitral awards should discount the amount they owe by the risk that the debtor might refuse to repay the debt."* (C-IV ¶ 172).

> 60. Concerning default risk, the Respondents continue to ignore that this is a breach-of-contract case. They also confuse the value of a debt to the creditor with its value to a third party. Default risk is relevant only to the latter. Even in the Respondents' inapt analogy to an annuity, the insurer's creditworthiness would not be relevant in determining the value owed by the insurer (even in present value terms) to the annuitant himself. (C-VI ¶ 60).

724. *Third*, Respondents' experts (Brailovsky/Wells) use a measure of default risk that includes risks irrelevant to the indemnity cash flows. Respondents' experts ignore the fact that *"the yield on PDVSA bonds implicitly incorporates the risk to its bondholders of PDVSA liability to Mobil CN in this proceeding."* (C-IV ¶ 174). Finally, Respondents' statements to the High Court in London that PDVSA *"remains one of the world's most important national oil companies"* with *"a balance sheet showing more than US$100 billion in assets"* and is *"still active in the international capital markets"* makes it even less appropriate to select a higher discount rate based on the likelihood of Respondents' default. (C-IV ¶ 175, partially quoted).

725. Claimant referenced the ICSID case in its discussion of the discount rate:

30. [...] The discount rate applicable to cash flows from Claimant's interest in the Project will be determined in the ICSID case, not this one. But when that occurs, the discount rate for an established project like Cerro Negro should be substantially lower than 10%. (C-V ¶ 30).

726. In response to Respondents citation of *Phillips Petroleum* and *Himpurna*, Claimant states as follows (C-VI ¶¶ 61 - 62):

61. [...] *Phillips Petroleum* did not involve the valuation of indemnification cash flows but rather the determination of the fair market value of a project. The discount rate adopted in *Himpurna* also has no precedential value because it is a self-described ad-hoc "equitable assessment," without any basis in principles of finance. The tribunal in *Himpurna* expressed concern about the ability of the respondent in that case to pay a large award, and the tribunal applied a high discount rate "to alleviate [the Respondents'] burden as much as possible [...]." The reverse is true here: PDVSA has reaped multi-billion-dollar gains as a direct result of the Government measures at issue in this case, and the Respondents themselves have informed this Tribunal that PDVSA is one of the most profitable and important national oil companies in the world. (C-VI ¶ 61).

62. The tribunal in *Himpurna* made other observations that are relevant to this case:

Another consideration concerns the nature of the breach. The respondent did not seek actively to dispossess the claimant of valuable contractual rights; it has suffered helplessly from a precipitate deterioration in the macroeconomic value of a project with respect to which it had accepted the entire market risk. In this regard, this case stands in stark contrast with a number of illustrious arbitral precedents [... in which ...] the defending State entity has acted to evict the foreign investor from a healthy ongoing profitable venture. Thus the notion of the victim's lost profits has gone hand in glove with that of the breaching party's gain. (C-VI ¶ 62).

## K.VII.3.b   Arguments by Respondents

727. Respondents explain that neither of Claimant's invented calculations - the **Fixed Reference Cash Flow** or the **Forecast Reference Cash Flow** - bears any relationship to the indemnity provisions in Annex G. (R-II ¶ 172). Respondents urge the Tribunal not to accept Claimant's invitation to rewrite the formula and expand the scope of the indemnity using its so-called *"reasonable business approach."* There is no basis in Venezuelan law or the AA for such an exercise. (R-III ¶¶ 196 – 197; R-IV ¶¶ 50, 54).

728. Testimony in New York demonstrated that there would have been no indemnity due in 2008, even if Claimant had agreed to migrate and if Claimant could prevail on all of the issues, including its approach to the **Threshold Cash Flow** and the **Adjusted Net Cash Flow** formulas. (R-IV ¶ 81).

729. Respondents contend that applying the indemnity provisions on the basis of projected rather than actual cash flows results in an indemnity of US$ 345 million. This amount is reduced to US$ 232 million *"when basic, conservative adjustments to the projected cash flows [are] made based on actual experience of the Project, still assuming that all governmental actions constituted Discriminatory Measures."* (R-III ¶ 192). Respondents arrive at this number by (1) *"application of the Reference (Threshold) Cash Flow formula as written (with the major exception of adapting it to the future), which requires deducting from revenues the royalties and taxes that would have been paid in the FY in question absent the Discriminatory Measures"* and (2) applying *"a market discount rate derived from methodologies widely accepted in business and finance."* (R-III ¶ 193, partially quoted).

730. To calculate the **Reference (Threshold) Cash Flow**, Respondents used the price scenario proffered by Claimant. That high price scenario, as Claimant has recognized, resulted in high royalties and taxes, and therefore a low **Reference (Threshold) Cash Flow**. (R-III ¶ 195, partially quoted, footnote omitted). Under the plain language of the formula as written, higher prices result in a declining indemnity. (R-III ¶ 196; R-IV ¶ 53). There is no evidence of the Parties' intent regarding this result. (R-IV ¶¶ 53 – 54).

731. Nothing in the **Reference (Threshold) Cash Flow** formula contemplates using a budget, an estimate, or a projection of any kind, for the future. (R-IV ¶ 58). As stated with respect to the 2007 calculations, the clear language of the *CEX* demands that the *CEX* that are subtracted from *TR* are *"the Party's pro rata share of actual Chargeable Expenditures for such FY, absent the*

*alleged Discriminatory Measures.*" (R-II ¶ 150). The definition requires the subtraction of actual expenses, not budgeted expenses. (R-II ¶ 151).

732. Respondents state that none of Claimant's witnesses was able to provide an explanation for the fact that nothing in the **Reference (Threshold) Cash Flow** formula contemplates using a budget or estimate or projection of any kind. (R-IV ¶ 58; R. Closing Slide 67; Tr. pp. 846 - 849). Neither Party expected that the budget prepared in 2006 for FY 2007 would be able to accurately reflect the *CEX* for the next 27.5 years. (R Closing Slide 72).

> 56. The testimony showed that there are myriad issues with both the 2006 budget and Claimant's cost projections, including: (i) the total disregard of Venezuelan inflation (Claimant's cost expert, Mr. Cline, said he did not even know what Venezuelan inflation was) that, unlike in earlier years, was not (and cannot be assumed in the future to be) offset by currency devaluations, coupled with Claimant's view that inflation could be controlled by accessing the "parallel" currency market or contracting with local vendors in dollars, both of which are illegal; the gross underestimation of capital expenditures (Claimant's **Fixed Reference Cash Flow**, based upon the 2007 budget prepared in November 2006, uses the absurd amount of US$6 million per year for the life of the Project, thereby ignoring turnaround costs and the enormous capital expenditures necessary to drill wells to offset what Mr. Cline said was the decline in well productivity); (iii) the failure to take account of the dramatic, industry-wide increase in the cost of oil services in 2008, when the price of oil hit an all-time high; (iv) the failure to appreciate the actual cost of turnarounds in Venezuela, including the turnaround costs for Venezuelan projects like Hamaca (US$230 million in 2009), where Chevron remains a partner; and (v) the failure to appreciate the true cost of the hypothetical "put" that Prof. Myers suggested might be purchased to protect against the possibility of the SCO price dropping below the Threshold Price in any future year. (R-IV ¶ 56, citations omitted).

733. As the FY 2007 budget was not even accurate for 2007, using the budgeted costs for FY 2008 – 2035 is even more absurd. (R-II n. 276). The budget included virtually no capital expenditures or turnaround costs and bore no relationship to what the actual expenditures for the next 27.5 years would be. (R-IV ¶ 55). As Respondents' experts Messrs. Pulliam and Finizza point out, Claimant's expert Mr. Cline's estimates forecasting operating costs were 20% too low in FY 2007 and more than 30% too low for FY 2008. The inaccuracy of Mr. Cline's forecasts for the near term makes

reliance on his forecasts for 10 – 20 years into the future inappropriate. (R-93 ¶ 87).

734. Respondents explain that the notion of using data that existed 3/4s of the way through FY 2007 or budgets prepared in 2006 for each of the succeeding 27.5 years is completely untenable (R-II ¶ 175). Since the FY 2007 budget was prepared in 2006, there have been dramatic cost increases for the Project, making the budget grossly inaccurate for the past and an unrealistic projection for the future. (R-II ¶ 192). Indeed, actual operating and capital costs were 18.5% higher than budgeted, totaling US$ 179.1, rather than US$ 151.1 million for FY 2007. (Respondents' expert Mr. Pereira states that actual operating costs incurred in FY 2007 totaled US$ 176.4 million, 21.6% higher than the US$ 145.1 million budget set by OCN. R-95 ¶ 13). This trend continued in 2008, where operating costs were US$ 210.4 million – 39.2% higher than budgeted. (R-II ¶ 192 n. 301).

735. Regarding the difference between actual expenses and budgeted expenses, Respondents state as follows:

> 152. Expert opinions are not required to prove that actual expenses and budgeted expenses rarely coincide in the petroleum industry or, indeed, in any industry. As Claimant well knows, actual expenses in the oil industry have increased dramatically in recent years with the price of oil, as demand for oil industry materials and services skyrocketed, quickly rendering the most meticulously prepared budgets obsolete. It should come as no surprise that the Cerro Negro Project was no exception. As detailed in the Direct Testimony of José Pereira, the Finance Manager for PetroMonagas, the mixed company that now operates the Cerro Negro Project, actual expenses of the Cerro Negro Project for 2007 were much higher than the budgeted amounts used by Claimant and its experts in their calculations of Adjusted Net Cash Flow for Fiscal Year 2007. (R-II ¶ 152).

736. Claimant's assumption of annual cost increases of only 2% *per annum* finds no support in either the formulas in the AA, the experience of the oil industry, or the history of the Project where actual costs have regularly exceeded budgeted costs. (R-II ¶¶ 192, 197). In the oil industry, the inflation rate in 2005 – 2007 alone was 4.5 greater than general inflation in the U.S. (R-II ¶ 191). Respondents' experts provide tables demonstrating that, over

the 5 year period ending in 2007, cost inflation in the petroleum industry ranged from 19 – 41%, while inflation in the U.S. economy generally was just over 8%. (Pulliam and Finizza, R-93 ¶ 88 Table 13). These costs move upward when the price of oil rises, but do not fall with declines in oil prices. (Brailovsky and Wells, R-98 ¶¶ 77-76). Realistic projections of costs based on actual Project data and industry experience are necessary.

737. Respondents state that it is widely known that budgets in large oil projects, such as the Project, can be and often are off-target by wide margins. (R-III ¶ 217). This was also consistent with the experience of the Project, where there have been serious underestimations of important cost items, even in short-term projections. (R-III ¶ 218). Respondents provide several examples based on the history of the Project, demonstrating *"the obvious reality that the budgeting process is characterized by uncertainty and inexactness and that one can never substitute a budget for actual experience even in the short term."* (R-III ¶ 119).

218. [OCN] budgeted the initial turnaround of the Cerro Negro upgrader at US$18 million in December 2004. In November 2005, after having expanded US$9 million on the turnaround, OCN budgeted an additional US$23.3 million for the completion of the turnaround activities in 2006. By the end of 2006, the turnaround had already cost almost US$44 million against an original budget of US$18 million. (R-III ¶ 218).

220. Claimant's argument with respect to the potential cost of future turnarounds is even more far-fetched. Attempting to undermine the estimate of US$100 million in 2010 dollars provided by José Pereira in his Direct Testimony, Claimant introduces statistics and testimony that do not relate to the specific circumstances of the Cerro Negro Project, ignoring both the actual cost of the limited initial turnaround that had commenced in 2005, oil industry and Venezuelan inflation since 2005, and the expected scope of the more expansive second turnaround in 2010. (R-III ¶ 220).

221. Claimant's calculations initially assumed that future turnarounds would cost US$22.6 million in 2007 dollars. It then adjusted its position to US$31.6 million in 2007 dollars for future turnarounds based upon the Direct Testimony of Mr. Lawless who stated that the initial turnaround cost US$30.5 million in 2006 dollars. As described above, and as detailed in the Supplemental Pereira Direct Testimony, the actual cost of the initial turnaround was approximately US$44 million in 2005 and 2006 dollars. Just by applying oil industry inflation indices and

Venezuelan inflation to that figure, one arrives at an estimated cost for a 2010 turnaround of US$94.7 million [...] (R-III ¶ 221).

738. Respondents' expert describes Mr. Lawless's estimate that future turnarounds should cost no more than US$ 28 million in 2006 dollars as indefensible. (R-116 ¶ 31). Respondents provide tables to demonstrate these arguments at R-III ¶¶ 221 and 222.

739. In order to make an appropriate cost forecast, Respondents' experts adjusted costs upward based on the actual cost history relative to budget, over the past 2 years. They assume a turnaround cost of US$ 100 million over 5 years (rather than US$ 22.6 million, as Mr. Cline assumes). (R-93 ¶ 121 (iii)).

740. The consequences of Claimant's use of the 2006 budget are wide reaching, even extending into the *TIT* calculations. (R-II ¶ 154). Using the FY 2007 budget and a risk-free discount rate, as Claimant's witnesses were instructed to do, conveniently assumes away all risks for the 27.5 years in question. (R-II ¶ 210).

741. In his written testimony, Pereira suggests that the budget for 2007 was unrealistically low – the budget was less than the expenses that had been incurred during 2005 and less than the budget for 2006 (where the actual expenses were 11.5% greater than the budget amount, amounting to US$ 163.3 million). (R-95 ¶ 11). When creating the 2007 budget, OCN knew of the inflationary pressures on costs on a going forward basis. (R-95 ¶ 12). Claimant's expert's (GCA) estimates for annual capital expenditure over the period 2009 – 2011 is lower than what was actually spent in 2008. (R-98 ¶ 74).

742. The cost experts also explain that coker drums will require repairs, and that this will result in increased costs. (R-116 ¶¶ 8 *et seq.*; C-213 ¶¶ 24 – 26). Respondents' expert notes that the repairs to the coker drums suggested by Claimant in Lawless testimony were inadequate. (R-116 ¶ 13). OCN's costs of US$ 2.1 million to repair 2 of the 4 coker drums likely would have been

higher than those that were actually incurred, unless OCN came to the timely conclusion that its technique was inappropriate. (R-116 ¶ 16).

743. Each of the following six arguments related to Claimant's **cash flow** calculations, in addition to the arguments related to the *CEX*, are relevant in Respondents' discount rate calculation.

744. *First*, Claimant has misrepresented the production capacity of the field at the time of the migration, ignoring facts that were well known to it. Rather than having the production capacity of 132,000 bpd of extra-heavy crude oil, in May 2007 the potential production capacity was only 110,000. At that time, 42 of the 150 wells were inactive *"due to pump failures, sand infiltration or high gas-to-oil ratios, as well as OCN's failure to rehabilitate inactive wells."* (R-III ¶¶ 225-227). The number of inactive wells was on the increase as Claimant left Venezuela. (R-III ¶ 226).

745. *Second*, the history of the Project speaks against Claimant's assumption that production of extra-heavy crude oil over the 27.5-year period will always be at the level of 120,000 bpd and that production and sale of SCO will always be 108,600 bpd. The average sales of SCO being 96.6 million bpd – 11% less than Claimant's 108.6 estimate. Furthermore, the estimate ignores the high likelihood that production of either extra-heavy or SCO, or both, will be interrupted by events such as natural disasters, political events, work stoppages, equipment failure, and governmental and/or OPEC action.

746. *Third*, the assumption that all Government Actions over the next 27.5 years that would reduce cash flows constitute *"Discriminatory Measures"* overlooks the fact that neither the AA nor the Congressional Authorization for the Project purports to *"freeze"* the law of Venezuela or prevent such Governmental Action. Further, there are many measures affecting all oil upgrading projects in Venezuela, including environmental and conservation measures, sustainable development requirements, rental increases, and a

host of others that would decrease cash flows without being *"Discriminatory Measures."* (R-II ¶¶ 204 – 207).

747. *Fourth*, the demand for SCO over the 27.5 year period is uncertain. Marketing the Cerro Negro SCO has been difficult, as it is by far the worst quality of all SCO produced in Venezuela due to its low gravity and high sulfur content.

748. *Fifth*, Respondents point out that Claimant has failed to demonstrate that the change in operatorship was either a Discriminatory Measure or caused the increase in costs. (R-IV ¶ 56; R. Closing Slide 46). Mr. Massey even contradicted the theory. (R-IV ¶ 56). *"Even if it were true that the change in operatorship resulted in higher costs, that fact would not constitute a basis for indemnity under the AA unless the required change itself constituted a Discriminatory Measure, which clearly was not the case here."* (R-III ¶ 215; R-IV ¶ 57).

749. *Sixth*, Respondents oppose Claimant's assessment that the price of SCO will always remain above the **Reference (Threshold) Price**. Oil prices have been historically volatile and an *"average"* of price is not relevant under the **Threshold Cash Flow** formula. Rather, the price in each of the FY in question is important. (R-II ¶¶ 198 – 203).

750. In response to Claimant's argument that the credit risk was not that of PDVSA but rather of the buyers of SCO, Respondents state that Claimant has fundamentally misunderstood what is at issue in the discount rate analysis, as there is no question that the alleged indemnification cash flows would come from PDVSA, not from the buyers of SCO. This is made clear by the entire analysis of Claimant's own experts, who never mentioned that they were valuing cash flows from SCO buyers rather than PDVSA. (R-IV ¶ 74).

751. Respondents argue that it is impossible to determine what an appropriate markdown in volume of production and sales would be if one were to

attempt to project revenues over the next 27.5 years. Respondents contend that, at the very least, the 5% reduction used by Respondents' experts based upon the history of the Project should be used. Other significant remaining risks would then be accounted for in the appropriate discount rate. (R-II ¶ 190).

752. Respondents take issue with Claimant's witnesses' testimony on virtually all aspects of the indemnity. Their conclusions were not based on expertise, but rather on the extensive instructions of counsel. (R-V ¶¶ 40 - 41).

753. Respondents assert that Claimant's witnesses' *"real risk-free tax-adjusted"* discount rate (which counsel instructed them to use) in effect is *"below risk-free"* and assumes away every risk that could come forward in 27.5 years. (R-II ¶¶ 208-210; R-III ¶ 198; R-IV ¶ 67). Respondents state that this rate does not comport with any recognized methodology for valuing future cash flows and that it ignored multiple types of risks – including operational, cost, price, governmental, and default risks – that must be taken into account in the determination of the discount rate. (R-II ¶ 212, R-III ¶ 198). Claimant's witnesses have stated that they considered all of these risks, but rather than account for them, the witnesses ignored them. (R-IV ¶ 70).

754. Respondents' experts also charge that Claimant's expert Prof. Myers's argument that *"[t]he risks of the indemnification cash flows, which are contractual obligations of PDVSA-CN and PDVSA, are minimal, similar to the interest and principal payments on a safe long-term bond"* is unsustainable. The diversification of risk theory that Prof. Myers used to arrive at this conclusion was also rejected in the Phillips case, chaired by the late Dr. Briner. (R-V ¶ 33; C-226; R-147). The argument that the cash flows are as secure as a U.S. Treasury bond is also unsupported by the market treatment of the bond, which never considered the PDVSA bond to be the same as a U.S. Treasury bond. (R-III ¶¶ 201, 205; R-IV ¶ 71; R-V ¶ 34). *"The logical conclusion is that the discount rate for a fixed PDVSA payment obligation would have to be considerably higher than the U.S. Treasury*

*rate, and a discount rate for a contingent indemnification cash flow would have to be even higher to account for the additional risks not faced by a PDVSA bondholder."* (R-IV ¶ 71). Likewise, the US$ 100 analogy made by Prof. Myers is both inapplicable and inapt. *First*, it demonstrates Claimant's misunderstanding of the issue and task of an expert, namely, to determine the appropriate discount rates based on the risks of the cash flow. *Second*, it assumes that the alleged indemnification cash flow was as safe as a U.S. Treasury Bond, demonstrating that Claimant's position that a risk-free discount rate should be used is completely untenable. (R-V ¶ 36).

755. Respondents maintain that, if the recognized ICAPM and other recognized methods for arriving at discount rates are not used, *"the absolute floor of any discount rate would have to be the PDVSA bond rate [Calculated at 9.91% based on the yield on the longest term PDVSA bond as of June 2007], as the purported cash flows are to come from PDVSA-CN or PDVSA itself under the PDVSA Guaranty."* (R-III ¶¶ 199, 206; R-IV ¶ 72). Respondents' experts emphasize the necessity of calculating the cash flow risks into the discount rate: *"unlike a general obligation bond of PDVSA, which has fixed amounts payable out of any PDVSA funds from all PDVSA projects, the indemnity cash flows at issue here would be totally dependent upon the Project's performance and future events, all of which involve risks in addition to those of a PDVSA bond."* (R-III ¶ 205; R-IV ¶ 71; R-V ¶ 34). Respondents' experts assert that these cash flow risks, which are acknowledged, but underestimated by Claimant's experts, could lower the prices and, therefore, the indemnity. Even Mr. Plunkett conceded that risks, including increased cost or reduced production as a result of non-discriminatory Venezuelan governmental measures or other potential events and incidents worldwide, would have a profound impact on the indemnity. (R-V ¶ 34).

756. In response to Prof. Myer's argument that Respondents' 19.8 % discount rate was double what the project discount rate should be, Respondents

performed a calculation of the value of the Project, disregarding the limitation and using a 10% discount rate. The resulting number was lower than the present value of the purported indemnity cash flow using a risk-free discount rate. This result contradicts Claimant's argument that the value of the indemnity cash flow is but a "*tiny fraction*" of what the Project value would be without applying the limitation and demonstrates that the use of a risk-free discount would result in a value that would exceed the value of Claimant's interest in the Project. (R-IV ¶ 76; R-V ¶¶ 37 - 39).

757. There is no support for Claimant's argument that even a 10% discount rate would be too high. (R-V ¶ 39). Without conceding that the rate would be appropriate, Respondents state that even Prof. Myers states that 10% would be within an acceptable range for the Project. (R-V ¶ 39).

758. In response to Claimant's argument against incorporating Respondents' default risk into the discount rate, Respondents explain the Venezuelan principle of law that "*in a damage claim the court does not take into account the debtor's ability to pay in assessing damages,*" is irrelevant in this matter. (R-III ¶ 201). Unlike in a breach of contract action where the breaching party is responsible for the damage suffered, the damages complained of by Claimant are economic losses as the result of alleged "*Discriminatory Measures.*" The Tribunal is considering the valuation of indemnity cash flows, rather than compensation for any wrongful act of PDVSA. (R-IV ¶ 73). The economic losses at issue were not caused by an alleged breach by PDVSA-CN. The indemnity cash flows are, in effect, a form of insurance contract, "*and it is elementary that no valuation would ever be made of such an indemnity without considering the default risk of the insurer.*" (R-IV ¶ 73).

759. The appropriate discount rate is essential to establish the value of the indemnity cash flows. Respondents calculated their discount rate as follows:

213. Respondents' experts Vladimir Brailovsky and Professor Louis T. Wells were instructed to use their best judgment and experience, without limitation, to determine the appropriate discount rate to be applied in calculating the present value of the projected future cash flows. [...] They were asked to assume only that: (a) contrary to the language of the AA, the formulas in the Accounting Procedures apply to future cash flows; (b) all of the measures taken by the Venezuelan Government at issue in this case constituted "Discriminatory Measures," even though that is clearly not the case; and (c) all of the other fundamental defenses interposed by Respondents, as set forth herein, are not accepted by this Tribunal. (R-ll 213, partially quoted).

760. Respondents' experts analyzed Claimant's parent company ExxonMobil's historical rates of return and considered the hypothetical return that could be gained if a willing buyer were found for the Project prior to any events giving rise to the indemnity. For the latter analysis, Respondents' experts gathered data from unchallenged published sources and "*utilized variations of the well-known Capital Asset Pricing Model (CAPM) that have been developed for international markets (generally called International CAPM or ICAPM models) to determine the return on equity that would be required (and the discount rate that would be employed) by a buyer of the future stream of cash flows from an oil project in Venezuela. They benchmarked the results of their analysis against an on-going survey of bankers involved in international projects who rate countries worldwide to assess risk of default.*" (R-III ¶ 203, partially quoted, footnotes omitted; R-IV ¶ 69; R-V ¶ 33). As a result of these analyses, Respondents' experts concluded that the appropriate discount rate to use in connection with the stream of projected cash flows at issue in this case would be 19.8%. (R-III ¶¶ 213 – 217). Respondents' experts point out that Claimant's experts GCA have agreed that a similar and possibly higher rate of return would be acceptable for international projects. (R-III ¶ 205).

[Applying the 19.8% discount rate] to the cash flows of the project, utilizing all of the cost, volume and price assumptions that were used by Drs. Myers and Jones, with a single change – namely, they determine the **Reference (Threshold) Cash Flow** for each [FY] from 2008 through 2035 based upon the actual language of the formula, as described above, which requires deduction from **Reference (Threshold) Revenues** of the royalties and income taxes that "would have been paid," adjusted only to eliminate the effects of the alleged Discriminatory Measures. This change reduces the alleged undiscounted cash

flows from US$10.3 billion, calculated by Myers and Jones based upon the instructions of counsel described above, to US$2.621 billion. Applying the 19.8% discount rate to that undiscounted cash flow would yield a net present value of US$345 million, even assuming no adjustments to Claimant's unrealistic assumptions regarding costs and volume over the life of the project. Reasonable adjustments to the cost and volume projections – based upon actual historical figures as opposed to the 2006 budgeted figures used by Claimant's experts, would reduce the undiscounted cash flow to US$1.837 billion. Applying the 19.8% discount rate to this figure results in a net present value of US$232 million. (R-II ¶¶ 218-219, partially quoted, footnotes omitted).

761. Respondents challenge the "*application of a low discount rate as urged by Claimant [because such] would effectively defeat the entire purpose of the limitation of liability reflected in Article 15.2(a) of the AA and the implementing provisions of the Accounting Procedures.*" (R-III ¶ 208; R-IV ¶ 75). A low rate inflates the present value of the indemnity cash flows – even to the point to making the indemnity exceed the value of the interests in the Project, resulting in a windfall for Claimant, yielding a present value higher than the value of the entire Project without consideration of any limitation. (R-III ¶ 208; R-IV ¶ 75). To illustrate this "*windfall*", Respondents apply the market discount rates of 19.8%, 18% and 16% to price scenarios that assume double and triple the **Reference (Threshold) Cash Flow** amount. Tables comparing these results to Claimant's are available at R-III ¶¶ 209 – 212 and R. Closing Slide 89.

762. Respondents present an additional series of calculations to illustrate how the indemnity provisions conceivably might operate if they were to be applied to future FYs under a variety of assumptions. (R-III ¶ 229 – 241). Each calculation employs the 19.8%, 18%, and 16% discount rates. Each "*adopts Claimant's interpretation of the calculation of royalties and taxes in arriving at the Reference (Threshold) Cash Flow. In Claimant's scenario, the royalties and taxes should be calculated as if the sales price of the SCO produced by the Project were not the market price but the Base (Threshold) Price, so that the royalties and taxes to be deducted from revenues are not, as the formula states, the royalties and taxes that 'would have been paid' in the FY in question absent the Discriminatory Measures but the royalties and taxes that might have been payable if the SCO price were equal to the Base*

*(Threshold) Price.*" (R-III ¶ 231). Each calculation "*also gives effect to the provisions of the AA and the Accounting Procedures contemplating, and requiring, a comparison of a Brent-equivalent cash flow with the Reference (Threshold) Cash Flow.*" (R-III ¶ 232).

763. Respondents also provide a calculation for the event that the AA was extinguished and a forward-looking analysis were required, arguing that the purpose of the indemnity provisions would be served by determining the maximum indemnity to which Claimant might have been entitled had the Project continued with Claimant involved.

> That amount would have been calculated based on the trigger for limitation of liability, which would have been reached, as stated in both the definition of **Reference (Threshold) Cash Flow** in the AA and in Section 15.2(a) itself, when the price per barrel of Brent crude oil reached US$27 in 1996 dollars (which is US$35.88 today). At that point, no indemnity would apply, even if the Government had taken discriminatory action against the Project or Claimant. As Claimant concedes, the price of the SCO produced by the Project was approximately 73% of the Brent price, due to the inferior quality of SCO as compared to Brent. Thus, when the price of Brent reached US$27 per barrel in 1996 dollars, the sales price of SCO would be approximately US$19.78 per barrel. The maximum cash flow protected by the indemnity would therefore be the cash flow resulting from the application of a sales price of production from the Project of US$19.78 per barrel in 1996 dollars (or US$26.29 today). (R-III ¶ 234, footnotes omitted; R-IV ¶¶ 61 – 64, partially quoted).

764. Respondents' calculations are based on this concept of maximum protected cash flows, which adopts Claimant's view of the **Reference (Threshold) Cash Flow** but gives effect to the entire structure of the AA and Accounting Procedures regarding the adjustments necessary to account for the quality and transportation differential between Brent and SCO as follows (R-III ¶¶ 235 – 241 numbers rounded, partially quoted, footnotes omitted):

> 236. Alternative 1. Assuming that all of Respondents' defenses have been rejected and all measures constituted Discriminatory Measures and the projected cash flows are as fixed by Claimant based on the 2006 budget, the net present value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007 would be US$1,445 million (discount rate 16%), US$1,288 million (discount rate 18%) or US$1,173 million (discount rate 19.8%).
>
> 237. Alternative 2. Applying the same data as above, but assuming that the royalty does not give rise to an indemnity obligation, the net present

value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007would be US$1,004 million (discount rate 16%), US$895 million (discount rate 18%) or US$815 million (discount rate 19.8%).

238.  Alternative 3. Applying the same data as the second alternative, but assuming that the income tax increases do not give rise to an indemnity obligation, the net present value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007 would be US$907 million (discount rate 16%), US$811 million (discount rate 18%) or US$740 million (discount rate 19.8%).

239.  Alternative 4. Assuming the same data as in the first calculation except applying Respondents' experts reasonable adjustments to the cash flows based on the actual history of the project, the net present value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007would be US$1,156 million (discount rate 16%), US$1026 million (discount rate 18%) or US$931 million (discount rate 19.8%).

240.  Alternative 5. Assuming the same data as in the Fourth calculation, and that the royalty measures do not give rise to an indemnity obligation, the net present value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007would be US$708 million (discount rate 16%), US$628 million (discount rate 18%) or US$570 million (discount rate 19.8%).

241.  Alternative 6. Applying the same information as Alternative 5 and assuming that the tax measure does not give rise to an indemnity obligation, the net present value of the **Reference (Threshold) Cash Flow** for FYs 2008 – 2035 as of 25 September 2007 would be US$643 million (discount rate 16%), US$570 million (discount rate 18%) or US$517 million (discount rate 19.8%).

765.  Finally, Respondents remind the Tribunal of 2 cases in the record that address the issue of discount rates in international arbitrations and demonstrate the soundness of Respondents' approach to the discount rate issue:

77.  […] In the *Phillips* case, the tribunal, chaired by the late Dr. Briner, flatly rejected Prof. Myers' approach to determining the discount rate, and in particular his reduction of the discount rate based upon risk "diversification" (a theory which he said in this case permitted him to eliminate the discount rate implications of certain risks, but which is contrary to the discussion of diversification in Dr. Jones's article. [See also R-V ¶ 33.] The *Himpurna* case involved damages based on the value of a stream of future cash flows that the supplier would have earned under a take-or-pay power supply contract in Indonesia but for the breach. The tribunal recognized the importance of the "fundamental issue of country risk, obvious to the least sophisticated businessman," and found that a 19% discount rate was appropriate even though the

cash flows at issue had no price risk, no currency risk and no marketing risk. (R-IV ¶ 77, citation omitted; case found at R-148 and C-226).

35. [...] *Himpurna* was introduced into this Arbitration by Respondents because it supports their position on discount rate. Commencing in the paragraph immediately succeeding the one cited by Claimant, the tribunal in *Himpurna* explained that although a cash flow "may be denominated in US dollars," and although the contract "may stipulate absolute obligations to pay, it still makes a difference whether the issuer is Switzerland or Swaziland. . . . This is the fundamental issue of country risk, obvious to the least sophisticated businessman." For that reason, the *Himpurna* tribunal rejected claimant's proposed 8.5% discount rate as being far too low because it only included a 3% risk premium, which the tribunal considered to be "absurd." The *Himpurna* tribunal found that a 19% discount rate was appropriate for that case, which involved a fixed and unconditional payment obligation under a long-term take-or-pay power purchase agreement in Indonesia, involving no marketing risk and no currency risk. In this case, the purported indemnity obligation is neither fixed nor unconditional and involves all of those and many other risks explored at the hearing. (R-V ¶ 35, citations omitted; case found at R-147).

## K.VII.3.c.  The Tribunal

766. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 15, 265, 310 − 341 |
| C-IV | ¶¶ | 9, 17 − 18, 57 − 60, 123 − 126, 162 − 221 |
| R.App | ¶¶ | 6-7 |
| R-II | ¶¶ | 150 − 219 |
| R-III | ¶¶ | 192 − 241 |

### Charts:

| Submission | | Pinpoint |
|---|---|---|
| R-II | ¶ | 186 (SCO Sales) |
| | ¶ | 215 (Table of Discount Rates) |
| | ¶ | 216  (Table of Discount Rates) |
| R-III | ¶ | 209    Inconsistent valuations when applying different discount rates to indemnity cash flows and project cash flows without limitation |
| | ¶¶ | 221, 222 (Turnaround Costs) |
| | ¶¶ | 225 − 227 (Production Capacity) |
| | ¶¶ | 236 − 241 (Indemnity Calculations with Discount Rates) |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-2 | Association Agreement Clause I *defining* "*Discriminatory Measures*", Article 15.1(b) |
| C-4 | Annex G (Accounting Procedures) to the Association Agreement Article 7.3 |
| C-11 | Congressional Authorization Fifteenth and Twentieth Conditions |
| C-18 | Order and Reasons for Judgment Approved by the Court for Handing Down dated 20 March 2008 rendered in *Mobil Cerro Negro Limited and Petróleos de Venezuela, S.A.*, High Court of Justice − Queen's Bench Division Commercial Court, Case No: 2008 Folio 61, [2008] EWHC 532 ¶ 68 |
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 98 − 99 |
| C-46 | Expert Report of William B. Cline of Gaffney, Cline & Associates, Inc., "Technical Assessment of the Cerro Negro Contract Area" (26 September 2008) at pp. 16 − 26, 32, 34 |
| App. 1 | Production and Cost Profiles |
| Figure 13 | Production Entitlement Distribution − Continuation of Current Operations |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) |
| Ex. 5 | 2004-2006 Damages Calculation |
| Ex. 10 | 2007 Damages Payable Calculation (Mobil-CN − 120kbd) |
| C-48 | Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (28 September 2008) pp. 2 − 4, 6 − 20, fn. 22 |
| App. C | Local Risks at C1-C9 |
| App. D. | Legal Instruction for the Calculation of the Appropriate Quantum of the Indemnity for Fiscal Years 2008-2035 at D-1 |
| Table 1 | Fixed Reference Cash Flow Summary |
| Table 2 | Fixed Reference Cash Flow (120,000 bbl/day EHO) |
| Table 3 | Fixed Reference Cash Flow Present Value (120,000 bbl/day EHO) |
| Table 4 | Forecast Reference Cash Flow (120,000 bbl/day EHO) |
| Table 5 | Forecast Reference Cash Flow (Base Price and Forecasted SCO Price) |
| Table 6 | Reference Cash Flow (Summary 2008 − 2035) |
| C-49 | Expert Report of Sarah A. Emerson of Energy Security Analysis, Inc., "The Long-Term Price of Cerro Negro Crude" (15 September 2008) at pp. 3, 5 − 9, 11 |
| C-50 | Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon ("*Lexecon*"), a Wholly-Owned Subsidiary of FT Consulting, Inc. (26 September 2008) and Attachments at 2 − 16 |
| AttachB | Calculation of Forecast Reference Cash Flow at 2 − 6, 8 |
| Figure 4 | Calculation of Fixed Reference Cash Flow |
| Figure B3 | Calculation of Revenues for Forecast Reference Cash Flow |
| Figure B4 | Calculation of Forecast Reference Cash Flow |

| | |
|---|---|
| C-51 | Cambridge Energy Research Associates, "The Cerro Negro Extra-heavy Oil Development: A World-class Asset" (26 September 2008) at 36, 40, 45 |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) at pp. 128 – 129, C-39-40 |
| C-87 | Association Agreement Clause I, Articles 3.3, 4.5(i), 4.5(n), 11.1(a), 14.1, 14.2, 15.1(b), 15.2(a), 18.4, 23.7, Annex F Articles 3.3, 4.2 – 4.3, Annex G (Accounting Procedures) Articles 1.9.1, 1.2, 1.4, 2.12, 7.3, 7.5, 7.52 |
| C-134 | Venezuelan Civil Code Art. 1276 |
| C-141 | Association Oil Supply Agreement (also known as Chalmette Offtake Agreement), Mobil Cerro Negro, Lagoven Cerro Negro, S.A. and Chalmette Refining (1 November 1997) Annex B |
| C-154 | Letter dated 23 June 2005 from Ministry of Energy and Mines to Cerro Negro, Communication # 935 |
| C-167 | BARRON'S DICTIONARY OF BUSINESS TERMS (3d ed. 2000) |
| C-186 | Transcript of *Aló Presidente* No. 288 (29 July 2007) p. 5 |
| C-213 | Testimony of Brian Lawless (14 May 2009) at ¶¶ 5, 10, 12, 13, 17 – 32, 34 – 46, 48 – 51, 54, 59 – 68 |
| Ex. 1 | 1 December 2004 PCN Board Presentation |
| Ex. 2 | 2 November 2006 PCN Board Presentation |
| C-215 | Second Declaration of Professor Eugenio Hernández-Bretón (14 May 2009) at ¶ 86 |
| C-216 | Reply Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon (15 May 2009) at ¶¶ 4, 13 – 16, 18 – 27, 31 – 32, 35, 37, 39, 95 Figures 2, 4, 6-7 |
| App. 17 | Ramón Espinasa, "The Performance of the Venezuelan Oil Sector 1997–2008: Official vs. International and Estimated Figures," Center for Hemispheric Policy, University of Miami, (26 February 2009) |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) pp. 15 – 32 |
| C-218 | Reply Expert Report of William B. Cline of Gaffney, Cline & Associates, Inc. (12 May 2009) pp. 3 – 15, Figures 2, 4 |
| C-219 | Expert Report of Neil Earnest of Muse Stancil (11 May 2009) at ¶¶ 19 – 26, 33 – 37 |
| C-220 | Reply Expert Report of Professor Stewart C. Myers of the Brattle Group (13 May 2009) at ¶¶ 5 – 8, 10 – 35, 38, 41, fn. 35, App. A and B |
| Ex. 2 | R. A. Brealey, S. C. Myers & F. Allen, *Principles of Corporate Finance*, 9th ed., New York: McGraw-Hill (2008) |
| Ex. 4 | Macquarie Research, ExxonMobil, "Put a Tiger in Your Bank," December 13, 2007 pp. 4, 19 |
| Ex. 7 | *Ibbotson Cost of Capital 2008 Yearbook*, Chicago: Morningstar, Inc. (2008) |
| C-221 | Reply Expert Report of Sarah A. Emerson of Energy Security Analysis, Inc. At 3 – 5, 8 – 11 |
| C-226 | *Phillips Petroleum Co. Iran v. Islamic Republic of Iran*, Award of 29 June 1989, 21 Iran-U.S. C.T.R. 79 (1989) |
| C-227 | *Southern Pacific Properties (Middle East) Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB 84/3, Award of 20 May 1992, 8 |

|       | ICSID Review-Foreign Inv. L.J. 328, 375 (1989) |
|-------|-----|
| C-244 | *Lyondell-CITGO Refining, LP v. PDVSA* (S.D.N.Y. No. 02-CV-0795), Declaration of Álvaro Silva Calderón (23 May 2002) |
| C-259 | Common Security Agreement among Mobil Cerro Negro Holding, Ltd., *et al.* (18 June 1998) App. N |
| C-261 | PDVSA Bond Prospectus (4 December 2007) at 92 – 93 |
| C-262 | *Lyondell-CITGO Refining, LP v. PDVSA* (S.D.N.Y. No. 02-CV-0795), Report of Barry Pulliam (30 September 2004) |
| C-263 | U.S. Energy Information Administration, "How dependent are we on foreign oil?" (27 April 2009) |
| C-264 | OPEC 2008 World Oil Outlook at 25 |
| C-275 | DAN B. DOBBS, DOBBS LAW OF REMEDIES, Vol. 3, at 126 (2d ed. 1993) |
| C-276 | *American List Corp. V. U.S. News & World Report, Inc.*, 550 N.Y.S.2d 590, 593-94 (N.Y. 1989) |
| C-327 | Updated Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC (30 July 2010) |
| C-328 | Updated Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. And Compass Lexecon (30 July 2010) |
| C-329 | Updated Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (30 July 2010) |
| C-330 | Updated Expert Report of Sarah A. Emerson of Energy Security Analysis, Inc., "The Long-Term Price of Cerro Negro Crude" (July 2010) |
| R-7 | Decree-Law 5200 Art. 3 |
| R-8 | *Mobil Cerro Negro Limited v. Petroleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 (Justice Walker), *Reasons for Judgment Approved by the Court for Handing Down and Order Discharging Freezing Injunction* (20 March 2008) ¶¶ 4, 5, 28(ii), 45, 68 |
| R-15 | First Affidavit of Hobert Plunkett (21 January 2008) |
| R-32 | Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61, 27 – 28 |
| R-35 | Tr. 2 December 2008 Hearing pp. 2, 30 – 31, 58 – 59, 70 – 71, 84 – 85, 130, 141 – 142, 162 |
| R-36 | Letter from Eugene D. Gulland, Esq., to Ben Preziosi, Esq., (23 December 2008) |
| R-37 | Outline Argument on Behalf of Claimant In Support of Its Application For an Order for Alternative Service and In Opposition to the Application by the Respondent to Discharge the Worldwide Freezing Order, dated 27 February 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶ 82, pp. 27 & 28 |
| R-38 | Tr. 24 January 2008, *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) p. 8, 9 |
| R-39 | First Affidavit of R. Dean Graves (25 February 2008), *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 |

| | Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) |
|---|---|
| R-42 | The *The Next Shock?*, THE ECONOMIST, 4 March 1999, *available at* www.economist.com |
| R-43 | Congressional Authorization Eighteenth and Twentieth Conditions |
| R-72 | Association Oil Supply Agreement (Chalmette Supply Contract) (1 November 1997) |
| R-93 | Expert Report of Barry Pulliam and Anthony Finizza, Ph.D., Econ One Research, Inc. (16 February 2009) at ¶¶ 1, 29 – 34, 41, 54(ii), 62 – 129, fn. 38, 43, Tables 11 – 13, 16 |
| App. 23 | Supporting Data for Figure 4, Annual Average World Oil Prices 1970-2008 at 26 |
| App. 32 | Supporting Data for Table 16, Calculation of Threshold Cash Flows, Fiscal Years 2008 – 2035 |
| R-94 | Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, prepared by Vladimir Brailovsky, Economía Aplicada, S.C. (16 February 2009) at ¶¶ 22(i), (iv), 32 – 36 |
| App. 9 | Wood Mackenzie, *ExxonMobil, Upstream RADAR Report*, July 2007 |
| R-95 | Direct Testimony of José Ángel Pereira Ruimwyk (12 February 2009) at ¶¶ 7, 10 – 16, 18, 19, 22, 24 – 29, 31 – 33, fn. 1, 2, 9, 13, 14, 23, 24, 25, 26, 27, 30 |
| App. 5 | Petrolera Cerro Negro Board of Directors Meeting, 2 November, 2006: Work Plan and Budget 2007 p. 31 |
| R-98 | Expert Report on the Discount Rate to be Applied to Projected Cash Flows Prepared by Vladimir Brailovsky and Louis T. Wells, (16 February 2009) at ¶¶ 13 – 14, 19 – 44, 47 – 98, fn. 4, 33 and Tables 5 – 10 |
| R-99 | *Marchers Back Work Stoppage in Venezuela*, LOS ANGELES TIMES, 24 December 2002 |
| R-100 | Letter from Chalmette Refining, LLC to PDV Chalmette, Inc. (7 February 2008) |
| R-101 | *America is Addicted to Foreign Oil*, August 7, 2008, *available at* www.PickensPlan.com |
| R-102 | *General Motors Outlines Roadmap for Cities to Plug Into the Chevrolet Volt Electric Vehicle, 3* February 2009, *available at* www.media.gm.com |
| R-103 | ExxonMobil Corporation, 2007 FINANCIAL & OPERATING REVIEW, *available at* www.exxonmobil.com |
| R-104 | *Exxon Mobil to spend $125 billion on production in next 5 years*, DENTON RECORD-CHRONICLE, 6 March 2008, *available at* www.dentonrc.com |
| R-105 | Jad Mouawad, *Exxon Plans to Lift Output a Million Barrels a Day*, NEW YORK TIMES (8 March 2007) |
| R-106 | IHS Herold Inc. And Harrison Lovegrove & Co. Limited, 2008 GLOBAL UPSTREAM PERFORMANCE REVIEW, *available at* www.herold.com, p. 5 |
| R-107 | International Energy Agency, MEDIUM-TERM OIL MARKET REPORT July 2008 |
| R-108 | Gaffney, Cline & Associates Inc., *Memorandum: Expected Returns and Approval Economics* (18 May 2008) |

| R-112 | Association Agreement Clause I, Article 15.2(a) |
|---|---|
| R-113 | Supplemental Expert Report on Fiscal Year 2007 Indemnity Cash Flow Calculation, Prepared by Vladimir Brailovsky (14 August 2009) at ¶¶ 9 – 16 |
| App. 12 | Cash Flows for Fiscal Year 2008 |
| R-114 | Supplemental Brailovsky/Wells Report at ¶¶ 7 – 39, 48 – 57, 62 – 81, 162 – 174, fn. 58, Table 2, 4 |
| App. 25 | Richard J. Miller, "Sources and Uses of Non-proprietary Economic Data: What Every Evaluation Engineer Should Know," Society of Petroleum Engineers No. 68596, April 2001 |
| App. 26 | Glenn Boyle, "Corporate Investment Policy: What is the Cost of Capital?," for *Telecom: Submission to Commerce Commission*, LECG (10 June 2002) pp. 8 – 9, 15 – 16 |
| App. 38 | Calculation of the Net Present Value of Threshold Cash Flow under Alternative Assumptions |
| R-115 | Supplemental Expert Report of Econ One Research, Inc. (14 August 2009) at ¶¶19 – 31, 37 – 45 |
| R-116 | Supplemental Direct Testimony of José Ángel Pereira Ruimwyk (11 August 2009) at ¶¶ 2 – 32, fn. 8, 23, 41, 43 |
| App. 27 | Organic Labor Law [*Ley Orgánica del Trabajo*] Official Gazette No. 5.152 (Extraordinary), published 19 June 1997, Art. 195 and 207 |
| App. 28 | PetroMonagas, "Automatic Head Opening System of Delta Valve" (English Translation and Spanish Original); Delta Valve Technical Specifications for Coker Drum Sliding Valves and Customer List |
| App. 29 | *Ley Contra los Ilícitos Cambiarios* (Law Against Illicit Exchanges) Official Gazette No. 38.879, published February 27, 2008, Art. 19 |
| R-117 | Bernard Mommer, *Venezuela, Politics and Petroleum* (Cuadernos del Cendes, Year 16, No. 42 September-December 1999) |
| R-124 | Cerro Negro, Confidential Preliminary Information Memorandum, Vol. I, March 1998 p. I-8 |
| R-127 | Annex G (Accounting Procedures) to the Association Agreement Articles 7.2, 7.3 |
| R-128 | Texas General Land Office Press Release, *Patterson requests state hearing on Exxon oilfield abuses: Company's oilfield sabotage, fraud and cover-up exposed in nearly 20-year-old case*, dated 17 July 2009 |
| R-129 | Joe Carroll, *Exxon Sabotage May Merit $1 Billion Fine, Agency Says (Update 2)*, BLOOMBERG (17 July 2009) |
| R-135 | *Institutional Investor's September 2009 Country Credit Ratings*, INSTITUTIONAL INVESTOR (September 2009) |
| R-136 | Muse Stancil, *Market Assessment for Alberta Clipper Project 2010-2020* (March 2007) |
| R-137 | Muse Stancil, *North American Ethanol Market Overview* (July 2007) |
| R-138 | Sarah A. Emerson, *The Outlook for Oil Consumption*, EASI ARGUS CRUDE OIL SUMMIT 2010 (27 January 2010) |
| R-139 | *The Causes of Soaring Oil Prices: Industry Analyst Views*, MULTINATIONAL MONITOR, Vol. 29, No. 4 (September – October 2007) |
| R-140 | Sander Cohan, *The Future of Motor Fuels*, NACS MAGAZINE (July |

|  | 2009) |
|---|---|
| R-141 | Sander Cohan, *Scatter Shot Reform*, INTERNATIONAL ASSOCIATION FOR ENERGY ECONOMICS (2009) |
| R-142 | Reid W. Click & Robert J. Weiner, *Resource nationalism meets the market: Political risk and the value of petroleum reserves*, JOURNAL OF INTERNATIONAL BUSINESS STUDIES (Vol. 41 2010) |
| R-143 | William H. Knull, III, Scott T. Jones, Timothy J. Tyler & Richard D. Deutsch, *Accounting for Uncertainty in Discounted Cash Flow Valuation of Upstream Oil and Gas Investments* (12 November 2007) pp. 19 – 22, n. 50 |
| R-145 | Claudia Cattaneo, *Where Oil and Water Mix*, FINANCIALPOST.COM (1 November 2008) |
| R-146 | Daniel Yergin, *It's Still the One*, FOREIGN POLICY (Sept./Oct. 2009) |
| R-147 | *Himpurna California Energy Ltd. (Bermuda) v. PT (Persero) Perusahaan Listruik Negara (Indonesia)*, Final Award dated May 4, 1999, YEARBOOK COMMERCIAL ARBITRATION, Vol. XXV (A. Jan van den Berg ed., Kluwer Law International 2000) ¶¶ 13, 332, 335, 357 – 358, 364 – 371, 386 |
| R-148 | *Phillips Petroleum Company Iran v. The Islamic Republic of Iran, The National Iranian Oil Company*, Case No. 39, Award No. 425-39-2 dated 29 June 1989, 21 IRAN-U.S. C.T.R. 79 (1989) ¶¶ 113, 136 – 155 |
| R-149 | The Nineteenth Annual Society of Petroleum Evaluation Engineers Survey of Economic Parameters Used in Property Evaluation (June 2000) pp. 9, 11 – 12 |
| R-150 | The Twentieth Annual Society of Petroleum Evaluation Engineers Survey of Economic Parameters Used in Property Evaluation (June 2001) pp. 15, 20 – 21 |
| R-151 | S SPEE 2007 Property Evaluation Survey pp. 19, 24, 26 |
| Unnumbered | Ministry of Energy, Petróleo y Otros Datos Estadísticos 2006 (49th ed. 2008), at 61 |

**Hearings:**

**At and Following the 2010 Hearings:**

| Submission | Pinpoint |
|---|---|
| C-V | ¶¶ 14 – 30 |
| C-VI | ¶¶ 47 – 62 |
| R-IV | ¶¶ 50 – 82 |
| R-V | ¶¶ 31 - 44 |
| C. Closing | p. 24 |
| C. Closing Slides | 23, 34 – 54, 80 |
| C. Opening Slides | 30 – 48, 51 - 56 |

| Speaker | Citation |
|---|---|
| Brailovsky | 1835-1837, 1845, 1848-1849, 1855-1856, 1861, 1878-1883, 1885-1889, 1967 |
| C. Closing | 2086-2090, 2096 |
| C. Opening | 35, 63, 78 |

| | |
|---|---|
| Cline | 1218, 1240, 1242-1250, 1266-1268, 1275-1278 |
| Cranmer | 446, 450, 458 |
| Cutt | 645, 651, 653 – 657, 691-692 |
| Expert Conf. | 1980-1985 |
| Finizza | 1772-1780, 1782-1783, 1786-1790, 1793-1797, 1812-1815, 1818 |
| Graves | 1526-1528, 1534-1535, 1537-1538, 1547-1548, 1558-1559, 1564, 1568-1572, 1581-1582, 1597-1603, 1606-1608, 1630-1632, 1653-1669, 1671-1672 |
| Hoenmans | 405, 414-415 |
| Jones | 1328-1330, 1335, 1358-1363, 1375-1378, 1383-1384, 1386, 1408 – 1410, 1417 – 1420, 1427, 1430-1431, 1435-1438, 1441-1442, 1449-1453, 1457-1460, 1471-1474, 1476, 1479-1483, 1487, 1503, 1504-1505 |
| Lawless | 1119-1121, 1123-1124, 1176, 1188-1189 |
| Leitzinger | 1823-1825, 1832 |
| Massey | 484, 500 - 501 |
| Myers | 1678-1679, 1682-1688, 1690, 1692-1693, 1695-1698, 1700, 1704, 1707-1708, 1714, 1716, 1735-1737, 1746-1747, 1762, 1765-1766, 1968 - 1969 |
| Pereira | 1033-1034, 1037-1040, 1048-1049, 1057, 1093-1096, 1101, 1103-1104, 1106-1108 |
| Plunkett | 796, 836-850 |
| R. Closing | 2107-2108, 2158-2165, 2169, 2170, 2174-2175, 2178-2180, 2182-2183, 2194 |
| R. Opening | 86, 91-92, 127-131 |
| Ward | 198, 223-224, 228, 307 – 308 |
| Wells | 1916, 1923, 1926-1929, 1935, 1938-1939, 1945-1947 |

767. As indicated above, the Tribunal's task is to apply the common intention of the Parties reflected in the AA. The interpretation of the Parties' agreement, and their intention should be based on the plain and ordinary meaning of the terms used by them, considering the agreement as a whole and its general context. The Tribunal has concluded that the intention of the Parties as reflected in the terms of the AA is to provide a basic level of compensation to the Claimant in the event of the occurrence of a Discriminatory Measure such as the ones it has found to have occurred in this case.

768. In light of the Tribunal's decisions and considerations, set out above, that it has jurisdiction to consider the issue of indemnity for FY 2008 – 2035, and its interpretation of the relevant provisions of the AA, the Tribunal hereby issues an Award of US$ 894.9 million in favor of Claimant. The Tribunal

thus accepts Respondents' calculation alternative 2 at the Discount Rate of 18%, found at Exhibit R-114 App. 38. This calculation assumes that all measures except for the Royalty Measures, could be classified as Discriminatory Measures. As a result of this calculation, the net present value of the Threshold Cash Flow for 2008 – 2035 as of 25 September 2007 is US$ 894.9 million, using an 18% discount rate. The reasons for this decision, which are consistent with the decision above for FY 2007, are as follows.

769. As indicated and extensively discussed above, the Tribunal is authorized to award compensation for FYs 2008 – 2035. Pursuant to the terms of the AA, the calculation of compensation for the economic consequences of Discriminatory Measures, in general, is subject to a limitation contained in a formula which calculates compensation on a FY by FY basis. In this case, the Respondents argue that there can be no compensation because this formula and limitation cannot be applied in the future, since there will be no operations by the Claimant in the future and no actual figures on which to base the application of the formula. Indeed, this fact makes it difficult to apply the indemnity formula. While this fact makes it more difficult to apply the indemnity formula, the Tribunal considers that the mere fact of difficulty in applying the formula is not sufficient reason for it not to award compensation. Difficulty in calculating damages or compensation is often faced by arbitral tribunals and is not sufficient reason to deny compensation where liability has been established. In this case, the intention of the Parties was to provide a certain level of compensation to the Claimant in the circumstances found by the Tribunal to have occurred.

770. In this case, it is clear that after the expropriation of the Claimant's rights, the Claimant could have no **Net Cash Flow** as defined in the relevant provisions of the AA and the Accounting Procedures. As a result, the limitation based on the use of an actual **Net Cash Flow** cannot apply. This leaves two alternatives: (i) apply the provisions of the AA and the formulas

in the Accounting Procedures in such a way that absence of actual **Net Cash Flow** does not prevent the application of the limitation intended by the Parties; or (ii) award damages "*at large*" under general damages principles at Venezuelan law. Neither of these alternatives would result in deciding *ex aequo et bono*. Rather, either would be the consequence of the application of the intention of the Parties as reflected in the AA as interpreted by the Tribunal. In the Tribunal's view, the most satisfactory of the alternatives is the application of the limitation contained in the provisions of the AA and the Accounting Formulas. This approach reflects the Parties' intention to provide limited contractual indemnification for Discriminatory Measures, rather than providing another broader form of compensation "*at large.*" In the Tribunal's view, this can be achieved by adopting the approach proposed by the Claimant and its experts in respect of the application of the formulas in the Accounting Procedures. This is a reasonable, practical approach which is consistent with the Parties' intention to provide a limited form of compensation. The Tribunal also accepts the Claimant's use of budget data and historical results in the calculation of the various components of the formulas. However, as described below, it takes a different view with respect to the appropriate discount rate, which leads it to accept the Respondents' alternative calculation of compensation payable contained in R-114, App. 38, Table A.38.3 (NPV @ 18%).

771. As in the previous section concerning the indemnity for 2007, the Tribunal again considers that the FY 2007 budget is the most accurate reflection of the Parties' intent and expectation for the Project's production, as well as costs. Indeed, the Parties agreed to this budget before the dispute arose. The budget also accurately indicates the anticipated SCO production and costs absent Discriminatory Measures. Finally, there is ample evidence in the record that it is not only feasible, but also probable that the Project, had it continued, could have met the budget – not only for 2008, but also for the years thereafter. (C-48 ¶ 3, p. 5). The Project had a demonstrated capacity to support the base EHO production of at least 120,000 bpd. (C-48 ¶ 3, p. 5).

Accordingly, the Tribunal concludes that it is appropriate in the circumstances of this case and under the meaning of the AA to use the FY 2007 budget amounts for production and costs in the indemnity calculation.

772. As a practical matter, the use of budgeted data may prevent the double counting of some production risks when calculating the indemnity. In this way, the selected discount rate can accurately encompass the relevant potential risks in the indemnity cash flow.

773. With respect to the Discount Rate, the Tribunal notes that the AA does not explicitly provide a discount rate or provide the Tribunal direction in this respect. The Tribunal does not view this as evidence that the Parties did not intend for the indemnification calculations to apply in the event that the Project were to no longer exist, in situations such as that before the Tribunal. Nor does the Tribunal consider that the absence of a discount rate is evidence that the Tribunal should award an undiscounted compensation package, especially where industry and accounting practice speaks against such. (See R-98). Rather, the Tribunal considers that an integral part of its assessment of compensation due involves selecting an appropriate discount rate for the indemnity values. The Parties have each conceded the necessity of discounting the indemnity cash flows and have presented alternative calculations using different discount rates. The dispute is which discount rate is appropriate under the circumstances.

774. Generally speaking, the Tribunal considers that there is a difference between valuing future cash flows under an indemnity formula and valuing the potential cash flows from a project. There is a valid distinction between the two exercises, not the least of which being that there may be fewer risks to indemnity cash flows than to Project cash flows. At the same time, it is essential not to apply a discount rate which would "*add back the very risks that the indemnity protects against.*" (Myers's Testimony at p. 1684). Rather, the discount rate should accurately reflect the risks related to the indemnity cash flow. In the present case, there are multiple risks to be taken

into consideration and the indemnity cash flows are linked with Project cash flows. Accordingly, historical rates of return, as well as other methods for evaluating and selecting an appropriate discount rate, are of relevance.

775. Given volatility in rates of return and the contractual 35-year duration of the Project, the Tribunal considers that long-term historical rates of return are relevant in determining the discount rate. (R-98 ¶ 23). Likewise, the historical return to shareholders, both in ExxonMobil and in other comparable oil companies, is also of relevance. In this respect, it is important to note that the average return for ExxonMobil shareholders has been 18.4%, while shareholders in the five largest companies, including ExxonMobil, earned an average return of 17.1%. (R-98 ¶ 26). This is relevant and is some indication of the reasonable expectation of rates of return.

776. The Tribunal has also considered the WAAC or hurdle rates that companies set for their investments. The Tribunal also notes that Gaffney, Cline & Associates has stated that an 18% return for large projects would be acceptable. (R-108).

777. In the view of the Tribunal, the 18% Discount Rate proposed as an alternative by Respondents' counsel, while lower than the rates provided in the *Phillips* decision and the *Himpurna* case, appropriately reflects the risks related to the indemnity cash flow analysis in the present case. The "*risk free*" rate proposed by the Claimant is not acceptable. While the Tribunal does not accept that valuation of the indemnification payments is the same as valuation of the Project itself, in the circumstances of this case, the Discount Rate of 18% is the most appropriate of the rates proposed by the Parties.

778. In view of the above considerations, the Tribunal concludes that, for the period of 2008 to 2035, Respondents must pay Claimant compensation of US$ 894.9 million.

## K.VIII.    Breach of the Association Agreement

### K.VIII.1    Arguments by Claimant

779. As specified in ¶ 356 of Claimant's **Principal Memorial**, Claimant requests that the Tribunal declare that PDVSA-CN breached the AA (i) by failing to indicate its concurrence, pursuant to Section 15.1(b) of the AA, that Discriminatory Measures causing a Materially Adverse Impact had occurred;(ii) by failing to cooperate with Claimant in the prosecution of its legal action against the Republic of Venezuela; (iii) by failing to negotiate in good faith the calculation of the indemnity that PDVSA-CN was obligated to pay Claimant under the AA; and (iv) by failing to pay to Claimant the indemnity that PDVSA-CN was obligated to pay under the AA. Claimant also requests that the Tribunal declare that PDVSA breached the Guaranty by failing to perform the obligations of its Guaranteed Affiliate, PDVSA-CN, under the AA.

780. Claimant maintains that under Section 15.1(b) of the AA, PDVSA-CN had ninety (90) days after receiving a Notice of Discriminatory Measure to give notice of concurrence that Discriminatory Measures resulting in Materially Adverse Impact had occurred and to fulfill its obligations under Sections 15.1(a) and (b). Claimant further maintains that it provided such notices in June 2007 to PDVSA-CN, which – in spite of having acknowledged the expropriation of Claimant's interest in the Project – ignored these notices, failed to perform its obligations and thus breached the AA (C-I ¶ 82; C-III ¶ 247; C-VI ¶ 5). Specifically, Claimant contends that PDVSA-CN (i) failed to give Claimant notice of concurrence that Discriminatory Measures have occurred that caused a Materially Adverse Impact; (ii) failed to cooperate with Claimant in its legal action against the Government; (iii) failed to negotiate in good faith the calculation of the compensation required; and (iv) ultimately, failed to pay the compensation it owes to Claimant under the AA (C-III ¶ 243, 245-246).

781. In particular, Claimant argues that (i) Article 1160 of the Civil Code required PDVSA-CN to interpret the AA in good faith and perform its obligations under the AA in good faith and (ii) that PDVSA-CN, in good faith, could not have failed to concur that at least the expropriation of Claimant's entire interest in the Project by operation of Decree-Law 5200 was a Discriminatory Measure resulting in a Materially Adverse Impact (C-III ¶ 244).

782. Furthermore, Claimant argues that PDVSA breached the Guaranty by failing to perform the obligations of its Guaranteed Affiliate, PDVSA-CN, under the AA, obligations which PDVSA was required to perform if PDVSA-CN did not and PDVSA was jointly and severally liable with PDVSA-CN (C-I ¶ 83).

783. In particular, Claimant maintains that on 10 October 2007, Claimant gave notice to PDVSA that PDVSA-CN was in breach of the AA and demanded performance by PDVSA of its obligation under the Guaranty, but that PDVSA did not perform PDVSA-CN's obligations and has not paid the compensation owed to Claimant and thus is in breach of its obligations under the Guaranty (C-I ¶ 83).

784. Finally, Claimant argues that its claims arose when Respondents failed to meet their obligations under the AA and the Guaranty. According to Claimant, Respondents breached the AA when they failed notably (i) to respond to Claimant's notices; (ii) to cooperate in good faith in negotiating and calculating the amount owed; and (iii) to pay the indemnity (C-V ¶ 12).

## K.VIII.2    Arguments by Respondents

785. Respondents contend that, despite Claimant's efforts to argue that Respondents breached their obligations under the AA and the Guaranty by not immediately paying over whatever sum Claimant desired, it is clear under the AA that PDVSA-CN could not be in breach of anything and that PDVSA therefore could not be in breach of the Guaranty. According to

Respondents, PDVSA-CN would have been perfectly within its rights to dispute the allegation (i) that a Discriminatory Measure had occurred giving rise to an indemnity obligation; (ii) that the other requirements of the AA for triggering indemnity had been met; or (iii) that the amount sought by Claimant was appropriate. Respondents assert that given the shortcomings of Claimant's case, Respondents' challenges are justified, and that the issue of breach would only arise if and when an arbitral tribunal determined that indemnification in a certain amount for specified Discriminatory Measures was due and was not thereafter paid in a timely manner. Respondents contend, therefore, that there has not been any breach of the AA by Respondents (R-III ¶ 50).

786. Thus, Respondents maintain that Respondents cannot be held to have acted in bad faith by not immediately (i) concurring with Claimant on its interpretation of the facts, the applicable law and the terms of the AA, and (ii) paying the amount claimed by Claimant, whether it was the US$ 12 billion calculated by Mr. Plunkett, the US$ 10 billion set forth in the Summary of Claimant's Position in the Terms of Reference, the US$ 7.6 billion originally calculated by one of Claimant's external experts, the US$ 6.45 to US$ 6.85 billion claimed in the present arbitration, or the US$ 5 billion that Claimant requested without explanation or discussion in the summer of 2007 for all of its interests in the Republic of Venezuela, including the Project and another project known as "*La Ceiba*." In light of the above, Respondents maintain that it is not clear what amount Claimant expected Respondents to pay (R-II ¶ 6).

787. Respondents contend that since the ICSID case was moving too slowly for Claimant, the latter brought this arbitration against Respondents in order (i) to obtain a worldwide freezing order and attachments not available in the context of the ICSID proceeding and (ii) to use this case to build an argument under the Chalmette Offtake Agreement supporting a future seizure of the 50% interest of a PDVSA subsidiary in the Chalmette refinery

in Louisiana. According to Respondents, none of the tactical reasons mentioned above has anything to do with the merits of an indemnity claim against PDVSA-CN under the AA (R-V ¶ 45).

## K.VIII.3  The Tribunal

788. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-I | ¶¶ | 76-85, 90 |
| C-III | ¶¶ | 242-253; 356 |
| C-IV | ¶ | 246 |
| C-V | ¶ | 12 |
| C-VI | ¶ | 5 |
| R-I | ¶¶ | 16-19 |
| R-II | ¶ | 2-10 |
| R-III | ¶ | 50 |
| R-V | ¶ | 45 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-44 | Expert Opinion of Professor Hernández-Bretón at ¶¶ 33-40; 88, 96-106 |
| C-103 | |
| C-141 | Transcript of Bernard Mommer Interview (12 February 2008) p. 8 Chalmette Offtake Agreement |

789. The Tribunal observes that Section 15.1(b) of the AA sets forth the conditions under which a party to the AA may commence arbitration under the AA. Section 15.1(b) provides that *"[i]f, within the ninety (90) days following the receipt of the Notice of Discriminatory Measure,* [PDVSA-CN] *does not give* [Claimant] *notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred, any Party may commence arbitration proceedings in accordance with Section 18.2."* The above provision therefore does not oblige PDVSA-CN to give notice of its concurrence that Discriminatory Measures resulting in a Material Adverse Impact have occurred within the specified ninety (90) days, as

Claimant argues. To the contrary, Section 15.1(b) contemplates the possibility of bona fide disputes between the parties to the AA concerning the occurrence of Discriminatory Measures resulting in a Material Adverse Impact and sets up a framework for the resolution of such disputes by means of arbitration. In other words, PDVSA-CN and Claimant are free under the AA to disagree on whether Discriminatory Measures resulting in a Material Adverse Impact have occurred. In the event no agreement is reached between the Parties, any party may commence arbitration to resolve any outstanding disputes, including disputes relating to the occurrence of Discriminatory Measures, whether such measures have had a Materially Adverse Impact on the Foreign Party, the compensation payable in the event a Discriminatory Measure having a Materially Adverse Impact occurs and the appropriate recommendations on amendments to the AA to restore the economic benefit to the Foreign Party.

790. The Tribunal considers (i) that, given the complexity of the many issues that were raised and that were examined above, a bona fide dispute existed and exists between the parties to the AA concerning whether Discriminatory Measures resulting in a Material Adverse Impact have occurred in this case; (ii) that PDVSA-CN's participation in this arbitration initiated by Claimant for the resolution of the said dispute is contemplated by the procedure contained in Clause XV of the AA and, more specifically, in Section 15.1(b) of the AA; and (iii) that Claimant has not proven any bad faith on the part of PDVSA-CN.

791. In particular, the Tribunal is not persuaded by Claimant's argument that PDVSA-CN, in good faith, could not have failed to concur that at least the expropriation of Claimant's entire interest in the Project by operation of Decree-Law 5200 was a Discriminatory Measure resulting in a Materially Adverse Impact. The Tribunal considers it relevant in this context that Claimant, through written notice letters to Respondents (see e.g. C-5, C-6, and C-7), went directly to the Republic of Venezuela and entered into

negotiations for an amicable settlement with the Government immediately after the four-month period established by Decree-Law 5200 for negotiation of the terms of migration ended without agreement having been reached with Claimant. Consequently, the Tribunal concludes, Claimant did not effectively attempt to negotiate from PDVSA-CN an admission that a Discriminatory Measure occurred, or a resulting payment, and/or modifications to the AA, concentrating, rather, on approaching the Government. The Tribunal next observes that Section 15.1(a) of the AA provides that PDVSA-CN shall cooperate with Claimant in the pursuit of legal actions undertaken by the latter to mitigate any damages suffered by it as a result of a Discriminatory Measure, "*[i]f* [PDVSA-CN] *concurs that the Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact* [...]." The AA, through the above provision, therefore does not oblige PDVSA-CN, in every case, to cooperate with Claimant in the prosecution of its legal action against the Republic of Venezuela, as Claimant appears to argue. To the contrary, the AA obliges PDVSA-CN to cooperate with Claimant in such legal actions only if PDVSA-CN concurs that a Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact.

792. The Tribunal considers, for the reasons stated above, that the AA therefore imposed no formal obligation on PDVSA-CN to cooperate with Claimant in the prosecution of Claimant's legal action against the Republic of Venezuela. In addition, the Tribunal has already noted that, in fact, Claimant did not initiate any legal proceedings before the domestic courts of the Republic of Venezuela, but only filed the ICSID arbitration which was against the Government of Venezuela and in which PDVSA-CN was not a party or directly involved. Consequently, there were no legal actions in which PDVSA-CN could in fact cooperate with Claimant.

793. The Tribunal further observes that Section 15.1(a) of the AA also provides that PDVSA-CN and Claimant shall negotiate in good faith the

compensatory damages necessary to remedy a Discriminatory Measure. Once again, however, this obligation under the AA applies only *"[i]f* [PDVSA-CN] *concurs that the Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact [...]."*

794. The Tribunal considers, once again, that particularly since Claimant directly negotiated with the Government, the AA therefore imposed no formal obligation on PDVSA-CN to negotiate with Claimant the calculation of any indemnity. Even if one considers Dr. Mommer's acknowledgement of expropriation as tantamount to concurrence that a Discriminatory Measure resulting in a Material Adverse Impact had occurred in this case, as the Tribunal has already noted, in fact, Claimant did not effectively attempt to negotiate payment from PDVSA-CN and/or modification to the AA, concentrating, rather, on the Republic of Venezuela, with which Claimant entered into negotiations for an amicable settlement immediately after the four-month period established by Decree-Law 5200 for negotiation of the terms of migration ended without agreement having been reached with Claimant. The Tribunal finally observes that Section 15.1(b) of the AA defines, in the following terms, the scope of arbitration proceedings brought to resolve disputes between the parties to the AA concerning whether Discriminatory Measures resulting in a Material Adverse Impact have occurred: *"(i) a determination of whether one or more Discriminatory Measures have occurred and, if so, whether such measures have had a Materially Adverse Impact on* [Claimant] *; and (ii) in the event of an affirmative answer to the two questions specified in clause (i) of this paragraph, an award for damages to compensate* [Claimant] *for the economic consequences of the Discriminatory Measure suffered by it to date [...]."* Pursuant to this provision, therefore, when PDVSA-CN does not concur that Discriminatory Measures resulting in a Material Adverse Impact have occurred, PDVSA-CN is under no obligation to pay any indemnity to Claimant until an arbitral tribunal constituted in accordance with Section 18.2 of the AA has rendered an award (i) deciding that Discriminatory

Measures resulting in a Material Adverse Impact have occurred and, (ii) in such a case, deciding the amount of compensation to be awarded.

795. In view of the above considerations, the Tribunal considers that the issue of breach would only arise if and when an arbitral tribunal determined that indemnification in a certain amount for specified Discriminatory Measures was due and was not thereafter paid in a timely manner. Such a determination is the purpose of the present award, which is particularly justified in light of the Tribunal's finding above that, in view of the complexity of the issues involved, (i) neither party was in a position to correctly evaluate its rights under the AA in the factual circumstances of this case when the dispute arose, and (ii) Claimant in good faith could believe it was entitled to billions of dollars and Respondents in good faith could believe that nothing was due under the AA.

796. Therefore, the Tribunal concludes that PDVSA-CN did not breach the AA for any of the reasons argued by Claimant and that, consequently, PDVSA did not breach the Guaranty by failing to perform the obligations of its Guaranteed Affiliate, PDVSA-CN, under the AA. Accordingly, the Tribunal finds that there are no grounds to grant Claimant's request for a declaration that PDVSA-CN breached the AA and that PDVSA breached the Guaranty.

## L. Considerations and Conclusions of the Tribunal Regarding the Counterclaims

797. This section considers Respondents' counterclaims and, therefore, presents Respondents' arguments prior to Claimant's arguments. To avoid confusion, *"Respondents"* in this section refers to PDVSA and PDVSA-CN, and Claimant continues to refer to *"Mobil CN."*

## L.I.     Jurisdiction

### L.I.1          Arguments by Respondents

798. Respondents have not presented any arguments related to jurisdiction.

### L.I.2.          Arguments by Claimant

799. Claimant argues that "*ICC tribunals have limited jurisdiction, based on the Parties' agreement.  In this case, the Respondents' failure to specify the legal basis for each counterclaim has obvious jurisdictional implications.*" (C-II ¶ 10).

800. With respect to the counterclaim for damages resulting from the attachments in New York, Claimant submits that the Federal District Court in New York possesses jurisdiction over claims for damages arising from attachments granted by that court. (C-IV ¶ 19 point 3, ¶¶ 243-244).

### L.I.3.          The Tribunal

801. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-II | ¶ | 10 |
| C-IV | ¶¶ | 19, 243 - 244 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-189 | Order of Attachment dated 27 December 2007 rendered in *Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro S.A.*, U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB) |
| C-201 | New York Civil Practice Law and Rules § 6212(e) |
| C-273 | *E.T.I. Euro Telecom International N.V. v. Bolivia*, No. 08-civ-4247 (S.D.N.Y. 9 December 2008) |

**Tribunal Materials**

Document Name and Pinpoint

ICC Case 15416 *Decision on Application by the Respondents for an Order Directing the Claimant to Withdraw the Attachments* (19 December 2008)

802. The Tribunal is not persuaded by Claimant's objections to jurisdiction over the counterclaims. Claimant refers to the merits of the counterclaims which will be examined hereafter.

803. For the same reasons for which the Tribunal has accepted its jurisdiction above regarding the claims raised by Claimant, in view of the very broad wording of the arbitration clause in Article 18.2 AA, the Tribunal also has jurisdiction over the counterclaims raised.

## L.II. Compensation for Attachment in New York

## L.II.1. Arguments by Respondents

804. Respondents present their argument that they are entitled to relief for damages incurred as a result of the conservatory measures undertaken by Claimant at R-II ¶ 230 (partially quoted, footnotes omitted):

> 230. [...] ExxonMobil determined that it had not made sufficient progress in the negotiations with the Venezuelan Government and needed to apply pressure by asserting claims against Respondents for US$12 billion in damages. The New York attachment was made despite the express understanding of good faith cooperation relating to the financing that the parties had been acting under for nearly an entire year and despite the provisions of the Termination Agreement, in which Claimant represented that "there is no provision of law, statute, regulation, rule, order, injunction, decree, writ or judgment. . . that . . . would prohibit, conflict with or in any way prevent the execution, delivery or performance of the terms of this Agreement." (R-II ¶ 230)

805. The attachments were unnecessary and improper in light of the fact that Respondent PDVSA, through PDV Chalmette, is still a 50/50 partner with an affiliate of ExxonMobil in Chalmette Refining. This joint venture has an estimated value of US$ 3.6 billion. (R.App. ¶ 10). Respondents' interest cannot be sold without ExxonMobil's permission. Respondents argue that this provided Claimant a security as a matter of fact.

### L.II.2. Arguments by Claimant

806. Claimant states that it sought and obtained conservatory measures in five jurisdictions (New York, England and Wales, the Netherlands, Curacao, and Aruba) to ensure that the Award to be rendered in this case would not become illusory through dissipation of the Respondents' assets.

> 242. The undisputed evidence demonstrates that the attachments were necessary to preserve [its] ability to enforce the Award it seeks in this arbitration proceeding. PDVSA-CN has been stripped of all its assets other than the funds attached in New York. Venezuelan officials have publicly stated that "PDVSA-CN does not exist." PDVSA's financial condition has declined over the last several years, and PDVSA has sold or announced its intention to sell many of its assets in the United States, the Netherlands Antilles, the Bahamas, Germany, the Netherlands, Sweden, and the United Kingdom. Mobil CN faced the possibility that, before this arbitration could begin, any eventual · award from the Tribunal would be meaningless. (C-IV ¶ 242, partially quoted, footnotes omitted).

807. The conservatory measures were permissible under **Article 23(2) of the ICC Rules** and the respective jurisdictions. (C-II ¶¶ 12-13, 15, 16). All except the conservatory measures in England and Wales remain.

808. Finally, Claimant states that "*the New York attachment was issued subject to a fully contested proceeding which Respondents have chosen not to appeal.*" (C.Reply ¶ 4; C-IV ¶¶ 241). Further, "*Respondents have made no showing that the attachment was wrongful in any respect and they ignore that, under New York law, the federal district court in New York possesses jurisdiction over claims for damages arising from attachments granted by that court.*" (C-IV ¶¶ 19 point 3, 243-244).

### L.II.3. The Tribunal

809. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | Pinpoint |
| --- | --- |

| C-II | ¶¶ | 12 – 16 |
| C-IV | ¶¶ | 19, 240 – 244 |
| C. Reply | ¶¶ | 4 – 5 |
| R-II | ¶¶ | 230 – 232, n. 359 |
| R. App | ¶ | 10 |

## Exhibits:

| Exhibit | Document Name |
| --- | --- |
| C-18 | Order and Reasons for Judgment Approved by the Court for Handing Down dated 20 March 2008 rendered in *Mobil Cerro Negro Limited and Petróleos de Venezuela, S.A.*, High Court of Justice - Queen's Bench Division Commercial Court, Case No: 2008 Folio 61, [2008] EWHC 532 |
| C-19 | Order Confirming Attachments dated 20 February 2008 rendered in *Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro S.A.*, U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB) |
| C-20 | 28 January 2008 letter from the Claimant to The Secretariat of the International Court of Arbitration, informing of application for and issuance of Freezing Injunction and Disclosure Order against Respondent Petróleos de Venezuela, S.A. in the High Court of Justice - Queen's Bench Division Commercial Court in London |
| C-21 | 8 February 2008 letter from the Claimant to The Secretariat of the International Court of Arbitration, informing of application for and issuance of orders of attachment against Respondent Petróleos de Venezuela, S.A. in the District Court of Amsterdam, the Kingdom of the Netherlands; the Court of First Instance of the Netherlands Antilles in Willemstad, Curacao; and the Court of First Instance of Aruba in Oranjestad, Aruba |
| C-22 | Tr. of "Declarations of the Minister of Popular Power for Energy and Petroleum and President of PDVSA, Rafael Ramírez, on the ExxonMobil - PDVSA Arbitration Case" [*Declaraciones del Ministro del Poder Popular para la Energía y Petróleo y Presidente de PDVSA, Rafael Ramírez, sobre el caso Arbitraje Exxon Mobil-PDVSA*] dated 8 February 2008, *available at* www.pdvsa.com |
| C-23 | Petróleos de Venezuela, S.A.'s Offer to Purchase and Consent Solicitation Statement dated 29 November 2007 |
| C-24 | Articles of Incorporation and By-Laws of Mixed Company Petromonagas, S.A. [*Acta Constitutiva y Estatutos Sociales de la Empresa Mixta Petromonagas, S.A.*] (published in Official Gazette of the Bolivarian Republic of Venezuela No. 38.883 of 4 March 2008) |
| C-25 | Consolidated Financial Statements as of 31 December 2007 and 2006 of Petróleos de Venezuela, S.A. and Affiliates With Report from the Independent Public Accountants [*Estados Financieros Consolidados 31 de diciembre 2007 y 2006 de Petróleos de Venezuela, S.A. y sus Filiales Con el Informe de los Contadores Públicos Independientes*] |
| C-26 | *PDVSA 1H07 Profits Drop 68.5% to US$896mn*, Business News |

|       | Americas, 21 February 2008 |
|-------|----------------------------|
| C-27  | *Citgo Scales Back in the U.S. to Fund Chávez's Goals*, The Wall Street Journal, 16 November 2007 |
| C-28  | *BORCO Buyers Inject $550M in Equity Capital*, The Tribune, 30 April 2008 |
| C-29  | *Citgo Sells Eagle Oil Products Line to Explorer*, Reuters UK, 24 August 2007 |
| C-30  | Citgo Sold the Refineries Paulsboro and Savannah to NuStar [*Citgo vendió las refinerías Paulsboro y Savannah a NuStar*], El Universal, 8 November 2007 |
| C-31  | *Venezuela Considers Sale of U.S. Refineries*, The New York Times, 2 February 2005 |
| C-32  | President Chávez Announced the Strategy to Latinoamericanize International Investments of PDVSA [*Presidente Chávez Anunció la Estrategia de Latinoamericanizar Inversiones Internacionales de PDVSA*], press release of Ministry of Popular Power for Communication and Information of the Bolivarian Republic of Venezuela, 1 February 2005 |
| C-38  | Propernyn B.V.'s Annual Accounts 2003 and Report to Management dated 20 December 2005 |
| C-189 | Order of Attachment dated 27 December 2007 rendered in *Mobil Cerro Negro, Ltd. V. PDVSA Cerro Negro S.A.*, U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB) |
| C-190 | Order of Supplemental Attachment (S.D.N.Y. 8 January 2008) |
| C-201 | New York Civil Practice Law and Rules § 6212(e) |
| C-202 | *SiVault Sys., Inc. v. Wondernet, Ltd.*, 2005 WL 681457 (S.D.N.Y. 25 March 2005) |
| C-203 | Declaration of Leonardus Cornelis Jacobus Maria Spigt at 13-18 |
| C-273 | *E.T.I. Euro Telecom International N.V. v. Bolivia*, No. 08-civ-4247 (S.D.N.Y. 9 December 2008) |
| R-12  | First Affidavit of Armando Giruad (13 February 2008) 30 – 33 |
| R-15  | First Affidavit of Hobert Plunkett (21 January 2008) |
| R-16  | Attachment Order of the Court of First Instance of Curaçao (1 February 2008); Attachment Order of the Court of First Instance of Aruba (1 February 2008); Attachment Order of the District Court of Amsterdam (5 February 2008) |
| R-28  | PDVSA Discussion Materials (Chalmette Refinery), prepared by Morgan Stanley (July 10, 2007) |
| R-30  | Affidavit of Brian O'Kelly (23 January 2008) submitted to the U.S. District Court for the Southern District of New York in Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro, S.A., 07 Civ. 11590 (DAB at ¶¶ 30-37 |
| R-32  | Argument of Ms. Otton-Goulder, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), 2008 Folio 61 |
| R-35  | Tr. of 2 December 2008 Hearing100, 110 – 114, 169 – 170 |
| R-39  | First Affidavit of R. Dean Graves (25 February 2008) *Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A.*, Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) |

| | |
|---|---|
| R-110 | Docket Account Management System Report, Case No. 1:07 CV 11590-1, United States District Court, Southern District of New York |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) at ¶¶ 26 – 27 |
| App. 46 | First Affidavit of Luis A. Ortiz-Álvarez (22 January 2008) submitted in *Mobil Cerro Negro Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008, Folio 61 |
| R-120 | Outline Argument on Behalf of Claimant in Support of Application for Worldwide Freezing Order (23 January 2008) submitted in *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A.*, High Court of Justice, Queen's Bench Division, Commercial Court (London), Claim No. 2008 Folio 61 pp. 23 - 25 |

**Tribunal Materials**

**Document Name and Pinpoint**

ICC Case 15416 *Decision on Application by the Respondents for an Order Directing the Claimant to Withdraw the Attachments* (19 December 2008)

**At and Following the 2010 Hearings:**

| Submission | | Pinpoint |
|---|---|---|
| R-IV | ¶¶ | 5, 59 – 61 |
| R. Closing | p. | 94 |
| R. Closing Slides | | 23, 80 |

| Speaker | Citation |
|---|---|
| C. Opening | 63 |
| Cutt | 773-775 |
| Graves | 1653-1668 |
| Jones | 1358-1363 |
| Leitzinger | 1823-1824 |
| Myers | 1697-1698, 1707 – 1708, 1746-1747 |
| R. Closing | 2124-2128 |
| R. Opening | 85-86 |

810. First, it is recalled that, on **19 December 2008**, this Tribunal denied the **Application by the Respondents for an Order Directing the Claimant to Withdraw the Attachments**. The relevant text of this Decision is provided in the Procedural History of this Award.

811. The Tribunal notes that the procedure for attachments was permitted by **Article 23.2 of the ICC Rules** and that the courts in New York found the attachment to be justified. Where courts have issued interim measures, arbitral tribunals are generally reluctant, absent specific circumstances, to assess damages that may have flowed from the measures adopted by a state court. Here the New York courts considered the measure and upheld it. Damages related to the proceedings in London can be pursued there.

812. The Tribunal does not see specific circumstances which, nevertheless, would provide for the liability of the Claimant for compensation. First, it is noted that Respondent did not appeal the decision of the New York courts. Further, the Tribunal does not find that the attachment was abusive. Neither Party was in a position to correctly evaluate its rights under the AA in the factual circumstances of this case at that time. The Tribunal accepts that Claimant in good faith believed it was entitled to billions of dollars and Respondent in good faith believed nothing was due under the AA.

813. In view of the above considerations, the Tribunal concludes that the initiation of the attachments was not a breach of the AA or of the ICC Rules incorporated by its arbitration clause, and therefore no damages are due to Respondent in this regard.

814. However, even though this Tribunal has no competence to rule on enforcement, it deems it appropriate to state, *motu proprio*, and without creating any obligation for Claimant, that it would seem to be desirable that the attached amount of approximately US$ 315 million, together with any accrued interest, be used by Claimant to partially satisfy the amount of the Award, to the fullest extent reasonably possible under the circumstances.

815. The Tribunal is also of the view that it has at least a *bona fide* responsibility to consider how payment of the attached funds can be made in order to avoid a situation where further court proceedings by either Party would become necessary to recover the attached funds together with any accrued

interest, or where after payment of the present Award by Respondents, Claimant still has the attached funds at its disposition. Though this Tribunal cannot rule on these attached funds, it seems clear that it would indeed be abusive for Claimant to claim in such case payment of the attached funds for claims decided by the present arbitration. In view of this consideration, the Tribunal will grant Respondents 60 days to pay, in order to enable the Parties to agree on a solution in this regard, such as for example, either for Claimant to release the attached funds or to reduce the amount payable by Respondents in the same amount. It should be noted that this period is also relevant with regard to the cancellation of bonds considered later in this Award.

816. Finally, the Tribuanal finds that the Claimant has not breached any obligation to Respondents and that, therefore, no payments or additional costs are due to Respondents.

## L.III. Product Sold and Delivered After 26 June 2007

### L.III.1. Arguments by Respondents

817. After the four-month period for the agreement on migration, 2.98 million barrels of SCO with a value of US$ 171,552,666 from the Project were shipped to the Chalmette Refinery. (R-II ¶ 221). When Mobil CN chose not to migrate, it lost all of its interest in the Project, including any barrels in "*inventory.*" (R-II ¶ 222 partially quoted, footnotes omitted). Mobil CN admits that it had no interest in approximately 1.68 million of the 2.98 million barrels of SCO that were delivered and that it owes PDVSA-CN approximately US$ 96.1 million in respect of those barrels. The remaining 1.3 million barrels of SCO were valued at approximately US$ 75.5 million, which is owed to Respondents.

### L.III.2. Arguments by Claimant

818. Under Article 8.2(b) of the AA, title to the EHO extracted from the Project vested in the participants at the wellhead upon extraction, according to their

participation in the Project. Accordingly, Mobil CN was the owner of its 41 2/3% share of EHO extracted before 27 June 2007 and of the SCO produced from that EHO. Mobil CN does not have to pay restitution for property it owned. (C-IV ¶ 224, footnotes omitted).

819. Claimant argues that **Decree-Law 5200** would not strip Claimant of title to the extracted oil because "*[t]he operative part of Decree-Law 5200 requires transfer of the activities of the Cerro Negro Association to PDVSA and does not purport to apply to oil inventory owned by the participants.*" (C-IV ¶ 225).

820. As a further indication that Claimant had title to the oil, Claimant highlights that "*[a] PDVSA subsidiary (PDVSA Petroleo, S.A.) prepared the bills of lading that designated the volumes as shipped 'on behalf of Mobil CN'*" and that this designation by a PDVSA subsidiary confirms that the 1.3 million barrels were, in fact, owned by Mobil CN. (C-IV ¶ 225).

## L.III.3.    The Tribunal

821. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-II | ¶¶ | 18, 20, 24 |
| C-III | ¶ | 309 |
| C-IV | ¶¶ | 19, 223 - 226 |
| R-II | ¶¶ | 221 – 223 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-33 | 30 July 2007 letter from David Perez, Vice President of Mobil Cerro Negro, Ltd. to Eulogio del Pino, PDVSA Petróleo, S.A., and Minister Rafael Ramírez, Minister for Popular Power for Energy and Petroleum of the Bolivarian Republic of Venezuela. |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages |

|         | Payable (26 September 2008) pp. 15-17 |
|---------|---------------------------------------|
| Ex. 9   | Adjusted Formula Price Based on Brent Ratio |
| Ex. 11  | Summary of Post-Expropriation Shipping Revenue |
| C-87    | Association Agreement Clause I *defining* *"Commercial Production"*, Article 8.2(b) |
| C-99    | Decree-Law 5200 Art. 4, 5 |
| C-265   | Bills of Lading dated 28 June 2007, 2 August 2007, and 20 August 2007 |
| R-14    | First Affidavit of Brian O'Kelly (8 February 2008) ¶¶ 4-9 |

822. The entitlement to the 1.6 million barrels of oil in question (valued at US$ 96,073,622 in Exhibit C-47 Ex. 11, which is referenced by both Parties) extracted after 26 June 2007 is not disputed: the Parties agree that this oil did not belong to Claimant and, therefore, its value should be offset against any amount of compensation ultimately awarded to Claimant in this Award.

823. As there is no dispute between the Parties in this regard, the Tribunal accepts Respondents' claim to this extent. The Claimant has already acknowledged that the amount payable to it by the Respondents pursuant to this Award should be automatically reduced by US$ 96,073,622 upon receipt by it of an appropriate release.

824. The 1.3 million barrels of oil (valued at US$ 75,479,045, again in the same expert report referenced by both Parties) extracted before 26 June 2007 vested at the wellhead and became the property of Claimant under Article 8.2(b) of the AA, which remained in effect until that date. The Arbitral Tribunal does not see any legal basis to order restitution of property owned by Claimant to Respondent. The Tribunal, therefore, denies the counterclaim in respect of this portion of the 2.98 million barrels at issue.

825. Finally, the Tribunal finds that the Claimant has not breached any obligation to Respondents and that, therefore, no payments or costs are due to Respondents.

## L.IV.  Project Financing

### L.IV.1.     Arguments by Respondents

826. The essential facts are not in dispute.  Claimant and Respondent PDVSA-CN were each responsible for 50% of the debt for the US$ 600 million raised through the sale of bonds and the US$ 300 million bank loan obtained to finance the Project. (R-II ¶ 224; C-IV ¶ 229).

827. After the issuance of **Decree-Law 5200**, PDVSA-CN and Claimant agreed to determine an appropriate strategy to avoid a potential default.  Rather than redeem the bonds and incur a redemption premium of US$ 100 million, *"PDVSA made a tender offer for the bonds which required the payment of principal, accrued interest[,] and a premium equal to about one-third of the redemption premium that would have been required in a redemption scenario."* (R-II ¶ 225).

828. On **28 December 2007**, PDVSA repaid the outstanding bank debt and accrued interest in the amount of US$ 129,138,839 million and paid US$ 501,140,756 to acquire 99.11% of the outstanding bonds.  PDVSA incurred fees and transactional costs totaling US$ 1,094,726. (R-II ¶ 226; C-217 p. 35).  Respondents argue that these transactions were necessary to avoid a declaration of default under the financing agreements which would have resulted from the Government's actions – not from any actions of the Parties before this arbitration. (R-II ¶ 228).

829. Mobil CN has benefitted from Respondents' actions.  Mobil CN made no payments to creditors and was relieved of any obligations toward creditors.  Further, *"the collateral that had been established for the benefit of the creditors, including cash of approximately US$250 million in collateral accounts maintained at the Bank of New York, was released to Mobil CN."* (R-II ¶ 226).  Having benefited from the transactions that were funded by PDVSA, Claimant cannot now claim that PDVSA must bear the full costs on its own. (R-II ¶ 228).

### L.IV.2. Arguments by Claimant

830. Claimant argues that PDVSA has no right to pursue a counterclaim based on the outstanding bonds, unless Mobil CN were to default on its payment obligations under those bonds. PDVSA acknowledges that, since December 2007, Mobil CN has made principal payments toward Mobil CN's portion of the bond liability and interest payments as due. (C-IV ¶ 233 footnotes omitted).

831. Although PDVSA has no right to pursue a counterclaim based on the outstanding bonds, Claimant states that it is willing to credit its 50% share of the outstanding amounts of the bonds held by PDVSA against the Award obtained in this proceeding, provided that PDVSA cancels the bonds. Claimant is not liable for the bond premium and transactional costs, which were caused by the expropriation of Claimant's investments. (C-IV ¶ 228).

832. Claimant acknowledges that it received a benefit from PDVSA's repayment of the bank loan and that an amount of approximately US $64.6 million corresponds to Claimant's share of the repaid debt. It states that it is willing to have this amount credited against an award against the Respondents in return for an appropriate release. Claimant also argues that it is also not liable for the bank loan restructuring costs. Under Article 23.9 of the AA, neither party shall have liability arising from transactions of the kind the Respondents executed to restructure the debt. Article 23.9 of the AA provides as follows:

> 23.9 Any agreement entered into by any of the Parties which [...] is outside the scope of this Agreement shall not be binding on the other Parties [...]. Only the Party entering into such agreement shall be subject to any liability that might arise there from. Each one of the Parties shall be liable for its own financing and none of the Parties shall incur liability for the debt, interest or fees arising from any financing obtained by the other Parties (or their Affiliates) in connection with the Project; it being understood that none of the Parties shall be obligated to participate in financings available to the other Parties.

833. Claimant maintains that "*the repayment of the bank debt and purchase of the bonds occurred at PDVSA's initiative, as a result of negotiations*

*between PDVSA and its creditors, and was designed to avoid the adverse
consequences that PDVSA would have suffered from a declared default."*
(C-IV ¶ 237). Claimant did not participate in the bond tender offer and
PDVSA was the sole purchaser of the bonds. (C-IV ¶ 238; C-23). Further,
there is no legal authority for PDVSA's alleged right to recover costs that
were attributable to its actions – especially in light of the fact that *"the
restructuring was prompted by the expropriation of Mobil CN's
participation in the venture by PDVSA's owner."* (C-IV ¶ 237).

834. Claimant also points out that PDVSA acknowledges that the debt
restructuring was necessary because of *"actions by the Venezuelan
Government"* and puts forward an equity argument in this respect:

> To require Mobil CN to pay for the debt restructuring necessitated by
> the expropriation of its assets to preserve the creditworthiness of
> PDVSA — whose sole shareholder, the Republic of Venezuela, carried
> out the expropriation — serves no equitable interest. On the contrary,
> equity demands that PDVSA bear the entire cost of the transactions.
> Mobil CN has already affirmed its willingness to credit its share of the
> bank loans against an award from this proceeding as well as its
> willingness to credit the outstanding bonds against such an award,
> provided that PDVSA cancels them. In equity and good conscience,
> PDVSA can ask for nothing more. (C-IV ¶ 239).

## L.IV.3.    The Tribunal

835. In the context of this section, the Tribunal, without repeating the contents,
takes particularly into account the following sections of the Parties' Briefs
and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-II | ¶¶ | 28 – 38 |
| C-III | ¶¶ | 341 |
| C-IV | ¶¶ | 227 - 239 |
| R-I | ¶ | 45 |
| R-II | ¶¶ | 224 – 229 fn. 357 |

### Exhibits:

| Exhibit | Document Name |
|---|---|

| C-23 | Petróleos de Venezuela, S.A.'s Offer to Purchase and Consent Solicitation Statement dated 29 November 2007 at 1 |
| C-34 | 30 March 2007 letter from Allen Broyles, First Vice-President of ABN AMRO Bank, N.V., acting as Facility Agent for Bank Lenders, to Mr. Eulogio del Pino, PDVSA Cerro Negro, S.A. and Mr. James Massey, Mobil Cerro Negro, Ltd. |
| C-35 | 26 April 2007 letter from Deutsche Bank Trust Company Americas Trust & Securities Services, as Bond Trustee, to The Bank of New York. |
| C-36 | 20 June 2007 letter from Andrew P. Strehle, Brown Rudnick Berlack Israels LLP, to Steven J. Reisman, Esq., Curtiss, Mallet-Prevost, Colt & Mosle LLP, and Mitchell A. Seider, Esq., Latham & Watkins LLP. |
| C-37 | Amended & Restated Bond Indenture among Cerro Negro Finance, Ltd., Mobil Cerro Negro, Ltd., PDVSA Cerro Negro, S.A., and Deutsche Bank Trust Company Americas, dated 28 December 2007 (without exhibits) §§ 1.01, 2.09, 5.06 |
| C-47 | Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC, on 2007 ICC Damages Payable (26 September 2008) p. 17 |
| C-69 | Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) |
| C-87 | Association Agreement Article 23.9 |
| C-217 | Reply Expert Report of R. Dean Graves of Alvarez & Marsal (12 May 2009) at 32, 33 |
| App. 8 | Bond Payment Information |
| C-327 | Updated Expert Report of R. Dean Graves of Alvarez & Marsal, Dispute Analysis & Forensic Services, LLC (30 July 2010) |
| R-14 | Affidavit of Brian O'Kelly ¶¶ 4 – 9 |

836. The Tribunal considers it obvious that Claimant should not be liable for any financing or additional costs caused by the Government's Discriminatory Measures.

837. The Tribunal takes note of Claimant's statement that it is willing to credit its share (50%) of the bank loan repaid by PDVSA against an Award in this proceeding, as well as its share (50%) of the outstanding amounts of the bonds held by PDVSA against an Award obtained in this proceeding upon receipt by it of an appropriate release. Indeed, there seems to be no controversy between the Parties that Claimant is 50% responsible for the principal amount of the bonds and loans.

838. The Tribunal notes that in 2007, shortly after the issuance of **Decree-Law 5200**, the Parties "*[...] agreed to work together [...] to avoid a potential*

*default with respect to the financing obligations for the Cerro Negro Project and to determine an appropriate strategy."* (R-II ¶225). In these circumstances, doubts could be raised as to whether the financing would be solely an obligation of PDVSA.

839. However, the Tribunal considers that Article 23.9 of the AA is so broadly phrased that it must cover also this situation, notably by providing that *"[...] each party is liable for its own financing and none of the Parties shall incur liability for the debt, interest or fees arising from any financing obtained by the other Parties [...]"*

840. Therefore, the Tribunal concludes that this counterclaim for related costs must be denied.

841. With respect to the outstanding bond liability, the Tribunal notes that neither of the Parties sought any express relief regarding the cancellation of the bonds. The Tribunal accepts the Claimant's position that while it maintains its payment obligations under the bonds, there is no basis for a claim against it for repayment of its share of the outstanding bond liability. Further, there was no evidence that the Claimant was in default of any of its obligations under the bonds. Accordingly, there is no basis to grant this portion of the Respondents' counterclaim. Nevertheless, the Claimant has repeatedly stated that it is willing to credit its 50% share of the outstanding bond liability against an award obtained against the Respondents in this proceeding, provided that PDVSA cancels the bonds. In light of this, the Tribunal is prepared to grant the Respondents a period of 60 days to pay the award in order to permit PDVSA time to make appropriate arrangements to cancel the bonds and provide suitable confirmation to the Claimant. If this can be achieved within the 60 day period, the amount owing by the Claimant may be set off against the Award granted in its favor.

842. With respect to the Claimant's share of the bank debt repaid by PDVSA, US$ 129,138,839, the Tribunal notes that the Claimant does not dispute its

responsibility for half of this amount, US$ 64,569,420 and is willing to have this amount credited against an Award entered against the Respondents subject to obtaining an appropriate release from PDVSA. (C-217 p. 35). In these circumstances, the Tribunal finds that the Respondents' counterclaim in the amount of US$ 64,569,420 is warranted and should be granted on the condition that an appropriate release be obtained and provided to the Claimant. Provided this is done within 60 days of this Award, the amount of US$ 64,569,420 on account of this aspect of the Respondents' counterclaim may be set off against the Claimant's Award against the Respondents.

843. Finally, the Tribuanal finds that the Claimant has not breached any obligation to Respondents and that, therefore, no payments are due to Respondents.

## M. Pre-Award and Post-Award Interest

### M.I. Arguments by Claimant

844. In its closing argument, Claimant stated that the Award should be quantified as of the date of the Award. Claimant explained that that would be akin to pre-award interest, given the valuation in the indemnity equations and in the memorials was only provided as of September 2007. Claimant also argued that the Award should declare that Claimant is entitled to post-award interest until payment is made in full. (C.Closing pp. 39 - 40).

845. Claimant's legal argument in favor of pre-award and post-award interest is best taken from its own words, found at C-III ¶¶ 342-344:

> 342. Under Venezuelan law, the quantum of the compensation must be determined at the time of the judgment or award. In the event of a time lag between the last update of the damages calculation and the award, the principle of full indemnification under Venezuelan law requires that Mobil CN be compensated by pre-award interest on the amount of the compensation, from the date of the calculation to the date of the award.

> 343. In addition, Mobil CN is entitled to post-award interest (*i.e.* interest accruing on the amount awarded from the date of the award until

payment or a court judgment enforcing the award) under the law of New York, which is the lex arbitri. Under New York law, post-award interest is a procedural matter governed by New York Civil Practice Law and Rules (CPLR) 5002. CPLR 5002 provides in relevant part:

Interest shall be recovered upon the total sum awarded, including interest to verdict, report or decision, in any action, from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment.

An arbitrator's award is a "report or decision" for the purposes of this provision. New York courts have confirmed that, under CPLR 5002, post-award, pre-judgment statutory interest accrues on arbitral awards from the date of the award.

344. Under the law of New York, post-award interest accrues at the simple interest rate specified in CPLR 5004. CPLR 5004 provides that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."

## M.II.     Arguments by Respondents

846. While Respondents have reserved the right to submit additional defenses, evidence, arguments, and claims as appropriate, Respondents have not made any arguments related to pre- and post-award interest. (R-III ¶ 245).

847. Respondents have, however, consistently referenced the idea that they seek relief "*plus interest*" in the counterclaims. (R-I ¶ 45, R-II ¶¶ 223 – 224, 229, 232 – 233; R-III ¶ 244). The only instance where Respondents give a "*start date*" for such interest, however, is with regard to Respondents' counterclaim concerning the shipments, where Respondents state that they seek interest on the amounts at issue from the date of each shipment. (R-II ¶ 223).

848. In one case cited by Respondents, *Phillips Petroleum* (R-148), the tribunal considered it fair to award interest at the rate of 10 % starting from the date of the taking, based on the "*Treaty of Amity*" referenced in that case. (R-148 ¶¶ 215, 217(a)). Respondents submitted this exhibit in defense of its "*discount rate*" position and have not, however, referenced it for any other argument.

## M.III.    The Tribunal

849. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 257; 342 - 344 |
| R-I | ¶ | 45 |
| R-II | ¶¶ | 223 – 224, 229, 232 - 233 |
| R-III | ¶¶ | 244 - 245 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶ 107 |
| C-142 | New York Civil Practice Law and Rules §§ 5002, 5004 |
| C-143 | *Murphy v. Wack*, 576 N.Y.S.2d 129, 130-31 (1991) |
| C-144 | *Kavares v. Motor Vehicle Acc. Indemnification Corp.*, 285 N.Y.S.2d 983, 986 (1967) |
| C-145 | *East India Trading Co. v. Halari*, 114 N.Y.S.2d 93, 94 (1952) |
| C-171 | 28 U.S.C. § 1961 |
| R-148 | *Phillips Petroleum Co. Iran v. Islamic Republic of Iran, The National Iranian Oil Company*, Case No. 39, Award No. 425-39-2 dated 29 June 1989, 21 Iran-U.S. C.T.R. 79 (1989) ¶¶ 215, 217(a) |

### At and Following the 2010 Hearings:

| Submission | | Pinpoint |
|---|---|---|
| C. Closing | pp. | 39 – 40 |

| Speaker | Citation |
|---|---|
| C. Closing | 2099 |

850. The Claimant has requested pre-award and post-award interest, as specified in Part V of the Claimant's **Principal Memorial**.

851. The Tribunal's decision on interest is subject to positive and negative constraints, which may result from (i) *lois de police* of the law governing the contract or the *lex arbitri*, or (ii) the terms of the contract itself. Absent

these constraints, the Tribunal should decide on how considerations of justice are best served by an award of interest.

852. The Tribunal finds that the Parties have not provided compelling arguments regarding the question of which law is applicable to pre-award and post-award interest. The Claimant appears to have referred to Venezuelan law as applying to pre-award interest and to New York law as applying to post-award interest without explaining this differentiation. The Tribunal does not see any compelling reason for such a differentiation and, using its discretion according to Art. 17.1. and 2 ICC Rules, finds that New York law is applicable to its decisions on interest, since the contracts (Art. 18.2 AA and section 12 of the Guaranty) provide for New York as the seat of arbitration and therefore New York law is the *lex arbitri,* and applicable to this arbitration

853. Regarding **pre-award interest**, the New York CPLR § 5002, however, does not provide a positive compelling rule for the Tribunal (*i.e.* there is no entitlement to pre-award interest pursuant to this statute, cited by Claimant). Thus, the Tribunal retains its discretion with regard to such an award. In making this decision, the Tribunal has identified four theoretical *"starting dates"* for the running of pre-award interest:

  \*      On the date of filing the Request for Arbitration

  \*      On the date of dispossession of rights

  \*      On the date of breach

  \*      On the date of notice to pay

854. The Tribunal has eliminated from consideration these four *"starting dates"* for the following reasons. *First,* a tribunal may award pre-award interest based on the date of filing the Request for Arbitration when the claimant has specifically made such a demand. Claimant, however, made no such demand in this case. *Second,* while the practice of awarding pre-award interest is common in expropriation cases, and while the Tribunal has found

an expropriation constituting a Discriminatory Measure causing a Materially Adverse Impact had occurred under the AA, this case is, first and foremost, a contractual matter. Accordingly, the Tribunal finds it preferable to approach the issue of pre-award interest contractually. While awarding pre-award interest from the date of breach may constitute a practice, the Tribunal has found, for the reasons set forth in § K.VIII above, that Respondents were not in breach of contract. Furthermore, while a tribunal may award pre-award interest based on the date that notice to pay was given, this Tribunal has found, for the reasons also stated in § K.VIII above, that notice under the AA did not oblige PDVSA-CN to make any payment to the extent the latter did not concur that a Discriminatory Measure causing a Materially Adverse Impact had occurred under the AA. Indeed, by reference to Section 15.1(b) of the AA, and as further explained below, the Tribunal considers that the conditions of Respondents' liability toward Claimant and the amount due could not be known by the Parties until this Award is rendered and that, therefore, a certain and liquidated debt is only due by Respondents on the date of this Award.

855. Recalling its considerations above in section K.VIII.3 concluding that there was no breach of the AA, the Tribunal is aware that this is a case of exceptional magnitude and complexity, as the procedure has shown in many ways. As the Tribunal has also had occasion above in this Award to observe in the context of the court attachments, it must be appreciated as a realistic evaluation that neither Party was in a position to correctly evaluate its rights under the AA in the factual circumstances of this case at an early stage. The Tribunal accepts that Claimant in good faith believed it was entitled to billions of dollars and Respondents, also in good faith, believed nothing was due under the AA. Indeed, as in many other disputes and arbitrations, the Parties could not interpret and apply the contract without the Tribunal's assistance and, therefore, it can only be this Award in this case that can give a certain value to the compensation due by Respondents to Claimant and to any credit accepted in this Award in favor of Respondents.

856. In view of these specific circumstances, the Tribunal considers it should use its discretion regarding the details of the interest, due to the fact that the awarded debt was not liquidated and due until the moment it was determined by this Award. For the Parties, the debt upon which interest is to be calculated was and is not certain, liquidated, and due until the moment of the Award. It is only when the Tribunal issues this Award that the payment obligations under the contract will become an obligation to pay a definite amount.

857. Therefore, the Tribunal decides not to grant pre-award interest either on the Claimant's claims or on the amounts credited in favor of Respondents in this Award.

858. Regarding **post-award interest**, the above difficulties and considerations do not exist, and such interest must be granted as part of the compensation due.

859. As provided by NY CPLR § 5002, which is also applicable since New York law, as *lex arbitri,* is applicable to arbitrations that are seated in New York, interest should start to run from the date of the Award.

860. For several practical reasons mentioned above (*i.e.* court attachments and cancellation of bonds) the Tribunal has concluded that it would be helpful for both Parties if the Tribunal were to grant a grace period of 60 days for Respondents' payment of the amount due pursuant to this Award. Indeed, the Tribunal is also aware that, for practical purposes, Respondents must be given the opportunity to satisfy the Award, which Respondents cannot do until the Award is notified and until Respondents have had a reasonable opportunity to comply with the Award. However, this does not change the conclusion that, in order to fully compensate Claimant, the amount of post-award interest is legally due as from the date of the Award. Therefore, although Respondents have been granted a grace period of 60 days within which to pay the Award, interest will nonetheless begin to run as of the date of this Award.

861. As to the interest rate, **Article 17(2) of the ICC Rules** requires the arbitrators to take account of the provisions of the contract. Absent an interest rate specified in the contract, the Tribunal may determine the interest rate, subject to any mandatory interest rate under the law applicable to interest.

862. Here, Claimant has claimed that the legal rate of interest under CPLR § 5004 is 9 percent per annum, but has not indicated whether the legal rate of interest is a *loi de police* (mandatory law governing the contract). If it is a *loi de police*, the Tribunal's discretion would be limited to providing the rate of 9 percent. However, the Tribunal does not consider itself to be constrained by a *loi de police* in this regard.

863. In the absence of a *loi de police* the Tribunal considers that, as is the practice in international arbitration, the market rate or a reasonable commercial rate would be the most appropriate interest rate.

864. Considering the circumstances of the contract and the Parties involved, the Tribunal concludes that the interest rate should be compound interest at the New York Prime Rate (annual) on the amounts awarded by the Tribunal from the date of this Award until the date payment is made. Interest shall be calculated on a prorated basis for any period less than one full year.

865. Regarding the principal amount on which interest is to be calculated in favor of Claimant, the two set-offs in favor of Respondents accepted above by the Tribunal have to be taken into account, *i.e.* (i) US$ 96,073,622 referred to in § 820 above, plus (ii) US$ 64,569,420. These have to be deducted from the original amount awarded to Claimant of US$ 907,581,000, leading to a principal amount for the calculation of interest of US$ 746,937, 958.

866. Beyond that calculation, the Tribunal recalls from its considerations above in this Award that, even though this Tribunal has no competence to rule on enforcement, it considers that the attached assets of approximately US$ 315 million, together with any accrued interest, should, to the fullest extent

reasonably possible under the circumstances, be used by Claimant to partially satisfy the amount of the Award. However, the Tribunal is not in a position to introduce that consideration into its calculation of interest:

1.   The Tribunal does not know the procedure and how quickly the Court will proceed in respect of release of the attached funds. As a result the Parties may be able to have these funds released quickly, or it may take a significant period of time.

2.   The Tribunal does not know the details of the bank account and interest rate (if any) applicable to the attached funds.

3.   The release of the funds is subject to court order and specific directions from the court.

4.   A further solution of this court procedure may depend upon an agreement between the Parties.

867.   Therefore, in addition to this Tribunal having no competence to rule on enforcement, this leaves too many variables of the court procedure undetermined for the Tribunal to attempt to deal in more detail with the set-off of these funds and interest payable on them beyond the expectation expressed above.

## N.   Arbitration Costs

### N.I.   Arguments by Claimant

868.   Claimant seeks to recover its costs of US$ 24,852,177.53, which it reasonably incurred to enforce its contractual rights against Respondents. (C.Costs ¶ 1). Claimant divides these costs into four categories, summarized and partially quoted here (C.Costs ¶¶ 6 – 9, partially quoted):

> 6.   *First*, US$22,085,058.22 of the Claimant's costs were incurred in connection with presenting its claims which are now submitted to the Tribunal. Those costs include attorneys' fees and other expenses incurred in the preparation and submission of C-I – C-VI (including the witness statements, expert reports, and documentary evidence submitted

therewith) and in connection with the Hearing. [C.Costs does not contain any claim for expenses incurred to engage non-testifying consulting experts. (C.Costs.Reply)]

7. *Second*, US$593,440.86 of Claimant's costs were incurred in connection with obtaining conservatory measures in aid of this arbitration proceeding from courts in New York, the Netherlands, the Netherlands Antilles (Curaçao) and Aruba before this Tribunal was constituted.

8. *Third*, US$719,380.45 of Claimant's costs were incurred in its successful opposition of the Respondents' application for an interim measure in the form of an order directing the Claimant to withdraw the foregoing conservatory measures. In connection with this application, Claimant made written submissions and participated in a hearing, which included oral argument and examination of witnesses, in December 2008.

9. *Fourth*, the Claimant has also incurred US$1,454,298 in the form of its portion of the fees and administrative expenses of the Tribunal and the ICC.

869. With respect to costs regarding the ICC Decision 2008 , Claimant states as follows:

8. [...] The Tribunal ruled in the Claimant's favor by denying the application. Consequently, the Tribunal has already determined that the Claimant has prevailed in respect of the dispute giving rise to these particular costs. The PDVSA Guaranty requires imposition of these costs on Respondent PDVSA. The Claimant has incurred and seeks recovery of such costs in the amount of US$719,380.45. (C.Costs ¶ 8).

870. Claimant explains that Section 13 of the PDVSA Guaranty requires the imposition of costs on PDVSA who, as guarantor, shall pay "*all reasonable and actual costs and expenses incurred by the Beneficiaries in connection with the satisfactory execution of this Guaranty, including, without limitation, reasonable attorneys' expenses and fees.*" (C.Costs ¶ 2).

871. Pursuant to **Article 31.3 of the ICC Rules**, the Tribunal "*shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*" (C-lll ¶ 347, emphasis in original). Article 31.1 further defines costs of the arbitration as "*the fees and expenses of the arbitrators and the ICC administrative expenses [. . .] the fees and expenses of any experts appointed by the Arbitral Tribunal, and the reasonable legal and other costs incurred by the parties for the arbitration.*"

872. This Tribunal should exercise its discretion in favor of requiring PDVSA-CN to pay the costs and expenses incurred by Claimant in bringing this arbitration on the ground that PDVSA-CN has failed to act in good faith. Although PDVSA-CN acknowledged to third parties that Mobil CN had been deprived of its participation in the venture and that, in effect, it would no longer have any cash flow from the Project, PDVSA-CN unjustifiably (1) failed to concur that a Discriminatory Measure causing a Materially Adverse Impact had occurred, (2) failed to engage in good faith negotiations on the calculation of the indemnity due, and (3) failed to pay any indemnity. As a consequence of PDVSA-CN's failure to act in good faith, Mobil CN was compelled to proceed to arbitration to seek enforcement of its rights under the AA. In these circumstances, the Tribunal should exercise its discretion in favor of Mobil CN's request and award it the costs and expenses, including attorneys' fees, incurred in the instant arbitration. (C-III ¶¶ 347-348).

873. Regarding Respondents' Cost Claims, Claimant argues that **Article 31 of the ICC Rules** would not support an Award to the Respondents of expenses incurred to employ Messrs. Kirtley and Marques. (C.Costs.Reply). Neither provided a report to the Tribunal and neither testified. Respondents' description that they were "*consultants for technical and financial matters*" does not provide sufficient detail as to what services were provided, how these services were related to the case, and whether the fees charged were reasonable in the circumstances. (C.Costs.Reply).

### N.II.     Arguments by Respondents

874. Respondents have reserved the right to submit additional defenses, evidence, arguments, and claims as appropriate. (R-III ¶ 245). Respondents submit their **Cost Claim** without prejudice to their jurisdictional defenses. (R.Costs).

875. In accordance with **Article 31 of the ICC Rules**, Respondents seek recovery of US$ 18,508,775.64. Respondents present these costs in a table

found at p. 3 of the R.Costs. Included in these costs, Respondents seek recovery of US$ 1,446,900 for Arbitrators' fees and expenses, ICC administrative costs, and the VAT Advance; US$ 12,348,970.50 for the legal fees of the Curtis Firm; and US$ 3,306,826.25 for the legal and financial expert fees.

876. Respondents describe Claimant's Cost Claim as "*staggering*" and excessive. Claimant's costs are more than US$ 6.3 million higher than Respondents'. Respondents compare aspects of their claim to Claimant's, briefly summarized and partially quoted below (R.Costs.Reply ¶¶ 3-4):

> 3.   Claimant's total submission for legal fees, US$13,134,268.22, is 6% higher than Respondents' request of US$12,348,970.50. Respondents' counsel has been working in two languages, Spanish and English, throughout the case.
>
> 4.   Claimant seeks US$8,504,319.23 in fees and expenses for their economic experts, while Respondents seek only approximately one third of that: US$2,958,034.59.

877. Respondents divide Claimant's costs relating to economic experts and address costs incurred for discount rate experts and costs incurred by all other experts. With respect to discount rate experts, Claimant seeks a total of US$ 4,687,717.53 (as compared to Respondents' costs of US$ 1,052,940). This is particularly troubling in light of Prof. Myers' testimony that he was performing an uncomplicated, straightforward calculation. Even Claimant's counsel indicated that Claimant's calculations required only "*primary school arithmetic.*" Further, Claimant's experts were instructed to use a "*risk free*" discount rate. Respondents posit that "*[i]t is hard to imagine that it cost as much as it apparently did for these experts to report the risk-free discount rate and apply it to cash flows that they were directed on how to calculate*" and argue that Claimant's costs for its discount rates are excessive. (R.Costs.Reply ¶¶ 6-7).

878. With respect to all other economic experts, Respondents report that Claimant seeks US$ 3,816,601.70, compared to Respondents' US$ 1,741,331.25. This gap is difficult to fathom in light of the fact that the

expert (Graves) was instructed on all aspects of the formulas. Although Claimant is entitled to retain as many experts as it wishes, there was an obvious duplication of effort among Claimant's experts. For example, Mr. Graves, in his affidavit, reported to the Tribunal what Mr. Cline's and Mr. Plunkett's conclusions were. This duplication should never be considered a legitimate part of even a meritorious cost application. (R.Costs.Reply ¶¶ 8-9).

879. Respondents reject Claimant's attempt to recover costs incurred in connection with its provisional measures campaign before national courts. Claimant obtained these freezing orders on the basis of a damage claim which even Claimant's experts have openly conceded to have been calculated on an *"indefensible"* basis. (R.Costs.Reply ¶ 10; see also Hearing Tr., pp. 1360 – 63; 1653-68; 1707 – 09).

880. Respondents' final argument with respect to cost recovery is best taken from their own language (R. Costs. Reploy ¶ 11):

> 11. The reality is that none of Claimant's costs is recoverable considering the lack of any legal or factual basis for the claim asserted in this Arbitration. Even if for some reason any part of the claim were to survive the legal and factual deficiencies evident in the record, there can be no doubt that the amount of any such claim has from the outset been grossly exaggerated by Claimant and that a large part of the costs for both parties has been incurred to deal with the issues generated by such exaggerations. Indeed, those exaggerations were the reasons this case and the case being pursued by Claimant and its affiliates against the State in ICSID were not settled amicably long ago.

881. Respondents also responded to Claimant's good faith argument (R-III fn. 172, citations omitted):

> 172. It is ironic that Claimant, on the one hand, urges that PDVSA-CN breached an obligation of good faith performance by not responding favorably to Claimant's June 2007 notice letters within 90 days, even though the AA itself has no such requirement and in fact specifically contemplates the procedure that will be followed in the event that PDVSA-CN does not affirmatively concur in any such notice, yet urges that it acted in good faith when it consciously chose not to provide the immediate notices that are specified in the same provision of the AA and that were admittedly designed to provide PDVSA-CN with the

opportunity to address the issues on a timely basis with the Venezuelan Government. While Claimant can point to absolutely no text or illustration of the principles of good faith that would even remotely support its frivolous argument on good faith, there is substantial and specific authority to the effect that the conduct of Claimant in this case in attempting to assert a claim now for indemnity when its prior conduct over a long period of time indicated the contrary would be inconsistent with well-established Venezuelan law principles of good faith.

## N.III.    The Tribunal

882. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

### Party Submissions:

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 345 – 348 |
| R-III | ¶¶ | fn. 172, 245 |

### Exhibits:

| Exhibit | Document Name |
|---|---|
| C-3 | PDVSA Guaranty [*Fianza de Fiel Cumplimiento de PDVSA*] dated 28 October 1997 Art. 13 |
| C-48 App. D | Expert Report of Professor Stewart C. Myers of the Brattle Group on the Value of Indemnification Cash Flows (28 September 2008) |
| | Legal Instruction for the Calculation of the Appropriate Quantum of the Indemnity for Fiscal Years 2008-2035 |
| C-50 | Expert Report of Dr. Scott T. Jones of FTI Consulting, Inc. and Compass Lexecon ("*Lexecon*"), a Wholly-Owned Subsidiary of FT Consulting, Inc. (26 September 2008) pp. 7 – 8 |
| C-200 | Tr. of Hearing on 13 February 2008 in Mobil Cerro Negro, Ltd. v. PDVSA Cerro Negro S.A., U.S. District Court for the Southern District of New York, Civil Action No. 07 Civ. 11590 (DAB) at 2-3 |
| C-332 | Cost Summary for Fees and Expenses |
| R-39 | First Affidavit of R. Dean Graves (25 February 2008) Mobil Cerro Negro Limited v. Petróleos de Venezuela, S.A., Claim No. 2008 Folio 61, High Court of Justice, Queen's Bench Division, Commercial Court (London) ¶13 |
| R-118 | Second Legal Expert Opinion of Professor José Mélich-Orsini (14 August 2009) ¶¶ 38 – 39 |
| R-119 | Second Legal Expert Opinion of Professor Enrique Urdaneta Fontiveros (14 August 2009) ¶¶ 53 - 71 |

**Tribunal Materials**

**Document Name and Pinpoint**

ICC Rules Art. 30, 31.3
PO-6 ¶ 2.1
ICC Case 15416 *Decision on Application by the Respondents for an Order Directing the Claimant to Withdraw the Attachments* (19 December 2008)

**At and Following the 2010 Hearings:**

| Submission | Pinpoint |
|---|---|
| C.Costs | ¶¶ |
| C.Costs.Reply | |
| R.Costs | |
| R.Costs.Reply | |

| Speaker | Citation |
|---|---|
| C. Opening | 63 |
| Chairman | 2008 |
| Graves | 1653 – 1668 |
| Jones | 1360 – 1363 |
| Myers | 1705, 1707 – 1709 |

883. For its decision on costs pursuant to **Article 31.3 of the ICC Rules** as to which Party shall bear costs of the arbitration, the Tribunal takes into account the following:

884. In this case of exceptional volume and complexity, the Claimant has prevailed with its claim that Respondents are liable and has been accorded in this Award a substantial amount, but has failed in a substantial other part of the quantum it sought. On the other hand, the Respondents have failed with their objections to jurisdiction and liability, but prevailed in their objections to a major part of the quantum sought by Claimant. Furthermore, irrespective of these results, for many of the issues disputed between the Parties, this has been *"a close case."* In fact, this Tribunal concluded in its consideration of pre-award interest, that it can be accepted that both Parties have been *bona fidedly* not in a position to quantify their claims before these were decided by this Award.

885. The Tribunal recalls that the costs of **Respondents' Application for an Order Directing Claimant to Withdraw Attachments** are to be fixed at

the time of the Award. (ICC Decision 2008 at 4). However, the Tribunal considers that, at the present stage of the procedure, these specific costs - which are of no considerable size when compared to the total costs claimed by the Parties - do not justify a specific ruling and can be included in the general consideration of the costs at the end of this procedure.

886. In view of the above considerations, the Tribunal concludes that the costs of this procedure should be shared equally and that each Party shall bear its own costs.

887. Claimant and Respondent each paid US$ 1,350,000 towards the advance on costs. At its session of **24 November 2011**, the Court fixed the costs of arbitration (*i.e.* fees and expenses of the Arbitral Tribunal and ICC administrative expenses) at US$ 2,700,000. Consequently, and in light of the Tribunal's decision above that the costs of this procedure should be shared equally, the Tribunal concludes that no reimbursement is due.

888. From the additional deposits paid to the trust account of the ICC by the Parties for the advance on VAT, payments will be made by the ICC to the members of the Tribunal for the VAT they have to pay on their fees. Any remaining part of the deposit for VAT will be reimbursed to the Parties in equal shares.

## O.    Taxation of Award

## O.I.    Arguments by Claimant

889. In order to prevent unjust enrichment and to ensure that Claimant will not be subject to double taxation, the Tribunal must require Respondents to pay the amount of taxes deducted and retained in connection with the indemnity calculation to the Venezuelan Treasury on Claimant's behalf. The Tribunal must also require Respondents to indemnify the Claimant against any attempt by the Venezuelan Government to impose liability on the Claimant in connection with those taxes. (C-III ¶¶ 349 – 353). Both of the above are required under the Framework of Conditions and the AA.

890. The indemnity calculations contained in Annex G already take hypothetical taxes to be paid into consideration and, in effect, credit PDVSA-CN with the amount of income tax that Claimant would have paid on its hypothetical revenues, absent the Discriminatory Measures. (C-III ¶ 352). If Respondents would not be required to pay the taxes deducted by the formulas, PDVSA-CN would be unjustly enriched by keeping for itself the amount of taxes that were deducted in the calculation of the indemnity. Claimant (1) would be unjustly penalized by having its indemnity reduced by the effect of the tax while its tax liability remained undischarged and (2) would be left exposed to double taxation if the Venezuelan Government attempted to tax the indemnity which was calculated on an after-tax basis. Such a result would be inconsistent with the principle of full compensation adopted by both the AA and Venezuelan law, would violate the principle of good faith that governs the interpretation and application of the Agreement, would contradict the expressed intent and purpose of Annex G to the Agreement, and would defy common sense. (C-III ¶ 352).

891. Claimant further argues that any attempt by the Venezuelan Government to impose a tax rate higher than the 34% rate that was used in the calculation of the indemnity would be a further violation of the Framework of Conditions and would constitute a Discriminatory Measure for which PDVSA-CN and PDVSA must compensate it. (C-III ¶ 353).

## O.II. Arguments by Respondents

892. Respondents had reserved the right to submit additional defenses, evidence, arguments, and claims as appropriate, but did not do so within the timetable provided in the procedure. (R-Ill ¶ 245).

## O.III. The Tribunal

893. In the context of this section, the Tribunal, without repeating the contents, takes particularly into account the following sections of the Parties' Briefs and of the evidence:

**Party Submissions:**

| Submission | | Pinpoint |
|---|---|---|
| C-III | ¶¶ | 349 - 354 |
| R-III | ¶ | 245 |

**Exhibits:**

| Exhibit | Document Name |
|---|---|
| C-44 | Declaration of Professor Eugenio Hernández-Bretón (27 September 2008) at ¶¶ 97-99 |
| C-87 | Association Agreement Article 15.1(b) Annex G (Accounting Procedures) to the Association Agreement, Articles 7.1 - 7.4 |

894. The Tribunal recalls that the Republic of Venezuela, though involved in the parallel ICSID arbitration, is not a party to the AA or this ICC arbitration. Therefore, this Tribunal has no authority to rule in any way regarding the conduct of this third party.

895. On the other hand, the Tribunal accepts Claimant's reasoning that the amount of compensation resulting from the application of the formulas contained in Annex G AA, Sections 7.1, 7.2, 7.3, and 7.4 (Ex. C-87), is effectively calculated on an after-tax basis, *i.e.* that the formula reduces the compensation by the taxes applicable to Mobil Cerro Negro's share of the income from the Project (C-III ¶¶ 349-353). The Tribunal agrees with Claimant's analysis that the Reference Cash Flow, in particular, is reduced by the amount of *TIT* to account for the income tax (at the rate of 34%) that Mobil Cerro Negro would have owed to the Government of Venezuela. It therefore follows, as Claimant argues, that (i) *TIT* should be considered as an amount credited to PDVSA-CN, equivalent to the amount of the income tax that Mobil Cerro Negro would have paid on its hypothetical revenues, had the Discriminatory Measures not occurred, and (ii) this income tax, deducted by application of the indemnity formulas mentioned above, must represent taxes withheld by PDVSA-CN, to be paid to the Venezuelan Treasury, on behalf of Mobil Cerro Negro, to discharge Mobil Cerro Negro's tax liability in respect of the relevant fiscal years

896. Accordingly, the Tribunal considers it appropriate to grant Claimant's request for an Award ordering Respondents: (i) to pay into the Venezuelan Treasury, on behalf of Mobil Cerro Negro, the aggregate amount of taxes that the Tribunal will have deducted, by application of the foregoing formulas, to arrive at the compensation owed by Respondents to Mobil Cerro Negro; (ii) to pay into the Venezuelan Treasury, on behalf of Mobil Cerro Negro, any additional tax liability that may be imposed by the Venezuelan Government on Mobil Cerro Negro's income from the Project or the compensation awarded by the Tribunal; and (iii) generally, to hold Mobil Cerro Negro harmless from any such tax liabilities.

897. The Tribunal accepts Claimant's argument that the foregoing decision is necessary to ensure that Mobil Cerro Negro will not be left in a situation where its indemnity is reduced by the effect of the tax, while its tax liability to the Government of Venezuela remains non-discharged and, conversely, to ensure that PDVSA-CN will not be unjustly enriched, by being left in a position where it might keep for itself the amount of taxes that were deducted in the calculation of the indemnity.

(For reasons of convenience for the signing procedure, the Decisions and signatures of the Tribunal are placed hereafter on separate pages of this Award.)

## P. Decisions

1. The Tribunal finds it has jurisdiction over the claims and the counterclaims pursuant to the arbitration clause in Article 18.2 of the Association Agreement and that Claimant is not prevented from pursuing its claims due to lack of exhaustion of local remedies.

2. Discriminatory Measures have occurred and caused a Materially Adverse Impact as defined in Clause XV of the Association Agreement dated 28 October 1997.

3. Respondent No.2 (PDVSA-CN) is liable for the economic consequences of Discriminatory Measures according to Clause XV of the Association Agreement dated 28 October 1997.

4. Respondent No.1 (PDVSA) is liable for the economic consequences of the same Discriminatory Measures due to the GUARANTY dated 28 October 1997 in favor of the above Association Agreement.

5. As a result of their liability mentioned above, both Respondents are jointly and severally liable to pay to Claimant an amount of US$ 12,681,000 for 2007 and US$ 894,900,000 for the period 2008 – 2035, for a total of US$ 907,581,000, subject to the two set-offs mentioned hereafter.

6. Based on Respondents' Counterclaim, US$ 96,073,622 shall be automatically set-off against the Award and, subject only to a satisfactory release by Respondent No. 1 (PDVSA) within the 60-day grace period mentioned hereafter in paragraph 7, US$ 64,569,420 also shall be set-off in favor of Respondents against the payment due under this Award, resulting in a net amount after both set-offs of US$ 746,937,958.

7. Further, the Tribunal takes note that Claimant is willing to credit its 50% share of the outstanding amounts of the bonds held by PDVSA after its tender offer and its respective payment, provided that PDVSA cancel the bonds within the 60-day grace period mentioned hereafter in paragraph 8.

8. Respondents are granted a period of 60 days to effect the payment of the amounts awarded.

9.  Respondents shall be liable for post-award compound interest at the New York Prime Rate (annual) on the principal amounts awarded by the Tribunal after the set-offs accepted above, *i.e.* on US$ 746,937,958, from the date of this Award until the date payment is made.

10. The amounts awarded shall be paid in full by Respondents, which shall, in addition, be required to: (i) pay into the Venezuelan Treasury, on behalf of Mobil Cerro Negro, the aggregate amount of taxes that the Tribunal has deducted, by application of the relevant formulas, to arrive at the compensation owed by Respondents to Mobil Cerro Negro and (ii) hold Mobil Cerro Negro harmless from any additional tax liability that may be imposed by the Venezuelan Government on Mobil Cerro Negro's income from the Project or the compensation awarded by the Tribunal pursuant to this Award.

11. In so far as not granted above, all other claims and counterclaims are denied.

12. The costs of this procedure, as determined by the ICC Court, are US$ 2,700,000.00. They shall be shared equally between the Parties and each Party shall bear its own costs. In light of the fact that the Parties paid the advance on costs in equal shares, no reimbursement is due.

Place of Arbitration: New York, NY USA
Date of this Award: 23 December 2011
Signatures of the Tribunal:

**Mr. Henri C. Alvarez**
(Co-Arbitrator)

**Mr. Jacques Salès**
(Co-Arbitrator)

**Prof. Dr. Karl-Heinz Böckstiegel**
(Chairman)